No. 13-3532

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————

GLICKENHAUS INSTITUTIONAL GROUP,

*Plaintiff-Appellee*,

v.

HOUSEHOLD INTERNATIONAL, INC., ET AL.,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court
for the Northern District of Illinois
No. 02-CV-5893
The Honorable Ronald A. Guzmán, District Judge

————————

## BRIEF AND REQUIRED SHORT APPENDIX
## FOR DEFENDANTS-APPELLANTS

————————

[Oral Argument Requested]

————————

R. RYAN STOLL
MARK E. RAKOCZY
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0700
ryan.stoll@skadden.com

PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

THOMAS J. KAVALER
JASON M. HALL
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
tkaveler@cahill.com

*Counsel for Defendants-Appellants*

February 12, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)     If the party or amicus is a corporation:

i)      Identify all its parent corporations, if any:

Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:

HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns 10% or more of the stock of HSBC Holdings plc.

BANCROFT PLLC

s/Paul D. Clement
Counsel for Defendants-Appellants

February 12, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)  The full name of every party that the attorney represents in the case:

Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)  If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:

HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns 10% or more of the stock of HSBC Holdings plc.

BANCROFT PLLC

s/D. Zachary Hudson
Counsel for Defendants-Appellants

February 12, 2014

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)     If the party or amicus is a corporation:

   i)     Identify all its parent corporations, if any:

Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

   ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:

HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns 10% or more of the stock of HSBC Holdings plc.

BANCROFT PLLC

s/William R. Levi
Counsel for Defendants-Appellants

February 12, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns 10% or more of the stock of HSBC Holdings plc.

> SKADDEN, ARPS, SLATE,
> MEAGHER & FLOM LLP
>
> s/R. Ryan Stoll
> Counsel for Defendants-Appellants

February 12, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)   The full name of every party that the attorney represents in the case:

Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any:

Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:

HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns
10% or more of the stock of HSBC Holdings plc.

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

s/Mark E. Rakoczy
Counsel for Defendants-Appellants

February 12, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

    Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any:

        Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

    ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

        HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns 10% or more of the stock of HSBC Holdings plc.

CAHILL GORDON & REINDEL LLP

s/Thomas J. Kavaler
Counsel for Defendants-Appellants

February 12, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellants furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Household International, Inc.; William F. Aldinger; David A. Schoenholz; and Gary L. Gilmer

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Eimer Stahl LLP; Wachtell, Lipton, Rosen & Katz; Milbank, Tweed, Hadley & McCloy and DeGrand & Wolfe, P.C., have appeared for Defendants-Appellants in the District Court.  Partners and associates of the law firms of Bancroft PLLC; Cahill Gordon & Reindel LLP; and Skadden, Arps, Slate, Meagher & Flom, LLP, have appeared for Defendants-Appellants in the District Court and appear for them in this Court.

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

Defendant-Appellant Household International, Inc., now known as HSBC Finance Corporation, is indirectly owned by HSBC Holdings plc.

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

HSBC Holdings plc has no parent corporation.  The ordinary shares of HSBC Holdings plc are traded on the London, Hong Kong, Paris, and Bermuda stock exchanges and in the United States as American Depositary Shares on the New

York Stock Exchange.  No publicly held corporation owns 10% or more of the stock of HSBC Holdings plc.

CAHILL GORDON & REINDEL LLP

s/Jason M. Hall
Counsel for Defendants-Appellants

February 12, 2014

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS............................i

TABLE OF AUTHORITIES...................................................xvii

REQUEST FOR ORAL ARGUMENT....................................xx

JURISDICTIONAL STATEMENT .......................................1

PRELIMINARY STATEMENT...............................................2

STATEMENT OF ISSUES..................................................7

STATEMENT OF THE CASE ...............................................8

    A.    Plaintiffs' Complaint and the District Court's Narrowing of the Class Period.................................8

    B.    Plaintiffs' Loss Causation Models and Defendants' Pre-Trial Motions ..............................................10

    C.    Phase I Proceedings ...........................................18

        1.    The Transmogrification of the Leakage Model ...........18

        2.    The Instruction Regarding Responsibility for a Representation ...........................................20

        3.    The Phase I Verdict....................................21

    D.    Phase II Proceedings...........................................23

    E.    Post-Trial Motions and Entry of Judgment Pursuant to Rule 54(b) .............................................27

SUMMARY OF ARGUMENT ..............................................30

STANDARD OF REVIEW...................................................32

ARGUMENT ...................................................................33

I.    Plaintiffs Failed To Prove Loss Causation. ...................34

II.   The Jury's *Ad Hoc*, Partial Adoption Of The Leakage Model Resulted In An Irrational And Unsupported Verdict. ................. 42

  A.   The Jury's Finding That the March 23, 2001 Statement Introduced the Leakage Model's Sum Total of Inflation Into the Stock Price Is Foreclosed by the Model Itself. ................. 43

  B.   There Is No Evidentiary Basis for Attributing $23.94 of Artificial Inflation to the March 23, 2001 Statement. ................. 48

III.   The District Court Wrongly Instructed The Jury On What It Means To "Make" An Alleged Misrepresentation ................. 50

IV.   The District Court Deprived Defendants Of A Meaningful Opportunity To Rebut The Presumption Of Reliance. ................. 56

  A.   The District Court's Conduct of Phase II Proceedings Rendered Defendants' Purported Failure to Rebut the Presumption of Reliance a Foregone Conclusion. ........... 58

  B.   In All Events, the Phase I Verdict Rebutted the Presumption of Reliance With Respect to All but Two of the Statements Found Fraudulent. ................. 65

CONCLUSION ................. 69

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(d)

REQUIRED SHORT ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*,
    353 F.3d 541 (7th Cir. 2003)........................................................33, 42

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)...........................................................57, 59, 67

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)...................................................................*passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................32

*Cent. Bank of Denver, N.A. v. First Interstate Bank, N.A.*,
    511 U.S. 164 (1994)............................................................................52

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)................................................................44, 45

*Dawson v. New York Life Ins. Co.*,
    135 F.3d 1158 (7th Cir. 1998)................................................33, 54, 56

*Dura Pharm., Inc. v Broudo*,
    544 U.S. 336 (2005)....................................................................37, 40

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)...............................................................*passim*

*Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund*,
    579 F.3d 401 (5th Cir. 2009)..............................................................39

*FindWhat Investor Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011).........................................................36

*Foss v. Bear, Sterns & Co.*,
    394 F.3d 540 (7th Cir. 2005)..............................................................10

*Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012)...........................................................53

*Haw. Ironworkers Annuity Trust Fund v. Cole,*
No. 10-371, 2011 WL 3862206 (N.D. Ohio Sept. 7, 2011) ................. 54

*In re DVI, Inc. Sec. Litig.,*
639 F.3d 623 (3d Cir. 2011) ............................................................... 67

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
574 F.3d 29 (2d Cir. 2009) ................................................................ 41

*In re Omnicom Grp., Inc. Sec. Litig.,*
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ................................................ 38

*In re REMEC Inc. Sec. Litig.,*
702 F. Supp. 2d 1202 (S.D. Cal. 2010) .............................................. 38

*In re UBS Ag Sec. Litig.,*
No. 07-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ............. 53

*In re Williams Sec. Litig.,*
558 F.3d 1130 (10th Cir. 2009) ............................................ 39, 41, 42

*In re Williams Sec. Litig.,*
496 F. Supp. 2d 1195 (N.D. Okla. 2007) ........................................... 39

*Janus Capital Grp., Inc. v. First Derivative Traders,*
131 S. Ct. 2296 (2011) ............................................................. *passim*

*Nathenson v. Zonagen, Inc.,*
267 F.3d 400 (5th Cir. 2001) ............................................................. 68

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda,*
730 F.3d 1111 (9th Cir. 2013) ........................................................... 39

*Ray v. Citigroup Global Markets, Inc.,*
482 F.3d 991 (7th Cir. 2007) ............................................................. 34

*Ross v. Black & Decker, Inc.,*
977 F.2d 1178 (7th Cir. 1992) ........................................................... 32

*Scaggs v. Consol. Rail Corp.,*
6 F.3d 1290 (7th Cir. 1993) ............................................................... 32

*Schleicher v. Wendt,*
   618 F.3d 679 (7th Cir. 2010)................................................................36

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*
   552 U.S. 148 (2008)...........................................................................34

*Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP,*
   475 F.3d 824 (7th Cir. 2007)..............................................................41

*Turyna v. Martam Constr. Co.,*
   83 F.3d 178 (7th Cir. 1996)..........................................................33, 42

*United States v. Ferguson,*
   584 F. Supp. 2d 447 (D. Conn. 2008).................................................38

*United States v. Olofson,*
   563 F.3d 652 (7th Cir. 2009)..............................................................33

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011).......................................................................64

## Statutes & Rule

15 U.S.C. § 78j(b).......................................................................................9

15 U.S.C. § 78t(a) ......................................................................................9

28 U.S.C. § 1658(b)..................................................................................10

28 U.S.C. § 2072(b)..............................................................................6, 65

SEC Rule 10b-5 .........................................................................................9

## Other Authorities

Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to
   Measure Damages in Fraud on the Market Cases,*
   37 UCLA L. Rev. 883 (1990)..............................................................17

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Seventh Circuit Rule 34(f), oral argument is requested as Defendants-Appellants believe it would assist the Court in resolution of this appeal.

## JURISDICTIONAL STATEMENT

This case involves a certified class action brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities Exchange Commission Rule 10b-5. The District Court thus had jurisdiction pursuant to 28 U.S.C. § 1331. On October 17, 2013, the District Court entered judgment pursuant to Rule 54(b) with respect to claimants with 10,092 claims, valued at $1,476,490,844, and awarded $986,408,772 in prejudgment interest, bringing the total judgment to $2,462,899,616. SA10. While 34,976 claims remain pending below, as the District Court recognized, the issues on appeal are "dispositive of the entire class." SA6. Defendants filed a timely notice of appeal on November 12, 2013, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Household International, Inc. is now known as HSBC Finance Corporation, which is a Delaware corporation with its principal place of business in Mettawa, Illinois.

## PRELIMINARY STATEMENT

This case amply demonstrates why defendants often settle even meritless securities cases once a class action is certified.  The District Court's effort to try this case as a class action launched a 12-year odyssey in which Plaintiffs were allowed to proceed to trial despite the absence of any evidence of loss causation, and Defendants were denied the right to raise fundamental defenses they would have had in individual cases in the name of making this case work as a class action.  Moreover, the length of the proceedings has guaranteed that the Supreme Court's case law has not stood still.  As a result, instructional errors that were manifest enough when given have become undeniable in light of subsequent Supreme Court decisions.  The net effect of all this is predictable: the jury awarded Plaintiffs billions of dollars based on mistaken instructions and despite a complete absence of evidence on critical elements of Plaintiffs' claims.  The jury's massive verdict is not a reflection of one of the most impactful securities frauds in history; it is a reflection of how far removed from governing precedent and basic fairness the proceedings below strayed.

Although the proceedings below were riddled with error, three errors in particular require reversal.

*First,* Plaintiffs failed to offer sufficient proof of loss causation. The "specific disclosures" and "leakage" models submitted by Plaintiffs as their sole proof of loss causation both assumed that Household's share price was inflated at the beginning of the Class Period due to unidentified pre-Class Period misrepresentations and omissions. And Plaintiffs' "leakage" model (the model the jury selected, albeit in a warped form as explained below) purported to estimate the total amount of inflation that could have "leaked out" of the share price over the entire Class Period without even attempting to tie the supposed leakage to particular corrective disclosures. Plaintiffs also offered no other evidence to explain the inflation, made no effort to account for non-fraud firm-specific explanations for the decline in value they asserted, and failed to explain how that inflation left the stock in the leakage model. That left Plaintiffs with no legally sufficient evidence of loss causation.

And things went from bad to worse at trial. Over objection, the Court permitted jurors to apply the leakage model in a manner for which it was never designed, thereby resulting in a nonsensical verdict. The

leakage model, by its own terms, attributed a maximum amount of $23.94 of total inflation to the Plaintiffs' three different theories of fraud (predatory lending, re-aging, and restatement) over the entire Class Period. Yet the District Court permitted the jury to attribute the entire $23.94 to a single statement on a single day reflecting only one of the three theories—a statement that occurred nearly 20 months into the Class Period and that was the 14th allegedly fraudulent statement chronologically. And this one statement was hardly the mother of all frauds; it was an article published in an industry circular ("*Origination News*") reprinting part of a statement that had been made public 10 days earlier on a day the jury found zero inflation.

*Second,* the jury was instructed in a manner that was error at the time, but is manifestly erroneous in light of *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). *Janus* leaves *no* question that the jury was wrongly instructed on the threshold issue of what it means to "make" an alleged misstatement. The jury was instructed that it could find that a Defendant made a representation if "the defendant made, *approved or furnished information to be included*, in a false statement ...." A536 (4714:5-10) (emphasis added); A338.

*Janus* squarely addressed, and unequivocally rejected, the theory that one who furnishes information to be included in a statement has made that statement or can be liable for a statement actually made by someone else.   *See* 131 S. Ct. at 2302.   That instructional error was clearly prejudicial and requires a new trial.

*Third*, in its effort to make this case work as a class action, the District Court prevented Defendants from meaningfully contesting whether individual class members relied on the misstatements the jury found.   Hamstringing Defendants in this way was fundamentally inconsistent with *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), which allowed a limited presumption of reliance, but not an irrefutable one. Subsequent cases have confirmed that reliance remains "an essential element of the § 10(b) private cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011), and the Supreme Court may provide further clarification this Term in *Halliburton Co. v. Erica P. John Fund*, No. 13-317.  There is no question that in an individual action Defendants would have every right to contest individual reliance.  Here, however, the District Court essentially eliminated Defendants' ability to obtain information (solely in Plaintiffs' possession) necessary to rebut the

*Basic* presumption and erroneously held that the Defendants' substantive rights had to be balanced with the imperatives of proceeding as a class action. That is not how class actions and the Rules Enabling Act are supposed to work. *See* 28 U.S.C. § 2072(b). Defendants' right to put on a full defense of their case cannot be balanced away or otherwise diminished in the name of allowing a procedural device to succeed. Regardless, the verdict itself, and the erroneous assignment of *all* inflation to a statement concerning only one component of the multi-issue fraud alleged, rebuts the presumption of reliance as a matter of law.

It is critical that this Court correct the District Court's failure to hold Plaintiffs to their burden in this case. Courts have justly worried about the "hydraulic pressure" to settle securities fraud cases in the wake of class certification, irrespective of the merits. If this is what a securities class action trial looks like—and this Court affirms the District Court's mishandling of this case—then that pressure will be insurmountable.

## STATEMENT OF ISSUES

1)   Whether Defendants are entitled to judgment in their favor as a matter of law because Plaintiffs failed to prove loss causation.

2)   Whether the finding that all the alleged artificial inflation in Household's stock price was introduced by a single statement relating to only one of Plaintiffs' three fraud theories, which is irreconcilable with Plaintiffs' loss causation theory and without any evidentiary support, requires a new trial.

3)   Whether the District Court's erroneous instruction on what it means to "make" a representation, which resulted in an inherently flawed verdict, requires a new trial.

4)   Whether the District Court deprived Defendants of a meaningful opportunity to rebut the presumption of reliance.

5)   Whether Defendants are entitled to judgment in their favor as a matter of law because, despite the severely circumscribed proceedings regarding reliance, Defendants successfully rebutted the presumption of reliance.

## STATEMENT OF THE CASE

### A.    Plaintiffs' Complaint and the District Court's Narrowing of the Class Period

On January 14, 2000, the Dow Jones Industrial Average stood at 11,723, a then all-time high.  By the end of 2002, the economy had taken a turn for the worse.  Between July 1999 and October 2002, the Dow fell 3,873 points, or 37.7%.  While the market overall was hit hard, consumer finance companies fared even worse.  During that same timeframe, the stock price for companies such as Household classified as "consumer finance companies" in S&P's Supercomposite 1500 Index fell by 53.71%.  Some companies within that sector fared particularly poorly—between July 1999 and October 2002, for example, Americredit's stock price dropped by over 50%, and Providian's stock price declined by over 90%.  *See* A521-A524.  Household's stock price also declined, though in line with overall sector performance; a 34.5% decline from July 1999 to October 2002.  *See id.*

In a shareholders' class action suit filed over a decade ago, in August 2002, Plaintiffs alleged that Household's stock price decline was not wholly attributable to the larger overall market decline, but due to the revelation of fraud that had been perpetrated by Household and

8

William F. Aldinger, David A. Schoenholz, and Gary Gilmer in violation
of §§ 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b),
78t(a) and Rule 10b-5.  Plaintiffs alleged that between October 23, 1997
and October 11, 2002, Defendants made false and misleading statements
with respect to three categories of business practices.  First, Plaintiffs
accused Defendants of improperly "re-aging" loans of delinquent
borrowers, which allegedly had the effect of "materially understat[ing]
the Company's true asset quality ratio and overstat[ing]" earnings during
the Class Period.  A9-A10.  Second, Plaintiffs asserted that Defendants
falsely denied that Household engaged in "predatory lending" practices
on a systematic basis.  A10-A12.  Third, Plaintiffs contended that
Defendants issued inaccurate financial statements with respect to the
booking of certain credit card contracts.  A12-A13.  Plaintiffs alleged that
"as the truth about Household's illegal operations and accounting fraud
was publicly revealed," the price of Household shares hit "a record seven-
year low."  A14.  Plaintiffs sought recovery for all purchasers of
Household stock between October 23, 1997 and October 11, 2002.

Defendants' moved to dismiss the suit because Plaintiffs had failed
to allege facts sufficient to establish that Defendants' purported

misrepresentations actually caused Plaintiffs' economic loss. Defendants separately moved to dismiss claims that had expired under the three-year statute of repose applicable before the enactment of the Sarbanes-Oxley Act on July 30, 2002.[1]  The District Court denied the former motion, but granted the latter, "dismiss[ing] with prejudice the 10(b) claims based on any misrepresentation or omission that occurred before July 30, 1999."  A164.  The District Court thus moved the beginning of the Class Period from October 23, 1997 to July 30, 1999, rendering non-actionable allegations that misrepresentations before July 30, 1999 had inflated the share price.

## B.    Plaintiffs' Loss Causation Models and Defendants' Pre-Trial Motions

District Court proceedings were bifurcated.  Phase I was designed to focus on class-wide liability issues such as whether there were any fraudulent statements that caused an economic loss.  Phase II was intended to address, if necessary after Phase I, individualized issues such as reliance and damages.  During Phase I discovery, Defendants

---

[1] The Sarbanes-Oxley Act extended the time within which to file a private securities fraud suit to two years after the discovery of the facts constituting the violation or five years after the violation, *see* 28 U.S.C. § 1658(b), but this Court has held that the Act does not apply retroactively.  *See Foss v. Bear, Sterns & Co.*, 394 F.3d 540, 542 (7th Cir. 2005).

attempted to require Plaintiffs to articulate their theory of economic loss by, among other things, serving interrogatories asking Plaintiffs to explain how the three alleged frauds artificially inflated the price of Household's stock, when the market learned of the alleged frauds, and how those revelations impacted share price. As their only response to these questions, Plaintiffs submitted a report by Professor Daniel Fischel. The report purported to measure the "alleged artificial inflation" that left Household's stock price during the Class Period using two alternative models—a "specific disclosures" model and a "leakage" model. Neither model purported to identify whether, when, or how Household's stock price became artificially inflated in the first place. Instead, per Plaintiffs' instructions, Professor Fischel merely assumed that Household's stock price was artificially inflated at the beginning of the Class Period on July 30, 1999 due to unidentified earlier misrepresentations and omissions by Defendants. He also assumed that all the inflation had left the stock by the last day of the Class Period, October 11, 2002. *See, e.g.*, A419 (84:3-7), A425 (202:16-20); Doc. 1361-6, Ex. 3 at 25-26.

Plaintiffs' specific disclosures model purported to measure price declines by identifying specific days on which (1) the media reported allegations regarding Household's allegedly "predatory lending," its "re-aging" practices, or a financial restatement occurred, and (2) Household's stock price subsequently had a statistically significant decline. Doc. 1361-2, Ex. 1, at 20-23. Plaintiffs' report states that, per these calculations, Household's stock price included $7.97 of artificial inflation on the first day of the Class Period due to unidentified pre-Class Period misrepresentations and omissions, and remained inflated by $7.97 until the first purported "specific disclosure" of Defendants' alleged misrepresentations regarding lending practices on November 15, 2001, at which point the amount of inflation began to decrease slowly, eventually reaching zero with the last disclosure. A166-A178.

Plaintiffs' leakage model also assumed that Household's stock price was artificially inflated on the first day of the Class Period due to unidentified pre-Class Period misrepresentations and omissions. But, unlike the specific disclosures model, the leakage model did not attempt to identify when or how the alleged artificial inflation left Household's stock price through specific statements that revealed the "truth" to the

market as to each of the three issues.  Instead, the leakage model was premised on the assumption that Defendants' alleged fraud, without regard to the specific category of misrepresentation at issue, "was revealed slowly over time" by unspecified means between November 15, 2001 and the last day of the Class Period.  Doc. 1361-2, Ex. 1 at 23-25. Plaintiffs' leakage model calculated the amount of artificial inflation in the stock price simply by measuring the difference between Household's stock performance from November 15, 2001 through October 11, 2002 and the performance of the S&P 500 and Financial Indexes during that same time frame, and then performing a regression analysis that controlled only for market and sector movements.  *See id*. at 19, 23-25. Stock price movements that could not be explained by market forces were deemed inflation.  According to these calculations, Household's stock price was artificially inflated by $17.81 at the start of the Class Period due to pre-Class Period misrepresentations and omissions, and the amount of artificial inflation fluctuated between $12.47 and $23.94 for most of the Class Period.  A187-A201.  Pursuant to Plaintiffs' instructions, the report does not indicate *any* connection between these fluctuations and Defendants' alleged fraudulent statements or partial

disclosures during or before the Class Period and does not attribute specific inflation amounts to any of the three theories of fraud alleged.

Soon after the submission of Plaintiffs' loss causation report, Defendants again moved to dismiss Plaintiffs' complaint in its entirety. Doc. 1121. Defendants explained that Plaintiffs' loss causation theory relied solely on artificial inflation introduced by unspecified misrepresentations and omissions occurring before July 30, 1999—*i.e.*, misrepresentations and omissions the Court had already declared non-actionable due to the statute of repose. The District Court acknowledged that Defendants may have reached the "correct conclusion," but decided that it would "make[] more sense" to finish discovery and rule on the issue pursuant to a summary judgment motion. Doc. 1228-2, Tab 2 at 7, 10.

The parties completed discovery and established Plaintiffs' final position on the timing and source of the alleged artificial inflation in Household's stock price. Plaintiffs' expert confirmed that his models assumed the pre-existence of artificial inflation in the stock price as of the opening day of the Class Period. A419 (84:3-7), A422 (133:24-134:3). Plaintiffs likewise admitted that they had not established the source or inception date of the alleged inflation. Doc. 1228 ¶ 46 (explaining that

Plaintiffs' models were "not designed to determine the date on which inflation came into the stock").

Pursuant to the District Court's earlier instructions, Defendants moved for summary judgment based on the fatal deficiencies in Plaintiffs' loss causation theory and evidence. Doc. 1231-2. The motion explained that Plaintiffs had two related problems. First, they offered no evidence that specific misrepresentations made during the Class Period introduced artificial inflation. Second, they offered no evidence of how any inflation had entered Household's stock price even before the Class Period. Indeed, they expressly disclaimed the need to offer any such evidence. *Id*. at 7, 10.

The District Court did not rule on the motion, so the parties proceeded to file various other pretrial motions. Among other things, Defendants filed a *Daubert* motion to exclude Plaintiffs' loss causation models and related testimony. Doc. 1364. Defendants explained that Plaintiffs had acknowledged that their models merely *assumed* the elements of loss causation, and thus were not credible proof of anything at all. *Id.* at 12-22. Defendants underscored the admission by Plaintiffs' expert that his report was merely "consistent with" Plaintiffs' allegations

and thus provided no support for the proposition that the alleged fraud actually caused any of Plaintiffs' alleged losses.  Doc. 1364 at 17-18; *see* A415 (49:17-50:3).

Defendants also stressed that Plaintiffs' loss causation report made no effort to account for, much less exclude, any non-fraud firm-specific explanations for the decline in the price of Household's stock price, but instead treated the impact of all information not attributable to general market or industry-wide forces as resulting from the alleged fraud.  *See* Doc. 1364 at 26-28; A417 (57:12-16).  Indeed, Defendants explained, the leakage model involved little more than identifying days on which Household's stock underperformed the S&P Finance and 500 Indexes and then attributing the entirety of that underperformance to the purported "leakage" of information revealing Defendants' alleged fraud, regardless of whether the movement was statistically significant, regardless of whether there was a firm-specific non-fraud related explanation for Household's stock price movement, and regardless even of whether there was any evidence of information about Household (fraud-related or not) leaking into the market.  *See* Doc. 1364 at 26-36.

Defendants attached to their motion an affidavit by Professor Bradford Cornell—a co-author of the sole authority relied on by Plaintiffs in support of their leakage model—highlighting the fundamental flaws in Plaintiffs' report. *See* Doc. 1361-2, Ex. 1 at 23-25 (citing Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990)). Professor Cornell explained that Plaintiffs' leakage model simply compared Household's stock performance to the S&P Indexes over an eleven-month window, "attribut[ing] any decline in the security price that is not due to movements in the market or the industry to disclosure of the fraud." A212. The "model assumes, without demonstrating, that all the news items that affect Household's stock price are related to the fraud." A213. Professor Cornell noted that numerous economists and courts have concluded that leakage "models such as the one employed by" Plaintiffs "do not adequately measure the extent a company's stock price decline can be attributed to leakage of fraud related news," and that therefore "any estimate of inflation produced by [such] model[s] cannot be relied upon." A213

The District Court denied Defendants' *Daubert* Motion in a minute order.  A216.

### C.    Phase I Proceedings

#### 1.    The Transmogrification of the Leakage Model

With discovery complete, and still with no ruling on Defendants' motion for summary judgment—which had then been pending for nearly a year—the District Court began the Phase I trial.  Plaintiffs' leakage model lacked a mechanism for parsing individual alleged misstatements or for isolating the impact of Plaintiffs' three theories of fraud and thus required the jury to either adopt the model wholesale or reject it altogether.  In the midst of trial, however, Plaintiffs attempted to convert the leakage model into a means for identifying the inflationary impact from specific statements.  Despite the absence of any evidence on which the jury could rely, and the all-or-nothing nature of the leakage model, Plaintiffs told the jury that it could disregard the model's inflation calculations, and "replace the inflation number with a zero" for each day of the Class Period until it found a misrepresentation.  A475 (2966:6-10).

When providing the jury with instructions on loss causation, the Court gave the jury three mutually exclusive options: (1) conclude that Plaintiffs' leakage model provided a reasonable estimate of losses;

(2) conclude that Plaintiffs' specific disclosures model provided a reasonable estimate of losses; or (3) conclude that neither model provided a reasonable estimate of losses. A259. In the latter case, the verdict form instructed that the jury had completed its task. *Id.* The Court also emphasized that the jury could "only use one model—the one ... chosen—to" assess economic loss. *Id.*

Because Defendants believed that Plaintiffs' attempt to repurpose their leakage model mid-trial as a means for identifying the amount of inflation due to specific misstatements created confusion which the Court's proposed instruction did not resolve, Defendants objected to the instruction. Defendants noted that there was no evidentiary basis under Plaintiffs' leakage model to determine the inflation associated with a specific misstatement if the jury found that any of the alleged misstatements included on the verdict form were not actionable:

> [I]f the jury rejects any aspect of [the expert's] analysis, if they find that on any day reflected in his table there was not a corrective disclosure that he found or there was not a false statement that he relied upon in developing his table ... the jury has no guidance whatsoever on how to reflect that decision.... Once the[ jury] ha[s] reached th[e] conclusion[] that on any given date the inflation was none, there's really—they have no guidance for how to determine the figure to use on any day following that doesn't just rely on speculation.

A529-A530 (4680:17-4681:18).  The Court overruled the objection.  A530 (4681:19-21).

## 2. The Instruction Regarding Responsibility for a Representation

Defendants also objected to the Court's proposed jury instruction on what it means to make a misrepresentation.  The instruction directed jurors to assess whether a "defendant made, *approved or furnished information to be included in* a false statement of fact or omitted a fact that was necessary, during" the Class Period.  A536 (4714:5-10) (emphasis added); A338.  Defendants explained that the Court's inclusion of the "approved, or furnished information" language was a misstatement of governing law and that this error would adversely impact the jury's evaluation of not only the misrepresentation element of the 10b-5 claim, but also issues of scienter, secondary liability, and the allocation of liability among Defendants.  *E.g.*, A495 (3853:9-16), A503 (3862:13-15).  The Court itself noted the significant appellate issues presented by the instruction and theory of liability advanced by Plaintiffs.  A490-A491 (3848:1-3849:1).

### 3.     The Phase I Verdict

After overruling Defendants' objections, the District Court gave the jury a verdict form listing 40 statements made during the Class Period that Plaintiffs alleged were fraudulent.  A262.  For each statement, the jury answered three questions: (1) with respect to each of the four Defendants (Household, Gilmer, Schoenholz, and Aldinger) whether Plaintiffs "prevailed on their 10(b)/Rule 10b-5 claim" with regard to the statement; (2) if yes, which "issue"—predatory lending, re-aging, or the financial restatement—the statement misrepresented; and (3) whether the Defendant(s) that the jury found liable for the statement acted knowingly or recklessly in making the statement.  A219.  The jury also completed a Table listing the amount of artificial inflation in the stock price for each day during the Class Period.  A288-A313.  As noted, the jury was instructed that in determining the amount of artificial inflation, it could apply only one of Plaintiffs' two loss causation models.  A259.

On May 7, 2009, the jury returned a verdict finding Defendants not liable for 23 of the 40 alleged misstatements included on the verdict form and that the other 17 statements were actionable.  The first statement found actionable by the jury—which did not occur until nearly 20 months

into the Class Period and which, chronologically, was the 14th statement of 40—was a March 23, 2001 *Origination News* article repeating part of a statement that had been previously released 10 days earlier: "Gary Gilmer, president and chief executive of Household's subsidiaries HFC and Beneficial said the company's 'position on predatory lending is perfectly clear. Unethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers.'" A272, A232. The March 23, 2001 statement related to only one of Plaintiffs' three theories of fraud: the predatory lending theory. The verdict form explicitly indicated that this statement did not relate to the re-aging or financial restatement theories. A232.

The jury indicated on the verdict form that it had selected Plaintiffs' leakage model (and not the specific disclosures model) and attempted to apply that model to the 17 statements it found actionable, but not the other 23. A259. The results were a predictable (and predicted) disaster. Indeed, the result was inconsistent with the leakage model itself. Household's stock price went from $54.72 on March 22, 2001, to $58.12 on March 23, 2001. A195. The leakage model attributed 67 cents of this increase to "inflation" in Household's stock price rather than broader

market and sector movements, but even that number was illusory, given the concession of Plaintiffs' expert that the 67 cent increase was due to a modeling artifact. *See, e.g.*, A477 (2968:2-5). Despite that and the fact that the March 23 statement pertained to only Plaintiffs' predatory lending theory, the jury attributed the sum total of inflation due to all three of Plaintiffs' fraud theories over the entire Class Period—$23.94— to that one statement. The jury entered "0" every day from July 30, 1999 through March 22, 2001. A288-A301. According to that calculation, the stock had an uninflated true value of $54.72 on March 22, and by the next day the stock was worth only $34.18, and reflected nearly $24 of inflation. *See* A195.

Following the verdict, Defendants moved for judgment as a matter of law or, in the alternative, a new trial. On July 28, 2010, the District Court denied that motion as premature. Doc. 1696. That same day, the Court entered a minute order denying Defendants' summary judgment motion, which had been filed more than two years earlier, as moot. A353.

### D.    Phase II Proceedings

On November 22, 2010, the District Court issued an order establishing Phase II procedures, which were intended to "address the

issue of defendant's rebuttal of the presumption of reliance as to particular individuals as well as the calculation of damages as to each plaintiff." A355. The centerpiece of Phase II proceedings as they pertain to reliance was a claim form submitted by Plaintiffs that included the following question:

> If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household's stock and thereby caused you to pay more for Household stock than you should have paid, would you have still purchased the stock at the inflated price you paid? YES__ NO__.

A362.

Over Defendants' objections, the District Court concluded that this question was sufficient to divide those claimants for whom a trial on reliance might be necessary—the YESes—from those where a trial was unnecessary—the NOs. The Court explained that the "question goes to the heart of the issue of individual reliance," and that a "NO" answer was essentially dispositive as to whether the presumption could be rebutted. *Id.* The Court also stated that relying on the claim form question "sensibly resolves the tension between the rebuttable presumption of reliance and the practicalities and purposes behind Federal Rule of Civil Procedure 23." *Id.* Beyond the distribution of this single question, the

24

only reliance-related discovery permitted pertained to whether a limited number of institutional claimants possessed non-public information. *See* A362-A363; A373.[2]

Deprived of the information necessary to address reliance, which was solely in the possession of Plaintiffs, Defendants were largely constrained to rely on the Phase I proceedings in their efforts to rebut the presumption of reliance. Defendants explained that even putting aside the broader problems with the jury verdict, the Phase I verdict would preclude awarding damages to the vast majority of class members. *See* Doc. 1780. Defendants submitted a second affidavit by Professor Cornell, who explained that "as a settled principle of economic and finance theory, if ... the amount of 'artificial inflation' does not increase[] by a statistically significant amount as a consequence of an alleged misrepresentation, then the market did not rely upon the alleged misrepresentation and the 'fraud on the market' presumption has been rebutted." A384. Here, the jury attributed all the inflation in Household's stock price to a single statement that related only to Plaintiffs' "predatory lending" theory. In

---

[2] Defendants were precluded from conducting any discovery relevant to the rebuttal of reliance during Phase I proceedings. *See* Docs. 225, 762, 935.

doing so, Professor Cornell observed, the jury necessarily and expressly found no inflation attributable to the "restatement" or "re-aging" issues, with the exception of a one-week period relating to a statement on December 4, 2001 regarding re-aging.  A383-A385.

Professor Cornell also reiterated the irrationality of the Phase I verdict.  As discussed, the jury assigned the full $23.94 of artificial inflation from the leakage model to a statement relating to only the issue of predatory lending.  But, Professor Cornell explained, "there is no valid basis under" the leakage "model by which the full $23.94 inflationary price impact can be assigned to the March 23, 2001 statement on the single issue of 'Predatory Lending.'"  A387.  To the contrary, although Plaintiffs' leakage model did not and could not disaggregate inflation into components related to each of the three fraud allegations, Plaintiffs' own analysis relies on the proposition that the numerical impact of each component must be non-zero.  Accordingly, Professor Cornell concluded, the Phase I jury verdict not only is unsupported by any evidence presented during trial, but is also "squarely inconsistent with" the leakage model itself and  "contrary to the established principles of finance and economics that underlay the use of such a model."  A388.  Tellingly,

Plaintiffs did not submit an affidavit by their expert defending the jury's application of the leakage model or its verdict.

Despite Professor Cornell's explanation of how the jury verdict necessarily rebutted the presumption of reliance, the District Court held that every claimant who answered "NO" to the claim form was "entitled to judgment as to liability because defendants have not created a triable issue of fact as to his reliance on price." A402.  In the same order, the District Court appointed a special master to identify "(1) the claims on which plaintiffs are entitled to judgment as a matter of law and the amount of each such allowed claim; (2) the claims on which defendants are entitled to judgment as a matter of law; and (3) the claims that must be resolved at trial," which are primarily the claims where a claimant answered "YES" to the claim form question.  A412.

### E.    Post-Trial Motions and Entry of Judgment Pursuant to Rule 54(b)

While special master proceedings were ongoing, the District Court decided it was the appropriate time to review Defendants' motions for judgment as a matter of law and for a new trial.  Defendants contended, among other things, that they were entitled to judgment because Plaintiffs failed to meet their burden of proof on loss causation.  Plaintiffs'

proffered models, which were their only proof of loss causation, simply
assumed that inflation was present in Household's stock price at the
beginning of the Class Period, failed to establish a causal connection
between alleged misrepresentations and losses, and failed to account for
non-fraud firm specific factors that explained some (or all) of the artificial
inflation identified.  Defendants asserted that, at a minimum, a new
Phase I trial was made necessary by the irrational and unsupported
application of Plaintiffs' leakage model, which resulted in the attribution
of the sum total of artificial inflation asserted by Plaintiffs due to all three
alleged strands of fraud over multiple statements to a single statement
related to only one of those three theories.  Defendants also contended
that a new trial was required because the jury was wrongly instructed on
what it means to make a representation in conflict with *Janus Capital
Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), which
infected several aspects of the jury's verdict.  Finally, Defendants argued
that the District Court had deprived them of a proper adjudication of the
element of reliance and that, in any event, the Phase I verdict itself
rebutted reliance with respect to the vast majority of the representations
found fraudulent.  *See* Docs. 1866, 1867.

The District Court denied Defendants' motion.  As to the glaring shortcomings of Plaintiffs' loss causation proof, the irrational application of Plaintiffs' leakage model, and the Court's circumscribed view of rebuttal of the presumption of reliance, the Court said only that it had "carefully reviewed all of the filings and can discern no basis for relief." SA5.  The Court did expound on its reasons for denying Defendants' new trial motion with respect to *Janus*, stating that "[b]ecause the instant case dealt with corporate insiders" and not "third party entit[ies]" the instruction was consistent with *Janus*, and that, "even assuming *arguendo* that the instruction included a misstatement" of the law, "Defendants cannot show prejudice."  *Id.*

On Plaintiffs' motion, the District Court entered judgment regarding claimants with 10,092 claims, valued at $1,476,490,844, pursuant to Rule 54(b).  *Id.*  In doing so, the Court expressly concluded that: (1) judgment against Defendants on these claims is final; (2) there was no just reason for delay; (3) there was no concern regarding wasting judicial resources because the legal issues associated with these claims "are dispositive of the entire class"; and (4) the court could not "ascertain any basis on which" the "claims will be mooted by future events."  SA6.

The Court also awarded pre-judgment interest in the amount of $986,408,772, bringing the total judgment to $2,462,899,616. SA10.

## SUMMARY OF ARGUMENT

The proceedings below are a case study in how district courts should not handle a securities class action proceeding, particularly one in which plaintiffs seek billions of dollars in damages. Early on Defendants identified fatal flaws with Plaintiffs' effort to prove loss causation. Rather than identifying specific allegedly fraudulent statements within the Class Period that introduced inflation into Household's stock price, or that maintained inflation attributable to any identified pre-Class Period misrepresentation, Plaintiffs insisted that they could just assume inflation was in the share price from the beginning based on unidentified pre-Class Period misrepresentations and omissions. The District Court sensed there was something wrong with that theory, but rather than rule on Defendants' motion for summary judgment, permitted Plaintiffs to proceed to trial. Then, the Court allowed things to go from bad to worse, allowing Plaintiffs to convert their already-flawed "leakage" model into something it never purported to be—a method for attributing inflation to specific misrepresentations within the Class Period. The results were a

predictable disaster and attribute absurd consequences to a single relatively innocuous statement relating to only one of Plaintiffs' three fraud theories.

But the errors do not stop there. The Court made a wholly independent error in instructing the jury regarding responsibility for particular representations. That instruction was erroneous and objected to when given, but its invalidity is manifest in light of the Supreme Court's intervening decision in *Janus*. The District Court's effort to paper over this glaring instructional error is deeply flawed, and the error was profoundly prejudicial.

Finally, in the Phase II proceedings, the District Court eliminated any meaningful ability for Defendants to dispute reliance on an individualized basis. The Supreme Court has, at least for the time being, created a rebuttable presumption of reliance. The District Court effectively converted the presumption into an irrebuttable one—reducing Defendants' defense to a Plaintiff-skewed (and Plaintiff-provided) question that tested nothing beyond reading comprehension and impermissibly baked the *Basic* presumption into a question designed to test it. And all this was expressly done in the name of balancing away

Defendants' rights in order to accommodate the needs of the class action device. A court adjudicating a securities class action in which plaintiffs seek billions of dollars in damages has a responsibility to ensure that the defendants' rights are fully respected. Yet here the District Court expressly compromised those rights. Common sense and the Rules Enabling Act forbid that result.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as matter of law de novo. *Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1182 (7th Cir. 1992). Judgment as a matter of law is appropriate when "the non-moving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

This Court reviews the denial of a motion for a new trial for an abuse of discretion. *See Ross*, 977 F.2d at 1182. A new trial is warranted when "the clear weight of the evidence is against the jury verdict," *Scaggs v. Consol. Rail Corp.*, 6 F.3d 1290, 1293 (7th Cir. 1993), or when a jury verdict is internally "inconsistent," *ABM Marking, Inc. v. Zanasi Fratelli,*

*S.R.L.*, 353 F.3d 541, 543 (7th Cir. 2003), or "hopelessly confused," *Turyna v. Martam Construction Co.*, 83 F.3d 178, 179 (7th Cir. 1996).

"Whether jury instructions correctly state the law is a matter [the Court] review[s] de novo," *United States v. Olofson*, 563 F.3d 652, 656 (7th Cir. 2009), and a new trial is mandated when a jury is given an erroneous legal instruction on a fundamental element of a cause of action that results in prejudice. *See Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998). "Prejudice to the complaining party includes the possibility that the jury based its decision on incorrect law." *Id.* Moreover, "[w]hen a jury could have based its verdict on either correct or incorrect statements of the law, its verdict must be set aside even if the verdict may have been based on a theory on which the jury was properly instructed." *Id.*

## ARGUMENT

In every private securities fraud case—including class actions— plaintiffs must prove that defendants: (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material

misrepresentation was the cause of that loss. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). The District Court proceedings in this case were riddled with errors from start to finish, *see* SA2-SA4, but the errors with respect to three of these critical elements—loss causation, the basic question of what it means to "make" an alleged misrepresentation, and reliance—were particularly pronounced and each independently requires reversal of the massive judgment on appeal.

## I. Plaintiffs Failed To Prove Loss Causation.

"To prevail on the merits in a private securities fraud action, investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss. This requirement is commonly referred to as 'loss causation.'" *Halliburton*, 131 S. Ct. at 2183. To prove loss causation, Plaintiffs were required to "show both that [Household's] alleged misrepresentations artificially inflated the price of [Household] stock and that the value of the stock declined once the market learned of the deception." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). Plaintiffs also needed to prove that their claimed losses could not "be explained by some additional factors revealed [] to the

market," such as company-specific news that adversely impacted the value of the stock. *Halliburton*, 131 S. Ct. at 2185.

Plaintiffs' evidence was legally insufficient, and judgment as a matter of law should have been granted, for at least three reasons. First, and most fundamentally, Plaintiffs made no attempt to prove how Household's stock price became inflated in the first instance. Both of their proffered models—the only proof submitted by Plaintiffs to prove loss causation—expressly and unabashedly assumed that Household's stock price was inflated on the first day of the Class Period due to unspecified pre-Class Period misrepresentations and omissions, and Plaintiffs' expert acknowledged that his "analysis [wa]s premised on [this] assumption" per Plaintiffs' instruction. Doc. 1361-6, Ex. 3 at 25-26. According to Plaintiffs' specific disclosures model, Household's stock price was already inflated by $7.97 on the first day of the Class Period as a result of unidentified pre-Class Period misstatements, and per the leakage model more than twice that much inflation—$17.81—was already baked into the share price at the outset. A166, A187. That is likely why Plaintiffs' expert underscored that the loss causation models Plaintiffs asked him to construct were merely "consistent with" Plaintiffs'

allegations, not that they provided legally sufficient proof of those allegations.  A415 (49:10-50:3).

The District Court never tried to explain how allowing Plaintiffs to attribute alleged inflation to unidentified pre-Class Period statements was permissible.  Indeed, as this Court has made clear, Plaintiffs cannot free themselves of their burden to "pin down *when* the stock's price was affected by the fraud."  *Schleicher v. Wendt*, 618 F.3d 679, 687 (7th Cir. 2010).  Nor can they avoid their obligation to explain how Household's stock price became artificially inflated by roughly estimating how much overvaluation came out of the stock during the Class Period, positing that what went down must have gone up, and calling it a day.

Plaintiffs' efforts to rely on unidentified pre-Class Period statements rather than explain how and when inflation entered Household's stock price is a giant step beyond even the broad "inflation maintenance" theories that have been countenanced by some courts.  In cases such as the Eleventh Circuit's decision in *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011), courts have permitted plaintiffs to rely on inflation introduced by prior non-actionable statements when those representations were reconfirmed by later

36

actionable statements.  But here, Plaintiffs made no effort to identify any pre-Class Period misstatements that introduced inflation into Household's stock price, let alone link such representations to confirmatory Class Period statements that maintained that inflation.[3]

Second, Plaintiffs failed to account for non-fraud firm-specific explanations for the decline in value of Household's stock during the Class Period.  In *Dura Pharmaceuticals, Inc. v Broudo*, 544 U.S. 336 (2005), a unanimous Supreme Court recognized that even when securities fraud takes place, investment losses may not result from the fraud—"changed economic circumstances, changed investor expectations, new industry-specific or firm-specific factors, conditions, or other events, ... taken separately or together [may] account for some or all of th[e] lower price." *Id.* at 343.  In recognition of this fact, courts have consistently held that economic theories that fail to separate out losses caused by the alleged fraud from losses caused by everything else are

---

[3] Moreover, Plaintiffs' roundabout attempt to rely on unidentified pre-Class Period statements as the source of inflation not only is unfaithful to the requirements of loss causation, it also creates a clear path for obscuring serious statute of repose problems. The District Court correctly trimmed Plaintiffs' asserted Class Period to July 30, 1999 through October 11, 2002 because of the statute of repose.  Undeterred, Plaintiffs' models allowed them to recover for inflation allegedly baked into the share price on July 30, 1999, notwithstanding the time bar imposed by the statute of repose.

insufficient. *See, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) ("Because the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss."), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010) (rejecting a leakage model for failing to control for firm-specific variables); *United States v. Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008) (same). Yet Plaintiffs did not meaningfully attempt to control for non-fraud firm-specific information that accounted for some—or even all—of the alleged decline in value of Household's stock during the Class Period. *See* A417 (57:12-16). As Plaintiffs explicitly acknowledged at trial, whether a stock price movement was "purely fraud related, combined fraud related, *or not at all fraud related*, they were all included in the leakage model." A473-A474 (2960:14-2960:17) (emphasis added).[4]

---

[4] At trial, Plaintiffs speculated that all non-fraud, firm-specific disclosures over the Class Period "cancel[ed] each other out," A432 (2684:6). There was, however, no evidence submitted to establish that implausible assertion. Moreover, even if such evidence existed it was still improper to fail to systematically address such movements because the specific dates of non-fraud related movement would be critical to assessing damages for any particular plaintiff depending on the dates of stock trades. As just one example, the leakage model included a 10-day period between July 5 and July 15, 2002, during which there was no identified news, fraud-

Plaintiffs' reliance on a leakage theory did not absolve them of their obligation to control for non-fraud explanations for the alleged decline in the value of Household's stock.  As the court in *In re Williams Securities Litigation* explained, "*Dura* leaves no room for doubt that even where a securities fraud plaintiff proceeds on a 'leakage' theory of corrective disclosure, he must still establish that the lower price reflects the fraud-related inflation and not" non-fraud related factors such as those listed in *Dura.*  496 F. Supp. 2d 1195, 1266-67 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013) (granting summary judgment for defendant where plaintiffs' expert's "theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events"); *Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund*, 579 F.3d 401, 410 (5th Cir. 2009) (holding that a damages model "that shows only how a 'stock reacted to the *entire bundle* of negative

---

related or otherwise, yet that model indicates a $2.52 decrease in inflation during that period.  A202.  A class member who purchased stock at the beginning of that 10-day period and sold it at the end would be able to recover, despite the fact the model identified no fraud-related movement during this period.   Asserting some fraud-related movement elsewhere "cancelled out" this decline does not cure the legal insufficiency of this outcome.

information,' rather than examining the 'evidence linking the *culpable* disclosure to the stock price movement'" is insufficient. (emphasis in original)).

Third, Plaintiffs' leakage model—the only loss causation theory credited by the jury—failed "to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton*, 131 S. Ct. at 2186 (emphasis in original); *see Dura*, 544 U.S. at 342 ("an inflated purchase price will not itself constitute or proximately cause the relevant economic loss"). Rather, the model merely assumed that all of the posited inflation in Household's stock price at the outset of the Class Period exited the stock price by the end of the Class Period without identifying any specific corrective disclosures with particular "deflationary" effects. *See, e.g.*, A423 (138:14-18). The remainder of that model's analysis is no more than an exercise in assigning stock declines to dates between July 30, 1999 and October 11, 2002, so that all of the inflation assumed to be in the stock at the beginning of the Class Period exits the stock price by the end of the Class Period. But that cannot demonstrate the loss caused by any particular

statement or corresponding disclosure, and no evidence submitted at trial made up for these fatal deficiencies.

Courts, including this Court, have uniformly recognized that a plaintiff must prove a causal connection between an alleged misrepresentation and the loss the plaintiff suffers. *See Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (plaintiff must establish "a causal connection between the material misrepresentation and the loss"); *In re Williams Sec. Litig.*, 558 F.3d at 1137 ("Without showing a causal connection that specifically links losses to misrepresentations, [Plaintiff] cannot succeed."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (plaintiff must "link[]" "the decline in the price of [the] stock" with "corrective disclosures"). The mere fact that a stock declines over time is not enough. The reasons for that rule are especially apparent where, as here, stock prices in an entire sector—and, indeed, the entire market—were declining. *See supra* p. 8.

"A plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was through a gradual process, attribute all prior losses to the revelation of the fraud." *In re*

*Williams*, 558 F.3d at 1138. "The inability to point to a single corrective disclosure does not relieve the plaintiff of showing how the truth was revealed; he cannot say, 'Well, the market *must* have known.'" *Id.* But that is exactly what Plaintiffs got away with here, and, again, the District Court never explained how or why that was permissible.

These failures, both individually and cumulatively, resulted in a complete failure of evidence on the critical element of loss causation. Defendants, therefore, were entitled to judgment as a matter of law, and this Court should remand the case with instructions to enter judgment in favor of Defendants.

## II.   The Jury's *Ad Hoc*, Partial Adoption Of The Leakage Model Resulted In An Irrational And Unsupported Verdict.

Plaintiffs failed to offer legally sufficient proof of loss causation. But to make matters worse, the District Court improperly permitted Plaintiffs to invite the jury to use the leakage model in ways that the model could not bear. Predictably, the result was a jury verdict that is manifestly contrary to the leakage model itself, facially absurd, and without evidentiary support, requiring a new trial. *See, e.g.*, *ABM Marking*, 353 F.3d at 543; *Turyna*, 83 F.3d at 179.

**A.    The Jury's Finding That the March 23, 2001 Statement Introduced the Leakage Model's Sum Total of Inflation Into the Stock Price Is Foreclosed by the Model Itself.**

According to the jury verdict, a single March 23, 2001 statement—a third-party partial reprint of a 10-day-old statement—somehow caused Household's stock to go from having zero of its $54.72 per share price attributable to inflation on March 22, 2001, to having $23.94 of its $58.12 per share price attributable to inflation on March 23, 2001.  A301; A195. That facially absurd finding was wholly precluded by the leakage model itself, which determined $23.94 to be the maximum amount of inflation attributable to the combined impact of Plaintiffs' three fraud theories over the entire Class Period.

The jury's assignment of the full $23.94 of inflation to a statement relating only to predatory lending requires a new trial for at least three reasons.  First, it is legally impossible to assign the entire $23.94 to a statement relating solely to one of Plaintiffs' three fraud theories. Plaintiffs' evidence was that $23.94 was the maximum aggregate inflationary stock price impact based on the combined effect of the three alleged frauds.  *See* A387.  The jury's conclusion that the full $23.94 is attributable to a statement addressing only predatory lending (and

reiterating part of a press release from 10 days earlier) is irreconcilable with the leakage model itself.  As Professor Cornell explained, "when, as here, it has been alleged that a securities fraud involved multiple 'issues,' the 'Leakage Model' cannot be used to determine the amount of 'artificial inflation' attributable to just one of those 'issues' ... This is a well-established principle of finance and economics...."  A385.  That is why Plaintiffs' expert "never stated, and could never state in a manner consistent with economic and finance theory, that his 'Leakage Model' provides a means to determine the inflationary price impact associated with any one individual issue among the three fraudulent issues alleged by Plaintiffs."  A386.

The jury's attribution of the sum total of the leakage model's inflation to one of the three alleged frauds gave rise to the same fundamental error requiring reversal in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  In *Comcast*, the Court held that a class action antitrust suit was wrongly certified because certification had been predicated on a model that did not provide a causal link between the plaintiff's one remaining theory of liability and damages.  The plaintiffs in that case initially "proposed four theories of antitrust impact," but the

district court rejected all but one. *Id*. at 1430. The district court then allowed the case to proceed despite the fact that plaintiffs' damages model "did not isolate damages resulting from any one theory of antitrust impact," but instead continued to calculate damages resulting from all four theories of unlawful conduct. *Id*. at 1431. The Supreme Court reversed the district court because there was "no question that the model failed to measure damages resulting from the particular antitrust injury on which [Comcast's] liability in this action is premised." *Id*. at 1433. "The methodology might have been sound ... if all four of th[e] alleged [market] distortions remained in the case," but once that was no longer true plaintiffs' theory of damages became untenable. *Id*. at 1434. The same is true here. The leakage model did not offer any mechanism for isolating the economic impact of a single theory of fraud. As in *Comcast*, the model was not designed to accommodate such tailoring; it calculated prix fixe prices for all three theories together across the Class Period, not à-la-carte options for particular theories.

Second, and relatedly, the leakage model did not permit the jury to isolate the amount of inflation resulting from any particular statement. It was designed, albeit in a flawed manner, to calculate the total extent

45

of the overvaluation of Household's stock over the Class Period. Because Plaintiffs' inflation calculations under the leakage model are not, and cannot be, separated into specific amounts attributed to individual alleged misstatements, the jury had no means for determining what portion, if any, of the $23.94 of artificial inflation could possibly be attributed to the March 23 statement.

Even assuming against fact and evidence that the leakage model could be used to isolate the inflation due to a specific misstatement, the only possible way the jury could have done so with respect to the March 23rd statement would have been to look to the difference between the inflation in the stock on March 22nd and March 23rd. Assuming that such an approach is viable for argument's sake, the jury would have found inflation of only 67 cents, because the model suggested that 67 cents of the relatively modest upward movement in Household's stock price on that day was attributable to overvaluation. The jury instead accepted the invitation to put zeroes all the way down, and then attributed the model's full inflationary impact over the entire Class Period to a single statement on a single day. But once the jury found Defendants not liable for the first 13 statements challenged by Plaintiffs

over the first 20 months of the Class Period and, accordingly, found no actionable inflationary impact associated with those statements, the leakage model no longer provided the jury with any basis to determine the inflationary impact of the March 23 statement standing alone. As Professor Cornell explained, "there is no valid basis under the jury verdict, and the jury's selection and application of" the "'Leakage Model,' to determine the actual inflationary price impact attributable to" the March 23 statement. A388.

Finally, the jury's attribution of $23.94 to a single statement necessarily (and improperly) included inflation resulting from misstatements for which the jury rejected liability. The model presented to the jury calculated artificial inflation as of March 22, 2001, to be $23.27, thereby attributing at most an increase of 67 cents to the new misstatement made the next day on March 23, 2001. A195. The other $23.27, or at least part thereof, was necessarily introduced by earlier misstatements for which the jury rejected liability. The jury's incorporation of inflation resulting from misstatements for which no liability was found—reminiscent of the model's flawed assumption of

preexisting inflation resulting from unidentified prior misstatements—further confirms the verdict's internal inconsistencies.

Plaintiffs' leakage theory was, in short, an all-or-nothing proposition. The leakage model did not offer any mechanism for isolating the economic impact of a single theory of fraud, let alone a single statement. It was not designed for use by a jury to distinguish between purported inflation from the 17 statements found fraudulent and purported inflation from the 23 statements the jury found nonfraudulent. Once the jury decided not to adopt Plaintiffs' theory wholesale, adopting it piecemeal was not an option. The District Court offered only predictable silence as to why the jury's irretrievably flawed verdict did not warrant a new trial.

### B. There Is No Evidentiary Basis for Attributing $23.94 of Artificial Inflation to the March 23, 2001 Statement.

More fundamentally, there is no record evidence—*none*—to support the jury's finding that $23.94 of inflation was introduced into the stock price by a single statement (partially) republished on March 23, 2001, but actually made 10 days earlier. As noted, the model itself attributed only 67 cents of inflationary impact to that day, and Plaintiffs admitted that even that 67 cents was a product of the model's overall methodology,

not a direct result of the statement that day.  *See, e.g.*, A477 (2968:2-5).

Given this complete absence of evidence, the jury could not properly

determine that Household's stock price went from having zero of its

$54.72 per share price attributable to inflation on March 22, 2001, to

having $23.94 of its $58.12 per share price attributable to inflation on

March 23, 2001.

The leakage calculations adopted by the jury for the remaining 16

statements found actionable fare no better.  Not a single one of those

statements bears any rational relationship to the supposed inflationary

movement in Household's stock price.  Indeed, 14 of those statements

occurred on dates on which the jury, applying the leakage model designed

for other purposes, found no increase in inflation.  *See* Doc. 1634-2 at 18-

19.  For example, although the jury found that a March 28, 2001

statement was fraudulent, the leakage model and thus the jury's

nonsensical verdict reflects no corresponding increase in inflation on that

date.  A301.  It is a flat line.  The same is true for the April 18, May 9,

July 18, August 10, October 17, and November 14, 2001 statements; the

January 16, March 13, April 9, May 10, and July 17, 2002 statements;

and the two August 14, 2002 statements.  A302-A312.  As for the two

remaining statements, Plaintiffs confirmed that the inflationary increases reflected in the leakage model were *not* attributable to the false statements.   While the model attributed some inflation to stock movements on December 4, they had nothing to do with the misrepresentation the jury found on that date, because that statement was not made until after trading hours, meaning any increase in inflation would have occurred on December 5, 2001, as Plaintiffs confirmed.  A438 (2875:5-11); A447 (2884:25-2885:7).  The leakage model found, however, no increase in inflation on December 5th.  A199.  It was another flat line. As for the final date, April 17, 2002, the model attributed a mere 6 cents of inflation, and Plaintiffs admitted that there was no statistically significant price increase that day.  A468 (2909:16-18).

Again, the District Court made no effort to explain how the jury's nonsensical verdict could be reconciled with Plaintiffs' evidence.

## III.  The District Court Wrongly Instructed The Jury On What It Means To "Make" An Alleged Misrepresentation.

A new trial is also required because the District Court incorrectly instructed the jury on the central element of what it means to "make" an alleged misrepresentation.  The jury instruction on the first element of the Rule 10b-5 claim directed jurors to address whether "the defendant

made, *approved or furnished information to be included in* a false statement of fact ….” A536 (4714:5-10) (emphasis added); A338. Defendants repeatedly objected to the Court's inclusion of the "approved or furnished information" language and underscored that this error of law would adversely impact not only who can be held liable for specific statements, but also the issues of scienter and secondary liability. The District Court overruled the objection but acknowledged that the instruction raised a potential significant issue for appeal. A490-A491 (3848:1-3849:1).

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), leaves no doubt that the instruction was erroneous and that a new trial is thus required. In *Janus*, the Supreme Court squarely held that the phrase "make[s] any untrue statement of a material fact" in Rule 10b-5 applies only to the person who "'makes' a statement by stating it." *Id*. at 2301, 2302. The Court expressly rejected the position that furnishing information to be included in a statement suffices. *Id*. at 2302-03 (holding that the Government's view that one who "'provides the false or misleading information that another person then puts into the statement'" actually "makes" the statement misstates the law). The

51

Court also made clear that "'substantial assistance'" in formulating the content of a representation is not enough. *Id.* at 2302 (noting that only the speaker, not a speechwriter, can be responsible under Rule 10b-5).

Plaintiffs' primary argument in support of the instruction, which the District Court endorsed, was that *Janus* applies only to "third party entit[ies]" and not "corporate insiders." SA5. But that contention is irreconcilable with *Janus* itself. First, nothing in *Janus* suggests that "corporate insiders" should be held to a different standard. Nothing in the text of § 10(b) or Rule 10b-5 differentiates between insiders and outsiders, nor did anything in the Court's opinion in *Janus*. To the contrary, *Janus* established a general principle that only the individual that actually *makes* a false statement can be held accountable for that statement.

Moreover, the District Court's limited view of *Janus* is contrary to *Janus*'s reasoning. The Supreme Court explained that the rule announced in *Janus* followed directly from the Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), which held that there is no private right of action against aiders and abettors—persons who "contribute 'substantial assistance' to the making

of a statement but do not actually make it." *Janus*, 131 S. Ct. at 2302. A broader reading of "make," the Court said, would "substantially undermine" *Central Bank* by making people who provide "substantial assistance" liable as *primary* violators for "making" false statements. The District Court's limited view of *Janus* would do exactly that for "corporate insiders."[5]

Courts have already rejected the strained reading of *Janus* adopted by the District Court. For example, in *In re UBS Ag Securities Litigation*, No. 07-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), plaintiffs "attempt[ed] to read into *Janus* a distinction that does not appear in the opinion—namely, that although the opinion applies to a third-party advisor, it does not apply to 'corporate insider[s].'" *Id.* at *10. But "while it is true that *Janus* might 'not alter the well-established rule that a corporation can act only through its employees and agents,' it is nonetheless also true that a theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus*

---

[5] This Court has subsequently noted that a plaintiff may not "get around" *Janus* by asserting that a defendant who did not "make" a statement nonetheless has a duty to correct a misstatement made by another—"no statute or rule creates such a duty." *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051-52 (7th Cir. 2012).

decision." *Id.*; *see also, e.g.*, *Haw. Ironworkers Annuity Trust Fund v. Cole*, No. 10-371, 2011 WL 3862206, at *4 (N.D. Ohio Sept. 7, 2011) ("The Court's interpretation of the verb 'to make' is an interpretation of the statutory language in question in this case, and therefore cannot be ignored simply because the defendants are corporate insiders.").

The District Court's erroneous instruction was prejudicial and contributed to an irrational and unsupportable verdict. As this Court has recognized, "the possibility that the jury based its decision on incorrect law" is itself prejudicial. *Dawson*, 135 F.3d at 1165. Here, there is no question that the jury based its decision on incorrect law—the instruction given is irreconcilable with *Janus*, and a new trial is required.

Moreover, the prejudice manifested by the District Court's error is readily apparent from even a casual review of the jury verdict. The jury's treatment of the critical March 23, 2001 statement is a prime example. The statement in the March 23, 2001 *Origination News* article, to which the jury assigned the entire $23.94 of artificial inflation, was attributed solely to Gilmer as "president and chief executive of Household's subsidiaries HFC and Beneficial." A272. The jury found that Gilmer made this statement "recklessly," but then—quite counterintuitively—

found that both Household and its CEO, Aldinger, "knowingly" made the statement. A232. After *Janus*, this scenario is not just counterintuitive, but legally impossible. The only conceivable explanation for finding that the person to whom the March 23, 2011 statement was attributed made that statement "recklessly," but finding Aldinger and Household did so "knowingly" is the District Court's misguided jury instruction. Indeed, that disconnect demonstrates both that the misguided instruction impacted the verdict and infected the jury's assessment of scienter.[6]

The anomalies created by the mistaken instruction do not end there. For example, Gary Gilmer was found responsible as a "maker" of representations in Household's Form 10-K and 10-Q filings. Yet the evidence showed that, at most, Gilmer "furnished" limited information used by others to prepare the filings. It is likely that the jury would not have found that Gilmer "made" the identified statements had it been properly instructed under *Janus*. Indeed, under a proper application of

---

[6] The District Court failed to address the obvious injustice of imposing liability on Defendant David Schoenholz notwithstanding that the jury found him not liable as to the March 23, 2001 statement that introduced all the purported inflation. Because the jury found that all inflation in the market price of Household stock was attributable to the March 23, 2001 statement, Schoenholz was entitled to judgment as a matter of law.

the law, Gilmer could not have been found to be a "maker" of 16 of the 17 statements found by the jury to be actionable.

Likewise, the jury found that Gilmer and Schoenholz "made" a statement that was, in fact, made solely by Aldinger during a Goldman Sachs presentation on December 4, 2001. A279. Similarly, the jury found that Gilmer and Aldinger "made" statements that, in fact, were made solely by Schoenholz at a conference on April 9, 2002. A246.[7]

Given the manifestly erroneous nature of the jury instruction after *Janus* and its clear impact on the verdict a new trial is plainly required.

## IV.    The District Court Deprived Defendants Of A Meaningful Opportunity To Rebut The Presumption Of Reliance.

The District Court's errors continued into Phase II, when the Court—in an effort to ensure that this case could proceed as a class action—deprived Defendants of any meaningful opportunity to rebut the

---

[7] Plaintiffs argued below that the District Court's flawed instruction was of no moment because the "approved or furnished" language was omitted in a restatement of the instruction later on in the document. Doc. 1876 at 36. But that later omission did nothing to correct the misstatement of law that was conveyed to the jury. This Court has underscored that "[w]hen a jury could have based its verdict on either correct or incorrect statements of the law, its verdict must be set aside even if the verdict may have been based on a theory on which the jury was properly instructed." *Dawson*, 135 F.3d at 1165. Moreover, the jury's deeply confused attribution of various statements to Defendants who in no way "made" those statements makes plain that the jury applied the more detailed and clearly erroneous instruction which *Janus* flatly prohibits.

presumption of reliance as to individual class members. That was an independent and clear reversible error.

Reliance "is an essential element of the § 10(b) private cause of action," ensuring "a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton*, 131 S. Ct. at 2184. Although the Supreme Court has endorsed—at least for the time being—a rebuttable presumption of reliance based on the fraud-on-the-market theory, it has repeatedly stressed that "'the presumption,' … is 'just that, and [can] be rebutted by appropriate evidence.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1193 (2013) (quoting *Halliburton*, 131 S. Ct. at 2185). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption." *Basic*, 485 U.S. at 248.

In establishing Phase II procedures, the District Court noted that it "receive[d] very little guidance from other courts because securities fraud class actions have rarely proceeded to trial, let alone reached subsequent proceedings." A356. True enough. The hydraulic pressures for settlement usually take their toll. But when a case actually goes to

trial, both the securities laws and the foundational principles of class actions demand that defendants have a meaningful opportunity to rebut the presumption of reliance. The District Court's refusal to allow Defendants to contest reliance in any meaningful way, especially in light of the Phase I verdict's undermining of the presumption, was erroneous under both the securities laws and the rules respecting the proper role of the class action device.

### A.   The District Court's Conduct of Phase II Proceedings Rendered Defendants' Purported Failure to Rebut the Presumption of Reliance a Foregone Conclusion.

The District Court here applied an overly muscular, almost cartoonish version of *Basic*'s presumption of reliance, which rendered the presumption effectively irrebuttable. Although the Phase I jury's verdict itself rebutted the presumption of reliance in many respects, *see infra*, the District Court nonetheless limited Defendants' efforts to rebut the presumption to a self-serving claim form drafted by Plaintiffs and discovery as to a limited number of institutional investors (which Defendants were forced to select even before most claims had been submitted) on the narrow issue whether those investors had non-public

information that might sever the link between the relevant alleged misrepresentation and the price paid. *See* A363; A373.

Those severe restrictions are wholly incompatible with *Basic*'s function as a limited and rebuttable presumption that does not obscure the reality that reliance remains an "essential element" of a plaintiff's case. *Amgen*, 133 S. Ct. at 1192. *Basic* could not have been more clear about the presumption's limited nature: "*Any* showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." 485 U.S. at 248 (emphasis added). But if "any showing" will allow defendants to effectively rebut the presumption, then restrictions on a defendant's right to obtain the information necessary to make such a showing are highly suspect. For instance, if a defendant is not permitted to obtain information regarding whether "a plaintiff traded or would have traded despite ... knowing the statement at issue was false," 485 U.S. at 248, then the rebuttable *Basic* presumption, which itself may be on thin ice,[8]

---

[8] The validity of *Basic* and its presumption of reliance are currently under Supreme Court review in *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317. For the reasons explained above, the District Court's conduct of Phase II proceedings

impermissibly becomes irrebuttable. And plaintiffs will be allowed to presume, rather than prove, an "essential element" of their case.

Here, the restrictions imposed by the Court were extreme. As to the vast majority of class members, Defendants were limited to the untested results of a deeply flawed claim form. And even as to the limited number of institutional investors with respect to which Defendants were not restricted to the claim form, discovery was limited to inquiries related to "non-publicly available information relied upon by individual purchasers." A373-A374. Nothing in *Basic*, of course, suggests that rebuttal of the presumption of reliance may be based on only non-public information in the possession of a plaintiff.

Plaintiffs' claim form question, which was the centerpiece of the Phase II proceedings and the primary means through which Defendants were purportedly given a chance to rebut *Basic*'s presumption of reliance, stated:

> If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household's stock and

---

was based on an unsupportable view of *Basic*, and a remand is necessary. But if the Supreme Court jettisons *Basic*'s presumption of reliance, the necessity of a remand will be beyond question. And *Halliburton* may have implications far beyond the District Court's mishandling of Phase II proceedings.

thereby caused you to pay more for Household stock than you should have paid, would you have still purchased the stock at the inflated price you paid?  YES__ NO__.

A362.   That loaded question amounts to little more than a reading comprehension test, which predictably resulted in an avalanche of forms checking the "NO" box.[9]

The District Court believed that this form passed muster for two reasons.  First, the Court explained, the claim form "question goes to the heart of the issue of individual reliance," and that a "NO" answer was essentially dispositive as to whether the presumption could be rebutted. *Id*.  Second, the Court stated that relying on the claim form question "sensibly resolves the tension between the rebuttable presumption of reliance and the practicalities and purposes behind Federal Rule of Civil Procedure 23." *Id*.

The District Court was wrong on both counts.  First, the content of the claim form question does not go to the heart of the relevant individual reliance question—whether investors *relied on the misrepresentations*—but instead impermissibly bakes the presumption into the question by

---

[9] If the correct answer were not obvious enough, the question was sent under the guise of a requirement "[t]o recover as a member of the Class," and the instructions advised claimants to "contact counsel for the plaintiff" if there were "any questions concerning ... the claim form."  Doc. 1721, Ex. 2 at 1, 3.

asking whether investors relied on the presumed inflationary impact of the misrepresentations.  That is clearly erroneous.  The claim form did not simply ask whether class members would have made their purchases if they knew specific statements were false.  It went further and asked whether they would have still purchased Household's stock *at the inflated price* if they knew the statements were false and "caused you to pay more for Household stock than you should have paid."  *Id.*  That bakes the *Basic* presumption into the very question that was supposed to give Defendants a limited opportunity to rebut the presumption.  *Basic* itself states that its presumption would be rebutted if a "plaintiff traded or would have traded despite ... knowing the statement" at issue "was false." 485 U.S. at 248.

Certainly, some class members at different points may have discredited statements asserting Household's compliance with "predatory lending" laws and may have believed the company would be required to address violations of "predatory lending" restrictions and nevertheless purchased Household stock.  For instance, the record suggests that Lead Plaintiff Glickenhaus purchased Household stock despite being aware of information suggesting that Household was

engaged in predatory lending practices.  In applying Plaintiffs' leakage model, the jury found that the "truth" about Household's alleged predatory lending practices began to "leak out" on November 15, 2001. A306.  Yet the trading records submitted by Glickenhaus show that, beginning on November 16, 2001, the day after the first partial disclosure, and continuing over the next 31 days, Glickenhaus made 15 separate purchases of Household stock.  *See* Doc. 1711-1, Tab 1.  So too, other class members may have found the issue concerning Household's alleged restatement to be immaterial to their trading decisions.  *See* Doc. 1780 at 27 (Davis Selected viewed the restatement issue as "not significant").  Still others would have based their trading decisions on factors unrelated to the representations at issue, such as pre-existing periodic acquisition plans or computerized trading models that were not dependent on Household's stock price.  *See id.* at 20-25 (addressing limited evidence concerning institutional quantitative funds, index funds, and passive investment funds)  *See Basic*, 485 U.S. at 251 ("For example, a plaintiff who decides, months in advance of an alleged misrepresentation, to purchase a stock; one who buys or sells a stock for reasons unrelated to its price; one who actually sells a stock 'short' days

before the misrepresentation is made—surely none of these people can state a valid clam under Rule 10b-5") (White, J., and O'Connor, J., concurring in part and dissenting in part).

The second prong of the District Court's reasoning was, if anything, more problematic.  In balancing away Defendants' right to meaningfully contest reliance—a right Defendants would clearly have in individual actions—in the name of accommodating the "practicalities and purposes behind Federal Rule of Civil Procedure 23," A362, the District Court got things exactly backwards and, in doing so, ignored the Supreme Court's jurisprudence regarding the intended function of class action law suits. The Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), reaffirmed that a class action is simply a procedural mechanism for aggregating individual claims that by their nature are amenable to class treatment.  Only when all "class members have suffered the same injury" and their claims "depend upon a common contention," which is "of such a nature that it is capable of classwide resolution," is class treatment appropriate.  *Id.* at 2551.  And the class device cannot be used to obliterate defendants' right "to litigate its ... defenses to individual claims." *Id.* at 2651.

Critically, class treatment does not alter the substance of the merits—nor could it consistent with the Rules Enabling Act.  *See* 28 U.S.C. § 2072(b) (the Federal Rules "shall not abridge, enlarge, or modify any substantive right").  It is inconceivable that in a non-class action, a court would permit plaintiffs, especially large and sophisticated investment companies, to recover billions of dollars without being required to actually establish, rather than presume, reliance.  But that is exactly what happened here because the District Court thought the merits should be fundamentally altered by the case's class action status.  If anything, the massive stakes of this class action should have made the District Court sensitive to ensuring that Defendants' ability to contest individualized reliance was fully preserved.  Instead, the District Court used the fact that thousands of claims and billions of dollars were on the line to circumscribe Defendants' rights.

**B.    In All Events, the Phase I Verdict Rebutted the Presumption of Reliance With Respect to All but Two of the Statements Found Fraudulent.**

The restrictions on Defendants' ability to rebut the presumption of reliance were particularly egregious in light of the fact that the Phase I findings themselves profoundly undermined the applicability of the

presumption of reliance to this case.  As already noted, the Phase I verdict's assignment of the total sum of inflation from the leakage model to the March 23, 2001 statement was deeply flawed for other reasons. But if that finding is to be taken seriously, as it must be in considering the validity of the Phase II proceedings, it surely would have rebutted the presumption of reliance with respect to the vast majority of alleged misstatements.

The jury found no artificial inflation for each day from the start of the Class Period (July 30, 1999) until March 23, 2001.  The jury then found that this single statement artificially inflated Household's stock price by $23.94.  For the next six months, from March 23 to September 7, 2001, the jury found that the $23.94 of artificial inflation remained constant; none of the purportedly actionable statements during that six-month period altered the amount of inflation in the stock.  The jury then found that from September 7, 2001 until the end of the Class Period (October 11, 2002), artificial inflation decreased.  *See* Doc. 1780-1, Ex. A at 6-8.  During that "disclosure period," the jury identified one additional misrepresentation that purportedly introduced $1.35 of artificial inflation into the stock on December 4, 2001.  *See id.*

Accordingly, the jury's verdict wholly untethers all but two of the actionable statements from any distortions of price.  Of the 17 purported misrepresentations made during the Class Period, only a single statement on March 23, 2001 (about predatory lending) and a single statement on December 4, 2001 (about re-aging) were associated with any statistically significant inflation of Household's stock price.  *See id.* These conclusions, if taken seriously, would wholly refute any presumption of reliance.  "If a market is generally efficient in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular public, material misrepresentation will be reflected in the security's price." *Amgen*, 133 S. Ct. at 1192.

Because statements made on all dates but March 23, 2001 and December 4, 2001 did not "affect market price" by further inflating the value of Household stock, "there is no basis for presuming classwide reliance on those misrepresentations and omissions through the information-processing mechanism of the market price." *Amgen*, 133 S. Ct. at 1194; *see also, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 638 (3d Cir. 2011) ("[A] defendant's successful rebuttal demonstrating that

misleading material statements or corrective disclosures did not affect the market price of the security defeats the presumption of reliance."); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 415 (5th Cir. 2001) (where it is established that a misrepresentation "did not affect the price of the stock" then the *Basic* presumption has been rebutted). The Defendants detailed all of this for the District Court, with support from Professor Cornell, but the District Court was wholly unmoved.[10]

The Court applied the *Basic* presumption in ways that are wholly incompatible with *Basic* itself, which allows "any showing" to rebut the presumption. Thus, even if *Basic* survives the summer, the Phase II proceedings were deeply and fatally flawed.

---

[10] The District Court cited the "inextricably intertwined" and "interdependen[t]" nature of Plaintiffs' fraud theories in support of its ruling that the Phase I verdict did nothing to rebut the presumption of reliance. A403. As explained *supra*, however, Plaintiffs' case was built on three distinct theories of fraud and the Phase I verdict, which attempts to tie specific alleged misstatements to specific theories, clearly reflects that fact. Moreover, while the District Court's Phase II ruling failed to recognize as much, during Phase I proceedings the Court expressly prohibited Plaintiffs from conflating those theories. At an April 27, 2009 hearing about the content and format of the Verdict Form, Plaintiffs argued that the jury should be required to determine only whether each challenged statement was false or misleading, and not be forced to identify to which theory (or theories) of fraud the statement pertained. *See* A512-A514 (4067:4-4069:10). The Court responded: "I disagree, period. I disagree.... I think that's a formula for reversal." A514 (4069:11-13). Accordingly, the Court ruled that, on the Verdict Form, "we're going to check as to what—which statement and why. I just think that's the only way to do it." A515 (4070:2-5).

## CONCLUSION

For all these reasons, this Court should vacate the judgment below and remand the case with instructions to enter judgment in favor of Defendants or, at a minimum, that a new trial be conducted. Alternatively, this Court should vacate the judgment and remand the matter for a proper adjudication of reliance.

Respectfully submitted,

R. RYAN STOLL
MARK E. RAKOCZY
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0700
ryan.stoll@skadden.com

s/PAUL D. CLEMENT
PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

THOMAS J. KAVALER
JASON M. HALL
CAHILL GORDON
 & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
tkaveler@cahill.com

*Counsel for Defendants-Appellants*

February 12, 2014

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1. This Brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, according to the "word count" function of Microsoft Word 2013, the Brief contains 13,980 words, excluding the parts of the Brief exempted from the word count by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

2. This Brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 point Century Schoolbook font, with footnotes in 12 point Century Schoolbook font.

Dated: February 12, 2014

s/D. Zachary Hudson
D. Zachary Hudson

## **CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 31(d)**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated: February 12, 2014

s/D. Zachary Hudson<br>
D. Zachary Hudson

# REQUIRED SHORT APPENDIX

# REQUIRED SHORT APPENDIX

## Table of Contents

1. Order
   Lawrence E. Jaffe Pension Plan v. Household International, Inc.
   (No. 02-C-5893)
   October 4, 2013 (Doc. 1887) ....................................................... SA1

2. Final Judgment Pursuant to Federal Rule of Civil Procedure 54(b)
   Lawrence E. Jaffe Pension Plan v. Household International, Inc.
   (No. 02-C-5893)[1]
   October 17, 2013 (Doc. 1898) ..................................................... SA9

---

[1] Exhibit A to the Final Judgment, listing the judgment amounts as to each of the 10,902 claims as to which judgment was entered, is not included herewith but is part of the record on appeal. *See* Doc. 1898 Ex. A.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LAWRENCE E. JAFFE PENSION PLAN,** | ) | |
| **on behalf of itself and others similarly** | ) | |
| **situated,** | ) | |
| **Plaintiffs,** | ) | **Case No: 02 C 5893** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **HOUSEHOLD INTERNATIONAL, INC.,** | ) | |
| **et al.,** | ) | |
| **Defendants.** | ) | |

### ORDER

For the reasons stated above, Defendants' post-trial motions [1866] are denied and Plaintiffs' motion for entry of judgment pursuant to Rule 54(b) and prejudgment interest [1868] is granted in part. Plaintiffs are to be awarded prejudgment interest at the average prime rate compounded annually from October 11, 2002 to the date of judgment. The Court expressly determines that there is no just reason for delay and directs that a final judgment be entered in favor of the List 1 claimants in the amounts specified in the Special Master's Report and Recommendation of July 11, 2013 (Dkt. # 1860-1)[1] plus prejudgment interest as specified herein. Plaintiffs to submit a proposed judgment order no more than 5 days from the date of entry of this order. Parties are to appear for a status on October 23, 2013 at 9:30 a.m. to discuss the status of the claims on Lists 2, 3, and 4.

### STATEMENT

This case involves a certified class action brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, including Securities Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5. After an over five-week jury trial from March 30, 2009 to May 7, 2009 ("Phase I"), a jury found various Defendants liable for violations of federal securities laws. Specifically, the jury found that certain Defendants made false public statements or failed to disclose material information regarding their business, financial results and credit quality of their loans, which Plaintiffs, as

---

[1] The Court notes that the Special Master indicated in his July 11, 2013 Report and Recommendation that some movement may occur among the lists of claimants as the parties worked through disputed issues. (Dkt. # 1860, at 3.) Thus, any reference to List 1 in this order refers to the List 1 attached the July 11, 2013 Report and Recommendation as well as any supplements thereto. As a result, any references in this order to amounts due to List 1 claimants, either for liability or prejudgment interest, are approximations and may be subject to change based on a final resolution of the lists.

**SA1**

investors, had a right to know.[2]  (Dkt. # 1545-2, PageID # 41372.)  Defendants' renewed motions for judgment as a matter or law or, in the alternative, a new trial, are before the Court as is Plaintiffs' motion for entry of judgment pursuant to Federal Rule of Civil Procedure ("Rule") 54(b) and prejudgment interest.  For the reasons stated below, Defendants' post-trial motions are denied, Plaintiffs' motion for entry of judgment under Rule 54(b) and prejudgment interest is granted in part.

Defendants' Post-Trial Motions

A court may grant judgment as a matter of law when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ.P. 50(a)(1); *see Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 300–01 (7th Cir. 2009).  The Court "do[es] not weigh evidence or assess the credibility of witnesses.  Instead, [it] draw[s] all reasonable inferences in favor of the nonmoving party."  *Thomas*, 604 F.3d at 300–01 (citations omitted).  Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1).  A motion for a new trial is granted only if the verdict is against the manifest weight of the evidence, the damages are excessive, or other reasons exist as to why the trial was unfair to the moving party.  *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010).  "A verdict will be set aside as contrary to the manifest weight of the evidence only if 'no rational jury' could have rendered the verdict."  *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (citing *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)).

Defendants contend that the Court should grant their motion for judgment as a matter of law for the following reasons:

(1) Plaintiffs' "leakage model" failed to establish loss causation as a matter of law because it: (a) failed to identify the misrepresentation alleged to have introduced inflation into Household's stock price; (b) failed to establish a causal connection between an alleged misrepresentation and a loss; (c) failed to account properly for stock price declines resulting from non-fraud firm-specific factors; and (d) has numerous additional infirmities that reinforce the model's structural errors.

(2) The jury's finding that the March 23, 2001 statement introduced the leakage model's sum total of inflation into the stock price precludes, as a matter of law, either materiality or application of the "fraud on the market" presumption of reliance as to the other statements.  Independently, because the jury found that all inflation in the market price of Household stock was attributable to the March 23, 2001 statement, but that defendant

---

[2]  The jury rendered a verdict on each of forty statements allegedly made by the defendants and indicated on the jury verdict form which of four defendants was liable as to each statement.  (Dkt. # 1611.)

Schoenholz was not liable for that statement, Defendant Schoenholz is entitled to judgment as a matter of law.

(3) There was no legally tenable basis for the jury to find the three theories of fraud present by Plaintiffs–restatement, predatory lending, and re-aging–to be actionable. As a matter of law, the record evidence fails to meet the requisite standards of scienter to sustain a finding of liability in a private securities fraud cause of action.

(4) Plaintiffs' failure to prove a primary violation of § 10(b) and Rule 10b-5 by any Defendant renders Plaintiffs' § 20(a) claims for controlling person liability against Defendants Aldinger and Schoenholz subject to dismissal as a matter of law. In addition, the evidence was insufficient as a matter of law to support the imposition of § 20(a) liability as to the statements at issue.

With respect to the motion for a new trial, Defendants assert the following:

(1) The jury's ad hoc partial adoption of the Plaintiffs' leakage model resulted in an irrational and unsupported verdict. The jury's finding that a March 23, 2001 statement concerning solely "predatory lending" introduced the leakage model's total sum of inflation into the stock price is legally impossible and foreclosed by the model itself and resulted in a wholly unsupported and irrational verdict.

(2) The jury instruction on the first element of Plaintiffs' claim misstated the law on this element, as established by *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).

(3) The jury was improperly instructed on the element of scienter as a consequence of the Court's *sua sponte* and erroneous insertion of a "knew or should have known" standard.

(4) The verdict form contained fundamental errors of law, including (a) wrongly excluding Arthur Andersen from the set of those potentially at fault for Plaintiffs' losses, thereby rendering the apportionment verdict legally defective, and (b) failing to require that § 20(a) liability be assessed with respect to specific statements for which liability was found, thereby rendering the § 20(a) verdict legally deficient, unsupported and irrational.

(5) The aggregate impact of erroneous evidentiary rulings resulted in an unfair trial. The Court erred in admitting prejudicial and unsupported expert testimony, including that of Fischel, Ghiglieri, Cross, and Devor, and Plaintiffs misused hearsay evidence for improper substantive purposes and improperly circumvented exclusion orders.

(6) The Phase II proceedings deprived Defendants of the right to a proper adjudication of the element of reliance. The limited discovery permitted as to certain claimants in Phase II demonstrated a lack of reliance and the Phase II proceedings improperly constrained

Defendants from a full and fair opportunity to rebut the presumption of reliance.

The Court addresses separately the motion for a new trial with respect to the allegedly improper jury instruction because the argument is based on a purported change in the law due to the Supreme Court's holding in *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). The jury instruction at issue summarized the Rule 10b-5 elements and directed the jurors to address whether:

> the defendant made*, approved, or furnished information to be included in* a false statement of fact or omitted a fact that was necessary, in light of the circumstances, to prevent a statement that was made from being false or misleading during the relevant time period . . . .

(Tr. 4714:5-10) (emphasis added). Defendants objected to the emphasized language. Tr. 3853, 3862. They assert that *Janus* restricted 10b-5 liability only to those who actually "made" the allegedly fraudulent statements and thus the additional language "approved, or furnished information to be included in" misstated the law.

In *Janus*, the Supreme Court addressed whether a mutual fund investment adviser "made" statements in the prospectus filed by its mutual fund client. The investment adviser provided the fund with investment management and advisory services, "but the two entities maintain[ed] legal independence." *Janus,* 131 S. Ct. at 2299. In addition, all of the officers of the mutual fund were also officers of the investment adviser, but only one member of the fund's board of directors was associated with the investment adviser. *Id.* The fund issued prospectuses "describing the investment strategy and operations of its mutual funds to investors," which a class of investors alleged contained materially false statements. The Supreme Court held that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302. The *Janus* court went on the state that "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right" and "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.*

To receive a new trial based on erroneous jury instructions, "a defendant must show both that the instructions did not adequately state the law and that the error was prejudicial to [him] because the jury was likely to be confused or misled." *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (internal quotation marks and citation omitted). "When assessing whether prejudice has resulted, the Court must consider the instructions as a whole, along with all the evidence and arguments in the case, and then decide whether the jury was misinformed about the applicable law." *Warfield v. City of Chi.*, 679 F. Supp. 2d 876, 884 (7th Cir. 2010).

The Court concludes that the instruction above did not misstate the law. Indeed, "*Janus* did not change the longstanding rule that corporate officials are liable for misstatements to which they give their imprimatur." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) (citing *Janus*, 131 S. Ct. at 2302 ("[I]n the ordinary case, attribution within a

4

**SA4**

statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.")).  As noted by another court, "*Janus Capital* addressed whether one corporate entity could be held liable for the false statements of another corporate entity, and thus is distinguishable on the facts from this case, as the [audit committee] Defendants here are charged with responsibility for false statements made by the Company itself."  *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 477 n.16 (S.D.N.Y. 2013).  Because the instant case dealt with corporate insiders versus a third party entity, Defendants' assertion that the summary jury instruction included a misstatement of the law based on *Janus* is rejected.

Moreover, even assuming *arguendo* that the instruction included a misstatement, Defendants cannot show prejudice.  In assessing whether a purported erroneous jury instruction requires a new trial, the Court must consider the instructions as a whole.  Here, the specific instruction as to the first element of 10b-5 claim excluded the *approved, or furnished information to be included in* language that was used in the summary instruction provided by the Court.  (Tr. 4714:22-4715:1 ("To meet the first element of their 10b-5 claim against any defendant, plaintiffs must prove the during the relevant time period, the defendant *made* a false or misleading statement of fact . . . .") (emphasis added).)  In addition, the evidence supported a finding by the jury that Household and the individual defendants were properly found responsible for the statements for which they were held liable because they had "ultimate authority" over the statements.  *Janus*, 131 S. Ct. at 2302.

For all of these reasons, the Court denies Defendants' motion for a new trial based on *Janus*.  With respect to the other arguments made by Defendants in their post-trial motions, the Court has carefully reviewed all of the filings and can discern no basis for relief.  Therefore, the motions [1866] are denied.

<u>Plaintiffs' Motion for Entry of Judgment and Prejudgment Interest</u>

*Rule 54(b) Certification*

Plaintiffs seek entry of judgment as those claimants identified in List 1 of the Special Master's July 11, 2013 Report and Recommendation, whose claims are valued at $1,476,490,844.00.  Defendants do not oppose entry of judgment as to these claimants in the event their post-trial motions are denied and the Court concludes that entry of judgment under Rule 54(b) is appropriate.

Rule 54(b) provides that "[w]hen an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  To determine if Rule 54(b) certification is appropriate, the Court must make two determinations: first, it must determine if judgment is final; then, the Court must decide if there is any just reason to delay the appeal.  *Curtiss–Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–8 (1980).

As to the first determination, it is clear that the judgment against the List 1 claimants is final.  The parties agree that the jury's verdict established liability as to these claimants and that no issues remain with respect to the amounts of their claims.  Because there has been a decision upon a cognizable claim for relief as to the List 1 claimants and it is final in that no issues of liability or amount remain, the Court finds that it is dealing with a final judgment.  *Id.* at 7.  The Court also finds that there is no just reason for delay because the equities and judicial administrative interests favor immediate entry of judgment as to the List 1 claims.  The Court has no concerns about wasting judicial resources at the appellate level as the legal issues associated with List 1 claimants are dispositive of the entire class.  (Defs.' Resp., Dkt. # 1875, at 7.)  Nor does the Court ascertain any basis on which the List 1 claimants' claims will be mooted by future events associated with the other class members.  Moreover, given the length of time this case has been pending, allowing the judgment for the List 1 claimants to proceed to appeal and final resolution is advantageous to all involved.

For these reasons, and as permitted by Rule 54(b), this Court expressly determines that there is no just reason for delay and directs that a final judgment be entered in favor of the List 1 claimants in the amounts specified in the Special Master's Report and Recommendation of July 11, 2013 (Dkt. # 1860-1).

*Prejudgment Interest*

Plaintiffs also seeks prejudgment interest on their liability award of $1,474,490.844.00.  "Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."  *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).  "[P]rejudgment interest should be presumptively available to victims of federal law violations."  *Gorenstein Enters., Inc. v. Quality Care-USA, Inc*., 874 F.2d 431, 436 (7th Cir. 1989).  While the decision to award prejudgment interest is in the court's discretion, the Seventh Circuit has noted, in assessing whether single or compound interest is to be awarded, that "compound prejudgment interest is the norm in federal litigation."  *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co.*, 325 F.3d 924, 937-38 (7th Cir. 2003) (internal quotation marks and citation omitted).

Defendants do not argue that prejudgment interest should not be awarded; instead, they assert that the Court should use the interest rate set by Congress in the postjudgment interest statute, which is a "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961.  The Seventh Circuit, however, has stated that this amount is "too low, because there is no default risk with Treasury bills."  *Gorenstein*, 874 F.2d at 437.

The Seventh Circuit went on to state that while "[w]e have chosen the prime rate for convenience[,] a more precise estimate would be the interest rate paid by the defendant for

**SA6**

unsecured loans." *Id*. According to Defendants, if the Court chooses not to use the statutory postjudgment interest rate just discussed, it should use the interest rate paid by them for unsecured loans. Defendants state that because Household "was a financially stable company with excellent credit ratings," it was "able to borrow on a short-term unsecured basis at rates well below the prime rate." (Defs.' Resp., Dkt. # 1875, at 15.) Specifically, Defendants state that the average interest rate that Household paid during the period 2002 through 2012 on its commercial paper[3] was 2.13636%. Compounding interest annually at this rate would result in a multiplier of 1.25657567 and an award of prejudgment interest of approximately $378,831,771.00.

Plaintiffs, on the other hand, ask the Court to use the prime rate for the period in question. According to the affidavit attached to Plaintiffs' prejudgment interest request, this rate ranged anywhere from a low of 3.25% (the prime rate from January 2009 to July 2013) to a high of 8.25% (the prime rate from July 2006 to August 2007). (Pls.' Mot. Entry J., 7/25/13 Steinholt Decl., Dkt. # 1871, Ex. A.) Using the prime rate and compounding annually from October 2002 to July 2013 leads to a prejudgment interest amount of $967,849,095.00. Using the prime rate and compounding monthly over the same period leads a prejudgment interest amount of $998,000,783.00. Plaintiffs challenge the use of the commercial paper rate for several reasons:

- It would not fully compensate them because the litigation has gone on for over 11 years, exposing them to greater risks and for far longer than Household's commercial paper lenders;
- Household (now known as HSBC Finance) has a lower cost of borrowing because its parent (HSBC) supports it and implicitly guarantees its debt;
- Using Household's commercial paper rate does not incorporate the borrowing costs of the three individual defendants;
- The "average borrowing rate for the overwhelming majority of class members on List 1 undoubtedly exceeded the prime rate, which warrants using the prime rate in the calculation of prejudgment interest."

(Pls.' Reply, Dkt. # 1883, at 1, 7, 8.) In addition, Plaintiffs' expert notes that Household indicates in its public filings that it ended new commercial paper issuances in the second quarter of 2012 and no longer had any new commercial paper issuances outstanding as of December 31, 2012. (Pls.' Reply, Dkt. # 1884, 9/12/13 Steinholt Decl., ¶ 9.) Thus, the 2012 commercial paper rate noted by Defendants of .3% is inaccurate and, the Court adds, borrowing rates for 2013 are not reflected in Defendants' calculation. (*Id*.)

Plaintiffs' expert notes other weaknesses with using Household's commercial paper rate

---

[3] Commercial paper is "short-term unsecured discounted paper usually sold by one company to another for immediate cash needs." http://www.merriam-webster.com/dictionary/commercial%20paper (last visited October 2, 2013).

but the Court need not discuss them as it concludes, based on the reasons stated above, that using Household's commercial paper rate does not represent an accurate market rate of interest that would fully compensate Plaintiffs for their lost use of money. Therefore, the Court, in its discretion, elects not to engage in refined rate setting and instead use the average prime rate during the relevant period. *Cement Div., Nat. Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) ("Our cases have consistently indicated . . . that the district court has the discretion not to engage in the kind of 'refined rate-setting' advocated by [the defendant] and to 'use the prime rate for fixing prejudgment interest where there is no statutory rate.'") (citation omitted). *See also First Nat. Bank of Chi. v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir. 1999) ("We hold today that to . . . award something other than the prime rate is an abuse of discretion, unless the district court engages in . . . a refined calculation").

Moreover, Plaintiffs ask that the amount be compounded monthly versus annually. While some courts have awarded monthly compound interest, the Court concludes that annual compounding will sufficiently compensate Plaintiffs for the lost use of their money and not result in a windfall. *In re Vivendi Universal, S.A. Sec. Litig*., 284 F.R.D. 144, 164 (S.D.N.Y. 2012) (in securities class action, awarding prejudgment interest compounded annually). *See also In re Oil Spill by Amoco Cadiz*, 954 F.2d at 1337 (awarding prejudgment interest compounded annually).

Finally, the Court finds that the prejudgment interest should begin to accrue as of the last date of the class period and the date on which inflation of the stock price returned to zero, which was October 11, 2002. *In re Vivendi Universal,* 284 F.R.D. at 163-64 (in securities class action, noting "plaintiffs request that interest be calculated from August 14, 2002, the last day of the class period because the calculation of interest based on the last day of the class period has been held to be fair and appropriate" and setting prejudgment interest to begin as of that date).

**Conclusion**

For the reasons stated above, Defendants' post-trial motions [1866] are denied and Plaintiffs' motion for entry of judgment pursuant to Rule 54(b) and prejudgment interest [1868] is granted. Plaintiffs are to be awarded prejudgment interest at the average prime rate compounded annually from October 11, 2002 to the date of judgment. The Court expressly determines that there is no just reason for delay and directs that a final judgment be entered in favor of the List 1 claimants in the amounts specified in the Special Master's Report and Recommendation of July 11, 2013 (Dkt. # 1860-1) plus prejudgment interest as specified herein. Plaintiffs to submit a proposed judgment order no more than 5 days from the date of entry of this order. Parties are to appear for a status on October 23, 2013 at 9:30 a.m. to discuss the status of the claims on Lists 2, 3, and 4.

**Date**: October 4, 2013

_____
**United States District Judge**
**Ronald A. Guzmán**

8

SA8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br> vs.<br><br>HOUSEHOLD INTERNATIONAL, INC., et al.,<br><br>    Defendants. | Lead Case No. 02-C-5893 (Consolidated)<br><br><u>CLASS ACTION</u><br><br>Judge Ronald A. Guzman |

**FINAL JUDGMENT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 54(b)**



This action was tried by a jury with the Honorable Ronald A. Guzman presiding, and the jury rendered its verdict for plaintiffs on May 7, 2009. Having denied defendants' post-trial motions in an Order dated October 4, 2013, the Court expressly finds, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay, and therefore expressly directs entry of this final judgment.

IT IS ORDERED AND ADJUDGED that the claimants set forth in Exhibit A hereto shall recover from defendants Household International, Inc., William F. Aldinger, David A. Schoenholz, and Gary Gilmer principal damages in the amount of $1,476,490,844.21 and prejudgment interest in the amount of $986,408,772.00, for a total amount of $2,462,899,616.21, as specified in Exhibit A, along with postjudgment interest and taxable costs.

IT IS FURTHER ORDERED AND ADJUDGED that defendants Household International, Inc., William F. Aldinger, and David A. Schoenholz shall be jointly and severally liable for said judgment and that defendant Gary Gilmer shall be severally liable for 10% of said judgment.

IT IS FURTHER ORDERED AND ADJUDGED that postjudgment interest shall accrue on the principal, prejudgment interest and taxable costs awarded in this judgment from the date of entry of this judgment until paid in full, at the rate established under 28 U.S.C. §1961.

IT IS FURTHER ORDERED AND ADJUDGED that the Court shall retain jurisdiction over any claim for attorneys' fees and taxable costs in this action.

IT IS SO ORDERED.

DATED: _10/17/2013_

THE HONORABLE RONALD A. GUZMAN
UNITED STATES DISTRICT JUDGE

**SA10**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/D. Zachary Hudson
D. Zachary Hudson