No. 13-3532

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

————————

GLICKENHAUS INSTITUTIONAL GROUP,

*Plaintiff-Appellee,*

v.

HOUSEHOLD INTERNATIONAL, INC., ET AL.,

*Defendants-Appellants.*

————————

On Appeal from the United States District Court
for the Northern District of Illinois
No. 02-CV-5893
The Honorable Ronald A. Guzmán, District Judge

————————

**APPENDIX OF DEFENDANTS-APPELLANTS
VOLUME I**

————————

R. RYAN STOLL
MARK E. RAKOCZY
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0700
ryan.stoll@skadden.com

PAUL D. CLEMENT
   *Counsel of Record*
D. ZACHARY HUDSON
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

THOMAS J. KAVALER
JASON M. HALL
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
tkaveler@cahill.com

*Counsel for Defendants-Appellants*

February 12, 2014

# TABLE OF CONTENTS TO THE APPENDIX
## VOLUME I

Amended Consolidated Class Action Complaint
    Mar. 13, 2003 (Doc. 54) .................................................................A1

Memorandum Order and Opinion
    Feb. 28, 2006 (Doc. 434) ...........................................................A159

Exhibit 53 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-4) (admitted at trial as
    PX1397) ......................................................................................A165

Exhibit 54 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-4) .......................................................A184

Exhibit 56 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-5) (admitted at trial as
    PX1395) ......................................................................................A186

Exhibit 57 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-5) .......................................................A205

Affidavit of Bradford Cornell, Exhibit 9 to Household
    Defendants' *Daubert* Motion to Exclude the "Expert"
    Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-7) .......................................................A207

Minute Order
    Mar. 23, 2009 (Doc. 1527) .........................................................A216

Jury Verdict
    May 7, 2009 (Doc. 1611) ...........................................................A219

# VOLUME II

Jury Instructions
        May 7, 2009 (Doc. 1614) .........................................................A314

Minute Order
        July 28, 2010 (Doc. 1693) ......................................................A353

Memorandum Opinion and Order
        Nov. 22, 2010 (Doc. 1703).....................................................A354

Order
        Jan. 31, 2011 (Doc. 1737) ......................................................A371

Affidavit of Bradford Cornell
        Oct. 14, 2011 (Doc. 1780-1) ..................................................A376

Memorandum Opinion and Order
        Sept. 21, 2012 (Doc. 1822)....................................................A400

Excerpts from Transcript of Deposition of Daniel Fischel on
        March 21, 2008 (Doc. 1361-5) (pp. 1-4, 45-60, 77-88,
        129-140, 197-213) .................................................................A413

Excerpts from the Transcript of Trial on April 16, 2009
        (Doc. 30) [Tr. 2477-2695].......................................................A429

Excerpts from the Transcript of Trial on April 20, 2009
        (Doc. 30) [Tr. 2802-3012].......................................................A435

Excerpts from the Transcript of Jury Instructions
        Conference on April 24, 2009
        (Doc. 30) [Tr. 3824-3965].......................................................A480

Excerpts from the Transcript of Jury Instructions
        Conference on April 27, 2009
        (Doc. 30) [Tr.3966-4073]........................................................A506

Excerpt from the Transcript of Trial on April 28, 2009
        (Doc. 30) [Tr. 4074-4303].......................................................A519

Excerpts from the Transcript of Jury Instructions
    Conference on May 1, 2009
    (Doc. 30) [Tr. 4672-4700]..........................................................A526

Excerpts from the Transcript of Jury Instructions
    Conference on May 4, 2009
    (Doc. 30) [Tr. 4769-4813]..........................................................A532

## INDEX TO TRANSCRIPT REFERENCES IN APPENDIX

| Name of Witness | Pages of Testimony in Transcript | Page where Testimony Begins in Appendix |
|---|---|---|
| Mukesh Bajaj | 4113-4117 | A521 |
| Daniel Fischel | 2683-2685, 2875-2910, 2936-2938, 2959-2961, 2966-2969 | A431 |

| Hearing other than Witness Testimony | Pages of Hearing in Transcript | Page where Hearing/Exhibit Begins in Appendix |
|---|---|---|
| Court and Counsel on April 16, 2009 Doc. 30 | 2683-2685 | A429 |
| Court and Counsel on April 20, 2009 Doc. 30 | 2875-2910, 2936-2938, 2959-2961, 2966-2969 | A435 |
| Jury Instructions Conference on April 24, 2009 Doc. 30 | 3838-3863 | A480 |
| Jury Instructions Conference on April 27, 2009 Doc. 30 | 4003-4004, 4066-4072 | A506 |
| Court and Counsel on April 28, 2009 Doc. 30 | 4113-4116 | A519 |
| Jury Instructions Conference on  May 1, 2009 Doc. 30 | 4679-4681 | A526 |
| Jury Instructions Conference on May 4, 2009 Doc. 30 | 4712-4715 | A532 |

INDEX TO DEPOSITION REFERENCES IN APPENDIX

| Name of Deponent | Pages of Deposition in Transcript | Page where Deposition/Exhibit Begins in Appendix |
|---|---|---|
| Daniel Fischel | 1-4, 45-60, 77-88, 129-140, 197-213 | A413 |

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated, | ) Lead Case No. 02-C-5893<br>) (Consolidated)<br>) |
| Plaintiff, | ) <u>CLASS ACTION</u><br>) |
| vs. | ) Judge Ronald A. Guzman<br>) Magistrate Judge Nan R. Nolan<br>) |
| HOUSEHOLD INTERNATIONAL, INC., et al., | )<br>) |
| Defendants. | )<br>) <u>DEMAND FOR JURY TRIAL</u> |

## [CORRECTED] AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . 3

Post-Class Period Events . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . 12

IV. PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A.    PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B.    HOUSEHOLD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.    OFFICER DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . 14

D.    DIRECTOR DEFENDANTS . . . . . . . . . . . . . . . . . . . . . 16

E.    AUDITOR DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . 17

F.    HFC DIRECTOR DEFENDANTS . . . . . . . . . . . . . . . . . . 18

G.    INVESTMENT BANK DEFENDANTS . . . . . . . . . . . . . . . 18

VI. DEFENDANTS' FRAUDULENT SCHEME
AND WRONGFUL COURSE OF BUSINESS . . . . . . . . . . . . . . . . . 18

A.    HOUSEHOLD'S ILLEGAL PREDATORY LENDING PRACTICES WERE
FORMULATED BY DEFENDANTS AT THE COMPANY'S CORPORATE
HEADQUARTERS . . . . . . . . . . . . . . . . . . . . . . . 19

The EZ Pay Plan Scam -- Defendants Misrepresented the
Interest Rates and Savings Associated with Household Loans . . . . . . . . . . . . . . 20

Household Improperly Used "Discount Points" to
Extract Additional Fees from Borrowers Rather Than
Reduce Their Interest Rate, as Represented to Borrowers . . . . . . . . . . . . . . 22

Household Concealed the Existence of
Prepayment Penalties in Its Loan Documents . . . . . . . . . . . . . . . . . . . . 24

Household Improperly Tacked Insurance Products onto
Its Loans by Misleading Borrowers into Believing They
Were Compulsory and/or Concealing Their Inclusion . . . . . . . . . . . . . . . . 24

Household Illegally "Up-Sold" Loans Carrying
Exorbitant Interest Rates (20% or Higher) . . . . . . . . . . . . . . . . . . . . . . 26

- i -

A2

Page

Household Vehemently Denied Engaging in
Predatory Lending Throughout Much of the Class Period . . . . . . . . . . . . . . . . . . . . . 29

The Predatory Lending Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Defendants' Illegal Predatory Lending Violated
Generally Accepted Accounting Principles . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B.    DEFENDANTS MANIPULATED HOUSEHOLD'S CREDIT QUALITY NUMBERS
BY IMPROPERLY "REAGING" OR "RESTRUCTURING" DELINQUENT
ACCOUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Household's "Reaging" Policies Violated GAAP . . . . . . . . . . . . . . . . . . . . . . 42

C.    DEFENDANTS ENGAGED IN IMPROPER ACCOUNTING OF COSTS
ASSOCIATED WITH VARIOUS CREDIT CARD CO-BRANDING, AFFINITY AND
MARKETING AGREEMENTS, RESULTING IN AN ALMOST $600 MILLION (PRE-
TAX) RESTATEMENT OF EARNINGS . . . . . . . . . . . . . . . . . . . . . . 44

Household's Restatement Is an Admission that the
Company's Financial Statements Violated GAAP . . . . . . . . . . . . . . . . . . . . . . 47

VI.  OTHER GAAP VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 51

HOUSEHOLD'S EXECUTIVE COMPENSATION PROGRAM
REWARDED THE OFFICER DEFENDANTS
FOR THEIR FRAUDULENT ACTIVITY . . . . . . . . . . . . . . . . . . . . . . . . 52

VIII. ANDERSEN'S ROLE IN DEFENDANTS'
FRAUDULENT SCHEME AND UNLAWFUL COURSE OF CONDUCT . . . . . . . . . 57

A.    GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.    ANDERSEN WAS NOT INDEPENDENT . . . . . . . . . . . . . . . . . . . . . 59

C.    ANDERSEN'S PARTICIPATION IN THE FRAUD IS CONSISTENT WITH ITS
PRIOR PARTICIPATION IN A SERIES OF MAJOR ACCOUNTING FRAUDS . . . 60

D.    ANDERSEN DISREGARDED MAJOR INDICATORS OF FINANCIAL STATEMENT
FRAUD AT HOUSEHOLD ("RED FLAGS") . . . . . . . . . . . . . . . . . . . 65

Andersen Knew the Risk of Fraud Was Extremely High . . . . . . . . . . . . . . . . . . 65

E.    ANDERSEN KNEW HOUSEHOLD'S DISCLOSURES WERE FALSE . . . . . . . 67

F.    ANDERSEN VIOLATED PROFESSIONAL STANDARDS . . . . . . . . . . . . 68

IX.  FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . 70

A.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 1997 . . . . 70

B.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 1998 . . . . 74

A3

Page

C.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 1999 . . . . 83

D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 2000 . . . . 93

E.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 2001
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

F.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 2002
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

X. BASIS OF ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

XI. FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

XII. SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

XIII. THIRD CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Household . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Director Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

The False and Misleading
Beneficial Registration Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Andersen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Goldman Sachs and Merrill Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

XIV. FOURTH CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

Household/HFC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

HFC Director Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

XV. STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

XVI. CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 152

XVII. PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

XVIII. JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

## I. INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired securities of Household International, Inc. ("Household" or the "Company"),[1] during the period from 10/23/97 to 10/11/02 (the "Class Period"), including common and preferred stock, bonds, notes, InterNotes(SM) and Trust indentures. This action is brought against the Company, certain of its senior officers and directors, its outside auditor, Arthur Andersen LLP ("Andersen"), as well as Goldman Sachs & Co., Inc. ("Goldman Sachs") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), which acted as financial advisors in connection with Household's 6/98 acquisition of Beneficial in an $8 billion share-for-share exchange.

2.      Between 10/97 and 10/02, Household engaged in the widespread abuse of its customers through a variety of illegal sales practices and improper lending techniques, such as deliberately confusing or misleading them with respect to rates, points, fees and penalties and other federally mandated disclosures. During the Class Period, defendants also improperly "reaged" or "restructured" delinquent accounts, thereby manipulating Household's publicly reported financial statistics regarding delinquencies and credit loss reserve ratios so as to make Household's operations appear stronger and more profitable than they were. The false statistics reported by defendants were also designed to give the appearance that the credit quality of Household's borrowers was more favorable than it actually was.

3.      Throughout the Class Period, defendants concealed that Household was engaged in a massive predatory lending scheme, in violation of federal disclosure guidelines, whereby Household systematically abused customers for the purpose of reporting purported "record" financial results throughout the Class Period. Defendants' wrongful scheme allowed them to artificially inflate the Company's financial and operational results, key financial metrics and risks associated with investing in the Company, including revenues, net income and earnings per share ("EPS"). Together with Andersen, Household's senior executives also manipulated the manner in which Household

---

[1]      Unless specified otherwise, Household or the Company includes its subsidiaries, Household Finance Corporation, Inc. ("HFC"), and Beneficial Corporation ("Beneficial"), subsequent to its merger with Household on 6/30/98.

accounted for costs associated with the Company's co-branding agreements, affinity agreements and marketing agreements.

4.    Defendants' scheme was crucial to Household's operations, as the perceived strength of its borrowers and the credit quality of its loan portfolio were extremely important to Household because the Company's business required it to constantly return to the debt securitization markets to fund Household's operations. In fact, Household registered and/or sold more than $75 billion worth of debt securities during the Class Period by consistently registering and selling securities via its HFC subsidiary. The credit quality of its customers and the strength of its reported statistics concerning delinquencies and credit loss reserve ratios were the metrics by which the quality, and thus the desirability, of the securities were evaluated by the market. Therefore, it was of paramount importance to Household that it continue to conceal the truth about its operating performance throughout the Class Period.

5.    It was not until mid-2002 that investors began to learn about the actual financial and operating condition of the Company. For example, during 3Q02, defendants were forced to admit that Household's earnings had been falsely reported for approximately eight and one-half years and that *Household would take a $600 million charge and restate its previously reported earnings for each and every quarter of the Class Period.* This $600 million (pre-tax) charge had the effect of wiping out $386 million of earnings previously reported by the Company. Then, during the first weeks of 4Q02, Household announced it had entered into a $484 million settlement agreement to resolve claims relating to its illegal, widespread predatory lending practices. Defendants have now admitted that this settlement and related costs resulted in a massive $525 million charge against the Company's earnings.

6.    As investors would later come to discover, the strong growth claimed by Household during the Class Period was illusory. Rather, it was the combination of predatory lending practices, improper reaging of delinquent loans and false accounting that allowed Household to report "record" financial results quarter after quarter throughout the Class Period. In fact, predatory lending, reaging and accounting manipulations were so central to Household's business model that, as defendants were forced to abandon these illegal practices, the price of Household securities plummeted. As

- 2 -

A6

news of the massive predatory lending settlement leaked out during the first week of 10/02, the price of Household stock dropped to as low as $20.00 per share, 70% below its Class-Period high. The decline in the price of Household stock reflected the market's realization that, without the ability to continue the unlawful activities detailed herein, the Company had lost its "competitive advantage." In fact, on 11/14/02 – one month after taking the second of two charges totaling over $1 billion – Household's Board of Directors ("Board") decided to sell the Company to HSBC Holdings plc ("HSBC") at a time when Household stock was trading at a seven-year low. Defendants' decision to sell Household quickly and at a bargain-basement price was a direct result of the fact that Household could no longer produce "record" results, having lost the advantage of using (a) predatory lending practices; (b) improper "reaging" techniques; and (c) accounting chicanery to manipulate Household's financials. With HSBC as a white knight, Household would be able to have HSBC supplement the Company's reserves and avoid additional massive writeoffs. Notwithstanding the fact that defendants' fraud has resulted in the elimination of well over $25 billion in market capitalization, the sale to HSBC was structured to ensure an immediate windfall to defendants William F. Aldinger ("Aldinger") and David A. Schoenholz ("Schoenholz"). Aldinger will receive over $60 million in consideration and options accelerations as a result of the proposed merger with HSBC, including a $10 million "special retention grant" for selling Household to HSBC. Schoenholz will receive over $20 million.

## II. SUMMARY OF THE ACTION

7.      Household was created as a holding company in 1981 as a result of the restructuring of HFC, which was established in 1878. Prior to the restructuring, Household operated in the financial services, individual life insurance, manufacturing, transportation and merchandising industries. Following the restructuring, the Company shifted the focus of its operations into the financial services business. From late 1994 through 1997, Household exited from several businesses that the Company claimed were providing insufficient returns on investment, such as its first mortgage origination and servicing business in the United States and Canada, the individual life and annuity product lines of its individual life insurance business, its consumer branch banking business, and its student loan business.

- 3 -

A7

8.     By the beginning of the Class Period, Household was principally a nonoperating holding company whose subsidiaries provided middle-market consumers with several types of loan products in the United States, United Kingdom and Canada. Household's customer base is primarily composed of nonconforming, nonprime or subprime consumers. Such customers generally have limited credit histories, modest incomes or high debt-to-income ratios or have experienced credit problems caused by occasional delinquencies, prior charge-offs or other credit-related actions.

9.     Household became one of the nation's largest mortgage lenders, through a combination of organic growth and acquisitions. In fact, immediately prior to and through the beginning of the Class Period, Household acquired several large consumer finance companies, which fueled its rapid growth, including:

5/97     Household acquires Transamerica Corporation's consumer finance business for $1.1 billion in cash.

8/97     Household acquires ACC Consumer Finance Corporation, a subprime auto lending business, for $200 million in cash and stock.

6/98     Household acquires Beneficial, a consumer finance holding company, in an $8 billion acquisition, with Household issuing over 168 million shares of common stock.

8/99     Household acquires Decision One Holding Company LLC, a privately held originator of nonconforming first and second mortgage loans.

2/00     Household acquires Renaissance Holdings, Inc. (a privately held issuer of secured and unsecured credit card programs), for $300 million.

3/00     Household acquires Banc One's $2.15 billion home equity portfolio for cash.

10.     As Household grew through acquisitions, the Company consistently told the market that Household had a competitive advantage through a sophisticated centralized technology system known as "Vision." The Vision system was purported to generate sales leads, reduce paperwork and, most importantly, centralize decision making throughout the loan origination process. This included generating scripts for sales staff, monitoring collections and delinquencies and determining charge-offs. The Vision system purportedly allowed the Company to maximize profits by cross-selling and up-selling products to its customers, monitoring delinquencies and collections, and managing lending risk. The Vision system was so critical to the Company's purported success that, in 2/00, Household

- 4 -

A8

was awarded a national information technology award from *CIO* magazine for the Vision system's superior technology and information management.

11.     Monitoring loan originations and performance was critical to Household's success — not only were Household's revenues dependent on loan originations, but the Company also met its funding requirements by reselling its loans as asset-backed securities through securitizations of its loan pools, *i.e.*, selling receivables for cash but continuing to service them for a fee. Since these securitized loan pools were sold immediately for cash, Household was able to record income from the spread between its loan cost and the price for which it sold the loan pool – commonly referred to as net interest margin ("NIM") income. Additionally, since Household was not a depository bank, income from securitizations was essential to its continuing operations. During the Class Period, Household raised over $75 billion in funding through the securitization markets.

12.     Since Household both generated loans from high risk borrowers and then sold these loans as asset-backed securities, it was critical to Household's profitability that it produce loan pools that were both stable and consistent. Investors were consistently assured that Household could achieve this goal through its sophisticated Vision system, as well as from having a unique "hands-on" customer relations programs and "flexible" loan collection policies. In fact, the Vision system enabled the Company to monitor and detect delinquent loans and was central to defendants' scheme of arbitrary "reaging" or "restructuring" of delinquent loans to make them current. Indeed, the Vision system itself was programmed to automatically reage delinquent accounts.

13.     The Company's stated policy for reaging consumer receivables permitted Household to reset the contractual delinquency status of an account to current if a predetermined number of consecutive payments had been received, and there was evidence that the reason for the delinquency had been cured. Defendants, however, failed to follow their own internal reaging policies. Throughout the Class Period, delinquent accounts were clandestinely reaged, in violation of Household's policy, upon the receipt of partial payment without any evidence that the account would no longer be delinquent.

14.     Thus, throughout the Class Period, defendants concealed that they had used reaging as a means to simply avoid reporting otherwise delinquent accounts and had failed to adequately

- 5 -

reserve for them. Defendants used "reaging" in order to materially understate the Company's true asset quality ratio and overstate EPS during the Class Period. This had the effect of lowering the number of defaults or delinquencies – a significant risk factor of Household's securitization program.

15.    In addition, to address the other significant risk factor of their securitization program – prepayment of loans – defendants engaged in a consistent and widespread pattern of predatory lending practices prior to and throughout the Class Period, as detailed in ¶¶51-106 herein.

16.    By mid-1998, Household began its exit from the consumer, mass-market credit card business, selling almost $2 billion in credit card receivables because this business had become too competitive. The credit card market was plagued by severe cannibalization, as credit card debtors were regularly solicited with better offers for increasingly lower financing deals.

17.    Intent on evading the pitfalls of the mass-market credit card business, defendants knew they had to prevent premature payoff of Household's secured loans via loan refinancings. To prevent prepayment of its secured loans via refinancings, defendants concocted the scheme complained of herein, whereby loans made to Household customers used all of a borrower's equity in a property at the time a loan was made. In this way, Household substantially reduced prepayment risk because it knew that it would be virtually impossible for competitors to come in and refinance Household customers under such circumstances. Also, in order to further deter prepayment of its secured loans, Household hid prepayment penalties in its loan documents and had Household employees conceal this from borrowers.

18.    Throughout the Class Period, Household engaged in the following forms of predatory lending practices: (a) false and deceptive loan practices, including fraud and forgery; (b) improper disclosures; (c) insurance sales abuses; (d) charging "discount points," which bore no relation to interest rates charges; and (e) concealing prepayment charges. These practices were detailed in the "Washington Department of Financial Institutions Expanded Report of Examination for Household Finance Corporation III," dated 4/30/02 ("WA Report"), published by the Washington Department of Financial Institutions ("WA Department"), attached hereto as Ex. 2, the contents of which were publicly disclosed on 8/29/02. The WA Report listed Household customer complaints from 1995 to 2002 and described in detail complaints between 2000 and 2002.

- 6 -

A10

19.    In 1/02, Household entered into a $12 million settlement with the California Department of Corporations relating to the imposition of improper fees, penalties and charges on California customers. Although the price of Household's stock declined almost 20% in the days following Household's settlement with the California Department of Corporations, defendants continued their scheme and wrongful course of business by attempting to conceal the truth about the California Department of Corporations' actions – maintaining that the overcharges were due to computer errors. Almost 75% of the settlement ($9 million) was for penalties, while only $3 million was for customer refunds.

20.    Concerned that they would no longer be able to conceal their reaging and predatory lending scheme, defendants redoubled their efforts in early 2002 to convince the market that the Company was not engaged in any improper lending practices or accounting improprieties. For example, on 2/07/02, Company spokesperson Megan Hayden ("Hayden") was quoted by *Copley News Service* as stating, "We make good loans that not only are legal loans, but are beneficial for our customers." In addition, defendant Schoenholz insisted that predatory lending allegations were "not a significant issue, not indicative of any widespread problem and certainly not a concern that it will spread elsewhere." *National Mortgage News*, 2/18/02. Defendants' repeated assurances had the effect of reinflating the price of Household stock almost 20%, to over $52 per share, by the end of 2/02. As pressure on Household's stock mounted, defendants' denials became more and more adamant: "It is absolutely against our policy to in any way quote a rate that is different than what the true rate is .... I can't underscore that enough." *Bellingham Herald* (quoting Household spokeswoman Hayden), 4/22/02. Defendants' constant stream of assurances about the integrity and strength of Household's operations buoyed the price of Household stock back over $60 per share in late 4/02.

21.    By mid-2002, defendants' scheme was beginning to unravel, as the Officer Defendants worked tirelessly to conceal their wrongful course of business. For example, defendant Aldinger fought tirelessly between 4/02 and 8/02 to ensure that the WA Report detailing defendants' illegal practices would remain concealed from the market. However, the pervasiveness and materiality of Household's wrongful business practices could no longer be concealed. In 7/02, Household was

- 7 -

A11

forced to announce another settlement of $400,000 in Washington – again blamed on a computer "glitch." On 8/29/02, defendants lost their battle to bury the WA Report, and its damning evidence of defendants' wrongdoing was made public. Regarding the Company's position that Household's predatory lending practices were isolated or nonrecurring, the WA Department noted:

> *It is inconceivable that borrowers from remotely different locations could all be confused about exactly the same thing in the same way,* or that HFC could somehow believe that the occurrence was isolated to a single branch location. The Department believes that the "equivalent rate" *sham proffered by HFC representatives is known and likely fostered by the corporation itself or at the least, by corporate officers overseeing large segments of the country. This belief appears to be supported by HFC headquarters' knowledge of the disclosures and sales practices when responding to complaints.*

*Id.* at 53 (emphasis added).[2]

22.    Despite this evidence, defendants continued to deny that predatory lending practices pervaded the Company's operations. However, concerns about the veracity of defendants' denials seeped into the market, causing the price of Household securities to slip. Indeed, the reaction of the securities markets to these revelations was dramatic and eliminated billions of dollars of market value. The price of Household stock declined from over $53.00 per share in 6/02 to approximately $30.00 per share in late 8/02, as the magnitude and pervasiveness of defendants' fraudulent practices began to be digested by investors.

23.    It was only at the end of the Class Period, on 10/11/02, when defendants announced that the Company would pay $484 million to settle predatory lending charges, that investors learned Household had been conducting its nationwide operations in direct violation of federal and state lending laws. Indeed, in 10/02, Minnesota Commerce Commissioner James Bernstein, whose department had investigated Household's predatory lending tactics for more than a year, was quoted in the Minneapolis *Star-Tribune* as stating, "Household claims that it's only a few bad apples, but we've ... found that the whole orchard is rotten.... Household's corporate culture encouraged rather than prohibited these deceptive and abusive lending practices ...."

24.    In addition to lowering defaults through abuse of the Company's reaging policies and to lowering prepayment rates through over-financing and up-selling loans, the widespread abuse of

---

[2]    All emphasis has been added, unless otherwise indicated.

Household's lending practices also had the effect of rendering the Company's financial statements materially false and misleading. Household's regularly reported key operational metrics, such as credit loss reserves, delinquencies, net charge-offs, credit quality and asset performance, were materially misrepresented by defendants' predatory lending and improper reaging practices.

25. Once Household's reaging and lending practices were revealed, it became obvious how Household had been able to report quarter after quarter of record-breaking financial success – especially during the period when the Company's competitors (such as Associates First Capital, whose shares fell by almost 50% in 1999, and ContiFinancial, which, by the end of 1999, teetered on the verge of bankruptcy) were struggling to survive. However, predatory lending and improper account reaging only partly explain how Household was able to post continuing strong growth. In addition to these manipulative and illegal activities, defendants also resorted to some simple, down-home book cooking. As investors learned in 8/02, when the Company's Chief Executive Officer ("CEO") and Chief Operating Officer ("COO") were required under the Sarbanes-Oxley Act to certify the veracity of their financial statements, Household had improperly booked an astounding $600 million in revenue during the period 1994 through 1H02.

26. At the time this restatement was announced, Household stated that its impact on earnings by period was as follows:

| $ millions | FY94-98 | FY99 | FY00 | FY01 | 1H02 | 1Q02 | 2Q02 | Total |
|---|---|---|---|---|---|---|---|---|
| Restatement Amount | $155.8M | $58.1M | $70.1M | $75.9M | $26.1M | $6.1M | $20.0M | $386.0M |

27. The restatement was dramatic and offered valuable insight into the Company's unprecedented ability to meet or exceed analysts' consensus estimates quarter after quarter. A review of the restated numbers confirms that, *without the boost provided by Household's improper accounting manipulations, the Company would not have had been able to post its purported string of back-to-back record-breaking quarters or have met or exceeded analysts' expectations throughout the Class Period.*

28. Thus, in the end, Household's secret formula for success, and its apparent ability to outperform its peers in a very trying market, was one part predatory lending, two parts accounting

- 9 -

A13

chicanery and three parts public funding. Throughout the Class Period, defendants were able to fund Household's operations and grow its businesses using a combination of public offerings, billions of dollars of debt offerings and the securitization of loans. As discussed herein, defendants were able to use 168 million shares of the Company's stock as currency to acquire Beneficial, in part due to investors' perceived value that Household shares were fairly priced – not, as they came to learn after the Class Period, artificially inflated. In addition, by manipulating its lending policies and collection practices, Household was also able to reduce its loan securitization costs and artificially inflate its reported net interest margin.

29.     The cumulative effect of the revelation of defendants' scheme or wrongful course of business decimated the price of Household shares. While Household shares traded as high as $63.25 at the beginning of 1Q02, they traded in the $20s – marking a record seven-year low for Household shares – as the truth about Household's illegal operations and accounting fraud was publicly revealed. The following chart illustrates how defendants successfully destroyed shareholder value during the Class Period:

- 10 -

A14

**Post-Class Period Events**

30.    On 11/14/02, Household announced that it had agreed to be acquired by HSBC, Europe's biggest bank. Under the proposed terms of the transaction, Household shareholders would receive 2.675 HSBC ordinary shares, or 0.5035 American Depositary Shares ("ADS"), for each Household share. Household's stock was trading at its seven-year low, and the deal valued Household shares at approximately $28.75. Joel Gomberg, an analyst with William Blair & Company, L.L.C. ("William Blair & Co."), also noted that Household's funding problems likely were a key driver of the merger. In fact, immediately after the public disclosure of the Company's improper activities, Household's credit rating in the debt market was downgraded, inhibiting the Company's ability to fund its operations. Even defendant Aldinger acknowledged, as was reported by the *Washington Post* on 11/15/02, that growth had slowed in 3Q02 because of "funding issues." Since HSBC maintained a large base of deposit customers, it could provide funding to Household without being forced to engage in securitizations.

31.    In addition, *Barron's*, on 11/18/02, made the following observations on HSBC's proposed acquisition of Household:

> The deal was quickly proclaimed an odd-couple pairing of a worldly British bank and a Midwestern lender to moderate-income, often financially strapped, Americans. In this view, *Household was the desperate party, eager for quick cash. And HSBC treated the company the way Household deals with its customers, using its leverage to set the terms to its greatest and most profitable advantage.*
>
> HSBC agreed to pay ... a 33% premium to Household's price before the deal, but it's half what the stock commanded as recently as April.
>
> *Household has been knocked back on its heels since then by concerns about its aggressive lending practices and accounting questions that have made the fixed-income markets unwilling to finance the company at favorable terms.* Last December, with the stock around 60, Barron's suggested that *Household had systematically understated its problem loans.*
>
> So, HSBC was able to grab Household at what appears to be a slender price, with the promise that the larger institution's enormous financing clout can fund the Household business at advantageous rates.

- 11 -

A15

## III. JURISDICTION AND VENUE

32.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act" or "1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  In addition, asserted herein are claims of strict liability and/or negligence arising under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act" or "1933 Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o, and 28 U.S.C. §1331.

33.     Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa, and §22 of the 1933 Act, 15 U.S.C. §77v.

34.     Venue is proper pursuant to §22 of the 1933 Act, §27 of the 1934 Act and 28 U.S.C. §1391(3).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination of false and misleading information to the investing public, occurred in this District.

35.     In connection with the acts, conduct and other wrongs complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and the facilities of the national securities markets.

## IV. PARTIES

**A.     PLAINTIFFS**

36.     (a)     Lead plaintiff Glickenhaus & Company ("Glickenhaus") is an SEC-registered investment advisor with hundreds of millions of dollars of assets under management.  Glickenhaus is a member of the New York Stock Exchange, the National Association of Securities Dealers, the Municipal Securities Rulemaking Board and the Securities Investor Protection Corporation. Glickenhaus specializes in the management of equity, balanced and fixed-income portfolios. Glickenhaus purchased Household securities during the Class Period as detailed in the attached Certification and suffered substantial damage as a result thereof.

(b)     Lead plaintiff PACE Industry Union Management Pension Fund ("PACE") is a self-insured, qualified Taft-Hartley Defined Benefit plan that is jointly administered and overseen by management and union trustees.  Currently, the fund administers over $3.5 billion of

- 12 -

A16

pension and retirement benefits for 75,000 plan participants, including paper, pulp and board mills workers and refinery workers from the Oil, Chemical & Atomic Workers Union that merged with the PACE International Union in 2000. The PACE International Union has over 250,000 members in the United States and Canada. PACE purchased Household securities during the Class Period as detailed in the attached Certification and suffered substantial damage as a result thereof.

(c)      Lead plaintiff The International Union of Operating Engineers Local No. 132 Pension Plan ("IUOE") is a self-insured, qualified Taft-Hartley Defined Benefit plan that is jointly administered and overseen by management and union trustees. Currently, the fund administers over $160 million of pension and retirement benefits for over 3,000 plan participants. The IUOE purchased Household securities during the Class Period as detailed in the attached Certification and suffered substantial damage as a result thereof.

(d)      Named plaintiff The Archdiocese of Milwaukee Supporting Fund, Inc. ("AMS Fund") is a nonprofit institution that was formed to support charitable organizations. By supporting charities in the Milwaukee area, as well as throughout the United States, the AMS Fund seeks to promote educational and social service initiatives that primarily are designed to provide assistance to the indigent and others similarly in need of assistance. The AMS Fund purchased Household securities during the Class Period as detailed in the attached Certification and suffered substantial damage as a result thereof.

(e)      Named plaintiff The West Virginia Laborers' Trust Fund (the "West Virginia Fund") is a self-insured, qualified Taft-Hartley Defined Benefit plan that receives direct employer fringe contributions required under local collective bargaining agreements. Currently, the West Virginia Fund administers pension and health care benefits to more than 2,000 active and retired laborers and their families. The West Virginia Fund has approximately $20 million in assets under management. The West Virginia Fund purchased Household securities during the Class Period as detailed in the attached Certification and suffered substantial damage as a result thereof.

- 13 -

A17

## B.   HOUSEHOLD

37.     Defendant Household is a holding company with three primary segments: consumer, credit card services and international.  Defendant HFC is a wholly owned subsidiary of Household.  During the Class Period, HFC acted as the finance arm of the Company and was responsible for issuing approximately $90 billion of debt, which proceeds were used to finance Household's lending activities, conducted primarily through HFC.  Household's consumer segment includes consumer lending, mortgage services, retail services and auto finance businesses.  The credit card services include the domestic MasterCard and Visa credit card businesses.  The Company's international segment includes foreign operations in the United Kingdom and Canada.

## C.   OFFICER DEFENDANTS

38.     Defendant Aldinger was, during the Class Period, CEO and Chairman of the Board.  Aldinger joined Household in 9/94 as President and CEO and became Chairman in 5/96.  During the Class Period, Aldinger was a member of Senior Management and of the Executive Committee, which acts for the Board during intervals between Board meetings.  As Household's CEO, Aldinger had general authority over all matters relating to the business and affairs of the Company, including, among other things, approving lending practices, reaging and collection techniques, as well as other business practices relating to the core operations of the Company -- consumer lending.

39.     Defendant Schoenholz was, during the Class Period, President and COO and Vice-Chairman of the Board.  During the Class Period, Schoenholz also served as Chief Financial Officer ("CFO"), Executive Vice President-CFO and Vice-President-Chief Accounting Officer.  As Household's principal financial officer and chief accounting officer throughout the Class Period, Schoenholz's responsibilities included, among other things, approving lending practices, reaging and collection techniques, as well as other business practices relating to the core operations and financial accounting of the Company.

40.     Defendant Gary Gilmer ("Gilmer") was, during the Class Period, Vice-Chairman of Consumer Lending and Group Executive of U.S. Consumer Finance, as well as a member of Senior Management.  Beginning in 1972, Gilmer ran HFC private label and credit insurance.  He also headed United Kingdom operations before being promoted to head of U.S. Consumer Finance on

- 14 -

A18

January 1, 1997. As the head of Consumer Finance throughout the Class Period, Gilmer was responsible for all aspects of the consumer lending arm of Household's business, including, among other things, approving lending practices, reaging and collection techniques, as well as other business practices relating to the core operations of the Company – consumer lending.

41.       The defendants named above in ¶¶38-40 are sometimes collectively referred to herein as the "Officer Defendants." Because of their senior executive, managerial positions, the Officer Defendants knew the adverse nonpublic information about Household's business, as well as its finances, markets and present and future business prospects via access to internal corporate and financial documents (including Household's operating plans, actual and projected quarterly reports, actual and projected revenue reports and actual and projected expense reports), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Each Officer Defendant had access to Household's core business through the Company's internal, automated technology system known as "Vision." The Officer Defendants signed various false financial statements filed with the SEC. Defendants Aldinger and Schoenholz also signed the Management's Report to Shareholders. As detailed in ¶¶192-344, during the Class Period, the Officer Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases, financial statements and other statements to the public made to analysts during conference calls and one-on-one meetings with analysts during Household's annual Financial Relations Conferences.

42.       Because of their senior executive and managerial positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Household's quarterly and annual reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. In fact, running the business and maintaining its financial and commercial success were the principal responsibilities of the Officer Defendants.

43.     The Officer Defendants are liable for the false statements pled herein, as those statements were each "group published" information, the result of the collective action of the Officer Defendants. The Officer Defendants knew or recklessly disregarded that said adverse undisclosed information had not been disclosed to and was being concealed from the investing public. The Officer Defendants also knew that the positive representations being made were then materially false and misleading. Each of the Officer Defendants either knew or recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Household securities and would artificially inflate or maintain the price of those securities. Each of the Officer Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and members of the class plaintiffs seek to represent.

D.     **DIRECTOR DEFENDANTS**

44.     Each of the defendants listed herein was a signatory of the Registration Statement and/or a director of Household at the time of the 6/98 Beneficial merger, including:

(a)     Aldinger is and was CEO and Chairman of the Board of Directors ("Board") of the Company.

(b)     Schoenholz is and was CFO of the Company.

(c)     Defendant Robert J. Darnall ("Darnall") is and was a member of the Board.

(d)     Defendant Gary G. Dillon ("Dillon") is and was a member of the Board and the Board's Audit Committee.

(e)     Defendant John A. Edwardson ("Edwardson") is and was a member of the Company's Board and the Board's Audit Committee.

(f)     Defendant Mary Johnston Evans ("Evans") was a director of the Company until 5/02 and a member of the Board and the Board's Audit Committee.

(g)     Defendant J. Dudley Fishburn ("Fishburn") is and was a member of the Board.

(h)     Defendant Cyrus F. Freidheim, Jr. ("Freidheim") is and was a member of the Company's Board of Directors.

(i)     Defendant Louis E. Levy ("Levy") is and was a director of the Company, a member of its Board and Chairman of its Audit Committee.  Defendant Levy retired as Vice Chairman of KPMG, LLP ("KPMG") (a provider of accounting and consulting services) in 1990, having been with KPMG since 1958.

(j)     Defendant George A. Lorch ("Lorch") is and was a member of the Board.

(k)     Defendant John D. Nichols ("Nichols") is and was a member of the Board.

(l)     Defendant James B. Pitblado ("Pitblado") is and was a member of the Board and the Board's Audit Committee.

(m)     Defendant S. Jay Stewart ("Stewart") is and was a member of the Board.

(n)     Defendant Louis W. Sullivan ("Sullivan") was a director of the Company until 5/02 and a member of the Board.

45.     The defendants named in ¶44(a)-(n) are collectively referred to herein as "Director Defendants." Each of the Director Defendants signed the Registration Statement used by Household to issue 168 million Household shares in connection with the 6/98 Beneficial merger.  Each of the Director Defendants participated in the issuance of the shares.

**E.     AUDITOR DEFENDANT**

46.     Defendant Andersen, a firm of certified public accountants, was engaged by Household to provide independent auditing, accounting, management consulting and tax services. Throughout the Class Period, Andersen reviewed Household's filings with the SEC, performed audits or reviews of the financial statements included in the Company's Registration Statements and other SEC reports, including audited and unaudited financial information and provided other consulting services, for which it received large fees. Andersen was engaged to and did perform these services so that Household's financial statements would be presented to stock purchasers, government agencies, the investing public and members of the financial community.  As a result of the myriad services it rendered to Household, Andersen's personnel were present at Household's corporate headquarters and financial offices frequently during the Class Period and had continual access to Household's confidential corporate financial and business information, including Household's financial condition, false financial statements and business problems. Andersen actively participated

- 17 -

A21

in the issuance of Household's false financial statements, issuing a false opinion on Household's financial statements during the Class Period, which was included in the Registration Statement.

**F.     HFC DIRECTOR DEFENDANTS**

47.     Defendants Aldinger, Schoenholz, Gilmer and J.A. Vozar ("Vozar") were, at all relevant times during the Class Period, directors at HFC.

**G.     INVESTMENT BANK DEFENDANTS**

48.     Merrill Lynch is a worldwide financial management and advisory company. As an investment bank, Merrill Lynch is a leading global underwriter of debt and equity securities and strategic advisor to corporations, governments, institutions and individuals worldwide.

49.     Goldman Sachs is a global investment banking, securities and investment management firm that provides a wide range of services, including evaluations of mergers and acquisitions.

## VI. DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

50.     Defendants' fraudulent scheme and wrongful course of business was designed to, and did, allow Household to regularly report *"record"* revenues and earnings and caused Household's securities to trade at artificially inflated levels throughout the Class Period. Defendants' misconduct included:

(a)     Predatory lending practices designed to maximize amounts lent to borrowers in the subprime market at unconscionable interest rates;

(b)     Misrepresentation and manipulation of defaults and delinquencies by arbitrarily reaging delinquent accounts, thereby effectively lowering the amount of credit loss reserves necessary and proper to cover the risk to which the Company was exposed; and

(c)     Improper accounting of expenses associated with its credit card co-branding, affinity and marketing initiatives agreements, which, when discovered by the Company's newly-appointed auditor, KPMG, led to a $600 million (pre-tax) restatement (going as far back as 1994), and resulted in lowering earnings throughout the Class Period.

- 18 -

A22

**A.  HOUSEHOLD'S ILLEGAL PREDATORY LENDING PRACTICES WERE FORMULATED BY DEFENDANTS AT THE COMPANY'S CORPORATE HEADQUARTERS**

51.    Household's lending strategy was to provide loans to borrowers tailored to maximize the loan-to-value ("LTV") ratio of a loan (and thus the loan amount), rather than to meet the borrowers' financial needs.  Loan officers were trained to ensure that the loan would be for as much money as possible, equal to or higher than the equity a borrower had in a property.  The Company targeted homeowners who carried both a mortgage and significant consumer debt and persuaded these individuals, by deliberately misleading them using confusing and unfair sales tactics, that consolidating their debts into one or more secured loans with Household would save them money, when in fact it would not.  Household would then make secured loans to borrowers in amounts high enough in relation to the value of their homes that the resulting debt-to-value ratio, coupled with prepayment penalties and other restrictions, prevented them from refinancing their loans with Household's competitors – thereby ensuring continued profits from the Company's own high cost loans. On top of those loans, Household would "up-sell" secondary loans to borrowers, whether they needed or wanted a secondary loan, frequently without the borrowers' knowledge.  These loans were used primarily to pay for the excessive charges the Company had piled onto the borrowers' primary loans.  In fact, Household designed its secondary loans so it could avoid federal disclosure rules and spring them on borrowers at the time of closing.  These secondary loans, which regularly carried interest rates of 20% and above, also served the purpose of further eliminating borrowers' equity.

52.    Household's sophisticated and specially designed predatory lending practices include:

(a)    Misrepresenting the actual interest rates on loans by falsely telling customers that making bi-weekly payments with Household's EZ Pay Plus Bi-weekly Payment Plan ("EZ Pay Plan") would produce lower interest rates, when it would not;

(b)    Charging finance charges or "discount points" that bore no relation to interest rates charged, failing to disclose the existence or amount of up-front finance charges and failing to disclose to customers that finance charges would be added to the amount of total debt owed;

(c)    Failing to disclose that loans contained prepayment penalties that effectively prevented refinancing with another lender;

- 19 -

A23

(d)   Illegally requiring borrowers to purchase credit, life and other types of insurance in order to secure loans and frequently forging signatures indicating customer approval of insurance purchases; and

(e)   Illegally "up-selling" loans carrying exorbitant interest rates of 20% or higher, mischaracterizing closed-ended loans as open-ended to avoid heightened disclosure requirements and restrictions connected with closed-ended loans and failing to comply even with the more relaxed disclosure requirements for open-ended loans.

53.     Household's illegal predatory lending practices are well documented in government agency reports condemning the Company's lending practices, including the WA Report, as well as in lawsuits filed in the States of California, Illinois and Washington. *ACORN, et. al. v. Household Int'l, Inc., et al.*, Case No. 02-1240 CW (N.D. Cal.) (the "California Complaint"); *Bell, et al. v. Household Int'l, Inc., et al.*, Case No. 02-CH-08640 (Circuit Court of Cook County, Ill.) (the "Illinois Complaint"), and *Luna, et al., v. Household Finance Corp., et al.*, Case No. 02-2-00178-0 (Chelan County Superior Court Wash.) (the "Washington Complaint") (collectively, "Consumer Fraud Complaints"), attached hereto as Exs. 3-5.

54.     The Company's use of illegal and unconscionable lending practices throughout the Class Period was both widespread and ingrained in Household's corporate culture. Significantly, between 1997 and 2002, *trainers from Household's corporate headquarters in Illinois visited branch offices to provide training in the various illegal lending techniques described above.*

**The EZ Pay Plan Scam – Defendants Misrepresented the**
**Interest Rates and Savings Associated with Household Loans**

55.     Throughout the Class Period, Household engaged in a pattern of intentionally misrepresenting interest rate amounts and lying to customers about the savings they would reap by refinancing with Household. This was done most often by using the EZ Pay Plan to confuse borrowers.

56.     The EZ Pay Plan scam was described, along with other lending abuses, in an article entitled "Home Wrecker; William Aldinger says his Household International succeeds in lending to bad credit risks by managing smarter. People suckered into his mortgages cite other reasons: lies and deceit." The article, which was published in the 9/02/02 issue of *Forbes* magazine ("9/02 *Forbes* Article"), detailed the EZ Pay Plan scam used by Household, stating:

- 20 -

A24

[In 1999,] Household ... began EZ Pay Plus, a program under which many borrowers, like [William] Myers [of Dayton, Ohio], were lured with lower interest rates but were really charged higher ones. EZ Pay Plus also hooked Corina Galindo, a teacher's assistant in Phoenix. In April 2000 *Household offered to replace her $67,300 mortgage, a Chase Manhattan Bank loan at 8.5% interest, with a bigger but seemingly cheaper one: $86,300 at an "effective rate" of 7.6%,* enough to pay off the old mortgage and a $12,200 personal loan she was paying off at 15.7%. At least, that is how she read a worksheet from a Household loan officer. Galindo signed up. Four days later, she says, she got nervous and reviewed the 80-page agreement — signed or initialed in two dozen places – and *spotted the real interest rate: 12.2%.*

How did it happen? Galindo says her agent, Jose Avila, handed her the worksheet, titled Bi-Weekly Payment Quote, with this sentence at the bottom: "If I can put together a loan that pays out like a 7.579%-a-year loan, but has a total term of 18.63 years ... would you be interested?" She was, though the claim wasn't exactly true. Her loan term would be reduced from 30 to 19 years, and payments would be automatically deducted from her checking account every two weeks. By paying off her mortgage faster, Galindo would pay lower total interest. Her new loan's payments would total $219,000 over 19 years. The Household pitch: Spread that over 30 years, and it's like a 30-year loan at 7.6%, lower than her Chase loan.

Never mind that her new mortgage wasn't a 30-year loan to begin with – and 12.2% is 12.2%. The $86,300 loan included processing fees of $6,000, or 7%, plus other charges. Many lenders levy 1% to 2%.

57.    Responding to the information in the 9/02 *Forbes* Article, Household stock opened

$2.75 lower on 9/03/02.

58.    The EZ Pay Plan scam was also at the core of the WA Report, which documented a

consistent pattern of widespread lending abuses, including wide use of the EZ Pay Plan scam:

[B]orrowers have been told that by accepting the bi-weekly payment program they can *effectively reduce the interest rate on their loan from approximately 14% down to 7%. The Department has encountered reference to this 14% to 7% statement a number of times and addressed the problem directly with HFC management in mid-2001.* HFC informed the Department that the "practice" was isolated to a single branch in Washington and that the matter was not a corporate practice. However, *the Department has identified the practice to other branches in Washington and has even received reports from regulators in other states concerning the practice. Contrary to HFC's claims, the Department does not believe the practice is isolated.*

While an interest rate savings will be achieved through the bi-weekly payment program, *for HFC to claim that the interest rate can be reduced through use of the program is a false and misleading statement designed to convince borrowers to accept a loan rate in the neighborhood of 14%, disguised as a loan rate of 7%.*

Ex. 2 at 41.

59.    Household's practice of misleading customers about their loans' true interest rates (and

the savings such loans would offer over customers' already existing loans) was widespread.

*Household loan officers and branch managers were instructed by Household corporate*

*headquarters to tell the customers that, in effect, they were cutting their interest rate to 7% by participating in the EZ Pay Plan when, in reality, the interest rate was substantially higher.* Characterized internally as "one of Household's biggest scams," the EZ Pay Plan resulted in customers being misled into thinking they were receiving low-interest loans when, in reality, they were not. In 1999, HFC Southwest Division Manager Dennis Hueman ("Hueman") drew up EZ Pay Plan presentations and worksheets that were subsequently used by HFC loan officers throughout the country to bilk customers via the EZ Pay Plan scam. In fact, the EZ Pay Plan scam was used across the country from California to Pennsylvania.

60.    Customer complaint calls received by collections representatives for Household Recovery Services during the Class Period confirmed to defendants that the account executives and branch managers who had originated loans had represented as a matter of course that the actual interest rate on Household loans was as low as 7%, even though they were actually sold with substantially higher interest rates.

**Household Improperly Used "Discount Points" to
Extract Additional Fees from Borrowers Rather Than
Reduce Their Interest Rate, as Represented to Borrowers**

61.    In general, when taking out a loan, a borrower can make an up-front cash payment to "buy down" the applicable interest rate. In this manner, a borrower can pay up front for a discount on the applicable interest rate. The rationale is that the higher the up-front cash payment, the lower the interest rate applied to a loan. At Household, discount points were routinely abused as a means to charge borrowers additional fees.

62.    The WA Report revealed that: (a) discount points regularly bore no relation to any interest-rate reduction; (b) borrowers were regularly provided with a "range" of buy-down points, yet at closing, the discount points charged were almost always at the top of the range and equaled 7.00%-7.25% of the loan value; (c) borrowers did not know that the points being paid were purportedly to buy down the rate of their loans; (d) borrowers were not offered any option of the amount of points to be prepaid; and (e) the applicable points on the loan would often be concealed from borrowers.

63.    The abuse of points and fees by Household pervaded its lending operations. Household real estate loans regularly had 7.5 to 8 points added to them as a method to extract additional fees from Household customers. These "discount points" did not have any buy-down effect on the interest rate of the loan. Account executives were instructed to sell customers on the loan's contract rate, *i.e.*, the rate of the loan *before* points, fees, insurance and other add-ons, over the annual percentage rate, which had the effect of misleading Household customers into thinking that the applicable interest rate was the same as the contract rate, when it was actually materially higher.

64.    The up-front finance charges (including points and fees) not only added to the effective interest rate paid by Household customers, but these charges were added to the amount that Household customers borrowed, thereby increasing the total debt secured against their homes. This practice was designed to, and did, significantly decrease borrowers' equity in their homes, inhibiting their ability to refinance their loans with Household's competitors.

65.    The WA Report confirmed that Household borrowers were consistently unaware, at the time their loans closed, that they had been assessed these up-front finance charges (often in excess of 7% of the loan amount) or that the fees and points had been added to their principal balance. *Household had intentionally withheld this information from its customers in order to sell the largest loan possible, which in fact was confirmed with respect to every single customer interviewed by the WA Department. Id.* at 45.

66.    The WA Department also detailed that Household had violated Regulation X of the Real Estate Settlement Procedures Act ("RESPA") by failing to provide, or providing customers inaccurate, good faith estimates ("GFE") of known charges. The WA Department concluded that the consistency with which the Company charged discount points equal to 7.25% of any loan belied Household's position that disclosing a wide "range" of points in the GFE provided to borrowers fulfilled their disclosure obligations. The WA Department stated that, "In the case of HFC ... the lender has knowledge of what it intends to charge. To disclose anything else is nothing more than a pretense.... To argue that a 'range' should be disclosed in the rare event that a lower amount of points may occur, is a mendacious use of its control over the disclosure process." *Id.* at 48.

- 23 -

A27

67.     Household's abusive use of up-front fees was fundamental and systemic, occurring across the nation.

**Household Concealed the Existence of**
**Prepayment Penalties in Its Loan Documents**

68.     Household included prepayment penalties in its loans to thwart customers' abilities to refinance their Household loans. Rather than disclosing the existence of prepayment penalties and their impact, *i.e.*, crippling borrowers' ability to refinance their loans, loan officers were trained to conceal or even lie about them.

69.     Household structured loans to include prepayment penalties, hiding the written disclosures in the loan documents by burying them like a "needle in a haystack" and affirmatively misrepresenting their very existence. *Id.* at 42. Rather, the WA Department found that HFC structured its sales process so as *"to sneak the prepayment penalty past the point of rescission."* *Id.* at 43. It was the conclusion of the WA Department that borrowers "were either not told of a prepayment penalty or that they were intentionally misled about the prepayment penalty." *See id.* at 42.

70.     Household implemented a policy that did not require customers to initial the prepayment penalty section indicating that they had read and understood the penalties. Rather, Household instructed its loan officers simply skip over this section without disclosing it to customers.

**Household Improperly Tacked Insurance Products onto**
**Its Loans by Misleading Borrowers into Believing They**
**Were Compulsory and/or Concealing Their Inclusion**

71.     Throughout the Class Period, Household routinely engaged in "Insurance Packing" – *i.e.*, selling insurance products to consumers in conjunction with loans when they were either unaware that they were purchasing such insurance or led to believe that such insurance was compulsory when it was not. In addition, the Household defendants routinely concealed (a) the total cost of insurance products sold in connection with the loans; (b) that the policies did not provide protection for the life of the loan; (c) that the customers were paying additional up-front points based

on the cost of the insurance; and (d) that these points would not be refunded if the insurance was cancelled.

72.    Defendants' practice of insurance packing pervaded Household's operations and was both a fundamental profit driver and core aspect of Household's business.  By at least 1996, Household had its branch managers and account executives throughout the country meet with "insurance trainers" sent from Household's corporate headquarters in Illinois, who stressed the importance of maintaining 60%-75% penetration when selling insurance (each type of loan had one to three opportunities to sell insurance, and loan officers were expected to close 60%-75% of these opportunities).  To achieve this result, branch managers and account executives were instructed to give the customer two quotes on a loan's monthly payment – one that included insurance and one that did not.  In fact, they were instructed by the insurance trainers to *outright lie to customers* about insurance costs by telling them that the higher quote did not include insurance and the lower quote did include insurance when, in fact, it was the opposite.  Indeed, it was not uncommon for loan officers to add on insurance without informing the customer, especially with closed-end loans.  For example, Texas District Manager Bruce Kwidzinski instructed his account executives to disclose only one quote, which included insurance, to their customers on 90% of their loans.  On the other 10% of their loans, they were allowed to tell the customers that insurance was optional.  At Household, account executives were constantly measured against each other through district and regional rankings, and insurance sales played a significant role in the rankings.

73.    In some parts of the country, insurance penetration rates reached as high as 92% to 100% at certain branches, in part due to Household's consistent refusal to provide the material disclosures required to be provided to borrowers under the Truth in Lending Act.

74.    The WA Report concluded:

The inclusion of unwanted or unneeded insurance products (as discussed throughout this report) by steering methods, misrepresentations or out-and-out fraud through forgery appears to be part of HFC's practice of obtaining maximum revenue from consumers regardless of any actual benefit to the consumer.  HFC encourages its employees to maximize the number of products sold, the dollar amount of loans sold and insurance products sold.  A review of HFC's Branch Sales Compensation policy for 2001 shows that account executives, branch managers and sales assistants are paid significant monthly incentives for maximizing borrower transactions in these areas.

*See id.* at 59.

**Household Illegally "Up-Sold" Loans Carrying
Exorbitant Interest Rates (20% or Higher)**

75.    Household engaged in a consistent pattern of illegally up-selling second loans to customers who had not requested them and who did not need them, but for the unconscionable and often undisclosed fees regularly charged on the first loans.  When springing these high interest (20% and higher) loans on customers at the time of closing, Household often failed to disclose to customers that the projected monthly payments under their consolidated loans included payments toward separate, so-called open-ended second loans.  Household made these second loans at interest rates significantly higher than those quoted and failed to disclose that the second loan would amortize at a slower rate than the customers' existing loans (if they amortized at all) and could result in balloon payments at end of the loan term.

76.    The 9/02 *Forbes* Article describes Household's conduct, stating:

At the closing on a Saturday, Galindo says, [Household loan officer] Avila also sprung on her a second mortgage – set up as a line of credit of $10,000 at 23.9%.  At her closing, she was drawing down $4,800 on this line to pay off yet another outstanding debt – a debt she had expected to be taken care of in the $86,300 first mortgage.  *Household structures many second mortgages as lines of credit, which lets it avoid federal rules that mortgage terms must be disclosed at least three days before closing.*

She protested but signed anyway.  *"I felt a lot of pressure,"* she says.  "Avila told us he never opens on Saturday and his family was waiting for him.  But I can't do anything.  I signed the papers."  Galindo now works nights cleaning classrooms to help pay off the new loans....

\*    \*    \*

William Myers paid off his credit card debt by refinancing his mortgage last year.  But he says *his new lender, Household International, charged him 11% interest, not 7.2% as promised.  Then it added $14,400 in fees and insurance to his $80,100 loan and stuck him with a $15,000 second mortgage – at 20% interest.  He didn't notice it until his first bill.*

\*    \*    \*

Myers, 66, was left owing a third more than his home was worth, scaring away rival lenders that might come to the rescue....  Household agents call [this tactic] "closing the back door."

77.    "Blocking the back door" was so essential to Household's operations that many of Household's underwriters would require second side-loans before they would approve first mortgage

- 26 -

A30

loans. For example, if branch managers or account executives sent a mortgage loan with an 80%
LTV ratio to the underwriting department, in many instances the loan would be rejected unless the
customer took out an additional loan that would bring the total LTV ratio above 100%.

78.     Household employees were also required to pressure customers into taking larger
loans than they wanted or could pay off, including loans with 125% LTV ratios. After its acquisition
of Beneficial, Household caused Beneficial to implement a practice to make loans for over 100%
of the value of a borrower's home. In order to increase the size of the loan sold to borrowers,
Household loan officers were encouraged to inflate the customer's income if the borrower's true debt-
to-income ratio was above 60% so that the recalculated ratio would fall below 50%. Extending loans
based on the value of a borrower's home rather than the borrower's ability to repay the loan violates
federal lending statutes.

79.     HFC also engaged in "blocking the back door" by intentionally directing appraisers
to undervalue property in order to use up the LTV ratio on the first mortgage, thereby ensuring that
the borrower would have to purchase an expensive second mortgage. The WA Department
confirmed this consistent pattern of "up-selling" loans at Household, stating:

> Accompanying the sale of two loans to borrowers was the consistent pattern of
> convincing the borrowers that the first would be carried at a very low rate (7%) while
> actually being made at a fairly high rate (11-14%). Most of these first mortgages also
> carried a significant amount of discount points (generally more than 7 points). *Often,
> the financed discount points alone ate up so much loan principal that the
> borrowers were forced into the high rate second in order to achieve the financing
> they sought.*
>
> Some borrowers complained that the value of their homes came in far too low. *The
> Department believes that HFC may intentionally direct the appraiser to undervalue
> the property in order to use up the LTV on the first mortgage, thereby forcing a
> high rate second of up to 25%.*
>
> *   *   *
>
> It is apparent to the Department that in at least some, if not many, transactions, *the
> borrowers did not "apply" for a second mortgage and did not desire a second
> mortgage, but at closing were faced with only one financing option: to take out a
> first and undesired second mortgage.* In certain cases it appears that the second
> mortgage was primarily used to pay for high points being charged by HFC. Further,
> all of the second mortgages reviewed by the Department carried very high rates of
> interest (generally in excess of 20%), as well as origination fees at nearly 4%. *In
> situations where the borrowers were required to take out a second mortgage
> primarily to pay points on the first mortgage, the borrower paid additional points*

*for points, as well as an exorbitant interest charge on the financing of both layers of the points.*

Ex. 2 at 43, 59.

80.    Moreover, in order to avoid the enhanced disclosure requirements and restrictions applicable to closed-end loans, Household often styled second mortgages as open-ended lines of credit. These second loans were not, however, open-ended. Household's mischaracterization allowed the Company to spring these second mortgages on borrowers on the day their loans were closed without any prior disclosure. This practice violated Regulation Z, §226.34(b), of the Truth in Lending Act ("TILA"), which prohibits lenders from structuring home-secured loans as open-ended plans to evade the more stringent disclosure requirements contained in Regulation Z, §226.32 (governing closed-ended loans). Moreover, Household failed to comply even with the more relaxed disclosure requirements applicable to open-ended loans, concluding that Household "has a practice of failing to make the material disclosures as required pursuant to [Regulation Z] §226.5b," which governs disclosure requirements for open-ended loans. WA Report at 54. The WA Department also concluded that Household was in serious violation of material disclosure requirements relating to closed-ended credit.

81.    Under Regulation Z, §226.15(a)(ii)(3), "[i]f the required notice and material disclosures are not delivered, *the right to rescind shall expire 3 years after the occurrence giving rise to the right of rescission*, or upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." 12 C.F.R. §226.15(a)(ii)(3). Thus, due to Household's consistent mischaracterization of closed-ended loans as open-ended loans, and its failure to provide proper disclosure of the terms of those loans under Regulation Z (governing both closed- and open-ended loans), Household customers' right to rescind the purportedly open-ended second loans was expanded from three days to three years.

82.    As detailed in several complaints brought on behalf of consumers nationwide, Household engaged in a multitude of "up-selling" techniques to sell their purported open-ended loans:

       (a)    Household falsely designated loans as open-ended despite the fact that they did not reasonably contemplate repeat transactions in order to avoid federal

- 28 -

A32

disclosure requirements under the Home Owners Equity Protection Act ("HOEPA"), 15 U.S.C. §1639, that would alert borrowers to the high costs and unfavorable terms of the loans;

(b)    Household did not provide the disclosures in advance of closing as required by HOEPA;

(c)    Household included prepayment penalties in violation of HOEPA;

(d)    Household routinely extended loans based primarily on the value of the borrowers' homes rather than their ability to repay the loans;

(e)    Household failed to provide the disclosures required by 15 U.S.C. §1637(a), (b) and (e) to be given upon application for true open-ended loans; and

(f)    With respect to closed-ended loans, Household consistently failed to make the disclosures required by HOEPA.

Moreover, Household did not disclose that the projected monthly payments under their consolidated loans included payments toward the open-ended loans made at interest rates significantly higher than those quoted, nor did they disclose that the separate, so-called open-ended loans would amortize at a slower rate than the customers' existing loans (if they amortized at all) and could result in balloon payments at the end of the loan term.

**Household Vehemently Denied Engaging in**
**Predatory Lending Throughout Much of the Class Period**

83.    In an effort to conceal the wrongful business practices that were allowing defendants to meet or beat analysts' EPS expectations throughout the Class Period, defendants consistently took the position that the predatory lending practices discussed above were not occurring at Household, and any assertion to the contrary was false. In fact, defendants maintained that Household's strong performance was based on its use of underwriting criteria that prevented the potential for customer abuse, that it had adopted technology that would alert management to early signs of abuse and that Household applied a "tangible benefits" test for its loans to ensure fair treatment of its customers. Although defendant Aldinger was advised by letter dated 7/23/01 that HFC and Beneficial were engaged in a pervasive predatory lending pattern, the Officer Defendants continued to disclaim the Company's involvement in such practices.

84.    At the same time Household was issuing such public denials regarding its predatory lending practices, it had also filed an injunction in Washington state court seeking to block the

- 29 -

A33

publication of the WA Report that detailed Household's predatory tactics. Hayden characterized the WA Report as a "draft" with "factual errors" that Household wanted to correct and tried to downplay the situation, stating, "It is our regulators' and the attorney general's job to investigate any complaints brought forth by consumers in their state, and we don't find anything unique or surprising that they are doing their job .... [W]e take proper steps to work with the department to uncover the facts and if necessary formulate an appropriate resolution for the borrower." Hayden also admitted that some "customers in Bellingham may have indeed been justified in their confusion about the rate of their loans" and claimed Household "took full and prompt responsibility" and is "satisfied that this situation was localized to the Bellingham branch." *American Banker* article, dated 5/31/02.

85.     But suspicions of Household's role in predatory lending were highlighted. On or about 6/26/02, Judge Claudia Wilken of the Northern District of California upheld the California Complaint on a motion to dismiss, ruling that the purpose and effect of arbitration agreements being used by Household were "'tainted with illegality.'"

86.     For example, on 7/26/02, Household admitted it was "possible" that one or a small group of rogue employees isolated at one of its remote branches in Washington "may" have misrepresented mortgage terms to "some" Whatcom County homeowners who refinanced their home loans at the Company's Bellingham office. This mischaracterization of the scope of defendants' fraud was typical of the Company's attempts to conceal the fact that such manipulations and illegal acts pervaded Household's operations and emanated from Household corporate headquarters.

87.     Yet, defendants continued to attempt to downplay the pervasiveness of the Company's predatory lending practices even after the WA Report was made available and Household was forced to announce that it would pay almost $500 million to settle claims against it for illegal lending practices, when investors began to appreciate the true magnitude of defendants' fraudulent scheme and wrongful course of conduct.

88.     The Company also went on a media offensive, publishing several very expensive, full-page ads in *The Wall Street Journal*, with headlines that read, "For 124 years, we've set the standard for responsible lending. And now we're doing it again." The text of the ad outlined the set

- 30 -

A34

of initiatives the Company had already taken to improve its lending procedures, and the bottom of the ad carried the legend, "Advocates for Responsible Lending."

89.     On 7/16/02, the WA Department announced that it had caused Household to return over $400,000 to over 1,000 Washington borrowers who were overcharged by the Company in connection with their real estate loans. The WA Department stated that the refunds resulted-from overcharges in real estate loans. Yet, on 7/17/02, Household attempted to deflect attention from the massive scheme used to drive its "record" results, stating that the overcharges were the result of simple computer system errors.

90.     Again attempting to make the rampant lending abuses taking place at Household appear to be isolated incidences of bad acts by rogue brokers, Company spokesperson Hayden, on 7/26/02, told the *Bellingham Herald* that Household employees "may" have misrepresented mortgage terms to "some" Whatcom County homeowners who refinanced their home loans at the Bellingham office of HFC. Hayden further stated that the manager of that office was replaced. The manager, Melissa Drury ("Drury"), however, claimed that she was being made a scapegoat for the Company and stated that she was a highly rated employee who had strong audits and conducted her job in accordance with her training and in accordance with Company guidelines and manager mandates. Drury was quoted as stating, "I've always had excellent audits. I've been probably one of the best employees that they've had over the last 13 years. I've always done what I've been taught." Drury further stated that *the sales pitches she used on potential borrowers were both approved and provided by Household*.

91.     Even the Company's new position, that acts of predatory lending were isolated and sporadic, was belied by the fact that borrowers in states across the country were duped by the same predatory lending tactics.

92.     The WA Department rejected the Company's position that Household's predatory lending practices were isolated or nonrecurring, stating:

> *Consumers repeatedly complained that they had relied on certain representations or promises by HFC representatives that proved to be misrepresentations, deceptions or false promises.* These misrepresentation claims ranged widely, including dishonest statements about rates and fees, prepayment penalties, monthly payment amount, insurance or other loan terms.

- 31 -

*    *    *

*It is inconceivable that borrowers from remotely different locations could all be confused about exactly the same thing in the same way, or that HFC could somehow believe that the occurrence was isolated to a single branch location. The Department believes that the "equivalent rate" sham proffered by HFC representatives is known and likely fostered by the corporation itself or at the least, by corporate officers overseeing large segments of the country.* This belief appears to be supported by HFC headquarters' knowledge of the disclosures and sales practices when responding to complaints.

*    *    *

The sameness of complaint allegations coupled with the wide diversity of complaint locales has made it *evident to the Department that misrepresentations, as well as the other five areas discussed [herein] are not relegated to specific transactions or loan officers, but rather to the HFC organization as a whole, including its affiliate Beneficial,* which has had a similar number and type of complaints filed against it.

Ex. 2 at 39, 53.

93.    In addition, as reported in the 9/02 *Forbes* Article, customers and some ex-employees tell of the same interest rate trick in a dozen states. *"'Household encourages, or at least tolerates, these abuses,'* says Minnesota Commerce Commissioner James Bernstein. *'It's not just an occasional rogue loan officer or a rogue office. It has to do with the corporate culture.'"* In fact, following Household's acquisition, Beneficial implemented the Household model to have Household District Managers almost immediately begin to pressure branch managers to engage in dishonest lending practices. Refusals by branch managers to engage in these practices and predatory techniques resulted in daily phone calls from District Managers, who would vigorously reprimand them for failing to do so in order to meet the Company's unrealistic sales goals and bring in as much money as other branch offices.

94.    Throughout the Class Period, Household's senior management, including the Officer Defendants, was aware of and, in fact, encouraged Household's predatory lending practices. In 1999, HFC Southwest Division Manager Hueman created an EZ Pay Plan presentation that he required all branches in his division to follow. This sales pitch included telling customers that, if they signed up for the EZ Pay Plan, they would receive an interest rate reduction on their loans. In addition, Hueman distributed worksheets and other paperwork related to the EZ Pay Plan to all Household

offices. By early 2000, the EZ Pay Plan accounted for one-third of Household's new loan originations.

95.    Upon rolling out his EZ Pay Plan presentation, Hueman visited branch offices in his division. When asked whether his sales presentation had been approved by Household's corporate management, *Hueman confirmed misleadingly that he had made the presentation to defendant Aldinger and Household's legal department and that it had, in fact, been approved for use in Household's branch offices.*

96.    In 1/99, following Household's acquisition of Beneficial, a group of district managers, branch managers and account executives were instructed to put together an updated "sales training module" from different offices throughout the country. The training manual update project was overseen by defendant Gilmer, then President of Household's consumer lending unit. The updated manual contained various sales techniques and included an EZ Pay Plan sales pitch stressing to borrowers that signing up for the program would effectively reduce a borrower's interest rate on the loan. Upon its completion in 7/99, the manual was distributed to all account executives and branch managers in all offices nationwide. Thereafter, Account Executives were trained in their branch offices using the manual.

**The Predatory Lending Settlement**

97.    On 10/11/02, Household issued a release announcing that, in addition to its most recent charge of $600 million (pre-tax) to cover the cost of its restatement, the Company would now be forced to pay $484 million (pre-tax) in restitution to customers nationwide (plus the cost of reimbursing the states for their investigation) to settle claims by a multistate group of attorney generals and banking regulators related to its predatory lending practices from 1/01/99 to 9/30/02. *This was the largest settlement ever in a state or federal consumer case.* In the release announcing the settlement, Aldinger admitted that Household had engaged in predatory lending, apologizing to customers for not always living up to their expectations.

98.    On 10/12/02, the *Star Tribune* (Minneapolis-St. Paul) published an article about Household's payment of $484 million to settle claims against the Company for its illegal practices. Minnesota Commerce Commissioner James Bernstein ("Bernstein") (whose department had

- 33 -

A37

investigated Household's predatory lending tactics for more than a year) was quoted as stating,
*"Household claims that it's only a few bad apples, but we've ... found that the whole orchard is
rotten .... Household's corporate culture encouraged rather than prohibited these deceptive and
abusive lending practices ....* Houschold took advantage of Minnesota consumers who were facing
difficult situations and, as a result, many were trapped in costly loans. *When we talked with
regulators in other states, the story was the same.'"* Bernstein confirmed that, contrary to
Household's representations in early 2002, the changes in Household's lending practices announced
in 2/02 were made '"because of regulatory pressure from Minnesota and other states."'

99.      Household's settlement with state attorney generals and banking regulators was
finalized on 12/19/02 and addressed its predatory lending activity in all 50 states and the District of
Columbia. Household confirmed that it would no longer engage in the improprieties alleged herein,
but rather would (a) ensure that its loans actually provide a benefit to customers before making them;
(b) limit prepayment penalties on current and future loans only to the first two years of a loan;
(c) limit points and origination fees to 5%; (d) reform and improve disclosure to customers; and
(e) eliminate "piggyback" second mortgages.

100.      In response to the announcements of Household's massive charges and its apparent
agreement to refrain from the illegal activities, which had driven Household's strong EPS growth
during the Class Period, Fitch placed the Company on Rating Watch Negative and issued a release
stating:

> The action takes into account today's announcement that Household is planning on
> taking two separate charges during the second half of 2002. The first charge, which
> could amount up to a sizeable $484 million pre-tax, is related to a proposed
> settlement between Household and state attorneys general and state banking
> regulatory agencies. This represents a nationwide resolution of issues related to
> Household's real estate lending practices and the Household Financial Corp. and
> Beneficial Finance Corp.'s branch businesses....
>
> Following the expected settlement with the multi-state group, management is hopeful
> that any uncertainty with respect to legal proceedings related to consumer protection
> laws will be removed from Household, which could stabilize capital market concerns
> going forward....  In Fitch's view, *the bigger challenge for Household will be
> replenishing lost revenue resulting from the implementation of "Best Practices."
> An ability to offset these revenues streams could pressure future profitability,
> which in turn could put pressure on the current rating.*

- 34 -

A38

101.    On 10/10/02, on rumors of a potential settlement relating to its predatory lending, shares of Household immediately declined another $3.50 per share, or 11%, to close trading at $27.75 per share on 10/10/02. Standard & Poor's credit rating service also lowered ratings on Household's long- and short-term debt to single-A-minus/A-2 from A/A1 after the announcement of the proposed settlement.

**Defendants' Illegal Predatory Lending Violated
Generally Accepted Accounting Principles**

102.    Throughout the Class Period, defendants engaged in improper and illegal "predatory lending" practices, as detailed in ¶¶51-101, that ultimately resulted in a $525 million charge to pre-tax income during 3Q02. By engaging in such practices, defendants violated Generally Accepted Accounting Principles ("GAAP") in that they failed to disclose the effect and potential effect of the illegal acts on Household's financial statements throughout the Class Period.

103.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. 17 C.F.R. §210.4-01(a)(1). Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-1(a).

104.    GAAP, as set forth in Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies, requires that a company establish a loss contingency, *i.e.*, reserve, when the estimated loss is probable and reasonably estimated. SFAS No. 5, ¶8. SFAS No. 5 further states:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

- 35 -

SFAS No. 5, ¶10.

105.    Defendants violated GAAP and SEC rules by failing to disclose the potential loss contingencies resulting from its illegal predatory lending practices that ultimately resulted in a $525 million pre-tax charge during 3Q02.

106.    Further, Household had an obligation to disclose to investors the impact its predatory lending practices had on its overall financial results. Regulation S-K states that management's discussion and analysis section shall:

(a)    Describe any unusual or infrequent events or transaction or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was affected. In addition, *describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.*

(b)    *Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income form continuing operations.* If the registrant knows of events that will cause material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §229.303(a)(3).

## B.    DEFENDANTS MANIPULATED HOUSEHOLD'S CREDIT QUALITY NUMBERS BY IMPROPERLY "REAGING" OR "RESTRUCTURING" DELINQUENT ACCOUNTS

107.    Household admits in its SEC filings that its customer base is primarily composed of nonconforming, nonprime or subprime consumers with limited credit histories, modest incomes or high debt-to-income ratios or who have experienced credit problems due to occasional delinquencies, prior charge-offs or other credit-related actions. To compensate for this additional risk, Household customers are charged a higher interest rate on loans.

108.    Household securitizes a significant portion of its receivables, *i.e.*, sells them for cash, but continues to service them, as part of their asset securitization program, for a fee with limited

recourse for future credit losses.[3]  Household's securitization of consumer receivables was, throughout the Class Period, a core source of funding for the Company.  Household reported NIM, fee and other income, and provision for credit losses for securitized receivables as a net amount in securitization income.  The Company also recorded a provision for estimated probable losses that it expected to incur over the life of the securitization.  Throughout the Class Period, securitization income as a percent of total revenue (other revenue and NIM after provision for credit losses) averaged about 28%.

109.    Since Household both generates loans from high-risk borrowers and then sells these loans as asset-backed securities, it is critical to Household's profitability that it generate loan pools that are both stable and consistent.  In order to achieve this goal and prevent defaults, defendants engaged in a consistent pattern of improperly reaging delinquent loans, throughout the Class Period, to make them current.

110.    "Reaging" resets as current loans that otherwise are in default.  Household would reset the contractual delinquency status of an account to current if a predetermined number of consecutive payments were received and there was evidence that the delinquency was cured.  In effect, the Company "reaged" the loan by adding the delinquencies to the end of the loan.  At Household, however, the Officer Defendants established procedures whereby accounts were reaged arbitrarily and without any evidence that the delinquency had been cured.

111.    Household had a centralized and highly automated system to support its underwriting, loan administration and collection functions across all consumer business segments.  This system was known as "Vision."  The Vision system centralized decision making throughout the loan

---

[3]    Household describes its securitization program as follows:

In the securitizations and secured financing transactions, Household sells a dedicated pool of receivables to a wholly-owned bankruptcy remote special purpose entity for cash, which, in turn, assigns the receivables to an unaffiliated trust that is a qualifying special purpose entity under Statement of Financial Accounting Standards No. 125 and/or 140, as applicable. Household continues to service the receivables and receives a servicing fee.

In connection with each transaction, we obtain opinions from nationally known law firms that the transfer of the receivables to the special purpose entity qualifies as a "true sale" for legal purposes and that the entity would not be "substantially consolidated" into any bankruptcy estate of the transferor.

origination process, including generating scripts for the sales staff, monitoring delinquencies and

collections and determining charge-offs. Defendants claimed that, by virtue of this system, they were

able to detect delinquent accounts at an early stage and immediately initiate collection efforts. The

Vision system was so critical to the Company's purported success that, in 2/00, Household was

awarded *CIO* magazine's prestigious "Enterprise Value Award." According to *CIO*, Household was

given the award for its use of the "Vision" system in 1999. In accepting the award, defendant Gilmer

stated:

> "Vision" has had an overwhelmingly positive effect on virtually every aspect of our
> consumer finance business. We have enjoyed faster and more profitable growth
> because our account executives are provided with greater numbers of qualified leads,
> prioritized by the Vision system. *Our credit losses are minimized because of the
> real-time links to our underwriting system* ....

Receiving real-time information about loan delinquencies, credit quality and cross-selling

opportunities enabled the Officer Defendants to see the problems in its loan departments and

collections. This allowed defendants to effectively and efficiently perpetrate the scheme alleged

herein that was allowing the Company to achieve its record-breaking results.

112. Indeed, the Vision system was designed to automatically "reage" delinquent accounts

if it received even a partial payment without any evidence that the delinquency was cured.

113. Defendants relied on the Vision system to track the success of Household's fraudulent

scheme, stating:

> We service each customer with a focus to understand that customer's personal
> financial needs.... [O]ur policies are designed to be *flexible to maximize the
> collectibility of our loans* while not incurring excessive collection expenses on loans
> that have a high probability of being ultimately uncollectible. Cross-selling of
> products, proactive credit management, "hands-on" customer care and targeted
> product marketing are means we use to retain customers and grow our business.

114. Even prior to the nationwide implementation of the Vision system, Household's loan

collection policies were very flexible. This "flexibility" was critical to the Company for two reasons.

First, since many of Household's customers were high risk borrowers, they required a closer

relationship with their lenders and often required more specialized methods to keep their loans

current and out of default. Second, as a result of requiring more flexibility in collections, investors

placed much greater reliance on Household's internal systems to identify which loans were truly

delinquent, and which could be salvaged with Household's specialized intervention, also known as "reaging." Again, while this flexibility increased investor reliance on the Company's internal monitoring and collections procedures, investors were consistently reassured that, because Household had over 130 years of experience in the subprime market, it had developed a unique strategy to avoid charge-offs and increase loan collectibility.

115.    Household's policies for loan delinquencies and charge-offs were reported in the Company's FY01 Report on Form 10-K, as follows:

> *Our credit and portfolio management procedures focus on risk-based pricing and effective collection efforts for each loan.* We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers, as well as policies designed to manage customer relationships, *such as reaging delinquent accounts to current in specific situations,* are helpful in maximizing customer collections.

* * *

> We believe our policies are responsive to the specific needs of the customer segment we serve.... *Our policies have been consistently applied and there have been no significant changes to any of our policies during any of the periods reported. Our loss reserve estimates consider our charge-off policies to ensure appropriate reserves exist for products with longer charge-off lives. We believe our charge-off policies are appropriate and result in proper loss recognition.*

116.    At Household, loan officers followed up on delinquent loans when a payment was 30 days past due. The loan officer was supposed to call the customer to get a "promise" of payment from the customer and use the call as an opportunity to up-sell or cross-sell products by convincing customers to take out additional loans or lines of credit, or consolidate their bills and convert their unsecured loans into loans secured with their homes or cars. Often customers did not even realize that their new consolidated loans were being secured by their homes or cars. Defendants established reserves designed to ensure that delinquent accounts were restructured rather than foreclosed.

117.    In furtherance of its scheme, the Officer Defendants caused Household to violate its own policies and reage accounts *at any level of delinquency*, including accounts that were over 270 days past due, with merely a single payment. The missed payments would then be added to the end of the loan. The single payment was the lesser of either one minimum monthly payment or 2.5% of the account balance. If it was the latter, that amount would become the new minimum payment.

118.    Accounts were often reaged multiple times in a single year. Indeed, a customer who made only three or four minimum payments a year could still appear current.

119.    Household used an incentive program to induce collections representatives to push reaging or restructuring of delinquent accounts. By virtue of this incentive program, collections representatives could receive monthly cash rewards or electronic items for reaging a sufficient number of accounts, regardless of whether such reaging was actually justified or enhanced the prospect for repayment.

120.    Although defendants characterized loan reaging or restructuring as a service to help out customers, it was clear that the main purpose behind the reaging was to make it appear that the statistics on Household's borrowers and its outstanding loans was stronger than it actually was. In fact, by 8/01, the Officer Defendants were so desperate that they had collections managers require representatives to pressure all customers to restructure their accounts. Even though collections representatives expressed discomfort with pushing restructuring to customers, they were forced to do so under the constant threat of being fired for not following instructions. Collection calls were randomly monitored by collections managers, and if a collections representative did not try to persuade all of his customers to restructure their accounts, a collections manager would reprimand him and tell him that corrective action would be taken unless the representative restructured more accounts. Monthly meetings were held with department managers to monitor collections goals.

121.    To cover their tracks, Household programmed its Vision system so that it did not generate any paperwork when delinquent accounts were reaged. In addition, because Vision automatically reaged accounts upon receiving even a partial payment, the customer was often unaware that missed payments were capitalized at the back of the loan.

122.    Household's charge-off policy and its policies on accruing interest varied by product, as follows:

| Product | Charge-off Policy | Nonaccrual Policy |
|---|---|---|
| Real estate | Carrying values in excess of net realizable value are charged off at the time of foreclosure or when settlement is reached with the borrower. | Interest income accruals are suspended when secured principal or interest payments are more than three months contractually past due and resumed when the receivable becomes less than three months contractually past due. |

- 40 -

| Product | Charge-off Policy | Nonaccrual Policy |
|---|---|---|
| Auto finance | Carrying values in excess of net realizable value are charged off at the earlier of the following:<br>•The collateral has been repossessed and sold;<br>•The collateral has been in our possession for more than 90 days; or<br>•The loan becomes 150 days contractually delinquent. | Interest income accruals are suspended when principal or interest payments are more than two months contractually past due and resumed when the receivable becomes less than two months contractually past due. |
| MasterCard and Visa | Charged off at six months contractually delinquent. | Interest accrues until charge-off. |
| Private label | Charged off at six months contractually delinquent. | Interest accrues until charge-off. |
| Personal non-credit card | Charged off at nine months contractually delinquent and no payment received in six months, but in no event to exceed twelve months. | Interest income accruals are suspended when principal or interest payments are more than three months contractually delinquent. For Personal Home Owners' Loans ("PHLs"), interest income accruals resume if the receivable becomes less than three months contractually past due. For all other personal non-credit card receivables, interest income is recorded as collected. |

123.    Beginning in 2002, Household consistently defended its collection and reaging policies as being necessary to its unique business. What investors did not know until the end of the Class Period, however, was that defendants had used reaging as a means to simply avoid reporting otherwise delinquent accounts. While Household sporadically disclosed its reaging policies, it was not until the Company filed a Form 8-K during 2Q02, on 4/9/02, that Household first broke out its reaging statistics, which revealed a huge number of accounts that had been reaged multiple times. In fact, at the time Household ultimately released its reaging statistics, 20% of its real estate secured loans and almost 17% of its domestic portfolio had been previously reaged. In addition, at this time, investors also learned for the first time that over 27% of the Company's "non-credit card" debt had been reaged during the Class Period.

124.    In addition to lowering defaults, the widespread abuse of the Company's reaging policies also had the effect of rendering the Company's financial statements materially false and misleading.

- 41 -

A45

**Household's "Reaging" Policies Violated GAAP**

125.    Throughout the Class Period, defendants engaged in the practice of "reaging" Household's delinquent accounts. *See* ¶¶107-124, *supra*. By reaging such accounts, defendants were able to report lower credit loss reserves, thus overstating net income reported in Household's SEC filings.

126.    Household's "reaging" practice is a "modification" of the contractual method of aging loans and more resembles the "recency-of-payments" method of aging.[4] According to the American Institute of Certified Public Accountant's ("AICPA") Audit and Accounting Guide – Audits of Finance Companies – the recency-of-payments method is considered a less conservative method of aging accounts. The AICPA also describes how some finance companies weaken the basis of the contractual method by modifying their calculations to consider accounts contractually current when two timely payments have been made on an account previously considered delinquent. The AICPA warns that, *while recent payments may alter the classification of a particular account, it doesn't necessarily indicate that the account is ultimately collectible.* The AICPA also cautions that *renewals without evidence of increased ability or willingness to repay may diminish the reliability of aging schedules. See* ¶¶2.114-2.118 of AICPA Audit and Accounting Guide Audits of Finance Companies With Conforming Changes as of 5/01/00.

127.    While Household engaged in "reaging" practices from the commencement of the Class Period, it was not until an analyst presentation on 4/9/02 that defendants finally revealed the impact of such practices. Incredibly, 17% of Household's total domestic portfolio had been reaged as of 12/31/01 and 6/30/02. Further, over 27% of Household's domestic "personal non-credit card" loans had been reaged as of 12/31/01 and 6/30/02.

128.    Further, by engaging in "reaging" practices that violated its own internal policies, as well as those policies disclosed to the public, the Officer Defendants caused Household to report lower credit loss reserves than required under GAAP and SEC reporting, thus overstating net income

[4]    The contractual method of aging is based on the status of payments under the original terms of the contracts, while the "recency-of-payments" method ages a loan based on the month in which the most recent collections were received, regardless of contractual payment terms for amounts of payments or loan periods.

- 42 -

A46

throughout the Class Period. Household's delinquency rate was significantly lower than those of its peers – about half the rate of other subprime mortgage lenders, like Providian Financial Corp. and AmeriCredit Corp.

129.    GAAP, as set forth in SFAS No. 5, Accounting for Contingencies, requires that a company establish a loss contingency, *i.e.*, reserve, when the estimated loss is probable and reasonably estimated. SFAS No. 5, ¶8.

130.    Additionally, Household's failure to disclose its "reaging" practices and statistics prior to 2Q02, when the Company was engaging in those practices during the entire Class Period, violates the most basic of GAAP principles and SEC rules. *Household had an obligation to disclose to investors the impact its "reaging" practices had on its overall financial results.*

131.    SFAS No. 5 further sets forth the following:

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

SFAS No. 5, ¶10.

132.    GAAP, as described in FASB Statement of Concepts ("FASCON") No. 1, ¶¶34, 42, states that:

> 34.    Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. The information should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence.

*    *    *

> 42.    Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

FASCON 1, ¶¶34, 42.

- 43 -

A47

133.    For this reason, financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. FASCON 1, ¶7.

## C. DEFENDANTS ENGAGED IN IMPROPER ACCOUNTING OF COSTS ASSOCIATED WITH VARIOUS CREDIT CARD CO-BRANDING, AFFINITY AND MARKETING AGREEMENTS, RESULTING IN AN ALMOST $600 MILLION (PRE-TAX) RESTATEMENT OF EARNINGS

134.    On 8/14/02, CEO Aldinger and COO Schoenholz (as the Company's principal financial officer) were required to file sworn statements, pursuant to §21(a)(1) of the Exchange Act, attesting to the accuracy of the Company's most recent annual and quarterly financial reports pursuant to the SEC Order dated 6/27/02. At this time, Household announced that, pursuant to a thorough review of its financial statements by its new independent auditors, KPMG, the Company had determined to adopt certain revisions to the accounting treatment of its MasterCard/Visa co-branding and affinity credit card relationships and a credit card marketing agreement with a third party.

135.    In its audit, KPMG concluded that the amortization rates approved by Andersen, which Household had used for co-branding and affinity credit card agreements and marketing agreements, were improper. Therefore, Household corrected its amortization schedules for prepaid expenses related to these agreements. Additionally, for marketing agreements, Household was to recognize expenses immediately, as opposed to over the life of the contract. As a result, Household would be restating its previously reported financial results as far back as 1994 and continuing until 2Q02 in the amount of about $600 million (pre-tax), or a decrease of $386 million in earnings.

136.    At the time this restatement was announced, Household stated that its impact on earnings by period was as follows:

| $ Millions | FY94-98 | FY99 | FY00 | FY01 | 1Q02 | 2Q02 | 1H02 | Total |
|---|---|---|---|---|---|---|---|---|
| Restatement Amount (After Tax) | $155.8M | $58.1M | $70.1M | $75.9M | $6.1M | $20.0M | $26.1M | $386.0M |

137.  Defendants caused the Company to falsely report its financial results by improperly accounting for its: (a) co-branding agreements;[5] (b) exclusive affinity agreements;[6] and (c) third-party credit card marketing agreements.  As a result of the improper accounting for the above, defendants caused Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income throughout the Class Period.

138.  Some of the improprieties are summarized as follows:

(a)     Co-Branding Agreements.  During 1992, Household entered into a co-branded credit card agreement with General Motors, referred to as the GM Card, which called for Household to pay an up-front fee (origination cost) to its partner for each new credit card account.  The contract was modified during 1994.  The existing GAAP at the time the contract was entered into and subsequently modified, required the origination costs to be netted with the credit card fee charged to the cardholder, if any, and amortized over the privilege period of the card.  The privilege period is the period of time that the cardholder is entitled to use the card.  GAAP further requires that if no significant fee is charged to the cardholder, the origination costs should be amortized over one year.  Household, in violation of GAAP, inappropriately amortized the origination costs over the term of the agreement, thus spreading the cost of the origination fees paid to its partner over a longer period of time than the one year allowed under GAAP.  This inappropriate accounting resulted in the overstatement of net income throughout the Class Period.

(b)     Affinity Agreement.  During 1996, Household acquired the AFL-CIO's $3.4 billion "Union Privilege" affinity card portfolio.  The Union Privilege was created by the AFL-CIO to market benefits to union members, and Household paid a premium for the Union Privilege portfolio.  In accordance with GAAP, Household began amortizing the premium over the contract life.  This same amortization period was used for Household's regulatory reporting.  In 1999,

---

[5]     Household defines a co-branded credit card in its FY01 Report on Form 10-K as "[a] MasterCard or Visa account that is jointly sponsored by the issuer of the card and another corporation (e.g., the GM Card®).  The account holder typically receives some form of added benefit for using the card."

[6]     Household defines an affinity credit card in its FY01 Report on Form 10-K as "[a] MasterCard or Visa account jointly sponsored by the issuer of the card and an organization whose members share a common interest (e.g., the AFL-CIO Union Plus (up) Credit Card Program.)."

- 45 -

A49

however, Household, in violation of GAAP, arbitrarily increased the amortization period for the premium, thus spreading the cost of the premium over a longer period of time, resulting in the overstatement of net income throughout 1999, 2000, 2001 and the first half of 2002.[7]

       (c)     Independent Third-Party Marketing Agreement. In 6/99, Household entered into a credit card marketing agreement with an independent marketing company. As part of the agreement, Household was reimbursed for marketing expenses, such as mass collective mailings, in return for a share of revenue from those mailings. Since the revenue-sharing payments were, in effect, Household's advertising and marketing expenses, GAAP requires such expenses to be recorded as incurred, and therefore the revenue-sharing payments should have been expensed as each mailing was dropped. Household, however, accounted for the revenue-sharing payments over a three-year period, thus overstating net income throughout 1999, 2000, 2001 and the first half of 2002.

     139.    As a result of the above improprieties, Household's restatement covered the period from 1994 through 2Q02. The amounts by which Household misstated and ultimately restated its EPS during the Class Period are shown below:

### Diluted EPS

|  | As Originally Reported | Restated | Difference |
|---|---|---|---|
| FY97 | $1.93 | $1.86 | <$0.07> |
| FY98[8] | $1.03 | $0.94 | <$0.09> |
| FY99 | $3.07 | $2.95 | <$0.12> |
| 1Q00 | $0.78 | $0.74 | <$0.04> |
| 2Q00 | $0.80 | $0.77 | <$0.03> |
| 3Q00 | $0.94 | $0.91 | <$0.03> |
| 4Q00 | $1.03 | $0.99 | <$0.04> |
| 1Q01 | $0.91 | $0.85 | <$0.06> |
| 2Q01 | $0.93 | $0.90 | <$0.03> |
| 3Q01 | $1.07 | $1.03 | <$0.04> |
| 4Q01 | $1.17 | $1.13 | <$0.04> |
| 1Q02 | $1.09 | $1.04 | <$0.05> |
| 2Q02 | $1.08 | $1.07 | <$0.01> |

---

[7]    The amortization period for the premium remained the same for Household's regulatory reporting.

[8]    1998 reported and restated diluted EPS includes a $751 million after-tax charge related to the merger and integration of Beneficial and a $118.5 million after-tax gain related to the sale of Beneficial's Canadian operations. The net impact of these items was to reduce diluted EPS by $1.27.

140.     The effect of these belated disclosures was significant.  The Company's release regarding the restatement was issued before the markets opened for trading, and when shares of Household opened, they immediately plunged to as low as $32.09 per share – a decline of over $4.71 per share relative to the prior day's close of $37.80 per share.  During the trading day on 8/14/02, institutional investors reacted to efforts by defendants to bolster the price of Household stock, which caused the stock to stabilize before closing slightly higher on that day.  Once such institutional buying tapered off and the Company made further disclosures regarding the effect of the restatement on Household's business and operations, shares of the Company declined once again.  *The significance of the restatement is further confirmed by the fact that Household would have missed analysts' EPS estimates for every one of the eight quarters of 2000 and 2001 and the first half of 2002 absent the accounting improprieties detailed herein.*

141.     Following the filing on 8/27/02 of the Company's amended FY01 Report on Form 10-K incorporating the restatement, shares of Household continued to trade lower, reaching below $33.00 on 9/4/02.  By 10/10/02, Household shares reached a seven-year low of $20.65.  By 10/24/02, when the Company filed its 3Q02 Report on Form 10-Q, which broke out its massive reaged statistics for the first time, shares of Household traded as low as $21.40 per share.

**Household's Restatement Is an Admission that the Company's Financial Statements Violated GAAP**

142.     *The fact that Household restated its financial statements is an admission that the financial statements originally issued were false and that the misstatements were material.*  Pursuant to GAAP, as set forth in Accounting Principles Board ("APB") No. 20, the type of restatement announced by Household was to correct for material errors in its previously issued financial statements.  APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change, as it dilutes confidence by investors in the financial statements, makes it difficult to compare financial statements and is often difficult, if not impossible, to generate the numbers when restatement occurs.  *Id.*, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, when there is a change in accounting principles used or to correct an error in

- 47 -

previously issued financial statements. Household's restatement was not due to a change in reporting

entity or a change in accounting principle but rather was due to errors in previously issued financial

statements.

143.    The fact that Household corrected its financial statements through a restatement

indicates that the errors were not merely a change in estimate based on events occurring after the

financial statements were issued. Otherwise, the restatement would violate APB No. 20, ¶31, which

states, *"[a] change in an estimate should not be accounted for by restating amounts reported in*

*financial statements of prior periods ...."*  *Id.*, ¶31.  Thus, the restatement is an admission by

Household that the financial results reported during the Class Period were incorrect based on

information available to defendants at the time the results were originally reported.  It is also an

admission that the Company's previously issued financial results and its public statements regarding

those results were materially false and misleading.

144.    The SEC recently reiterated its position regarding restatements:

> [R]estatements should not be used to make any adjustments to take into account
> subsequent information that did not and could not have existed at the time the
> original financial statements were prepared.  That is, GAAP does not allow a change
> in an accounting estimate resulting from new information or subsequent
> developments to be accounted for as a restatement of previous financial statements.
> *See* APB Opinion 20, ¶31.  The APB has defined the kind of "errors" that may be
> corrected through a restatement: "Errors in financial statements result from
> mathematical mistakes, mistakes in the application of accounting principles, or
> oversight or misuse of facts that existed at the time that the financial statements were
> prepared." *See id.* at ¶¶13, 36-37.  In accordance with APB 20, the Commission does
> not condone the use of restatements by public companies or auditors to make any
> adjustments (particularly to judgmental reserves) to take into account subsequent
> information that did not and could not have existed at the time the original financial
> statements were prepared.

145.    In addition, the SEC noted:

> [T]he Commission often seeks to enter into evidence restated financial statements,
> and the documentation behind those restatements, in securities fraud enforcement
> actions in order, *inter alia*, to prove the falsity and materiality of the original financial
> statements [and] to demonstrate that persons responsible for the original
> misstatements acted with scienter ....

146.    On 8/14/02, Household hosted a conference call to discuss the restatement. Based

on defendant Schoenholz's comments, it is clear that the restatement was necessitated by the

misapplication of GAAP and the misuse and oversight of facts that existed at the time. Specifically, on this call, Schoenholz stated:

> In connection with the engagement of KPMG as our new auditors we've under gone a thorough review of our banking statements and related accounting policies. Part of this review we've adapted certain revisions to the accounting treatment of our MasterCard/Visa affinity and co-branded credit card relationship agreements as well as a related marketing agreement with a third party credit card marketing company.

147.   The "revisions to the accounting treatment" to which defendant Schoenholz referred were due to misapplications of GAAP and misuse of facts available at the time.[9] The primary Financial Accounting Standards Board ("FASB") SFAS for Household's accounting of its co-branded agreements, affinity agreement and marketing agreement is SFAS No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases. SFAS No. 91 was issued with an effective date of fiscal years beginning after 12/15/87 — well before Household entered into the agreements described above.

148.   Further, in reference to the co-branded agreement, on 5/20/93 the Emerging Issues Task Force released Issue No. 93-1, Accounting for Individual Credit Card Acquisitions ("EITF 93-1"). EITF 93-1 was issued to provide guidance on how to account for credit cards that are acquired individually ("one at a time") by paying an amount to a third party for each approved credit card agreement. EITF 93-1 specifically identifies co-branders as such third parties. EITF 93-1 makes it clear that Household should have been amortizing the amounts paid to its co-brander over the privilege period or, if no fee is charged to the cardholder, no more than one year. EITF 93-1 states, in relevant part:

> The Task Force reached a consensus that credit card accounts acquired individually should be accounted for as originations under Statement 91 and Issue 92-5. Amounts paid to a third party to acquire individual credit card accounts should be deferred and netted against the related credit card fee, if any, and *the net amount should be amortized on a straight-line basis over the privilege period. If a significant fee is charged to the cardholder, the privilege period is the period that the fee entitles the cardholder to use the credit card. If there is no significant fee, the privilege period should be one year.*

---

[9]     The "revisions to the accounting treatment" were not due to a change in accounting principles because APB No. 20 only allows restatement for a change in accounting principle for a few specific circumstances, none of which apply to Household. The special circumstances relate to inventory, initial public distribution and reporting a change in entity. APB No. 20, ¶¶19, 27-30, 34-35.

- 49 -

EITF 93-1.

149.    During the 8/14/02 conference call, defendant Schoenholz admitted that Household was amortizing payments made to its co-brander over the term of the contract, rather than over one year, and therefore would be restating its previously reported financial statements to reflect the one-year amortization period.

150.    Household also violated GAAP and SEC rules in accounting for the premium paid for its affinity portfolio when, in 1999, it arbitrarily increased the amortization period for premium paid by 50%, from 10 years to as much as 15 years.  Defendants had no basis for increasing the amortization period other than to report more favorable net income associated with the affinity portfolio by "spreading" the impact of the premium paid over a longer period of time than allowed for under GAAP.  In fact, defendants knew a change to Household's regulatory reporting would be scrutinized and such an arbitrary change would not be allowed, therefore, Household did not change the amortization period for regulatory reporting purposes.

151.    Ultimately, KPMG required Household to change the extended amortization period back to the original ten-year period and restate its previously issued financial statements.  As discussed in ¶¶142-150, had this change simply been a change in estimate, restatement would not have been allowed.

152.    During 6/99, Household entered into a credit card marketing agreement with a third party provider of credit card marketing services.  This agreement allowed Household to be reimbursed for marketing (advertising) expenses and mass collective mailings in return for a share of revenue from those mailings over a three-year period.  These "revenue-sharing" payments were for the marketing, advertising and solicitation of the cards – they were not incremental *direct* costs of origination.[10]  Household improperly accounted for these indirect marketing expenses (revenue-sharing payments) by amortizing them over a three-year period, when, in fact, such payments should have been expensed as incurred.

---

[10]    SFAS No. 91 defines incremental direct costs as "costs to originate a loan that (a) result directly from and are essential to the lending transaction and (b) would not have been incurred by the lender had that lending transaction not occurred."  SFAS No. 91, Appendix C, ¶80.

153.    SFAS No. 91 requires that such marketing costs be expensed for as incurred. SFAS

91 specifically states:

> All other lending-related costs, including costs related to activities performed
> by the lender for advertising, soliciting potential borrowers, servicing existing loans
> ... *shall be charged to expense as incurred*.

SFAS No. 91, ¶7.

## VI. OTHER GAAP VIOLATIONS

154.    Due to these accounting improprieties, the Company presented its financial statements

in a manner that violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same

accounting principles and practices used to prepare annual financial statements was violated (APB

No. 28, ¶10);

(b)    The principle that financial reporting should provide information about the

economic resources of an enterprise, the claims to those resources, and effects of transactions, events

and circumstances that change resources and claims to those resources was violated (FASCON 1,

¶40);

(c)    The principle that financial reporting should provide information about how

management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

for the use of enterprise resources entrusted to it was violated. To the extent that management offers

securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general (FASCON 1, ¶50);

(d)    The principle that financial reporting should be reliable in that it represents

what it purports to represent was violated. That information should be reliable as well as relevant

is a notion that is central to accounting (FASCON 2, ¶¶58-59);

(e)    The principle of completeness, which means that nothing is left out of the

information that may be necessary to ensure that it validly represents underlying events and

conditions, was violated (FASCON 2, ¶79); and

(f)    The principle that conservatism be used as a prudent reaction to uncertainty

to try to ensure that uncertainties and risks inherent in business situations are adequately considered

- 51 -

A55

was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASCON 2, ¶¶95, 97).

155.    Further, the undisclosed adverse information concealed by defendants during the relevant period is the type of information that, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be, and must be, disclosed.

## HOUSEHOLD'S EXECUTIVE COMPENSATION PROGRAM REWARDED THE OFFICER DEFENDANTS FOR THEIR FRAUDULENT ACTIVITY

156.    The Officer Defendants were both highly motivated and had ample opportunity to perpetrate the fraud complained of herein.

(a)      The Officer Defendants had a strong personal financial gain motive in making false and misleading statements relating to Household's financial results. The Officer Defendants also had a strong motive in concealing that Household was improperly reaging delinquent accounts and preventing timely charge-offs, thereby causing the reported credit asset quality of Household's customers to appear more favorable than it was in reality. The Officer Defendants concealed that the Company's strong performance was resulting from its participation in predatory lending practices in violation of federal and state laws. In fact, it was only through defendants' fraudulent conduct and scheme detailed in ¶¶50-155 that Household was able to meet or exceed analysts' expectations with respect to the Company's income and EPS during the Class Period and earn the millions of dollars of compensation and bonus payments. Absent the improprieties alleged herein, Household would have failed to meet analysts' consensus estimates for each quarter of FY00 and FY01 and 1H02.

157.    The Officer Defendants' annual compensation and incentives were tied to the financial, as well as non-financial, performance of the Company throughout the Class Period. Household purported to be a "pay-for-performance" company. Household's corporate goal was to link compensation to financial performance; hence, compensation programs were designed so that base salaries were generally competitive with a comparable group (12 companies, all in the S&P Financials Index), with substantially higher earnings potential on bonus and long-term compensation

if employees delivered superior stockholder earnings results. Performance during the Class Period was measured primarily by EPS growth.

158.    The four components of executive compensation for the Officer Defendants were: (i) Base Salary (determined by individual financial and non-financial performance, position in salary range and general economic conditions); (ii) Annual Cash Bonus (tied directly to overall and/or business unit financial performance, as well as individual performance ... when certain objective or subjective performance goals are not met, annual bonuses may be reduced or not paid); (iii) Long-Term Incentives (compensation based on the increase in stock price); and (iv) Executive Benefits (other perks).

159.    For example, defendant Aldinger's executive compensation outlined in the FY97 Proxy Statement provided:

> Mr. Aldinger's annual cash bonus was determined based on the satisfaction of various individual objective non-financial and financial performance goals. Under the 1994 Key Executive Bonus Plan, the financial performance goals of Household are (a) *targeted earnings per share*, (b) *targeted return on equity*, (c) targeted operating efficiency ratio, (d) *targeted reserve to charge-off ratio*, and (e) targeted equity to managed assets ratio. Mr. Aldinger had additional goals in 1997 to build depth in management, complete an auto lending strategy, and actively represent us with stock analysts, portfolio managers and institutional shareholders. All were met. For 1997, Mr. Aldinger's total annual bonus opportunity was between zero and 225% of his annual salary (with a target bonus of 150%). He was awarded a bonus of $1,500,000 (188% of his base salary) based on his individual objectives and corporate performance as certified by the Committee.

160.    Between FY98 and FY01, defendant Aldinger received bonus payments alone of $14.3 million. These payments were based upon Aldinger's ability each year to cause Household to meet targeted EPS, targeted core receivable growth, targeted operation efficiency ratios, targeted tangible equity to managed assets, targeted increases in the number of Household's products used per customer and targeted revenue growth – the very same metrics that the Officer Defendants manipulated through their fraudulent conduct throughout the Class Period. Thus, each of the metrics used to determine defendant Aldinger's bonuses and other compensation during the Class Period had the effect of encouraging him to engage in the improprieties detailed herein in ¶¶50-155.

### WILLIAM F. ALDINGER

| Year | Salary | Bonus | Other Annual Compensation | Number of Shares Underlying Options | LT Payouts | All Other Compensation |
|------|--------|-------|---------------------------|-------------------------------------|------------|------------------------|
| 1997 | $ 794,233 | $1,500,000 | $186,185 | 450,000 | -0- | $155,156 |
| 1998 | 888,463 | 2,300,000 | 82,188 | 500,000 | -0- | 151,383 |
| 1999 | 1,000,000 | 3,000,000 | 107,639 | 460,000 | -0- | 213,104 |
| 2000 | 1,000,000 | 4,000,000 | 154,242 | 600,000 | -0- | 245,382 |
| 2001 | 1,000,000 | 5,000,000 | 160,763 | 800,000 | -0- | 305,382 |

### DAVID A. SCHOENHOLZ

| Year | Salary | Bonus | Other Annual Compensation | Number of Shares Underlying Options | LT Payouts | All Other Compensation |
|------|--------|-------|---------------------------|-------------------------------------|------------|------------------------|
| 1997 | $370,674 | $ 435,000 | -0- | 120,000 | $172,813 | $ 51,844 |
| 1998 | 425,482 | 750,000 | -0- | 134,000 | 222,305 | 56,918 |
| 1999 | 500,000 | 1,500,000 | -0- | 124,000 | 456,094 | 79,101 |
| 2000 | 500,000 | 2,000,000 | -0- | 150,000 | -0- | 123,433 |
| 2001 | 500,000 | 2,500,000 | -0- | 200,000 | -0- | 155,382 |

### GARY D. GILMER

| Year | Salary | Bonus | Other Annual Compensation | Number of Shares Underlying Options | LT Payouts | All Other Compensation |
|------|--------|-------|---------------------------|-------------------------------------|------------|------------------------|
| 1997 | $296,155 | $ 270,000 | $579,368 | 75,000 | -0- | $ 36,070 |
| 1998 | 404,809 | 850,000 | 288,951 | 134,000 | -0- | 34,954 |
| 1999 | 500,000 | 1,500,000 | 44,303 | 124,000 | -0- | 83,459 |
| 2000 | 500,000 | 2,000,000 | 63,743 | 150,000 | -0- | 122,873 |
| 2001 | 500,000 | 2,500,000 | 25,125 | 200,000 | -0- | 155,382 |

161.     Defendants Schoenholz and Gilmer, as well as other senior executives, were also paid annual bonuses based on performance goals that had the effect of encouraging their participation in the reaging, predatory lending and accounting schemes, as defined herein, including:

162.     Thus, as demonstrated above, a significant portion of each of the Officer Defendants' compensation was directly tied to his ability to cause Household to meet targeted EPS, regardless of the long-term impact on Household or the risk that such practices would result in earnings restatements or regulatory sanctions. Although the Company did not provide details for the entire restated period, the following table compares the impact of the restatement on diluted EPS to the consensus estimate for 1Q00 through 2Q02, illustrating the significance of defendants' accounting manipulations on Household's performance vis-a-vis earnings estimates:

- 54 -

| Quarter | As Reported | Restated | Consensus Estimate | Reported v. Restated |
|---------|-------------|----------|---------------------|----------------------|
| 1Q00 | 0.78 | 0.74 | 0.77 | +0.01 v. - ($0.03) |
| 2Q00 | 0.80 | 0.77 | 0.79 | +0.01 v. - ($0.03) |
| 3Q00 | 0.94 | 0.91 | 0.94 | +0.00 v. - ($0.04) |
| 4Q00 | 1.03 | 0.99 | 1.03 | +0.00 v. - ($0.04) |
| 1Q01 | 0.91 | 0.85 | 0.91 | +0.00 v. - ($0.04) |
| 2Q01 | 0.93 | 0.90 | 0.93 | +0.00 v. - ($0.04) |
| 3Q01 | 1.07 | 1.03 | 1.07 | +0.00 v. - ($0.04) |
| 4Q01 | 1.17 | 1.13 | 1.17 | +0.00 v. - ($0.04) |
| 1Q02 | 1.09 | 1.04 | 1.05 | +0.04 v. - ($0.01) |
| 2Q02 | 1.08 | 1.07 | 1.08 | +0.00 v. - ($0.01) |

163. Without the boost provided by defendants' improper accounting, Household would likely not have had a single quarter of meeting or exceeding analysts' expectations, not to mention posting its purported string of back-to-back "record" results. Moreover, the financial impact of the Company's predatory lending practices and improper reaging on the Company's operations was devastating.

164. Household's predatory lending and reaging practices were directly related to, and greatly impacted, Household's core business operations. Indeed, consumer lending accounted for the overwhelming majority of the Company's revenue during the Class Period. Throughout the Class Period, each of the Officer Defendants was a high-level corporate executive engaged in the management and oversight of the core aspects of Household's businesses.

165. Additionally, the Officer Defendants ran Household and its subsidiaries as "hands-on" managers and closely monitored the Company's business on a regular basis. *See* ¶¶41-43. Each of the Officer Defendants was a core member of the senior management team during the Class Period and was directly involved in the day-to-day operations of the Company. They were privy to proprietary information concerning Household's business, operations, growth, financial statements and financial condition. The Officer Defendants had access to, and control over, the Vision system that was launched in July 1999 and provided them with information relating to all aspects of the Company's performance. *Id.*

166. The Officer Defendants also controlled the contents of public statements issued by or on behalf of Household and made statements and predictions regarding Household's operations

- 55 -

A59

and financial condition. They were the primary spokespeople on behalf of the Company and hosted quarterly and annual conference calls to announce financial results. In addition, defendants hosted periodic one-on-one meetings with analysts, where they provided very positive information about the Company's operations and key financial metrics, while knowing or recklessly disregarding that these analysts would then repeat their statements to the market, directly impacting stock price. *See* ¶¶41-43.

167.    Defendants were able to perpetrate the fraudulent scheme complained of herein in part by using the Company's centralized and highly automated "Vision" information system. Developed over three years at a cost of $83 million, Vision was launched in July 1999. Vision connected all of Household's over 1,400 branches across the nation, allowing various offices to view the same information on customer accounts in real time and enabling the Officer Defendants and Household's senior management to monitor the Company's day-to-day lending operations. Using Vision, the Officer Defendants were able to centralize decision-making throughout the loan process, including generating scripts for the sales staff, monitoring delinquencies and collectibles, determining charge-offs and training the sales force.

168.    In addition, Vision priced each loan automatically based on criteria specified by Household. Vision also enhanced defendants' ability to analyze and assess Household's cross-selling ability by providing "suggestive selling" techniques. After the customer's information was input into Vision, the system prompted the account executive to up-sell or offer an alternative that Vision had selected as a product that the customer would have a high propensity to buy. Upon closing, Vision created all the loan documents and printed them on the branch office printer. In this way, the Officer Defendants were able to directly monitor and control Household's lending practices.

169.    On 10/11/02, Fitch Ratings placed the Company on Rating Watch Negative and issued a release stating:

> In Fitch's view, *the bigger challenge for Household will be replenishing lost revenue resulting from the implementation of "Best Practices." An ability to offset these revenues streams could pressure future profitability, which in turn could put pressure on the current rating.*

170.    Indeed, on 1/15/03, Household issued a Press Release announcing 4Q02 results. Household reported net income of $388 million and EPS of $0.66, comparted to 4Q01 net income of $549 million and EPS of $1.17, a 44% decrease in EPS.

## VIII.  ANDERSEN'S ROLE IN DEFENDANTS'
## FRAUDULENT SCHEME AND UNLAWFUL COURSE OF CONDUCT

### A.    GENERAL

171.    Andersen, a worldwide firm of certified public accountants, was involved in various facets of Household's business.  Andersen audited Household's financial statements, prepared Household's tax returns and provided consulting services on a wide range of topics throughout the Class Period. Andersen examined and opined on Household's financial statements for FY97, FY98, FY99, FY00 and FY01 and reviewed Household's interim results and releases.  As a result of the far-reaching scope of services provided by Andersen, it was intimately familiar with Household's business affairs, and its personnel were present at Household's Chicago headquarters on a year-round basis.  Andersen's Chicago office was routinely involved in the structuring and/or approval of the practices and/or Offerings detailed herein.

172.    Andersen, however, turned its back on its responsibilities to Household investors and the investing public and abandoned its professional standards by helping Household perpetrate the massive accounting fraud alleged herein.

173.    Andersen falsely represented that Household's financial statements for FY97, FY98, FY99, FY00 and FY01 were presented in accordance with GAAP and that Andersen's audits of Household's financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS").  Andersen also consented to the incorporation of its reports on Household's financial statements in Household's Reports on Form 10-K for those years and in Household's Registration Statements for the Company's: (a) registration of over $75 billion of debt securities, filed on 2/16/99, 7/01/99, 3/24/00, 9/13/00, 2/23/01, 5/03/01, 11/20/01, 12/18/01 and 4/09/02; and (b) registration of approximately 168 million shares of Household stock valued at approximately $8 billion, declared effective or filed on or about 6/01/98. Andersen also consented to the use of its name as an expert in each Registration Statement filed and issued pursuant to these

- 57 -

A61

offerings, including the Form S-4 registration statement used to consummate the Beneficial merger (the "Beneficial Registration Statement"). Andersen's issuance of, and multiple consents to reissue materially false reports on, Household's 1997-2001 financial statements were themselves violations of GAAS.

174.    With respect to Household's financial statements for 2001, Andersen represented in a report dated 1/14/02, the following:

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders of Household International, Inc.

We have audited the accompanying consolidated balance sheets of Household International, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2001 and 2000, and the related consolidated statements of income, changes in preferred stock and common shareholders' equity and cash flow for each of the three years in the period ended December 31, 2001. These financial statements are the responsibility of Household International, Inc.'s management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Household International, Inc. and subsidiaries as of December 31, 2001 and 2000, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States.

175.    Andersen issued nearly identical audit reports for 1997 (issued 1/21/98), 1998 (issued 1/20/99), 1999 (issued 1/14/00) and 2000 (issued 1/15/01).

176.    Andersen's reports were false and misleading due to its failure to conduct its audits in compliance with GAAS and because Household's financial statements were not prepared in conformity with GAAP, as alleged in detail in ¶¶102-106 and 125-155, so that issuing the reports was in violation of GAAS and SEC rules. Andersen knew its reports would be relied upon by potential investors in Household securities. Throughout the same period, Andersen performed

- 58 -

A62

reviews of Household's quarterly financial statements, reviewed and approved Household's quarterly Reports on Form 10-Q and reviewed, discussed and approved Household's press releases.

## B.    ANDERSEN WAS NOT INDEPENDENT

177.    Household was an extremely important client to Andersen. In 2001 alone, Andersen received $4.6 million in fees for services it provided to Household, of which $1.9 million related to the audit fees and another $2.7 million related to its highly-profitable non-audit services, including consulting work. In 2000, Andersen received $4 million in fees, of which $2 million related to audit fees and $2 million related to non-audit services. In 2000 and 2001, these fees were particularly important to Andersen's partners, as their incomes were dependent on the continued business from Household. Andersen's Chicago partners had a particular incentive and were under enormous pressure to not only retain Household but increase the billings to the client, which generated significant revenues for the Chicago office. Andersen partners assigned to the Household account held regular meetings during the Class Period to discuss ways to sell more services and bill more fees to Household.

178.    Because Andersen partners could not increase the fees from Household fast enough by performing traditional audit and accounting work, Andersen incentivized its partners to sell its much more lucrative consulting services. Andersen tied part of its audit partners' compensation to the solicitation and marketing of non-audit consulting services and creating other revenue-sharing arrangements between audit and consulting partners groups. Andersen put tremendous pressure on partners to generate more fees. A "depth chart" was developed for each audit client based upon the level of services provided to that client. Partners received extra units (worth about $200,000 per year) based on the additional services sold. Hundreds of Andersen partners were each earning in excess of $1 million per year during the Class Period, based primarily upon the level of fees that each individual partner "controlled" or sold to his or her assigned clients.

179.    Professional Audit Standards promulgated by both the AICPA and the SEC require that auditors be independent, objective and free of conflicts of interest. ET, §§54, 55, 102.

## C.     ANDERSEN'S PARTICIPATION IN THE FRAUD IS CONSISTENT WITH ITS PRIOR PARTICIPATION IN A SERIES OF MAJOR ACCOUNTING FRAUDS

180.     Andersen's egregious conduct surrounding the Household affair is hardly an isolated incident. Andersen is a recidivist violator of the federal securities laws with a history of accounting improprieties, conflicts of interest and document destruction in some of the most egregious cases of accounting fraud in the history of the U.S. securities markets, its now-former client list making up a veritable "who's who" of financial disasters. Moreover, Andersen's conduct in these cases often shares the same underlying themes as its conduct in the Household debacle. A nonexhaustive list of Andersen's involvement in major accounting scandals follows:

(a)     Enron.     Andersen's intimate involvement in the world's most notorious accounting scandal is now common knowledge. Indeed, the entire Andersen partnership was convicted of obstruction of justice charges because of its felonious conduct, directed from Andersen world headquarters in Chicago, the office which perpetrated the accounting improprieties detailed herein. As summarized by Judge Melinda Harmon of the Southern District of Texas:

> Lead Plaintiff has identified numerous violations by Arthur Andersen of GAAS, GAAP, risk factors for fraud, accounting rules, and rules of professional conduct for accounts that Arthur Andersen violated. Yet Arthur Andersen certified that Enron's financial statements for 1997-2000 were in compliance with GAAP and its audits of the financial statements complied with GAAS.... Lead Plaintiff has also alleged that Arthur Andersen destroyed documents to conceal its fraudulent accounting. All of these constitute primary violations under §10(b).

> Furthermore Lead Plaintiff has alleged specific facts giving rise to a strong inference of scienter. Arthur Andersen's comprehensive accounting, auditing, and consulting services to Enron necessarily made it intimately privy to the smallest details of Enron's alleged fraudulent activity.

*In re Enron Corp. Secs., Derivative & ERISA Litig.*, MDL-1446, Civil Action No. H-01-3624 Consolidated Cases, 2002 U.S. Dist. LEXIS 25211, at *706 (S.D. Tex. Dec. 20, 2002).[11]

(b)     Worldcom.     Worldcom was a telecommunications giant that reported stellar revenue, net income and EPS growth in the latter half of the 1990s and into 2002. The growth caused Worldcom's stock price to soar and enabled it to compile over 70 acquisitions and raise

---

[11]     Judge Harmon also noted "several similar prior fraudulent audits of other companies, establishing a pattern of such conduct, and the SEC's and courts' repeated imposition of penalties on Arthur Andersen and its employees ...." *Id.*

billions of dollars from public investors. All along, Andersen audited – or, rather, "cooked" – Worldcom's books. Worldcom is now bankrupt. Worldcom's precipitous fall into the largest bankruptcy ever has caused well over $100 billion in damages to investors. Andersen's complicity in the fraud speaks for itself. Shortly before its bankruptcy filing in 6/02, Worldcom admitted that Andersen had overseen Worldcom's *overstatement of income by $3.85 billion*. By 9/02, Worldcom had disclosed that more than $9 billion in previously-recognized revenue just did not exist when it was recorded. On 11/04/02, the court-appointed bankruptcy examiner issued an interim report detailing a "smorgasbord" of questionable accounting practices going back several years, stating: "These issues relate to the culture, internal controls, management, integrity, disclosures and financial statements." Andersen, Worldcom's auditor throughout this period, worked closely with Worldcom senior executives for almost half a decade while this massive fraud took place.

(c)     Dynegy. Like Enron and Worldcom, Andersen audited Dynegy's financial statements, which also were patently false and misleading to investors. These false and misleading financial statements enabled Dynegy to issue over $1 billion in debt that is now nearly worthless and caused billions of dollars of damages to persons who were fraudulently induced into buying Dynegy securities. That these financial statements were the product of fraud is not open to debate. On 9/24/02, the SEC announced:

> The Commission [has] found that Dynegy engaged in securities fraud in connection with its disclosures and accounting for Project Alpha, and negligently included materially misleading information about the round-trip energy trades in two press releases it issued in early 2002.... Dynegy, without admitting or denying the Commission's findings, has agreed to the entry of the cease-and-desist order and to pay a $3 million penalty in a related civil suit filed in U.S. district court in Houston.

In 11/02, Dynegy restated results for 1999 through 2001. On 1/31/03, Dynegy announced its second major restatement in three months, stating that it would revise results for 1999 through 2001 and the first three quarters of 2002 as a result of a reaudit that would reduce net income by *$431 million* over the four-year period.

(d)     Qwest. Qwest has been forced to restate *all* of its financial statements for 1999 through 2001 – the entire length of its engagement with Andersen! Once again, this fraud took place while Qwest was being audited by Andersen. Further, Qwest is now the subject of

- 61 -

Congressional, SEC and Department of Justice investigations into its accounting manipulations. Qwest's defense is that it relied on the advice of its accountants – Andersen. The falsity of Qwest's financial reporting is clear. Notably, in 9/02, Qwest announced that its restatement would erase $950 million in revenue (later revised to $1.86 billion). The vast majority of this restated revenue was booked in so-called "swap" transactions that Qwest never registered as revenue until it hired Andersen. Many of these swaps were made with another Andersen client, the now-defunct Global Crossing (see below). Furthermore, in 8/01, Qwest was required by the SEC to amend its FY00 Report on Form 10-K to include a disclosure that its 2000 results had benefited from a pension credit of $299 million, or $182 million after tax, in FY00, compared to a charge of $8 million in 1999 – again, a transaction permitted by Andersen. On 7/20/01, Qwest admitted that its classification of costs had been incorrect such that cost of sales had been overstated and Sales, General & Administrative ("SG&A") expenses had been understated.

(e)      Global Crossing. Global Crossing, the bankrupt fiber-optic network operator, once had a $38.9 billion market value – but again, its stock value was based on false financials certified by Andersen. Global Crossing sought protection from creditors on 1/28/02 after amassing $12.4 billion in debt. The SEC and the Federal Bureau of Investigation have began examining Global Crossing's accounting – accounting approved by Andersen – after a former vice-president of finance alleged that the company inflated revenue from leasing space on its lines while under-reporting costs for buying space on rivals' networks – the very same "swap" transactions as Qwest. When these bogus revenue figures were erased, Global Crossing was revealed to be a financial disaster and never would have been able to secure public funding of its operations had it told the truth.

(f)      Waste Management. In 1998, Waste Management restated its 1992 through 1996 financial statements, which had been audited by Andersen's Houston office, revealing a massive fraud that included the overstatement of profits by as much as $1.7 billion. At the time, this was the largest restatement of earnings in history. In 6/01, as a result of its egregious behavior associated with its audits of its Waste Management client, the SEC hit Andersen with the first anti-fraud injunction in 20 years and the largest civil penalty ($7 million) in SEC history for an

- 62 -

A66

accounting firm. The SEC also required Andersen to sign a consent decree promising to refrain from wrongdoing in the future. Andersen partner Goolsby signed that agreement. Andersen knew its ongoing conduct with another client, Enron, violated the agreement when it was signed. As with Enron, Andersen's willingness to keep quiet about fraudulent accounting to protect the huge fees it earned played a significant role in Waste Management's ability to perpetrate one of the largest accounting frauds in history. Andersen recognized Waste Management's "aggressive" accounting as early as 1988, according to SEC documents, and by 1993, Andersen had documented that Waste Management was a "high-risk client" and that the client inflated profits by more than $100 million. However, during the same time frame, Andersen was relentlessly marketing its consulting services to the client, resulting in consulting fees more than double the size of the audit fees. Even when Waste Management refused to fix the improper accounting practices recommended by Andersen in prior years, Andersen caved in and continued to sign off on the company's annual audits. This went on for the next three years. According to the SEC, those decisions were backed at the highest levels at the same Andersen office that audited Household's financial statements. These decisions were backed by Andersen's Practice Director, the firm's Managing Partner and the Audit Division Head for the firm's national office in Chicago. Several parallels exist between the conduct of the Chicago office of Andersen in Waste Management, Enron and here. For example: Enron and Waste Management were major Andersen clients that generated millions of dollars in fees each year. Andersen's Chicago office participated in the audits of Waste Management, Enron and Household.

        (g)    <u>Sunbeam</u>. In 5/01, the SEC filed an injunctive action against Andersen partner Phillip E. Harlow, the former engagement partner on the Sunbeam account, for authorizing the issuance of unqualified audit opinions on Sunbeam's 1996 and 1997 financial statements, even though he was aware of many of the company's accounting improprieties and disclosure failures. In 2001, Andersen paid $110 million to settle shareholder lawsuits in connection with Sunbeam's restatement of six quarters of financial results. Indeed, the SEC stated that Sunbeam's purported turnaround was little more than accounting gimmicks, accomplished through the creation of inappropriate "cookie-jar" reserves. In Sunbeam, as in Enron, Andersen's document destruction was a common theme. In fact, an Andersen partner testified that, months after the restatements were

announced and after shareholder lawsuits had been filed, the firm ordered its Fort Lauderdale employees to dispose of any workpapers or correspondence that did not agree with the final documentation of the Sunbeam restatement.

(h)    Baptist Foundation of Arizona.  In a suit filed by the Arizona Attorney General, Andersen agreed to pay investors $217 million to settle a suit in connection with the 1999 failure of the Baptist Foundation of Arizona ("Foundation"), where an ongoing Ponzi scheme wiped out $590 million of the savings of investors, many of them retirees. The Arizona authorities brought the action to revoke the licenses of three Andersen auditors. Jay Steven Ozer ("Ozer"), one of the senior partners on Andersen's audits of the Foundation, audited Charles Keating's ("Keating") Lincoln Savings & Loan, described below. Ozer agreed to give up his Arizona accounting license. Particularly egregious in the Foundation situation was the fact that outside CPAs and professionals continued to warn Andersen for two years that they highly suspected fraudulent accounting at the Foundation, yet Andersen completely ignored them. An accountant for the Foundation testified that, more than two years before the bankruptcy, she met with Andersen and openly explained the nature of the fraud.  Subsequently, a Texas Baptist group became suspicious, called Andersen and told Andersen about the suspected fraudulent accounting at the Foundation.  Additionally, a sole practitioner CPA figured the fraud out in an afternoon by conducting a simple search of public records, revealing that the company used to engage in transactions with the Foundation had a negative net worth of approximately $106 million and couldn't possibly make good on the debt to the Foundation.  Calls were made to the Andersen office involved here and stated, "'You must withdraw your unqualified opinion immediately. The company's effectively broke. Call me.'"

(i)    Colonial Realty Company. In the mid 1990s, the State of Connecticut revoked Andersen's license to practice after investigating Andersen's conduct in its audits surrounding the collapse of Colonial Realty Company, a national real estate syndication firm. Central to the Colonial Realty Company fraud was a Ponzi scheme that involved deliberate and grossly exaggerated valuation of Colonial Realty Company properties.  Andersen furnished unqualified opinions supporting Colonial Realty Company's extravagant valuations and claims and assisted in preparing private placement memoranda in connection with the public offerings that resulted in investors'

- 64 -

sustaining substantial losses.    As with Enron, after conducting an extensive investigation, Connecticut's Attorney General concluded that Andersen employees destroyed incriminating documents under the auspices of complying with Andersen's document retention policy.

(j)    Lincoln Savings/ACC. Andersen was also associated with this infamous fraud perpetrated by Keating. In 1984 and 1985, Andersen improperly issued "clean" or unqualified-audit opinions on the ACC/Lincoln Savings financial statements.    Those opinions were included in ACC/Lincoln Savings SEC filings and helped Keating promote an illusion of prosperity that was used to market notes to investors.    Thus, Andersen participated in the Keating fraud that bilked investors out of over $500 million. In 1992, Andersen paid $30 million to settle the securities fraud action. Andersen, of course, did not learn a lesson from this experience. In fact, Ozer, an Andersen partner and a member of the Andersen audit team on ACC/Lincoln Savings, went on to be a key Andersen auditor on the aforementioned Foundation scandal.

181.    These cases demonstrate that for years Andersen has demonstrated a callous, reckless disregard for its duty to investors and the public trust.    Andersen's conduct throughout this period displays an uncaring, calculated cost/benefit approach to ignoring fraud and improper accounting in its audit engagements.    As the facts above indicate, Andersen remained, until the end, unrepentant, choosing to fight these cases rather than actually rectify its improper behavior. In essence, Andersen considered compromising its integrity and getting caught allying itself with management's interests to be an ordinary and necessary cost of doing business.

D.    **ANDERSEN DISREGARDED MAJOR INDICATORS OF FINANCIAL STATEMENT FRAUD AT HOUSEHOLD ("RED FLAGS")**

**Andersen Knew the Risk of Fraud Was Extremely High**

182.    Andersen had direct knowledge of Household's improper accounting as alleged herein. Andersen also knew that the risk of fraudulent financial reporting at Household was very high. In designing and carrying out audit procedures, professional standards specifically require that auditors assess the risk of material misstatement due to fraud.    To that end, Andersen, pursuant to Statement of Auditing Standards ("SAS") No. 82 (AU §§316, 110), was required to assess the risk of fraudulent financial statements at Household. Andersen had a "responsibility to plan and perform

- 65 -

A69

the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU §316 provides categories of fraud risk factors that should be considered in making that assessment.  Andersen knew that Household possessed many of the risk factors delineated in AU §316.16-.18, including:

> *Risk factors relating to management's characteristics and influence over the control environment....*
>
> — A significant portion of management's compensation represented by bonuses, stock options, or other incentives, the value of which is contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow.
>
> — An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices.
>
> — A practice by management of committing to analysts, creditors, and other third parties to achieve what appear to be unduly aggressive or clearly unrealistic forecasts.
>
> *      *      *
>
> — Management setting unduly aggressive financial targets and expectations for operating personnel.

AU §316.17(a).

183.    Andersen knew that Household management had not only an "excessive interest" but a highly unusual interest in maintaining the Company's stock price.  Household executives received multi-millions of dollars in bonuses from hitting a series of stock-price targets based on Household's compensation practices.

184.    As depicted in the following chart, Household experienced dramatic growth between 1997 and 2001.  Note the following:

|  | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| **Reported EPS** | $1.93 | $2.30[12] | $3.07 | $3.55 | $4.08 |

---

[12]    1998 EPS has been adjusted for a $118.5 million after-tax gain related to the sale of Beneficial Corporation's Canadian operations and a $751 million after-tax charge related to the merger and integration of Beneficial.

- 66 -

A70

Upon restatement, the EPS was reduced as follows:

|              | 1997   | 1998   | 1999   | 2000   | 2001   |
|--------------|--------|--------|--------|--------|--------|
| Restated EPS | $1.86  | $2.21  | $2.95  | $3.40  | $3.91  |

## E.    ANDERSEN KNEW HOUSEHOLD'S DISCLOSURES WERE FALSE

185.    In accordance with GAAS, Andersen was required to consider whether Household's disclosures accompanying its financial statements were adequate. SAS No. 32, as set forth in AU §431.02-.03, states:

> .02    The presentation of financial statements in conformity with generally accepted accounting principles includes adequate disclosure of material matters. These matters relate to the form, arrangement, and content of the financial statements and their appended notes, including, for example, the terminology used, the amount of detail given, the classification of items in the statements, and the bases of amounts set forth. An independent auditor considers whether a particular matter should be disclosed in light of the circumstances and facts of which he is aware at the time.

> .03    If management omits from the financial statements, including the accompanying notes, information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and should provide the information in his report, if practicable, unless its omission from the auditor's report is recognized as appropriate by a specific Statement on Auditing Standards....

AU §431.02-.03.

186.    The required disclosures include those concerning Household's illegal predatory lending practices and the impact its reaging practices had on Household's reported results. As detailed herein, Household's disclosures with respect to its accounting practices were woefully inadequate.

187.    Further, auditors are required to consider the effect of an illegal act on the financial statements. If an auditor concludes that an illegal act has or is likely to have occurred, then the auditor is required to evaluate the adequacy of disclosure in the financial statements of the potential effects of the illegal act and should also consider if a loss contingency is required. AU §317.14-.15 states:

> .14    The auditor should consider the effect of an illegal act on the amounts presented in financial statements including contingent monetary effects, such as fines, penalties and damages. Loss contingencies resulting from illegal acts that may be required to be disclosed should be evaluated in the same manner as other loss contingencies. Examples of loss contingencies that may arise from an illegal act are: threat of expropriation of assets, enforced discontinuance of operations in another country, and litigation.

.15    The auditor should evaluate the adequacy of disclosure in the financial statements of the potential effects of an illegal act on the entity's operations. If material revenue or earnings are derived from transactions involving illegal acts, or if illegal acts create significant unusual risks associated with material revenue or earnings, such as loss of significant business relationship, that information should be considered for disclosure.

## F.    ANDERSEN VIOLATED PROFESSIONAL STANDARDS

188.    In addition to Andersen's improper departures from professional standards as particularized above, Andersen also violated the following professional standards, among others.

189.    The bylaws of AICPA require that members adhere to the Principles and Rules of the Code of Professional Conduct ("ET"). Andersen violated those rules, including the following:

### ET §53 – Article II – The Public Interest

*Members should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism.*

### ET §102 – Integrity and Objectivity

.02    *Knowing misrepresentations in the preparation of financial statements or records.* A member shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET §102.01] when he or she knowingly

a.    Makes, or permits or directs another to make, materially false and misleading entries in an entity's financial statements or records shall be considered to have knowingly misrepresented facts in violation of rule 102 [ET §102.01] ....

### ET §501 – Acts Discreditable

.05  501.4 – *Negligence in the preparation of financial statements or records.* A member shall be considered to have committed an act discreditable to the profession in violation of rule 501 [ET §501.01] when, by virtue of his or her negligence, such member –

a.    Makes, or permits or directs another to make, materially false and misleading entries in the financial statements or records of an entity; or

b.    Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

c.    Signs, or permits or directs another to sign, a document containing materially false and misleading information.

Additionally, AU §220 – **Independence** further states that:

.01     The second general standard is:

In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

.02     This standard requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business but also to creditors and those who may otherwise rely (in part, at least) upon the independent auditor's report, as in the case of prospective owners or creditors.

190.     One of Andersen's responsibilities as Household's independent auditor was to obtain "[s]ufficient competent evidential matter ... to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§150.02, 110.01. In violation of GAAS, and contrary to the representations in its report on Household's financial statements, Andersen did not obtain sufficient, competent evidential matter to support Household's assertions regarding its income, assets, debt and shareholders' equity for FY97, FY98, FY99, FY01 and FY01. Moreover, Andersen deliberately ignored information indicating that Household's financial statements did not "present fairly" the Company's financial position.

191.     Due to Andersen's false statements, knowledge of the improper accounting, failure to identify and modify its reports to identify Household's false financial reporting, and lack of independence, Andersen violated the following GAAS standards:

(a)     The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors.

(b)     The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement.

(c)     The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report.

- 69 -

A73

(d)    The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised.

(e)    The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed.

(f)    The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

(g)    The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP.

(h)    The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed.

(i)    The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report.

(j)    The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

## IX.  FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 1997

192.    On 10/23/97, Household announced 3Q97 financial results in a press release entitled "Household Reports All-Time Record Results," which stated:[13]

> Household International today reported record net income of $187.2 million for the third quarter, up 34 percent from $139.9 million for the year-ago quarter. Earnings per share rose 23 percent to a quarterly record of $1.70, compared with $1.38 a year earlier.

> *   *   *

> William F. Aldinger, Household's chairman and chief executive officer, said "We are pleased to announce another record quarter. Contributing to our good results were wider margins, higher average managed receivables, and a continued focus on efficiency, which more than offset the impact of higher credit losses."

---

[13]    The financial results and per-share amounts until 6/07/98 included herein are not adjusted for the 3:1 split that occurred on 6/01/98.

193.    On 10/24/97, these financial results and management's discussion of the results were repeated to the market in analysts' reports. In addition to artificially inflating the price of Household shares, defendants' false statements also had the effect of misleading analysts who relied on these misleading representations in issuing very positive reports and advising investors to purchase shares of Household, as follows:

**Joel Gomberg (William Blair & Co.) Report of 10/24/97**

Household reported third-quarter EPS of $1.70 ... and $0.02 better than our $1.68 estimate and that of consensus. Household continues to deliver on its commitment for 20%-plus EPS growth. Earnings per share were better than expected due to expense controls; however, internally generated loan growth was disappointing during the quarter....

HI is growing at a rate in excess of 20%, yet trades at a 1998 P/E multiple that represents a relative discount to its peer group and a 25%-plus discount to our long-term growth rate. Foremost, we are attracted to this experienced senior management team and its disciplined strategy to focus on a few high-margin businesses, to be a leader in cost-management, skill at executing acquisitions, and conservative income recognition and balance sheet management....

\* \* \*

Management conveyed a more positive tone with respect to credit quality.... We anticipate that the company's credit losses will remain lower than industry averages, due to its co-branding strategy in the credit card area and high percentage of consumer finance receivables backed by residential real estate. Lastly, Household's significant loan-loss provision levels during the past couple years have provided loan-loss reserve coverage well above peer levels and management earnings flexibility in 1998.

\* \* \*

Profitability is strong because the typical HFC customer will pay a higher price for personal service and is more sensitive to the payment amount than interest rate. Management also has instilled a very sales-oriented culture, supported by an aggressive incentive compensation structure.

194.    On 11/13/97, Household filed with the SEC its 3Q97 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the false financial results and other false representations as were made in the 10/23/97 corporate release, the 3Q97 Report on Form 10-Q also stated that the unaudited financial results were prepared in accordance with GAAP and included, "[i]n the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation." The 3Q97 Report on Form 10-Q was signed by defendant Schoenholz.

- 71 -

A75

195.    On 12/08/97, defendant Aldinger visited the offices of William Blair & Co., after

which analyst Joel Gomberg issued a very positive report on Household the next day, reiterating his

long-term Buy rating on the stock.  The report stated, in part, that:

> The meeting [with Aldinger] reinforced our positive view of Household.
>
> *    *    *
>
> Bill Aldinger is confident that the company will deliver on its commitment
> of 20% or better EPS growth in 1998.  We are maintaining our 1998 EPS estimate
> of $7.95, up 22% from our 1997 EPS estimate of $6.50.  We expect 1998 to represent
> the seventh consecutive year of 20%-plus EPS growth....  Investors are likely to focus
> on internally generated loan growth during the next few quarters. *Loan growth is the
> key that drives revenue and earnings growth over the long term and represents a
> catalyst to drive the stock higher.*

196.    The statements made by defendants in ¶¶192-195 above were each materially false

and misleading when made.  As set forth in ¶¶1-155, the true facts, which were then known to or

recklessly disregarded by defendants, based on their review of Household's internal operating data,

were:

(a)    Defendants were engaged in a widespread and consistent pattern of improper

and illegal predatory lending practices, which included, among other things:

(i)    Misrepresenting the interest rates and savings associated with loans

by providing deceptive and nonconforming loan documents to borrowers that were designed to

obscure actual loan amounts and interest rates (¶¶55-60);

(ii)    Failing to disclose "discount points" that were nothing more than

stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(iii)    Concealing the existence of prepayment penalties (¶¶68-70);

(iv)    Using such practices as fraud and forgery to sell ancillary products,

such as life, disability and other types of credit insurance (¶¶71-74); and

(v)    Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-

82).

(b)    As set forth in ¶¶51-106, defendants were engaged in a sophisticated and

fraudulent predatory lending scheme.

- 72 -

A76

(c)    As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to:

(i)    Manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(ii)    Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(iii)    Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, as detailed in ¶¶111-114 and 121, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

(d)    The Officer Defendants designed the predatory lending practices and reaging of delinquent accounts, allowing the Company to:

(i)    Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

(ii)    Under-report non-performing assets and misreport credit quality (¶¶125-133);

(iii)    Consistently report lower loan loss reserves by improperly lowering defaults and prepayments (¶¶102-106 and 125-133);

(iv)    Recognize interest income that should not have been accrued in accordance with the Company's own lending practices and policies (¶¶102-106, 125-133 and 154-155); and

(v)    Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-155).

(e)    As set forth in ¶¶134-155, throughout the Class Period, defendants engaged in improper accounting for Household's credit card co-branding, affinity and third-party marketing agreements, causing Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income.

(f)    In addition to the false and materially misleading financial data, the Company's SEC filings also concealed the true risks of investing in Household, including the risk of investing in a company that was not reporting its financial results in conformity with GAAP, which disclosures were wholly ineffective and inappropriate and did not alert investors to the true risks of investing in Household securities.

(g)    Household and the Officer Defendants had no basis to, and did not in fact, believe Aldinger's forecasts of 20+% growth in EPS in FY98 and FY99 because they were impossible to achieve in light of ¶¶(a)-(f) above.

## B.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 1998

197.    On 1/21/98, Household announced its FY97 results in a press release entitled "Household EPS Grows More than 20% for 6th Consecutive Quarter" that stated, in part:

> Household International today reported all-time record net income and earnings per share for the fourth quarter and year ended December 31, 1997. Full-year earnings per share of $6.50 rose 22 percent and net income increased 27 percent to $686.6 million.
>
> Quarterly earnings per share totaled $1.98, a 22 percent increase from $1.62 for the fourth quarter of 1996, on a greater number of average shares outstanding. Net income rose 33 percent to an all-time quarterly record of $217.6 million, compared with $163.6 million a year earlier.
>
> William F. Aldinger, Household's chairman and chief executive officer, said, "Household achieved another year of earnings per share growth in excess of 20 percent – the sixth consecutive year that we've done so. We grew revenues 18 percent and kept expenses essentially flat. We absorbed increased chargeoffs consistent with industry-wide trends and further strengthened our credit loss reserves. We also improved our return on managed assets. Our return on equity exceeded 18 percent, even though we significantly increased our capital levels. Overall, it was a terrific year."
>
> Mr. Aldinger added, "1997 was not only a record year, it was a year of investing in the long-term growth of our company. We acquired the consumer finance business of Transamerica Corporation and ACC Consumer Finance, an industry leader in non-prime auto finance. We expect both acquisitions to contribute to another record year in 1998."

198.    The Officer Defendants' false statements also had the effect of misleading analysts who relied on these representations in issuing very positive reports and advising investors to purchase shares of Household, as follows:

**Jennifer Scutti (Prudential Securities) Report of 2/18/98**

Based on improving efficiency ratio levels, manageable credit quality, expanding margins, and stable portfolio growth, we believe that Household International is positioned to consistently generate earnings growth in the 18%-20% range over the next two years.

\*    \*    \*

[C]ross-selling of other Household products has helped to keep the "churn" rate on loans low. The company, however, intends to include prepayment penalties increasingly on current and future loan originations. In addition to helping keep prepayments low, cross-selling has also supported portfolio growth for the company as 40% of Household Finance Corp.'s home equity borrowers are private-label cardholders, while 30% are bankcard customers.

The company has maintained a conservative posture as it has grown the business slowly and deliberately while managing costs carefully....

\*    \*    \*

Broad funding strategy offers flexibility and supports growth. The company has maintained a broad funding strategy, utilizing securitizations, commercial paper, and medium- and long-term debt. Currently, 40% of funding is due to securitization activity, which we believe could fall to 35% over the next few quarters.

199.    On 3/13/98, the Company, through its subsidiary, HFC, caused to be declared effective a registration statement on Form S-3, registering for sale $3 billion of debt securities.

200.    On 3/30/98, Household filed with the SEC its FY97 Report on Form 10-K, signed by defendants Aldinger and Schoenholz, as well as the Director Defendants. In addition to reiterating the same false representations as were made in the 1/21/98 corporate release, the FY97 Report on Form 10-K also stated that the Company's financial statements met the requirements of Regulation S-X and incorporated by reference information specified by Item 302 of Regulation S-K.

201.    With respect to its loan delinquencies and charge-off policies, defendants represented that:

*Our focus is to continue using risk-based pricing and effective collection efforts for each loan.* We have a process that gives us a reasonable basis for predicting the asset quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our

- 75 -

A79

frequent and early contact with delinquent customers is helpful in managing net credit losses.

202.    Additionally, Andersen issued a "clean" audit opinion on 1/21/98, which was incorporated by reference into the Report on Form 10-K. Andersen stated that it had audited Household's financial statements and Schedule 14(d) for FY97 in accordance with GAAS and opined that they "fairly state[] in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole."

203.    On 4/3/98, defendants Aldinger and Gilmer hosted the Company's annual Financial Relations Conference for analysts and investors. Immediately after this conference, several analysts issued very positive reports and encouraged investors to purchase shares of Household as follows:

**Joel Gomberg (William Blair & Co.) Report of 4/6/98**

Management conveyed a positive tone ....

Management reiterated its profitability and growth targets. Bill Aldinger, chairman and CEO, is confident that the company will deliver on its commitment of 20% or better EPS growth in 1998 (its seventh consecutive year of 20%-plus earnings growth). Management also reaffirmed several long-term financial targets....

Household appears on track to meet or exceed first-quarter estimates. Our first-quarter EPS estimate is *$1.50*, compared with *$1.30* a year ago.

We reaffirm our Long-term Buy recommendation. Management has a very disciplined strategy to focus on a few high-margin businesses, be the low-cost provider, and out execute the competition....

**D. Hochstim (Bear Stearns) Report of 4/06/98**

Gary Gilmer who is now the senior executive in charge of HFC presented a review of the business. HFC continues to seek to generate loan growth by 1) increasing its new originations and 2) reducing payoffs. In addition to growth, there is also a focus on maintaining credit quality. To increase growth, the company plans to target its marketing efforts and refine its compensation system to encourage the origination of more real estate secured loans. There has also been an increased emphasis on selling real estate secured loans to existing unsecured customers (private label and personal unsecured) in an effort to increase the proportion of real estate secured lending.... The company plans to increase its originations of PHLs (personal home loans) which are underwritten as unsecured loans but have some real estate as collateral.

*    *    *

A range of initiatives – increased customer contact, increased manual underwriting, and further refinements of loss prediction and account management tools ....

- 76 -

204.  On 4/23/98, Household announced its 1Q98 financial results in a press release entitled, "Household International Reports First Quarter Net Income Up 30%, to a Record $170 Million," which stated, in part, that:

> Household International today reported *first quarter net income rose 30 percent to a record $170.3 million*, compared with $131.5 million for the first quarter of 1997. *Earnings per share increased 18.5 percent to a record $1.54 from $1.30 a year ago.* .
>
> William F. Aldinger, Household's chairman and chief financial officer, said, "Our first quarter results reflect improving fundamentals in our two largest businesses. The strong growth in earnings was driven by an expanded net interest margin, higher receivables and improved efficiency...."

205.  The Officer Defendants' false statements regarding the Company's better-than-expected, "record" financial results also had the effect of misleading analysts, who relied on these representations in issuing very positive reports and advising investors to purchase shares of Household, as follows:

**Joel Gomberg (William Blair & Co.) Report of 4/23/98**

> Household reported first-quarter earnings per diluted share of $1.54 ... $0.04 better than our $1.50 estimate, and $0.02 above the Street consensus of $1.52.

> \*   \*   \*

> The company is optimistic about credit card growth in 1998, with plans to increase its marketing budget significantly.

> \*   \*   \*

> Management conveyed a positive tone with respect to credit quality.

206.  On 5/12/98, Household filed with the SEC its 1Q98 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 4/23/98 corporate release, the 1Q98 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

207.  On 6/30/98, Household acquired Beneficial in a stock-swap deal valued at over $8 billion. Household issued over 168 million shares of common stock.

- 77 -

A81

208.  On or about 7/20/98, the Company, through its subsidiary, HFC, caused to be declared effective, a registration statement on Form S-3, registering for sale $5 billion of debt securities.

209.  On 7/22/98, Household announced 2Q98 results in a press release entitled, "Household International Reports Second Quarter Income of $249.4 Million and Earnings Per Share of $.49, Before Merger Charge," which stated:[14]

> Household International today reported second quarter income of $249.4 million and earnings per share of $.49, for the combined operations of Household and Beneficial Corporation before costs related to the merger, completed on June 30, 1998, and related integration.... Including the $1 billion pretax merger charge. Household incurred a loss for the quarter of $501.6 million, or $1.03 per share. Net income for the second quarter of 1997 was $238.6 million, and earnings per share were $.50.
>
> Before giving effect to the merger, Household's earnings per share would have been a second quarter of $.61, a 24 percent increase over the year-ago quarter. Beneficial's earnings per share would have been $.81 for the second quarter of 1998, compared to $1.61 a year ago, which included $.59 of securitization and other nonrecurring gains.
>
> William F. Aldinger, Household's chairman and chief executive officer, said ... "I am really excited about the company's prospects. The Beneficial acquisition strengthens many of our key businesses, provides significant opportunities to improve efficiency and gives us a platform for additional revenue growth."

210.  Based on these purported positive results, shares of Household traded to over $51.62 per share, before closing at $51.25 per share that day. In addition, many analysts covering the stock issued or reiterated "Buy" recommendations on shares of Household.

211.  On or about 8/03/98, the Company, through its subsidiary, HFC, caused to be declared effective, a registration statement on Form S-3, registering for sale $3 billion of debt securities.

212.  On 8/14/98, Household filed with the SEC, its 2Q98 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 7/22/98 corporate release, the 2Q98 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of

---

[14]     Since the Beneficial merger was accounted for as a pooling of interests, all prior and current period information reflect the combined companies' results. In addition, EPS data have been restated to reflect Household's three-for-one common stock split effective 6/01/98.

management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

213.    On 9/2/98, BT Alex. Brown Incorporated ("BT Alex. Brown") hosted a conference call with defendant Schoenholz and industry analysts, after which they also issued very positive reports and encouraged investors to purchase shares of the Company, stating:

**Mark Alpert (BT Alex. Brown) Report of 9/2/98**

Maintain "strong buy" investment rating, with target price of $65, or 20x our 1999 EPS estimate [at $3.25].

*    *    *

As a result of expected synergies from the merger, the Company recently endorsed 20% EPS growth for 1999 and 2000 and set a 17% growth target in 2001....

We are maintaining our EPS estimates of $2.27 in 1998 and $3.25 in 1999 (fully pooled). Our target price remains $65 (on a 12-month horizon) or 20x our 1999 EPS estimate....

*    *    *

Loan Growth ... is running about 10-12%, and while retention is an issue (prepayments), it's less of a problem than earlier (helped by the problems of the monoline competitors)....

214.    On 10/22/98, Household announced 3Q98 results in a press release entitled, "Household International Reports Record Third Quarter Results," which stated, in part, that:

Household International today *reported net income rose 20 percent to a third-quarter record of $318.0 million*, compared with $264.7 million for the third quarter of 1997. *Earnings per share increased 19 percent to a third-quarter record of $.63* from $.53 a year ago.

William F. Aldinger, Household's chairman and chief executive officer, said, "Our tight focus on our core markets, our conservative capital base and our *disciplined approach to funding and liquidity management enabled Household to achieve record earnings for the quarter*.

Commenting on Household's results for the quarter, Mr. Aldinger added, "The company's operating results were solid with 6 percent annualized receivable growth, margin expansion and improving efficiency. Credit quality was within expectations and reserve coverage remains conservative."

215.    On or about 11/13/98, Household filed with the SEC, its 3Q98 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 10/22/98 corporate release, the 3Q98 Report on Form 10-Q also stated, in part, that the

unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

216.     On 12/15/98, after meeting with management of the Company, BT Alex. Brown analyst Mark Alpert issued a "Strong Buy" recommendation on shares of Household and stated that recent weakness in the Company's shares appeared "unwarranted." Notwithstanding that stocks in the banking and subprime lending industry were trading lower, the BT Alex. Brown report entitled "Visit With Management In Chicago Convinces Us That The Story Is Sound" stated, in part, that:

> Stock price weakness appears unwarranted, in our view. All businesses with the exception of U.S. Visa and MasterCards are performing well and generally producing ROEs of at least 20%.

> \*     \*     \*

> Balance sheet is very strong (capital and reserves), in our opinion.

> \*     \*     \*

> We believe stock is very undervalued. We reiterate our $53 target price (12 month horizon) and "strong buy" investment rating on the shares.

> \*     \*     \*

> Household is reducing its usage of securitizations to alleviate accounting concerns (gain on sale). Securitizations are about 30% of receivables, down from a past target of 35%-40%. The Company hasn't securitized a home equity loan in 2 years.

217.     The statements made by defendants in ¶¶197-216 above were each materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were:

(a)     Defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices, which included, among other things:

(i)     Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

(ii)      Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(iii)      Concealing the existence of prepayment penalties (¶¶68-70);

(iv)      Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(v)      Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

(b)   .   As set forth in ¶¶51-106, defendants were engaged in a sophisticated and fraudulent predatory lending scheme.

(c)      As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to:

(i)      Manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(ii)      Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(iii)      Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, as detailed in ¶¶111-114 and 121, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

(d)      The Officer Defendants designed the predatory lending practices and reaging of delinquent accounts, allowing the Company to:

(i)      Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

- 81 -

A85

(ii)      Under-report non-performing assets and misreport credit quality (¶¶125-133);

(iii)      Consistently report lower loan loss reserves by improperly lowering defaults and prepayments (¶¶102-106 and 125-133);

(iv)      Recognize interest income that should not have been accrued in accordance with the Company's own lending practices and policies (¶¶102-106, 125-133 and 154-155); and

(v)      Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-155).

(e)      As set forth in ¶¶134-155, throughout the Class Period, defendants engaged in improper accounting for Household's credit card co-branding, affinity and third-party marketing agreements, causing Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income. Due to defendants' improper accounting, the Company was forced to restate earnings for an eight-year period from 1994 through 2Q02. As set forth in ¶¶134-155, defendants have admitted that Household's results for FY97 were materially false and misleading and have restated these results as follows:

**DILUTED EPS**

|       | As Reported | Restated | Difference |
|-------|-------------|----------|------------|
| FY97  | $1.93       | $1.86    | <$0.07>    |

(f)      In addition to the false and materially misleading financial data, the Company's SEC filings also contained inadequate risk disclosures that did not disclose the true risks of investing in Household – specifically, the risk of investing in a company that was not reporting its financial results in conformity with GAAP. In addition, and as a result thereof, the purported risk disclosures were wholly ineffective and inappropriate and did not alert investors to the true risks of investing in Household securities.

- 82 -

A86

C.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 1999

218.     On 1/20/99, Household issued a press release entitled, "Household International Reports Q4 and Full Year Results," which stated, in part, that:

> Household International today announced that it achieved *record net income and earnings per share for the fourth quarter ended December 31, 1998. Net income of $349.9 million was up 71 percent from $204.8 million recorded in Q497, and reported EPS of $.71 was up 73 percent from $.41 reported in Q497....*
>
> *       *       *
>
> Receivables of the company's core consumer finance businesses, other than bankcard, grew 12 percent from a year ago and three percent sequentially.
>
> *       *       *
>
> The company's managed net interest margin widened to 8.03 percent, up from 7.92 percent in the prior quarter and 7.80 percent a year ago. The sequential quarter and year-over-year improvement resulted from higher yields on unsecured products and lower funding costs, partially offset by the effect of a shift in mix toward secured products.

219.     Based on these purported positive results, shares of Household rallied, climbing almost $3.00 per share, to close trading at $44.50 per share, on heavy trading volume of 3.4 million shares.

220.     On 1/26/99, Household senior management held a meeting with analyst Warburg Dillon Read, who met with each of the Company's business line managers. Based on representations at this meeting, analyst Thomas Hanley issued a positive report that stated, in part:

> **Thomas Hanley (Warburg Dillon Read) Report of 1/27/99**
>
> [T]he outlook for growth looks strong. The consumer finance operation is doing better than anticipated ....
>
> *       *       *
>
> At the meeting, senior management outlined their financial objectives for 1999, including earnings per share of $3.00-$3.10, a return on managed assets of 1.70%-1.90%, a return on common equity of 20%-22%, an efficiency ratio of 35%, and core receivable growth of 8%-10%. We believe these goals are quite achievable.

221.     On 2/16/99, the Company, through its subsidiary, HFC, caused to be declared effective, a registration statement on Form S-3, registering for sale $6.05 billion of debt securities.

222.    The materially false and misleading statements issued by defendants had their
intended effect, and, on 3/09/99, Duff & Phelps Credit Rating Co. reaffirmed all credit ratings for
Household and its subsidiaries, publishing a press release that stated, in part:

> The reaffirmation is based upon the expectation that Household's capital measures
> will be maintained in the targeted range, particularly tangible equity-to-tangible
> managed assets (TEMA) of 7 to 7.25 percent and managed debt-to-tangible equity
> (leverage) of 12.5 to 14 times. Household's TEMA and leverage ratios are currently
> at the lower end and higher end, respectively, of its peers. Positively, recent shifts in
> the receivables portfolio to less risky assets such as real estate-secured loans and a
> reduction in higher-risk credit card receivables, are supportive of the current capital
> targets....
>
> The renewed focus on higher-risk customers should bring higher yields, but greater
> risk, to the managed portfolio.   Partially offsetting this higher risk is the
> aforementioned shift in asset mix towards lower-risk real estate-secured product.
> *Given the continuing competitive environment and the focus on higher-risk
> customers, it is important that Household accurately identify and price for risk in
> the origination process.*

223.    The following day, 3/10/99, *The Wall Street Journal* reported that Household had
announced its institution of a repurchase of $2 billion worth of shares, whereby defendants would
cause the Company to repurchase up to 10% of Household's outstanding shares.  According to *The
Wall Street Journal*, defendant Aldinger stated that the reason for the share repurchase was that
shares of the Company were "undervalued."

224.    Following the publication of these releases on 3/9/99 and 3/10/99, shares of
Household rallied over $4.00 per share, to close trading above $45.81 per share, on heavy trading
volume of 3.5 million shares traded on 3/10/99.

225.    On 3/30/99, Household filed with the SEC its FY99 Report on Form 10-K, signed
by Aldinger, Schoenholz and the Director Defendants.  In addition to reiterating the same false
representations as were made in the 1/20/99 corporate release, the FY99 Report on Form 10-K also
stated that the Company's financial statements met the requirements of Regulation S-X and
incorporated by reference information specified by Item 302 of Regulation S-K.

226.    With respect to its loan delinquencies and charge-off policies, defendants represented
that:

> *Our focus is to continue using risk-based pricing and effective collection efforts
> for each loan.* We have a process that gives us a reasonable basis for predicting the
> asset quality of new accounts.  This process is based on our experience with

numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers is helpful in managing net credit losses.

227.    Andersen issued a "clean" audit opinion on 1/20/99, incorporated by reference in the Report on Form 10-K. Andersen stated that it had audited Household's financial statements and Schedule 14(d) for FY98 in accordance with GAAS and opined that they "fairly state[] in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole."

228.    In late 3/99 and early 4/99, Aldinger and other senior management participated in a series of conferences and one-on-one analyst meetings, during which defendants again reassured analysts about the strength of Household's business. After these meetings, analysts issued reports stating:

**Mark Alpert (BT Alex. Brown) Report of 3/30/99**

Focus is on top line revenue growth (est. 10%-12% in 1999) and consistent long-term earnings growth of at least 15%, in our opinion.

*    *    *

Our target price is $55 or approximately 15x our 2000 estimate (on a 12-18 month horizon). We reiterate our "strong buy" rating.

*    *    *

Management remains comfortable with consensus EPS estimates for 1Q99 ($0.62), full year 1999 (in a range of $3.00-$3.10), and full year 2000 (growth of about 16%).

*    *    *

There is a new emphasis on cross-selling. For example, Household has begun to offer "preapproved" credit cards to new home equity borrowers, and has experienced a 70% acceptance rate in tests, at an acquisition cost of only $25 per account (about 1/4 the industry average). In addition, it booked $40 million in home equity loans in February by cross-marketing to existing credit card holders. The goal is to increase the estimated 12% "wallet share" the Company holds on average of its 40 million customers (home equity, auto, credit cards, and unsecured loans). Every 1% point increase would translate into about $5 billion of receivables growth.

229.    On 4/22/99, Household announced 1Q99 results in a press release entitled, "Household International Reports Record First Quarter Results," which stated:

*Household International today reported record first quarter operating income and operating earnings per share. Net operating income rose 34 percent to $320.8*

- 85 -

A89

million, compared with net operating income of $239.3 million a year ago. Earnings per share increased 38 percent to $.65 from operating EPS of $.47 a year ago....

\* \* \*

William F. Aldinger, Household's chairman and chief executive officer, said, "Strong loan growth in our consumer finance business, improved efficiency and higher income from our tax refund loan business led to the strongest first quarter in our 120 year history.... We have great momentum in this business."

\* \* \*

Aldinger continued, "1999 is off to a very good start and we are on track to meet our earnings and growth targets."

230.     Following the publication of the release of purported record-breaking 1Q99 results, Household traded above $51.00 per share. In addition, also helping to sustain the artificial inflation in Household shares was a report by ABN AMRO, also published on 4/22/99, which proclaimed Household the brokerage house's "top pick" and gave the Company's shares a near-term price target of $65.00 per share. Prudential Securities also issued a "strong buy" rating on shares of Household with a $62.00 near-term price target, raised from the prior target of $56.00 per share.

231.     On 5/13/99, Household filed with the SEC its 1Q99 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 4/22/99 corporate release, the 1Q99 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

232.     On 7/1/99, the Company, through its subsidiary, HFC, caused to be declared effective a registration statement on Form S-3, registering for sale $7.5 billion of debt securities.

233.     On 7/22/99, Household announced 2Q99 results in a press release entitled, "Household International Reports Record Second Quarter Results," which stated, in part, that:

> *Household International today reported that second quarter net income rose 31 percent to a record $326.9 million, compared with operating net income of $249.4 million a year ago. Earnings per share increased 37 percent to a record $.67, compared with operating EPS of $.49 a year ago.* Cash basis EPS for the quarter rose 28 percent.

- 86 -

A90

William F. Aldinger, Household's chairman and chief executive officer, said, "Our results, a second quarter record, highlight the growth and improved profitability of our consumer finance businesses...."

Aldinger continued, "Business fundamentals are strong and reflect the positive trends we have seen since late last year. Our net interest margin percentage expanded substantially, credit quality improved and costs remained well under control. Receivable growth was strong in the consumer finance business. We have excellent momentum."

Aldinger added, "Growth in the HFC and Beneficial consumer finance branch business continues to improve and also gives us an excellent platform from which to cross-sell many of our other products. Our 1,400 branches and 7,000 branch employees give us a real advantage as we focus on satisfying more of our customers' credit needs."

234.    Following the publication of the release of purported record-breaking 1Q99 results, shares of Household traded above $51.00 per share. In addition, also helping to sustain the artificial inflation in Household shares was a report by Prudential Securities, on 7/23/99, which reiterated its "strong buy" rating on shares of the Company and its $62.00 near-term share price target; and a report by Warburg Dillon Read reiterating a "Buy," stating, in part:

**Thomas H. Hanley (Warburg Dillon Read) Report of 7/22/99**

HI appears to be firing on all cylinders. The ROE improved to 20.9% and the ROMA increased to 1.78%. We find no fundamental reason the stock should trade at a discount to its peers and we reiterate our Buy.

\*    \*    \*

\*    Credit quality improved for the second consecutive quarter.

\*    \*    \*

Overall, given the strong showing in the branches, we are very comfortable with management's target of 10% core receivable growth in 1999.... Consequently, we remain comfortable with our EPS estimates of $3.05 in 1999 and $3.60 in 2000.

235.    On 8/16/99, Household filed with the SEC its 2Q99 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 7/22/99 corporate release, the 2Q99 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

236.    In late 9/99 and early 10/99, Household participated in a series of conferences and one-on-one analyst meetings at Company headquarters, during which defendants again reassured them about the strength of the Company's business. After these meetings analysts reported, in part, as follows:

### Mark Alpert (Deutsche Banc Alex. Brown) Report of 9/30/99

[T]he fundamental businesses appear positioned the best they've been in several years while the company's relative P/E ratio is at its lowest level since fall 1994.

*    *    *

Household's stock price has been adversely affected (as have most financial stocks) by the negative sentiment stemming from rising interest rates. Nonetheless, business remains as strong, if not stronger, than it has been in some time. Branch loan growth appears to be running in the 12%-15% range, aided by the Beneficial integration, the demise of securitizers, and the success of a new technology platform, VISION.

*    *    *

We are maintaining our 1999 and 2000 EPS estimates of $3.07 nad $3.55, respectively.... Our target price is 15x our 2000 EPS estimate, or $53 (on a 12-month horizon).

*    *    *

Household's credit quality picture is actually improving. Home equity loans, which are secured by property, represent about 70% of the branch loan portfolio, the highest percentage in recent history.

*    *    *

Household has spent about $90 million in the last two years on systems designed to increase productivity and cross-selling in its branches. Household measures branch productivity as "loans closed per account executive per month." This ratio has increased 69% under the new platform known as VISION.

### D. Hochstim (Bear Stearns) Report of 10/08/99

In a series of meetings with investors this week, Household's Bill Aldinger, Gary Gilmer, and Bobby Mehta provided updates on the company's businesses.

Management appears optimistic about internally generated loan growth at HFC and improved profitability as well as account and loan growth in the bankcard business. Loans are expected to grow by about 2.5% in 3Q.

*    *    *

We continue to recommend purchase with a price target of $55 to $60.

*    *    *

- 88 -

A92

Branch business growth has accelerated.... Beneficial branches account for about 1000 of the company's 1400 branches and are now operated with Household's compensation program. Compensation is up (roughly 2/3 is performance based) and attrition is at the lowest level in years. The company's new VISION system enables prescreened leads to be provided as desired to the branches based on a range of criteria.

Loan production per branch has increased by about 25% from a year ago and payoffs/liquidations have fallen by about 20%. Internally generated loans in the branch system are growing at a 15% annualized rate .... The company also believes that Fannie Mae's and Freddie Mac's efforts to expand into non-prime lending will have little impact on Household's home equity lending as a result of the loans' lower average balances and borrowers' payment problems. Household's focus is on helping borrowers consolidate their debt. Nearly all borrowers are approached with offers, almost none approach the company seeking credit. Customers of both the Household and Beneficial branch systems are primarily payment sensitive.

\* \* \*

[T]he company has begun to focus on using its proprietary information to refine its marketing efforts and to attract customers and build business. For example, home equity customers in the branches have been underwritten for credit cards. Branch personnel are paid a fee for each card issued which reduces account acquisition costs to $25 to $40. Underwriting is performed by the company's centralized systems.

237.    On 10/19/99, Household announced 3Q99 results in a press release entitled, "Household International Reports Highest Quarterly Earnings in Company's History," which stated, in part:

*Household International today reported that third quarter net income rose 26 percent to a record $399.9 million, compared with $318.0 million a year ago. Earnings per share increased 32 percent to a record $.83, from $.63 a year ago.*

William F. Aldinger, Household's chairman and chief executive officer said, "Our quarter reflects excellent performance in all of our businesses, with the key drivers being accelerating internal receivable and revenue growth. Retail consumer finance growth was particularly strong. Looking ahead to the fourth quarter and into next year, we see great momentum across all businesses, but most notably in our HFC/Beneficial finance business. I am confident we will achieve our earnings goal for this year and we are well positioned for next year."

238.    Defendants' false statements had their intended effect, and following the announcement of 3Q99 results, analysts from Bear Stearns ("The company delivered what it promised: margin improvement, an increase in profitability, stable credit performance, and faster internally generated receivable growth."), J.P. Morgan and ABN AMRO ("this is a 'blow out' for HI," reiterating Buy and top pick rating) on 10/19/99 again issued very positive reports and advised investors to purchase shares of Household.

239.    On 11/12/99, Household filed with the SEC its 3Q99 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 10/19/99 corporate release, the 3Q99 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

240.    Immediately following defendants' publication of these purported positive results, shares of Household rallied almost $4.00 per share, to close trading at $44.13 per share, on heavy trading volume of 1.2 million shares.

241.    Taking advantage of the artificial inflation in the price of Household's stock, on 12/2/99, defendants announced in a press release that they had arranged to acquire Renaissance Holdings, Inc. ("Renaissance"), a privately held credit card issuer formerly based in Beaverton, Oregon, for $300 million in stock and cash. Following disappointing receivables growth in the 3Q99, down 21% year-over-year, analysts were quick to note that, while Household was paying six times book value, the Renaissance acquisition was important to the Company because it supplied much-needed growth.

242.    The statements made by defendants in ¶¶218-241 above were each materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by the Vision system, were:

(a)    Defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices, which included, among other things:

(i)    Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

(ii)    Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(iii)    Concealing the existence of prepayment penalties (¶¶68-70);

- 90 -

A94

(iv)    Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(v)    Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

(b)    As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against Household's earnings, $484 million of which was for a nationwide settlement with state attorney generals.

(c)    As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to:

(i)    Manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(ii)    Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(iii)    Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, as detailed in ¶¶111-114 and 121, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

(d)    The Officer Defendants designed the predatory lending practices and reaging of delinquent accounts, allowing the Company to:

(i)    Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

(ii)    Under-report non-performing assets and misreport credit quality (¶¶125-133);

- 91 -

A95

(iii)      Consistently report lower loan loss reserves by improperly lowering defaults and prepayments (¶¶102-106 and 125-133);

(iv)      Recognize interest income that should not have been accrued in accordance with the Company's own lending practices and policies (¶¶102-105, 125-133 and 154-155); and

(v)      Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-155).

(e)      As set forth in ¶¶134-155, throughout the Class Period, defendants engaged in improper accounting for Household's credit card co-branding, affinity and third-party marketing agreements, causing Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income. Due to defendants' improper accounting, the Company was forced to restate earnings for an eight-year period from 1994 through 2Q02. As set forth in ¶¶134-153, defendants have admitted that Household's results for FY98 were materially false and misleading and have restated these results as follows:

**DILUTED EPS**

|       | As Reported | Restated | Difference |
|-------|-------------|----------|------------|
| FY98  | $1.03       | $0.94    | <$0.09>    |

(f)      In addition to the false and materially misleading financial data, the Company's SEC filings also contained inadequate risk disclosures that did not disclose the true risks of investing in Household – specifically, the risk of investing in a company that was not reporting its financial results in conformity with GAAP. In addition, and as a result thereof, the purported risk disclosures were wholly ineffective and inappropriate and did not alert investors to the true risks of investing in Household securities.

(g)      Household and the Officer Defendants had no basis to, and did not in fact, believe Aldinger's forecasts of 20+% growth in EPS in FY99 and FY00 because they were impossible to achieve in light of ¶¶(a)-(f) above.

D.   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 2000**

243.   On 1/19/00, Household announced 4Q99 and FY99 results in a press release entitled,

*"Household International Reports Best Quarter and Year in Its History,"* that stated, in part:

Household International today reported that fourth quarter earnings per share increased 30 percent to a record $.92 from $.71 a year ago. Fourth quarter net income rose 25 percent to a record $438.8 million, compared with $349.9 million . a year ago.

For the full year, Household reported record earnings per share of $3.07, which was 33 percent over 1998 operating earnings per share. Net income totaled $1.5 billion, or 29 percent above the prior year's operating net income.

\*   \*   \*

William F. Aldinger, Household's chairman and chief executive officer, said "We are very pleased to report another record quarter, the culmination of an absolutely outstanding year for Household. Growth and profitability in the quarter were excellent and exceeded our expectations. Revenues were particularly strong."

Commenting on the full year results, Aldinger continued, "Our record earnings reflect an outstanding year in our consumer finance business, a dramatic turnaround in our MasterCard/Visa business, and strong results in all of our other businesses. We are particularly pleased with excellent receivable growth in 1999, particularly in our branches, while fully realizing all of the acquisition synergies of the Beneficial merger. We move into the new year with a real sense of excitement, great momentum throughout the company and strong competitive positions in each of our businesses."

\*   \*   \*

Credit quality improved from both the third quarter and a year ago.

\*   \*   \*

Reserves to nonperforming loans were 100.1 percent at year end.

244.   In addition to artificially inflating the price of Household's shares, defendants' false statements also resulted in analysts from Bear Stearns (reiterating "buy") and ABN AMRO (reiterating "top pick" rating – "Credit Quality improved and charge offs have declined to levels not seen since 1997; the outlook is for further improvement") issuing very positive reports on 1/19/00 and 1/20/00 and advising investors to purchase shares of Household.

245.   On 3/24/00, the Company, through its subsidiary, HFC, caused to be filed (or declared effective), a Registration Statement on Form S-3, registering for sale $11.261 billion of debt securities.

- 93 -

A97

246.    On 3/28/00, Household filed with the SEC its FY99 Report on Form 10-K, signed by Aldinger, Schoenholz and the Director Defendants. The FY99 Report on Form 10-K also contained key financial indicators and representations regarding the operational condition of the Company, in part, as follows:

> Our return on average common shareholders' equity ("ROE") rose to 23.5 percent in 1999 compared to 18.2 percent in 1998, excluding merger and integration related costs and the gain on sale of Beneficial Canada, and 17.3 percent in 1997. Our return on average owned assets ("ROA") improved to 2.64 percent in 1999 compared to 2.29 percent in 1998, excluding the nonrecurring items, and 2.03 percent in 1997. Our return on average managed assets ("ROMA") improved to 1.99 percent in 1999 compared to 1.60 percent in 1998, excluding the nonrecurring items, and 1.38 percent in 1997. Including the merger and integration related costs and the gain on sale of Beneficial Canada, ROE was 8.1 percent, ROA was 1.04 percent and ROMA was .72 percent in 1998. *Our operating net income, ROA, ROMA and ROE have increased steadily over the past three years as a result of our focus on higher-return core businesses and improved efficiency.* We expect this trend to continue as we focus on growth of these higher return core businesses.

247.    With respect to its loan delinquencies and charge-off policies, defendants represented that:

> *Our focus is to continue using risk-based pricing and effective collection efforts for each loan.* We have a process that gives us a reasonable basis for predicting the asset quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers is helpful in managing net credit losses.

248.    In addition to reiterating the same false representations as were made in the 1Q00 corporate release, the FY99 Report on Form 10-K also stated that the Company's financial statements met the requirements of Regulation S-X and incorporated by reference information specified by Item 302 of Regulation S-K. The FY99 Report on Form 10-K also contained the "Management's Report" (signed by Aldinger and Schoenholz), which represented to Household shareholders that the consolidated financial statements for FY99 had been prepared in accordance with GAAP, had been audited by Andersen and were an accurate representation of the Company's financials for FY99.

249.    Additionally, defendant Andersen issued a clean audit opinion on 1/14/00, which was incorporated by reference into the Report on Form 10-K. Andersen stated that it had audited Household's financial statements and Schedule 14(d) for FY99 in accordance with GAAS and opined

- 94 -

A98

that it "fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole."

250.    In a further effort to ensure that the Company could continue to manipulate delinquencies and loan loss reserves, in a footnote to the FY99 Report on Form 10-K, Household revealed that it had shifted over $6.7 billion in credit card receivables to its subsidiary, HFC, from its banking unit, after federal banking regulations slated to go into effect would have resulted in the Company stiffening credit charge-offs and delinquency reporting requirements for unsecured consumer debt held.  New regulations had an adverse effect on bank credit card issuers that were competitors of Household.  According to Household's FY99 Report on Form 10-K, however, "The application of the new rules will not have an impact on our financial statements."

251.    On 4/05/00, defendants hosted their annual Financial Relations Conference with analysts and investors, during which they provided additional guidance about the Company.  After this meeting, analysts again issued very positive reports and "Buy" and "Strong Buy" recommendations on Household, in part, as follows:

**Mark Alpert (Deutsche Banc Alex. Brown) Report of 4/05/00**

The bullish tone at Household's recent 2 day investor conference confirmed our confidence in our EPS outlook

Management reviewed trends across all business lines revealing continued strong operating momentum throughout the company in 1Q00.

Technology continues to drive improved efficiency at the company and remains one of management's primary focuses.  We expect a continued high level of technology investments by the company in 2000 to further drive efficiency improvements over the next several years.

Chairman and CEO Bill Aldinger affirmed expected EPS and receivables growth of 15% and 12%, respectively in 2000.

\*    \*    \*

We remain comfortable with our "street high" 1Q and full year 2000 EPS estimates of $0.78 and $3.55, respectively.  We expect the company to report 1Q EPS on 4/19.  Maintain our STRONG BUY rating.

\*    \*    \*

Technology has been a core focus at HI since the mid 80's and is a main factor in the improved efficiency at Household over the last few years.  The VISION system is a proprietary centralized platform that generates and prioritizes millions of new

leads and routs them to the corresponding branch. This not only has driven cross-sell opportunities, but also allowed the sales force to make more efficient targeted sales calls. Additionally the system also identifies customers most likely to switch to competitors. *This accompanied by the company's customer care focus (which it momentarily rewards employees based on)* allows branch managers to better manage customer retention levels.

**R. Napoli (ABN AMRO) Report of 4/05/00**

The company committed to 10% to 12% loan growth and 15% EPS growth in 2000.

Detailed segment presentations confirmed that this company is operationally "hitting on all cylinders"

Much of the time was spent on HI's rapidly developing Internet and other technology efforts (Vision loan management system), in our opinion, the technology strength of this business positively surprised attendees and should help the street view this company as having a foot in the "New Economy."

We reiterate our Top Pick rating on HI and $65 target price.

*       *       *

The strongest growth in the branches will come from traditional home equity and the PHL product. Home equity loans represented 36% of the portfolio up from 30% two years ago. We believe this will continue to increase.

**D. Hendrix (Friedman, Billings Ramsey & Co.) Report of 4/5/00**

*Yesterday's investor conference enhanced our confidence in Household's ability to meet or exceed the company's 15% EPS growth and 10-12% asset growth goals for 2000.* The message was resoundingly clear yesterday – strategic focus, coupled with cost discipline and technological advancement will perpetuate asset and EPS growth. Household is not only the most efficient diversified lender, but also the only lender that offers a full complement of secured and unsecured products catering to the middle-market, specifically sub-prime customer.

252.    On 4/19/00, Household announced 1Q00 results in a press release entitled,

*"Household International Reports Record First Quarter Results,"* which stated, in part:

Household International today reported that earnings per share rose 20 percent to a first quarter record of $.78, from $.65 a year ago. Net income increased to $372.9 million, up 16 percent from $320.8 million in the first quarter of 1999. Cash earnings for the quarter totaled $415 million.

William F. Aldinger, Household's chairman and chief executive officer, said, "This was the *strongest first quarter in our company's history, with all of our businesses performing well.* Revenue and receivable growth were strong, and credit quality continued to improve. To build upon the momentum that is evident in these results, we increased our investment in marketing programs and e-commerce initiatives."

*       *       *

"The year is off to a great start," Aldinger concluded. "We are seeing a continuation of the very positive business trends that emerged in the second half of 1999. We remain comfortable with our receivable, revenue and earnings per share growth targets for 2000."

\*   \*   \*

Revenues grew 21 percent compared to the year-ago quarter, driven by significant receivables growth, an expanded net interest margin and higher fee income.

253.     These consensus-beating results also spurred analysts to issue additional positive reports encouraging investors to purchase Household shares. On 4/20/00, William Blair & Co. reiterated its long-term "Buy" rating and raised its 2000 EPS estimate to $3.53 per share from $3.50, and Bear Stearns also reiterated its "Buy" rating on Household shares and reiterated its near-term price target of $60.00 per share.

254.     On 5/10/00, Household filed with the SEC its 1Q00 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 4/19/00 corporate release, the 1Q00 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

255.     On 5/18/00, after meeting with Household management, including CEO Aldinger, in Philadelphia on 5/17/00, Deutsche Banc issued a report with a "Strong Buy" rating and highlighted the Company's ability to leverage the existing customer base and the fact that Household's credit quality remained stable and was contributing to growth and profitability, as follows:

LEVERAGING THE CUSTOMER BASE. A key to the Household growth story is its potential to leverage the existing base of 45 million customers. Currently, the cross-sell ratio is 1.2x, and management expects to bring that to at least 2x. It estimates that it holds a 12% share of its customer wallet today, and that every 1% increase would add $5 billion to receivables growth. Examples of leveraging the customer would include 1) the branches are now selling 15,000 credit cards per month (home equity borrowers are pre screened and offered a card), 2) the private label business is generating 30% of the branch customers (as they are used for leads to debt consolidation business), and 3) the 6 million of annual turndowns in the private label card business are used to generate card business at the subprime business of recently acquired Renaissance Holdings. Many of the new business leads are generated by the company's technology-based VISION system, which holds data on 200 million consumers, as much as some credit bureaus. Each day, branch representatives have leads ranked by priority and product.

- 97 -

A101

Deutsche Banc also called Household an "under appreciated 'growth'" story.

256.    On 5/26/00, Bear Stearns also issued a report with a "Buy" rating on shares of
Household after participating in a conference call with the Company's Chief Information Officer,
Ken Harvey, who discussed the improvements in information technologies that gave defendants
greater loan monitoring and loss prevention controls and abilities, in part, as follows:

> The company has seen significant increases in productivity from the implementation
> of its Vision system in HFC and Beneficial branches. New accounts grew by 39%
> over the past year and there was a 69% increase in balances associated with new
> accounts.

257.    On 6/22/00, Deutsche Banc Alex. Brown issued a follow-up report on Household
focusing on the Company's denials of claims that it had engaged in predatory lending practices in
the face of the Department of Justice's announcement that it would institute an action against
Associates First, a competitor in the subprime lending market. The Deutsche Banc Alex. Brown
report stated, in part:

> *We also believe that Household, while in many of the same markets* as Associates,
> has a different business model that is less likely to lead to similar legal problems.
> We reiterate our STRONG BUY rating.

258.    On 7/19/00, Household announced 2Q00 results in a press release entitled,
*"Household International Reports Strongest Second Quarter in Its History,"* which stated, in part:

> Household International today reported that earnings per share rose to a second
> quarter record $.80, up 19 percent from $.67 a year ago. Net income increased 17
> percent to $383.9 million, from $326.9 million in the second quarter of 1999. Cash
> earnings per share for the quarter totaled $.88.

> "Our superb second quarter results were highlighted by *outstanding receivables and
> revenue growth and a significant improvement in credit quality,*" said William F.
> Aldinger, Household's chairman and chief executive officer.

> The company's managed receivables portfolio grew 22 percent from a year ago,
> reaching almost $80 billion. The company added $4.5 billion of receivables in the
> quarter, an increase of 6 percent. Revenues rose 20 percent compared to the year-ago
> quarter.

> Aldinger continued, "Our record performance reflects strong sales and marketing
> results in all of our businesses coupled with our continued focus on risk management
> and operational efficiency."

> Aldinger concluded, "Our results to date include significant investments in people,
> technology and marketing to support future growth and profitability. While our plan
> calls for additional investment in the second half of the year, we are comfortable in
> our ability to achieve our 15 percent EPS growth target for 2000."

- 98 -

A102

259.    Defendants' false statements had their intended effect, and following the announcement of 2Q00 results, analysts at UBS Warburg ("company reaffirmed its 15% EPS growth target for 2000"; "[w]e believe HI shares represent a good value"; "reiterate our Buy rating"), Bear Stearns (maintained "Buy" rating), William Blair & Co. ("Our Long-term Buy ... recommendation is supported by management's disciplined strategy to focus on high-margin businesses, be the low-cost provider, and its commitment to strong reserve and capital levels.") and ABN AMRO ("The real story was the cleanliness and quality of the reported earnings .... We reiterate our Top Pick rating on this clean, easy to understand story.") again issued very positive reports and advised investors to purchase shares of Household.

260.    On 8/11/00, Household filed with the SEC its 2Q00 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations made in the 6/19/00 corporate release, the 2Q00 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

261.    On 9/07/00, after meeting with CEO Aldinger and heads of major Household operating divisions at the Company's Chicago offices, Deutsche Banc Alex. Brown reiterated its "Strong Buy" recommendation on the Company in its report, as follows:

> Aldinger reiterated the sentiment that Household's businesses are stronger than ever. He expressed comfort with an EPS growth rate of 15% for FY 2000, and a 13-15% EPS growth target over the next 3-4 years.

> \*    \*    \*

> Fundamentally, all of the metrics seem to be in place for a strong FY 2000 and 2001. Management has set a three- to four-year EPS growth target range of 13-15%. Internal receivables growth is running above the high-end of management's target of 12-15%.

> In the aftermath of Citigroup's agreement to acquire Associates First, Household gains scarcity value, in our opinion, and management will be under greater scrutiny to enhance shareholder value. We reiterate our target price of 15x our 2001 EPS estimate of $4.00, or $60 (on a one year horizon). We continue to rate the shares a STRONG BUY.

> \*    \*    \*

- 99 -

A103

Household's home equity portfolio is the strongest that it has ever been ($34.0 billion in receivables), with 80% of the growth coming from the secured portfolio. Key drivers of internal growth are Household's branch network (1400 branches with expectations of opening 25 per year), its centralized processing model, customer relationships, and personnel.

\* \* \*

We were given a demonstration of Household's proprietary lead generation tool, Vision. The system runs on all of the company's branches, allowing various offices to view the same information on customer accounts in real-time. Vision tracks customer account history, queuing customer service reps. on the next best product to sell. Once a sale is closed, the system generates the appropriate paperwork and correspondence. Thus, Vision raises the level of productivity, allowing the sales force to focus on selling ancillary products, as well as bringing in new business. The system also allows branch managers to be more effective in delegating accounts to the sales force. Going forward, management expects Vision to increase the cross-sell ratio from 1.2x to at least 2x. *By all accounts, the Vision technology platform is ahead of what we've seen at other companies, and is central to Household's cross-sell and e-commerce initiatives.* In our opinion, Vision gives Household a competitive advantage, allowing the company to leverage its 45 million customer base.

262.    On 9/13/00, the Company, through its subsidiary, HFC, caused to be filed (or declared effective), a Registration Statement on Form S-3, registering for sale $10 billion of debt securities.

263.    On 10/18/00, Household announced 3Q00 results in a press release entitled, *"Household International Reports Highest Quarterly EPS in Its History; Ninth Consecutive Record Quarter,"* which stated, in part:

Third quarter earnings per share rose 13 percent to $.94, compared to $.83 a year ago. Net income also rose to a third quarter record of $451.2 million, a 13 percent increase from $399.9 million a year ago. Cash earnings per share for the quarter totaled $1.02.

\* \* \*

"Our strong third quarter results reflect a continuation of outstanding receivables and revenue growth. At the same time, we achieved year-over-year improvements in credit quality," said William F. Aldinger, Household's chairman and chief executive officer.... These positive trends give us a high degree of confidence in our ability to deliver 15 percent EPS growth for 2000."

264.    Following the publication of the release of these record-breaking, stellar results, shares of Household traded above $50.00 per share on 10/19/00.

265.    In addition to inflating the price of Household shares, defendants' false statements also resulted in analysts from Friedman, Billings, Ramsey & Co. ("With obvious strength in its business model, HI's management has guided analysts to the top end of its 12-15% annual EPS

- 100 -

A104

growth range ... price target raised to $55 from $48.") and ABN AMRO (reiterating "Top Pick"

rating) issuing favorable reports on the Company.

266.     On 11/07/00, Household issued a press release entitled, "Household International

Responds to Citigroup's Announcement to Change Lending Practices at Associates First Capital,"

which stated:

> Household International supports Citigroup's announcement today of its efforts to
> boost consumer protections at Associates First Capital. Their proposed *changes are*
> *generally consistent with the stringent policies and procedures that have long been*
> *in place at Household International.*
>
> *Household's long-standing view has been that unethical lending practices of any*
> *type are abhorrent to our company, employees, and most importantly our*
> *customers.* So-called "predatory lending" practices undermine the integrity of the
> industry in which we compete.

267.     The statement in ¶266 above was materially false and misleading when made. As set

forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants,

based on their review of Household's internal operating data, including information provided to them

by Household's Vision system, were that defendants were engaged in a widespread and consistent

pattern of improper and illegal predatory lending practices. These practices included, among other

things:

(a)     Misrepresenting the interest rates and savings associated with loans by

providing deceptive and nonconforming loan documents to borrowers that were designed to obscure

actual loan amounts and interest rates (¶¶55-60);

(b)     Failing to disclose "discount points" that were nothing more than stacked fees

and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(c)     Concealing the existence of prepayment penalties (¶¶68-70);

(d)     Using such practices as fraud and forgery to sell ancillary products, such as

life, disability and other types of credit insurance (¶¶71-74); and

(e)     Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

268.     As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted.

269.     On 11/14/00, Household filed with the SEC its 3Q00 Report on Form 10-Q, signed

by defendant Schoenholz. In addition to reiterating the same false representations made in the

10/18/00 corporate release, the 3Q00 Report on Form 10-Q also stated, in part, that the unaudited

quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of

management, all adjustments (consisting of normal recurring accruals) considered necessary for a

fair presentation."

      270.    During the first week of 12/00, defendants Aldinger and Schoenholz participated in

a series of one-on-one meetings with analysts, during which defendants again reassured them about

the strength of the Company's business. After the meetings, these analysts issued reports as follows:

### D. Hochstim (Bear Stearns) Report of 12/01/00

*The company has seen no signs of credit deterioration .... The company has stress tested its portfolio and has assumed worse than expected delinquencies and chargeoffs in its 2001 planning. We believe reserves are adequate given the company's conservative coverage of losses and the continuing shift to secured lending.*

*   *   *

We continue to recommend purchase of HI shares with a Buy rating and a near term target price of $61, or 15x our 2001 estimate. We continue to believe that the company's solid EPS growth justifies a higher valuation.

### Joel Gomberg (William Blair & Co.) Report of 12/06/00

Management conveyed a positive outlook, and the all-day meetings renewed our conviction in the company's increasing ability to add considerable value through its broad product array, multiple distribution channels, partnership skill-set, and potent technology platform.

      271.    The statements made by defendants in ¶¶243-265 and 269-270 above were each

materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then

known to or recklessly disregarded by defendants, based on their review of Household's internal

operating data, including information provided to them by Household's Vision system, were:

      (a)    Defendants were engaged in a widespread and consistent pattern of improper

and illegal predatory lending practices, which included, among other things:

      (i)    Misrepresenting the interest rates and savings associated with loans

by providing deceptive and nonconforming loan documents to borrowers that were designed to

obscure actual loan amounts and interest rates (¶¶55-60);

(ii)    Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(iii)    Concealing the existence of prepayment penalties (¶¶68-70);

(iv)    Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(v)    Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

(b)    As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against Household's earnings, $484 million of which was for a nationwide settlement with state attorney generals.

(c)    As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to:

(i)    Manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(ii)    Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(iii)    Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, as detailed in ¶¶111-114 and 121, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

(d)    The Officer Defendants designed the predatory lending practices and reaging of delinquent accounts, allowing the Company to:

(i)    Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure

- 103 -

A107

of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

(ii)     Under-report non-performing assets and misreport credit quality (¶¶125-133);

(iii)     Consistently report lower loan loss reserves by improperly lowering defaults and prepayments (¶¶102-106 and 125-133);

(iv)     Recognize interest income that should not have been accrued in accordance with the Company's own lending practices and policies (¶¶102-106, 125-133 and 154-155); and

(v)     Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-153).

(e)     As set forth in ¶¶134-155, throughout the Class Period, defendants engaged in improper accounting for Household's credit card co-branding, affinity and third-party marketing agreements, causing Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income. Due to defendants' improper accounting, the Company was forced to restate earnings for an eight-year period from 1994 through 2Q02. As set forth in ¶¶134-153, the Officer Defendants have admitted that Household's results for FY99, 1Q00, 2Q00 and 3Q00 were materially false and misleading and have restated these results as follows:

## DILUTED EPS

|       | As Reported | Restated | Difference |
|-------|-------------|----------|------------|
| FY99  | $3.07       | $2.95    | <$0.12>    |
| 1Q00  | $0.78       | $0.74    | <$0.04>    |
| 2Q00  | $0.80       | $0.77    | <$0.03>    |
| 3Q00  | $0.94       | $0.91    | <$0.03>    |

(f)     In addition to the false and materially misleading financial data, the Company's SEC filings also contained inadequate risk disclosures that did not disclose the true risks of investing in Household -- specifically, the risk of investing in a company that was not reporting its financial results in conformity with GAAP. In addition, and a result thereof, the purported risk

- 104 -

A108

disclosures were wholly ineffective and inappropriate and did not alert investors to the true risks of

investing in Household securities.

**E.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 2001**

272.    On 1/17/01, Household announced 4Q00 and FY00 results in a press release entitled,

***"Household International Reports Highest Full Year and Quarterly EPS in Its History; Tenth***

***Consecutive Record Quarter,"*** which stated, in part, that:

> Household International today reported full year earnings per share of $3.55, a 16
> percent increase over $3.07 a year ago and the highest earnings per share in the
> company's 122-year history. Net income totaled $1.7 billion, or 14 percent above the
> prior year.
>
> Net managed revenues for the full year increased 18 percent to $8.9 billion,
> compared to $7.5 billion in 1999.
>
> Household's fourth quarter earnings per share rose 12 percent to a record $1.03, from
> $.92 a year ago. Fourth quarter net income rose 12 percent to an all-time high of
> $492.7 million, compared with $438.8 million a year ago.
>
> "These strong fourth quarter results cap off a terrific year in which we delivered on
> all or our earnings and growth goals," said William F. Aldinger, Household's
> chairman and chief executive officer. ***"Growth and profitability in the quarter were***
> ***excellent, while credit quality and our balance sheet remained strong...."***
>
> Commenting on the full year results, Aldinger continued, ***"Our record earnings per***
> ***share reflect strong top-line growth and improved credit quality.*** At the same time,
> we made significant investments in our technology and human capital that enhance
> our ability to achieve sustainable and consistent revenue and receivables growth. We
> have built a powerful franchise that is capable of delivering 13 to 15 percent annual
> earnings per share growth."

273.    Following the publication of the release of these record-breaking, stellar results,

shares of Household traded as high as $57.13 per share.

274.    Defendants' false statements had their intended effect, and, following the

announcement of 4Q00 and FY00 results, analysts again issued very positive reports, strongly

reiterating "Buy" ratings and advising investors to purchase shares of Household.

275.    On 2/01/01, Deutsche Banc Alex. Brown hosted an investor meeting for Household's

CEO, Aldinger, in New York. As a result of this meeting, and based on Aldinger's discussions with

analysts, Deutsche Banc Alex. Brown issued a report that stated, in part:

> Mr. Aldinger expressed his bullishness on the future prospects for the company ....

Household is very comfortable with its guidance of 13%-15% EPS over the next three years. Mr. Aldinger provided several reasons why Household will meet its objective. First, the company is entering 2001 with higher receivables than expected. Second, Fed rates cuts which were not factored into Household business model will further improve the company's margin.  Household estimates that for a 50 bps reduction in rates, EPS improves by $0.10.  Third, the slowing economy will likely provide Household with portfolio acquisition opportunities.  Lastly, in a slowing economy, Household believes it is better positioned against competitors based on its brand name, market presence, diverse revenue stream, and borrower profile.

*    *    *

Household believes that its pre-payment fees on its real estate portfolio lessens the impact from refinance (refi) activity. About 75% of the portfolio carries pre-payment penalties, making it expensive for a borrower to exit the Household network.  In 1998, only 25% of home equity loans had prepayment penalties. Household has also extended the life of its loans to reduce refi activity.  Lastly, the company has enhanced its service, thereby raising the level of customer satisfaction.  This three-pronged strategy has led to lower attrition.

*    *    *

We reiterate our STRONG BUY rating on the stock.

276.    On 2/23/01, the Company, through its subsidiary, HFC, caused to be filed (or declared effective), a Registration Statement on Form S-3, registering for sale $1 billion of unsecured medium-term notes called "HFC InterNotes (SM)."

277.    On 3/28/01, Household filed with the SEC its FY00 Report on Form 10-K, signed by Aldinger, Schoenholz and the Director Defendants.  In addition to reiterating the same false representations made in the 1/17/01 corporate release and in the meetings with analysts, the FY00 Report on Form 10-K also stated, in part, that the Company's financial statements met the requirements of Regulation S-X and incorporated by reference information specified by Item 302 of Regulation S-K. The FY00 Report on Form 10-K also contained the "Management's Report" (signed by Aldinger and Schoenholz), which represented to Household shareholders that the consolidated financial statements for FY00 had been prepared in accordance with GAAP, had been audited by Andersen and were an accurate representation of the Company's financials for FY00.

278.    With respect to its loan delinquencies and charge-off policies, defendants represented that:

*Our focus is to continue using risk-based pricing and effective collection efforts for each loan.* We have a process that gives us a reasonable basis for predicting the asset quality of new accounts.  This process is based on our experience with

- 106 -

A110

numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers is helpful in managing net credit losses.

279. Additionally, defendant Andersen issued a clean audit opinion on 1/15/01, which was incorporated by reference into the FY00 Report on Form 10-K. Andersen stated that it had audited Household's and its subsidiaries' financial statements for each of the three years in the period ended 12/31/00 in accordance with GAAS and opined that these consolidated financial statements "present fairly, in all material respects, the consolidated financial position" of Household and its subsidiaries in conformity with GAAP.

280. On 3/23/01, *Origination News*, a division of *American Banker*, also quoted Gilmer, who again defended the Company from charges of predatory lending. Gilmer was quoted as stating that Household's "position on predatory lending is perfectly clear. Unethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers." *The Christian Science Monitor* also reported Household spokesman Craig Streem's statement that the Company had conducted research to determine whether customers understood the terms of their loans, and the result was that, overwhelmingly, borrowers fully understood the terms of their loans.

281. The statement in ¶280 above was materially false and misleading when made. As set forth in ¶¶51-101, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were that defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices. These practices included, among other things:

(a)    Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

(b)    Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(c)    Concealing the existence of prepayment penalties (¶¶68-70);

- 107 -

A111

(d)    Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(e)    Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

282.    As set forth in ¶¶51-101, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against Household's earnings, $484 million of which was for a nationwide settlement with state attorney generals.

283.    At a 4/02/01 dinner for investors, CFO Aldinger strongly reaffirmed the Company's outlook for 13%-15% EPS growth in 2001, regardless of declining economic conditions that were already adversely affecting Household's competitors.

284.    On 4/03/01, following defendants' Annual Financial Relations meeting, analysts were so impressed with senior management's discussion of business that they reiterated or raised Household's rating to a "Buy." Bear Stearns raised its price target to $70.00 (from $65.00) in a report that stated:

**D. Hochstim/S. Coren (Bear Stearns) Report of 4/04/01**

Household remains particularly well positioned for a slowdown .... *The company continues to carefully manage credit risk, improve customer service, productivity, and operating efficiency.* In addition, the company has been preparing for a downturn for more than a year, having tightened underwriting standards, raising cutoffs, reducing credit lines, and building its collection staff. The company's experience lending to consumers over the past one hundred-plus years, its tightening of underwriting, and its continued reserve building should enable the company to effectively weather a downturn. (Interestingly there are no signs yet of credit stress among its customers.)

\*    \*    \*

The company continue [sic] to emphasize secured lending and is only soliciting home owners.

Prepayment penalties on 75% of the portfolio (and about 95% of recent production) provide prepayment protection.

**Robert P. Napoli (ABN AMRO) Report of 4/04/01**

*There were no real surprises at the meeting other than the fact that the business continues to perform so well in an environment that includes a continuous stream of negative company announcements.*

- 108 -

*Credit trends stand out in particular, as HI seems to have the sector's most positive trends.* We are projecting increasing credit losses for essentially all consumer and commercial finance companies under our coverage ... a 20% increase in consumer credit losses for the US. Supporting our outlook is the fact that consumer bankruptcies have spiked up this year by about 16% (year to date) after falling for two years. *HI is bucking this trend as it repeatedly said credit losses are stable.*

*Chairman/CEO Bill Aldinger strongly affirmed HI's outlook for 13% to 15% EPS growth in 2001, regardless of the economic environment.*

\*   \*   \*

Predatory lending issues do not seem to be a significant risk for HI .... *We continue to believe that HI has one of the cleanest consumer lending operations in the U.S. and thus is least likely to have predatory lending issues.*

Legg Mason reiterated a strong "Buy" rating and noted in a 4/04/01 report:

**David Sochol (Legg Mason) Report of 4/05/01**

We concur with *management's assessment that HI is well positioned to deliver attractive relative growth even amid a sharper economic slowdown*, as NIM improvement, portfolio acquisitions, and share buybacks should more than offset higher credit costs (although at present HI continues to see fairly stable portfolio performance).

\*   \*   \*

[David Schoenholz] commented that he is *absolutely confident that HI is well ahead of the curve on asset quality* and expects a solid 1Q01 as well as strong 2001. HI is seeing stable delinquency trends in 1Q01, and expects further increase in the risk-adjusted margin during the year.

285.    On 4/18/01, Household issued a release announcing another "Record" Quarter,

reporting its *"11th Consecutive Record Quarter."* The release stated:

Household International today reported that earnings per share rose 17 percent to a first quarter record of $.91 from $.78 a year ago. Net income increased to $431.8 million, up 16 percent from $372.9 million in the first quarter of 2000. This quarter marked the 11th consecutive quarter of record results.

William F. Aldinger, Household's chairman and chief executive officer, said "Our outstanding results reflect the sustainability and earnings power of our franchise. Receivables and revenues grew nicely in the quarter. At the same time, credit quality remained stable and we strengthened our balance sheet. We also repurchased 8.8 million shares in the quarter.

"All of our businesses are performing well and have great momentum," Aldinger added....

"We are very comfortable with our ability to achieve our receivable and earnings per share growth targets for 2001." Aldinger concluded, "I look forward to another record year."

- 109 -

A113

286. On 5/03/01, the Company, through its subsidiary, HFC, caused to be filed (or declared effective), a Registration Statement on Form S-3, registering for sale $16.57 billion of debt securities.

287. Following the announcement of yet another "record" quarter, shares of Household traded to a near-Class-Period high of $64.00 per share. By 5/08/01, Household shares traded as high as $66.75, and by 5/17/01, they reached the Class-Period high of $69.90 per share.

288. On 5/09/01, Household filed its 1Q01 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations made in the 4/18/01 release, the 1Q01 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

289. On 7/18/01, Household issued a release announcing its *"12th Consecutive Record Quarter."* The release stated:

> Household International today reported record earnings per share of $.93, up to 16 percent from a year ago. Net income rose 14 percent, to $439.0 million, from $383.9 million for the second quarter of 2000.
>
> William F. Aldinger, Household's chairman and chief executive officer, said, "We had a terrific quarter – our 12th consecutive quarter of record results. *Given the softening economic environment, I am particularly pleased with our ability to consistently deliver strong, quality earnings.*
>
> "Results for the quarter were excellent," Aldinger added. "We enjoyed strong receivable and revenue growth compared to a year ago, with all of our businesses performing well. In addition, delinquency was stable in the quarter ....
>
> "Our strong performance to date has positioned us well to achieve another record year in 2001," Aldinger concluded.

290. Based on these purported positive results, shares of Household again rallied to a Class-Period-closing high of $69.48 on 7/18/01.

291. Defendants' false statements had their intended effect, and, on 7/18/01, following the release of the report of 2Q01 results, several analysts issued very positive reports and advised

investors to purchase shares of Household: UBS Warburg report ("Credit quality continues to hold up better than expected with charge-offs up 15 basis points to 3.71% and delinquencies holding steady at 4.27% ... reiterate our Buy rating"); William Blair & Co. report ("Another impressive quarter.... Management reiterates confidence in 15% EPS growth in 2001 .... *Household has among the best credit-quality patterns in the industry.... Management anticipates generally stable credit for balance of 2001*"); Legg Mason report ("reiterate our Strong Buy rating based on the company's continuing solid execution, better-than-expected fundamentals, impressive absolute and relative performance, our increased confidence in its ability to consistently deliver 15% EPS growth this year and next, and our expectation that this will drive further P/E multiple expansion"); and Bear Stearns report ("No surprises, very clean quarter, receivable growth strong, credit stable, profitability (23% ROE) still very high.").

292.    On 8/10/01, Household filed with the SEC its 2Q01 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations made in the 7/18/01 release, the 2Q01 Report on Form 10-Q falsely stated that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

293.    On 7/23/01, defendants caused Household to issue a release entitled, "Household International Redefines Best Practices in Subprime Lending," stating:

> Household International, the $101 billion (managed assets) consumer lender, announced today the broadest set of voluntary responsible lending initiatives ever seen in the consumer finance industry ... and will protect millions of consumers from unethical and unfair lending practices.
>
> *Household's new Best Practice Initiatives are an addition to the company's already comprehensive responsible lending practices and go far beyond any existing city, state or federal regulatory/legal requirements.*
>
> Designed to become a benchmark in the consumer finance industry, Household's initiatives include:
>
> - reducing the prepayment fee duration from five years to three years on all real estate loans;
>
> - identifying borrowers nationwide who have been victims of predatory lending and are at risk of losing their homes through foreclosure; and providing them with tailored solutions, such as subsidized interest rates and no-fee loans;

- 111 -

A115

- providing new and existing customers who have a better credit rating/payment history with dramatically-improved interest rates;

- implementing new and enhanced standards to ensure every loan made by Household has numerous tangible customer benefits; and

- doubling customers' time to cancel any insurance product (from 30 to 60 days) and improving disclosure.

\* \* \*

"On behalf of Household and our 32,000 employees, I am very proud to announce the adoption of these Best Practice Initiatives that perfectly complement our 123 year history of responsible lending," said William F. Aldinger, chairman and chief executive officer of Household International.

\* \* \*

In addition to these new Initiatives, Household already has a variety of responsible lending programs and practices in place to ensure its customers are treated fairly. For example, at the time of loan closing, Household shows all borrowers (unless they specifically decline to view it) an educational video on the loan closing process that reiterates the terms, features and conditions of their loan. Then, they are asked to complete a survey confirming they understand the key elements of their loan and their satisfaction with the service they received.

294.     On 7/24/01, *The New York Times* published a statement by Household spokesperson Craig Streem, which said that the timing of these policies was not tied to actions by any fair-lending advocates and that the Company had been working on the announced changes for "quite some time. So, it really is a coincidence."

295.     The clear purpose and intent was to condition investors to believe that Household was *not* engaged in predatory lending and that the Company had adopted and initiated a comprehensive program to assure that such illicit practices were not being adopted by Household employees.

296.     On 8/30/01, after meeting with executive management at the Company's headquarters, William Blair & Co. analyst Joel Gomberg issued a report stating, in part:

Management conveyed a positive outlook, and the onsite meeting renewed our conviction in the company's increasing ability to add considerable value through its broad product array, multiple distribution channels, risk-management skills, and potent technology platform.

\* \* \*

Management continues to be confident in its ability to achieve its target of 15% EPS growth in 2001 and 13%-15% in 2002. While the extent of the economic deceleration remains unknown, Household took a more defensive posture early by migrating its portfolio from unsecured credit to lower-loss real estate secured.

- 112 -

A116

297.    On 9/26/01, after meeting with management (Aldinger, Schoenholz, Gilmer, Bangs,

Fabiano and Harvey) at the Company's headquarters, Deutsche Banc Alex. Brown analyst Mark

Alpert issued a report reiterating defendants' false representations. The report raised EPS estimates,

stating:

> We have more confidence in our earnings forecast for Household than virtually any
> other company in our universe (except the GSEs, Fannie and Freddie).
>
> *    *    *
>
> Household's course has not changed over the last 12-18 months....
>
>        Management is sticking to its long-term EPS growth target of 13%-15%,
> driven by revenue growth.... Momentum is strong going into next year, and the
> company is confident that even in a recession it will meet the low end of the range.
>
> *There are few other companies with such solid outlook in our universe.*

298.    On 10/17/01, Household announced 3Q01 results in a release entitled, *"Household

Reports Highest Quarterly Net Income in Its 123-Year History."*  The release stated:

> Earnings per share of $1.07 rose 14 percent from $.94 the prior year.  Net income
> increased 12 percent, to $504 million, from $451 million in the third quarter of 2000.
>
> "Household's performance this year has been outstanding, even as the economy has
> continued to weaken," said William F. Aldinger, chairman and chief executive
> officer. "The third quarter was no exception. *Receivable and revenue growth were
> strong, and credit performance was within our expectations.   We further
> strengthened our balance sheet* and continued to repurchase shares.
>
> *    *    *
>
> "The strength of our franchise gives me confidence that we will achieve the high end
> of our earnings target of 13 to 15 percent EPS growth for the year," Aldinger
> concluded.

299.    On 11/14/01, Household filed with the SEC its 3Q01 Report on Form 10-Q, signed

by defendant Schoenholz.   In addition to reiterating the same false representations made in

Household's 3Q01 release, the 3Q01 Report on Form 10-Q stated, in part, that the unaudited

quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of

management, all adjustments (consisting of normal recurring accruals) considered necessary for a

fair presentation."

300.    On 11/16/01, UBS Warburg issued a report reiterating management's explanation that

a suit against Household brought by the California Department of Corporations regarding over-

billing was the result of a computer "glitch." Based on the Company's assurances, UBS Warburg did not adjust its rating on shares of Household and continued to maintain a $70.00 price target for Household shares. Reflecting defendants' assurances, Bear Stearns issued a report calling the share price decline that resulted from the announcement of the California settlement an "overreaction." Bear Stearns did not adjust its $75.00 price target on Household shares.

301.    On 11/26/01, the *National Mortgage News* reported that the Company had issued a formal statement regarding charges of predatory lending, stating that Household "vehemently denies any assertion that it has willfully violated laws that regulate its business."

302.    The statements made by defendants in ¶¶272-279 and 283-301 above were each materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were:

(a)    Defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices, which included, among other things:

(i)    Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

(ii)    Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(iii)    Concealing the existence of prepayment penalties (¶¶68-70);

(iv)    Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(v)    Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

(b)    As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against Household's earnings, $484 million of which was for a nationwide settlement with state attorney generals.

- 114 -

A118

(c)    As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to:

(i)    Manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(ii)    Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(iii)    Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, as detailed in ¶¶111-114 and 121, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

(d)    The Officer Defendants designed the predatory lending practices and reaging of delinquent accounts, allowing the Company to:

(i)    Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

(ii)    Under-report non-performing assets and misreport credit quality (¶¶125-133);

(iii)    Consistently report lower loan loss reserves by improperly lowering defaults and prepayments (¶¶102-106 and 125-133);

(iv)    Recognize interest income that should not have been accrued in accordance with the Company's own lending practices and policies (¶¶102-106 and 125-133); and

(v)    Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-153).

(e)    As set forth in ¶¶134-155, throughout the Class Period, the Officer Defendants engaged in improper accounting for Household's credit card co-branding, affinity and third-party

marketing agreements, causing Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income. Due to defendants' improper accounting, the Company was forced to restate earnings for an eight-year period from 1994 through 2Q02. As set forth in ¶¶134-155, the Officer Defendants have admitted that Household's results for 4Q00, FY00, 1Q01, 2Q01 and 3Q01 were materially false and misleading and have restated these results as follows:

### DILUTED EPS

|  | As Reported | Restated | Difference |
|---|---|---|---|
| 4Q00 | $1.03 | $0.99 | <$0.04> |
| FY00 | $3.55 | $3.40 | <$0.15> |
| 1Q01 | $0.91 | $0.85 | <$0.06> |
| 2Q01 | $0.93 | $0.90 | <$0.03> |
| 3Q01 | $1.07 | $1.03 | <$0.04> |

(f)     In addition to the false and materially misleading financial data, the Company's SEC filings also contained inadequate risk disclosures that did not disclose the true risks of investing in Household – specifically, the risk of investing in a company that was not reporting its financial results in conformity with GAAP. In addition, and as a result thereof, the purported risk disclosures were wholly ineffective and inappropriate and did not alert investors to the true risks of investing in Household securities.

303.     By 12/01, Household's purported success far outpaced industry competitors. On 12/10/01, *BusinessWeek* printed an article, stating:

> *How is Household thriving despite the tough environment? Executives attribute the company's success to strong collection practices and its long history in the business.* "Investors ask us what will happen if we go through a recession," says Craig A. Streem, vice-president. "And we can talk about how we did in the Great Depression." Then, the company's losses rose until 1932, then dropped sharply....
>
> *     *     *
>
> *Household says that its hands-on approach to dealing with borrowers is the backbone of its business model. "We get paid for being flexible in working with our borrowers,"* says Streem. To keep loan losses low, the company doubled its collections staff in the past 18 months, to 5,000, he says. Collectors are paid salary plus a bonus for keeping loans current and on the books.

The *BusinessWeek* article continued, stating that while most analysts wholeheartedly recommended purchase of Household shares – most of which had investment banking relationships with the

Company – at least one analyst claimed that Household's accounting policies understated losses and delinquencies. The report summarized both the allegations and the Company's direct denials:

HOUSEHOLD IS ACCUSED OF:

- Rolling over late loans by adding missed payments to ends of loans, thus masking delinquencies

- Delaying recognition of charge-offs to boost earnings

- Moving loans from its bank subsidiary to minimize need for reserves

- Cutting on balance sheet reserves, though its portfolio is riskier

HOUSEHOLD REPLIES:

- The practice is an industry norm, and collection rates improve after loans are "reaged"

- Charge-off policy follows industry standards closely

- Applying bank regulatory rules would barely increase the amount of charge-offs

- Total reserves are at the highest level in company history

304.    To shore up investors, on 12/04/01, defendant Aldinger spoke at an investor conference, where he directly addressed concerns raised in a recent *Barron's* article regarding the Company's accounting practices. The following day, UBS Warburg analyst J. McDonald maintained a "Buy" rating based on Aldinger's representations and issued a report on Household entitled "Management Remains Confident in Outlook," which stated, in part:

> Mr. Aldinger cited three factors that have enabled Household to deliver favorable credit performance in a difficult economic environment: maintaining prudent growth and avoiding major trouble spots, managing portfolio mix to a lower-risk blend, and taking proactive steps to improve collections and reduce open-to-buy exposure.
>
> Management stated that it is comfortable with current reserve levels. The company held 102% reserve coverage of managed charge-offs at the end of 3Q01. It increased its managed reserves by $569 million, 19%, from last year and has over-provisioned relative to charge-offs (on an owned and managed basis) for the past several quarters.
>
> *    *    *
>
> The company provided some detail on the "other unsecured" loan category and "personal homeowner loans" (PHLs). PHLs are high-LTV loans that are secured by real estate but are underwritten, priced, and reported as unsecured loans. Mr. Aldinger stated that, contrary to a recent press article, the average PHL loan size is $15,000 and the company never reclassifies any of its loans from one category to another.

\* \* \*

Addressing a recent press article questioning some changes to the company's accounting practices, Mr. Aldinger noted that Household's policy for charging-off unsecured consumer finance loans was implemented in 1996 to align the company's practices with other non-bank consumer lenders. *The changes comply with applicable accounting standards, were fully disclosed, and have been uniformly applied since that time.*

\* \* \*

Mr. Aldinger expressed satisfaction with the firm's reserve policy, emphasizing the Company's recent reserve-building achievements....

\* \* \*

Mr. Aldinger restated his confidence in Household's ability to deliver 13%-15% EPS growth in 2002....

305.    Based on Aldinger's false reassurances, the price of Household stock increased $2.69 to close at $59.15.

306.    On 12/14/01, Bear Stearns issued a positive report on Household. Responding to additional guidance given by the Company, the report stated:

> The company's ability to defer chargeoffs on its unsecured loan portfolio for as much as 18 months concerns some observers. This concern seems unwarranted as 98% of unsecured loans are charged off by 12 months delinquent.
>
> We don't believe earnings are distorted by re-aging as Household only re-ages about 10% of its other unsecured and real estate secured lending customers.

\* \* \*

> The recent controversy [over the company's delinquency and chargeoff policies] seems unjustified given the fact that Household's delinquency and chargeoff policies are old. They have been consistently applied for the past five years.
>
> *We believe the company's reserving is also unaffected by its delinquency recognition and re-aging policies as reserves are established based on expected losses. Re-aging a small percentage of accounts or delaying chargeoffs will not materially alter collections or the need for reserves as the company's experience enables it to fairly accurately predict its credit experience (which is also reflected in its risk based pricing).*

\* \* \*

> Re-aging accounts does defer chargeoffs, but in most cases, it actually appears to AVOID CHARGEOFFS.

\* \* \*

- 118 -

A122

*Household does re-age accounts, but this practice is reserved for the company's best customers. Contrary to the belief of some other analysts, the company has no automatic re-age policy....*

307.    The statements made by defendants in ¶¶303-306 above were each materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were:

(a)    As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(b)    Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(c)    Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

308.    The Officer Defendants' reaging of delinquent accounts allowed the Company to:

(a)    Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

(b)    Under-report nonperforming assets and misreport credit quality (¶¶125-133); and

(c)    Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-153).

309.    On 12/18/01, the Company, through its subsidiary, HFC, caused to be filed (or declared effective), a Registration Statement on Form S-3, registering for sale $3 billion of debt securities.

- 119 -

A123

F.     **DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING 2002**

310.     On 1/10/02, the Company, through its subsidiary, HFC, caused to be filed (or declared

effective), a Registration Statement on Form S-3, registering for sale $15 billion of debt securities.

311.     On 1/16/02, Household issued a release announcing "Record Quarterly and Full-Year

Net Income" for 4Q01 and FY01. The release stated:

> *Household International today reported fourth quarter earnings per share of*
> *$1.17, its fourteenth consecutive record quarter.* Fourth quarter earnings per share
> rose 14 percent from $1.03 the prior year. *Net income in the fourth quarter*
> *increased 11 percent, to an all-time quarterly record of $549 million.*
>
> For the full year, Household reported earnings per share of $4.08, representing a 15
> percent increase from $3.55 in 2000. Net income for 2001 totaled $1.9 billion, also
> an all-time high, 13 percent above $1.7 billion earned in 2000.
>
> "Household's fourth quarter results were simply outstanding," said William F.
> Aldinger, chairman and chief executive officer, "demonstrating the tremendous
> strength and earnings power of the Household franchise. Receivable and revenue
> growth exceeded our expectations while credit indicators weakened only modestly
> in a tough economic environment. Recognizing the importance of a strong balance
> sheet, we provided $154 million in excess of owned chargeoffs, bringing our reserves
> to their highest level ever."
>
> Commenting on the full-year's results, Aldinger added, "In 2001, we demonstrated
> that our business model generates superior results in a weak economy as well as in
> the strong economic periods of previous years. Exceptional revenue growth of 18
> percent more than offset the increases in credit losses during the year. We further
> strengthened our balance sheet while investing in sales and marketing to position our
> franchise for sustainable growth in the future. We are well-positioned to deliver 13
> to 15 percent EPS growth for 2002."

312.     Subsequent to the Company's announcement of 4Q01 and FY01 results on 1/16/02,

defendants Aldinger and Schoenholz hosted a conference call on the same day to discuss its business

and prospects. Based on Household management's 1/11/02 press release and statements to analysts,

including the 1/16/02 conference call, analysts wrote positive reports about Household and its

prospects. These reports were consistent with and repeated management's false and misleading

statements, which statements had been made to the analysts with the intention they would be

repeated to the market.

313.     On 3/13/02, Household filed with the SEC its FY01 Report on Form 10-K, signed

by defendants Aldinger and Schoenholz. In addition to reiterating the same false representations

made in the 1/16/02 corporate release and in the meetings with analysts, the FY00 Report on Form

- 120 -

**A124**

10-K also stated that the Company's financial statements met the requirements of Regulation S-X and incorporated by reference information specified by Item 302 of Regulation S-K. The FY01 Report on Form 10-K also incorporated by reference information relating to Credit Quality Statistics, Credit Loss Reserves Activity and NIM from the 2001 Annual Report. The FY01 Report on Form 10-K also contained the "Management's Report" (signed by Aldinger and Schoenholz), which represented to Household shareholders that the consolidated financial statements for FY01 had been prepared in accordance with GAAP, had been audited by Andersen and were an accurate representation of the Company's financials for FY01.

314.    In addition, the "Management's Report" also stated:

> Management has long recognized its responsibility for conducting the company's affairs in a manner which is responsive to the interest of employees, shareholders, investors and society in general. This responsibility is included in the statement of policy on ethical standards which provides that *the company will fully comply with laws, rules and regulations of every community in which it operates and adhere to the highest ethical standards. Officers, employees and agents of the company are expected and directed to manage the business of the company with complete honesty, candor and integrity.*

315.    With respect to its loan delinquencies and charge-off policies, defendants represented that:

> *Our credit and portfolio management procedures focus on risk-based pricing and effective collection efforts for each loan.* We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers, as well as policies designed to manage customer relationships, such as reaging delinquent accounts to current in specific situations, are helpful in maximizing customer collections. We have been preparing for an economic slowdown since late 1999. Throughout 2000 and 2001, we emphasized real estate secured loans which historically have a lower loss rate as compared to our other loan products, grew sensibly, tightened underwriting policies, reduced unused credit lines, strengthened risk model capabilities and invested heavily in collections capability by adding over 2,500 collectors. As a result, 2001 charge-off and delinquency performance has been well within our expectations.

316.    Additionally, defendant Andersen issued a clean audit opinion on 1/14/02, which was incorporated by reference into the FY01 Report on Form 10-K. Andersen stated that it had audited Household's financial statements and Schedule 14(d) for FY01 in accordance with GAAS and opined that they "fairly state[] in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole."

- 121 -

A125

317. On or about 2/06/02, Association of Community Organizations for Reform Now ("ACORN") announced that it had filed a class action lawsuit against Household in Alameda County Superior Court, accusing the Company of fraud and misrepresentation and deliberately withholding information about the true costs of up to $2 billion in secured loans originated by Household. The ACORN suit also alleged that Household was using improper techniques to prevent refinancing and incentivizing account executives with bonuses if they were able to "close the back door," as it was known within the Company. Household was quick to deny these allegations and reassure shareholders that the Company did not engage in any predatory practices:

| 2/07/02 | (*Copley News Service*) Company spokeswoman Hayden stated, "You simply cannot stay in business for 125 years by misleading your borrowers .... We do the right thing for our borrowers. We make good loans that not only are legal loans, but are beneficial for our customers." |
|---|---|
| 2/07/02 | (*Contra Costa Times*) Streem stated, "They have charged us in the past with being a predatory lender, but those allegations have almost uniformly proven false and misleading," suggesting that the ACORN suits were mere nuisance suits. |
| 2/18/02 | (*National Mortgage News*) David Schoenholz stated, "'Our first take on [the allegations of predatory lending raised in the ACORN action] is that *it is not a significant issue, not indicative of any widespread problem* and certainly not a concern that it will spread elsewhere.'" |
| 4/22/02 | (*Bellingham Herald*) Hayden stated, "'*It is absolutely against our policy to in any way, quote a rate that is different than what the true rate is* .... I can't underscore that enough.'" |

318. The statement in ¶317 above was materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were that defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices. These practices included, among other things:

(a) Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

- 122 -

A126

       (b)     Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

       (c)     Concealing the existence of prepayment penalties (¶¶68-70);

       (d)     Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-77); and

       (e)     Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

319.    As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against Household's earnings, $484 million of which was for a nationwide settlement with state attorney generals.

320.    On 2/07/02, Aldinger and Schoenholz hosted a conference call to respond to market concerns about the stock. Based on information provided by them, analysts issued positive reports supporting defendants as follows:

### Robert Napoli (ABN AMRO) Report of 2/7/02

Below we have many of the issues brought up on the conference call:

Concern: Household is now unable to roll its commercial paper and has lost access to that market.

Company response: Household has had no problems with its commercial paper funding and the cost of that funding has not increased.

\*   \*   \*

Concern: Arthur Andersen (HI's auditor) is going to force Household to make changes to its accounting policies and is getting more aggressive with the company.

Company Response: Arthur Andersen has always been aggressive with HI. There are *no accounting changes being discussed and there are to be no surprises in the 10K.* HI's board of directors has had long conversations about Arthur Andersen and they plan to watch to see if a change has to be made but none is anticipated at this point.

\*   \*   \*

Concern: HI's lawsuit in California which was recently settled is going to have a negative effect on the company's ability to generate fee income and could have a negative effect on its ROE and ROA and revenue outlook.

Company response: The issue in California cost HI about $1 MM in revenue per year on a $10.8 billion revenue base.

\*   \*   \*

[ACORN] lawsuit looks frivolous to us and management agreed....

\*   \*   \*

We reiterate our Buy rating and $75 target price.

321.    Defendants' denials of the veracity of ACORN's suit and predatory lending claims had an immediate impact on the price of Household shares. After trading down under the pressure of the ACORN allegations, following the publication of defendants' denials, shares of the Company rebounded over $3.30 per share on 2/07/02, on heavy trading volume of over 12 million shares – six times the average daily trading volume.

322.    On 4/09/02, the Company, through its subsidiary, HFC, caused to be filed (or declared effective), a Registration Statement on Form S-3, registering for sale $10 billion of debt securities.

323.    On 4/09/02, Household hosted its annual Financial Relations meeting, during which Aldinger, Schoenholz and other senior management again conditioned analysts and investors to believe that the Company was poised to achieve its target growth of 13%-15% over the next two years and that Household was achieving its top line and profitability. In addition, Household also told analysts the following:

**Todd A. Pitsinger (Friedman, Billings, Ramsey & Co., Inc.) Report of 4/10/02**

The company provided several new disclosures in its investor packet yesterday, which provide significant transparency beyond regular company reports to help investors assess the operating model.

\*   \*   \*

Household also provided greater disclosure surrounding its re-age policies (a.k.a. deferments). We have greatly anticipated this data to help explain why HI's delinquency rates in various products are competitively lower than many industry peers. HI disclosed that 9.4% of its overall portfolio has been re-aged once in the last 12 months, compared to 8.5% at the end of 2000. The 11% YOY rise is in response to the recession.

In addition, re-aged accounts are no longer contractually delinquent even if more than one payment is added to the principle of a loan. Said another way, companies that use deferments report lower delinquency results, especially in the subprime marketplace, because accounts that become one or two cycles delinquent typically never cure and are always delinquent by standard GAAP measures.

Of greater interest, for the last several quarters, management at HI has talked down the benefit of re-aging accounts in its auto finance division. As consistent supporters

- 124 -

A128

of the re-age process and AmeriCredit (ACF-Buy), HI's historical commentary disputed our contention and ACF's views that deferments are a vital tool in the auto finance business. HI disclosed at the end of 2001 a 4% deferment rate in its auto finance business, effectively consistent with ACF's 5% rate. The release of this data should help to alleviate investors concerns regarding deferment activity in auto finance.

**Joel Gomberg (William Blair & Co.) Report of 4/10/02**

[Management] presentation renewed our conviction in the company's growth ....

\* \* \*

Management enhanced disclosure across a wide variety of areas, including accounting, credit policies, and funding. High level of new detail included its managed re-aged receivables, which stood at 16.9% of loans, compared with 14.3% in 2000. Re-aged loans are delinquent loans that customers have made partial repayments of their past due balances. The ratio is clearly high, but reflects Household's subprime customer base, which requires more rehabilitation, particularly in tougher economic times. There has been no change in re-aging policies, and accrual of interest is stopped or reserved against upon restructuring.

\* \* \*

The potential for further lawsuits and negative publicity from predatory lending is an enhanced risk, given the heightened regulatory environment and this an election year. Household has been subject to consumer advocate lawsuits (as have others) and recently settled a case of overcharging customers, due to a systems error in California. Management is committed to ensure its lending practices are in compliance with governmental regulations.

324. On 4/17/02, Household announced 1Q02 results in a press release entitled,

***"Household Reports Record First Quarter Net Income"*** that stated, in part:

Household International today reported first quarter earnings per share of $1.09, its fifteenth consecutive record quarter. First quarter earnings per share rose 20 percent from $.91 the prior year. Net income in the first quarter increased 18 percent, to a record $511 million.

"Household turned in a very strong first quarter," said William F. Aldinger, Household's chairman and chief executive officer .... In addition to delivering record results this quarter, we strongly added to our capital and reserve levels and further enhanced liquidity. We remain committed to maintaining a strong balance sheet and maximum financial flexibility.

"Our credit quality performance was well within our expectations in light of the continued weakness in the economy," Aldinger continued. "We anticipate a very manageable credit environment for the remainder of the year."

Aldinger concluded, "We are off to a great start, and I am comfortable with our ability to meet our 13 to 15 percent earnings per share growth target for 2002."

325.    Subsequent to the Company's announcement of 1Q02 results, defendants Aldinger and Schoenholz hosted a conference call on the same day to discuss its business and prospects. Based on Household management's statements to analysts, including on the 10/17/01 conference call, analysts wrote positive reports about Household and its prospects. These reports were consistent with and repeated management's false and misleading statements, which statements had been made to the analysts with the intention they would be repeated to the market.

**John MacDonald (UBS Warburg) Report of 4/18/02**

We are raising our full-year 2002 estimate to $4.68 from $4.65 to reflect our outlook for continued strong receivable growth, manageable charge-off levels, and small degree of NIM compression. Our 2003 estimate remains $5.25.

* * *

The company experienced a sharp rise in securitization revenue, which ballooned to $146 million ($0.21 per share) in 1Q02 .... The company securitized $2.4 billion of receivables in the first quarter compared to $900 million in the year ago quarter.

326.    Based on these purported positive results, as well as the Company's denials that it was engaged in any predatory lending practices, shares of Household traded above $58.95 per share in inter-day trading on 4/15/02 – within one week, Household shares traded at over $63.25.

327.    On 5/04/02, Credit Suisse First Boston issued a research report on the Company in which it concluded that the predatory pricing suits did not represent a "material financial risk" to Household, nor did they present "any risk to Household's business practices."

328.    On 5/10/02, Household filed with the SEC, its 1Q02 Report on Form 10-Q, signed by defendant Schoenholz. In addition to reiterating the same false representations as were made in the 4/17/02 corporate release, the 1Q02 Report on Form 10-Q also stated, in part, that the unaudited quarterly financial results were prepared in accordance with GAAP and included, "in the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation."

329.    Household spokespeople continued to publicly deny allegations that Household was engaged in predatory lending but rather reassured investors:

5/10/02    Household spokesperson, Hayden, in *The Record*, stated: "Our position is that the accusations [regarding predatory lending] are baseless .... *The loans are legal, they are compliant with state and federal laws and our own policies,*

- 126 -

A130

> *and in each instance they have benefits for each customer....* The loan[s] conform[] to the company's 'tangible benefits test.'"

5/14/02    Company spokesperson Streem, in *AP Online*, stated: *"All of [Household's] lending policies are in accord with federal and state regulations and requirements ...."*

330.    On 5/31/02, in a report by *American Banker*, Household spokesperson Hayden characterized the WA Report as a "draft" with "factual errors" that Household wanted to correct and tried to downplay the situation, stating:

"It is our regulators' and the attorney general's job to investigate any complaints brought forth by consumers in their state, and we don't find anything unique or surprising that they are doing their job .... [W]e take proper steps to work with the department to uncover the facts and if necessary formulate an appropriate resolution for the borrower." [] Hayden also admitted that some "customers in Bellingham may have indeed been justified in their confusion about the rate of their loans" and claimed Household "took full and prompt responsibility" and is "satisfied that this situation was localized to the Bellingham branch."

331.    The statements in ¶¶329-330 above were materially false and misleading when made. As set forth in ¶¶51-101, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were that defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices. These practices included, among other things:

(a)    Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

(b)    Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(c)    Concealing the existence of prepayment penalties (¶¶68-70);

(d)    Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(e)    Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

332.    As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against

- 127 -

A131

Household's earnings, $484 million of which was for a nationwide settlement with state attorney

generals.

333.    On 7/17/02, Household announced 2Q02 results in a press release entitled,

"Household Reports Record Second Quarter Results on Strong Receivables Growth," which stated,

in part:

> Household International today reported second quarter earnings per share increased
> 16 percent, from $.93 the prior year. These results mark Household's
> sixteenth consecutive record quarter. Second quarter net income increased 17
> percent, to a record $514 million.
>
> "Our results this quarter were fueled by ongoing strong demand for our loan
> products," said William F. Aldinger, Household's chairman and chief executive
> officer. "Growth this quarter was strong, while we have maintained our conservative
> underwriting criteria....
>
> Aldinger concluded, "The company's operating performance has been very strong in
> the first half of 2002, and, although the economic environment is likely to remain
> uncertain, we believe our businesses are well-positioned for the remainder of the
> year."

334.    The same day, on 7/17/02, Household also hosted a conference call with analysts and

investors, during which defendants reiterated the same false and misleading financial information

published in Household's release. During this call, defendants also hosted a question-and-answer

session, during which Aldinger said the following about the predatory lending issue:

> The impact on us of those changed laws has been virtually nil or minimal. That is
> because we already have in place our best practices. *In many cases, our best
> practices exceed what these states have been asking or are in line with what these
> states are asking....* Now let's talk about the lawsuits. We think straight out that the
> class action suits brought by Acorn (phonetic) in particular are just baseless, and we
> don't see any long-term impact there. We think they are wrong.... On the AGS,
> obviously again, it is a political issue. There has been lots of talk. We will like we
> do on everything else focus on resolving that issue over the next six months or so, but
> I cannot go into any details except to say that *I am confident that our best practices
> and our current model ultimately will prevail, and we will do what we do because
> we do not do predatory lending....*  [T]he final message is lots of moving parts, lots
> of headline issues, but economically, we run a very strict model and a very good
> model for our customers, and *we don't think when we are sitting here talking to you
> next year there will be anything substantially different in the returns or practices.*
> I am sorry for such a long answer.

335.    Following the release of Household's purported "record"-setting 2Q02 results, and

following this conference call, Deutsche Banc Alex. Brown analyst Alpert issued a report on 7/18/02

reiterating a "Strong Buy" rating and a $74 price target on Household shares. The Deutsche Banc

Alex. Brown report further stated that asset quality remained stable and delinquencies came in better than expected. It further stated: "While the issue of subprime loans, the hotbed for predatory lending debates, will continue to receive regulatory scrutiny, Household's diverse business model gives the company an edge, in our opinion.... [T]he fundamentals at the company remain solid. Company guidance remains the same even in the tough economic environment."

336.    On 8/14/02, Household issued a press release entitled, "Household International Certifies Accuracy of SEC Filings in 2002 – Reaffirms Business Outlook for Balance of the Year; Restates Certain Prior Period Accounts." The press release stated that defendants Aldinger and Schoenholz certified to the accuracy of their most recent SEC filings, which stated, in part:

> Commenting on the company's recent results, Aldinger said, "Household's results for the year-to-date have been fueled by strong demand for our loan products throughout our businesses. Our loan underwriting approach continues to be conservative in these times of economic uncertainty, and we remain committed to strong reserve and capital levels. The company's operating performance in the first half of the year has been very strong, and our businesses are well-positioned for the remainder of the year."

> Aldinger continued, "Household has undergone a thorough review of our financial statements and related accounting policies in conjunction with our new auditors, KPMG LLP. As part of this review, we have determined to adopt certain revisions to the accounting treatment of our Mastercard/Visa co-branding and affinity credit card relationships, and a credit card marketing agreement with a third party. We are restating earnings to reflect the cumulative impact of the adjusted items over the period in which the adjustments are applicable as determined in consultation with our new auditors at KPMG. The restatement associated with these matters has the effect of reducing second quarter earnings per share by $.01, or approximately 1 percent, and EPS for the six months ended June 30, 2002 by $.06, or 2.8 percent, versus what was reported in the company's earnings release of July 17, 2002. These changes are not expected to have any significant impact on our future results of operations."

Household announced that it was restating earnings from 1994 to 2Q02, lowering net income (and equity) by $386 million.

337.    On the same day, defendants Aldinger and Schoenholz held a conference call to discuss the restatement. During the call, they made the same false representations to the analysts that were then repeated to the market through reports issued by them. Based upon representations made by defendants, these analysts issued reports stating that the restatement would not have a material impact:

- 129 -

**M. Alpert/G. Swanberg (Deutsche Banc – North America) Report of 8/14/02**

- More importantly, the company said that its businesses remain very strong, that it is confident in its pending litigation with consumer advocacy groups, and that KPMG has done a full scrubbing of the books without any other concerns.

[W]e maintain our STRONG BUY rating as the fundamentals remain very strong with a talented and recently reorganized management team at the helm.

**Todd A. Pitsinger (Friedman Billings Ramsey & Co.) Report of 8/15/02**

Earnings Restatement Is a Disappointment – Not a Disaster

REITERATE OUR BUY RATING AND $73 PRICE TARGET. While the restatements are extremely disappointing in the current skittish environment, HI's business fundamentals and earnings model remain intact. Despite substantial headline risk associated with current lawsuits and predatory lending issues, management does not believe that heightened regulatory scrutiny (FFIEC guidelines, regulatory agreements, etc.) affecting the subprime credit card issuers will impact HI, nor does the company believe that the current lawsuits will ultimately impact the company's operating strategy....

338.    On 8/28/02, Household issued a press release stating that KPMG had completed its audits of the Company for FY99-FY01 and had rendered unqualified opinions for both entities. As a result, Household could again issue debt and/or equity securities under their respective, effective registration statements.

339.    On 9/02/02, Company spokesperson Hayden stated that she was not aware of any pending enforcement actions or settlement talks.

340.    During the week of 9/12/02, defendant Aldinger and other senior management, including Tom Detelich, Group Executive for Consumer Lending, met with Deutsche Banc Alex. Brown analysts. Based on information provided at these in-depth, face-to-face meetings, analyst Mark Alpert stated that Deutsche Banc Alex. Brown "came away feeling more comfortable with the likely resolution than [they] had anticipated" and issued a very positive report reiterating a "buy" rating, which stated in part:

Household does not agree with most of the allegations, and *when it finds a problem, it has quickly made changes (including firing people) when necessary*. Nonetheless, in the words of CEO Aldinger, the issue is solely one of being "right or wrong." Household wants to get out of the spotlight, out of the press, and beyond reproach, not just in Washington, but throughout the country. It will do what is necessary without sacrificing the business model.

\* \* \*

- 130 -

A134

Mr. Aldinger reiterated a 13%-15% earnings growth target and a double digit increase in 2003.

In the long-run, even if 15% earnings growth is not sustainable, we believe 10% is the minimum achievable....

341.     On 9/16/02, *Forbes* magazine published a 9/02/02 letter written by Detelich, the newly-appointed Group Executive for Consumer Lending, which stated:

"Home Wrecker" (Sept. 2, p. 62) disregarded facts and instead crafted an inaccurate portrayal of William Aldinger's Household International and its consumer lending business. While one complaint is one too many, *you neglected to mention that 99.99% of our consumer-lending customers do not have a complaint regarding their loan.* FORBES neglected to say that our branches undergo three quality assurance audits a year and that more than 56,000 customer audit calls are made to ensure we meet the highest standards of responsible lending. FORBES did not give any credit to our industry-leading disclosures, such as our one-page, simple-language loan summary – in which customers are clearly communicated with about the terms of their contracts. We regret that FORBES didn't find these facts relevant. But at Household, our satisfied customers know the difference.

342.     The statements made by defendants in ¶¶310-316, 320-328 and 333-341 above were each materially false and misleading when made. As set forth in ¶¶1-155, the true facts, which were then known to or recklessly disregarded by defendants, based on their review of Household's internal operating data, including information provided to them by Household's Vision system, were:

(a)     Defendants were engaged in a widespread and consistent pattern of improper and illegal predatory lending practices, which included, among other things:

(i)     Misrepresenting the interest rates and savings associated with loans by providing deceptive and nonconforming loan documents to borrowers that were designed to obscure actual loan amounts and interest rates (¶¶55-60);

(ii)     Failing to disclose "discount points" that were nothing more than stacked fees and had no bearing on the ultimate interest rate charged on loans (¶¶61-67);

(iii)     Concealing the existence of prepayment penalties (¶¶68-70);

(iv)     Using such practices as fraud and forgery to sell ancillary products, such as life, disability and other types of credit insurance (¶¶71-74); and

(v)     Illegally "up-selling" second loans with exorbitant interest rates (¶¶75-82).

- 131 -

A135

(b)      As set forth in ¶¶51-106, defendants' fraudulent predatory lending scheme persisted throughout the entire Class Period and eventually resulted in a $525 million charge against Household's earnings, $484 million of which was for a nationwide settlement with state attorney generals.

(c)      As set forth in ¶¶107-133, defendants improperly engaged in the practice of "reaging" or "restructuring" delinquent loans to make them current if the customer made one minimum monthly payment, such that the missed payments were added to the back end of the loan. Although defendants characterized "reaging" as a customer service, in fact, the Company used it to:

(i)      Manipulate its reported delinquency ratios and delay or prevent charge-offs (¶¶107-133);

(ii)      Cross-sell or up-sell additional loans or lines of credit (¶¶107-116); and

(iii)      Convert customers' unsecured loans into loans secured by their homes or cars without disclosing this information to them (¶116). In addition, as detailed in ¶¶111-114 and 121, defendants designed the Vision system to automatically reage delinquent accounts when the computer received only a partial payment without any evidence that the delinquency had been cured.

(d)      The Officer Defendants designed the predatory lending practices and reaging of delinquent accounts, allowing the Company to:

(i)      Understate its true levels of delinquencies, such that any financial metrics that were dependent upon delinquencies or defaults and important to investors as a measure of Household's health, including credit loss reserves, were also materially false and misleading (¶¶125-133);

(ii)      Under-report non-performing assets and misreport credit quality (¶¶125-133);

(iii)      Consistently report lower loan loss reserves by improperly lowering defaults and prepayments (¶¶102-106 and 125-133);

- 132 -

A136

(iv)     Recognize interest income that should not have been accrued in accordance with the Company's own lending practices and policies (¶¶102-106, 125-133 and 154-155); and

(v)     Artificially inflate reported revenues and EPS throughout the Class Period (¶¶102-106 and 125-153).

(e)     As set forth in ¶¶134-155, throughout the Class Period, defendants engaged in improper accounting for Household's credit card co-branding, affinity and third-party marketing agreements, causing Household to overstate its finance income, securitization income and fee income and misstate certain of its expenses, resulting in an overstatement of net income. Due to defendants' improper accounting, the Company was forced to restate earnings for an eight-year period from 1994 through 2Q02. As set forth in ¶¶134-153, the Officer Defendants have admitted that Household's results for 4Q01, FY01, 1Q02 and 2Q02 were materially false and misleading and have restated these results as follows:

### DILUTED EPS

|        | As Reported | Restated | Difference |
|--------|-------------|----------|------------|
| 4Q01   | $1.17       | $1.13    | <$0.04>    |
| FY01   | $4.08       | $3.91    | <$0.16>    |
| 1Q02   | $1.09       | $1.04    | <$0.05>    |
| 2Q02   | $1.08       | $1.07    | <$0.01>    |

(f)     In addition to the false and materially misleading financial data, the Company's SEC filings also contained inadequate risk disclosures that did not disclose the true risks of investing in Household – specifically, the risk of investing in a company that was not reporting its financial results in conformity with GAAP. In addition, and a result thereof, the purported risk disclosures were wholly ineffective and inappropriate and did not alert investors to the true risks of investing in Household securities.

343.     By 9/02, the Officer Defendants had been forced to take a $600 million charge and eliminate $386 million of previously reported earnings. They realized that they could no longer conceal the magnitude and pervasiveness of their scheme and wrongful course of business. Knowing that Household would be forced to suspend many of its illegal activities and incur a substantial

- 133 -

A137

charge as part of any settlement with the state attorney generals, the Officer Defendants attempted to effect a soft landing and were somewhat successful in doing so. As defendant Aldinger began to manipulate down expectations for Household performance, stating that, even if 15% earnings growth was not sustainable, "10% was the minimum achievable," Household stock declined to approximately $28 per share in late 9/02.

344.    In early 10/02, rumors began to circulate in the market of a pending settlement that would terminate Household's ability to continue the illegal practices detailed herein and require a $500+ million payment. In response, the price of Household stock dropped from as high as $29 on 9/30/02 to less than $21 during early 10/02. On 10/14/02, Household disclosed that it had agreed to settle with the state attorney generals regarding the claims related to its predatory lending practices and would pay $484 million in connection therewith. The deterioration in Household's business during 2002 was a direct result of the increasing scrutiny it was subjected to for the illegal tactics detailed herein, *which tactics have ultimately resulted in well over $1 billion worth of charges and writeoffs, and the elimination of over $20 billion of market capitalization.* Defendants' misconduct ultimately forced the Household Board to approve Household's acquisition by HSBC in 11/02 because of the market's suspicions concerning the integrity of the Company and its operations.

## X. BASIS OF ALLEGATIONS

345.    Plaintiffs allege the following based upon an investigation of counsel, including a review of SEC filings issued by Household and HFC, as well as regulatory filings and reports, news articles, securities analyst reports, advisories about the Company, press releases and other public statements issued by the Company or its representatives, media reports about the Company, and interviews of, among others, former Household employees and other persons with knowledge of defendants. Except as alleged herein, the underlying information concerning defendants' misconduct and the particulars thereof is not available to plaintiffs and the public and lies within the possession and control of defendants and other Household insiders. Based upon the substantial facts already uncovered, plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

- 134 -

A138

## XI. FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### (Against Household, the Officer Defendants and Andersen)

346.    Plaintiffs incorporate ¶¶1-345 by reference.

347.    During the Class Period, defendants Household, the Officer Defendants and Andersen disseminated the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

348.    Defendants Household, Andersen and the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Household securities during the Class Period.

349.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Household securities. Plaintiffs and the class would not have purchased Household securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

350.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their purchases of Household securities during the Class Period.

## XII. SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the 1934 Act
### (Against Household and the Officer Defendants)

351.    Plaintiffs incorporate ¶¶1-350 by reference.

352.    The Officer Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Officer Defendants controlled other employees of Household. Household controlled the Officer Defendants and each of its officers, executives and all of its employees.

353.    In addition to the duties of full disclosure imposed on defendants by their status as controlling persons of the Company, as a result of their affirmative statements and reports or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulations S-X, 17 C.F.R. §§210.01 *et seq.*, and S-K, 17 C.F.R. §§229.10 *et seq.*, and other SEC regulations, including accurate and truthful information with respect to Household's stock, operations, financial condition and earnings, so that the market price of Household's securities would be based on truthful, complete and accurate information. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## XIII. THIRD CLAIM FOR RELIEF

### For Violations of Sections 11, 12(a)(2) and 15 of the 1933 Act
### (Against Household, the Officer Defendants, the Director Defendants,
### Andersen, Goldman Sachs and Merrill Lynch)

354.    Plaintiffs incorporate all paragraphs as if set forth herein. Plaintiffs expressly exclude any allegation complained of herein that could be construed to allege intentional or reckless conduct.

355.    Plaintiff West Virginia Fund asserts this claim for violations of §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, on behalf of itself and all other members of the Beneficial subclass.

356.    This claim is brought against Household, the Officer Defendants, the Director Defendants, Andersen, Goldman Sachs and Merrill Lynch.

357.    Plaintiff West Virginia Fund and the members of the Beneficial subclass acquired Household's shares pursuant to Household's 6/01/98 Form S-4 Registration Statement and Joint Proxy Statement-Prospectus (the "Beneficial Registration Statement"), which shares were issued in connection with the Household/Beneficial merger.

**Household**

358.    Household was the issuer of shares registered via the Beneficial Registration Statement. As such, Household is *strictly liable* for the false statements contained in the Beneficial Registration Statement.

**Director Defendants**

359.    Each of the Officer Defendants and Director Defendants named in this Claim for Relief signed the Beneficial Registration Statement and/or was a Director of Household at the time the Beneficial Registration Statement was declared effective and Household issued approximately 168 million shares pursuant thereto.

360.    The Officer Defendants were involved in the preparation, filing and dissemination of the Beneficial Registration Statement. None of them made a reasonable investigation of or possessed reasonable grounds for the belief that the statements contained in the Beneficial Registration Statement were true and that it did not omit any material fact necessary to make the statements made therein not misleading. In the exercise of reasonable care, these defendants would have known of the misstatements and omissions complained of herein.

361.    The Officer Defendants solicited the exchange of Beneficial shares pursuant to the Beneficial Registration Statement. The actions taken by them included participation in the preparation and dissemination of the false and misleading statements pled herein.

**The False and Misleading**
**Beneficial Registration Statement**

362.    The Beneficial Registration Statement included Household's FY94-FY97 and interim FY98 financial results, including Household's reported EPS for these periods. The Beneficial Registration Statement stated:

- 137 -

**A141**

COMPARATIVE PER SHARE

The comparative per share data presented below are based on and derived from, and should be read in conjunction with, the historical consolidated financial statements and the related notes thereto of Household ... all of which are incorporated by reference herein, and the unaudited pro forma condensed combined financial information of Household and the related notes thereto included elsewhere in this Joint Proxy Statement-Prospectus ....

### SUMMARY SELECTED HISTORICAL FINANCIAL DATA OF HOUSEHOLD
### (IN MILLIONS, EXCEPT PER-SHARE DATA)

|  | Year Ended December 31, | | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
|  | 1993 | 1994 | 1995 | 1996 | 1997 | 1997 | 1998 |
| Net income | 298.7 | 367.6 | 453.2 | 538.6 | 686.6 | 131.5 | 170.3 |
| Earnings per share: Diluted | .95 | 1.17 | 1.44 | 1.77 | 2.17 | .43 | .51 |

363.    The Beneficial Registration Statement also incorporated by reference the financial statements contained in Household's FY97 Report on Form 10-K (filed on 3/30/98) and 1Q98 Report on Form 10-Q (filed on 5/12/98), which documents had been previously filed by Household with the SEC.

364.    The financial results for FY97 and 1Q98 contained in the Beneficial Registration Statement were false. The true facts are:

### DILUTED EPS

|  | As Reported | Restated | Difference |
|---|---|---|---|
| Cumulative FY94-FY96 | $4.38 | $4.10 | <$0.28> |
| FY97 | $2.17 | $2.07 | <$0.10> |
| 1Q98 | $0.51[15] | $0.48 | <$0.03> |

### NET INCOME (IN MILLIONS)

|  | As Reported | Restated | Difference |
|---|---|---|---|
| Cumulative FY94-FY96 | $1,359.4 | $1,277.3 | <$82.1> |
| FY97 | $ 686.6 | $ 655.2 | <$31.4> |
| 1Q98 | $1,359.4 | $1,277.3 | <$82.1> |

[15]    Household did not provide quarterly details for the 1998 restatement. The restated net income and diluted EPS for 1Q98 assumes the impact of the FY98 restatement was spread equally over the quarters.

- 138 -

A142

365.    The Beneficial Registration Statement also included false representations about the accuracy of Household's SEC filings, stating that Household's "SEC Reports complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder" and that "none of the [Household's] SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading."

366.    The Beneficial Registration Statement also represented that:

[t]he consolidated financial statements of [Household] included in [its] SEC Reports filed and publicly available prior to the date of this Agreement (as amended to the date of this Agreement, the "Filed Acquiror SEC Reports") complied as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with GAAP (except, in the case of the unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto) and fairly present the consolidated financial position of [Household] and its consolidated subsidiaries as of the dates thereof and the consolidated results of their operations and their consolidated cash flows for the periods then ended....

367.    As to Household's outstanding liabilities, the Beneficial Registration Statement stated that neither Household "nor any of its subsidiaries has any material liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be recognized or disclosed on a consolidated balance sheet of [Household] and its consolidated subsidiaries or in the notes thereto."

368.    Each of the statements made in ¶¶362-367 above were false and misleading when made. The true facts were that Household's SEC filings did *not* comply with the regulations of the Securities Act, as the Beneficial Registration Statement included Household's consolidated financial statements for FY94-FY97, as well as Household's interim financial statements for 1Q98, all of which were false, did not fairly or accurately present Household's financial position or its results of operations and had not been *prepared* in compliance with GAAP, as detailed in ¶102-106 and 125-155.

369.    In addition to the false statements concerning Household's financial performance that were included in the Beneficial Registration Statement, defendants falsely represented in the

- 139 -

A143

Beneficial Registration Statement that Household was operating in *"compliance with applicable laws."* Specifically addressing the propriety of its business practices and the veracity of its SEC filings, the Beneficial Registration Statement stated:

> *None of the information to be supplied by [Household] for inclusion or incorporation by reference in the Registration Statement or the Merger Proxy Statement will, in the case of the Registration Statement, at the time it becomes effective and at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or, in the case of the Merger Proxy Statement or any amendments* thereof or supplements thereto, at the time of the mailing of the Merger Proxy Statement and any amendments or supplements thereto and at the time of the Company Stockholders Meeting and the Acquiror Stockholders Meeting, *contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. The Merger Proxy Statement (except for such portions thereof that relate only to the Company or its subsidiaries or Affiliates) and the Registration Statement will comply as to form in all material respects with the provisions of the Exchange Act and the Securities Act, respectively, and the rules and regulations promulgated thereunder.*

> \*   \*   \*

> *[Household] and its subsidiaries are in compliance with all judgments, orders, decrees, statutes, Laws, ordinances, rules and regulations of any Governmental Entity applicable to them,* except for such noncompliance which, individually or in the aggregate, would not, individually or in the aggregate have a Material Adverse Effect on [Household].

**Andersen**

370. Andersen is an accounting firm that consented to being named as preparing and certifying Household's false FY94-FY97 financial statements, which were included in the Beneficial Registration Statement. Andersen is liable for the false financials it certified and its statement that these financial statements were correct and prepared in accordance with GAAP because it failed to conduct a reasonable investigation and did not have reasonable grounds to believe Household's financial statements that its opinion or Household's FY94-FY97 financial statements, including Household's reported EPS as detailed in ¶¶171-191 herein, were not false.

**Goldman Sachs and Merrill Lynch**

371. Goldman Sachs and Merrill Lynch acted as financial experts in connection with the preparation and filing of the Beneficial Registration Statement and the consummation of the Household/Beneficial Merger. Both Goldman Sachs and Merrill Lynch acted as financial advisors

and experts within the meaning of §11, concerning the fairness "from a financial point of view" of the consideration to be received by Beneficial shareholders in connection with the Household/Beneficial merger.

372.    Goldman Sachs and Merrill Lynch each consented to being named as having prepared and/or certified that part of the Beneficial Registration Statement addressing the valuation of the consideration received by Beneficial shareholders. Both Goldman Sachs and Merrill Lynch prepared opinion letters and consented to the inclusion of those opinion letters in the Beneficial Registration Statement. Each of the opinion letters falsely stated that the Exchange Ratio (that is, the ratio of Household shares received by each Beneficial shareholder in exchange for their Beneficial shares) was "fair from a financial point of view to the holders" of Beneficial stock, as detailed below:

(a)      Goldman Sachs' opinion letter of 4/07/98 included in the Beneficial Registration Statement provided:

Board of Directors Beneficial Corporation 100 Beneficial Center Peapack, NJ 07977

Ladies and Gentlemen:

You have requested our opinion as to the fairness from a financial point of view to the holders of the outstanding shares of Common Stock, par value $.01 per share (the "Shares"), of Beneficial Corporation (the "Company") of the exchange ratio of 1.0222 shares of common stock, par value $1.00 per share ("Household Common Stock"), of Household International, Inc. ("Household") to be received for each Share (the "Exchange Ratio") pursuant to the Agreement and Plan of Merger dated as of April 7, 1998 by and among Household, Household Acquisition Corp., a wholly owned subsidiary of Household, and the Company (the "Agreement").

Goldman, Sachs & Co., as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. We are familiar with the Company having provided certain investment banking services to the Company from time to time, including advisory services to the Company in connection with the sale of its Canadian subsidiary and the proposed sale of its German subsidiary ("BNL Germany"), having participated as a co-manager on the Company's September 1997 asset securitization and having acted as its financial advisor in connection with, and having participated in certain of the negotiations leading to, the Agreement. We have also acted as principal in the purchase of certain assets owned by BNL Germany. We also have provided certain investment banking services to Household from time to time including acting as a lead or co-manager on various asset securitizations and various debt financings and as a co-manager of the June 1997 secondary offering of Household common stock, and may provide investment banking services to Household in the future. Goldman, Sachs & Co. provides a full range of financial advisory and security services and, in the course of its normal trading activities, may

- 141 -

A145

from time to time effect transactions and hold securities, including derivative securities of the Company or Household, for its own account and for the accounts of customers.

In connection with this opinion, we have reviewed, among other things, the Agreement; Annual Reports to Stockholders and Annual Reports on Form 10-K of the Company and Household for the five years ended December 31, 1997; certain interim reports to stockholders and Quarterly Reports on Form 10-Q of the Company and Household; certain other communications from the Company and Household to their respective stockholders; certain internal financial analyses and forecasts for the Company and Household prepared by their respective managements including forecasts of certain cost savings and revenue enhancements (the "Synergies") resulting from the Merger prepared by the management of Household and reviewed by the management of the Company. We also have held discussions with members of the senior management of the Company and Household regarding the strategic rationale for, and the potential benefits of, the transaction contemplated by the Agreement and the past and current business operations, financial condition and future prospects of their respective companies. In addition, we have reviewed the reported price and trading activity for the Shares and the Household Common Stock, compared certain financial and stock market information for the Company and Household with similar information for certain other companies the securities of which are publicly traded, reviewed the financial terms of certain recent business combinations including certain transactions in the consumer finance industry and performed such other studies and analyses as we considered appropriate.

We have relied upon the accuracy and completeness of all of the financial and other information reviewed by us and have assumed such accuracy and completeness for purposes of rendering this opinion. In that regard, we have assumed, with your consent, that the financial forecasts of Household, including, without limitation, the Synergies, have been reasonably prepared on a basis reflecting the best currently available judgments and estimates of Household and that such forecasts will be realized in the amounts and at the times contemplated thereby. We are not experts in the evaluation of loan portfolios for purposes of assessing the adequacy of allowances for losses with respect thereto and have assumed, with your consent, that such allowances for each of the Company and Household are in the aggregate adequate to cover such losses. In addition, we have not reviewed individual credit files nor have we made an independent evaluation or appraisal of the assets and liabilities of the Company or Household or any of their subsidiaries and we have not been furnished with any such evaluation or appraisal. We have assumed that the transaction contemplated by the Agreement will be accounted for as a pooling of interests for accounting purposes. Our advisory services and the opinion expressed herein are provided for the information and assistance of the Board of Directors of the Company in connection with its consideration of the transaction contemplated by the Agreement and such opinion does not constitute a recommendation as to how any holder of Shares should vote with respect to such transaction.

Based upon and subject to the foregoing and based upon such other matters as we consider relevant, *it is our opinion that as of the date hereof the Exchange Ratio pursuant to the Agreement is fair from a financial point of view to the holders of Shares.*

Very truly yours,

/s/ Goldman, Sachs & Co.
Goldman, Sachs & Co.

- 142 -

A146

(b)      The Beneficial Registration Statement also contained Merrill Lynch's opinion

letter dated as of 4/16/98, which stated:

Investment Banking Group
Merrill Lynch & Co., Inc.
World Financial Center
North Tower
New York, New York
10281-1325
212 449 1000

April 16, 1998

Board of Directors
Beneficial Corporation
100 Beneficial Center
Peapack, NJ 07977

Members of the Board of Directors:

Beneficial Corporation (the "Company"), Household International, Inc. (the "Acquiror") and Household Acquisition Corporation II, a newly formed, wholly-owned subsidiary of the Acquiror (the "Acquisition Sub"), have entered into an Agreement and Plan of Merger, dated as of April 7, 1998 (the "Agreement"), pursuant to which the Acquisition Sub will be merged with and into the Company in a transaction (the "Merger") in which (i) each outstanding share of the Company's common stock (including each attached right issued pursuant to the Company Rights Agreement (as defined in the Agreement)), par value $.01 per share (the "Company Shares"), will be converted into the right to receive 1.0222 shares (the "Exchange Ratio") of the common stock of the Acquiror, par value $1.00 per share (the "Acquiror Shares"), (ii) each share of the Company's $5.50 Dividend Cumulative Convertible Preferred Stock, without par value (the "Company Convertible Preferred Stock"), will be converted into the right to receive the number of Acquiror Shares that a holder of the number of Company Shares into which such share of Company Convertible Preferred Stock could have been converted immediately prior to the Merger would have the right to receive pursuant to clause (i) of this paragraph, and (iii) each share of the Company's 5% Cumulative Preferred Stock, par value $50.00 per share, $4.50 Dividend Cumulative Preferred Stock, par value $100.00 per share, and $4.30 Dividend Cumulative Preferred Stock, without par value (collectively, the "Company Preferred Stock"), will be converted into the right to receive one share of newly created preferred stock of the Acquiror with terms substantially identical to those of the Company Preferred Stock. In connection with the Merger, the parties also have entered into agreements pursuant to which the Company granted to the Acquiror and the Acquiror granted to the Company reciprocal options to acquire 19.9% of their respective common stock.

You have asked us whether, in our opinion, the Exchange Ratio is fair from a financial point of view to the holders of the Company Shares, other than the Acquiror and its affiliates.

In arriving at the opinion set forth below, we have, among other things:

(1)      Reviewed certain publicly available business and financial information relating to the Company and the Acquiror that we deemed to be relevant;

- 143 -

A147

(2)    Reviewed certain information, including certain internal financial analyses and forecasts for the Company and the Acquiror prepared by their respective managements, including forecasts of certain cost savings and revenue enhancements (the "Expected Synergies") resulting from the Merger prepared by the management of the Acquiror and reviewed by the management of the Company;

(3)    Conducted discussions with members of senior management of the Company and the Acquiror concerning the matters described in clauses 1 and 2 above, as well as their respective businesses and prospects before and after giving effect to the Merger and the Expected Synergies;

(4)    Reviewed the market prices and valuation multiples for the Company Shares and the Acquiror Shares and compared them with those of certain publicly traded companies that we deemed to be relevant;

(5)    Reviewed the results of operations of the Company and the Acquiror and compared them with those of certain publicly traded companies that we deemed to be relevant;

(6)    Compared the proposed financial terms of the Merger with the financial terms of certain other transactions that we deemed to be relevant;

(7)    Participated in certain discussions and negotiations among representatives of the Company and the Acquiror and their financial and legal advisors;

(8)    Reviewed the potential pro forma impact of the Merger;

(9)    Reviewed the Agreement; and

(10)    Reviewed such other financial studies and analyses and took into account such other matters as we deemed necessary, including our assessment of general economic, market and monetary conditions.

In preparing our opinion, we have assumed and relied on the accuracy and completeness of all information supplied or otherwise made available to us, discussed with or reviewed by or for us, or publicly available, and we have not assumed any responsibility for independently verifying such information or undertaken ann [sic] independent evaluation or appraisal of any of the assets or liabilities of the Company or the Acquiror. In addition, we have not assumed any obligation to conduct any physical inspection of the properties or facilities of the Company or the Acquiror. With respect to the financial forecast information and the Expected Synergies furnished to or discussed with us by the Company or the Acquiror, we have assumed that they have been reasonably prepared and reflect the best currently available estimates and judgment of the Company's or the Acquiror's management as to (i) the expected future financial performance of the Company or the Acquiror, as the case may be, and (ii) the Expected Synergies. We have further assumed that the Merger will be accounted for as a pooling of interests under generally accepted accounting principles and that it will qualify as a tax-free reorganization for U.S. federal income tax purposes.

Our opinion is necessarily based upon market, economic and other conditions as they exist and can be evaluated on, and on the information made available to us as of, the date hereof. We have assumed that in the course of obtaining the necessary regulatory or other consents or approvals (contractual or otherwise) for the Merger, no restrictions, including any divestiture requirements or amendments or

- 144 -

A148

modifications, will be imposed that will have a material adverse effect on the contemplated benefits of the Merger.

We are acting as financial advisor to the Company in connection with the Merger and will receive a fee from the Company for our services, a significant portion of which is contingent upon the consummation of the Merger. In addition, the Company has agreed to indemnify us for certain liabilities arising out of our engagement. We are currently, and have in the past, provided financial advisory and financing services to the Company and the Acquiror and/or its or their affiliates and may continue to do so and have received, and may receive, fees for the rendering of such services. In addition, in the ordinary course of our business, we may actively trade the Company Shares and other securities of the Company, as well as the Acquiror Shares and other securities of the Acquiror, for our own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

This opinion is for the use and benefit of the Board of Directors of the Company. Our opinion does not address the merits of the underlying decision by the Company to engage in the Merger and does not constitute a recommendation to any shareholder as to how such shareholder should vote on the proposed Merger or any matter related thereto.

We are not expressing any opinion herein as to the prices at which the Company Shares or the Acquiror Shares will trade following the announcement or consummation of the Merger.

*On the basis of and subject to the foregoing, we are of the opinion that, as of April 7, 1998, the Exchange Ratio is fair from a financial point of view to the holders of the Company Shares,* other than the Acquiror and its affiliates.

Very truly yours,

/s/ Merrill Lynch, Pierce, Fenner & Smith Incorporated
Merrill Lynch, Pierce, Fenner & Smith Incorporated

373.    The opinion letters issued by Merrill Lynch and Goldman Sachs were each false and misleading when issued, as the Exchange Ratio was *not* "fair" to Beneficial shareholders. Rather, the failure of Merrill Lynch and Goldman Sachs to conduct a reasonable investigation in connection with the issuance of these opinions resulted in each of them failing to uncover and consider the true facts as detailed herein. Thus, Merrill Lynch and Goldman Sachs falsely opined that the Household/Beneficial merger was "fair from a financial point of view" to the Beneficial subclass, notwithstanding the fact that the strength of Household's historical performance, its prospects and its financial statements were overstated based upon the improper practices detailed in the Complaint and/or the accounting improprieties detailed in ¶¶102-106 and 125-155.

374.    In fact, Household was not in compliance with applicable law, was engaged in predatory lending practices and was improperly reaging delinquent accounts, which practices were

- 145 -

A149

designed to skew the ratios of delinquencies, charge-offs and credit loss reserves in the Company's financial statements and the strength of its operating performance. Moreover, Household's failure to comply with applicable laws subjected the Company to huge contingent liability which was not properly reflected on Household's balance sheet. Defendants also failed to disclose that they improperly amortized expenses associated with their credit card co-branding and affinity relationships and marketing initiatives agreement with a third party.

375. The West Virginia Fund and the Beneficial subclass acquired their Household shares in connection with the merger in exchange for their Beneficial shares without knowledge of the untruths or omissions alleged herein. As a direct and proximate result, the West Virginia Fund and the Beneficial subclass have suffered substantial damage.

376. Each of the defendants actively participated in drafting, revising or approving the Beneficial Registration Statement by which the Household shares were issued and exchanged for Beneficial shares held by the West Virginia Fund and all other members of the Beneficial subclass. The Beneficial Registration Statement was a "document" which was designed to sell and offered to sell Household shares and was calculated by defendants to be relied upon by the Beneficial subclass in approving the Household/Beneficial merger. The Beneficial Registration Statement was widely distributed by defendants for that purpose.

377. The members of the Beneficial subclass acquired their Household shares under the materially false and misleading statements alleged in ¶¶362-367. The members of the Beneficial subclass did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions about Household, including its true business condition and its overstated and projected earnings, which defendants made in the Beneficial Registration Statement disseminated in connection with the Household/Beneficial merger.

378. Each of the defendants named herein had an affirmative duty to conduct a reasonable investigation of the statements contained in the Beneficial Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, each of the defendants named herein should have known of the material misstatements and

- 146 -

A150

omissions contained in the Beneficial Registration Statement as set forth herein. *None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that statements contained in the Beneficial Registration Statement were true or that there was not any omission of material fact necessary to make the statements made therein not misleading.* As such, each of these defendants is liable to the members of the Beneficial subclass.

379.    Each of the defendants named in this Claim for Relief issued, caused to be issued and participated in the issuance of the Beneficial Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated §§11 and 12(a)(2) of the Securities Act.

380.    As a direct and proximate result of defendants' wrongful conduct, the Household stock received by the Beneficial subclass was artificially inflated, and plaintiffs and the Beneficial subclass suffered substantial damages in connection with this acquisition of Household stock.

381.    This action was brought within two years after the discovery of the untrue statements and omissions (and within two years after such discovery should have been made in the exercise of reasonable diligence) and within five years after the merger between Household and Beneficial was consummated.

382.    By reason of the foregoing, defendants named in this Claim for Relief violated §§11, 12(a)(2) and 15 of the Securities Act and are liable to plaintiffs and the members of the Beneficial subclass who acquired Household stock in exchange for their Beneficial shares pursuant to the Beneficial Registration Statement, each of whom has been damaged by reason of such violations.

### XIV.  FOURTH CLAIM FOR RELIEF

**For Violation of Sections 11 and 15 of the 1933 Act**
**(Against Household/HFC, the HFC Director Defendants and Andersen)**

383.    Plaintiffs AMS Fund and West Virginia Fund incorporate all paragraphs as if set forth herein. For purposes of this Claim for Relief, plaintiffs expressly exclude and disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this Claim for Relief is based solely on claims of strict liability and/or negligence under the Securities Act.

- 147 -

A151

384. This Claim for Relief is brought against Household/HFC, the HFC Director Defendants and Andersen. During the Class Period, HFC and/or Household filed registration statements in connection with the registration for sale and/or the sale of debt securities, including Form S-3 registration statements filed with the SEC on or about 2/16/99, 7/01/99, 3/24/00, 9/13/00, 2/23/01, 5/03/01, 11/20/01, 12/18/01 and 4/09/02 (collectively, the "Debt Registration Statements"), which Debt Registration Statements were used to sell more than $75 billion of debt securities during the Class Period (collectively, the "Debt Securities").

385. Plaintiffs AMS Fund and West Virginia Fund each purchased Debt Securities that were issued pursuant to and are traceable to the Debt Registration Statements. The Debt Registration Statements were false and misleading, as they omitted to state facts necessary to make the statements contained therein not misleading and failed to adequately disclose material facts as described below.

**Household/HFC**

386. Household and/or HFC is either the registrant, issuer or owner of the wholly owned subsidiary that acted as the registrant of the securities sold via the Debt Registration Statements and thus are strictly liable for the false statements therein.

**HFC Director Defendants**

387. Aldinger, Schoenholz, Gilmer and Vozar were each responsible for the contents and dissemination of the Debt Registration Statements, as they were directors of HFC and/or Household, signed the Debt Registration Statements and participated in the preparation and dissemination of the Debt Registration Statements by preparing, reviewing and/or signing the Debt Registration Statements and thereby caused them to be filed with the SEC.

**Accountants**

388. Andersen consented to the incorporation of its report on the Company's false financial statements in the Debt Registration Statements.

389. As a provider of mortgage and credit card lending services, Household depended on its ability to raise huge amounts of cash to fund its lending operations. During the Class Period, the Company raised well over $75 billion through a series of debt offerings conducted through its wholly owned subsidiary, HFC. During the Class Period, HFC acted as the lending arm of the Company,

- 148 -

A152

and in addition to raising enormous amounts of debt to fund the Company's lending operations, HFC offered real estate secured loans, auto finance loans, MasterCard and Visa credit cards, private label credit cards, tax refund anticipation loans, retail installment sales finance loans and other types of unsecured loans to consumers. Despite the dominance and control over HFC by Household, HFC was and is a reporting company that files with the SEC its own financial statements.

390.   Unbeknownst to shareholders, however, during the Class Period, the Debt Registration Statements were false and materially misleading and omitted to disclose facts necessary to make the statements contained therein not materially false and misleading. For example, investors only learned on 8/14/02 – the same day the Company CEO and COO (as the Company's principal financial officers) were required to certify the veracity of their financial statements – that Household had improperly booked about $600 million (pre-tax), or $386 million (post-tax) in revenue during the period from 1994 through the second half of 2002. In addition to the Household restatement, HFC also restated its financial results by taking a charge of $264.8 million (post-tax) and $418.8 million (pre-tax). The massive restatement at HFC accounted for a significant portion of the Household restatement, as is indicated below:

| [Post-Tax Effects] | 1Q02 | 2Q02 | 1H02 | FY01 | FY00 | FY99 | FY94-FY98 | Total |
|---|---|---|---|---|---|---|---|---|
| Household Restatement Amount* | $6.1M | $20.0M | $26.1M | $75.9M | $70.1M | $58.1M | $155.8M | $386.0M |
| HFC Restatement Amount** | $17.9M | $5.9M | $23.8M | $56.7M | $59.8M | $54.3M | $70.2M | $264.8M |
| HFC Restatement as a % of Total | 293.4% | 29.5% | 91.1% | 74.7% | 85.3% | 93.4% | 45.0% | 68.6% |

\*      Source: Household 2001 Report on Form 10-K/A00, dated 8/27/02
\*\*     Source: HFC 2Q02 Report on Form 10-Q/A00, dated 8/27/02

391.   Each of the Debt Registration Statements used to sell the Debt Securities was signed by the HFC Director Defendants and was materially false and misleading, in that it contained material misstatements of fact or omitted to include facts necessary to make the statements contained therein not materially misleading, for the following reasons, among others:

(a)     The Debt Registration Statements filed by HFC and/or Household contained a statement of the purported ratio of earnings to fixed charges for Household and/or its subsidiaries for the period from 1992 to current. For purposes of calculating these ratios, the earnings detailed in the Debt Registration Statements purportedly consisted of income from continuing operations, to which was added income taxes and fixed charges. In fact, however, the Debt Registration Statements were materially false because the fixed earning figure presented by Household and/or HFC was artificially inflated and did not reflect the true earnings of either HFC or the Company, as has now been admitted;

(b)     The Debt Registration Statements were also materially false and misleading, as they included the false financial statements of HFC and/or Household for the periods from FY94-FY97 and incorporated Reports on Form 10-K and/or the interim financial statements filed with the SEC on Form 10-Q for FY98, FY99, FY00 and/or FY01, which financial statements defendants represented had been prepared in accordance with GAAP and which interim financial information purportedly was prepared in accordance with the instructions for Form 10-Q and Article 10 of Regulation S-X. In fact these financial statements had artificially inflated and over-reported earnings for the Company and HFC and, as a result, were not prepared in accordance with GAAP or other SEC rules;

(c)     Despite the falsity of HFC and/or Household's financial statements, which were incorporated into the Debt Registration Statements and which failed to properly account for HFC and/or Household's actual income, defendant Andersen consented to the inclusion of the false financial statements in the Debt Registration Statements and its report to the Board Directors of HFC in each incorporated Report on Form 10-K, which report stated that, "In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Household Financial Corporation and its subsidiaries" at that time and that these financial statements were prepared "in conformity with generally accepted accounting principles." In fact, this was not true – HFC and Household's financial statements were not prepared in conformity with GAAP, and Household and HFC were required to restate their false financial statements in 2002.

392.    Plaintiffs AMS Fund and West Virginia Fund and the members of the Securities Act subclass purchased the Debt Securities traceable to the false and misleading Debt Registration Statements. As a direct and proximate result of defendants' acts and omissions in violation of §§11 and/or 15 of the Securities Act, plaintiffs AMS Fund and West Virginia Fund and the members of the Securities Act subclass suffered substantial damages in connection with their purchases of the Debt Securities. By reason of the conduct herein alleged, each defendant violated and/or, in violation of §15 of the Securities Act, controlled a person who violated §15 of the 1933 Act.

393.    At the time they purchased the Debt Securities traceable to the defective Debt Registration Statements, plaintiffs AMS Fund and West Virginia Fund and members of the Securities Act subclass were without knowledge of the facts concerning the false or misleading statements or omissions alleged herein.

394.    Less than two years has elapsed from the time plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time this action was commenced. Less than five years have elapsed from the time the securities upon which this Claim for Relief is brought were *bona fide* offered to the time this action was commenced.

## XV. STATUTORY SAFE HARBOR

395.    The statutory safe harbor provided for forward-looking statements ("FLS") does not apply to the false FLS pled. None of the particular written FLS in Household's allegedly false financial statements or oral FLS in Household's conference calls and meetings with analysts was so identified as required. Defendants are liable for the false FLS pled because, at the time each FLS was made, the speaker knew the FLS was false, and the FLS was authorized and/or approved by an executive officer or management of Household who knew the FLS was false. None of the historic or present-tense statements made by defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

- 151 -

## XVI. CLASS ACTION ALLEGATIONS

396.    Plaintiffs bring this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class of persons who purchased Household securities during the Class Period.  Excluded from the class are defendants herein, members of defendants' immediate families, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

397.    This action is properly maintainable as a class action for the following reasons:

(a)    The class is so numerous that joinder of all class members is impracticable. As of 10/11/02, Household had billions of dollars of securities outstanding, including over 454 million shares of common stock.  Members of the class are scattered throughout the United States.

(b)    There are questions of law and fact common to members of the class that predominate over any questions affecting only individual members.  The common questions include, *inter alia*, the following:

(i)    Whether defendants' acts as alleged herein violated the federal securities laws;

(ii)    Whether defendants participated in and pursued the course of conduct complained of herein;

(iii)    Whether documents, SEC filings, press releases and other statements disseminated to the investing public and Household's shareholders during the Class Period misrepresented material facts about the operations, financial condition and earnings of the Company;

(iv)    Whether the market prices of Household securities during the Class Period were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(v)    To what extent the members of the class have sustained damages and the proper measure of damages;

(c)     Plaintiffs' claims are typical of the claims of other members of the class, and plaintiffs have no interests adverse or antagonistic to the interests of the class.

(d)     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature. Accordingly, plaintiffs are adequate representatives of the class and will fairly and adequately protect the interests of the class.

(e)     Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

398.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein. Because of the size of the individual class members' claims, few, if any, class members could afford to seek legal redress individually for the wrongs complained of herein.

## XVII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the class, pray for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiffs and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     As to the §§11, 12(a)(2) and/or 15 claims, awarding rescission or a recessionary measure of damages;

D.     Awarding plaintiffs and other members of the class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements; and

E.     Awarding plaintiffs and other members of the class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

- 153 -

## A157

## XVIII.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 7, 2003

MARVIN A. MILLER
MILLER FAUCHER AND CAFFERTY LLP
30 North LaSalle Street, Suite 3200
Chicago, IL  60602
Telephone:  312/782-4880
312/782-4485 (fax)

Designated as Local Counsel

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
PATRICK J. COUGHLIN
AZRA Z. MEHDI (90785467)
LUKE O. BROOKS (90785469)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

SCOTT & SCOTT, LLC
DAVID R. SCOTT
MICHAEL SWICK
108 Norwich Avenue
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)

Attorneys for Plaintiffs

C:\WINDOWS\Temporary Internet Files\OLK9351\DRD83076.cpt

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 02 C 5893 (Consolidated) |
| HOUSEHOLD INTERNATIONAL, INC., MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC., GOLDMAN SACHS & CO., INC., ARTHUR ANDERSEN, L.L.P., WILLIAM F. ALDINGER, DAVID A. SCHOENHOLZ, GARY GILMER, J.A. VOZAR, ROBERT J. DARNALL, GARY G. DILLON, JOHN A. EDWARDSON, MARY JOHNSTON EVANS, J. DUDLEY FISHBURN, CYRUS F. FREIDHEIM, LOUIS E. LEVY, GEORGE A. LORCH, JOHN D. NICHOLS, JAMES B. PITBLADO, S. JAY STEWART, and LOUIS W. SULLIVAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Ronald A. Guzmán |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lawrence E. Jaffe Pension Plan, on behalf of itself and all others similarly situated, brought this suit alleging violations of 15 U.S.C. § 78(j)(b) ("§ 10(b)" of the Exchange Act of 1934 ("1934 Act")) and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") against Household, Household Officers, identified as Aldinger, Schoenholz, and Gilmer, and Arthur Andersen ("Andersen")[1] in Count I; violation of 15 U.S.C. § 78(t)(a) ("§ 20(a)" of the 1934 Act) by

---

[1] On January 31, 2006, the Court entered a revised order preliminarily approving settlement of the class claims against Arthur Andersen, L.L.P.

Household, and Household Officers in Count II; violations of 15 U.S.C. §§ 77k, 77l(a)(2), and

77o ("§§ 11, 12(a)(2), and 15" of the Securities Act of 1933 ("1933 Act")) by Household,

Household Officers, Household Directors,[2] Andersen, Goldman Sachs & Co., Inc. and Merrill

Lynch, Pierce, Fenner & Smith, Inc. in Count III,[3] and violations of §§ 11, 15 of the 1933 Act by

Household, Household Directors and Andersen in Count IV. On December 3, 2004, the Court

certified the class solely as to the § 10(b) claims. Glickenhaus & Co. has been named lead

plaintiff.

All defendants except Andersen have moved pursuant to Federal Rule Civil Procedure

("Rule") 12(b)(6) and 12(c) to dismiss as time-barred § 10(b) claims that arose prior to July 30,

1999. For the reasons set forth in this Memorandum Opinion and Order, the Court treats

defendants' motion as one for judgment on the pleadings and grants the motion.

## FACTS

Because the Court has fully set forth the allegations in a prior opinion in this case, it will

not restate the facts in detail here. For a complete factual background, *see Lawrence E. Jaffe

Pension Plan*, 2004 WL 574665, at *1-3.

---

[2]The Household Directors are identified as Aldinger, Schoenholz, Robert J. Darnall, Gary
G. Dillon, John A. Edwardson, Mary Johnston Evans, J. Dudley Fishburn, Cyrus F. Freidheim,
Jr., Louis E. Levy, George A. Lorch, John D. Nichols, James B. Pitblado, S. Jay Stewart, and
Louis W. Sullivan. HFC is a wholly owned subsidiary of Household and its directors are
identified as Aldinger, Schoenholz, Gilmer, and J.A. Vozar.

[3]Goldman Sachs and Merrill Lynch were terminated as parties when the Court granted a
motion to dismiss Count III in a previous Memorandum Opinion and Order. *See Lawrence E.
Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 574665, at *18 (N.D. Ill.
Mar. 22, 2004).

2

## DISCUSSION

Pursuant to Rule 12(b)(6) and 12(c), defendants have moved to dismiss for failure to state a claim the class' § 10(b) claims that arose more than three years prior to the enactment of the Sarbanes-Oxley Act on July 30, 2002 as time-barred. Because a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) must be filed prior to any responsive pleading, which have already been filed in this case, the Court treats the motion as one for judgment on the pleadings. *See N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 n.3 (7th Cir. 1998); FED. R. CIV. P. 12(b)(6), 12(c). On a motion for judgment on the pleadings, the court accepts "all well-pleaded allegations in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). "[T]he motion should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989).

A statute of repose is an affirmative defense that a defendant is required to plead under Rule 8(c). *Stirchak v. Shiley*, No. 96 C 257, 1996 WL 166958, at *1 (N.D. Ill. Apr. 5, 1996). Usually "complaints do not have to anticipate affirmative defenses to survive . . . ." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). "The exception occurs where . . . the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely . . . ." *Id.* It is important to note that tolling principles – equitable estoppel and equitable tolling – do not apply to the statute of repose for securities fraud claims because its purpose is to set an outer limit that is unaffected by what plaintiff knows. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).

3

A161

On July 30, 2002, Congress enacted the Sarbanes-Oxley Act, which provides that securities claims involving "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" may be brought not later than the earlier of two years after the discovery of the facts constituting the violation or five years after the violation. *See* 28 U.S.C. § 1658(b). Further, the Act's limitations period "appl[ies] to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act." *See id.* (comments).

The instant lawsuit was filed on August 19, 2002, *i.e.*, after the enactment of the Sarbanes-Oxley Act. Thus, it would seem, the Sarbanes-Oxley limitations period would apply.

However, all is not that simple. In some cases, applying the Sarbanes-Oxley limitations would resurrect previously time-barred claims, thereby putting defendants at risk of liability where previously they had been out of the woods, so to speak.

In *Foss v. Bear, Stearns Co.*, 394 F.3d 540, 542 (7th Cir. 2005), a post-Sarbanes-Oxley securities fraud action, the Seventh Circuit affirmed the district court's dismissal of the complaint for failure to state a claim and held that the plaintiff's § 10(b) and Rule 10b-5 claim based on a violation that occurred outside of the three-year statute of repose period applicable prior to the enactment of the Sarbanes-Oxley Act[4] was barred because the Act is not retroactive and does not revive expired claims. *Id.* at 541-42. Although plaintiffs rely on *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1289 (11th Cir. 2005), in which the Eleventh Circuit held that the factual record was too undeveloped to determine whether to make a legal determination

---

[4]Prior to the enactment of the Sarbanes-Oxley Act, a plaintiff was required to file a securities fraud claim "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf*, 501 U.S. at 359.

4

as to the retroactivity of Sarbanes-Oxley, this Court is duty-bound to adhere to *Foss*.

Defendants argue that the claim of any member of the class who purchased Household securities prior to July 30, 1999 expired under the three-year statute of repose applicable prior to the Sarbanes-Oxley Act. In other words, defendants assume that the "violation" that triggers the statute of repose is the purchase of Household securities. Plaintiff did not address the issue.

Courts have held that the triggering event for the statute of repose is defendant's misrepresentation or omission in connection with the sale or purchase of a security. *Wafra Leasing Corp. v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 864 (N.D. Ill. 2002); *Antell v. Arthur Andersen LLP*, No. 97 C 3456, 1998 WL 245878 at *5-6 (N.D. Ill. May 4, 1998). *Cf. Beard v. J.I. Case Co.*, 823 F.2d 1095, 1097 n.1 (7th Cir. 1987) ("[A] period of repose bars a suit a fixed number of years after an action by the defendant . . . , even if this period ends before the plaintiff suffers any injury.") *But see Otto v. Variable Annuity Life Ins. Co.*, 816 F. Supp. 458, 461 n.3 (N.D. Ill.1992) ("[A] violation of § 10(b) and Rule 10b-5 is comprised not only of a misrepresentation or omission of material fact, but also includes the purchase or sale of any security.") (citations and quotations omitted). The Court finds persuasive the reasoning of those cases holding that the statute of repose commences when a defendant makes a misrepresentation or omission in connection with the sale or purchase of a security.

Under the three-year statute of repose, claims based on any misrepresentation or omission in connection with the sale or purchase of a security that occurred before July 30, 1999 expired before the Sarbanes-Oxley Act became effective on July 30, 2002. *See* 501 U.S. at 364. These claims expired regardless of the fact that plaintiffs allege they did not have inquiry notice as to these claims until much later. *See Neal v. Honeywell, Inc.*, 33 F.3d 860, 865 (7th Cir. 1994) ("The statute of repose for a federal securities claim may expire before the plaintiff discovers the

5

fraud."), *abrogated on other grounds*, *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 125 S.Ct. 2444, 2449 (2005); *see also Lampf*, 501 U.S. at 363 (stating that tolling principles do not apply to the three-year statute of repose). Accordingly, the Court grants defendants' motion.

## CONCLUSION

For the reasons set forth above, the Court grants defendants' motion for judgment on the pleadings [doc. no. 243-1] which seeks to dismiss part of the Amended Consolidated Class Action Complaint. The Court dismisses with prejudice the § 10(b) claims based on any misrepresentation or omission that occurred before July 30, 1999 in connection with the sale or purchase of a security.

**SO ORDERED**                          ENTERED: 2/28/2006

                                        HON. RONALD A. GUZMAN
                                        **United States Judge**

6

**A164**

# Exhibit 53

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Using Specific Disclosures**

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------------|---------------------|------------|
| 07/30/99 | $42.94 | $7.97 | $34.97 |
| 08/02/99 | $41.88 | $7.97 | $33.91 |
| 08/03/99 | $40.00 | $7.97 | $32.03 |
| 08/04/99 | $40.31 | $7.97 | $32.35 |
| 08/05/99 | $40.56 | $7.97 | $32.60 |
| 08/06/99 | $40.25 | $7.97 | $32.28 |
| 08/09/99 | $40.88 | $7.97 | $32.91 |
| 08/10/99 | $39.50 | $7.97 | $31.53 |
| 08/11/99 | $40.25 | $7.97 | $32.28 |
| 08/12/99 | $40.19 | $7.97 | $32.22 |
| 08/13/99 | $40.75 | $7.97 | $32.78 |
| 08/16/99 | $39.75 | $7.97 | $31.78 |
| 08/17/99 | $41.50 | $7.97 | $33.53 |
| 08/18/99 | $42.00 | $7.97 | $34.03 |
| 08/19/99 | $41.69 | $7.97 | $33.72 |
| 08/20/99 | $41.88 | $7.97 | $33.91 |
| 08/23/99 | $42.94 | $7.97 | $34.97 |
| 08/24/99 | $42.44 | $7.97 | $34.47 |
| 08/25/99 | $41.19 | $7.97 | $33.22 |
| 08/26/99 | $39.81 | $7.97 | $31.85 |
| 08/27/99 | $37.81 | $7.97 | $29.85 |
| 08/30/99 | $37.44 | $7.97 | $29.47 |
| 08/31/99 | $37.75 | $7.97 | $29.78 |
| 09/01/99 | $39.56 | $7.97 | $31.60 |
| 09/02/99 | $38.50 | $7.97 | $30.53 |
| 09/03/99 | $39.94 | $7.97 | $31.97 |
| 09/07/99 | $39.94 | $7.97 | $31.97 |
| 09/08/99 | $39.56 | $7.97 | $31.60 |
| 09/09/99 | $39.88 | $7.97 | $31.91 |
| 09/10/99 | $40.63 | $7.97 | $32.66 |
| 09/13/99 | $41.50 | $7.97 | $33.53 |
| 09/14/99 | $41.13 | $7.97 | $33.16 |
| 09/15/99 | $40.44 | $7.97 | $32.47 |
| 09/16/99 | $40.25 | $7.97 | $32.28 |
| 09/17/99 | $41.13 | $7.97 | $33.16 |
| 09/20/99 | $41.75 | $7.97 | $33.78 |
| 09/21/99 | $40.50 | $7.97 | $32.53 |
| 09/22/99 | $41.44 | $7.97 | $33.47 |
| 09/23/99 | $40.00 | $7.97 | $32.03 |
| 09/24/99 | $39.44 | $7.97 | $31.47 |
| 09/27/99 | $40.38 | $7.97 | $32.41 |
| 09/28/99 | $39.69 | $7.97 | $31.72 |
| 09/29/99 | $40.63 | $7.97 | $32.66 |
| 09/30/99 | $40.13 | $7.97 | $32.16 |
| 10/01/99 | $39.38 | $7.97 | $31.41 |
| 10/04/99 | $40.44 | $7.97 | $32.47 |
| 10/05/99 | $41.06 | $7.97 | $33.10 |

1

**A166**

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 10/06/99 | $42.88 | $7.97 | $34.91 |
| 10/07/99 | $42.38 | $7.97 | $34.41 |
| 10/08/99 | $44.31 | $7.97 | $36.35 |
| 10/11/99 | $42.69 | $7.97 | $34.72 |
| 10/12/99 | $41.69 | $7.97 | $33.72 |
| 10/13/99 | $39.75 | $7.97 | $31.78 |
| 10/14/99 | $38.94 | $7.97 | $30.97 |
| 10/15/99 | $37.00 | $7.97 | $29.03 |
| 10/18/99 | $37.88 | $7.97 | $29.91 |
| 10/19/99 | $38.94 | $7.97 | $30.97 |
| 10/20/99 | $39.56 | $7.97 | $31.60 |
| 10/21/99 | $39.00 | $7.97 | $31.03 |
| 10/22/99 | $39.75 | $7.97 | $31.78 |
| 10/25/99 | $38.88 | $7.97 | $30.91 |
| 10/26/99 | $39.06 | $7.97 | $31.10 |
| 10/27/99 | $41.56 | $7.97 | $33.60 |
| 10/28/99 | $45.69 | $7.97 | $37.72 |
| 10/29/99 | $44.63 | $7.97 | $36.66 |
| 11/01/99 | $45.00 | $7.97 | $37.03 |
| 11/02/99 | $45.31 | $7.97 | $37.35 |
| 11/03/99 | $44.56 | $7.97 | $36.60 |
| 11/04/99 | $45.63 | $7.97 | $37.66 |
| 11/05/99 | $46.06 | $7.97 | $38.10 |
| 11/08/99 | $44.63 | $7.97 | $36.66 |
| 11/09/99 | $43.06 | $7.97 | $35.10 |
| 11/10/99 | $42.56 | $7.97 | $34.60 |
| 11/11/99 | $41.31 | $7.97 | $33.35 |
| 11/12/99 | $44.13 | $7.97 | $36.16 |
| 11/15/99 | $44.13 | $7.97 | $36.16 |
| 11/16/99 | $45.13 | $7.97 | $37.16 |
| 11/17/99 | $43.25 | $7.97 | $35.28 |
| 11/18/99 | $42.50 | $7.97 | $34.53 |
| 11/19/99 | $41.88 | $7.97 | $33.91 |
| 11/22/99 | $41.25 | $7.97 | $33.28 |
| 11/23/99 | $40.94 | $7.97 | $32.97 |
| 11/24/99 | $40.38 | $7.97 | $32.41 |
| 11/26/99 | $40.25 | $7.97 | $32.28 |
| 11/29/99 | $39.38 | $7.97 | $31.41 |
| 11/30/99 | $39.56 | $7.97 | $31.60 |
| 12/01/99 | $39.56 | $7.97 | $31.60 |
| 12/02/99 | $40.31 | $7.97 | $32.35 |
| 12/03/99 | $41.00 | $7.97 | $33.03 |
| 12/06/99 | $39.50 | $7.97 | $31.53 |
| 12/07/99 | $38.25 | $7.97 | $30.28 |
| 12/08/99 | $38.69 | $7.97 | $30.72 |
| 12/09/99 | $39.50 | $7.97 | $31.53 |
| 12/10/99 | $39.06 | $7.97 | $31.10 |

2

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 12/13/99 | $38.25 | $7.97 | $30.28 |
| 12/14/99 | $37.94 | $7.97 | $29.97 |
| 12/15/99 | $37.63 | $7.97 | $29.66 |
| 12/16/99 | $38.31 | $7.97 | $30.35 |
| 12/17/99 | $38.13 | $7.97 | $30.16 |
| 12/20/99 | $37.94 | $7.97 | $29.97 |
| 12/21/99 | $37.25 | $7.97 | $29.28 |
| 12/22/99 | $36.63 | $7.97 | $28.66 |
| 12/23/99 | $37.50 | $7.97 | $29.53 |
| 12/27/99 | $36.88 | $7.97 | $28.91 |
| 12/28/99 | $36.19 | $7.97 | $28.22 |
| 12/29/99 | $35.94 | $7.97 | $27.97 |
| 12/30/99 | $36.56 | $7.97 | $28.60 |
| 12/31/99 | $37.25 | $7.97 | $29.28 |
| 01/03/00 | $34.69 | $7.97 | $26.72 |
| 01/04/00 | $35.00 | $7.97 | $27.03 |
| 01/05/00 | $34.38 | $7.97 | $26.41 |
| 01/06/00 | $36.00 | $7.97 | $28.03 |
| 01/07/00 | $36.38 | $7.97 | $28.41 |
| 01/10/00 | $36.50 | $7.97 | $28.53 |
| 01/11/00 | $36.00 | $7.97 | $28.03 |
| 01/12/00 | $36.75 | $7.97 | $28.78 |
| 01/13/00 | $37.69 | $7.97 | $29.72 |
| 01/14/00 | $37.31 | $7.97 | $29.35 |
| 01/18/00 | $36.50 | $7.97 | $28.53 |
| 01/19/00 | $36.81 | $7.97 | $28.85 |
| 01/20/00 | $36.00 | $7.97 | $28.03 |
| 01/21/00 | $35.63 | $7.97 | $27.66 |
| 01/24/00 | $34.50 | $7.97 | $26.53 |
| 01/25/00 | $33.94 | $7.97 | $25.97 |
| 01/26/00 | $35.63 | $7.97 | $27.66 |
| 01/27/00 | $35.69 | $7.97 | $27.72 |
| 01/28/00 | $34.19 | $7.97 | $26.22 |
| 01/31/00 | $35.25 | $7.97 | $27.28 |
| 02/01/00 | $35.25 | $7.97 | $27.28 |
| 02/02/00 | $36.13 | $7.97 | $28.16 |
| 02/03/00 | $35.63 | $7.97 | $27.66 |
| 02/04/00 | $35.38 | $7.97 | $27.41 |
| 02/07/00 | $35.06 | $7.97 | $27.10 |
| 02/08/00 | $35.75 | $7.97 | $27.78 |
| 02/09/00 | $33.88 | $7.97 | $25.91 |
| 02/10/00 | $33.88 | $7.97 | $25.91 |
| 02/11/00 | $31.88 | $7.97 | $23.91 |
| 02/14/00 | $31.31 | $7.97 | $23.35 |
| 02/15/00 | $32.94 | $7.97 | $24.97 |
| 02/16/00 | $30.88 | $7.97 | $22.91 |
| 02/17/00 | $31.69 | $7.97 | $23.72 |

3

**A168**

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Using Specific Disclosures**

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 02/18/00 | $30.88 | $7.97 | $22.91 |
| 02/22/00 | $31.06 | $7.97 | $23.10 |
| 02/23/00 | $30.69 | $7.97 | $22.72 |
| 02/24/00 | $30.63 | $7.97 | $22.66 |
| 02/25/00 | $30.88 | $7.97 | $22.91 |
| 02/28/00 | $31.88 | $7.97 | $23.91 |
| 02/29/00 | $31.94 | $7.97 | $23.97 |
| 03/01/00 | $33.25 | $7.97 | $25.28 |
| 03/02/00 | $35.13 | $7.97 | $27.16 |
| 03/03/00 | $36.63 | $7.97 | $28.66 |
| 03/06/00 | $34.81 | $7.97 | $26.85 |
| 03/07/00 | $32.88 | $7.97 | $24.91 |
| 03/08/00 | $31.81 | $7.97 | $23.85 |
| 03/09/00 | $32.44 | $7.97 | $24.47 |
| 03/10/00 | $32.75 | $7.97 | $24.78 |
| 03/13/00 | $32.44 | $7.97 | $24.47 |
| 03/14/00 | $32.13 | $7.97 | $24.16 |
| 03/15/00 | $34.25 | $7.97 | $26.28 |
| 03/16/00 | $36.81 | $7.97 | $28.85 |
| 03/17/00 | $36.88 | $7.97 | $28.91 |
| 03/20/00 | $35.56 | $7.97 | $27.60 |
| 03/21/00 | $37.88 | $7.97 | $29.91 |
| 03/22/00 | $37.75 | $7.97 | $29.78 |
| 03/23/00 | $38.88 | $7.97 | $30.91 |
| 03/24/00 | $37.94 | $7.97 | $29.97 |
| 03/27/00 | $36.13 | $7.97 | $28.16 |
| 03/28/00 | $36.69 | $7.97 | $28.72 |
| 03/29/00 | $36.50 | $7.97 | $28.53 |
| 03/30/00 | $36.38 | $7.97 | $28.41 |
| 03/31/00 | $37.31 | $7.97 | $29.35 |
| 04/03/00 | $39.13 | $7.97 | $31.16 |
| 04/04/00 | $38.13 | $7.97 | $30.16 |
| 04/05/00 | $39.06 | $7.97 | $31.10 |
| 04/06/00 | $40.38 | $7.97 | $32.41 |
| 04/07/00 | $38.88 | $7.97 | $30.91 |
| 04/10/00 | $40.00 | $7.97 | $32.03 |
| 04/11/00 | $40.63 | $7.97 | $32.66 |
| 04/12/00 | $44.00 | $7.97 | $36.03 |
| 04/13/00 | $42.06 | $7.97 | $34.10 |
| 04/14/00 | $38.06 | $7.97 | $30.10 |
| 04/17/00 | $39.63 | $7.97 | $31.66 |
| 04/18/00 | $39.69 | $7.97 | $31.72 |
| 04/19/00 | $39.94 | $7.97 | $31.97 |
| 04/20/00 | $41.81 | $7.97 | $33.85 |
| 04/24/00 | $43.38 | $7.97 | $35.41 |
| 04/25/00 | $44.69 | $7.97 | $36.72 |
| 04/26/00 | $43.63 | $7.97 | $35.66 |

4

**A169**

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Using Specific Disclosures**

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------------|----------------------|------------|
| 04/27/00 | $42.00 | $7.97 | $34.03 |
| 04/28/00 | $41.75 | $7.97 | $33.78 |
| 05/01/00 | $42.00 | $7.97 | $34.03 |
| 05/02/00 | $42.06 | $7.97 | $34.10 |
| 05/03/00 | $40.75 | $7.97 | $32.78 |
| 05/04/00 | $39.13 | $7.97 | $31.16 |
| 05/05/00 | $39.75 | $7.97 | $31.78 |
| 05/08/00 | $41.13 | $7.97 | $33.16 |
| 05/09/00 | $40.25 | $7.97 | $32.28 |
| 05/10/00 | $39.38 | $7.97 | $31.41 |
| 05/11/00 | $39.94 | $7.97 | $31.97 |
| 05/12/00 | $40.38 | $7.97 | $32.41 |
| 05/15/00 | $41.94 | $7.97 | $33.97 |
| 05/16/00 | $42.81 | $7.97 | $34.85 |
| 05/17/00 | $41.69 | $7.97 | $33.72 |
| 05/18/00 | $42.81 | $7.97 | $34.85 |
| 05/19/00 | $41.44 | $7.97 | $33.47 |
| 05/22/00 | $41.88 | $7.97 | $33.91 |
| 05/23/00 | $43.00 | $7.97 | $35.03 |
| 05/24/00 | $45.75 | $7.97 | $37.78 |
| 05/25/00 | $45.38 | $7.97 | $37.41 |
| 05/26/00 | $45.38 | $7.97 | $37.41 |
| 05/30/00 | $46.56 | $7.97 | $38.60 |
| 05/31/00 | $47.00 | $7.97 | $39.03 |
| 06/01/00 | $47.13 | $7.97 | $39.16 |
| 06/02/00 | $47.00 | $7.97 | $39.03 |
| 06/05/00 | $47.13 | $7.97 | $39.16 |
| 06/06/00 | $46.38 | $7.97 | $38.41 |
| 06/07/00 | $47.25 | $7.97 | $39.28 |
| 06/08/00 | $46.19 | $7.97 | $38.22 |
| 06/09/00 | $44.44 | $7.97 | $36.47 |
| 06/12/00 | $43.56 | $7.97 | $35.60 |
| 06/13/00 | $44.69 | $7.97 | $36.72 |
| 06/14/00 | $45.38 | $7.97 | $37.41 |
| 06/15/00 | $43.06 | $7.97 | $35.10 |
| 06/16/00 | $42.44 | $7.97 | $34.47 |
| 06/19/00 | $42.75 | $7.97 | $34.78 |
| 06/20/00 | $43.94 | $7.97 | $35.97 |
| 06/21/00 | $44.06 | $7.97 | $36.10 |
| 06/22/00 | $43.19 | $7.97 | $35.22 |
| 06/23/00 | $42.13 | $7.97 | $34.16 |
| 06/26/00 | $42.13 | $7.97 | $34.16 |
| 06/27/00 | $41.81 | $7.97 | $33.85 |
| 06/28/00 | $42.81 | $7.97 | $34.85 |
| 06/29/00 | $43.00 | $7.97 | $35.03 |
| 06/30/00 | $41.56 | $7.97 | $33.60 |
| 07/03/00 | $41.88 | $7.97 | $33.91 |

5

**A170**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------------|----------------------|------------|
| 07/05/00 | $42.00 | $7.97 | $34.03 |
| 07/06/00 | $41.63 | $7.97 | $33.66 |
| 07/07/00 | $42.75 | $7.97 | $34.78 |
| 07/10/00 | $42.69 | $7.97 | $34.72 |
| 07/11/00 | $43.50 | $7.97 | $35.53 |
| 07/12/00 | $43.94 | $7.97 | $35.97 |
| 07/13/00 | $44.00 | $7.97 | $36.03 |
| 07/14/00 | $44.88 | $7.97 | $36.91 |
| 07/17/00 | $42.81 | $7.97 | $34.85 |
| 07/18/00 | $43.44 | $7.97 | $35.47 |
| 07/19/00 | $45.25 | $7.97 | $37.28 |
| 07/20/00 | $46.38 | $7.97 | $38.41 |
| 07/21/00 | $45.81 | $7.97 | $37.85 |
| 07/24/00 | $45.94 | $7.97 | $37.97 |
| 07/25/00 | $45.50 | $7.97 | $37.53 |
| 07/26/00 | $44.25 | $7.97 | $36.28 |
| 07/27/00 | $44.69 | $7.97 | $36.72 |
| 07/28/00 | $43.75 | $7.97 | $35.78 |
| 07/31/00 | $44.56 | $7.97 | $36.60 |
| 08/01/00 | $44.56 | $7.97 | $36.60 |
| 08/02/00 | $44.44 | $7.97 | $36.47 |
| 08/03/00 | $46.63 | $7.97 | $38.66 |
| 08/04/00 | $49.63 | $7.97 | $41.66 |
| 08/07/00 | $49.88 | $7.97 | $41.91 |
| 08/08/00 | $50.00 | $7.97 | $42.03 |
| 08/09/00 | $48.88 | $7.97 | $40.91 |
| 08/10/00 | $48.19 | $7.97 | $40.22 |
| 08/11/00 | $49.06 | $7.97 | $41.10 |
| 08/14/00 | $49.19 | $7.97 | $41.22 |
| 08/15/00 | $47.88 | $7.97 | $39.91 |
| 08/16/00 | $46.75 | $7.97 | $38.78 |
| 08/17/00 | $46.38 | $7.97 | $38.41 |
| 08/18/00 | $46.94 | $7.97 | $38.97 |
| 08/21/00 | $46.63 | $7.97 | $38.66 |
| 08/22/00 | $47.31 | $7.97 | $39.35 |
| 08/23/00 | $47.25 | $7.97 | $39.28 |
| 08/24/00 | $47.44 | $7.97 | $39.47 |
| 08/25/00 | $47.75 | $7.97 | $39.78 |
| 08/28/00 | $48.25 | $7.97 | $40.28 |
| 08/29/00 | $48.00 | $7.97 | $40.03 |
| 08/30/00 | $48.00 | $7.97 | $40.03 |
| 08/31/00 | $48.00 | $7.97 | $40.03 |
| 09/01/00 | $47.38 | $7.97 | $39.41 |
| 09/05/00 | $47.63 | $7.97 | $39.66 |
| 09/06/00 | $50.19 | $7.97 | $42.22 |
| 09/07/00 | $50.56 | $7.97 | $42.60 |
| 09/08/00 | $52.44 | $7.97 | $44.47 |

6

## A171

## Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------------|----------------------|------------|
| 09/11/00 | $51.63 | $7.97 | $43.66 |
| 09/12/00 | $51.13 | $7.97 | $43.16 |
| 09/13/00 | $51.25 | $7.97 | $43.28 |
| 09/14/00 | $51.00 | $7.97 | $43.03 |
| 09/15/00 | $50.50 | $7.97 | $42.53 |
| 09/18/00 | $50.75 | $7.97 | $42.78 |
| 09/19/00 | $51.56 | $7.97 | $43.60 |
| 09/20/00 | $52.31 | $7.97 | $44.35 |
| 09/21/00 | $52.88 | $7.97 | $44.91 |
| 09/22/00 | $52.00 | $7.97 | $44.03 |
| 09/25/00 | $53.38 | $7.97 | $45.41 |
| 09/26/00 | $54.13 | $7.97 | $46.16 |
| 09/27/00 | $54.69 | $7.97 | $46.72 |
| 09/28/00 | $56.44 | $7.97 | $48.47 |
| 09/29/00 | $56.63 | $7.97 | $48.66 |
| 10/02/00 | $55.19 | $7.97 | $47.22 |
| 10/03/00 | $55.63 | $7.97 | $47.66 |
| 10/04/00 | $54.88 | $7.97 | $46.91 |
| 10/05/00 | $55.69 | $7.97 | $47.72 |
| 10/06/00 | $52.63 | $7.97 | $44.66 |
| 10/09/00 | $52.19 | $7.97 | $44.22 |
| 10/10/00 | $49.50 | $7.97 | $41.53 |
| 10/11/00 | $47.94 | $7.97 | $39.97 |
| 10/12/00 | $46.25 | $7.97 | $38.28 |
| 10/13/00 | $47.56 | $7.97 | $39.60 |
| 10/16/00 | $49.13 | $7.97 | $41.16 |
| 10/17/00 | $47.50 | $7.97 | $39.53 |
| 10/18/00 | $48.75 | $7.97 | $40.78 |
| 10/19/00 | $50.63 | $7.97 | $42.66 |
| 10/20/00 | $50.44 | $7.97 | $42.47 |
| 10/23/00 | $49.19 | $7.97 | $41.22 |
| 10/24/00 | $50.25 | $7.97 | $42.28 |
| 10/25/00 | $49.50 | $7.97 | $41.53 |
| 10/26/00 | $47.44 | $7.97 | $39.47 |
| 10/27/00 | $47.50 | $7.97 | $39.53 |
| 10/30/00 | $49.38 | $7.97 | $41.41 |
| 10/31/00 | $50.31 | $7.97 | $42.35 |
| 11/01/00 | $49.63 | $7.97 | $41.66 |
| 11/02/00 | $51.50 | $7.97 | $43.53 |
| 11/03/00 | $51.50 | $7.97 | $43.53 |
| 11/06/00 | $52.50 | $7.97 | $44.53 |
| 11/07/00 | $51.88 | $7.97 | $43.91 |
| 11/08/00 | $51.63 | $7.97 | $43.66 |
| 11/09/00 | $50.50 | $7.97 | $42.53 |
| 11/10/00 | $50.75 | $7.97 | $42.78 |
| 11/13/00 | $49.13 | $7.97 | $41.16 |
| 11/14/00 | $49.00 | $7.97 | $41.03 |

7

A172

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Using Specific Disclosures**

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------|-----------|-------|
| 11/15/00 | $49.31 | $7.97 | $41.35 |
| 11/16/00 | $49.13 | $7.97 | $41.16 |
| 11/17/00 | $48.19 | $7.97 | $40.22 |
| 11/20/00 | $45.75 | $7.97 | $37.78 |
| 11/21/00 | $46.25 | $7.97 | $38.28 |
| 11/22/00 | $44.06 | $7.97 | $36.10 |
| 11/24/00 | $45.31 | $7.97 | $37.35 |
| 11/27/00 | $46.50 | $7.97 | $38.53 |
| 11/28/00 | $48.38 | $7.97 | $40.41 |
| 11/29/00 | $50.13 | $7.97 | $42.16 |
| 11/30/00 | $49.88 | $7.97 | $41.91 |
| 12/01/00 | $49.56 | $7.97 | $41.60 |
| 12/04/00 | $48.38 | $7.97 | $40.41 |
| 12/05/00 | $50.19 | $7.97 | $42.22 |
| 12/06/00 | $50.75 | $7.97 | $42.78 |
| 12/07/00 | $51.81 | $7.97 | $43.85 |
| 12/08/00 | $53.06 | $7.97 | $45.10 |
| 12/11/00 | $52.63 | $7.97 | $44.66 |
| 12/12/00 | $51.94 | $7.97 | $43.97 |
| 12/13/00 | $50.94 | $7.97 | $42.97 |
| 12/14/00 | $50.94 | $7.97 | $42.97 |
| 12/15/00 | $50.25 | $7.97 | $42.28 |
| 12/18/00 | $52.00 | $7.97 | $44.03 |
| 12/19/00 | $53.63 | $7.97 | $45.66 |
| 12/20/00 | $51.94 | $7.97 | $43.97 |
| 12/21/00 | $52.44 | $7.97 | $44.47 |
| 12/22/00 | $52.44 | $7.97 | $44.47 |
| 12/26/00 | $53.25 | $7.97 | $45.28 |
| 12/27/00 | $54.31 | $7.97 | $46.35 |
| 12/28/00 | $55.94 | $7.97 | $47.97 |
| 12/29/00 | $55.00 | $7.97 | $47.03 |
| 01/02/01 | $53.69 | $7.97 | $45.72 |
| 01/03/01 | $58.00 | $7.97 | $50.03 |
| 01/04/01 | $57.13 | $7.97 | $49.16 |
| 01/05/01 | $54.88 | $7.97 | $46.91 |
| 01/08/01 | $54.06 | $7.97 | $46.10 |
| 01/09/01 | $52.88 | $7.97 | $44.91 |
| 01/10/01 | $52.81 | $7.97 | $44.85 |
| 01/11/01 | $53.44 | $7.97 | $45.47 |
| 01/12/01 | $53.69 | $7.97 | $45.72 |
| 01/16/01 | $55.19 | $7.97 | $47.22 |
| 01/17/01 | $56.31 | $7.97 | $48.35 |
| 01/18/01 | $54.88 | $7.97 | $46.91 |
| 01/19/01 | $54.50 | $7.97 | $46.53 |
| 01/22/01 | $53.75 | $7.97 | $45.78 |
| 01/23/01 | $55.50 | $7.97 | $47.53 |
| 01/24/01 | $56.63 | $7.97 | $48.66 |

8

**A173**

## Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 01/25/01 | $56.69 | $7.97 | $48.72 |
| 01/26/01 | $57.50 | $7.97 | $49.53 |
| 01/29/01 | $59.10 | $7.97 | $51.13 |
| 01/30/01 | $58.59 | $7.97 | $50.62 |
| 01/31/01 | $57.48 | $7.97 | $49.51 |
| 02/01/01 | $58.92 | $7.97 | $50.95 |
| 02/02/01 | $58.80 | $7.97 | $50.83 |
| 02/05/01 | $58.98 | $7.97 | $51.01 |
| 02/06/01 | $58.11 | $7.97 | $50.14 |
| 02/07/01 | $59.20 | $7.97 | $51.23 |
| 02/08/01 | $58.78 | $7.97 | $50.81 |
| 02/09/01 | $59.20 | $7.97 | $51.23 |
| 02/12/01 | $60.33 | $7.97 | $52.36 |
| 02/13/01 | $60.25 | $7.97 | $52.28 |
| 02/14/01 | $59.45 | $7.97 | $51.48 |
| 02/15/01 | $58.26 | $7.97 | $50.29 |
| 02/16/01 | $59.09 | $7.97 | $51.12 |
| 02/20/01 | $57.53 | $7.97 | $49.56 |
| 02/21/01 | $55.65 | $7.97 | $47.68 |
| 02/22/01 | $55.76 | $7.97 | $47.79 |
| 02/23/01 | $56.58 | $7.97 | $48.61 |
| 02/26/01 | $58.00 | $7.97 | $50.03 |
| 02/27/01 | $59.11 | $7.97 | $51.14 |
| 02/28/01 | $57.92 | $7.97 | $49.95 |
| 03/01/01 | $58.40 | $7.97 | $50.43 |
| 03/02/01 | $59.41 | $7.97 | $51.44 |
| 03/05/01 | $59.08 | $7.97 | $51.11 |
| 03/06/01 | $59.87 | $7.97 | $51.90 |
| 03/07/01 | $61.50 | $7.97 | $53.53 |
| 03/08/01 | $61.11 | $7.97 | $53.14 |
| 03/09/01 | $60.27 | $7.97 | $52.30 |
| 03/12/01 | $58.43 | $7.97 | $50.46 |
| 03/13/01 | $60.45 | $7.97 | $52.48 |
| 03/14/01 | $59.69 | $7.97 | $51.72 |
| 03/15/01 | $60.36 | $7.97 | $52.39 |
| 03/16/01 | $60.01 | $7.97 | $52.04 |
| 03/19/01 | $59.90 | $7.97 | $51.93 |
| 03/20/01 | $57.88 | $7.97 | $49.91 |
| 03/21/01 | $55.85 | $7.97 | $47.88 |
| 03/22/01 | $54.72 | $7.97 | $46.75 |
| 03/23/01 | $58.12 | $7.97 | $50.15 |
| 03/26/01 | $57.94 | $7.97 | $49.97 |
| 03/27/01 | $59.85 | $7.97 | $51.88 |
| 03/28/01 | $59.35 | $7.97 | $51.38 |
| 03/29/01 | $58.15 | $7.97 | $50.18 |
| 03/30/01 | $59.24 | $7.97 | $51.27 |
| 04/02/01 | $59.50 | $7.97 | $51.53 |

9

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 04/03/01 | $58.92 | $7.97 | $50.95 |
| 04/04/01 | $58.45 | $7.97 | $50.48 |
| 04/05/01 | $59.73 | $7.97 | $51.76 |
| 04/06/01 | $58.54 | $7.97 | $50.57 |
| 04/09/01 | $59.45 | $7.97 | $51.48 |
| 04/10/01 | $61.12 | $7.97 | $53.15 |
| 04/11/01 | $60.54 | $7.97 | $52.57 |
| 04/12/01 | $61.40 | $7.97 | $53.43 |
| 04/16/01 | $60.33 | $7.97 | $52.36 |
| 04/17/01 | $60.91 | $7.97 | $52.94 |
| 04/18/01 | $63.38 | $7.97 | $55.41 |
| 04/19/01 | $63.05 | $7.97 | $55.08 |
| 04/20/01 | $62.45 | $7.97 | $54.48 |
| 04/23/01 | $62.23 | $7.97 | $54.26 |
| 04/24/01 | $63.10 | $7.97 | $55.13 |
| 04/25/01 | $64.75 | $7.97 | $56.78 |
| 04/26/01 | $63.40 | $7.97 | $55.43 |
| 04/27/01 | $64.38 | $7.97 | $56.41 |
| 04/30/01 | $64.02 | $7.97 | $56.05 |
| 05/01/01 | $64.46 | $7.97 | $56.49 |
| 05/02/01 | $65.46 | $7.97 | $57.49 |
| 05/03/01 | $65.29 | $7.97 | $57.32 |
| 05/04/01 | $65.70 | $7.97 | $57.73 |
| 05/07/01 | $65.50 | $7.97 | $57.53 |
| 05/08/01 | $65.42 | $7.97 | $57.45 |
| 05/09/01 | $66.05 | $7.97 | $58.08 |
| 05/10/01 | $65.08 | $7.97 | $57.11 |
| 05/11/01 | $64.91 | $7.97 | $56.94 |
| 05/14/01 | $65.22 | $7.97 | $57.25 |
| 05/15/01 | $66.94 | $7.97 | $58.97 |
| 05/16/01 | $68.64 | $7.97 | $60.67 |
| 05/17/01 | $68.20 | $7.97 | $60.23 |
| 05/18/01 | $67.57 | $7.97 | $59.60 |
| 05/21/01 | $67.67 | $7.97 | $59.70 |
| 05/22/01 | $67.71 | $7.97 | $59.74 |
| 05/23/01 | $66.48 | $7.97 | $58.51 |
| 05/24/01 | $66.44 | $7.97 | $58.47 |
| 05/25/01 | $66.27 | $7.97 | $58.30 |
| 05/29/01 | $66.00 | $7.97 | $58.03 |
| 05/30/01 | $65.80 | $7.97 | $57.83 |
| 05/31/01 | $65.66 | $7.97 | $57.69 |
| 06/01/01 | $65.74 | $7.97 | $57.77 |
| 06/04/01 | $66.43 | $7.97 | $58.46 |
| 06/05/01 | $66.98 | $7.97 | $59.01 |
| 06/06/01 | $65.96 | $7.97 | $57.99 |
| 06/07/01 | $65.82 | $7.97 | $57.85 |
| 06/08/01 | $65.80 | $7.97 | $57.83 |

10

**A175**

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|---|---|---|---|
| 06/11/01 | $65.78 | $7.97 | $57.81 |
| 06/12/01 | $65.30 | $7.97 | $57.33 |
| 06/13/01 | $65.25 | $7.97 | $57.28 |
| 06/14/01 | $64.71 | $7.97 | $56.74 |
| 06/15/01 | $63.80 | $7.97 | $55.83 |
| 06/18/01 | $63.65 | $7.97 | $55.68 |
| 06/19/01 | $63.82 | $7.97 | $55.85 |
| 06/20/01 | $64.61 | $7.97 | $56.64 |
| 06/21/01 | $66.71 | $7.97 | $58.74 |
| 06/22/01 | $67.01 | $7.97 | $59.04 |
| 06/25/01 | $65.95 | $7.97 | $57.98 |
| 06/26/01 | $65.14 | $7.97 | $57.17 |
| 06/27/01 | $65.70 | $7.97 | $57.73 |
| 06/28/01 | $65.98 | $7.97 | $58.01 |
| 06/29/01 | $66.70 | $7.97 | $58.73 |
| 07/02/01 | $66.60 | $7.97 | $58.63 |
| 07/03/01 | $66.23 | $7.97 | $58.26 |
| 07/05/01 | $66.95 | $7.97 | $58.98 |
| 07/06/01 | $66.54 | $7.97 | $58.57 |
| 07/09/01 | $66.48 | $7.97 | $58.51 |
| 07/10/01 | $65.55 | $7.97 | $57.58 |
| 07/11/01 | $65.24 | $7.97 | $57.27 |
| 07/12/01 | $66.40 | $7.97 | $58.43 |
| 07/13/01 | $67.16 | $7.97 | $59.19 |
| 07/16/01 | $68.11 | $7.97 | $60.14 |
| 07/17/01 | $68.95 | $7.97 | $60.98 |
| 07/18/01 | $69.48 | $7.97 | $61.51 |
| 07/19/01 | $66.50 | $7.97 | $58.53 |
| 07/20/01 | $67.28 | $7.97 | $59.31 |
| 07/23/01 | $67.50 | $7.97 | $59.53 |
| 07/24/01 | $67.01 | $7.97 | $59.04 |
| 07/25/01 | $66.76 | $7.97 | $58.79 |
| 07/26/01 | $65.38 | $7.97 | $57.41 |
| 07/27/01 | $66.18 | $7.97 | $58.21 |
| 07/30/01 | $66.09 | $7.97 | $58.12 |
| 07/31/01 | $66.29 | $7.97 | $58.32 |
| 08/01/01 | $65.75 | $7.97 | $57.78 |
| 08/02/01 | $66.00 | $7.97 | $58.03 |
| 08/03/01 | $65.99 | $7.97 | $58.02 |
| 08/06/01 | $65.71 | $7.97 | $57.74 |
| 08/07/01 | $66.44 | $7.97 | $58.47 |
| 08/08/01 | $65.86 | $7.97 | $57.89 |
| 08/09/01 | $66.24 | $7.97 | $58.27 |
| 08/10/01 | $67.13 | $7.97 | $59.16 |
| 08/13/01 | $68.01 | $7.97 | $60.04 |
| 08/14/01 | $68.00 | $7.97 | $60.03 |
| 08/15/01 | $67.95 | $7.97 | $59.98 |

11

**A176**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------------|---------------------|------------|
| 08/16/01 | $66.87 | $7.97 | $58.90 |
| 08/17/01 | $65.99 | $7.97 | $58.02 |
| 08/20/01 | $65.50 | $7.97 | $57.53 |
| 08/21/01 | $64.86 | $7.97 | $56.89 |
| 08/22/01 | $65.48 | $7.97 | $57.51 |
| 08/23/01 | $64.72 | $7.97 | $56.75 |
| 08/24/01 | $62.35 | $7.97 | $54.38 |
| 08/27/01 | $61.96 | $7.97 | $53.99 |
| 08/28/01 | $61.34 | $7.97 | $53.37 |
| 08/29/01 | $60.70 | $7.97 | $52.73 |
| 08/30/01 | $59.31 | $7.97 | $51.34 |
| 08/31/01 | $59.10 | $7.97 | $51.13 |
| 09/04/01 | $57.06 | $7.97 | $49.09 |
| 09/05/01 | $57.22 | $7.97 | $49.25 |
| 09/06/01 | $57.00 | $7.97 | $49.03 |
| 09/07/01 | $55.04 | $7.97 | $47.07 |
| 09/10/01 | $56.31 | $7.97 | $48.34 |
| 09/17/01 | $52.83 | $7.97 | $44.86 |
| 09/18/01 | $52.64 | $7.97 | $44.67 |
| 09/19/01 | $52.30 | $7.97 | $44.33 |
| 09/20/01 | $51.46 | $7.97 | $43.49 |
| 09/21/01 | $50.34 | $7.97 | $42.37 |
| 09/24/01 | $52.85 | $7.97 | $44.88 |
| 09/25/01 | $52.08 | $7.97 | $44.11 |
| 09/26/01 | $53.60 | $7.97 | $45.63 |
| 09/27/01 | $54.49 | $7.97 | $46.52 |
| 09/28/01 | $56.38 | $7.97 | $48.41 |
| 10/01/01 | $57.50 | $7.97 | $49.53 |
| 10/02/01 | $57.83 | $7.97 | $49.86 |
| 10/03/01 | $58.20 | $7.97 | $50.23 |
| 10/04/01 | $59.63 | $7.97 | $51.66 |
| 10/05/01 | $58.35 | $7.97 | $50.38 |
| 10/08/01 | $56.50 | $7.97 | $48.53 |
| 10/09/01 | $56.59 | $7.97 | $48.62 |
| 10/10/01 | $58.22 | $7.97 | $50.25 |
| 10/11/01 | $56.95 | $7.97 | $48.98 |
| 10/12/01 | $54.89 | $7.97 | $46.92 |
| 10/15/01 | $55.91 | $7.97 | $47.94 |
| 10/16/01 | $56.00 | $7.97 | $48.03 |
| 10/17/01 | $57.16 | $7.97 | $49.19 |
| 10/18/01 | $57.53 | $7.97 | $49.56 |
| 10/19/01 | $56.91 | $7.97 | $48.94 |
| 10/22/01 | $56.92 | $7.97 | $48.95 |
| 10/23/01 | $57.25 | $7.97 | $49.28 |
| 10/24/01 | $55.44 | $7.97 | $47.47 |
| 10/25/01 | $57.19 | $7.97 | $49.22 |
| 10/26/01 | $57.48 | $7.97 | $49.51 |

12

A177

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Using Specific Disclosures**

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 10/29/01 | $54.49 | $7.97 | $46.52 |
| 10/30/01 | $53.52 | $7.97 | $45.55 |
| 10/31/01 | $52.30 | $7.97 | $44.33 |
| 11/01/01 | $52.90 | $7.97 | $44.93 |
| 11/02/01 | $52.76 | $7.97 | $44.79 |
| 11/05/01 | $53.75 | $7.97 | $45.78 |
| 11/06/01 | $56.53 | $7.97 | $48.56 |
| 11/07/01 | $58.72 | $7.97 | $50.75 |
| 11/08/01 | $57.79 | $7.97 | $49.82 |
| 11/09/01 | $57.98 | $7.97 | $50.01 |
| 11/12/01 | $58.21 | $7.97 | $50.24 |
| 11/13/01 | $60.00 | $7.97 | $52.03 |
| 11/14/01 | $60.90 | $7.97 | $52.93 |
| 11/15/01 | $58.90 | $6.11 | $52.79 |
| 11/16/01 | $57.80 | $6.11 | $51.69 |
| 11/19/01 | $58.75 | $6.11 | $52.64 |
| 11/20/01 | $58.37 | $6.11 | $52.26 |
| 11/21/01 | $58.56 | $6.11 | $52.45 |
| 11/23/01 | $59.62 | $6.11 | $53.51 |
| 11/26/01 | $60.18 | $6.11 | $54.07 |
| 11/27/01 | $60.76 | $6.11 | $54.65 |
| 11/28/01 | $60.34 | $6.11 | $54.23 |
| 11/29/01 | $59.80 | $6.11 | $53.69 |
| 11/30/01 | $58.99 | $6.11 | $52.88 |
| 12/03/01 | $56.29 | $4.20 | $52.09 |
| 12/04/01 | $58.23 | $4.20 | $54.03 |
| 12/05/01 | $61.00 | $6.05 | $54.95 |
| 12/06/01 | $60.66 | $6.05 | $54.61 |
| 12/07/01 | $59.66 | $6.05 | $53.61 |
| 12/10/01 | $57.60 | $6.05 | $51.55 |
| 12/11/01 | $56.66 | $6.05 | $50.61 |
| 12/12/01 | $54.15 | $3.66 | $50.49 |
| 12/13/01 | $54.23 | $3.66 | $50.57 |
| 12/14/01 | $53.35 | $3.66 | $49.69 |
| 12/17/01 | $54.57 | $3.66 | $50.91 |
| 12/18/01 | $56.12 | $3.66 | $52.46 |
| 12/19/01 | $56.87 | $3.66 | $53.21 |
| 12/20/01 | $56.50 | $3.66 | $52.84 |
| 12/21/01 | $55.90 | $3.66 | $52.24 |
| 12/24/01 | $56.09 | $3.66 | $52.43 |
| 12/26/01 | $56.38 | $3.66 | $52.72 |
| 12/27/01 | $57.83 | $3.66 | $54.17 |
| 12/28/01 | $58.88 | $3.66 | $55.22 |
| 12/31/01 | $57.94 | $3.66 | $54.28 |
| 01/02/02 | $57.09 | $3.66 | $53.43 |
| 01/03/02 | $57.05 | $3.66 | $53.39 |
| 01/04/02 | $59.19 | $3.66 | $55.53 |

13

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Using Specific Disclosures**

| Date | Stock Price | Artificial Inflation | True Value |
|---|---|---|---|
| 01/07/02 | $58.10 | $3.66 | $54.44 |
| 01/08/02 | $56.74 | $3.66 | $53.08 |
| 01/09/02 | $57.10 | $3.66 | $53.44 |
| 01/10/02 | $56.54 | $3.66 | $52.88 |
| 01/11/02 | $54.38 | $3.66 | $50.72 |
| 01/14/02 | $52.78 | $3.66 | $49.12 |
| 01/15/02 | $55.20 | $3.66 | $51.54 |
| 01/16/02 | $54.45 | $3.66 | $50.79 |
| 01/17/02 | $53.76 | $3.66 | $50.10 |
| 01/18/02 | $54.85 | $3.66 | $51.19 |
| 01/22/02 | $54.05 | $3.66 | $50.39 |
| 01/23/02 | $53.35 | $3.66 | $49.69 |
| 01/24/02 | $53.75 | $3.66 | $50.09 |
| 01/25/02 | $54.71 | $3.66 | $51.05 |
| 01/28/02 | $52.85 | $3.66 | $49.19 |
| 01/29/02 | $49.85 | $3.66 | $46.19 |
| 01/30/02 | $49.35 | $3.66 | $45.69 |
| 01/31/02 | $51.24 | $3.66 | $47.58 |
| 02/01/02 | $51.10 | $3.66 | $47.44 |
| 02/04/02 | $48.80 | $3.66 | $45.14 |
| 02/05/02 | $47.53 | $3.66 | $43.87 |
| 02/06/02 | $44.71 | $3.66 | $41.05 |
| 02/07/02 | $48.01 | $3.66 | $44.35 |
| 02/08/02 | $52.00 | $3.66 | $48.34 |
| 02/11/02 | $51.45 | $3.66 | $47.79 |
| 02/12/02 | $50.80 | $3.66 | $47.14 |
| 02/13/02 | $52.15 | $3.66 | $48.49 |
| 02/14/02 | $51.92 | $3.66 | $48.26 |
| 02/15/02 | $50.89 | $3.66 | $47.23 |
| 02/19/02 | $50.35 | $3.66 | $46.69 |
| 02/20/02 | $50.65 | $3.66 | $46.99 |
| 02/21/02 | $48.50 | $3.66 | $44.84 |
| 02/22/02 | $48.65 | $3.66 | $44.99 |
| 02/25/02 | $49.58 | $3.66 | $45.92 |
| 02/26/02 | $49.98 | $3.66 | $46.32 |
| 02/27/02 | $52.08 | $5.30 | $46.78 |
| 02/28/02 | $51.50 | $5.30 | $46.20 |
| 03/01/02 | $53.00 | $5.30 | $47.70 |
| 03/04/02 | $57.25 | $5.30 | $51.95 |
| 03/05/02 | $56.28 | $5.30 | $50.98 |
| 03/06/02 | $57.77 | $5.30 | $52.47 |
| 03/07/02 | $58.36 | $5.30 | $53.06 |
| 03/08/02 | $59.90 | $5.30 | $54.60 |
| 03/11/02 | $59.73 | $5.30 | $54.43 |
| 03/12/02 | $59.16 | $5.30 | $53.86 |
| 03/13/02 | $58.40 | $5.30 | $53.10 |
| 03/14/02 | $57.48 | $5.30 | $52.18 |

14

**A179**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|---|---|---|---|
| 03/15/02 | $58.95 | $5.30 | $53.65 |
| 03/18/02 | $58.98 | $5.30 | $53.68 |
| 03/19/02 | $58.98 | $5.30 | $53.68 |
| 03/20/02 | $57.61 | $5.30 | $52.31 |
| 03/21/02 | $57.90 | $5.30 | $52.60 |
| 03/22/02 | $58.14 | $5.30 | $52.84 |
| 03/25/02 | $56.30 | $5.30 | $51.00 |
| 03/26/02 | $57.00 | $5.30 | $51.70 |
| 03/27/02 | $57.50 | $5.30 | $52.20 |
| 03/28/02 | $56.80 | $5.30 | $51.50 |
| 04/01/02 | $57.03 | $5.30 | $51.73 |
| 04/02/02 | $57.05 | $5.30 | $51.75 |
| 04/03/02 | $55.75 | $5.30 | $50.45 |
| 04/04/02 | $56.83 | $5.30 | $51.53 |
| 04/05/02 | $57.98 | $5.30 | $52.68 |
| 04/08/02 | $59.06 | $5.30 | $53.76 |
| 04/09/02 | $59.25 | $5.30 | $53.95 |
| 04/10/02 | $59.35 | $5.30 | $54.05 |
| 04/11/02 | $57.05 | $5.30 | $51.75 |
| 04/12/02 | $58.10 | $5.30 | $52.80 |
| 04/15/02 | $57.48 | $5.30 | $52.18 |
| 04/16/02 | $59.52 | $5.30 | $54.22 |
| 04/17/02 | $60.70 | $5.30 | $55.40 |
| 04/18/02 | $61.20 | $5.30 | $55.90 |
| 04/19/02 | $62.44 | $5.30 | $57.14 |
| 04/22/02 | $60.90 | $5.30 | $55.60 |
| 04/23/02 | $61.80 | $5.30 | $56.50 |
| 04/24/02 | $61.36 | $5.30 | $56.06 |
| 04/25/02 | $59.18 | $5.30 | $53.88 |
| 04/26/02 | $59.60 | $5.30 | $54.30 |
| 04/29/02 | $57.25 | $5.30 | $51.95 |
| 04/30/02 | $58.29 | $5.30 | $52.99 |
| 05/01/02 | $57.70 | $5.30 | $52.40 |
| 05/02/02 | $57.43 | $5.30 | $52.13 |
| 05/03/02 | $57.00 | $5.30 | $51.70 |
| 05/06/02 | $55.68 | $5.30 | $50.38 |
| 05/07/02 | $54.75 | $5.30 | $49.45 |
| 05/08/02 | $57.11 | $5.30 | $51.81 |
| 05/09/02 | $56.29 | $5.30 | $50.99 |
| 05/10/02 | $54.25 | $5.30 | $48.95 |
| 05/13/02 | $55.82 | $5.30 | $50.52 |
| 05/14/02 | $56.85 | $5.30 | $51.55 |
| 05/15/02 | $55.47 | $5.30 | $50.17 |
| 05/16/02 | $55.00 | $5.30 | $49.70 |
| 05/17/02 | $54.31 | $5.30 | $49.01 |
| 05/20/02 | $53.51 | $5.30 | $48.21 |
| 05/21/02 | $52.69 | $5.30 | $47.39 |

15

A180

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|------|------|------|
| 05/22/02 | $52.85 | $5.30 | $47.55 |
| 05/23/02 | $53.27 | $5.30 | $47.97 |
| 05/24/02 | $53.07 | $5.30 | $47.77 |
| 05/28/02 | $52.85 | $5.30 | $47.55 |
| 05/29/02 | $52.80 | $5.30 | $47.50 |
| 05/30/02 | $51.65 | $5.30 | $46.35 |
| 05/31/02 | $51.15 | $5.30 | $45.85 |
| 06/03/02 | $50.94 | $5.30 | $45.64 |
| 06/04/02 | $50.69 | $5.30 | $45.39 |
| 06/05/02 | $52.19 | $5.30 | $46.89 |
| 06/06/02 | $53.60 | $5.30 | $48.30 |
| 06/07/02 | $52.87 | $5.30 | $47.57 |
| 06/10/02 | $52.59 | $5.30 | $47.29 |
| 06/11/02 | $52.99 | $5.30 | $47.69 |
| 06/12/02 | $52.48 | $5.30 | $47.18 |
| 06/13/02 | $50.30 | $5.30 | $45.00 |
| 06/14/02 | $50.80 | $5.30 | $45.50 |
| 06/17/02 | $52.74 | $5.30 | $47.44 |
| 06/18/02 | $52.75 | $5.30 | $47.45 |
| 06/19/02 | $51.55 | $5.30 | $46.25 |
| 06/20/02 | $49.80 | $5.30 | $44.50 |
| 06/21/02 | $49.68 | $5.30 | $44.38 |
| 06/24/02 | $50.00 | $5.30 | $44.70 |
| 06/25/02 | $49.00 | $5.30 | $43.70 |
| 06/26/02 | $48.65 | $5.30 | $43.35 |
| 06/27/02 | $49.90 | $5.30 | $44.60 |
| 06/28/02 | $49.70 | $5.30 | $44.40 |
| 07/01/02 | $47.93 | $5.30 | $42.63 |
| 07/02/02 | $47.60 | $5.30 | $42.30 |
| 07/03/02 | $48.05 | $5.30 | $42.75 |
| 07/05/02 | $50.00 | $5.30 | $44.70 |
| 07/08/02 | $49.54 | $5.30 | $44.24 |
| 07/09/02 | $47.05 | $5.30 | $41.75 |
| 07/10/02 | $44.07 | $5.30 | $38.77 |
| 07/11/02 | $45.00 | $5.30 | $39.70 |
| 07/12/02 | $46.30 | $5.30 | $41.00 |
| 07/15/02 | $45.67 | $5.30 | $40.37 |
| 07/16/02 | $46.10 | $5.30 | $40.80 |
| 07/17/02 | $42.37 | $5.30 | $37.07 |
| 07/18/02 | $42.41 | $5.30 | $37.11 |
| 07/19/02 | $40.72 | $5.30 | $35.42 |
| 07/22/02 | $38.84 | $5.30 | $33.54 |
| 07/23/02 | $36.29 | $5.30 | $30.99 |
| 07/24/02 | $39.97 | $5.30 | $34.67 |
| 07/25/02 | $38.80 | $5.30 | $33.50 |
| 07/26/02 | $37.66 | $3.10 | $34.56 |
| 07/29/02 | $39.85 | $3.10 | $36.75 |

16

A181

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|---|---|---|---|
| 07/30/02 | $40.30 | $3.10 | $37.20 |
| 07/31/02 | $42.67 | $3.10 | $39.57 |
| 08/01/02 | $41.26 | $3.10 | $38.16 |
| 08/02/02 | $39.45 | $3.10 | $36.35 |
| 08/05/02 | $36.98 | $3.10 | $33.88 |
| 08/06/02 | $39.72 | $3.10 | $36.62 |
| 08/07/02 | $38.28 | $3.10 | $35.18 |
| 08/08/02 | $40.96 | $3.10 | $37.86 |
| 08/09/02 | $40.45 | $3.10 | $37.35 |
| 08/12/02 | $39.70 | $3.10 | $36.60 |
| 08/13/02 | $37.80 | $3.10 | $34.70 |
| 08/14/02 | $38.09 | $2.16 | $35.93 |
| 08/15/02 | $39.60 | $2.16 | $37.44 |
| 08/16/02 | $37.54 | $0.32 | $37.22 |
| 08/19/02 | $37.75 | $0.32 | $37.43 |
| 08/20/02 | $36.75 | $0.32 | $36.43 |
| 08/21/02 | $37.15 | $0.32 | $36.83 |
| 08/22/02 | $40.65 | $0.32 | $40.33 |
| 08/23/02 | $37.80 | $0.32 | $37.48 |
| 08/26/02 | $39.08 | $0.32 | $38.76 |
| 08/27/02 | $37.70 | -$0.88 | $38.58 |
| 08/28/02 | $36.80 | -$0.88 | $37.68 |
| 08/29/02 | $36.38 | -$0.88 | $37.26 |
| 08/30/02 | $36.11 | -$0.88 | $36.99 |
| 09/03/02 | $33.36 | -$2.09 | $35.45 |
| 09/04/02 | $34.40 | -$2.09 | $36.49 |
| 09/05/02 | $33.36 | -$2.09 | $35.45 |
| 09/06/02 | $33.95 | -$2.09 | $36.04 |
| 09/09/02 | $36.33 | -$2.09 | $38.42 |
| 09/10/02 | $35.15 | -$2.09 | $37.24 |
| 09/11/02 | $35.43 | -$2.09 | $37.52 |
| 09/12/02 | $33.85 | -$2.09 | $35.94 |
| 09/13/02 | $34.67 | -$2.09 | $36.76 |
| 09/16/02 | $33.59 | -$2.09 | $35.68 |
| 09/17/02 | $29.52 | -$2.09 | $31.61 |
| 09/18/02 | $29.85 | -$2.09 | $31.94 |
| 09/19/02 | $29.25 | -$2.09 | $31.34 |
| 09/20/02 | $29.05 | -$2.09 | $31.14 |
| 09/23/02 | $27.61 | -$3.62 | $31.23 |
| 09/24/02 | $27.55 | -$3.62 | $31.17 |
| 09/25/02 | $28.15 | -$3.62 | $31.77 |
| 09/26/02 | $29.28 | -$3.62 | $32.90 |
| 09/27/02 | $27.64 | -$3.62 | $31.26 |
| 09/30/02 | $28.31 | -$3.62 | $31.93 |
| 10/01/02 | $28.40 | -$3.62 | $32.02 |
| 10/02/02 | $27.32 | -$3.62 | $30.94 |
| 10/03/02 | $26.60 | -$3.62 | $30.22 |

17

A182

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Using Specific Disclosures

| Date | Stock Price | Artificial Inflation | True Value |
|------|-------------|----------------------|------------|
| 10/04/02 | $24.66 | -$4.88 | $29.54 |
| 10/07/02 | $23.25 | -$4.88 | $28.13 |
| 10/08/02 | $23.58 | -$4.88 | $28.46 |
| 10/09/02 | $21.00 | -$4.88 | $25.88 |
| 10/10/02 | $26.30 | -$0.68 | $26.98 |
| 10/11/02 | $28.20 | $0.00 | $28.20 |

18

# Exhibit 54



Household International, Inc. Common Stock Price and True Value
For Quantification Using Specific Disclosures
July 30, 1999 – October 11, 2002

# Exhibit 56

## Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 07/30/99 | $42.94 | $25.13 | $17.81 |
| 08/02/99 | $41.88 | $24.51 | $17.37 |
| 08/03/99 | $40.00 | $23.41 | $16.59 |
| 08/04/99 | $40.31 | $23.59 | $16.72 |
| 08/05/99 | $40.56 | $23.74 | $16.82 |
| 08/06/99 | $40.25 | $23.56 | $16.69 |
| 08/09/99 | $40.88 | $23.92 | $16.95 |
| 08/10/99 | $39.50 | $23.12 | $16.38 |
| 08/11/99 | $40.25 | $23.56 | $16.69 |
| 08/12/99 | $40.19 | $23.52 | $16.67 |
| 08/13/99 | $40.75 | $23.85 | $16.90 |
| 08/16/99 | $39.75 | $23.27 | $16.48 |
| 08/17/99 | $41.50 | $24.29 | $17.21 |
| 08/18/99 | $42.00 | $24.58 | $17.42 |
| 08/19/99 | $41.69 | $24.40 | $17.29 |
| 08/20/99 | $41.88 | $24.51 | $17.37 |
| 08/23/99 | $42.94 | $25.13 | $17.81 |
| 08/24/99 | $42.44 | $24.84 | $17.60 |
| 08/25/99 | $41.19 | $24.11 | $17.08 |
| 08/26/99 | $39.81 | $23.30 | $16.51 |
| 08/27/99 | $37.81 | $22.13 | $15.68 |
| 08/30/99 | $37.44 | $21.91 | $15.53 |
| 08/31/99 | $37.75 | $22.10 | $15.65 |
| 09/01/99 | $39.56 | $23.16 | $16.41 |
| 09/02/99 | $38.50 | $22.53 | $15.97 |
| 09/03/99 | $39.94 | $23.38 | $16.56 |
| 09/07/99 | $39.94 | $23.38 | $16.56 |
| 09/08/99 | $39.56 | $23.16 | $16.41 |
| 09/09/99 | $39.88 | $23.34 | $16.54 |
| 09/10/99 | $40.63 | $23.78 | $16.85 |
| 09/13/99 | $41.50 | $24.29 | $17.21 |
| 09/14/99 | $41.13 | $24.07 | $17.05 |
| 09/15/99 | $40.44 | $23.67 | $16.77 |
| 09/16/99 | $40.25 | $23.56 | $16.69 |
| 09/17/99 | $41.13 | $24.07 | $17.05 |
| 09/20/99 | $41.75 | $24.44 | $17.31 |
| 09/21/99 | $40.50 | $23.70 | $16.80 |
| 09/22/99 | $41.44 | $24.25 | $17.18 |
| 09/23/99 | $40.00 | $23.41 | $16.59 |
| 09/24/99 | $39.44 | $23.08 | $16.35 |
| 09/27/99 | $40.38 | $23.63 | $16.74 |
| 09/28/99 | $39.69 | $23.16 | $16.53 |
| 09/29/99 | $40.63 | $23.71 | $16.92 |
| 09/30/99 | $40.13 | $23.41 | $16.71 |
| 10/01/99 | $39.38 | $22.98 | $16.40 |
| 10/04/99 | $40.44 | $23.60 | $16.84 |
| 10/05/99 | $41.06 | $23.96 | $17.10 |

1

A187

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 10/06/99 | $42.88 | $25.02 | $17.86 |
| 10/07/99 | $42.38 | $24.73 | $17.65 |
| 10/08/99 | $44.31 | $25.86 | $18.46 |
| 10/11/99 | $42.69 | $24.91 | $17.78 |
| 10/12/99 | $41.69 | $24.33 | $17.36 |
| 10/13/99 | $39.75 | $23.19 | $16.56 |
| 10/14/99 | $38.94 | $22.72 | $16.22 |
| 10/15/99 | $37.00 | $21.59 | $15.41 |
| 10/18/99 | $37.88 | $22.10 | $15.77 |
| 10/19/99 | $38.94 | $22.72 | $16.22 |
| 10/20/99 | $39.56 | $23.09 | $16.48 |
| 10/21/99 | $39.00 | $22.76 | $16.24 |
| 10/22/99 | $39.75 | $23.19 | $16.56 |
| 10/25/99 | $38.88 | $22.68 | $16.19 |
| 10/26/99 | $39.06 | $22.79 | $16.27 |
| 10/27/99 | $41.56 | $24.25 | $17.31 |
| 10/28/99 | $45.69 | $26.66 | $19.03 |
| 10/29/99 | $44.63 | $26.04 | $18.59 |
| 11/01/99 | $45.00 | $26.26 | $18.74 |
| 11/02/99 | $45.31 | $26.44 | $18.87 |
| 11/03/99 | $44.56 | $26.00 | $18.56 |
| 11/04/99 | $45.63 | $26.62 | $19.00 |
| 11/05/99 | $46.06 | $26.88 | $19.18 |
| 11/08/99 | $44.63 | $26.04 | $18.59 |
| 11/09/99 | $43.06 | $25.13 | $17.94 |
| 11/10/99 | $42.56 | $24.84 | $17.73 |
| 11/11/99 | $41.31 | $24.11 | $17.21 |
| 11/12/99 | $44.13 | $25.75 | $18.38 |
| 11/15/99 | $44.13 | $25.75 | $18.38 |
| 11/16/99 | $45.13 | $26.33 | $18.79 |
| 11/17/99 | $43.25 | $25.24 | $18.01 |
| 11/18/99 | $42.50 | $24.80 | $17.70 |
| 11/19/99 | $41.88 | $24.43 | $17.44 |
| 11/22/99 | $41.25 | $24.07 | $17.18 |
| 11/23/99 | $40.94 | $23.89 | $17.05 |
| 11/24/99 | $40.38 | $23.56 | $16.82 |
| 11/26/99 | $40.25 | $23.49 | $16.76 |
| 11/29/99 | $39.38 | $22.98 | $16.40 |
| 11/30/99 | $39.56 | $23.08 | $16.48 |
| 12/01/99 | $39.56 | $23.08 | $16.48 |
| 12/02/99 | $40.31 | $23.52 | $16.79 |
| 12/03/99 | $41.00 | $23.92 | $17.08 |
| 12/06/99 | $39.50 | $23.05 | $16.45 |
| 12/07/99 | $38.25 | $22.32 | $15.93 |
| 12/08/99 | $38.69 | $22.57 | $16.11 |
| 12/09/99 | $39.50 | $23.05 | $16.45 |
| 12/10/99 | $39.06 | $22.79 | $16.27 |

2

**A188**

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 12/13/99 | $38.25 | $22.32 | $15.93 |
| 12/14/99 | $37.94 | $22.14 | $15.80 |
| 12/15/99 | $37.63 | $21.95 | $15.67 |
| 12/16/99 | $38.31 | $22.35 | $15.96 |
| 12/17/99 | $38.13 | $22.25 | $15.88 |
| 12/20/99 | $37.94 | $22.14 | $15.80 |
| 12/21/99 | $37.25 | $21.73 | $15.52 |
| 12/22/99 | $36.63 | $21.37 | $15.25 |
| 12/23/99 | $37.50 | $21.88 | $15.62 |
| 12/27/99 | $36.88 | $21.52 | $15.36 |
| 12/28/99 | $36.19 | $21.11 | $15.07 |
| 12/29/99 | $35.94 | $20.90 | $15.04 |
| 12/30/99 | $36.56 | $21.26 | $15.30 |
| 12/31/99 | $37.25 | $21.66 | $15.59 |
| 01/03/00 | $34.69 | $20.17 | $14.52 |
| 01/04/00 | $35.00 | $20.35 | $14.65 |
| 01/05/00 | $34.38 | $19.99 | $14.39 |
| 01/06/00 | $36.00 | $20.93 | $15.07 |
| 01/07/00 | $36.38 | $21.15 | $15.22 |
| 01/10/00 | $36.50 | $21.23 | $15.27 |
| 01/11/00 | $36.00 | $20.93 | $15.07 |
| 01/12/00 | $36.75 | $21.37 | $15.38 |
| 01/13/00 | $37.69 | $21.92 | $15.77 |
| 01/14/00 | $37.31 | $21.70 | $15.61 |
| 01/18/00 | $36.50 | $21.23 | $15.27 |
| 01/19/00 | $36.81 | $21.41 | $15.41 |
| 01/20/00 | $36.00 | $20.93 | $15.07 |
| 01/21/00 | $35.63 | $20.72 | $14.91 |
| 01/24/00 | $34.50 | $20.06 | $14.44 |
| 01/25/00 | $33.94 | $19.73 | $14.20 |
| 01/26/00 | $35.63 | $20.72 | $14.91 |
| 01/27/00 | $35.69 | $20.75 | $14.94 |
| 01/28/00 | $34.19 | $19.88 | $14.31 |
| 01/31/00 | $35.25 | $20.50 | $14.75 |
| 02/01/00 | $35.25 | $20.50 | $14.75 |
| 02/02/00 | $36.13 | $21.01 | $15.12 |
| 02/03/00 | $35.63 | $20.72 | $14.91 |
| 02/04/00 | $35.38 | $20.57 | $14.80 |
| 02/07/00 | $35.06 | $20.39 | $14.67 |
| 02/08/00 | $35.75 | $20.79 | $14.96 |
| 02/09/00 | $33.88 | $19.70 | $14.18 |
| 02/10/00 | $33.88 | $19.70 | $14.18 |
| 02/11/00 | $31.88 | $18.54 | $13.34 |
| 02/14/00 | $31.31 | $18.21 | $13.10 |
| 02/15/00 | $32.94 | $19.15 | $13.78 |
| 02/16/00 | $30.88 | $17.95 | $12.92 |
| 02/17/00 | $31.69 | $18.43 | $13.26 |

3

**A189**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|-------------|------------|----------------------|
| 02/18/00 | $30.88 | $17.95 | $12.92 |
| 02/22/00 | $31.06 | $18.06 | $13.00 |
| 02/23/00 | $30.69 | $17.85 | $12.84 |
| 02/24/00 | $30.63 | $17.81 | $12.82 |
| 02/25/00 | $30.88 | $17.95 | $12.92 |
| 02/28/00 | $31.88 | $18.54 | $13.34 |
| 02/29/00 | $31.94 | $18.57 | $13.37 |
| 03/01/00 | $33.25 | $19.34 | $13.91 |
| 03/02/00 | $35.13 | $20.43 | $14.70 |
| 03/03/00 | $36.63 | $21.30 | $15.33 |
| 03/06/00 | $34.81 | $20.24 | $14.57 |
| 03/07/00 | $32.88 | $19.12 | $13.76 |
| 03/08/00 | $31.81 | $18.50 | $13.31 |
| 03/09/00 | $32.44 | $18.86 | $13.57 |
| 03/10/00 | $32.75 | $19.04 | $13.71 |
| 03/13/00 | $32.44 | $18.86 | $13.57 |
| 03/14/00 | $32.13 | $18.68 | $13.44 |
| 03/15/00 | $34.25 | $19.92 | $14.33 |
| 03/16/00 | $36.81 | $21.41 | $15.41 |
| 03/17/00 | $36.88 | $21.44 | $15.43 |
| 03/20/00 | $35.56 | $20.68 | $14.88 |
| 03/21/00 | $37.88 | $22.02 | $15.85 |
| 03/22/00 | $37.75 | $21.95 | $15.80 |
| 03/23/00 | $38.88 | $22.61 | $16.27 |
| 03/24/00 | $37.94 | $22.06 | $15.88 |
| 03/27/00 | $36.13 | $21.01 | $15.12 |
| 03/28/00 | $36.69 | $21.33 | $15.35 |
| 03/29/00 | $36.50 | $21.15 | $15.35 |
| 03/30/00 | $36.38 | $21.08 | $15.29 |
| 03/31/00 | $37.31 | $21.62 | $15.69 |
| 04/03/00 | $39.13 | $22.68 | $16.45 |
| 04/04/00 | $38.13 | $22.10 | $16.03 |
| 04/05/00 | $39.06 | $22.64 | $16.42 |
| 04/06/00 | $40.38 | $23.40 | $16.98 |
| 04/07/00 | $38.88 | $22.53 | $16.34 |
| 04/10/00 | $40.00 | $23.18 | $16.82 |
| 04/11/00 | $40.63 | $23.54 | $17.08 |
| 04/12/00 | $44.00 | $25.50 | $18.50 |
| 04/13/00 | $42.06 | $24.38 | $17.68 |
| 04/14/00 | $38.06 | $22.06 | $16.00 |
| 04/17/00 | $39.63 | $22.97 | $16.66 |
| 04/18/00 | $39.69 | $23.00 | $16.69 |
| 04/19/00 | $39.94 | $23.15 | $16.79 |
| 04/20/00 | $41.81 | $24.23 | $17.58 |
| 04/24/00 | $43.38 | $25.14 | $18.24 |
| 04/25/00 | $44.69 | $25.90 | $18.79 |
| 04/26/00 | $43.63 | $25.28 | $18.34 |

4

**A190**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 04/27/00 | $42.00 | $24.34 | $17.66 |
| 04/28/00 | $41.75 | $24.20 | $17.55 |
| 05/01/00 | $42.00 | $24.34 | $17.66 |
| 05/02/00 | $42.06 | $24.38 | $17.68 |
| 05/03/00 | $40.75 | $23.62 | $17.13 |
| 05/04/00 | $39.13 | $22.68 | $16.45 |
| 05/05/00 | $39.75 | $23.04 | $16.71 |
| 05/08/00 | $41.13 | $23.83 | $17.29 |
| 05/09/00 | $40.25 | $23.33 | $16.92 |
| 05/10/00 | $39.38 | $22.82 | $16.55 |
| 05/11/00 | $39.94 | $23.15 | $16.79 |
| 05/12/00 | $40.38 | $23.40 | $16.98 |
| 05/15/00 | $41.94 | $24.31 | $17.63 |
| 05/16/00 | $42.81 | $24.81 | $18.00 |
| 05/17/00 | $41.69 | $24.16 | $17.53 |
| 05/18/00 | $42.81 | $24.81 | $18.00 |
| 05/19/00 | $41.44 | $24.02 | $17.42 |
| 05/22/00 | $41.88 | $24.27 | $17.61 |
| 05/23/00 | $43.00 | $24.92 | $18.08 |
| 05/24/00 | $45.75 | $26.52 | $19.23 |
| 05/25/00 | $45.38 | $26.30 | $19.08 |
| 05/26/00 | $45.38 | $26.30 | $19.08 |
| 05/30/00 | $46.56 | $26.99 | $19.58 |
| 05/31/00 | $47.00 | $27.24 | $19.76 |
| 06/01/00 | $47.13 | $27.31 | $19.81 |
| 06/02/00 | $47.00 | $27.24 | $19.76 |
| 06/05/00 | $47.13 | $27.31 | $19.81 |
| 06/06/00 | $46.38 | $26.88 | $19.50 |
| 06/07/00 | $47.25 | $27.38 | $19.87 |
| 06/08/00 | $46.19 | $26.77 | $19.42 |
| 06/09/00 | $44.44 | $25.75 | $18.68 |
| 06/12/00 | $43.56 | $25.25 | $18.32 |
| 06/13/00 | $44.69 | $25.90 | $18.79 |
| 06/14/00 | $45.38 | $26.30 | $19.08 |
| 06/15/00 | $43.06 | $24.96 | $18.10 |
| 06/16/00 | $42.44 | $24.60 | $17.84 |
| 06/19/00 | $42.75 | $24.78 | $17.97 |
| 06/20/00 | $43.94 | $25.46 | $18.47 |
| 06/21/00 | $44.06 | $25.54 | $18.53 |
| 06/22/00 | $43.19 | $25.03 | $18.16 |
| 06/23/00 | $42.13 | $24.41 | $17.71 |
| 06/26/00 | $42.13 | $24.41 | $17.71 |
| 06/27/00 | $41.81 | $24.23 | $17.58 |
| 06/28/00 | $42.81 | $24.73 | $18.08 |
| 06/29/00 | $43.00 | $24.84 | $18.16 |
| 06/30/00 | $41.56 | $24.01 | $17.55 |
| 07/03/00 | $41.88 | $24.19 | $17.68 |

5

**A191**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|------|------|------|
| 07/05/00 | $42.00 | $24.26 | $17.74 |
| 07/06/00 | $41.63 | $24.05 | $17.58 |
| 07/07/00 | $42.75 | $24.70 | $18.05 |
| 07/10/00 | $42.69 | $24.66 | $18.03 |
| 07/11/00 | $43.50 | $25.13 | $18.37 |
| 07/12/00 | $43.94 | $25.38 | $18.55 |
| 07/13/00 | $44.00 | $25.42 | $18.58 |
| 07/14/00 | $44.88 | $25.92 | $18.95 |
| 07/17/00 | $42.81 | $24.73 | $18.08 |
| 07/18/00 | $43.44 | $25.09 | $18.34 |
| 07/19/00 | $45.25 | $26.14 | $19.11 |
| 07/20/00 | $46.38 | $26.79 | $19.58 |
| 07/21/00 | $45.81 | $26.47 | $19.35 |
| 07/24/00 | $45.94 | $26.54 | $19.40 |
| 07/25/00 | $45.50 | $26.29 | $19.21 |
| 07/26/00 | $44.25 | $25.56 | $18.69 |
| 07/27/00 | $44.69 | $25.82 | $18.87 |
| 07/28/00 | $43.75 | $25.28 | $18.47 |
| 07/31/00 | $44.56 | $25.74 | $18.82 |
| 08/01/00 | $44.56 | $25.74 | $18.82 |
| 08/02/00 | $44.44 | $25.67 | $18.77 |
| 08/03/00 | $46.63 | $26.94 | $19.69 |
| 08/04/00 | $49.63 | $28.67 | $20.96 |
| 08/07/00 | $49.88 | $28.81 | $21.06 |
| 08/08/00 | $50.00 | $28.89 | $21.11 |
| 08/09/00 | $48.88 | $28.24 | $20.64 |
| 08/10/00 | $48.19 | $27.84 | $20.35 |
| 08/11/00 | $49.06 | $28.34 | $20.72 |
| 08/14/00 | $49.19 | $28.42 | $20.77 |
| 08/15/00 | $47.88 | $27.66 | $20.22 |
| 08/16/00 | $46.75 | $27.01 | $19.74 |
| 08/17/00 | $46.38 | $26.79 | $19.58 |
| 08/18/00 | $46.94 | $27.12 | $19.82 |
| 08/21/00 | $46.63 | $26.94 | $19.69 |
| 08/22/00 | $47.31 | $27.33 | $19.98 |
| 08/23/00 | $47.25 | $27.30 | $19.95 |
| 08/24/00 | $47.44 | $27.41 | $20.03 |
| 08/25/00 | $47.75 | $27.59 | $20.16 |
| 08/28/00 | $48.25 | $27.88 | $20.37 |
| 08/29/00 | $48.00 | $27.73 | $20.27 |
| 08/30/00 | $48.00 | $27.73 | $20.27 |
| 08/31/00 | $48.00 | $27.73 | $20.27 |
| 09/01/00 | $47.38 | $27.37 | $20.01 |
| 09/05/00 | $47.63 | $27.51 | $20.11 |
| 09/06/00 | $50.19 | $28.99 | $21.19 |
| 09/07/00 | $50.56 | $29.21 | $21.35 |
| 09/08/00 | $52.44 | $30.29 | $22.14 |

6

## A192

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|-------------|------------|----------------------|
| 09/11/00 | $51.63 | $29.83 | $21.80 |
| 09/12/00 | $51.13 | $29.54 | $21.59 |
| 09/13/00 | $51.25 | $29.61 | $21.64 |
| 09/14/00 | $51.00 | $29.46 | $21.54 |
| 09/15/00 | $50.50 | $29.18 | $21.32 |
| 09/18/00 | $50.75 | $29.32 | $21.43 |
| 09/19/00 | $51.56 | $29.79 | $21.77 |
| 09/20/00 | $52.31 | $30.22 | $22.09 |
| 09/21/00 | $52.88 | $30.55 | $22.33 |
| 09/22/00 | $52.00 | $30.04 | $21.96 |
| 09/25/00 | $53.38 | $30.84 | $22.54 |
| 09/26/00 | $54.13 | $31.27 | $22.86 |
| 09/27/00 | $54.69 | $31.51 | $23.17 |
| 09/28/00 | $56.44 | $32.52 | $23.91 |
| 09/29/00 | $56.63 | $32.69 | $23.94 |
| 10/02/00 | $55.19 | $31.80 | $23.39 |
| 10/03/00 | $55.63 | $32.05 | $23.57 |
| 10/04/00 | $54.88 | $31.62 | $23.25 |
| 10/05/00 | $55.69 | $32.09 | $23.60 |
| 10/06/00 | $52.63 | $30.33 | $22.30 |
| 10/09/00 | $52.19 | $30.07 | $22.11 |
| 10/10/00 | $49.50 | $28.52 | $20.98 |
| 10/11/00 | $47.94 | $27.62 | $20.31 |
| 10/12/00 | $46.25 | $26.65 | $19.60 |
| 10/13/00 | $47.56 | $27.41 | $20.15 |
| 10/16/00 | $49.13 | $28.31 | $20.82 |
| 10/17/00 | $47.50 | $27.37 | $20.13 |
| 10/18/00 | $48.75 | $28.09 | $20.66 |
| 10/19/00 | $50.63 | $29.17 | $21.45 |
| 10/20/00 | $50.44 | $29.07 | $21.37 |
| 10/23/00 | $49.19 | $28.35 | $20.84 |
| 10/24/00 | $50.25 | $28.96 | $21.29 |
| 10/25/00 | $49.50 | $28.52 | $20.98 |
| 10/26/00 | $47.44 | $27.34 | $20.10 |
| 10/27/00 | $47.50 | $27.37 | $20.13 |
| 10/30/00 | $49.38 | $28.45 | $20.92 |
| 10/31/00 | $50.31 | $28.99 | $21.32 |
| 11/01/00 | $49.63 | $28.60 | $21.03 |
| 11/02/00 | $51.50 | $29.68 | $21.82 |
| 11/03/00 | $51.50 | $29.68 | $21.82 |
| 11/06/00 | $52.50 | $30.25 | $22.25 |
| 11/07/00 | $51.88 | $29.89 | $21.98 |
| 11/08/00 | $51.63 | $29.75 | $21.88 |
| 11/09/00 | $50.50 | $29.10 | $21.40 |
| 11/10/00 | $50.75 | $29.24 | $21.51 |
| 11/13/00 | $49.13 | $28.31 | $20.82 |
| 11/14/00 | $49.00 | $28.24 | $20.76 |

7

A193

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Including Leakage**

| Date | Stock Price | True Value | Artificial Inflation |
|------|-------------|------------|----------------------|
| 11/15/00 | $49.31 | $28.42 | $20.90 |
| 11/16/00 | $49.13 | $28.31 | $20.82 |
| 11/17/00 | $48.19 | $27.77 | $20.42 |
| 11/20/00 | $45.75 | $26.36 | $19.39 |
| 11/21/00 | $46.25 | $26.65 | $19.60 |
| 11/22/00 | $44.06 | $25.39 | $18.67 |
| 11/24/00 | $45.31 | $26.11 | $19.20 |
| 11/27/00 | $46.50 | $26.80 | $19.70 |
| 11/28/00 | $48.38 | $27.88 | $20.50 |
| 11/29/00 | $50.13 | $28.89 | $21.24 |
| 11/30/00 | $49.88 | $28.74 | $21.13 |
| 12/01/00 | $49.56 | $28.56 | $21.00 |
| 12/04/00 | $48.38 | $27.88 | $20.50 |
| 12/05/00 | $50.19 | $28.92 | $21.27 |
| 12/06/00 | $50.75 | $29.25 | $21.50 |
| 12/07/00 | $51.81 | $29.86 | $21.95 |
| 12/08/00 | $53.06 | $30.58 | $22.48 |
| 12/11/00 | $52.63 | $30.33 | $22.30 |
| 12/12/00 | $51.94 | $29.93 | $22.01 |
| 12/13/00 | $50.94 | $29.35 | $21.58 |
| 12/14/00 | $50.94 | $29.35 | $21.58 |
| 12/15/00 | $50.25 | $28.96 | $21.29 |
| 12/18/00 | $52.00 | $29.97 | $22.03 |
| 12/19/00 | $53.63 | $30.90 | $22.72 |
| 12/20/00 | $51.94 | $29.93 | $22.01 |
| 12/21/00 | $52.44 | $30.22 | $22.22 |
| 12/22/00 | $52.44 | $30.22 | $22.22 |
| 12/26/00 | $53.25 | $30.69 | $22.56 |
| 12/27/00 | $54.31 | $31.22 | $23.09 |
| 12/28/00 | $55.94 | $32.15 | $23.79 |
| 12/29/00 | $55.00 | $31.61 | $23.39 |
| 01/02/01 | $53.69 | $30.86 | $22.83 |
| 01/03/01 | $58.00 | $34.06 | $23.94 |
| 01/04/01 | $57.13 | $33.19 | $23.94 |
| 01/05/01 | $54.88 | $31.54 | $23.33 |
| 01/08/01 | $54.06 | $31.07 | $22.99 |
| 01/09/01 | $52.88 | $30.39 | $22.48 |
| 01/10/01 | $52.81 | $30.36 | $22.46 |
| 01/11/01 | $53.44 | $30.71 | $22.72 |
| 01/12/01 | $53.69 | $30.86 | $22.83 |
| 01/16/01 | $55.19 | $31.72 | $23.47 |
| 01/17/01 | $56.31 | $32.37 | $23.94 |
| 01/18/01 | $54.88 | $31.54 | $23.33 |
| 01/19/01 | $54.50 | $31.33 | $23.17 |
| 01/22/01 | $53.75 | $30.89 | $22.86 |
| 01/23/01 | $55.50 | $31.90 | $23.60 |
| 01/24/01 | $56.63 | $32.69 | $23.94 |

8

**A194**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|-------------|------------|----------------------|
| 01/25/01 | $56.69 | $32.75 | $23.94 |
| 01/26/01 | $57.50 | $33.56 | $23.94 |
| 01/29/01 | $59.10 | $35.16 | $23.94 |
| 01/30/01 | $58.59 | $34.65 | $23.94 |
| 01/31/01 | $57.48 | $33.54 | $23.94 |
| 02/01/01 | $58.92 | $34.98 | $23.94 |
| 02/02/01 | $58.80 | $34.86 | $23.94 |
| 02/05/01 | $58.98 | $35.04 | $23.94 |
| 02/06/01 | $58.11 | $34.17 | $23.94 |
| 02/07/01 | $59.20 | $35.26 | $23.94 |
| 02/08/01 | $58.78 | $34.84 | $23.94 |
| 02/09/01 | $59.20 | $35.26 | $23.94 |
| 02/12/01 | $60.33 | $36.39 | $23.94 |
| 02/13/01 | $60.25 | $36.31 | $23.94 |
| 02/14/01 | $59.45 | $35.51 | $23.94 |
| 02/15/01 | $58.26 | $34.32 | $23.94 |
| 02/16/01 | $59.09 | $35.15 | $23.94 |
| 02/20/01 | $57.53 | $33.59 | $23.94 |
| 02/21/01 | $55.65 | $31.99 | $23.66 |
| 02/22/01 | $55.76 | $32.05 | $23.71 |
| 02/23/01 | $56.58 | $32.64 | $23.94 |
| 02/26/01 | $58.00 | $34.06 | $23.94 |
| 02/27/01 | $59.11 | $35.17 | $23.94 |
| 02/28/01 | $57.92 | $33.98 | $23.94 |
| 03/01/01 | $58.40 | $34.46 | $23.94 |
| 03/02/01 | $59.41 | $35.47 | $23.94 |
| 03/05/01 | $59.08 | $35.14 | $23.94 |
| 03/06/01 | $59.87 | $35.93 | $23.94 |
| 03/07/01 | $61.50 | $37.56 | $23.94 |
| 03/08/01 | $61.11 | $37.17 | $23.94 |
| 03/09/01 | $60.27 | $36.33 | $23.94 |
| 03/12/01 | $58.43 | $34.49 | $23.94 |
| 03/13/01 | $60.45 | $36.51 | $23.94 |
| 03/14/01 | $59.69 | $35.75 | $23.94 |
| 03/15/01 | $60.36 | $36.42 | $23.94 |
| 03/16/01 | $60.01 | $36.07 | $23.94 |
| 03/19/01 | $59.90 | $35.96 | $23.94 |
| 03/20/01 | $57.88 | $33.94 | $23.94 |
| 03/21/01 | $55.85 | $32.10 | $23.75 |
| 03/22/01 | $54.72 | $31.45 | $23.27 |
| 03/23/01 | $58.12 | $34.18 | $23.94 |
| 03/26/01 | $57.94 | $34.00 | $23.94 |
| 03/27/01 | $59.85 | $35.91 | $23.94 |
| 03/28/01 | $59.35 | $35.41 | $23.94 |
| 03/29/01 | $58.15 | $34.21 | $23.94 |
| 03/30/01 | $59.24 | $35.30 | $23.94 |
| 04/02/01 | $59.50 | $35.56 | $23.94 |

9

**A195**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 04/03/01 | $58.92 | $34.98 | $23.94 |
| 04/04/01 | $58.45 | $34.51 | $23.94 |
| 04/05/01 | $59.73 | $35.79 | $23.94 |
| 04/06/01 | $58.54 | $34.60 | $23.94 |
| 04/09/01 | $59.45 | $35.51 | $23.94 |
| 04/10/01 | $61.12 | $37.18 | $23.94 |
| 04/11/01 | $60.54 | $36.60 | $23.94 |
| 04/12/01 | $61.40 | $37.46 | $23.94 |
| 04/16/01 | $60.33 | $36.39 | $23.94 |
| 04/17/01 | $60.91 | $36.97 | $23.94 |
| 04/18/01 | $63.38 | $39.44 | $23.94 |
| 04/19/01 | $63.05 | $39.11 | $23.94 |
| 04/20/01 | $62.45 | $38.51 | $23.94 |
| 04/23/01 | $62.23 | $38.29 | $23.94 |
| 04/24/01 | $63.10 | $39.16 | $23.94 |
| 04/25/01 | $64.75 | $40.81 | $23.94 |
| 04/26/01 | $63.40 | $39.46 | $23.94 |
| 04/27/01 | $64.38 | $40.44 | $23.94 |
| 04/30/01 | $64.02 | $40.08 | $23.94 |
| 05/01/01 | $64.46 | $40.52 | $23.94 |
| 05/02/01 | $65.46 | $41.52 | $23.94 |
| 05/03/01 | $65.29 | $41.35 | $23.94 |
| 05/04/01 | $65.70 | $41.76 | $23.94 |
| 05/07/01 | $65.50 | $41.56 | $23.94 |
| 05/08/01 | $65.42 | $41.48 | $23.94 |
| 05/09/01 | $66.05 | $42.11 | $23.94 |
| 05/10/01 | $65.08 | $41.14 | $23.94 |
| 05/11/01 | $64.91 | $40.97 | $23.94 |
| 05/14/01 | $65.22 | $41.28 | $23.94 |
| 05/15/01 | $66.94 | $43.00 | $23.94 |
| 05/16/01 | $68.64 | $44.70 | $23.94 |
| 05/17/01 | $68.20 | $44.26 | $23.94 |
| 05/18/01 | $67.57 | $43.63 | $23.94 |
| 05/21/01 | $67.67 | $43.73 | $23.94 |
| 05/22/01 | $67.71 | $43.77 | $23.94 |
| 05/23/01 | $66.48 | $42.54 | $23.94 |
| 05/24/01 | $66.44 | $42.50 | $23.94 |
| 05/25/01 | $66.27 | $42.33 | $23.94 |
| 05/29/01 | $66.00 | $42.06 | $23.94 |
| 05/30/01 | $65.80 | $41.86 | $23.94 |
| 05/31/01 | $65.66 | $41.72 | $23.94 |
| 06/01/01 | $65.74 | $41.80 | $23.94 |
| 06/04/01 | $66.43 | $42.49 | $23.94 |
| 06/05/01 | $66.98 | $43.04 | $23.94 |
| 06/06/01 | $65.96 | $42.02 | $23.94 |
| 06/07/01 | $65.82 | $41.88 | $23.94 |
| 06/08/01 | $65.80 | $41.86 | $23.94 |

10

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|------|------|------|
| 06/11/01 | $65.78 | $41.84 | $23.94 |
| 06/12/01 | $65.30 | $41.36 | $23.94 |
| 06/13/01 | $65.25 | $41.31 | $23.94 |
| 06/14/01 | $64.71 | $40.77 | $23.94 |
| 06/15/01 | $63.80 | $39.86 | $23.94 |
| 06/18/01 | $63.65 | $39.71 | $23.94 |
| 06/19/01 | $63.82 | $39.88 | $23.94 |
| 06/20/01 | $64.61 | $40.67 | $23.94 |
| 06/21/01 | $66.71 | $42.77 | $23.94 |
| 06/22/01 | $67.01 | $43.07 | $23.94 |
| 06/25/01 | $65.95 | $42.01 | $23.94 |
| 06/26/01 | $65.14 | $41.20 | $23.94 |
| 06/27/01 | $65.70 | $41.76 | $23.94 |
| 06/28/01 | $65.98 | $42.04 | $23.94 |
| 06/29/01 | $66.70 | $42.76 | $23.94 |
| 07/02/01 | $66.60 | $42.66 | $23.94 |
| 07/03/01 | $66.23 | $42.29 | $23.94 |
| 07/05/01 | $66.95 | $43.01 | $23.94 |
| 07/06/01 | $66.54 | $42.60 | $23.94 |
| 07/09/01 | $66.48 | $42.54 | $23.94 |
| 07/10/01 | $65.55 | $41.61 | $23.94 |
| 07/11/01 | $65.24 | $41.30 | $23.94 |
| 07/12/01 | $66.40 | $42.46 | $23.94 |
| 07/13/01 | $67.16 | $43.22 | $23.94 |
| 07/16/01 | $68.11 | $44.17 | $23.94 |
| 07/17/01 | $68.95 | $45.01 | $23.94 |
| 07/18/01 | $69.48 | $45.54 | $23.94 |
| 07/19/01 | $66.50 | $42.56 | $23.94 |
| 07/20/01 | $67.28 | $43.34 | $23.94 |
| 07/23/01 | $67.50 | $43.56 | $23.94 |
| 07/24/01 | $67.01 | $43.07 | $23.94 |
| 07/25/01 | $66.76 | $42.82 | $23.94 |
| 07/26/01 | $65.38 | $41.44 | $23.94 |
| 07/27/01 | $66.18 | $42.24 | $23.94 |
| 07/30/01 | $66.09 | $42.15 | $23.94 |
| 07/31/01 | $66.29 | $42.35 | $23.94 |
| 08/01/01 | $65.75 | $41.81 | $23.94 |
| 08/02/01 | $66.00 | $42.06 | $23.94 |
| 08/03/01 | $65.99 | $42.05 | $23.94 |
| 08/06/01 | $65.71 | $41.77 | $23.94 |
| 08/07/01 | $66.44 | $42.50 | $23.94 |
| 08/08/01 | $65.86 | $41.92 | $23.94 |
| 08/09/01 | $66.24 | $42.30 | $23.94 |
| 08/10/01 | $67.13 | $43.19 | $23.94 |
| 08/13/01 | $68.01 | $44.07 | $23.94 |
| 08/14/01 | $68.00 | $44.06 | $23.94 |
| 08/15/01 | $67.95 | $44.01 | $23.94 |

11

A197

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|-------------|------------|----------------------|
| 08/16/01 | $66.87 | $42.93 | $23.94 |
| 08/17/01 | $65.99 | $42.05 | $23.94 |
| 08/20/01 | $65.50 | $41.56 | $23.94 |
| 08/21/01 | $64.86 | $40.92 | $23.94 |
| 08/22/01 | $65.48 | $41.54 | $23.94 |
| 08/23/01 | $64.72 | $40.78 | $23.94 |
| 08/24/01 | $62.35 | $38.41 | $23.94 |
| 08/27/01 | $61.96 | $38.02 | $23.94 |
| 08/28/01 | $61.34 | $37.40 | $23.94 |
| 08/29/01 | $60.70 | $36.76 | $23.94 |
| 08/30/01 | $59.31 | $35.37 | $23.94 |
| 08/31/01 | $59.10 | $35.16 | $23.94 |
| 09/04/01 | $57.06 | $33.12 | $23.94 |
| 09/05/01 | $57.22 | $33.28 | $23.94 |
| 09/06/01 | $57.00 | $33.06 | $23.94 |
| 09/07/01 | $55.04 | $31.48 | $23.56 |
| 09/10/01 | $56.31 | $32.37 | $23.94 |
| 09/17/01 | $52.83 | $30.22 | $22.61 |
| 09/18/01 | $52.64 | $30.11 | $22.53 |
| 09/19/01 | $52.30 | $29.92 | $22.38 |
| 09/20/01 | $51.46 | $29.44 | $22.02 |
| 09/21/01 | $50.34 | $28.80 | $21.54 |
| 09/24/01 | $52.85 | $30.23 | $22.62 |
| 09/25/01 | $52.08 | $29.79 | $22.29 |
| 09/26/01 | $53.60 | $30.57 | $23.03 |
| 09/27/01 | $54.49 | $31.07 | $23.42 |
| 09/28/01 | $56.38 | $32.44 | $23.94 |
| 10/01/01 | $57.50 | $33.56 | $23.94 |
| 10/02/01 | $57.83 | $33.89 | $23.94 |
| 10/03/01 | $58.20 | $34.26 | $23.94 |
| 10/04/01 | $59.63 | $35.69 | $23.94 |
| 10/05/01 | $58.35 | $34.41 | $23.94 |
| 10/08/01 | $56.50 | $32.56 | $23.94 |
| 10/09/01 | $56.59 | $32.65 | $23.94 |
| 10/10/01 | $58.22 | $34.28 | $23.94 |
| 10/11/01 | $56.95 | $33.01 | $23.94 |
| 10/12/01 | $54.89 | $31.30 | $23.59 |
| 10/15/01 | $55.91 | $31.97 | $23.94 |
| 10/16/01 | $56.00 | $32.06 | $23.94 |
| 10/17/01 | $57.16 | $33.22 | $23.94 |
| 10/18/01 | $57.53 | $33.59 | $23.94 |
| 10/19/01 | $56.91 | $32.97 | $23.94 |
| 10/22/01 | $56.92 | $32.98 | $23.94 |
| 10/23/01 | $57.25 | $33.31 | $23.94 |
| 10/24/01 | $55.44 | $31.61 | $23.83 |
| 10/25/01 | $57.19 | $33.25 | $23.94 |
| 10/26/01 | $57.48 | $33.54 | $23.94 |

12

**A198**

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 10/29/01 | $54.49 | $31.07 | $23.42 |
| 10/30/01 | $53.52 | $30.52 | $23.00 |
| 10/31/01 | $52.30 | $29.82 | $22.48 |
| 11/01/01 | $52.90 | $30.17 | $22.73 |
| 11/02/01 | $52.76 | $30.09 | $22.67 |
| 11/05/01 | $53.75 | $30.65 | $23.10 |
| 11/06/01 | $56.53 | $32.59 | $23.94 |
| 11/07/01 | $58.72 | $34.78 | $23.94 |
| 11/08/01 | $57.79 | $33.85 | $23.94 |
| 11/09/01 | $57.98 | $34.04 | $23.94 |
| 11/12/01 | $58.21 | $34.27 | $23.94 |
| 11/13/01 | $60.00 | $36.06 | $23.94 |
| 11/14/01 | $60.90 | $36.96 | $23.94 |
| 11/15/01 | $58.90 | $34.96 | $23.94 |
| 11/16/01 | $57.80 | $34.20 | $23.60 |
| 11/19/01 | $58.75 | $34.81 | $23.94 |
| 11/20/01 | $58.37 | $34.52 | $23.85 |
| 11/21/01 | $58.56 | $34.62 | $23.94 |
| 11/23/01 | $59.62 | $35.68 | $23.94 |
| 11/26/01 | $60.18 | $36.24 | $23.94 |
| 11/27/01 | $60.76 | $36.82 | $23.94 |
| 11/28/01 | $60.34 | $36.40 | $23.94 |
| 11/29/01 | $59.80 | $35.86 | $23.94 |
| 11/30/01 | $58.99 | $35.05 | $23.94 |
| 12/03/01 | $56.29 | $33.70 | $22.59 |
| 12/04/01 | $58.23 | $34.29 | $23.94 |
| 12/05/01 | $61.00 | $37.06 | $23.94 |
| 12/06/01 | $60.66 | $36.72 | $23.94 |
| 12/07/01 | $59.66 | $35.72 | $23.94 |
| 12/10/01 | $57.60 | $34.30 | $23.30 |
| 12/11/01 | $56.66 | $34.46 | $22.20 |
| 12/12/01 | $54.15 | $34.35 | $19.80 |
| 12/13/01 | $54.23 | $33.94 | $20.29 |
| 12/14/01 | $53.35 | $33.71 | $19.64 |
| 12/17/01 | $54.57 | $33.96 | $20.61 |
| 12/18/01 | $56.12 | $34.28 | $21.84 |
| 12/19/01 | $56.87 | $34.83 | $22.04 |
| 12/20/01 | $56.50 | $34.75 | $21.75 |
| 12/21/01 | $55.90 | $34.53 | $21.37 |
| 12/24/01 | $56.09 | $34.49 | $21.60 |
| 12/26/01 | $56.38 | $34.56 | $21.82 |
| 12/27/01 | $57.83 | $34.53 | $23.30 |
| 12/28/01 | $58.88 | $34.94 | $23.94 |
| 12/31/01 | $57.94 | $34.66 | $23.28 |
| 01/02/02 | $57.09 | $34.51 | $22.58 |
| 01/03/02 | $57.05 | $34.64 | $22.41 |
| 01/04/02 | $59.19 | $35.25 | $23.94 |

13

A199

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 01/07/02 | $58.10 | $34.91 | $23.19 |
| 01/08/02 | $56.74 | $34.45 | $22.29 |
| 01/09/02 | $57.10 | $34.68 | $22.42 |
| 01/10/02 | $56.54 | $34.84 | $21.70 |
| 01/11/02 | $54.38 | $34.53 | $19.85 |
| 01/14/02 | $52.78 | $34.25 | $18.53 |
| 01/15/02 | $55.20 | $34.92 | $20.28 |
| 01/16/02 | $54.45 | $34.58 | $19.87 |
| 01/17/02 | $53.76 | $34.86 | $18.90 |
| 01/18/02 | $54.85 | $34.82 | $20.03 |
| 01/22/02 | $54.05 | $34.81 | $19.24 |
| 01/23/02 | $53.35 | $34.76 | $18.59 |
| 01/24/02 | $53.75 | $34.89 | $18.86 |
| 01/25/02 | $54.71 | $35.01 | $19.70 |
| 01/28/02 | $52.85 | $34.75 | $18.10 |
| 01/29/02 | $49.85 | $33.27 | $16.58 |
| 01/30/02 | $49.35 | $33.59 | $15.76 |
| 01/31/02 | $51.24 | $34.12 | $17.12 |
| 02/01/02 | $51.10 | $33.76 | $17.34 |
| 02/04/02 | $48.80 | $32.74 | $16.06 |
| 02/05/02 | $47.53 | $32.54 | $14.99 |
| 02/06/02 | $44.71 | $32.24 | $12.47 |
| 02/07/02 | $48.01 | $32.45 | $15.56 |
| 02/08/02 | $52.00 | $33.29 | $18.71 |
| 02/11/02 | $51.45 | $33.51 | $17.94 |
| 02/12/02 | $50.80 | $33.31 | $17.49 |
| 02/13/02 | $52.15 | $33.79 | $18.36 |
| 02/14/02 | $51.92 | $33.88 | $18.04 |
| 02/15/02 | $50.89 | $32.89 | $18.00 |
| 02/19/02 | $50.35 | $32.51 | $17.84 |
| 02/20/02 | $50.65 | $32.93 | $17.72 |
| 02/21/02 | $48.50 | $32.50 | $16.00 |
| 02/22/02 | $48.65 | $32.41 | $16.24 |
| 02/25/02 | $49.58 | $33.13 | $16.45 |
| 02/26/02 | $49.98 | $33.26 | $16.72 |
| 02/27/02 | $52.08 | $33.53 | $18.55 |
| 02/28/02 | $51.50 | $33.69 | $17.81 |
| 03/01/02 | $53.00 | $33.98 | $19.02 |
| 03/04/02 | $57.25 | $35.04 | $22.21 |
| 03/05/02 | $56.28 | $35.11 | $21.17 |
| 03/06/02 | $57.77 | $35.60 | $22.17 |
| 03/07/02 | $58.36 | $35.36 | $23.00 |
| 03/08/02 | $59.90 | $35.96 | $23.94 |
| 03/11/02 | $59.73 | $35.79 | $23.94 |
| 03/12/02 | $59.16 | $35.79 | $23.37 |
| 03/13/02 | $58.40 | $35.54 | $22.86 |
| 03/14/02 | $57.48 | $35.61 | $21.87 |

14

**A200**

### Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|---|---|---|---|
| 03/15/02 | $58.95 | $36.26 | $22.69 |
| 03/18/02 | $58.98 | $36.05 | $22.93 |
| 03/19/02 | $58.98 | $36.21 | $22.77 |
| 03/20/02 | $57.61 | $35.68 | $21.93 |
| 03/21/02 | $57.90 | $35.67 | $22.23 |
| 03/22/02 | $58.14 | $35.75 | $22.39 |
| 03/25/02 | $56.30 | $35.24 | $21.06 |
| 03/26/02 | $57.00 | $35.34 | $21.66 |
| 03/27/02 | $57.50 | $35.70 | $21.80 |
| 03/28/02 | $56.80 | $35.55 | $21.25 |
| 04/01/02 | $57.03 | $35.35 | $21.68 |
| 04/02/02 | $57.05 | $35.53 | $21.52 |
| 04/03/02 | $55.75 | $35.22 | $20.53 |
| 04/04/02 | $56.83 | $35.44 | $21.39 |
| 04/05/02 | $57.98 | $35.70 | $22.28 |
| 04/08/02 | $59.06 | $35.82 | $23.24 |
| 04/09/02 | $59.25 | $36.09 | $23.16 |
| 04/10/02 | $59.35 | $36.12 | $23.23 |
| 04/11/02 | $57.05 | $35.32 | $21.73 |
| 04/12/02 | $58.10 | $35.70 | $22.40 |
| 04/15/02 | $57.48 | $35.24 | $22.24 |
| 04/16/02 | $59.52 | $35.87 | $23.65 |
| 04/17/02 | $60.70 | $36.76 | $23.94 |
| 04/18/02 | $61.20 | $37.26 | $23.94 |
| 04/19/02 | $62.44 | $38.50 | $23.94 |
| 04/22/02 | $60.90 | $36.96 | $23.94 |
| 04/23/02 | $61.80 | $37.86 | $23.94 |
| 04/24/02 | $61.36 | $37.42 | $23.94 |
| 04/25/02 | $59.18 | $35.24 | $23.94 |
| 04/26/02 | $59.60 | $35.66 | $23.94 |
| 04/29/02 | $57.25 | $34.55 | $22.70 |
| 04/30/02 | $58.29 | $34.95 | $23.34 |
| 05/01/02 | $57.70 | $35.09 | $22.61 |
| 05/02/02 | $57.43 | $35.51 | $21.92 |
| 05/03/02 | $57.00 | $35.36 | $21.64 |
| 05/06/02 | $55.68 | $34.68 | $21.00 |
| 05/07/02 | $54.75 | $34.50 | $20.25 |
| 05/08/02 | $57.11 | $35.28 | $21.83 |
| 05/09/02 | $56.29 | $35.03 | $21.26 |
| 05/10/02 | $54.25 | $34.61 | $19.64 |
| 05/13/02 | $55.82 | $35.10 | $20.72 |
| 05/14/02 | $56.85 | $35.54 | $21.31 |
| 05/15/02 | $55.47 | $35.44 | $20.03 |
| 05/16/02 | $55.00 | $35.76 | $19.24 |
| 05/17/02 | $54.31 | $35.91 | $18.40 |
| 05/20/02 | $53.51 | $35.32 | $18.19 |
| 05/21/02 | $52.69 | $35.15 | $17.54 |

15

**A201**

## Household International, Inc. Common Stock
## Estimate of Alleged Artificial Inflation
## For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|------|------|------|
| 05/22/02 | $52.85 | $35.11 | $17.74 |
| 05/23/02 | $53.27 | $35.40 | $17.87 |
| 05/24/02 | $53.07 | $35.22 | $17.85 |
| 05/28/02 | $52.85 | $34.87 | $17.98 |
| 05/29/02 | $52.80 | $34.91 | $17.89 |
| 05/30/02 | $51.65 | $34.77 | $16.88 |
| 05/31/02 | $51.15 | $34.89 | $16.26 |
| 06/03/02 | $50.94 | $34.27 | $16.67 |
| 06/04/02 | $50.69 | $34.03 | $16.66 |
| 06/05/02 | $52.19 | $34.28 | $17.91 |
| 06/06/02 | $53.60 | $33.77 | $19.83 |
| 06/07/02 | $52.87 | $33.81 | $19.06 |
| 06/10/02 | $52.59 | $34.01 | $18.58 |
| 06/11/02 | $52.99 | $33.45 | $19.54 |
| 06/12/02 | $52.48 | $33.56 | $18.92 |
| 06/13/02 | $50.30 | $32.86 | $17.44 |
| 06/14/02 | $50.80 | $33.18 | $17.62 |
| 06/17/02 | $52.74 | $34.54 | $18.20 |
| 06/18/02 | $52.75 | $34.67 | $18.08 |
| 06/19/02 | $51.55 | $34.31 | $17.24 |
| 06/20/02 | $49.80 | $33.78 | $16.02 |
| 06/21/02 | $49.68 | $33.52 | $16.16 |
| 06/24/02 | $50.00 | $33.50 | $16.50 |
| 06/25/02 | $49.00 | $33.32 | $15.68 |
| 06/26/02 | $48.65 | $32.40 | $16.25 |
| 06/27/02 | $49.90 | $33.12 | $16.78 |
| 06/28/02 | $49.70 | $33.51 | $16.19 |
| 07/01/02 | $47.93 | $33.09 | $14.84 |
| 07/02/02 | $47.60 | $32.66 | $14.94 |
| 07/03/02 | $48.05 | $32.29 | $15.76 |
| 07/05/02 | $50.00 | $33.31 | $16.69 |
| 07/08/02 | $49.54 | $33.26 | $16.28 |
| 07/09/02 | $47.05 | $32.47 | $14.58 |
| 07/10/02 | $44.07 | $31.59 | $12.48 |
| 07/11/02 | $45.00 | $31.86 | $13.14 |
| 07/12/02 | $46.30 | $31.61 | $14.69 |
| 07/15/02 | $45.67 | $31.50 | $14.17 |
| 07/16/02 | $46.10 | $31.09 | $15.01 |
| 07/17/02 | $42.37 | $30.78 | $11.59 |
| 07/18/02 | $42.41 | $29.85 | $12.56 |
| 07/19/02 | $40.72 | $29.39 | $11.33 |
| 07/22/02 | $38.84 | $28.46 | $10.38 |
| 07/23/02 | $36.29 | $26.99 | $9.30 |
| 07/24/02 | $39.97 | $28.29 | $11.68 |
| 07/25/02 | $38.80 | $28.23 | $10.57 |
| 07/26/02 | $37.66 | $28.98 | $8.68 |
| 07/29/02 | $39.85 | $30.66 | $9.19 |

16

**A202**

## Household International, Inc. Common Stock
### Estimate of Alleged Artificial Inflation
### For Quantification Including Leakage

| Date | Stock Price | True Value | Artificial Inflation |
|------|------------|-----------|---------------------|
| 07/30/02 | $40.30 | $30.75 | $9.55 |
| 07/31/02 | $42.67 | $31.18 | $11.49 |
| 08/01/02 | $41.26 | $30.63 | $10.63 |
| 08/02/02 | $39.45 | $29.86 | $9.59 |
| 08/05/02 | $36.98 | $28.87 | $8.11 |
| 08/06/02 | $39.72 | $29.66 | $10.06 |
| 08/07/02 | $38.28 | $30.00 | $8.28 |
| 08/08/02 | $40.96 | $31.36 | $9.60 |
| 08/09/02 | $40.45 | $31.72 | $8.73 |
| 08/12/02 | $39.70 | $31.41 | $8.29 |
| 08/13/02 | $37.80 | $30.74 | $7.06 |
| 08/14/02 | $38.09 | $31.70 | $6.39 |
| 08/15/02 | $39.60 | $31.99 | $7.61 |
| 08/16/02 | $37.54 | $31.78 | $5.76 |
| 08/19/02 | $37.75 | $32.53 | $5.22 |
| 08/20/02 | $36.75 | $32.10 | $4.65 |
| 08/21/02 | $37.15 | $32.17 | $4.98 |
| 08/22/02 | $40.65 | $32.51 | $8.14 |
| 08/23/02 | $37.80 | $31.95 | $5.85 |
| 08/26/02 | $39.08 | $32.31 | $6.77 |
| 08/27/02 | $37.70 | $32.12 | $5.58 |
| 08/28/02 | $36.80 | $31.58 | $5.22 |
| 08/29/02 | $36.38 | $31.69 | $4.69 |
| 08/30/02 | $36.11 | $31.78 | $4.33 |
| 09/03/02 | $33.36 | $30.40 | $2.96 |
| 09/04/02 | $34.40 | $30.87 | $3.53 |
| 09/05/02 | $33.36 | $30.49 | $2.87 |
| 09/06/02 | $33.95 | $30.85 | $3.10 |
| 09/09/02 | $36.33 | $31.31 | $5.02 |
| 09/10/02 | $35.15 | $30.99 | $4.16 |
| 09/11/02 | $35.43 | $30.86 | $4.57 |
| 09/12/02 | $33.85 | $30.12 | $3.73 |
| 09/13/02 | $34.67 | $30.32 | $4.35 |
| 09/16/02 | $33.59 | $30.24 | $3.35 |
| 09/17/02 | $29.52 | $29.69 | -$0.17 |
| 09/18/02 | $29.85 | $29.44 | $0.41 |
| 09/19/02 | $29.25 | $28.52 | $0.73 |
| 09/20/02 | $29.05 | $28.41 | $0.64 |
| 09/23/02 | $27.61 | $28.46 | -$0.85 |
| 09/24/02 | $27.55 | $27.90 | -$0.35 |
| 09/25/02 | $28.15 | $28.39 | -$0.24 |
| 09/26/02 | $29.28 | $28.94 | $0.34 |
| 09/27/02 | $27.64 | $28.20 | -$0.56 |
| 09/30/02 | $28.31 | $28.41 | -$0.10 |
| 10/01/02 | $28.40 | $29.52 | -$1.12 |
| 10/02/02 | $27.32 | $28.45 | -$1.13 |
| 10/03/02 | $26.60 | $27.26 | -$0.66 |

17

**A203**

**Household International, Inc. Common Stock**
**Estimate of Alleged Artificial Inflation**
**For Quantification Including Leakage**

| Date | Stock Price | True Value | Artificial Inflation |
|------|-------------|------------|----------------------|
| 10/04/02 | $24.66 | $26.53 | -$1.87 |
| 10/07/02 | $23.25 | $25.70 | -$2.45 |
| 10/08/02 | $23.58 | $26.75 | -$3.17 |
| 10/09/02 | $21.00 | $25.66 | -$4.66 |
| 10/10/02 | $26.30 | $26.98 | -$0.68 |
| 10/11/02 | $28.20 | $28.20 | $0.00 |

18

**A204**

# Exhibit 57



Household International, Inc. Common Stock Price and True Value
For Quantification Including Leakage
July 30, 1999 – October 11, 2002

# EXHIBIT 9

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: Lawrence E. Jaffe Pension Plan Plaintiff, | ) ) ) ) ) | |
| v. | ) ) ) | Lead Case No. 02-C-5893 |
| Household International, Inc., et al Defendant, | ) ) ) ) | |

## AFFIDAVIT OF BRADFORD CORNELL

October 30, 2008

### I.     Qualifications

(1)     I am currently a visiting Professor of Finance at the California Institute of Technology. Previously, I was a Professor of Finance and Director of the Bank of America Research Center at the Anderson Graduate School of Management at the University of California, Los Angeles ("UCLA") for 26 years.

(2)     I earned a master's degree in Statistics from Stanford University in 1974 and earned my doctorate in Financial Economics from Stanford in 1975. I have served as an editor of numerous journals relating to business and finance and have written more than 80 articles and two books on finance and securities, including Corporate Valuation: Tools For Effective Appraisal and Decision Making, published by McGraw-Hill, and The Equity Risk Premium and the Long-Run Future of the Stock Market, published by John Wiley and Sons. To complement my academic writing, I have also authored articles for *The Wall Street Journal* and the *Los Angeles Times*.

(3)     In 1988, I was cited by the Financial Management Association as one of the ten most prolific authors in the field of finance. I have also received prizes and grants for my research from the Chicago Board of Trade, the Chicago Mercantile Exchange and the Institute for Quantitative Research in Finance. My article, "Corporate Stakeholders and Corporate Finance," received the 1987 Distinguished Applied Research Award from the Financial Management Association. In 1999, I was awarded the I/B/E/S prize for empirical work in finance and accounting (with Wayne Landsman and Jennifer Conrad). More recently, Richard Roll and I received a Graham and Dodd Scroll Award from the Financial Analyst Society for our work on delegated agent asset pricing theory.

(4)     I have served as a Vice President of the Western Finance Association. I am also a past director of both the American Finance Association and the Western Finance Association. I have served as an associate editor of numerous professional journals including: *The Journal of Finance, The Journal of Futures Markets, The Journal of Financial Research* and *The Journal of International Business Studies*. I have served as a reviewer for nearly a dozen other professional journals.

(5)     My teaching and writing have focused on a number of different financial and economic issues, many of which are relevant to the subject matter of this declaration. I currently teach Applied Corporate Finance and Investment Banking at Caltech. I have drawn upon this experience in order to formulate the opinions provided herein. In addition to my teaching, writing, and research studies, I also serve as senior consultant to CRA International ("CRA"), an international consulting firm. In my position as a senior consultant, I advise business and legal clients on financial economic issues. Prior to my affiliation with CRA, which began in March of 1999, I operated FinEcon, a financial economic consulting company, through which I also advised business and legal clients on financial economic issues. I have served as a consultant and given testimony for both plaintiffs and defendants in a variety of securities, regulatory and commercial lawsuits. During my many years of experience as an expert witness and consultant, I have provided economic analyses and expert testimony (again, for both plaintiffs and defendants) related to valuation, corporate finance and damages issues. I have been engaged as a damages expert in numerous high-profile cases that revolved around complex financial and securities transactions.

(6)    My background is described more fully in my curriculum vitae, which is attached as

Exhibit 1 to this affidavit. A list of my publications may also be found as part of Exhibit

1.

(7)    My hourly rate in this matter is $750.

## II.    Materials Reviewed and Opinions

(1)    In preparing by opinions in this matter I have reviewed:

    a.    The report, rebuttal report and deposition transcript of Prof. Daniel Fischel.

    b.    The report and rebuttal report of Dr. Mukesh Bajaj.

    c.    My published article: "Using Finance Theory to Measure Damages in Fraud on the

    Market Cases." With G. Morgan. *UCLA Law Review*, Vol. 37, No. 2, 1990, pp.

    883–924.

    d.    The expert report of Dr. Blaine Nye and the court opinion in Re *Williams Securities*

    *Litigation*.

(2)    Based on my review of his report, I understand Prof. Fischel did the following in

developing his leakage model. First, he estimated a regression model which related the

return on Household's stock to the returns on the S&P 500 and S&P Financials Indexes

during the period from November 15, 2000 to November 14, 2001. Second, Prof. Fischel

used the regression model to predict the returns for Household's stock on a daily basis

during the period from November 15, 2001 to October 11, 2002 (the alleged "leakage

period"). Finally, he calculated a value line based on the assumption that but-for leakage

of fraud related information, the return on Household's stock would have equaled the

predicted return from the regression model for every day during the leakage period.

(3)    Although Prof. Fischel refers to his leakage model as an event study approach, citing my

paper with Mr. Morgan as support, I do not agree. Instead, it is what Mr. Morgan and I

refer to as a comparable index approach. I say this because during the alleged leakage period Prof. Fischel does not identify any specific events. Instead, for every day during the period his procedure treats the difference between the return predicted by his model and the actual return on Household stock as being attributable to the leakage of fraud related information. As a result, Prof. Fischel's approach, as applied to the leakage period, is identical to the comparable index approach described on page 898 of Cornell and Morgan.

(4)     Whether Prof. Fischel's approach is called an event approach or a comparable index approach, it still suffers from the problem that Mr. Morgan and I discuss on page 903 of our paper. There we say, "The trouble with the comparable index approach, . . . is that it attributes any decline in the security price that is not due to movements in the market or the industry to disclosure of the fraud. If the disclosure of the fraud is associated with the release of other company-specific news, the comparable index approach will overestimate the true damages."

(5)     The recognition of this problem with the comparable index approach is not unique to Mr. Morgan and me. It has been widely documented in the academic literature, including published work by Prof. Fischel. In fact Prof. Fischel concedes this issue in his deposition:[1]

> *Q: So there are a bunch of stock price movements that were significant under your regression analysis that are not attributable to fraud related disclosures?*
>
> *A: Correct.*

(6)     Furthermore, this comports with common sense. For companies like Household over a period as long as the alleged leakage period, there are hundreds, if not thousands, of news

---

[1] Daniel R. Fischel's deposition, March 21, 2008, page 57, line 12.

items. Assuming the model employed by Prof. Fischel properly nets out market and
industry related effects, there are still hundreds of news items that deal with Household
itself. Prof. Fischel's leakage model assumes, without demonstrating, that all the news
items that affect Household's stock price are related to the fraud. In my opinion as an
economist, that assertion does not provide adequate evidence, indeed it really provides no
evidence, that the stock price decline was caused by leakage of fraud related information
rather than disclosure of other firm specific news.

(7)    In this respect, I note that in addition to economists courts have also concluded that
models such as the one employed by Prof. Fischel do not adequately measure the extent a
company's stock price decline that can be attributed to leakage of fraud related news. For
instance, in Re *Williams Securities Litigation*, Dr. Blaine Nye used a model similar to
Prof. Fischel's also with the goal of estimating the impact of the leakage of fraud related
news on Williams's stock price. In response, the court granted a Daubert motion
excluding Dr. Nye's testimony saying that "the applicable law requires a securities fraud
plaintiff in a 'fraud on the market case' to identify compensable losses by separating the
compensable fraud-related losses from losses attributable to general economic conditions,
broad market trends, industry-specific stresses, management incompetence, bad luck and
other non-fraud factors." In my opinion, the court's thinking in Williams is spot on from
the perspective of an economist. Although Prof. Fischel's model could take account of
market and industry factors, assuming it is properly specified, it does not take account of
firm specific factors. Therefore, any estimate of inflation produced by this model cannot
be relied upon.

(8)    There is one final issue that arises when regression models are applied over long periods
to predict returns as Prof. Fischel does in his leakage model. No regression model

perfectly accounts for market and industry factors. Nonetheless, if the models are used to

calculate residual returns over intervals of no more than a few days, the errors are

generally minor. However, when a model is used to predict returns over periods

hundreds of days long the errors compound. Such compounding, in turn, can produce

significant errors in measured inflation. This is another reason to be skeptical of the

results produced by the comparable index approach.


Bradford Cornell

October 30, 2008

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California }

County of _Los Angeles_ }

On _October 30 2008_ before me, ____ _PATRICIA Knoebl-Wood_ ,
⟶Date                              Here Insert Name and Title of the Officer

personally appeared ____ _Bradford Cornell_ ____
                              Name(s) of Signer(s)

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Patricia Knoebl Wood_
                              Signature of Notary Public

PATRICIA KNOEBL-WOOD
Commission # 1761318
Notary Public - California
Los Angeles County
My Comm. Expires Aug 12, 2011

Place Notary Seal Above

──────── OPTIONAL ────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _Affidavit_

Document Date: _October 30, 2008_     Number of Pages: _7_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _Bradford Cornell_
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Item #5907    Reorder: Call Toll-Free 1-800-876-6827

A215

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5893 | **DATE** | 3/23/2009 |
| **CASE TITLE** | Jaffe vs. Household et al. | | |

**DOCKET ENTRY TEXT**

Minute entry dated 3/23/09 [1526] is amended as follows to include pages 1-3: For the reasons provided in this Minute Order, the Court denies defendants' *Daubert* motion to exclude the testimony of Daniel Fischel pursuant to Federal Rule of Evidence ("Rule") 702 [doc. no. 1361].

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

Under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993), a court must conduct a three-step inquiry: "[1] the witness must be qualified as an expert by knowledge, skill, experience, training, or education; [2] the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and [3] the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations and quotation omitted).

Defendants argue that Daniel Fischel's testimony is inadmissible because his causation analysis is not useful to the fact finder in that he did not evaluate any causal connection, assumed his conclusion thereby making his opinion regarding causation useless to the fact finder and merely concluded that there is economic evidence "consistent with" plaintiffs' allegations but did not rule out non-fraud explanations. The Court disagrees.

Fischel's report, rebuttal report and documents underlying those reports establish that Fischel analyzed in detail the causal relationship between defendants' conduct and investors' losses. Fischel utilizes a well-established methodology in analyzing loss causation in securities fraud cases: an event study. *See Carpe v. Aquila, Inc.*, No. 02-0388-CV, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) ("Failure to conduct an event study comparing the stock's price to the market as a whole or a selected index of similar businesses is enough to cause an expert's opinion to be excluded."); *see also In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-16 (C.D. Cal. 2003) (barring expert report that did not include an event study and stating that "[a] proper measure of damages in the securities context . . . requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong."), *aff'd sub nom. Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th Cir. 2005); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) (excluding expert testimony because "[t]he reliability of the Expert

Witness' proposed testimony is called into question by his failure to indicate . . . whether he conducted an 'event study' to determine whether [defendant's] stock price was affected by company specific factors exclusive of the challenged fraud").

To the extent that defendants take issue with Fischel's analysis, they are, in essence, questioning the validity of the use of an event study to establish materiality and causation. However, an event study is "[t]he gold standard, which is accepted by both courts and economists . . . ." Marge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 99 (2006).

An event study is an examination of the association between news about a company (good, bad, or neutral) and stock price movements. The researcher is examining whether the association between news and share price movements is strong enough to support an inference of, among other things, causation. If price movements are found that are unexplained by the "market model" and are statistically significant, either individually or collectively, a causal connection between the event in question and price movements is established. The study will separate out the effects of company-specific news on the stock price from the effects of market or industry forces on the price, thereby identifying the "true" price and the inflationary component thereof. Typically, event studies work backward from what is ultimately determined to be a fair price, after dissipation of inflation, to determine how much inflation was contained in the price due to fraud during the relevant time frame all the way back to the beginning.

*Id.* "Event study analysis is a ubiquitous tool in assessing claims of loss causation as well as the 'materiality' of misstatements or fraudulently omitted information." Allen Farrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of* Dura Pharmaceuticals, Inc. v. Broudo, 63 Bus. Law. 163, 166 (2007). "Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the issuer] which defendants allegedly have distorted." *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993); *see* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part II: Empirical Studies of Corporate Law*, 4 Am. Law & Econ. Rev. 380, 400 (Fall 2002) ("It is therefore safe to conclude that, with regard to securities litigation, the methodology's appropriateness for valuation issues is a settled part of the landscape . . . .").

Typically, defendants, rather than plaintiffs, in securities fraud litigation rely on the event study approach because it may underestimate the amount of inflation in certain circumstances, e.g., when there is leakage of true information. *See* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part II: Empirical Studies of Corporate Law*, 4 Am. Law & Econ. Rev. 380, 400 (Fall 2002) ("[T]he event study technique will understate the damages . . . because part of the impact of the information has been incorporated into the stock price before the announcement date."). It is interesting to note that in the instant case, however, plaintiffs rely on the event study approach and defendants rely on the comparable index approach. *See* Paul Grier, *Establishing Upper and Lower Limits for Settlement Negotiations in Rule 10b-5 Class Action Litigation*, in Securities Litigation 1993 at 445 (PLI Corp. Litigation and Administrative Practice Series No. 479, 1993) ("[T]he event study approach underestimates damages because it assumes that the event effects the security price only on specific class period days while the comparable index approach assumes that the event can effect the security price on all of the class period days.").

Anomalies aside, Fischel offers the jury two ways to determine whether defendants' conduct caused investors' loss, both of which utilize the event study method: quantification using specific disclosures and quantification using leakage.[1] Fischel's methodologies involve precisely the kind of analysis that finds

02C5893 Jaffe vs. Household et al.                                                    Page 2 of 3

A217

extensive support in economic, legal and financial articles. *See, e.g.*, G.N. Pettengill & J.M. Clark, *Estimating Expected Returns in an Event Study Framework: Evidence from the Dartboard Column*, 40 Quarterly Journal of Business & Economics (2001), at 19; A.C. MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature (March 1997), at 13-39; Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 545-90 (1994); Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 899 (1990).

Fischel's event study (as do all event studies) employs a regression analysis, which measures stock price movements upon disclosure of new information, rather than the omission of information. *See* Daniel P. Lefler & Allan W. Kleidon, *Just How Much Damage Did Those Misrepresentations Actually Cause and to Whom?: Damages Measurement in "Fraud on the Market" Securities Class Actions*, in Securities Litigation & Enforcement Institute 2005, at 285, 289 (PLI Corp. Law & Practice, Course Handbook Series No. 6746, 2005) (". . . [U]nder *Dura*, the principle of loss causation limits recovery to the price reaction that actually occurred at the time of the disclosure (or disclosures) that actually occurred."). Fischel's regression analysis calculates the amount of artificial inflation resulting from an alleged omission on any day during the class period. It estimates the effect of the specific corrective disclosures and information leakage that caused dissipation of the artificial inflation that existed from the time of the first actionable nondisclosure and subtracts from the equation general market movements in order to determine the true effect of the information disclosed.

In sum, the Court holds that Fischel's testimony is admissible because he evaluated the causal connection between defendants' conduct and investors' loss via a reliable methodology that accounts for non-fraud explanations. Accordingly, Fischel's testimony will assist the trier of fact to understand the evidence and determine facts in issue. The Court thus denies defendants' motion to exclude Fischel's testimony.

1.To the extent that defendants rely on *In re Williams Securities Litigation* for the proposition that Fischel's quantification based on leakage is inadmissible, the Court finds the case inapposite. 496 F. Supp. 2d 1195, 1272 (N.D. Okla. 2007). In that case, the court barred the loss causation expert's testimony because he "performed no regression analysis, or even an analysis of statistical significance, to differentiate fraud-related effects from forces unrelated to the fraud." *Id.* In the instant case, however, Fischel performed a regression analysis and employed a statistical significance measure in his event study.

02C5893 Jaffe vs. Household et al.                                    Page 3 of 3

A218

Verdict Form

02 CV 5893

**Statement No. 1**

| | **Question No. 1**<br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes ___ No X | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No X | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No X | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes ___ No X | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

FILED
MAY 07 2009

1

A219

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |

**Statement No. 2**

| | | | |
|---|---|---|---|
| Household | Yes___ No_X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No_X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No_X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No_X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

2

**A220**

**Statement No. 3**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| Household | Yes ___ No _X_ | 2+ Delinquency/Re-Aging ___  Restatement ___ | Knowingly ___ Recklessly ___  Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No _X_ | 2+ Delinquency/Re-Aging ___  Restatement ___ | Knowingly ___ Recklessly ___  Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No _X_ | 2+ Delinquency/Re-Aging ___  Restatement ___ | Knowingly ___ Recklessly ___  Knowingly ___ Recklessly ___ |
| Aldinger | Yes ___ No _X_ | 2+ Delinquency/Re-Aging ___  Restatement ___ | Knowingly ___ Recklessly ___  Knowingly ___ Recklessly ___ |

3

A221

**Statement No. 4**

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes___ No___ **X** | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No___ **X** | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No___ **X** | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No___ **X** | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

4

A222

| | **Question No. 1** | **Question No. 2** | **Question No. 3** |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 5** | | | |
| Household | Yes ___ No **X** | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No **X** | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No **X** | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes ___ No **X** | 2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

5

**A223**

**Statement No. 6**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). (more than one line can be checked): | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly (choose one) in making the statement about the issue by placing an "X" on the appropriate line. |
| Household | Yes ___ No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes ___ No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

6

|  | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 7** |  |  |  |
| Household | Yes___ No _X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No _X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No _X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No _X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |

7

**A225**

**Statement No. 8**

| | **Question No. 1**<br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes ___ No _X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No _X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No _X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes ___ No _X_ | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

8

**A226**

**Statement No. 9**

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes___ No_X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No_X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No_X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No_X_ | 2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |

9

**A227**

|  | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 10** |  |  |  |
| Household | Yes ___ No **X** | Predatory Lending ___<br><br>2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No **X** | Predatory Lending ___<br><br>2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No **X** | Predatory Lending ___<br><br>2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes **X** No ___ | Predatory Lending ___<br><br>2+ Delinquency/Re-Aging ___<br><br>Restatement ___ | Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___<br><br>Knowingly ___ Recklessly ___ |

10

A228

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 11** | | | |
| Household | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

11

A229

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 12** | | | |
| Household | Yes___ No X | 2+ Delinquency/Re-Aging _____<br>Restatement _____ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No X | 2+ Delinquency/Re-Aging _____<br>Restatement _____ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No X | 2+ Delinquency/Re-Aging _____<br>Restatement _____ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No X | 2+ Delinquency/Re-Aging _____<br>Restatement _____ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

12

A230

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 13** | | | |
| Household | Yes___  No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Gilmer | Yes___  No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___  No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |
| Aldinger | Yes___  No X | Predatory Lending ___<br>2+ Delinquency/Re-Aging ___<br>Restatement ___ | Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___<br>Knowingly ___ Recklessly ___ |

13

**A231**

| | **Question No. 1** | **Question No. 2** | **Question No. 3** |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). (**more than one line can be checked**): | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly (**choose one**) in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 14** | | | |
| Household | Yes X  No ___ | Predatory Lending X | Knowingly X Recklessly ___ |
| Gilmer | Yes X  No ___ | Predatory Lending X | Knowingly ___ Recklessly X |
| Schoenholz | Yes ___ No X | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes X  No ___ | Predatory Lending X | Knowingly ___ Recklessly X |

14

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |

**Statement No. 15**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| Household | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

15

**A233**

| | **Question No. 1** | **Question No. 2** | **Question No. 3** |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |

**Statement No. 16**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| Household | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

16

A234

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |

**Statement No. 17**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| Household | Yes ⊠ No ___ | 2+ Delinquency/Re-Aging ___ ⊠<br>Restatement ___ ⊠ | Knowingly ___ Recklessly ⊠<br>Knowingly ___ Recklessly ⊠ |
| Gilmer | Yes ⊠ No ___ | 2+ Delinquency/Re-Aging ___ ⊠<br>Restatement ___ ⊠ | Knowingly ___ Recklessly ⊠<br>Knowingly ___ Recklessly ⊠ |
| Schoenholz | Yes ⊠ No ___ | 2+ Delinquency/Re-Aging ___ ⊠<br>Restatement ___ ⊠ | Knowingly ___ Recklessly ⊠<br>Knowingly ___ Recklessly ⊠ |
| Aldinger | Yes ⊠ No ___ | 2+ Delinquency/Re-Aging ___ ⊠<br>Restatement ___ ⊠ | Knowingly ___ Recklessly ⊠<br>Knowingly ___ Recklessly ⊠ |

17

**A235**

**Statement No. 18**

| | Question No. 1 — Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | Question No. 2 — If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | Question No. 3 — For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes X   No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X   No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X   No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X   No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

18

A236

**Statement No. 19**

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

19

A237

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). (more than one line can be checked): | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly (choose one) in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 20** | | | |
| Household | Yes _X_ No ___ | 2+ Delinquency/Re-Aging _X_<br>Restatement _X_ | Knowingly _X_ Recklessly ___<br>Knowingly ___ Recklessly _X_ |
| Gilmer | Yes _X_ No ___ | 2+ Delinquency/Re-Aging _X_<br>Restatement _X_ | Knowingly _X_ Recklessly _X_<br>Knowingly ___ Recklessly _X_ |
| Schoenholz | Yes _X_ No ___ | 2+ Delinquency/Re-Aging _X_<br>Restatement _X_ | Knowingly _X_ Recklessly ___<br>Knowingly ___ Recklessly _X_ |
| Aldinger | Yes _X_ No ___ | 2+ Delinquency/Re-Aging _X_<br>Restatement _X_ | Knowingly _X_ Recklessly ___<br>Knowingly ___ Recklessly _X_ |

20

A238

**Statement No. 21**

| | Question No. 1<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | Question No. 2<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | Question No. 3<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

21

A239

**Question No. 1**

Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A?

**Question No. 2**

If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**:

**Question No. 3**

For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line.

**Statement No. 22**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| Household | Yes **X** No ___ | 2+ Delinquency/Re-Aging **X** <br> Restatement **X** | Knowingly ___ Recklessly **X** <br> Knowingly ___ Recklessly **X** |
| Gilmer | Yes **X** No ___ | 2+ Delinquency/Re-Aging **X** <br> Restatement **X** | Knowingly ___ Recklessly **X** <br> Knowingly ___ Recklessly **X** |
| Schoenholz | Yes **X** No ___ | 2+ Delinquency/Re-Aging **X** <br> Restatement **X** | Knowingly ___ Recklessly **X** <br> Knowingly ___ Recklessly **X** |
| Aldinger | Yes **X** No ___ | 2+ Delinquency/Re-Aging **X** <br> Restatement **X** | Knowingly ___ Recklessly **X** <br> Knowingly ___ Recklessly **X** |

22

**A240**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 23** | | | |
| Household | Yes [X] No ___ | 2+ Delinquency/Re-Aging [X] | Knowingly ___ Recklessly [X] |
| Gilmer | Yes [X] No ___ | 2+ Delinquency/Re-Aging [X] | Knowingly ___ Recklessly [X] |
| Schoenholz | Yes [X] No ___ | 2+ Delinquency/Re-Aging [X] | Knowingly ___ Recklessly [X] |
| Aldinger | Yes [X] No ___ | 2+ Delinquency/Re-Aging [X] | Knowingly ___ Recklessly [X] |

23

**A241**

|  | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
|  | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 24** |  |  |  |
| Household | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

24

**A242**

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 25** | | | |
| Household | Yes___ No **X** | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No **X** | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No **X** | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No **X** | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

25

**A243**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 26** | | | |
| Household | Yes___ No $\times$ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No $\times$ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No $\times$ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No $\times$ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

26

A244

**Statement No. 27**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Household** | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| **Gilmer** | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| **Schoenholz** | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| **Aldinger** | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

27

A245

|  | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 28** | | | |
| Household | Yes X  No ___ | 2+ Delinquency/Re-Aging X | Knowingly ___ Recklessly X |
| Gilmer | Yes X  No ___ | 2+ Delinquency/Re-Aging X | Knowingly ___ Recklessly X |
| Schoenholz | Yes X  No ___ | 2+ Delinquency/Re-Aging X | Knowingly ___ Recklessly X |
| Aldinger | Yes X  No ___ | 2+ Delinquency/Re-Aging X | Knowingly ___ Recklessly X |

28

**A246**

**Statement No. 29**

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement ___ | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X  No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

29

**A247**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 30** | | | |
| Household | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

30

A248

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 31** | | | |
| Household | Yes ___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes ___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes ___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes ___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

31

A249

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 32** | | | |
| Household | Yes ✗  No ___ | 2+ Delinquency/Re-Aging ✗<br>Restatement ✗ | Knowingly ___ Recklessly ✗<br>Knowingly ___ Recklessly ✗ |
| Gilmer | Yes ✗  No ___ | 2+ Delinquency/Re-Aging ✗<br>Restatement ✗ | Knowingly ___ Recklessly ✗<br>Knowingly ___ Recklessly ✗ |
| Schoenholz | Yes ✗  No ___ | 2+ Delinquency/Re-Aging ✗<br>Restatement ✗ | Knowingly ___ Recklessly ✗<br>Knowingly ___ Recklessly ✗ |
| Aldinger | Yes ✗  No ___ | 2+ Delinquency/Re-Aging ✗<br>Restatement ✗ | Knowingly ___ Recklessly ✗<br>Knowingly ___ Recklessly ✗ |

32

**A250**

| | Question No. 1 | Question No. 2 | Question No. 3 |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 33** | | | |
| Household | Yes___ No✗ | Predatory Lending ___ | Knowingly___ Recklessly___ |
| Gilmer | Yes___ No✗ | Predatory Lending ___ | Knowingly___ Recklessly___ |
| Schoenholz | Yes___ No✗ | Predatory Lending ___ | Knowingly___ Recklessly___ |
| Aldinger | Yes___ No✗ | Predatory Lending ___ | Knowingly___ Recklessly___ |

33

**A251**

|  | **Question No. 1** | **Question No. 2** | **Question No. 3** |
|---|---|---|---|
|  | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 34** |  |  |  |
| Household | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

34

**A252**

|  | **Question No. 1** | **Question No. 2** | **Question No. 3** |
|---|---|---|---|
|  | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 35** |  |  |  |
| Household | Yes___  No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___  No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___  No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___  No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

35

**A253**

**Statement No. 36**

| | Question No. 1 — Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | Question No. 2 — If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). (**more than one line can be checked**): | Question No. 3 — For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly (**choose one**) in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| Household | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Gilmer | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |
| Aldinger | Yes X No ___ | Predatory Lending X<br>2+ Delinquency/Re-Aging X<br>Restatement X | Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X<br>Knowingly ___ Recklessly X |

36

A254

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 37** | | | |
| Household | Yes X  No ___ | Predatory Lending X | Knowingly ___ Recklessly X |
| Gilmer | Yes X  No ___ | Predatory Lending X | Knowingly ___ Recklessly X |
| Schoenholz | Yes X  No ___ | Predatory Lending X | Knowingly ___ Recklessly X |
| Aldinger | Yes X  No ___ | Predatory Lending X | Knowingly ___ Recklessly X |

37

**A255**

| | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 38** | | | |
| Household | Yes X No ___ | 2+ Delinquency/Re-Aging X<br><br>Restatement X | Knowingly ___ Recklessly X<br><br>Knowingly ___ Recklessly X |
| Gilmer | Yes X No ___ | 2+ Delinquency/Re-Aging X<br><br>Restatement X | Knowingly ___ Recklessly X<br><br>Knowingly ___ Recklessly X |
| Schoenholz | Yes X No ___ | 2+ Delinquency/Re-Aging X<br><br>Restatement X | Knowingly ___ Recklessly X<br><br>Knowingly ___ Recklessly X |
| Aldinger | Yes X No ___ | 2+ Delinquency/Re-Aging X<br><br>Restatement X | Knowingly ___ Recklessly X<br><br>Knowingly ___ Recklessly X |

38

|  | **Question No. 1**<br><br>Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | **Question No. 2**<br><br>If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked):** | **Question No. 3**<br><br>For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
|---|---|---|---|
| **Statement No. 39** |  |  |  |
| Household | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No _X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

39

**A257**

| | **Question No. 1** | **Question No. 2** | **Question No. 3** |
|---|---|---|---|
| | Have Plaintiffs prevailed on their 10(b)/Rule 10b-5 claim with regard to any of the statements set forth in Table A? | If you answered "yes" for any of the statements in Question No. 1, identify the issue or issues that the statement misrepresented by placing an "X" on the appropriate line(s). **(more than one line can be checked)**: | For each issue identified in Question No. 2, indicate whether the defendant acted knowingly or recklessly **(choose one)** in making the statement about the issue by placing an "X" on the appropriate line. |
| **Statement No. 40** | | | |
| Household | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Gilmer | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Schoenholz | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |
| Aldinger | Yes___ No_X_ | Predatory Lending ___ | Knowingly ___ Recklessly ___ |

40

A258

If you answered "no" for **all** of the statements in Question No. 1, you have finished with the Verdict Form. Please turn to the last page, sign and date the Verdict Form and inform the Court that you have finished.

If you answered "yes" for **any** statement in Question No. 1, please proceed to Question No. 4.

**Question No. 4**

Determine which, if any, of plaintiffs' proposed damages models reasonably estimates plaintiffs' damages **(choose only one option below)**:

Neither of plaintiffs' proposed damages models reasonably estimates plaintiffs' damages ____

Leakage Model (Plaintiffs' Ex. 1395) reasonably estimates plaintiffs' damages __X__

Specific Disclosures Model (Plaintiffs' Ex. 1397) reasonably estimates plaintiffs' damages ____

If you determine that neither of the proposed damages models reasonably estimates plaintiffs' damages, then you have finished with the Verdict Form. Please turn to the last page, sign and date the Verdict Form and inform the Court that you have finished.

Otherwise, write the amount of loss per share, if any, that, according to the model you have chosen, any defendant's conduct caused plaintiffs to suffer on each of the dates set forth in Table B. (If no loss was caused on any date, write "none" or "0.") **You may use only one model – the one you have chosen -- to fill out Table B.**

Then proceed to Question No. 5

41

**A259**

## Question No. 5

If you checked "Knowingly" in Question No. 3 for all 40 alleged false or misleading statements, please proceed to Question No. 6.

If you checked "Recklessly" in Question No. 3 for any of the 40 alleged false or misleading statements, you must determine what percentage of responsibility, if any, for any loss plaintiffs suffered is due to the conduct of Defendants Household, William Aldinger, David Schoenholz, and Gary Gilmer. In making this determination, you should consider the nature of the conduct of each person found to have caused or contributed to plaintiffs' loss and the nature and extent of the causal relationship between each such person's conduct and plaintiffs' loss.

| | |
|---|---|
| Household | 55 % |
| William Aldinger | 20 % |
| David Schoenholz | 15 % |
| Gary Gilmer | 10 % |
| TOTAL | (This must equal 100%) |

Please proceed to Question No. 6.

42

**A260**

**Question No. 6**

With respect to the Section 20(a) claim, have plaintiffs proved that Defendant William Aldinger is a controlling person as to:

Household:           Yes X      No ___
David Schoenholz:    Yes X      No ___
Gary Gilmer:         Yes X      No ___

Please proceed to Question No. 7.

**Question No. 7**

With respect to the Section 20(a) claim, have plaintiffs proved that Defendant David Schoenholz is a controlling person as to:

Household:           Yes X      No ___
William Aldinger:    Yes X      No ___
Gary Gilmer:         Yes X      No ___

Please proceed to Question No. 8.

**Question No. 8**

With respect to the Section 20(a) claim, have plaintiffs proved that Defendant Gary Gilmer is a controlling person as to:

Household:           Yes ___    No X
William Aldinger:    Yes ___    No X
David Schoenholz:    Yes ___    No X

43

A261

**TABLE A**
**ALLEGED FALSE OR MISLEADING**
**STATEMENTS**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 1. | 08/16/1999 | Household 10-Q<br><br>Defendants'<br>Exhibit 854 | Household 10-Q for quarter ending 6/30/99. Household reported net income of $326.9 million for the quarter ended June 30, 1999 and EPS of $0.67 [HHT 0015884]:<br><br>Delinquency<br>Two-Months-and-Over Contractual Managed Delinquency (as a percent of managed consumer receivables):<br><br>                    6/30/99  3/31/99  12/31/98  9/30/98  6/30/98<br>First mortgage     12.72%  10.91%  14.90%  11.80%  11.07%<br>Home equity       3.29    3.54    3.67     3.73   3.55<br>Auto finance       1.87    1.74    2.29     2.05   1.67<br>MasterCard/Visa   3.11    3.61    3.75     3.73   3.30<br>Private label       6.62    6.37    6.20     6.55   6.10<br>Other unsecured   8.17    7.84    7.94     8.03   7.82<br>Total            4.72%  4.81%  4.90%   4.96%  4.65%<br>          [HHT0015902]<br><br>                          *     *     *<br><br>"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.96 percent, compared with 5.04 percent at March 31, 1999 and 4.89 percent at June 30, 1998. The annualized total consumer owned chargeoff ratio in the second quarter of 1999 was 3.54 percent, compared with 3.92 percent in the prior quarter and 3.69 percent in the year-ago quarter. Managed consumer two-months-and-over contractual delinquency ("delinquency") as a percent of managed consumer receivables was 4.72 percent, compared with 4.81 percent at March 31, 1999 and 4.65 percent at June 30, 1998. The annualized total consumer managed chargeoff ratio in the second quarter of 1999 was 4.10 percent, compared with 4.37 percent in the prior quarter and 4.26 percent in the year-ago quarter."  [HHT0015897] |

1

A262

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 2. | 10/19/1999 | Household Press Release<br><br>Plaintiffs' Exhibit 506 | October 19, 1999 Household Press Release entitled "Household International Reports Highest Quarterly Earnings in Company's History": Household "reported that third quarter net income rose 26 percent to a record $399.9 million, compared with $318.0 million a year ago. Earnings per share increased 32 percent to a record $.83, from $.63 a year ago." [HHS 02914429]<br><br>* * *<br><br>"Our quarter reflects excellent performance in all of our businesses, with the key drivers being accelerating internal receivable and revenue growth." [HHS 02914429]<br><br>* * *<br><br>"Credit Quality and Loss Reserves<br><br>Credit quality remained stable in the quarter and improved from a year ago. The annualized managed net chargeoff ratio for the third quarter was 4.09 percent, compared with 4.10 percent in the second quarter and 4.33 percent in the year-ago quarter. The managed delinquency ratio (60+ days) was 4.89 percent at September 30, compared with 4.72 percent at June 30 and 4.96 percent a year ago." [HHS 02914430] |
| 3. | 11/12/1999 | Household 10-Q<br><br>Plaintiffs' Exhibit 736 | Household 10-Q for quarter ending 9/30/99: Household reported net income of $399.9 million for the quarter ended September 30, 1999 and EPS of $0.84: [HHS 03138203]<br><br>"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 5.24 percent at September 30, 1999, compared with 4.96 percent at June 30, 1999 and 5.23 percent at September 30, 1998. The annualized total consumer owned chargeoff ratio was 3.63 percent in the third quarter of 1999, compared with 3.54 percent in the prior quarter and 3.79 percent in the year-ago quarter.<br><br>Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.89 percent at September 30, 1999, compared with 4.72 percent at June 30, 1999 and 4.96 percent at September 30, 1998. The annualized total consumer managed chargeoff ratio was 4.09 percent in the third quarter of 1999, compared with 4.10 percent in the prior quarter and 4.33 percent in the year-ago quarter." [HHS 03138217] |

2

**A263**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | Delinquency<br>Two-Months-and-Over Contractual Managed Delinquency (as a percent of managed consumer receivables): |
| | | | |

|  | 9/30/99 | 6/30/99 | 3/31/99 | 12/31/98 | 9/30/98 |
|---|---|---|---|---|---|
| First mortgage | 12.56% | 12.72% | 10.91% | 14.90% | 11.80% |
| Home equity | 3.46 | 3.29 | 3.54 | 3.67 | 3.73 |
| Auto finance | 2.26 | 1.87 | 1.74 | 2.29 | 2.05 |
| MasterCard/Visa | 3.10 | 3.11 | 3.61 | 3.75 | 3.73 |
| Private label | 6.66 | 6.62 | 6.37 | 6.20 | 6.55 |
| Other unsecured | 8.57 | 8.17 | 7.84 | 7.94 | 8.03 |
| Total | 4.89% | 4.72% | 4.81% | 4.90% | 4.96% |

[HHS 03138224]

"Credit quality remained relatively stable in the quarter and improved from a year ago. The modest increase in managed delinquency as a percent of managed consumer receivables from the prior quarter was due to the seasoning of our Beneficial home equity and other unsecured products." [HHS 03138224]

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 4. | 01/19/2000 | Household Press Release<br><br>Plaintiffs' Exhibit 746 | January 19, 2000 Household Press Release entitled "Household International Reports Best Quarter and Year in Its History". Household "reported that fourth quarter earnings per share increased 30 percent to a record $.92 from $.71 a year ago. Fourth quarter net income rose 25 percent to a record $438.8 million, compared with $349.9 million a year ago. For the full year, Household reported record earnings per share of $3.07, which was 33 percent over 1998 operating earnings per share. Net income totaled $1.5 billion, or 29 percent above the prior year's operating net income." [HHS 03148802]<br><br>"We are very pleased to report another record quarter, the culmination of an absolutely outstanding year for Household. Growth and profitability in the quarter were excellent and exceeded our expectations. Revenues were particularly strong. . . . Our record earnings reflect an outstanding year in our consumer finance business, a dramatic turnaround in our MasterCard/Visa business, and strong results in all of our other businesses. We are particularly pleased with excellent receivable |

3

A264

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | growth in 1999, particularly in our branches, while fully realizing all of the acquisition synergies of the Beneficial merger." [HHS 03148802]<br><br>*    *    *<br><br>"Credit Quality and Loss Reserves<br>Credit quality improved from both the third quarter and a year ago. The annualized net chargeoff ratio for the fourth quarter fell 13 basis points to 3.96 percent, the lowest level since 1997. The chargeoff ratio was 4.09 percent in the third quarter and 4.39 percent in the year-ago quarter. The managed delinquency ratio (60+days) improved 23 basis points to 4.66 percent at December 31, compared with 4.89 percent at September 30 and 4.90 percent a year ago." [HHS 03148804 |
| 5. | 03/28/2000 | Household FY99 Report on Form 10-K<br><br>Plaintiffs' Exhibit 1462 | Household FY99 Report on Form 10-K filed with the SEC on March 28, 2000 Household reported net income of 1.486 billion and E.P.S. of $3.10 [p.127]:<br><br>*    *    *<br><br>"Delinquency and Chargeoffs. Our delinquency and net chargeoff ratios reflect, among other factors, the quality of receivables, the average age of our loans, the success of our collection efforts and general economic conditions. . . .<br>We track delinquency and chargeoff levels on an owned and a managed basis. We apply the same credit and portfolio management procedures to both our owned and off-balance sheet portfolios. Our focus is to use risk-based pricing and effective collection efforts for each loan. We have a process which we believe gives us a reasonable basis for predicting the asset quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers is helpful in managing net credit losses." [p.98]<br><br>*    *    *<br><br>Managed Two-Month-and-Over Contractual Delinquency Ratios<br>[p.115]<br><br>|  | 1999 | 1998 | 1997 | 1996 | 1995 |<br>Home equity | 3.27% | 3.67% | 3.69% | 3.04% | 2.76%<br>Auto finance/1/ | 2.43 | 2.29 | 2.09 | – | –<br>MasterCard/Visa | 2.78 | 3.75 | 3.10 | 2.73 | 2.19<br>Private label | 5.97 | 6.20 | 5.81 | 4.60 | 3.93<br>Other unsecured | 8.81 | 7.94 | 7.81 | 6.21 | 5.68<br>Total consumer | 4.66% | 4.90% | 4.64% | 3.92% | 3.36% |

4

**A265**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | **Ratio of Net Chargeoffs to Average Managed Receivables for the Year** |
| | | | |

| | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|
| Home equity | 0.58% | 0.63% | 0.64% | 0.60% | 0.64% |
| Auto finance /1/ | 4.96 | 5.39 | 4.60 | — | — |
| MasterCard/Visa | 6.66 | 5.95 | 5.55 | 4.54 | 4.12 |
| Private label | 5.65 | 5.65 | 4.62 | 3.42 | 3.75 |
| Other unsecured | 6.52 | 6.97 | 5.48 | 4.29 | 3.60 |
| Total Consumer loan products | 4.13 | 4.29 | 3.84 | 2.96 | 2.51 |
| Commercial | 0.93 | 0.52 | 1.66 | 0.92 | 2.10 |
| Total | 4.09% | 4.24 | 3.80% | 2.92% | 2.49% |

[p.115]

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 6. | 04/19/2000 | Household Press Release<br><br>Plaintiffs' Exhibit 453 | April 19, 2000 Household Press Release entitled "Household International Reports Record First Quarter Results". Household "reported that earnings per share rose 20 percent to a first quarter record of $.78, from $.65 a year ago. Net income increased to $372.9 million, up 16 percent from $320.8 million in the first quarter of 1999." [HHS 02902345]<br><br>"This was the strongest first quarter in our company's history, with all of our businesses performing well. Revenue and receivable growth were strong, and credit quality continued to improve." [HHS 02902345]<br><br>"Credit Quality and Loss Reserves<br>At March 31, the managed delinquency ratio (60+days) declined to 4.43 percent, from 4.66 percent at December 31 and 4.81 percent a year ago. Dollars of delinquency were flat with year-end 1999. The annualized managed net chargeoff ratio for the first quarter was 4.00 percent compared to 3.96 percent in the prior quarter and improved 37 basis points from the year-ago quarter." [HHS 02902346] |

5

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 7. | 05/10/2000 | Household 10-Q<br><br>**Plaintiffs'**<br>Exhibit 735 | Household 10-Q for 3/31/00 quarter ending: Household reported net income of $372.9 million for the quarter ended March 30, 2000 and EPS of $0.79 per share [HHS 03138125]:<br><br>CREDIT QUALITY<br>We track delinquency and chargeoff levels on a managed basis and we apply the same credit and portfolio management procedures as on our owned portfolio. [HHS 03138142]<br>Delinquency<br>Two-Months-and-Over Contractual Managed Delinquency (as a percent of managed consumer receivables):<br><br>|  | 3/31/00 | 12/31/99 | 9/30/99 | 6/30/99 | 3/31/99 |<br>| Managed: |  |  |  |  |  |<br>| Real estate secured | 2.99% | 3.27% | 3.46% | 3.29% | 3.54% |<br>| Auto finance | 1.52 | 2.43 | 2.26 | 1.87 | 1.74 |<br>| MasterCard/Visa | 3.06 | 2.78 | 3.10 | 3.11 | 3.61 |<br>| Private label | 5.94 | 5.97 | 6.66 | 6.62 | 6.37 |<br>| Other unsecured | 8.56 | 8.81 | 8.57 | 8.17 | 7.84 |<br>| Total | 4.43% | 4.66% | 4.89% | 4.72% | 4.81% |<br>| Owned | 4.58% | 4.81% | 5.24% | 4.96% | 5.04% |<br><br>[HHS 03138142]<br><br>"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.58 percent at March 31, 2000, compared with 4.81 percent at December 31, 1999 and 5.04 percent at March 31, 1999. The annualized consumer owned chargeoff ratio was 3.53 percent in the first quarter of 2000, compared with 3.62 percent in the prior quarter and 3.92 percent in the year-ago quarter. [HHS 03138137]<br><br>Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.43 percent at March 31, 2000, compared with 4.66 percent at December 31, 1999 and 4.81 percent at March 31, 1999. The annualized total consumer managed chargeoff ratio was 4.00 percent in the first quarter of 2000, compared with 3.96 percent in the prior quarter and 4.37 percent in the year-ago quarter." [HHS 03138137] |

6

**A267**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 8. | 07/19/2000 | Household Press Release<br><br>Plaintiffs' Exhibit 884 | July 19, 2000 Household Press Release entitled "Household International Reports Record Strongest Second Quarter in Its History". Household "reported that earnings per share rose to a second quarter record $.80, up 19 percent from $.67 a year ago. Net income increased 17 percent to $383.9 million, from $326.9 million in the second quarter of 1999.... The company's managed receivables portfolio grew 22 percent from a year ago, reaching almost $80 billion. The company added $4.5 billion of receivables in the quarter, an increase of 6 percent. Revenues rose 20 percent compared to the year-ago quarter." [HHS 03407363]<br><br>    *     *     *<br><br>"Credit Quality and Loss Reserves<br>Credit quality improved dramatically during the quarter, as dollars of chargeoff and delinquency declined from first quarter levels. At June 30, the managed delinquency ratio (60+days) improved for the third consecutive quarter, to 4.16 percent. This represented a 27 basis-point improvement from the first quarter and a 56 basis-point improvement from a year ago. The annualized managed net chargeoff ratio for the second quarter feel 26 basis points sequentially, to 3.74 percent. The chargeoff ratio was 4.10 percent a year ago." [HHS 03407364] |

7

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 9. | 08/11/2000 | Household 10-Q<br><br>Plaintiffs' Exhibit 404 | Household 10-Q for 6/30/00 quarter ending: Household reported net income of $383.9 million for the quarter ended June 30, 2000 and EPS of $0.80:<br><br>CREDIT QUALITY<br>We track delinquency and chargeoff levels on a managed basis and we apply the same credit and portfolio management procedures as on our owned portfolio. [HHS 02879712]<br>Delinquency<br>Two-Months-and-Over Contractual Managed Delinquency (as a percent of managed consumer receivables) [HHS 02879713]: (see table below) |

|  | 6/30/00 | 3/31/00 | 12/31/99 | 9/30/99 | 6/30/99 |
|---|---|---|---|---|---|
| Managed: |  |  |  |  |  |
| Real estate secured | 2.72% | 2.99% | 3.27% | 3.46% | 3.29% |
| Auto finance | 1.99 | 1.52 | 2.43 | 2.26 | 1.87 |
| MasterCard/Visa | 3.14 | 3.06 | 2.78 | 3.10 | 3.11 |
| Private label | 5.77 | 5.94 | 5.97 | 6.66 | 6.62 |
| Other unsecured | 7.92 | 8.56 | 8.81 | 8.57 | 8.17 |
| Total | 4.16% | 4.43% | 4.66% | 4.89% | 4.72% |
| Owned | 4.25% | 4.58% | 4.81% | 5.24% | 4.96% |

[HHS 02879693]

*        *        *

"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.25 percent, compared with 4.58 percent at March 31, 2000 and 4.96 percent at June 30, 1999. The annualized total consumer owned chargeoff ratio in the second quarter of 2000 was 3.27 percent, compared with 3.53 percent in the prior quarter and 3.54 percent in the year-ago quarter. [HHS 02879706]

Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.16 percent, compared with 4.43 percent at March 31, 2000 and 4.72 percent at June 30, 1999. The annualized total consumer managed chargeoff ratio in the second quarter of 2000 was 3.74 percent, compared with 4.00 percent in the prior quarter and 4.10 percent in the year-ago quarter." [HHS 02879706]

8

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 10. | 10/18/2000 | Household Press Release<br><br>Plaintiffs' Exhibit 505 | October 18, 2000 Household Press Release entitled "Household International Reports Highest Quarterly EPS in Its History; Ninth Consecutive Record Quarter": Household reported that "third quarter earnings per share rose 13 percent to $.94, compared to $.83 a year ago. Net income also rose to a third quarter record of $451.2 million, a 13 percent increase from $399.9 million a year ago." [HHS 02914234]<br><br>"Our strong third quarter results reflect a continuation of outstanding receivables and revenue growth. At the same time, we achieved year-over-year improvements in credit quality." [HHS 02914234]<br><br>*     *     *<br><br>*     *     *<br><br>"Credit Quality and Loss Reserves<br>The annualized managed net chargeoff ratio for the third quarter improved for a second consecutive quarter, to 3.74 percent in the second quarter. The third quarter chargeoff also fell for the second consecutive quarter. The third quarter chargeoff ratio dropped 62 basis points from the level of a year ago, with improvement across all products. At September 30, the managed delinquency ratio (60+days) was 4.21 percent, compared with 4.16 percent in the second quarter and significantly below the year-ago level of 4.89 percent." [HHS 02914235] |
| 11. | 11/01/2000 | *St. Louis Dispatch* article<br><br>Plaintiffs' Exhibit 824 | "Streem says HFC never pressures people to buy credit life insurance." [HHS 03238043] |

9

**A270**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 12. | 11/14/2000 | Household 10-Q<br><br>Defendants' Exhibit 858 | Household 10-Q for quarter ending 9/30/2000: "Household reported net income of $451.2 million for the quarter ended September 30, 2000 and EPS of $0.95 [HHT 0015984]:<br><br>**CREDIT QUALITY**<br>We track delinquency and chargeoff levels on a managed basis and we apply the same credit and portfolio management procedures as on our owned portfolio.<br><br>**Delinquency**<br>Two-Months-and-Over Contractual Managed Delinquency (as a percent of managed consumer receivables):<br><br>|  | September 30, 2000 | June 30, 2000 | March 31, 2000 | December 31, 1999 | September 30, 1999 |<br>|---|---|---|---|---|---|<br>| Managed: |  |  |  |  |  |<br>| Real estate secured | 2.77% | 2.72% | 2.99% | 3.27% | 3.46% |<br>| Auto finance | 2.19 | 1.99 | 1.52 | 2.43 | 2.26 |<br>| MasterCard/Visa | 3.48 | 3.14 | 3.06 | 2.78 | 3.10 |<br>| Private label | 5.67 | 5.77 | 5.94 | 5.97 | 6.66 |<br>| Other unsecured | 7.72 | 7.92 | 8.56 | 8.81 | 8.57 |<br>| Total Managed | 4.21% | 4.16% | 4.43% | 4.66% | 4.89% |<br>| Owned | 4.29% | 4.25% | 4.58% | 4.81% | 5.24% |<br><br>[HHT 0015998]<br><br>* * *<br><br>"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.29 percent, compared with 4.25 percent at June 30, 2000 and 5.24 percent at September 30, 1999. The annualized consumer owned chargeoff ratio in the third quarter of 2000 was 3.01 percent, compared with 3.27 percent in the prior quarter and 3.63 percent in the year-ago quarter.<br><br>Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.21 percent at September 30, 2000, compared with 4.16 percent at June 30, 2000 and 4.89 percent at September 30, 1999. The annualized total consumer managed chargeoff ratio in the third quarter of 2000 was 3.47 percent, compared with 3.74 percent in the prior quarter and 4.09 percent in the year-ago quarter." [HHT 0015994] |

10

**A271**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 13. | 01/17/2001 | Household Press Release<br><br>Plaintiffs' Exhibit 491 | January 17, 2001 Household Press Release entitled "Household International Reports Highest Full Year and Quarterly EPS in Its History; Tenth Consecutive Record Quarter". Household reported full year earnings per share of $3.55, a 16 percent increase over $3.07 a year ago and the highest earnings per share in the company's 122-year history. Net income totaled $1.7 billion, or 14 percent above the prior year. Net managed revenues for the full year increased 18 percent to $8.9 billion, compared to $7.5 billion in 1999. Household's fourth quarter earnings per share rose 12 percent to a record $1.03, from $.92 a year ago. Fourth quarter net income rose 12 percent to an all-time high of $492.7 million, compared with $438.8 million a year ago."<br><br>"These strong fourth quarter results cap off a terrific year in which we delivered on all or our earnings and growth goals.... Growth and profitability in the quarter were excellent, while credit quality and our balance sheet remained strong.... Our record earnings per share reflect strong top-line growth and improved credit quality."  [HHS 02912516]<br><br>*     *     *<br><br>"Credit Quality and Loss Reserves<br>The fourth quarter annualized managed net chargeoff ratio improved for the third consecutive quarter to 3.41 percent from 3.47 percent in the third quarter. The fourth quarter chargeoff ratio was 55 basis points lower than a year ago and reached its lowest level since the fourth quarter of 1996. The managed delinquency ratio (60+days) at December 31, 2000 was 4.20 percent, stable with 4.21 percent in the third quarter and 46 basis points better than a year ago."  [HHS 02912517] |
| 14. | 03/23/2001 | *Origination News* article<br><br>Plaintiffs' Exhibit 1307 | *Origination News* – March 23, 2001: "Gary Giltner, president and chief executive of Household's subsidiaries HFC and Beneficial said the company's 'position on predatory lending is perfectly clear. Unethical lending practices of any type are abhorrent to our company, our employees and most importantly our customers.'"  [TEL 002334] |

11

A272

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 15. | 03/28/2001 | Household FY00 Report on Form 10-K<br><br>Defendants' Exhibit 851 | Household FY00 Report on Form 10-K filed with the SEC on March 28, 2001 Household reported net income of 1.7 billion and E.P.S. of $3.55 [HHT 0015623]:<br><br>* * *<br><br>"Our focus is to use risk-based pricing and effective collection efforts for each loan. We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers is helpful in managing net credit losses."  [HHT 0015608]<br><br>* * *<br><br>"Delinquency and Chargeoffs: Our delinquency and net chargeoff ratios reflect, among other factors, changes in the mix of loans in our portfolio, the quality of loans in our portfolio, the average age of our loans, the success of our collection efforts and general economic conditions." . . .<br><br>We track delinquency and chargeoff levels on both an owned and a managed basis. We apply the same credit and portfolio management procedures to both our owned and off-balance sheet portfolios. Our focus is to use risk-based pricing and effective collection efforts for each loan. We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers is helpful in managing net credit losses."  [HHT 0015609]<br><br>* * * |

CONSUMER TWO-MONTH-AND-OVER CONTRACTUAL DELINQUENCY RATIOS

| | 2000 Quarter End | | | | 1999 Quarter End | | | |
|---|---|---|---|---|---|---|---|---|
| | 4 | 3 | 2 | 1 | 4 | 3 | 2 | 1 |
| **Managed:** | | | | | | | | |
| Real estate secured | 2.63% | 2.77% | 2.72% | 2.99% | 3.27% | 3.46% | 3.29% | 3.54% |
| Auto finance | 2.55 | 2.19 | 1.99 | 1.52 | 2.43 | 2.26 | 1.87 | 1.74 |
| MasterCard/Visa | 3.49 | 3.48 | 3.14 | 3.06 | 2.78 | 3.10 | 3.11 | 3.61 |
| Private label | 5.48 | 5.67 | 5.77 | 5.94 | 5.97 | 6.66 | 6.62 | 6.37 |
| Other unsecured | 7.97 | 7.72 | 7.92 | 8.56 | 8.81 | 8.57 | 8.17 | 7.84 |
| Total Managed | 4.20% | 4.21% | 4.16% | 4.43% | 4.66% | 4.89% | 4.72% | 4.81% |
| Total Owned | 4.26% | 4.29% | 4.25% | 4.58% | 4.81% | 5.24% | 4.96% | 5.04% |

[HHT 0015609]

12

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 16. | 04/18/2001 | Household Press Release<br><br>Plaintiffs' Exhibit 504 | April 18, 2001 Household Press Release entitled "Household International Reports First Quarter Results; 11th Consecutive Record Quarter". Household "reported that earnings per share rose 17 percent to a first quarter record of $.91 from $.78 a year ago. Net income increased to $431.8 million, up 16 percent from $372.9 million in the first quarter of 2000. This quarter marked the 11th consecutive quarter of record results." [HHS 02914121]<br><br>* * *<br><br>"Credit Quality and Loss Reserves<br>At March 31, the managed delinquency ratio (60+days) was 4.25 percent, compared to 4.43 percent a year ago and 4.20 percent at December 31, 2000. The annualized managed net chargeoff ratio for the first quarter was 3.56 percent, a 44 basis points improvement from the year-ago quarter and up modestly from 3.41 percent in the prior quarter." [HHS 02914123] |
| 17. | 05/09/2001 | Household 10-Q<br><br>Plaintiffs' Exhibit 733 | Household 10-Q for 3/31/01 quarter ended: Household reported net income of $431.8 million for the quarter ended March 31, 2001 and EPS of $0.92 [HHS 0313791]:<br><br>CREDIT QUALITY<br>We track delinquency and chargeoff levels on a managed basis and we apply the same credit and portfolio management procedures as on our owned portfolio.<br><br>Delinquency<br>Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables): |

| | March 31, 2001 | December 31, 2000 | September 30, 2000 | June 30, 2000 | March 31, 2000 |
|---|---|---|---|---|---|
| **Managed:** | | | | | |
| Real estate secured | 2.61% | 2.63% | 2.77% | 2.72% | 2.99% |
| Auto finance | 1.79 | 2.55 | 2.19 | 1.99 | 1.52 |
| MasterCard/Visa | 3.68 | 3.49 | 3.48 | 3.14 | 3.06 |
| Private label | 5.50 | 5.48 | 5.67 | 5.77 | 5.94 |
| Other unsecured | 8.37 | 7.97 | 7.72 | 7.92 | 8.56 |
| Total managed | 4.25% | 4.20% | 4.21% | 4.16% | 4.43% |
| Owned | 4.36% | 4.26% | 4.29% | 4.25% | 4.58% |

[HHS 03137930]

13

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | *    *    * |
| | | | "Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.36 percent at March 31, 2001, compared with 4.26 percent at December 31, 2000 and 4.58 percent at March 31, 2000. The annualized consumer owned chargeoff ratio in the first quarter of 2001 was 3.12 percent, compared with 2.98 percent in the prior quarter and 3.53 percent in the year-ago quarter. |
| | | | Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.25 percent at March 31, 2001, compared with 4.20 percent at December 31, 2000 and 4.43 percent at March 31, 2000. The annualized consumer managed chargeoff ratio in the first quarter of 2001 was 3.56 percent, compared with 3.41 percent in the prior quarter and 4.00 percent in the year-ago quarter." [HHS 03137924] |
| 18. | 07/18/2001 | Household Press Release<br><br>Plaintiffs' Exhibit 503 | July 18, 2001 Household Press Release entitled "Household International Reports Second Quarter Results; 12th Consecutive Record Quarter": Household "reported record earnings per share of $.93, up 16 percent from a year ago. Net income rose 14 percent, to $439.0 million, from $383.9 million for the second quarter of 2000." . . . <br><br>"We had a terrific quarter – our 12th consecutive quarter of record results.  Given the softening economic environment, I am particularly pleased with our ability to consistently deliver strong, quality earnings.  Results for the quarter were excellent. . . .  We enjoyed strong receivable and revenue growth compared to a year ago, with all of our businesses performing well.  In addition, delinquency was stable in the quarter." [HHS 02914097]<br><br>"Credit Quality and Loss Reserves<br>At June 30th, the managed delinquency ratio (60+days) was 4.27 percent, stable with 4.25 percent in the first quarter.  The managed delinquency ratio a year ago was 4.16 percent.  The annualized managed net chargeoff ratio for the second quarter was 3.71 percent, essentially unchanged from the year-ago quarter and up modestly from 3.56 percent in the first quarter." [HHS 02914098] |

14

A275

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 19. | 07/27/2001 | *Star Tribune* article<br><br>Plaintiffs' Exhibit 1451 | *Star Tribune* – July 27, 2001: "Megan Hayden, a Household spokeswoman, said that terms of loans are disclosed to all customers, as required by state and federal laws. 'Frankly, you don't stay in business in this industry by taking advantage of your customers,' she said. 'So I take exception to any characterization that we engaged in predatory lending practices.'" |
| 20. | 08/10/2001 | Household 10-Q<br><br>Plaintiffs' Exhibit 6 | Household 10-Q for 6/30/01 quarter ended: Household reported net income of $439 million for the quarter ended June 30, 2001 and EPS of $0.94 [AA 062721]:<br><br>CREDIT QUALITY<br>We track delinquency and chargeoff levels on a managed basis and we apply the same credit and portfolio management procedures as on our owned portfolio.<br>[AA 062738]<br>Delinquency<br>Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables): |

Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables):

| | June 30, 2001 | March 31, 2001 | December 31, 2000 | September 30, 2000 | June 30, 2000 |
|---|---|---|---|---|---|
| Managed: | | | | | |
| Real estate secured | 2.63% | 2.61% | 2.63% | 2.77% | 2.72% |
| Auto finance | 2.09 | 1.79 | 2.55 | 2.19 | 1.99 |
| MasterCard/Visa | 3.60 | 3.68 | 3.49 | 3.48 | 3.14 |
| Private label | 5.66 | 5.50 | 5.48 | 5.67 | 5.77 |
| Other unsecured | 8.43 | 8.37 | 7.97 | 7.72 | 7.92 |
| Total managed | 4.27% | 4.25% | 4.20% | 4.21% | 4.16% |
| Owned | 4.48% | 4.36% | 4.26% | 4.29% | 4.25% |

[AA 062739]

* * * *

"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.48 percent at June 30, 2001, compared with 4.36 percent at March 31, 2001 and 4.25 percent at June 30, 2000. The annualized consumer owned chargeoff ratio in the second quarter of 2001 was 3.26 percent, compared with 3.12 percent in the prior quarter and 3.27 percent in the year-ago quarter.

15

A276

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.27 percent at June 30, 2001, compared with 4.25 percent at March 31, 2001 and 4.16 percent at June 30, 2000. The annualized consumer managed chargeoff ratio in the second quarter of 2001 was 3.71 percent, compared with 3.56 percent in the prior quarter and 3.74 percent in the year-ago quarter." [AA 062733] |
| 21. | 10/17/2001 | Household Press Release

Plaintiffs' Exhibit 978 | October 17, 2001 Household Press Release entitled "Household Reports Highest Quarterly Net Income in Its 123-Year History". Household "reported earnings per share of $1.07 rose 14 percent from $.94 the prior year. Net income increased 12 percent, to $504 million, from $451 million in the third quarter of 2000." [HHS 03453676]

"Credit Quality and Loss Reserves
At September 30th, the managed delinquency ratio (60+ days) was 4.43 percent, compared to 4.27 percent in the second quarter and 4.21 percent a year ago. The sequential increase was across all products and was well within company expectations. The annualized managed net chargeoff ratio for the third quarter was 3.74 percent, up slightly from 3.71 percent in the second quarter. The managed net chargeoff ratio was 3.47 percent in the prior-year quarter." [HHS 03453677] |

16

A277

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 22. | 11/14/2001 | Household 10-Q<br><br>Plaintiffs' Exhibit 707 | Household 10-Q for quarter ended 9/30/01: Household reported net income of $503.8 million for the quarter ended September 30, 2001 and EPS of $1.09 [HHS 03111409]:<br><br>**CREDIT QUALITY**<br>We track delinquency and chargeoff levels on a managed basis and we apply the same credit and portfolio management procedures as on our owned portfolio.<br>[HHS 03111425]<br><br>Delinquency<br>Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables): |

Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables):

|  | September 30, 2001 | June 30, 2001 | March 31, 2001 | December 30, 2000 | September 30, 2000 |
|---|---|---|---|---|---|
| Managed: |  |  |  |  |  |
| Real estate secured | 2.74% | 2.63% | 2.61% | 2.63% | 2.77% |
| Auto finance | 2.54 | 2.09 | 1.79 | 2.55 | 2.19 |
| MasterCard/Visa | 3.91 | 3.60 | 3.68 | 3.49 | 3.48 |
| Private label | 5.88 | 5.66 | 5.50 | 5.48 | 5.67 |
| Other unsecured | 8.51 | 8.43 | 8.37 | 7.97 | 7.72 |
| Total managed | 4.43% | 4.27% | 4.25% | 4.20% | 4.21% |
| Owned | 4.58% | 4.48% | 4.36% | 4.26% | 4.29% |

[HHS 03111426]

*    *    *

*    *    *

"Owned consumer two-months-and-over contractual delinquency as a percent of owned consumer receivables was 4.58 percent at September 30, 2001, compared with 4.48 percent at June 30, 2001 and 4.29 percent at September 30, 2000. The annualized total consumer owned chargeoff ratio in the third quarter of 2001 was 3.43 percent, compared with 3.26 percent in the prior quarter and 3.01 percent in the year-ago quarter.

Managed consumer two-months-and-over contractual delinquency as a percent of managed consumer receivables was 4.43 percent at September 30, 2001, compared with 4.27 percent at June 30, 2001 and 4.21 percent at September 31, 2000. The annualized total consumer managed chargeoff ratio in the third quarter of 2001 was 3.74 percent, compared with 3.71 percent in the prior quarter and 3.47 percent in the year-ago quarter." [HHS 03111420]

17

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | *                 *                 *                 *<br><br>"Managed delinquency as a percent of managed consumer receivables increased modestly over both the previous and prior-year quarters. Compared to the previous quarter, all products reported higher delinquencies principally as the result of a weakening economy." [HHS 03111426] |
| 23. | 12/04/2001 | Goldman Sachs Presentation<br><br>Plaintiffs' Exhibit 1248 | December 4, 2001 Goldman Sachs Presentation: defendants made false statements regarding Household's accounting practices, including reaging and restructuring.<br><br>*                 *                 *<br><br>"Charge off policies are appropriate for our target market and result in proper loss recognition" (PFG000158)<br><br>"All policies have been consistently applied and realistically report results" (PFG000158)<br><br>"Why are Household's Credit Losses Better"<br>– better credit skills (PFG000152) |
| 24. | 01/16/2002 | Household Press Release<br><br>Plaintiffs' Exhibit 706 | January 16, 2002 Household Press Release entitled "Household Reports Record Quarterly and Full-Year Net Income": Household "reported fourth quarter earnings per share of $1.17, its fourteenth consecutive record quarter. Fourth quarter earnings per share rose 14 percent from $1.03 the prior year. Net income in the fourth quarter increased 11 percent, to an all-time quarterly record of $549 million. For the full year, Household reported earnings per share of $4.08, representing a 15 percent increase from $3.55 in 2000. Net income for 2001 totaled $1.9 billion, also an all-time high, 13 percent above $1.7 billion earned in 2000."<br><br>"Household's fourth quarter results were simply outstanding . . . demonstrating the tremendous strength and earnings power of the Household franchise. Receivable and revenue growth exceeded our expectations while credit indicators weakened only modestly in a tough economic environment. . . . In 2001, we demonstrated that our business model generates superior results in a weak economy as well as in the strong economic periods of previous years. Exceptional revenue growth of 18 percent more than offset the increases in credit losses during the year." [HHS 03110403 – HHS 03110404] |

18

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | "Credit Quality and Loss Reserves<br>At December 31st, the managed delinquency ratio (60+days) was 4.46 percent, up 3 basis points from 4.43 percent in the third quarter. The managed delinquency ratio was 4.20 percent a year ago. The annualized managed net chargeoff ratio for the fourth quarter was 3.90 percent, up 16 basis points from 3.74 percent in the third quarter. The managed net chargeoff ratio in the year-ago quarter was 3.41 percent." [HHS 03110405] |
| 25. | 02/06/2002 | *Copley News Services* article<br><br>Plaintiffs' Exhibit 1442 | *Copley News Services* – February 6, 2002: "You simply cannot stay in business for 125 years by misleading your borrowers . . . . We do the right thing for our borrowers. We make good loans that not only are legal loans, but are beneficial for our customers." [p.1] |
| 26. | 02/18/2002 | *National Mortgage News* article<br><br>Plaintiffs' Exhibit 1291 | *National Mortgage News* – February 18, 2002:<br><br>"Our first take on [the allegations of predatory lending raised in the ACORN action] is that it is not a significant issue, not indicative of any widespread problem and certainly not a concern that it will spread elsewhere." [TEL 002227] |
| 27. | 03/13/2002 | Household FY01 Report on Form 10-K<br><br>Defendants' Exhibit 852 | Household FY01 Report on Form 10-K filed with the SEC on March 13, 2002 Household reported Net Income of $1.923 billion in 2001, and E.P.S. of $4.13 [HHT 0015815 – HHT 0015816]:<br><br>Household International, Inc. and Subsidiaries<br>CREDIT QUALITY STATISTICS – OWNED BASIS<br>All dollar amounts are stated in millions.<br>At December 31, unless otherwise indicated.<br>Owned Two-Month-and-Over Contractual Delinquency Ratios |

| | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| Real estate secured | 2.63% | 2.58% | 3.10% | 3.95% | 3.66% |
| Auto finance | 2.92 | 2.46 | 2.02 | 2.90 | 1.48 |
| MasterCard/Visa | 5.67 | 4.90 | 3.59 | 5.09 | 3.55 |
| Private label | 5.99 | 5.60 | 6.09 | 6.03 | 5.60 |
| Personal non-credit card | 9.04 | 7.99 | 9.06 | 8.24 | 7.55 |
| Total consumer | 4.53% | 4.26% | 4.82% | 5.31% | 4.87% |

[HHT 0015809]

19

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | Household International, Inc. and Subsidiaries<br>CREDIT QUALITY STATISTICS – MANAGED BASIS<br>All dollar amounts are stated in millions.<br>At December 31, unless otherwise indicated.<br><br>Managed Two-Month-and-Over Contractual Delinquency Ratios<br><br>|  | 2001 | 2000 | 1999 | 1998 | 1997 |<br>| Real estate secured | 2.68% | 2.63% | 3.27% | 3.67% | 3.69% |<br>| Auto finance | 3.16 | 2.55 | 2.43 | 2.29 | 2.09 |<br>| MasterCard/Visa | 4.10 | 3.49 | 2.78 | 3.75 | 3.10 |<br>| Private label | 5.48 | 5.48 | 5.97 | 6.20 | 5.81 |<br>| Personal non-credit card | 8.87 | 7.97 | 8.81 | 7.94 | 7.81 |<br>| Total consumer | 4.46% | 4.20% | 4.66% | 4.90% | 4.64% |<br><br>[HHT 0015810]<br><br>* * * * * *<br><br>"Management has long recognized its responsibility for conducting the company's affairs in a manner which is responsive to the interest of employees, shareholders, investors and society in general. This responsibility is included in the statement of policy on ethical standards which provides that the company will fully comply with laws, rules and regulations of every community in which it operates and adhere to the highest ethical standards. Officers, employees and agents of the company are expected and directed to manage the business of the company with complete honesty, candor and integrity." [HHT 0015848]<br><br>* * * * * *<br><br>"Our credit and portfolio management procedures focus on risk-based pricing and effective collection efforts for each loan. We have a process which we believe gives us a reasonable basis for predicting the credit quality of new accounts. This process is based on our experience with numerous marketing, credit and risk management tests. We also believe that our frequent and early contact with delinquent customers, as well as policies designed to manage customer relationships, such as reaging delinquent accounts to current in specific situations, are helpful in maximizing customer collections. . . . As a result, charge-off and delinquency performance has been well within our expectations." [HHT 0015797] |

20

A281

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | * * * * * * "We believe our policies are responsive to the specific needs of the customer segment we serve. . . . *Our policies have been consistently applied and there have been no significant changes to any of our policies during any of the periods reported.* Our loss reserve estimates consider our charge-off policies to ensure appropriate reserves exist for products with longer charge-off lives. We believe our charge-off policies are appropriate and result in proper loss recognition." [HHT 0015798] * * * * * * "Our policies for consumer receivables permit reset of the contractual delinquency status of an account to current, subject to certain limits, if a predetermined number of consecutive payments has been received and there is evidence that the reason for the delinquency has been cured. Such reaging policies vary by product and are designed to manage customer relationship and maximize collections." [HHT 0015798] |
| 28. | 04/09/2002 | Household Financial Relations Conference  Plaintiffs' Exhibit 135 | April 9, 2002 Financial Relations Conference: • Credit Quality Trend – Manageable, Modest Increases [chart on HHS 01883530] • Credit Policies – Overview – In some cases charge-off policy is longer than bank policy to optimize customer management. [HHS 01883554] • Reage Policies – Overview • Reage policies are an inherent part of value proposition for our customers for which they pay above bank prices • Not intended to defer credit loss recognition or to overstate net income • Policies have been consistently applied and are appropriate for each product [HHS 01883557] • Credit Policies – Personal Non-Credit Card • Restructures • If an account is ever 90+, lifetime limit of 4 restructures allowed [HHS 01883579] Defendants included information regarding Household's reage portfolio in a number of charts included in Plaintiffs' Exhibit 135 – the charts are located at HHS01883560, HHS01883561, HHS01883562, HHS01883564, HHS01883565, HHS01883566, and HHS01883567. |

21

A282

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 29. | 04/17/2002 | Household Press Release

Plaintiffs' Exhibit 635 | April 17, 2002 Household Press Release entitled "Household Reports Record First Quarter Net Income". Household "reported first quarter earnings per share of $1.09, its fifteenth consecutive record quarter. First quarter earnings per share rose 20 percent from $.91 the prior year. Net income in the first quarter increased 18 percent, to a record $511 million."

"Household turned in a very strong first quarter. . . . In addition to delivering record results this quarter, we strongly added to our capital and reserve levels and further enhanced liquidity. We remain committed to maintaining a strong balance sheet and maximum financial flexibility."

"Our credit quality performance was well within our expectations in light of the continued weakness in the economy. . . . We anticipate a very manageable credit environment for the remainder of the year." [HHS 02980361]

\*                    \*                    \*

"Credit Quality and Loss Reserves
At March 31st, the *managed basis* delinquency ratio (60+days) was 4.63 percent, up 17 basis points from 4.46 percent at year-end 2001 and up 38 basis points from 4.25 percent a year ago. The annualized *managed basis* net charge-off ratio for the first quarter of 4.09 percent increased 19 basis points from 3.90 percent in the fourth quarter of 2001. . . ."

"The *owned basis* delinquency ratio at March 31st was 4.77 percent, compared to 4.53 percent at December 31st and 4.36 percent a year ago. The annualized *owned basis* charge-off ratio for the first quarter was 3.61 percent compared to 3.43 percent in the previous quarter and 3.12 percent a year ago." [HHS 02980363] |
| 30. | 04/21/2002 | *Bellingham Herald* article

Plaintiffs' Exhibit 1445 | *Bellingham Herald* – April 21, 2002: "It is absolutely against our policy to in any way quote a rate that is different than what the true rate is . . . . I can't underscore that enough" [p.1] |

22

A283

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 31. | 05/03/2002 | *Chicago Tribune* article<br><br>Plaintiffs' Exhibit 1440 | *Chicago Tribune* – May 3, 2002: "Household denied that it misleads customers. 'Acorn continues to launch baseless accusations and lawsuits rather than work to enact real solutions to help eliminate predatory lending from the marketplace,' the lender's statement said." [p.1] |
| 32. | 05/10/2002 | Household 10-Q<br><br>Plaintiffs' Exhibit 232 | Household 10-Q for quarter ended 3/31/2002. Household reported net income of $511 million, and E.P.S of $1.09 [HHS 02135167]<br><br>CREDIT QUALITY<br><br>Delinquency – Owned Basis<br>Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables): |

|  | March 31, 2002 | December 31, 2001 | March, 31 2001 |
|---|---|---|---|
| Real estate secured | 2.88% | 2.63% | 2.55% |
| Auto finance | 2.04 | 2.92 | 1.74 |
| MasterCard/Visa | 6.54 | 5.67 | 5.02 |
| Private label | 6.33 | 5.99 | 5.62 |
| Personal non-credit card | 9.60 | 9.04 | 8.79 |
| Total Owned | 4.77% | 4.53% | 4.36% |

[HHS 02135187]

23

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 33. | 05/10/2002 | *The Record* article<br><br>Plaintiffs' Exhibit 1443 | *The Record* – May 10, 2002: "Our position is that the accusations [regarding predatory lending] are baseless . . . . The loans are legal, they are compliant with state and federal laws and our own policies, and in each instance they have benefits for each customer. . . . Hayden says the loan[s] conform[] to the company's 'tangible benefits test'" |
| 34. | 05/31/2002 | *American Banker* article<br><br>Plaintiffs' Exhibit 1446 | *American Banker* – May 31, 2002: "It is our regulators' and the attorney general's job to investigate any complaints brought forth by consumers in their state, and we don't find anything unique or surprising that they are doing their job. . . . [W]e take proper steps to work with the department to uncover the facts and if necessary formulate an appropriate resolution for the borrower." . . . "some customers in Bellingham may have indeed been justified in their confusion about the rate of their loans" and claimed Household "took full and prompt responsibility" and is "satisfied that this situation was localized to the Bellingham branch." |
| 35. | 07/02/2002 | *The Oregonian*<br><br>Plaintiffs' Exhibit 1447 | *The Oregonian* – July 2, 2002: "'We've made mistakes,' said Megan Hayden, spokeswoman for the Prospect Heights, Ill., company. 'Is there a companywide pattern of abuse? Absolutely not.'" |
| 36. | 07/17/2002 | Household Press Release<br><br>Plaintiffs' Exhibit 788 | July 17, 2002 Household Press Release entitled "Household Reports Record Second Quarter Results on Strong Receivables Growth". Household "reported second quarter earnings per share increased 16 percent to $1.08, from $.93 the prior year. These results mark Household's sixteenth consecutive record quarter. Second quarter net income increased 17 percent, to a record $514 million."<br><br>*    *    *<br><br>"Our results this quarter were fueled by ongoing strong demand for our loan products. . . . Growth this quarter was strong, while we have maintained our conservative underwriting criteria. . . ." [HHS 03195884] |

24

**A285**

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| | | | "Credit Quality and Loss Reserves<br><br>At June 30th, the *managed basis* delinquency ratio (60+days) was 4.53 percent, down 10 basis points from 4.63 percent at the end of March, led by improvement in the MasterCard/Visa portfolio. The managed basis delinquency ratio was 4.27 percent a year ago. The annualized *managed basis* net charge-off ratio for the second quarter of 4.26 percent was 17 basis points higher than the first quarter and 55 basis points higher than a year ago."<br><br>*          *          *<br><br>"The *owned basis* delinquency ratio at June 30th was 4.61 percent, compared to 4.77 percent at March 31st and 4.48 percent a year ago. The annualized *owned basis* net charge-off ratio for the second quarter was 3.76 percent compared to 3.61 percent in the previous quarter and 3.26 a year ago." [HHS 03195886] |
| 37. | 08/14/2002 | Household Press Release<br><br>Plaintiffs' Exhibit 227 | August 14, 2002 Household Press Release entitled "Household International Certifies Accuracy of SEC filings in 2002": "Household's results for the year-to-date have been fueled by strong demand for our loan products throughout our businesses. Our loan underwriting approach continues to be conservative in these times of economic uncertainty, and we remain committed to strong reserve and capital levels." [HHS 02133695] |

25

A286

| Stmt No. | Date | Document Title | Statement |
|---|---|---|---|
| 38. | 08/14/2002 | Household 10-Q<br><br>Defendants' Exhibit 874 | Household 10-Q for quarter-ended 6/30/2002 issued on 8/14/2002: Household reported net income of $507 million and E.P.S. of $1.08 [HHT 0017112]<br><br>CREDIT QUALITY<br>Delinquency – Owned Basis<br>Two-Months-and-Over Contractual Delinquency (as a percent of consumer receivables):<br><br><table><tr><td></td><td>June 30, 2002</td><td>March 31, 2002</td><td>June 30, 2001</td></tr><tr><td>Real estate secured</td><td>2.78%</td><td>2.88%</td><td>2.59%</td></tr><tr><td>Auto finance</td><td>2.99</td><td>2.04</td><td>2.35</td></tr><tr><td>MasterCard/Visa</td><td>6.13</td><td>6.54</td><td>4.80</td></tr><tr><td>Private label</td><td>6.19</td><td>6.33</td><td>6.54</td></tr><tr><td>Personal non-credit card</td><td>9.12</td><td>9.60</td><td>8.79</td></tr><tr><td>Total Owned</td><td>4.61%</td><td>4.77%</td><td>4.48%</td></tr></table>[HHT 0017131]<br><br>*     *     *<br><br>"Our credit policies for consumer loans permit the reset of the contractual delinquency status of an account to current, subject to certain limits, if a predetermined number of consecutive payments has been received and there is evidence that the reason for the delinquency has been cured. Such reaging<br><br>*     *     *<br><br>policies vary by product and are designed to manage customer relationship and ensure maximum collections." [HHT 0017132]<br><br>Household reiterated this disclosure in its Form 10-K/A for fiscal year 2001, filed with the SEC on August 27, 2002. |
| 39. | 08/23/2002 | *Origination News* article<br><br>Plaintiffs' Exhibit 1439 | *Origination News* – August 23, 2002: "'We clearly follow all state and federal laws and regulations,' Household spokeswoman Megan Hayden said." |

26

A287

**TABLE B**

| Date | Amount |
|------|--------|
| 07/30/99 | $____0____ per share |
| 08/02/99 | $____0____ per share |
| 08/03/99 | $____0____ per share |
| 08/04/99 | $____0____ per share |
| 08/05/99 | $____0____ per share |
| 08/06/99 | $____0____ per share |
| 08/09/99 | $____0____ per share |
| 08/10/99 | $____0____ per share |
| 08/11/99 | $____0____ per share |
| 08/12/99 | $____0____ per share |
| 08/13/99 | $____0____ per share |
| 08/16/99 | $____0____ per share |
| 08/17/99 | $____0____ per share |
| 08/18/99 | $____0____ per share |
| 08/19/99 | $____0____ per share |
| 08/20/99 | $____0____ per share |
| 08/23/99 | $____0____ per share |
| 08/24/99 | $____0____ per share |
| 08/25/99 | $____0____ per share |
| 08/26/99 | $____0____ per share |
| 08/27/99 | $____0____ per share |
| 08/30/99 | $____0____ per share |
| 08/31/99 | $____0____ per share |
| 09/01/99 | $____0____ per share |
| 09/02/99 | $____0____ per share |
| 09/03/99 | $____0____ per share |
| 09/07/99 | $____0____ per share |
| 09/08/99 | $____0____ per share |
| 09/09/99 | $____0____ per share |
| 09/10/99 | $____0____ per share |

| **Date** | **Amount** |
|----------|------------|
| 09/13/99 | $_____ 0 per share |
| 09/14/99 | $_____ 0 per share |
| 09/15/99 | $_____ 0 per share |
| 09/16/99 | $_____ 0 per share |
| 09/17/99 | $_____ 0 per share |
| 09/20/99 | $_____ 0 per share |
| 09/21/99 | $_____ 0 per share |
| 09/22/99 | $_____ 0 per share |
| 09/23/99 | $_____ 0 per share |
| 09/24/99 | $_____ 0 per share |
| 09/27/99 | $_____ 0 per share |
| 09/28/99 | $_____ 0 per share |
| 09/29/99 | $_____ 0 per share |
| 09/30/99 | $_____ 0 per share |
| 10/01/99 | $_____ 0 per share |
| 10/04/99 | $_____ 0 per share |
| 10/05/99 | $_____ 0 per share |
| 10/06/99 | $_____ 0 per share |
| 10/07/99 | $_____ 0 per share |
| 10/08/99 | $_____ 0 per share |
| 10/11/99 | $_____ 0 per share |
| 10/12/99 | $_____ 0 per share |
| 10/13/99 | $_____ 0 per share |
| 10/14/99 | $_____ 0 per share |
| 10/15/99 | $_____ 0 per share |
| 10/18/99 | $_____ 0 per share |
| 10/19/99 | $_____ 0 per share |
| 10/20/99 | $_____ 0 per share |
| 10/21/99 | $_____ 0 per share |
| 10/22/99 | $_____ 0 per share |
| 10/25/99 | $_____ 0 per share |

| **Date** | **Amount** |
|---|---|
| 10/26/99 | $____0____ per share |
| 10/27/99 | $____0____ per share |
| 10/28/99 | $____0____ per share |
| 10/29/99 | $____0____ per share |
| 11/01/99 | $____0____ per share |
| 11/02/99 | $____0____ per share |
| 11/03/99 | $____0____ per share |
| 11/04/99 | $____0____ per share |
| 11/05/99 | $____0____ per share |
| 11/08/99 | $____0____ per share |
| 11/09/99 | $____0____ per share |
| 11/10/99 | $____0____ per share |
| 11/11/99 | $____0____ per share |
| 11/12/99 | $____0____ per share |
| 11/15/99 | $____0____ per share |
| 11/16/99 | $____0____ per share |
| 11/17/99 | $____0____ per share |
| 11/18/99 | $____0____ per share |
| 11/19/99 | $____0____ per share |
| 11/22/99 | $____0____ per share |
| 11/23/99 | $____0____ per share |
| 11/24/99 | $____0____ per share |
| 11/26/99 | $____0____ per share |
| 11/29/99 | $____0____ per share |
| 11/30/99 | $____0____ per share |
| 12/01/99 | $____0____ per share |
| 12/02/99 | $____0____ per share |
| 12/03/99 | $____0____ per share |
| 12/06/99 | $____0____ per share |
| 12/07/99 | $____0____ per share |
| 12/08/99 | $____0____ per share |

| **Date** | **Amount** |
|----------|------------|
| 12/09/99 | $_____0_____ per share |
| 12/10/99 | $_____0_____ per share |
| 12/13/99 | $_____0_____ per share |
| 12/14/99 | $_____0_____ per share |
| 12/15/99 | $_____0_____ per share |
| 12/16/99 | $_____0_____ per share |
| 12/17/99 | $_____0_____ per share |
| 12/20/99 | $_____0_____ per share |
| 12/21/99 | $_____0_____ per share |
| 12/22/99 | $_____0_____ per share |
| 12/23/99 | $_____0_____ per share |
| 12/27/99 | $_____0_____ per share |
| 12/28/99 | $_____0_____ per share |
| 12/29/99 | $_____0_____ per share |
| 12/30/99 | $_____0_____ per share |
| 12/31/99 | $_____0_____ per share |
| 01/03/00 | $_____0_____ per share |
| 01/04/00 | $_____0_____ per share |
| 01/05/00 | $_____0_____ per share |
| 01/06/00 | $_____0_____ per share |
| 01/07/00 | $_____0_____ per share |
| 01/10/00 | $_____0_____ per share |
| 01/11/00 | $_____0_____ per share |
| 01/12/00 | $_____0_____ per share |
| 01/13/00 | $_____0_____ per share |
| 01/14/00 | $_____0_____ per share |
| 01/18/00 | $_____0_____ per share |
| 01/19/00 | $_____0_____ per share |
| 01/20/00 | $_____0_____ per share |
| 01/21/00 | $_____0_____ per share |
| 01/24/00 | $_____0_____ per share |

| **Date** | **Amount** |
|----------|-----------|
| 01/25/00 | $____0____ per share |
| 01/26/00 | $____0____ per share |
| 01/27/00 | $____0____ per share |
| 01/28/00 | $____0____ per share |
| 01/31/00 | $____0____ per share |
| 02/01/00 | $____0____ per share |
| 02/02/00 | $____0____ per share |
| 02/03/00 | $____0____ per share |
| 02/04/00 | $____0____ per share |
| 02/07/00 | $____0____ per share |
| 02/08/00 | $____0____ per share |
| 02/09/00 | $____0____ per share |
| 02/10/00 | $____0____ per share |
| 02/11/00 | $____0____ per share |
| 02/14/00 | $____0____ per share |
| 02/15/00 | $____0____ per share |
| 02/16/00 | $____0____ per share |
| 02/17/00 | $____0____ per share |
| 02/18/00 | $____0____ per share |
| 02/22/00 | $____0____ per share |
| 02/23/00 | $____0____ per share |
| 02/24/00 | $____0____ per share |
| 02/25/00 | $____0____ per share |
| 02/28/00 | $____0____ per share |
| 02/29/00 | $____0____ per share |
| 03/01/00 | $____0____ per share |
| 03/02/00 | $____0____ per share |
| 03/03/00 | $____0____ per share |
| 03/06/00 | $____0____ per share |
| 03/07/00 | $____0____ per share |
| 03/08/00 | $____0____ per share |

| **Date** | **Amount** |
|---|---|
| 03/09/00 | $_____ 0 per share |
| 03/10/00 | $_____ 0 per share |
| 03/13/00 | $_____ 0 per share |
| 03/14/00 | $_____ 0 per share |
| 03/15/00 | $_____ 0 per share |
| 03/16/00 | $_____ 0 per share |
| 03/17/00 | $_____ 0 per share |
| 03/20/00 | $_____ 0 per share |
| 03/21/00 | $_____ 0 per share |
| 03/22/00 | $_____ 0 per share |
| 03/23/00 | $_____ 0 per share |
| 03/24/00 | $_____ 0 per share |
| 03/27/00 | $_____ 0 per share |
| 03/28/00 | $_____ 0 per share |
| 03/29/00 | $_____ 0 per share |
| 03/30/00 | $_____ 0 per share |
| 03/31/00 | $_____ 0 per share |
| 04/03/00 | $_____ 0 per share |
| 04/04/00 | $_____ 0 per share |
| 04/05/00 | $_____ 0 per share |
| 04/06/00 | $_____ 0 per share |
| 04/07/00 | $_____ 0 per share |
| 04/10/00 | $_____ 0 per share |
| 04/11/00 | $_____ 0 per share |
| 04/12/00 | $_____ 0 per share |
| 04/13/00 | $_____ 0 per share |
| 04/14/00 | $_____ 0 per share |
| 04/17/00 | $_____ 0 per share |
| 04/18/00 | $_____ 0 per share |
| 04/19/00 | $_____ 0 per share |
| 04/20/00 | $_____ 0 per share |

| Date | Amount | |
|---|---|---|
| 04/24/00 | $_____ *0* | per share |
| 04/25/00 | $_____ *0* | per share |
| 04/26/00 | $_____ *0* | per share |
| 04/27/00 | $_____ *0* | per share |
| 04/28/00 | $_____ *0* | per share |
| 05/01/00 | $_____ *0* | per share |
| 05/02/00 | $_____ *0* | per share |
| 05/03/00 | $_____ *0* | per share |
| 05/04/00 | $_____ *0* | per share |
| 05/05/00 | $_____ *0* | per share |
| 05/08/00 | $_____ *0* | per share |
| 05/09/00 | $_____ *0* | per share |
| 05/10/00 | $_____ *0* | per share |
| 05/11/00 | $_____ *0* | per share |
| 05/12/00 | $_____ *0* | per share |
| 05/15/00 | $_____ *0* | per share |
| 05/16/00 | $_____ *0* | per share |
| 05/17/00 | $_____ *0* | per share |
| 05/18/00 | $_____ *0* | per share |
| 05/19/00 | $_____ *0* | per share |
| 05/22/00 | $_____ *0* | per share |
| 05/23/00 | $_____ *0* | per share |
| 05/24/00 | $_____ *0* | per share |
| 05/25/00 | $_____ *0* | per share |
| 05/26/00 | $_____ *0* | per share |
| 05/30/00 | $_____ *0* | per share |
| 05/31/00 | $_____ *0* | per share |
| 06/01/00 | $_____ *0* | per share |
| 06/02/00 | $_____ *0* | per share |
| 06/05/00 | $_____ *0* | per share |
| 06/06/00 | $_____ *0* | per share |

| **Date** | **Amount** |
|----------|-----------|
| 06/07/00 | $___*0*___ per share |
| 06/08/00 | $___*0*___ per share |
| 06/09/00 | $___*0*___ per share |
| 06/12/00 | $___*0*___ per share |
| 06/13/00 | $___*0*___ per share |
| 06/14/00 | $___*0*___ per share |
| 06/15/00 | $___*0*___ per share |
| 06/16/00 | $___*0*___ per share |
| 06/19/00 | $___*0*___ per share |
| 06/20/00 | $___*0*___ per share |
| 06/21/00 | $___*0*___ per share |
| 06/22/00 | $___*0*___ per share |
| 06/23/00 | $___*0*___ per share |
| 06/26/00 | $___*0*___ per share |
| 06/27/00 | $___*0*___ per share |
| 06/28/00 | $___*0*___ per share |
| 06/29/00 | $___*0*___ per share |
| 06/30/00 | $___*0*___ per share |
| 07/03/00 | $___*0*___ per share |
| 07/05/00 | $___*0*___ per share |
| 07/06/00 | $___*0*___ per share |
| 07/07/00 | $___*0*___ per share |
| 07/10/00 | $___*0*___ per share |
| 07/11/00 | $___*0*___ per share |
| 07/12/00 | $___*0*___ per share |
| 07/13/00 | $___*0*___ per share |
| 07/14/00 | $___*0*___ per share |
| 07/17/00 | $___*0*___ per share |
| 07/18/00 | $___*0*___ per share |
| 07/19/00 | $___*0*___ per share |
| 07/20/00 | $___*0*___ per share |

| Date | Amount |
|------|--------|
| 07/21/00 | $_____0_____ per share |
| 07/24/00 | $_____0_____ per share |
| 07/25/00 | $_____0_____ per share |
| 07/26/00 | $_____0_____ per share |
| 07/27/00 | $_____0_____ per share |
| 07/28/00 | $_____0_____ per share |
| 07/31/00 | $_____0_____ per share |
| 08/01/00 | $_____0_____ per share |
| 08/02/00 | $_____0_____ per share |
| 08/03/00 | $_____0_____ per share |
| 08/04/00 | $_____0_____ per share |
| 08/07/00 | $_____0_____ per share |
| 08/08/00 | $_____0_____ per share |
| 08/09/00 | $_____0_____ per share |
| 08/10/00 | $_____0_____ per share |
| 08/11/00 | $_____0_____ per share |
| 08/14/00 | $_____0_____ per share |
| 08/15/00 | $_____0_____ per share |
| 08/16/00 | $_____0_____ per share |
| 08/17/00 | $_____0_____ per share |
| 08/18/00 | $_____0_____ per share |
| 08/21/00 | $_____0_____ per share |
| 08/22/00 | $_____0_____ per share |
| 08/23/00 | $_____0_____ per share |
| 08/24/00 | $_____0_____ per share |
| 08/25/00 | $_____0_____ per share |
| 08/28/00 | $_____0_____ per share |
| 08/29/00 | $_____0_____ per share |
| 08/30/00 | $_____0_____ per share |
| 08/31/00 | $_____0_____ per share |
| 09/01/00 | $_____0_____ per share |

| **Date** | **Amount** |
|---|---|
| 09/05/00 | $_____ *0* per share |
| 09/06/00 | $_____ *0* per share |
| 09/07/00 | $_____ *0* per share |
| 09/08/00 | $_____ *0* per share |
| 09/11/00 | $_____ *0* per share |
| 09/12/00 | $_____ *0* per share |
| 09/13/00 | $_____ *0* per share |
| 09/14/00 | $_____ *0* per share |
| 09/15/00 | $_____ *0* per share |
| 09/18/00 | $_____ *0* per share |
| 09/19/00 | $_____ *0* per share |
| 09/20/00 | $_____ *0* per share |
| 09/21/00 | $_____ *0* per share |
| 09/22/00 | $_____ *0* per share |
| 09/25/00 | $_____ *0* per share |
| 09/26/00 | $_____ *0* per share |
| 09/27/00 | $_____ *0* per share |
| 09/28/00 | $_____ *0* per share |
| 09/29/00 | $_____ *0* per share |
| 10/02/00 | $_____ *0* per share |
| 10/03/00 | $_____ *0* per share |
| 10/04/00 | $_____ *0* per share |
| 10/05/00 | $_____ *0* per share |
| 10/06/00 | $_____ *0* per share |
| 10/09/00 | $_____ *0* per share |
| 10/10/00 | $_____ *0* per share |
| 10/11/00 | $_____ *0* per share |
| 10/12/00 | $_____ *0* per share |
| 10/13/00 | $_____ *0* per share |
| 10/16/00 | $_____ *0* per share |
| 10/17/00 | $_____ *0* per share |

| **Date** | **Amount** |
|----------|-----------|
| 10/18/00 | $_____ 0 __ per share |
| 10/19/00 | $_____ 0 __ per share |
| 10/20/00 | $_____ 0 __ per share |
| 10/23/00 | $_____ 0 __ per share |
| 10/24/00 | $_____ 0 __ per share |
| 10/25/00 | $_____ 0 __ per share |
| 10/26/00 | $_____ 0 __ per share |
| 10/27/00 | $_____ 0 __ per share |
| 10/30/00 | $_____ 0 __ per share |
| 10/31/00 | $_____ 0 __ per share |
| 11/01/00 | $_____ 0 __ per share |
| 11/02/00 | $_____ 0 __ per share |
| 11/03/00 | $_____ 0 __ per share |
| 11/06/00 | $_____ 0 __ per share |
| 11/07/00 | $_____ 0 __ per share |
| 11/08/00 | $_____ 0 __ per share |
| 11/09/00 | $_____ 0 __ per share |
| 11/10/00 | $_____ 0 __ per share |
| 11/13/00 | $_____ 0 __ per share |
| 11/14/00 | $_____ 0 __ per share |
| 11/15/00 | $_____ 0 __ per share |
| 11/16/00 | $_____ 0 __ per share |
| 11/17/00 | $_____ 0 __ per share |
| 11/20/00 | $_____ 0 __ per share |
| 11/21/00 | $_____ 0 __ per share |
| 11/22/00 | $_____ 0 __ per share |
| 11/24/00 | $_____ 0 __ per share |
| 11/27/00 | $_____ 0 __ per share |
| 11/28/00 | $_____ 0 __ per share |
| 11/29/00 | $_____ 0 __ per share |
| 11/30/00 | $_____ 0 __ per share |

| Date | Amount |
|------|--------|
| 12/01/00 | $_____ 0 _____ per share |
| 12/04/00 | $_____ 0 _____ per share |
| 12/05/00 | $_____ 0 _____ per share |
| 12/06/00 | $_____ 0 _____ per share |
| 12/07/00 | $_____ 0 _____ per share |
| 12/08/00 | $_____ 0 _____ per share |
| 12/11/00 | $_____ 0 _____ per share |
| 12/12/00 | $_____ 0 _____ per share |
| 12/13/00 | $_____ 0 _____ per share |
| 12/14/00 | $_____ 0 _____ per share |
| 12/15/00 | $_____ 0 _____ per share |
| 12/18/00 | $_____ 0 _____ per share |
| 12/19/00 | $_____ 0 _____ per share |
| 12/20/00 | $_____ 0 _____ per share |
| 12/21/00 | $_____ 0 _____ per share |
| 12/22/00 | $_____ 0 _____ per share |
| 12/26/00 | $_____ 0 _____ per share |
| 12/27/00 | $_____ 0 _____ per share |
| 12/28/00 | $_____ 0 _____ per share |
| 12/29/00 | $_____ 0 _____ per share |
| 01/02/01 | $_____ 0 _____ per share |
| 01/03/01 | $_____ 0 _____ per share |
| 01/04/01 | $_____ 0 _____ per share |
| 01/05/01 | $_____ 0 _____ per share |
| 01/08/01 | $_____ 0 _____ per share |
| 01/09/01 | $_____ 0 _____ per share |
| 01/10/01 | $_____ 0 _____ per share |
| 01/11/01 | $_____ 0 _____ per share |
| 01/12/01 | $_____ 0 _____ per share |
| 01/16/01 | $_____ 0 _____ per share |
| 01/17/01 | $_____ 0 _____ per share |

| **Date** | **Amount** |
|---|---|
| 01/18/01 | $_____*0*___ per share |
| 01/19/01 | $_____*0*___ per share |
| 01/22/01 | $_____*0*___ per share |
| 01/23/01 | $_____*0*___ per share |
| 01/24/01 | $_____*0*___ per share |
| 01/25/01 | $_____*0*___ per share |
| 01/26/01 | $_____*0*___ per share |
| 01/29/01 | $_____*0*___ per share |
| 01/30/01 | $_____*0*___ per share |
| 01/31/01 | $_____*0*___ per share |
| 02/01/01 | $_____*0*___ per share |
| 02/02/01 | $_____*0*___ per share |
| 02/05/01 | $_____*0*___ per share |
| 02/06/01 | $_____*0*___ per share |
| 02/07/01 | $_____*0*___ per share |
| 02/08/01 | $_____*0*___ per share |
| 02/09/01 | $_____*0*___ per share |
| 02/12/01 | $_____*0*___ per share |
| 02/13/01 | $_____*0*___ per share |
| 02/14/01 | $_____*0*___ per share |
| 02/15/01 | $_____*0*___ per share |
| 02/16/01 | $_____*0*___ per share |
| 02/20/01 | $_____*0*___ per share |
| 02/21/01 | $_____*0*___ per share |
| 02/22/01 | $_____*0*___ per share |
| 02/23/01 | $_____*0*___ per share |
| 02/26/01 | $_____*0*___ per share |
| 02/27/01 | $_____*0*___ per share |
| 02/28/01 | $_____*0*___ per share |
| 03/01/01 | $_____*0*___ per share |
| 03/02/01 | $_____*0*___ per share |

| **Date** | **Amount** |
|----------|------------|
| 03/05/01 | $ _0_ per share |
| 03/06/01 | $ _0_ per share |
| 03/07/01 | $ _0_ per share |
| 03/08/01 | $ _0_ per share |
| 03/09/01 | $ _0_ per share |
| 03/12/01 | $ _0_ per share |
| 03/13/01 | $ _0_ per share |
| 03/14/01 | $ _0_ per share |
| 03/15/01 | $ _0_ per share |
| 03/16/01 | $ _0_ per share |
| 03/19/01 | $ _0_ per share |
| 03/20/01 | $ _0_ per share |
| 03/21/01 | $ _0_ per share |
| 03/22/01 | $ _0_ per share |
| 03/23/01 | $ _23.94_ per share |
| 03/26/01 | $ _23.94_ per share |
| 03/27/01 | $ _23.94_ per share |
| 03/28/01 | $ _23.94_ per share |
| 03/29/01 | $ _23.94_ per share |
| 03/30/01 | $ _23.94_ per share |
| 04/02/01 | $ _23.94_ per share |
| 04/03/01 | $ _23.94_ per share |
| 04/04/01 | $ _23.94_ per share |
| 04/05/01 | $ _23.94_ per share |
| 04/06/01 | $ _23.94_ per share |
| 04/09/01 | $ _23.94_ per share |
| 04/10/01 | $ _23.94_ per share |
| 04/11/01 | $ _23.94_ per share |
| 04/12/01 | $ _23.94_ per share |
| 04/16/01 | $ _23.94_ per share |
| 04/17/01 | $ _23.94_ per share |

| **Date** | **Amount** |
|----------|-----------|
| 04/18/01 | $ _23.94_ per share |
| 04/19/01 | $ _23.94_ per share |
| 04/20/01 | $ _23.94_ per share |
| 04/23/01 | $ _23.94_ per share |
| 04/24/01 | $ _23.94_ per share |
| 04/25/01 | $ _23.94_ per share |
| 04/26/01 | $ _23.94_ per share |
| 04/27/01 | $ _23.94_ per share |
| 04/30/01 | $ _23.94_ per share |
| 05/01/01 | $ _23.94_ per share |
| 05/02/01 | $ _23.94_ per share |
| 05/03/01 | $ _23.94_ per share |
| 05/04/01 | $ _23.94_ per share |
| 05/07/01 | $ _23.94_ per share |
| 05/08/01 | $ _23.94_ per share |
| 05/09/01 | $ _23.94_ per share |
| 05/10/01 | $ _23.94_ per share |
| 05/11/01 | $ _23.94_ per share |
| 05/14/01 | $ _23.94_ per share |
| 05/15/01 | $ _23.94_ per share |
| 05/16/01 | $ _23.94_ per share |
| 05/17/01 | $ _23.94_ per share |
| 05/18/01 | $ _23.94_ per share |
| 05/21/01 | $ _23.94_ per share |
| 05/22/01 | $ _23.94_ per share |
| 05/23/01 | $ _23.94_ per share |
| 05/24/01 | $ _23.94_ per share |
| 05/25/01 | $ _23.94_ per share |
| 05/29/01 | $ _23.94_ per share |
| 05/30/01 | $ _23.94_ per share |
| 05/31/01 | $ _23.94_ per share |

A302

| **Date** | **Amount** |
|---|---|
| 06/01/01 | $ 23.94 per share |
| 06/04/01 | $ 23.94 per share |
| 06/05/01 | $ 23.94 per share |
| 06/06/01 | $ 23.94 per share |
| 06/07/01 | $ 23.94 per share |
| 06/08/01 | $ 23.94 per share |
| 06/11/01 | $ 23.94 per share |
| 06/12/01 | $ 23.94 per share |
| 06/13/01 | $ 23.94 per share |
| 06/14/01 | $ 23.94 per share |
| 06/15/01 | $ 23.94 per share |
| 06/18/01 | $ 23.94 per share |
| 06/19/01 | $ 23.94 per share |
| 06/20/01 | $ 23.94 per share |
| 06/21/01 | $ 23.94 per share |
| 06/22/01 | $ 23.94 per share |
| 06/25/01 | $ 23.94 per share |
| 06/26/01 | $ 23.94 per share |
| 06/27/01 | $ 23.94 per share |
| 06/28/01 | $ 23.94 per share |
| 06/29/01 | $ 23.94 per share |
| 07/02/01 | $ 23.94 per share |
| 07/03/01 | $ 23.94 per share |
| 07/05/01 | $ 23.94 per share |
| 07/06/01 | $ 23.94 per share |
| 07/09/01 | $ 23.94 per share |
| 07/10/01 | $ 23.94 per share |
| 07/11/01 | $ 23.94 per share |
| 07/12/01 | $ 23.94 per share |
| 07/13/01 | $ 23.94 per share |
| 07/16/01 | $ 23.94 per share |

| **Date** | **Amount** |
|----------|-----------|
| 07/17/01 | $ _23.94_ per share |
| 07/18/01 | $ _23.94_ per share |
| 07/19/01 | $ _23.94_ per share |
| 07/20/01 | $ _23.94_ per share |
| 07/23/01 | $ _23.94_ per share |
| 07/24/01 | $ _23.94_ per share |
| 07/25/01 | $ _23.94_ per share |
| 07/26/01 | $ _23.94_ per share |
| 07/27/01 | $ _23.94_ per share |
| 07/30/01 | $ _23.94_ per share |
| 07/31/01 | $ _23.94_ per share |
| 08/01/01 | $ _23.94_ per share |
| 08/02/01 | $ _23.94_ per share |
| 08/03/01 | $ _23.94_ per share |
| 08/06/01 | $ _23.94_ per share |
| 08/07/01 | $ _23.94_ per share |
| 08/08/01 | $ _23.94_ per share |
| 08/09/01 | $ _23.94_ per share |
| 08/10/01 | $ _23.94_ per share |
| 08/13/01 | $ _23.94_ per share |
| 08/14/01 | $ _23.94_ per share |
| 08/15/01 | $ _23.94_ per share |
| 08/16/01 | $ _23.94_ per share |
| 08/17/01 | $ _23.94_ per share |
| 08/20/01 | $ _23.94_ per share |
| 08/21/01 | $ _23.94_ per share |
| 08/22/01 | $ _23.94_ per share |
| 08/23/01 | $ _23.94_ per share |
| 08/24/01 | $ _23.94_ per share |
| 08/27/01 | $ _23.94_ per share |
| 08/28/01 | $ _23.94_ per share |

| **Date** | **Amount** |
|---|---|
| 08/29/01 | $ 23.94 per share |
| 08/30/01 | $ 23.94 per share |
| 08/31/01 | $ 23.94 per share |
| 09/04/01 | $ 23.94 per share |
| 09/05/01 | $ 23.94 per share |
| 09/06/01 | $ 23.94 per share |
| 09/07/01 | $ 23.56 per share |
| 09/10/01 | $ 23.94 per share |
| 09/17/01 | $ 22.61 per share |
| 09/18/01 | $ 22.53 per share |
| 09/19/01 | $ 22.38 per share |
| 09/20/01 | $ 22.02 per share |
| 09/21/01 | $ 21.54 per share |
| 09/24/01 | $ 22.62 per share |
| 09/25/01 | $ 22.29 per share |
| 09/26/01 | $ 23.03 per share |
| 09/27/01 | $ 23.42 per share |
| 09/28/01 | $ 23.94 per share |
| 10/01/01 | $ 23.94 per share |
| 10/02/01 | $ 23.94 per share |
| 10/03/01 | $ 23.94 per share |
| 10/04/01 | $ 23.94 per share |
| 10/05/01 | $ 23.94 per share |
| 10/08/01 | $ 23.94 per share |
| 10/09/01 | $ 23.94 per share |
| 10/10/01 | $ 23.94 per share |
| 10/11/01 | $ 23.94 per share |
| 10/12/01 | $ 23.59 per share |
| 10/15/01 | $ 23.94 per share |
| 10/16/01 | $ 23.94 per share |
| 10/17/01 | $ 23.94 per share |

| **Date** | **Amount** | |
|---|---|---|
| 10/18/01 | $ 23.94 | per share |
| 10/19/01 | $ 23.94 | per share |
| 10/22/01 | $ 23.94 | per share |
| 10/23/01 | $ 23.94 | per share |
| 10/24/01 | $ 23.83 | per share |
| 10/25/01 | $ 23.94 | per share |
| 10/26/01 | $ 23.94 | per share |
| 10/29/01 | $ 23.42 | per share |
| 10/30/01 | $ 23.00 | per share |
| 10/31/01 | $ 22.48 | per share |
| 11/01/01 | $ 22.73 | per share |
| 11/02/01 | $ 22.67 | per share |
| 11/05/01 | $ 23.10 | per share |
| 11/06/01 | $ 23.94 | per share |
| 11/07/01 | $ 23.94 | per share |
| 11/08/01 | $ 23.94 | per share |
| 11/09/01 | $ 23.94 | per share |
| 11/12/01 | $ 23.94 | per share |
| 11/13/01 | $ 23.94 | per share |
| 11/14/01 | $ 23.94 | per share |
| 11/15/01 | $ 23.94 | per share |
| 11/16/01 | $ 23.60 | per share |
| 11/19/01 | $ 23.94 | per share |
| 11/20/01 | $ 23.85 | per share |
| 11/21/01 | $ 23.94 | per share |
| 11/23/01 | $ 23.94 | per share |
| 11/26/01 | $ 23.94 | per share |
| 11/27/01 | $ 23.94 | per share |
| 11/28/01 | $ 23.94 | per share |
| 11/29/01 | $ 23.94 | per share |
| 11/30/01 | $ 23.94 | per share |

| Date | Amount |
|------|--------|
| 12/03/01 | $ 22.59 per share |
| 12/04/01 | $ 23.94 per share |
| 12/05/01 | $ 23.94 per share |
| 12/06/01 | $ 23.94 per share |
| 12/07/01 | $ 23.94 per share |
| 12/10/01 | $ 23.30 per share |
| 12/11/01 | $ 22.20 per share |
| 12/12/01 | $ 19.80 per share |
| 12/13/01 | $ 20.29 per share |
| 12/14/01 | $ 19.64 per share |
| 12/17/01 | $ 20.61 per share |
| 12/18/01 | $ 21.84 per share |
| 12/19/01 | $ 22.04 per share |
| 12/20/01 | $ 21.75 per share |
| 12/21/01 | $ 21.37 per share |
| 12/24/01 | $ 21.60 per share |
| 12/26/01 | $ 21.82 per share |
| 12/27/01 | $ 23.30 per share |
| 12/28/01 | $ 23.94 per share |
| 12/31/01 | $ 23.28 per share |
| 01/02/02 | $ 22.58 per share |
| 01/03/02 | $ 22.41 per share |
| 01/04/02 | $ 23.94 per share |
| 01/07/02 | $ 23.19 per share |
| 01/08/02 | $ 22.29 per share |
| 01/09/02 | $ 22.42 per share |
| 01/10/02 | $ 21.70 per share |
| 01/11/02 | $ 19.85 per share |
| 01/14/02 | $ 18.53 per share |
| 01/15/02 | $ 20.28 per share |
| 01/16/02 | $ 19.87 per share |

| **Date** | **Amount** | |
|----------|-----------|---|
| 01/17/02 | $ 18.90 | per share |
| 01/18/02 | $ 20.03 | per share |
| 01/22/02 | $ 19.24 | per share |
| 01/23/02 | $ 18.59 | per share |
| 01/24/02 | $ 18.86 | per share |
| 01/25/02 | $ 19.70 | per share |
| 01/28/02 | $ 18.10 | per share |
| 01/29/02 | $ 16.58 | per share |
| 01/30/02 | $ 15.76 | per share |
| 01/31/02 | $ 17.12 | per share |
| 02/01/02 | $ 17.34 | per share |
| 02/04/02 | $ 16.06 | per share |
| 02/05/02 | $ 14.99 | per share |
| 02/06/02 | $ 12.47 | per share |
| 02/07/02 | $ 15.56 | per share |
| 02/08/02 | $ 18.71 | per share |
| 02/11/02 | $ 17.94 | per share |
| 02/12/02 | $ 17.49 | per share |
| 02/13/02 | $ 18.36 | per share |
| 02/14/02 | $ 18.04 | per share |
| 02/15/02 | $ 18.00 | per share |
| 02/19/02 | $ 17.84 | per share |
| 02/20/02 | $ 17.72 | per share |
| 02/21/02 | $ 16.00 | per share |
| 02/22/02 | $ 16.24 | per share |
| 02/25/02 | $ 16.45 | per share |
| 02/26/02 | $ 16.72 | per share |
| 02/27/02 | $ 18.55 | per share |
| 02/28/02 | $ 17.81 | per share |
| 03/01/02 | $ 19.02 | per share |
| 03/04/02 | $ 22.21 | per share |

| Date | Amount | |
|------|--------|---|
| 03/05/02 | $ 21.17 | per share |
| 03/06/02 | $ 22.17 | per share |
| 03/07/02 | $ 23.00 | per share |
| 03/08/02 | $ 23.94 | per share |
| 03/11/02 | $ 23.94 | per share |
| 03/12/02 | $ 23.37 | per share |
| 03/13/02 | $ 22.86 | per share |
| 03/14/02 | $ 21.87 | per share |
| 03/15/02 | $ 22.69 | per share |
| 03/18/02 | $ 22.93 | per share |
| 03/19/02 | $ 22.77 | per share |
| 03/20/02 | $ 21.93 | per share |
| 03/21/02 | $ 22.23 | per share |
| 03/22/02 | $ 22.39 | per share |
| 03/25/02 | $ 21.06 | per share |
| 03/26/02 | $ 21.66 | per share |
| 03/27/02 | $ 21.80 | per share |
| 03/28/02 | $ 21.25 | per share |
| 04/01/02 | $ 21.68 | per share |
| 04/02/02 | $ 21.52 | per share |
| 04/03/02 | $ 20.53 | per share |
| 04/04/02 | $ 21.39 | per share |
| 04/05/02 | $ 22.28 | per share |
| 04/08/02 | $ 23.24 | per share |
| 04/09/02 | $ 23.16 | per share |
| 04/10/02 | $ 23.23 | per share |
| 04/11/02 | $ 21.73 | per share |
| 04/12/02 | $ 22.40 | per share |
| 04/15/02 | $ 22.24 | per share |
| 04/16/02 | $ 23.65 | per share |
| 04/17/02 | $ 23.94 | per share |

| **Date** | **Amount** |
|----------|-----------|
| 04/18/02 | $ 23.94 per share |
| 04/19/02 | $ 23.94 per share |
| 04/22/02 | $ 23.94 per share |
| 04/23/02 | $ 23.94 per share |
| 04/24/02 | $ 23.94 per share |
| 04/25/02 | $ 23.94 per share |
| 04/26/02 | $ 23.94 per share |
| 04/29/02 | $ 22.70 per share |
| 04/30/02 | $ 23.34 per share |
| 05/01/02 | $ 22.61 per share |
| 05/02/02 | $ 21.92 per share |
| 05/03/02 | $ 21.64 per share |
| 05/06/02 | $ 21.00 per share |
| 05/07/02 | $ 20.25 per share |
| 05/08/02 | $ 21.83 per share |
| 05/09/02 | $ 21.26 per share |
| 05/10/02 | $ 19.64 per share |
| 05/13/02 | $ 20.72 per share |
| 05/14/02 | $ 21.31 per share |
| 05/15/02 | $ 20.03 per share |
| 05/16/02 | $ 19.24 per share |
| 05/17/02 | $ 18.40 per share |
| 05/20/02 | $ 18.19 per share |
| 05/21/02 | $ 17.54 per share |
| 05/22/02 | $ 17.74 per share |
| 05/23/02 | $ 17.87 per share |
| 05/24/02 | $ 17.85 per share |
| 05/28/02 | $ 17.98 per share |
| 05/29/02 | $ 17.89 per share |
| 05/30/02 | $ 16.88 per share |
| 05/31/02 | $ 16.26 per share |

| **Date** | **Amount** |
|----------|------------|
| 06/03/02 | $ 16.67 per share |
| 06/04/02 | $ 16.66 per share |
| 06/05/02 | $ 17.91 per share |
| 06/06/02 | $ 19.83 per share |
| 06/07/02 | $ 19.06 per share |
| 06/10/02 | $ 18.58 per share |
| 06/11/02 | $ 19.54 per share |
| 06/12/02 | $ 18.92 per share |
| 06/13/02 | $ 17.44 per share |
| 06/14/02 | $ 17.62 per share |
| 06/17/02 | $ 18.20 per share |
| 06/18/02 | $ 18.08 per share |
| 06/19/02 | $ 17.24 per share |
| 06/20/02 | $ 16.02 per share |
| 06/21/02 | $ 16.16 per share |
| 06/24/02 | $ 16.50 per share |
| 06/25/02 | $ 15.68 per share |
| 06/26/02 | $ 16.25 per share |
| 06/27/02 | $ 16.78 per share |
| 06/28/02 | $ 16.19 per share |
| 07/01/02 | $ 14.84 per share |
| 07/02/02 | $ 14.94 per share |
| 07/03/02 | $ 15.76 per share |
| 07/05/02 | $ 16.69 per share |
| 07/08/02 | $ 16.28 per share |
| 07/09/02 | $ 14.58 per share |
| 07/10/02 | $ 12.48 per share |
| 07/11/02 | $ 13.14 per share |
| 07/12/02 | $ 14.69 per share |
| 07/15/02 | $ 14.17 per share |
| 07/16/02 | $ 15.01 per share |

| **Date** | **Amount** |
|---|---|
| 07/17/02 | $ 11.59 per share |
| 07/18/02 | $ 12.56 per share |
| 07/19/02 | $ 11.33 per share |
| 07/22/02 | $ 10.38 per share |
| 07/23/02 | $ 9.30 per share |
| 07/24/02 | $ 11.68 per share |
| 07/25/02 | $ 10.57 per share |
| 07/26/02 | $ 8.68 per share |
| 07/29/02 | $ 9.19 per share |
| 07/30/02 | $ 9.55 per share |
| 07/31/02 | $ 11.49 per share |
| 08/01/02 | $ 10.63 per share |
| 08/02/02 | $ 9.59 per share |
| 08/05/02 | $ 8.11 per share |
| 08/06/02 | $ 10.06 per share |
| 08/07/02 | $ 8.28 per share |
| 08/08/02 | $ 9.60 per share |
| 08/09/02 | $ 8.73 per share |
| 08/12/02 | $ 8.29 per share |
| 08/13/02 | $ 7.06 per share |
| 08/14/02 | $ 6.39 per share |
| 08/15/02 | $ 7.61 per share |
| 08/16/02 | $ 5.76 per share |
| 08/19/02 | $ 5.22 per share |
| 08/20/02 | $ 4.65 per share |
| 08/21/02 | $ 4.98 per share |
| 08/22/02 | $ 8.14 per share |
| 08/23/02 | $ 5.85 per share |
| 08/26/02 | $ 6.77 per share |
| 08/27/02 | $ 5.58 per share |
| 08/28/02 | $ 5.22 per share |

| Date | Amount | |
|---|---|---|
| 08/29/02 | $ 4.69 | per share |
| 08/30/02 | $ 4.33 | per share |
| 09/03/02 | $ 2.96 | per share |
| 09/04/02 | $ 3.53 | per share |
| 09/05/02 | $ 2.87 | per share |
| 09/06/02 | $ 3.10 | per share |
| 09/09/02 | $ 5.02 | per share |
| 09/10/02 | $ 4.16 | per share |
| 09/11/02 | $ 4.57 | per share |
| 09/12/02 | $ 3.73 | per share |
| 09/13/02 | $ 4.35 | per share |
| 09/16/02 | $ 3.35 | per share |
| 09/17/02 | $ -0.17 | per share |
| 09/18/02 | $ 0.41 | per share |
| 09/19/02 | $ 0.73 | per share |
| 09/20/02 | $ 0.64 | per share |
| 09/23/02 | $ -0.85 | per share |
| 09/24/02 | $ -0.35 | per share |
| 09/25/02 | $ -0.24 | per share |
| 09/26/02 | $ 0.34 | per share |
| 09/27/02 | $ -0.56 | per share |
| 09/30/02 | $ -0.10 | per share |
| 10/01/02 | $ -1.12 | per share |
| 10/02/02 | $ -1.13 | per share |
| 10/03/02 | $ -0.66 | per share |
| 10/04/02 | $ -1.87 | per share |
| 10/07/02 | $ -2.45 | per share |
| 10/08/02 | $ -3.17 | per share |
| 10/09/02 | $ -4.66 | per share |
| 10/10/02 | $ -0.68 | per share |
| 10/11/02 | $ 0.00 | per share |