No. 13-3532

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

————————

GLICKENHAUS INSTITUTIONAL GROUP,

*Plaintiff-Appellee,*

v.

HOUSEHOLD INTERNATIONAL, INC., ET AL.,

*Defendants-Appellants.*

————————

On Appeal from the United States District Court
for the Northern District of Illinois
No. 02-CV-5893
The Honorable Ronald A. Guzmán, District Judge

————————

**APPENDIX OF DEFENDANTS-APPELLANTS
VOLUME II**

————————

R. RYAN STOLL
MARK E. RAKOCZY
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0700
ryan.stoll@skadden.com

PAUL D. CLEMENT
 *Counsel of Record*
D. ZACHARY HUDSON
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

THOMAS J. KAVALER
JASON M. HALL
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
tkaveler@cahill.com

*Counsel for Defendants-Appellants*

February 12, 2014

# TABLE OF CONTENTS TO THE APPENDIX
## VOLUME I

Amended Consolidated Class Action Complaint
    Mar. 13, 2003 (Doc. 54) ................................................................A1

Memorandum Order and Opinion
    Feb. 28, 2006 (Doc. 434) ..........................................................A159

Exhibit 53 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-4) (admitted at trial as
    PX1397) ....................................................................................A165

Exhibit 54 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-4) ......................................................A184

Exhibit 56 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-5) (admitted at trial as
    PX1395) ....................................................................................A186

Exhibit 57 to Household Defendants' *Daubert* Motion to
    Exclude the "Expert" Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-5) ......................................................A205

Affidavit of Bradford Cornell, Exhibit 9 to Household
    Defendants' *Daubert* Motion to Exclude the "Expert"
    Testimony of Daniel Fischel
    Jan. 30, 2009 (Doc. 1361-7) ......................................................A207

Minute Order
    Mar. 23, 2009 (Doc. 1527) ........................................................A216

Jury Verdict
    May 7, 2009 (Doc. 1611) ...........................................................A219

# VOLUME II

Jury Instructions
    May 7, 2009 (Doc. 1614) .........................................................A314

Minute Order
    July 28, 2010 (Doc. 1693) .....................................................A353

Memorandum Opinion and Order
    Nov. 22, 2010 (Doc. 1703).....................................................A354

Order
    Jan. 31, 2011 (Doc. 1737) .....................................................A371

Affidavit of Bradford Cornell
    Oct. 14, 2011 (Doc. 1780-1) .................................................A376

Memorandum Opinion and Order
    Sept. 21, 2012 (Doc. 1822)....................................................A400

Excerpts from Transcript of Deposition of Daniel Fischel on
    March 21, 2008 (Doc. 1361-5) (pp. 1-4, 45-60, 77-88,
    129-140, 197-213) ...............................................................A413

Excerpts from the Transcript of Trial on April 16, 2009
    (Doc. 30) [Tr. 2477-2695]......................................................A429

Excerpts from the Transcript of Trial on April 20, 2009
    (Doc. 30) [Tr. 2802-3012]......................................................A435

Excerpts from the Transcript of Jury Instructions
    Conference on April 24, 2009
    (Doc. 30) [Tr. 3824-3965]......................................................A480

Excerpts from the Transcript of Jury Instructions
    Conference on April 27, 2009
    (Doc. 30) [Tr.3966-4073]........................................................A506

Excerpt from the Transcript of Trial on April 28, 2009
    (Doc. 30) [Tr. 4074-4303]......................................................A519

Excerpts from the Transcript of Jury Instructions
    Conference on May 1, 2009
    (Doc. 30) [Tr. 4672-4700].........................................................A526

Excerpts from the Transcript of Jury Instructions
    Conference on May 4, 2009
    (Doc. 30) [Tr. 4769-4813].........................................................A532

## INDEX TO TRANSCRIPT REFERENCES IN APPENDIX

| <u>Name of Witness</u> | Pages of Testimony <u>in Transcript</u> | Page where Testimony <u>Begins in Appendix</u> |
|---|---|---|
| Mukesh Bajaj | 4113-4117 | A521 |
| Daniel Fischel | 2683-2685, 2875-2910, 2936-2938, 2959-2961, 2966-2969 | A431 |

| Hearing other than Witness Testimony | Pages of Hearing in Transcript | Page where Hearing/Exhibit Begins in Appendix |
|---|---|---|
| Court and Counsel on April 16, 2009 Doc. 30 | 2683-2685 | A429 |
| Court and Counsel on April 20, 2009 Doc. 30 | 2875-2910, 2936-2938, 2959-2961, 2966-2969 | A435 |
| Jury Instructions Conference on April 24, 2009 Doc. 30 | 3838-3863 | A480 |
| Jury Instructions Conference on April 27, 2009 Doc. 30 | 4003-4004, 4066-4072 | A506 |
| Court and Counsel on April 28, 2009 Doc. 30 | 4113-4116 | A519 |
| Jury Instructions Conference on May 1, 2009 Doc. 30 | 4679-4681 | A526 |
| Jury Instructions Conference on May 4, 2009 Doc. 30 | 4712-4715 | A532 |

INDEX TO DEPOSITION REFERENCES IN APPENDIX

| Name of Deponent | Pages of Deposition in Transcript | Page where Deposition/Exhibit Begins in Appendix |
|---|---|---|
| Daniel Fischel | 1-4, 45-60, 77-88, 129-140, 197-213 | A413 |

02C5893   Judge Guzman
Jaffe v. Household International, Inc.
Filed Jury Instructions (Given).

Case: 13-3532      Document: 53-2      Filed: 02/12/2014      Pages: 233

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry or sex.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

FILED
MAY 0 7 2009
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

FILED
MAY 0 7 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

In this case, Defendants William Aldinger, David Schoenholz and Gary Gilmer are individuals, Defendant Household is a corporation and Plaintiffs are entities that purchased Household stock that represent a class of others similarly situated. All parties are equal before the law. Defendants and Plaintiffs are entitled to the same fair consideration.

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations.

During the trial, certain testimony was presented to you by the reading of a deposition and video. You should give this testimony the same consideration you would give it had the witness appeared and testified here in court.

A stipulation is an agreement between both sides that certain facts are true. If the parties have stipulated to a fact, you must accept that fact as proved.

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements, periodic summations and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

You will recall that during the course of this trial I instructed you that I admitted certain evidence only for a limited purpose. You must consider this evidence only for the limited purpose for which it was admitted.

During the trial I provided you with a written copy of the limiting instructions that apply to certain categories of evidence, including analyst reports, investor relations reports, presentations to investors, ratings agency reports, newspaper and magazine articles, complaints and settlements in other legal proceedings, and individual customer complaints. I will not read those instructions again, but they are included in the instructions that you will take to the jury room and that you must follow in your deliberations.

Some evidence was admitted for the limited purpose of assisting you to evaluate an expert witness' opinion. Such evidence must not be used by you for any other purpose.

Certain evidence in this case is admitted for a limited purpose only to show that the contents were publicly available, whether they affected the price of Household stock, or that Defendants were on notice of the contents. You must consider this evidence only for the limited purpose for which it was admitted.

First, a number of documents known as analyst reports were admitted in evidence. Analyst reports are written by market analysts employed by investment banks or brokerage firms, who comment on Household's business, its securities, and the economy in general. These exhibits are not admitted to show that what the analysts said was true. This evidence is admitted only to show that the contents of the analyst reports were publicly available, whether they affected the price of Household stock, or that Defendants were on notice of the contents, and for no other purpose.

Second, certain documents called investor relations reports were admitted in evidence. Household's investor relations report were prepared by Household employees for internal use within the company. The investor relations reports typically include quotations or excerpts from selected analyst reports. To the extent the investor relations reports quote from, attach or paraphrase statements made by analysts, you may consider those portions of the investor relations reports only for the limited purpose of showing that the contents of the analyst reports were publicly available, whether they affected the price of Household stock, or that Defendants were on notice of the contents, and for no other

purpose.

Third, certain evidence was admitted about presentations that Household executives made to analysts and investors, either in person or on conference calls. This evidence is admitted for the limited purpose of showing that the contents of the presentations were publicly available or whether they affected the price of Household stock, and for no other purpose.

Fourth, some reports prepared by ratings agencies that relate to Household's financial condition were admitted. These reports were not admitted to show that what the ratings agencies said was true. This evidence was admitted only to show that the contents of the ratings agencies' reports were publicly available, whether they affected the price of Household stock, or that Defendants were on notice of the contents, and for no other purpose.

Fifth, a number of newspaper and magazine articles were admitted. These articles are not admitted to show that the contents of the articles were true. Unless I instruct you to the contrary, you are to consider newspaper or magazine articles only for the limited purpose of showing that the contents of the articles were publicly available, whether they affected the price of Household stock, or that Defendants were on notice of the contents, and for no other purpose.

Certain evidence in this case is admitted only for the limited purpose of showing what one or more of the Defendants knew when they made the public statements that Plaintiffs allege were false or misleading. You must consider this evidence only for the limited purpose for which it was admitted.

First, evidence was admitted about complaints that were filed publicly against Household in certain other lawsuits during the relevant time period. This evidence is not admitted to show that the allegations asserted against Household in those prior lawsuits were true. These litigation documents, and any testimony about them, are admitted only for the limited purpose of (a) showing that the existence and nature of the prior lawsuits were known to one or more of the Defendants, (b) showing that this information was publicly available, or (c) showing whether the complaints affected the price of Household stock. You are not to consider this evidence for any other purpose.

Second, evidence was admitted about complaints made by certain individual customers of Household. The evidence about individual customer complaints is not admitted to show that the customers' complaints were true. This evidence is admitted only for the limited purpose of showing that the existence and nature of the complaints were known to one or more of the Defendants, and for no other purpose.

Third, evidence was admitted about settlements that Household entered into to resolve certain legal proceedings during the relevant time period.

Evidence about a settlement is not admitted to show that Household was at fault

or admitted any wrongdoing in the matter that was settled.  The evidence is

admitted only for the limited purpose of showing whether a settlement affected

the price of Household stock, and you must not consider this evidence for any

other purpose.

Each party is entitled to have the case decided solely on the evidence that applies to that party.

Any notes you have taken during the trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

the witness's memory;

any interest, bias, or prejudice the witness may have;

the witness's intelligence;

the manner of the witness while testifying;

and the reasonableness of the witness's testimony in light of all the evidence in the case.

You may consider the statements given by any party or witness who testified under oath before trial as evidence of the truth of what he or she said in the earlier statements, as well as in deciding what weight to give his or her testimony.

With respect to other witnesses, the law is different. If you decide that, before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his testimony here in court, you may consider the earlier statement or conduct only in deciding whether his testimony here in court was true and what weight to give to his testimony here in court.

In considering a prior inconsistent statement or conduct, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

It is proper for a lawyer to meet with any witness in preparation for trial.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and materials mentioned during this trial.

Plaintiffs contend that defendants at one time destroyed documents regarding Andrew Kahr's recommendations for Household and documents regarding use of the effective rate presentation. However, defendants contend that they did not destroy any documents regarding Andrew Kahr's recommendations, and whatever they did with regard to documents relating to the effective rate presentation was for legitimate business purposes.

Defendants' destruction of a document, standing alone, does not warrant an inference that the document contained information that is unfavorable to the defendants. You may assume that such evidence would have been unfavorable to defendants only if you find by a preponderance of the evidence that:

1.    Defendants intentionally destroyed evidence or caused evidence relevant to plaintiffs' claims to be destroyed; and

2.    Defendants destroyed the evidence or caused the evidence to be destroyed in bad faith, in other words, for the purpose of hiding adverse information.

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such a person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case.

Certain demonstrative exhibits have been shown to you. Those exhibits are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.

You must give separate consideration to each claim and each party in this

case.

When I say a particular party must prove something by "a preponderance of the evidence," or when I use the expression "if you find," or "if you decide," this is what I mean: when you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

Plaintiffs contend that Defendants Household, William Aldinger, David Schoenholz and Gary Gilmer violated Section 10b of the Securities Exchange Act and the Securities Exchange Commission or SEC's Rule **10b-5.** From now on, I will use "10b-5" to refer to both the Section and the Rule.

To prevail on their 10b-5 claim against any defendant, plaintiffs must prove each of the following elements by a preponderance of the evidence as to that defendant:

(1) the defendant made, approved, or furnished information to be included in a false statement of fact or omitted a fact that was necessary, in light of the circumstances, to prevent a statement that was made from being false or misleading during the relevant time period between July 30, 1999 and October 11, 2002;

(2) the false statement or omission was material;

(3) the defendant acted with a particular state of mind; and

(4) the defendant's statement or omission was a substantial factor in causing plaintiffs' economic loss.

If you find that the plaintiffs have proved each of the above elements as to any defendant, your verdict should be for the plaintiffs and against that defendant. If you find that the plaintiffs have not proved each of the above elements as to any defendant, your verdict should be for that defendant and against the plaintiffs.

To meet the first element of their 10b-5 claim against any defendant, plaintiffs must prove that during the relevant time period the defendant made a false or misleading statement of fact or omitted a fact that was necessary to prevent a statement that was made from being misleading.

Table A to the verdict form that you will be given, sets forth the statements that plaintiffs claim are false and misleading.

In determining whether a statement of fact is false or misleading, you must consider the statement in light of the circumstances that existed at the time it was made.

An omission violates 10b-5 only if the defendant has a duty to disclose the omitted fact. The defendants do not have a duty to disclose every fact they possess about Household or any fact that is in the public domain. But each defendant has a duty to disclose a fact if a prior or contemporaneous statement he or it made about the same subject would be misleading if the fact is not disclosed. If a defendant does not have a duty to disclose a fact but chooses to make a statement about it, the statement must be truthful and not misleading.

Defendant Household is required to file with the SEC an annual report, called a 10-K, and quarterly reports, called 10-Qs, for the first three quarters of each year. These reports include financial statements and other disclosures. Financial statements present a company's financial position at one moment in

time, or its operating results and cash flows for a specified period. Household has no duty to update its 10-Q reports on any cycle other than quarterly.

Household is required to prepare its financial statements regarding the delinquency status of loans and the accounting for its credit card agreements in accordance with generally accepted accounting principles or GAAP. GAAP are the accepted rules and procedures used by accountants in preparing financial statements. If you find that any of Household's financial statements regarding the delinquency status of loans and the accounting for its credit card agreements was not prepared in accordance with GAAP, you may presume that that portion of the financial statement is false or misleading.

To meet the second element of their 10b-5 claim against any defendant, plaintiffs must prove that the false or misleading statement of fact that the defendant made, or failed to make, was material.

A statement of fact or omission is material if there is a substantial likelihood that a reasonable investor would have considered it important in deciding whether to buy or sell Household stock. An important statement or omission is one that a reasonable investor would view as significantly altering the total mix of information to be considered in deciding whether to buy or sell Household stock.

A reasonable investor is presumed to have ordinary intelligence and is presumed to have information available in the public domain.

In determining whether a statement or omission is material, you must consider it in light of the circumstances that existed at the time the statement was made or the fact was omitted.

To meet the third element of their 10b-5 claim against any defendant, plaintiffs must prove that the defendant acted with a specific state of mind. Defendants William Aldinger, David Schoenholz, Gary Gilmer acted with the required state of mind in making a statement of material fact if he made the statement knowing that it was false or misleading or with reckless disregard for a substantial risk that it was false or misleading.

Defendants William Aldinger, David Schoenholz or Gary Gilmer acted with the required state of mind in failing to disclose a material fact if he knew that the omission would make another statement he made on the same subject misleading or he recklessly disregarded a substantial risk that the omission would make another statement he made on the same subject misleading.

A defendant's conduct is reckless if it is an extreme departure from the standards of ordinary care and he knows that it presents a risk of misleading investors or the risk is so obvious that he had to have been aware of it.

A finding that any defendant acted with the required state of mind depends on what he knew or should have known when he made a particular statement or omission.

Defendant Household, which can only act through its employees, had the required state of mind with respect to a false statement or omission if defendants William Aldinger, David Schoenholz, Gary Gilmer or any other Household

employee made the statement or omission with the required state of mind while acting within the scope of his or her employment.

The fact that Household restated certain financial statements does not, by itself, prove that any defendant acted knowingly or recklessly with respect to the information in the original financial statements. However, you may consider it along with any other evidence to determine whether any defendant acted knowingly or recklessly.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

To meet the last element of their 10b-5 claim against any defendant as to any false or misleading statement or omission of material fact, plaintiffs must prove that the defendant's particular statement or omission was a substantial cause of the economic loss plaintiffs suffered. Plaintiffs do not have to prove that any statement or omission was the sole cause of plaintiffs' loss.

A statement or omission of material fact is a substantial cause of plaintiffs' loss if (1) it causes Household's stock price to be higher than it would be if the statement had not been made or the concealed fact had been disclosed; and (2) the market's discovery of the truth about that statement or omission causes Household's stock price to decrease. The truth may be revealed to the market through a single disclosure or a series of disclosures made by any person or entity.

Household is liable for any violation of 10b-5 that you find defendants William Aldinger, David Schoenholz, Gary Gilmer, or any other Household employee committed while acting within the scope of his or her employment and trying to further Household's goals.  A Household officer or employee acts within the scope of his or her employment when transacting business Household assigned to him or her or doing anything that can reasonably be considered to be part of his or her employment.

If you find that plaintiffs have not proved all of the elements of their 10b-5 claim against any defendant, then you should not consider the question of damages.

If you find that plaintiffs have proved all of the elements of their 10b-5 claim against any defendant, then you must determine the amount of per share damages, if any, to which plaintiffs are entitled. Plaintiffs can recover only actual damages, which is the difference between the price plaintiffs paid for each share of Household stock and the price each share would have cost if no false or misleading statement or omission of material fact had occurred, in other words, the measure of inflation in the stock price. This is the only damages calculation you will be asked to make in this case. Any damages you award must have a reasonable basis in the evidence. Damages need not be proved with mathematical certainty but there must be enough evidence for you to make a reasonable estimate of damages.

Under Section 20(a) of the Securities Exchange Act, a defendant may be liable for what is called a "secondary violation," even if he did not violate 10b-5, if he had the authority to control another defendant who violated 10b-5. Plaintiffs claim that each of the Individual Defendants, William Aldinger, David Schoenholz, and Gary Gilmer is liable for a secondary violation under Section 20(a).

To prove that any defendant is liable for a secondary violation, plaintiffs have the burden of proving both of the following elements:

1.      that another defendant (called a "primary violator") violated 10b-5 in the manner I have previously explained; and

2.      that the defendant was a "controlling person" with respect to the primary violator.

If you determine that no defendant has violated 10b-5, you do not have to consider whether any defendant was a controlling person.

If you find that any defendant was a primary violator, however, you must then determine whether any of the other defendants was a "controlling person" as to that primary violator.

To establish that William Aldinger, David Schoenholz or Gary Gilmer was a "controlling person," plaintiffs must prove that:

(1) the defendant actually exercised general control over the operations of the primary violator; and

(2) the defendant had the power or ability, even if that power was not exercised, to control the specific transaction or activity upon which the primary violation was based — in this case, making the specific false statement or omission of material fact.

Both of these elements must be established as to each individual defendant. The parties have stipulated that both William Aldinger and David Schoenholz actually exercised general control over the operations of Household, so no proof is required on that element as to those two defendants, in their relation to Household.

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

A verdict form has been prepared for you.

[Verdict form read.]

Take the verdict form to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

The verdict must represent the considered judgment of each juror. Your verdict for or against any party must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of other jurors or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are impartial judges of the facts.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.0.3**
**Eastern Division**

Lawrence E Jaffe, et al.

Plaintiff,

v.                                              Case No.: 1:02−cv−05893

                                                Hon. Ronald A. Guzman

Household International Inc., et al.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, July 28, 2010:

      MINUTE entry before Honorable Ronald A. Guzman: The Court denies defendants' Motion for Summary Judgment Dismissing All Remaining Claims of the Class [doc. no. 1227] as moot. Mailed notice (cjg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | | |
|---|---|---|
| **LAWRENCE E. JAFFE PENSION** | ) | |
| **PLAN, on Behalf of Itself and All Others** | ) | |
| **Similarly Situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **02 C 5893 (Consolidated)** |
| | ) | |
| **HOUSEHOLD INTERNATIONAL, INC.,** | ) | **Judge Ronald A. Guzmán** |
| **MERRILL LYNCH, PIERCE, FENNER,** | ) | |
| **& SMITH, INC., GOLDMAN SACHS &** | ) | |
| **CO., INC., ARTHUR ANDERSEN, L.L.P.,** | ) | |
| **WILLIAM F. ALDINGER, DAVID A.** | ) | |
| **SCHOENHOLZ, GARY GILMER,** | ) | |
| **J.A. VOZAR, ROBERT J. DARNALL,** | ) | |
| **GARY G. DILLON, JOHN A.** | ) | |
| **EDWARDSON, MARY JOHNSTON** | ) | |
| **EVANS, J. DUDLEY FISHBURN,** | ) | |
| **CYRUS F. FREIDHEIM, LOUIS E. LEVY,** | ) | |
| **GEORGE A. LORCH, JOHN D.** | ) | |
| **NICHOLS, JAMES B. PITBLADO,** | ) | |
| **S. JAY STEWART, and LOUIS W.** | ) | |

**SULLIVAN,**                                      )

                                                   )

        **Defendants.**                            )


### MEMORANDUM OPINION AND ORDER

Before the Court are the parties' submissions regarding post-verdict Phase II of this case. This Order addresses the parties' concerns and creates the protocol for Phase II, as well as the appropriate method of calculating damages with respect to each class member's claims.


### Background

On May 7, 2009, the jury found that defendants Household International, Inc., William Aldinger, David Schoenholz and Gary Gilmer violated 15 U.S.C. § 78(j)(b) ("§ 10(b)") of the Exchange Act of 1934 ("1934 Act")), and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") and 15 U.S.C. § 78(t)(a) ("§ 20(a)") with respect to statements made from March 23, 2001 to October 11, 2002. In addition, the jury determined the inflation per share from March 23, 2001 to October 11, 2002.

We now move to Phase II of the class action.  Previously, Magistrate Judge Nan R. Nolan bifurcated class discovery and held that discovery as to any individual plaintiff's reliance would occur after a determination of class-wide liability and the applicability of the fraud-on-the-market theory.  Neither party filed objections to that ruling.  Accordingly, Phase II shall address the issue of defendant's rebuttal of the presumption of reliance as to particular individuals as well as the calculation of damages as to each plaintiff.  In creating a Phase II

protocol, this Court receives very little guidance from other courts because securities fraud class actions have rarely proceeded to trial, let alone reached subsequent proceedings. *See, e.g.*, *Edward J. Bartolo Corp. v. Coopers & Lybrand*, 928 F. Supp. 557, 560 (W.D. Pa. 1996).

On one hand, plaintiffs contend that the only remaining tasks are implementing the procedure by which defendants will exercise the right to rebut the presumption of reliance and determining the formula for calculating class members' claims and calculating damages. Plaintiffs ask the Court to approve a notice to be sent to class members advising them of the verdict and their right to file a claim for recovery along with an interrogatory addressing the issue of reliance.

On the other hand, defendants argue that due process guarantees their right to a jury trial as well as pretrial discovery regarding the contested individual issues of reliance. Defendants contend that there is no reasonable substitute for the consideration of class members' actual trading history to quantify damages.

## Discussion

### I.    Rebutting the Presumption of Reliance

Having prevailed on their fraud-on-the-market theory, plaintiffs are entitled to a presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). In *Basic*, the Court explained the fraud-on-the-market doctrine as follows:

An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market

price, an investor's reliance on any public material misrepresentations, therefore, may be

presumed for purposes of a Rule 10b-5 action. *Id.* The fraud-on-the-market doctrine provides "a

practical resolution to the problem of balancing the substantive requirement of proof of reliance

in securities cases against the procedural requisites of [Federal Rule of Civil Procedure] 23." *Id.*

at 242 (alteration in original). Following *Basic*, the Seventh Circuit has explained that the

reliance required for a Rule 10b-5 action is not reliance as used in the lay sense of the term:

> "[R]eliance" is a synthetic term. It refers not to the investor's state of mind but to
> the effect produced by a material misstatement or omission. Reliance is the
> confluence of materiality and causation. The fraud on the market doctrine is the
> best example; a material misstatement affects the security's price, which injures
> investors who did not know of the misstatement.

*Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1170 (7th Cir. 1995).

When someone makes a false (or true) statement that adds to the supply of available

information, that news passes to each investor through the price of the stock. And since all stock

trades at the same price at any one time, every investor effectively possesses the same supply of

information. The price both transmits the information and causes the loss.

*Schleicher v. Wendt*, __ F.3d ____, No. 09-2154, 2010 WL 3271964, at *1 (7th Cir. Aug. 20,

2010). Thus, when the fraud-on-the-market theory applies, "the plaintiff has indirect knowledge

of the misrepresentation or omission underlying the fraud. He is reacting to a change in price,

and the change was induced by a misrepresentation, so he receives as it were the distant signal of

the misrepresentation and acts in response to it." *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d

1207, 1213 (7th Cir. 1993). Accordingly, "[w]hen a company's stock trades in a large and

efficient market, the contestable elements of the Rule 10b-5 claim reduce to falsehood, scienter, materiality, and loss." *Schleicher*, 2010 WL 3271964, at *1.

In order to rebut the presumption of reliance, defendants must show that in purchasing Household shares, class members did not rely on the integrity of Household's stock price. The *Basic* Court said a defendant could rebut the presumption by making a showing that: (1) "the 'market makers' were privy to the truth . . . , and thus that the market price would not be affected by [defendants'] misrepresentations"; (2) the truth had "credibly entered the market and dissipated the effects of the misstatements"; or (3) something severed "the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." *Id*. at 248-49.

At trial, defendants addressed the first two methods when they raised a "truth-on-the-market" defense and attempted to prove that the truth about Household's predatory lending practices and credit quality manipulation was well known. (*See* Trial Tr. at 1264:21-23 (testimony by Gary Gilmer, then-Vice-Chairman of Consumer Lending and Group Executive of U.S. Consumer Finance, that there was a discussion in the marketplace about Household's use of prepayment penalties); *id.* at 1266:20-1269:2 (discussing press coverage of Household's use of origination points); *id.* at 1268:25-1269:3 ("A: It is true that the things that we have been discussing were well publicized. Q: No secret. A: None whatsoever."); *id.* at 1287:11-1288:3 (stating that Household never "hid" the fact that it often placed a second mortgage on top of first mortgages); *id.* at 1292:7-15 (discussing that the market was aware of Household's use of the high loan-to-value ("LTV") loan (loan amount that exceeds or nearly exceeds the value of the house that is used as collateral); *id.* at 1308:6-10 (testifying that the "world knew" that Household loans had prepayment penalties); *id.* at 1385:8-1387:20 (stating that the market was aware that Household utilized incentive compensation methods with its employees); *id.* at

1283:9-17 (discussing analyst report recommending "sell" due to ACORN lawsuit and

questioning Household's lending practices); *id.* at 1284-1286:21 (stating information about the

ACORN lawsuit was "out in the marketplace" and "available to the shareholders"); *id.* at

1341:17-1345:7 (testifying that Household's lending practices were criticized routinely in the

press); *id.* at 1391:10-1394:15 (stating that there was discussion "in the press and in the

marketplace about Household's customer complaints"); *id.* at 1403:22-1406:3 (testifying that

investors knew that Household faced headline risk); *id.* at 1410:5-1412:7 (stating that there was

an awareness in the marketplace that Household was facing a "more onerous regulatory

environment"); *id.* at 1711:4-20, 1713:6-10; (discussing that investors knew about the debate in

the market on the subject of predatory lending, knew what Household's products were, knew that

Household's employees violated Company policy and knew that state and federal regulators

"were on to that"); *id.* at 2133:16-23 (stating that Household's one-payment reage and automatic

reage policies were disclosed to the public in securitization documents); *id.* at 2137:5-18;

2152:16-2153:4 (testimony by David Schoenholz, then-President and COO and Chairman of the

Board, stating that Household utilized a "two-pronged disclosure approach" regarding its re-

aging policies in 2002); *id.* at 2147:13-22, 3265:22-3266:2 (arguing that Household's reage

policies were explained to the investment community at the April 9, 2002 Financial Relations

Conference); *id.* at 3085:8-15 (testimony by William Aldinger, then-CEO and Chairman of the

Board, explaining that "professional investors — and individual investors, in fact — rely on

[analyst] reports," such as the Legg Mason report, in making their investment decisions."); *id.* at

3100:12-14 (stating that it was his "understanding that a document filed with the SEC is

available to everybody"); *id.* at 3156:17-3158:9 (testifying that while there was no disclosure in

the 2001 Form 10-K of Household's one-payment practice, this practice was disclosed in a

November 12, 1999 securitization prospectus); *id.* at 3158:13-3159:24 (explaining that while Household did not disclose its automatic reage practice in the 2001 Form 10-K, the practice was disclosed in a securitization document filed with the SEC on August 3, 2001); *id.* at 3159:23-24 (stating, "It's hard to conceal anything that you've filed with the SEC.  It's a public record after that."); *id.* at 3185:2-3193:21 (discussing the Legg Mason analyst report that analyzed Household's use of high LTV loans and other Household lending practices); *id.* at 3251:24-3254:23 (arguing that Household had been disclosing its re-aging policies for quite some time); Defs.' Trial Ex. ("Defs.' Ex.") 91 (analyst report discussing Household's growth strategy of writing the largest home equity loan it prudently could write); Defs.' Ex. 222 (Salomon Smith Barney analyst report discussing Household's predatory lending-rebated headline risk); Defs.' Ex. 338 (*American Banker* article discussing Household's predatory lending-related headline risk); Defs.' Ex. 230 (discussing Goldman Sachs analyst report that defendants claim made the market aware of Household's incentive compensation programs); Defs.' Ex. 534 (analyst report discussing lawsuit filed by ACORN); Defs.' Ex. 613 (newspaper article discussing ACORN complaints); Defs.' Ex. 624 (news article questioning predatory lending); Defs.' Ex. 695 at HHT0002335 (stating that "[d]elinquent accounts may be restructured (deemed current) every six months.  Accounts are automatically restructured if the customer has made the equivalent of one payment equal to at least 95% of a full standard payment.  Once restructured, the account is deemed current; however, the credit limit is zero."); Defs.' Ex. 852 at F11-ITOO15798 ("Our policies . . . permit reset of the contractual delinquency status of an account to current, subject to certain limits, if a predetermined number of consecutive payments has been received and there is evidence that the reason for the delinquency has been cured."); Defs.' Ex. 880 at HHTOO17968 (providing that "[t]he master servicer may in its discretion . . . treat a home equity loan as current

if the borrower has made one scheduled payment to cure the delinquency status of the home equity loan").

Throughout the trial, defendants presented evidence that the investors in Household stock were among the most sophisticated in the world and could not have been fooled by the alleged misrepresentations regarding Household's predatory lending and re-aging practices and their impact on its credit quality. Unfortunately for defendants, however, the jury concluded otherwise. The jury found that defendants made material false statements or omissions and caused plaintiffs' economic loss on a class-wide basis, in other words, that the truth did not enter the market and dissipate the effects of defendants' false statements or omissions. Thus, the issues with regard to the first two of the three methods of rebutting the presumption of reliance have been litigated and defendants will not be afforded a second bite at the apple, regardless of how they frame the issue.

As to the third method of rebutting the presumption of reliance, however, Phase II will afford defendants an opportunity to rebut the presumption using the third method set forth in *Basic*, *i.e.*, that the link between the alleged misrepresentations and either the price received or paid by the plaintiff was severed. Plaintiffs argue that it is difficult to imagine a circumstance in which a class member would have purchased Household stock with actual knowledge of defendants' fraud and that there is no basis to believe that any class member did so. The Court agrees. The evidence establishes that defendants did not provide any material nonpublic information to any investors (except Wells Fargo). Thus, there is no evidence that any class member purchased Household stock with actual knowledge that its price had been artificially inflated by defendants' fraud. However, that does not foreclose the remote possibility that some

class member may have purchased Household stock for a reason totally unrelated to its value as reflected by the market price.

Accordingly, the Notice and Preliminary Claim Questionnaire to plaintiffs will require each class member to answer, under the penalty of perjury, the following question:

> If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household stock and thereby caused you to pay more for Household stock than you should have paid, would you have still purchased the stock at the inflated price that you paid?  YES ___  NO ___.

(Court's Modified Proof of Claim and Release.)  This question goes to the heart of the issue of individual reliance.[1]  If the answer is "no," it does not matter whether the individual plaintiff purchased or sold any Household share (1) via an options contract, (2) as a day trader, (3) to hedge another tracking strategy, (4) through an automatic dividend reinvestment program or (5) pursuant to a proprietary trading model.  However, if the answer is "yes," defendants will have evidence that helps them rebut the presumption of reliance.  Defendants may issue additional interrogatories to plaintiffs answering "yes" to obtain convincing proof that price paid no part whatsoever in their decision-making.  This protocol sensibly resolves the tension between the rebuttable presumption of reliance and the practicalities and purposes behind Federal Rule of Civil Procedure 23.

There is one exception to this protocol:  Wells Fargo.  Defendants already have reason to suspect that Wells Fargo, as part of its due diligence investigation of a potential (but

---

[1] Defendants concede that they have no incentive to waste time and money on examining small shareholders who do not indicate that they would have purchased stock regardless of whether they knew of defendants' false and misleading statements.

unconsummated) merger with Household in 2002, was privy to non-public information regarding Household's pervasive and aggressive write-off, expense deferral and re-aging policies, which ultimately scotched the merger. As to Wells Fargo, the Court will allow discovery as to whether its knowledge of these policies in 2002 severs the link between Household's misrepresentations and either the price received (or paid) by Wells Fargo for Household stock. Defendants will be permitted to proceed with discovery as to Wells Fargo without waiting for Wells Fargo to return its completed questionnaire.

## II.     Calculating Damages

### A.     The Netting Approach

Next, the Court addresses threshold damages issues with regard to the calculation of the class members' claims. Although damages cannot be based on pure speculation, they need not be calculated with mathematical precision. *Hoefferle Truck Sales, Inc. v. Divco-Wayne Corp.*, 523 F.2d 543, 553 (7th Cir. 1975); *see, e.g.*, *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 383 (7th Cir. 1986) ("Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer."). The parties agree that the correct measure of damages in a Rule 10b-5 case is out-of-pocket loss. *See Associated Randall Bank v. Griffen, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 214 (7th Cir. 1993); 5E ARNOLD S. JACOBS, *Out of Pocket Measure of Damages, in* DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS § 20:7 (2010). Under this measure, damages are defined as the difference between the purchase price and the price that would have been received but for the alleged fraud. *Harris Trust & Sav. Bank v. Ellis*, 810 F.2d 700, 706-07 (7th Cir. 1987). Defendants argue that recovery should be

limited to "actual damages," which would require plaintiffs' out-of-pocket losses to be netted against any of plaintiffs' inflationary gains attributable to defendants' fraud.  (Defs.' Resp. 8. (arguing that actual damages are calculated by netting inflation-related gains against losses).)  Plaintiffs argue that gains made with respect to the sale of shares are irrelevant because their claims are based on losses that resulted solely from purchases (as opposed to sales) of Household shares.  (Pls.' Post-Verdict Submission 18.; *see In re Schering-Plough Corp. Sec. Litig.*, No. 1-029, 2003 U.S. Dist. LEXIS 26297, at *26 (D.N.J. Oct. 9, 2003).

While the Seventh Circuit has yet to address whether out-of-pocket damages are limited to "actual damages" in Rule 10b-5 cases, the Second, Fifth, Ninth and Tenth Circuits have held that they are and require that plaintiffs' losses be netted against their profits attributable to the same fraud.[2]  *See Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313-14 (2d Cir. 1977); *Abrahamson v. Gleschner*, 568 F.2d 862, 878-79 (2d Cir. 1976); *Blackie v. Barrack*, 524 F.2d 891, 908-09 (9th Cir. 1975) (holding that if the stock is resold at an inflated price the purchaser-seller's damages should be offset by any profits recovered due to inflation in the stock price attributable to the fraud); *Wolf v. Frank*, 477 F.2d 467, 478-79 (5th Cir. 1973); *Richardson v. MacArthur*, 451 F.2d 35, 43-44 (10th Cir. 1971).  Courts in this district have also generally held that damages should be offset by any inflationary gains attributable to the defendant's fraud. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009) (netting plaintiffs' losses with gains from inflated stock prices attributable to fraud); *In re Comodisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001) (holding the same).  This Court agrees that in a Rule 10b-5 action out-of-pocket damages should be limited to actual damages because it is a better measurement of the true economic loss sustained by plaintiffs due to defendants'

---

[2] These courts said that conclusion was dictated by the Securities Exchange Act of 1934, which states that "no person . . . shall recover, [] a total amount in excess of his *actual damages* on account of the act complained of."  § 78bb(a) (emphasis added).  Rule 10b-5 does not endorse any specific theory or methodology of quantifying economic loss.

fraud. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (stating that securities laws are not designed to provide investors with insurance against market losses, but to protect them against economic losses that misrepresentations actually cause); *Arenson v. Broadcom Corp.*, No. SA CV 02-301GLT, 2004 WL 3253646, at *2 (C.D. Cal. Dec. 6, 2004) (holding that where a plaintiff engages in multiple purchases and sales during the period in which the stock is inflated, the proper damages methodology is to take all the inflation losses resulting from all purchases at the inflated price and reduce this amount by all the inflation gain resulting from all sales at the inflated price); *see also* Frank H. Easterbrook & Daniel R. Fischel, *Optimal Damages in Securities Cases*, 52 U. CHI. L. REV. 611, 651-52 (1985) (basing damages on the net harm that an offender's acts cause should achieve optimal deterrence). Therefore, this Court holds that out-of-pocket damages are limited to actual damages such that plaintiffs' losses must be netted against any of their profits attributable to the same fraud.

The jury has already determined the per share inflation for each day Household's stock was affected by defendants' fraud—March 23, 2001 through October 11, 2002 ("Damages Period"). Accordingly, the measure of each plaintiff's out-of-pocket damages depends on when, and if, he bought and sold shares during the Damages Period. Consistent with the standard set forth above, damages in this case will be as follows: (1) for shares purchased during the Damages Period but not sold, damages will be the amount of artificial inflation at the time of purchase; (2) for shares purchased before the class period and sold during the Damages Period at a gain or a loss damages will be plaintiff's out-of-pocket loss less any gain obtained or loss avoided because of artificial inflation at the time of the sale; and (3) for shares purchased during the Damages Period, damages will be the artificial inflation at the time of purchase less the artificial inflation at the time of sale.

Further, plaintiffs' damages will be limited by the mathematical formula provided in the 90-Day Bounce Back Rule. The Private Securities Litigation Reform Act of 1995 ("PSLRA") 90-Day Bounce Back Rule provides that damages:

> [S]hall not exceed the difference between the purchase . . . price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

§ 78u-4(e)(1). For purposes of the 90-Day Bounce Back Rule, the "mean trading price" of a security shall be an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period. § 78u-4(e)(3).

Here, the 90-day period begins on October 11, 2002, the date the jury found defendants' fraud no longer affected Household's stock. Consistent with the formula set forth above, recoverable damages in this case will be limited by the 90-Day Bounce Back Rule as follows: (1) no limitation for Household shares sold prior to October 11, 2002; (2) for Household shares sold during the 90-Day Bounce Back period from October 11, 2002 through January 8, 2003, damages will be limited to the purchase price per share less the average closing price from October 11, 2002 through the day of the sale; and (3) for Household shares retained at the end of January 8, 2003, damages will be limited to the purchase price per share less the 90-day average closing price from October 11, 2002 through January 8, 2003. § 78u-4(e)(1)-(3).

## B.     FIFO v. LIFO

The parties also disagree as to the appropriate method for matching purchases and sales when a shareholder has engaged in multiple transactions. Here, the parties propose two

opposing theories for matching transactions: the first-in first-out ("FIFO") method and the last-in first-out ("LIFO") method. Each method, however, clearly favors one party over the other. The LIFO method favors the defendants by taking into consideration gains that might have accrued to plaintiffs during the class period. *See In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101-02 (S.D.N.Y. 2005) (explaining that LIFO leads to lower damages by offsetting gains). Under LIFO, sales of the defendant's stock during the class period are matched against the last shares purchased. *Id.* at 102. Because both the purchase and sale occurred during the class period, it is likely that both transactions were affected by the fraud. *See id.* Thus, any gains that might have accrued to plaintiffs through the sale of stock during the class period because of fraud related inflation in the stock price are offset from plaintiff's total losses during the class period, thereby lowering plaintiff's total damages. *Id.*

The FIFO method, however, often gives plaintiffs a windfall by not taking into consideration gains they obtained from sales of stock during the class period at a price that was inflated by fraud. *In re Schering-Plough.*, 2003 U.S. Dist. Lexis 26297, at *26. Under FIFO, plaintiff's sales are matched first against the earliest purchases of stock, often matching sales during a class period with stock purchased prior to the class period. *Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 532 (N.D. Cal. 2009). Because some of the sales are matched with pre-class period stock, courts applying FIFO exclude such transactions from the damage calculations (including any gains from such transactions), thus usually resulting in a higher damages for the plaintiffs.[3] *Johnson v. Dana Corp. et al.*, No. 3:05 CV 7388, 2006 WL 782746, at *1-3 (N.D.

---

[3] Courts that find deterrence to be the primary objective of Rule 10b-5 tend to use FIFO because it creates higher damage awards, while courts emphasizing compensation as the primary objective tend to use LIFO. *Compare Kane v. Shearson Loeb Rohades, Inc.*, No. 86-551-CIV, 1989 U.S. Dist. LEXIS 19022, at *15, *23 (S.D. Fla. May 3, 1989), *with S.E.C. v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937, 2005 WL 217018, at *7 (S.D.N.Y. Jan. 31, 2005). This Court attempts to apply a solution that reasonably and fairly accomplishes both objectives.

Ohio May 24, 2006) (explaining that FIFO does not provide for netting of inflation-related gains).  Consequently, the major reason (if not the only reason) why numerous courts have held that LIFO is the appropriate method for matching transactions in securities fraud cases is because it takes into account inflation related gains due to the fraud, and therefore, is a more accurate reflection of plaintiff's damages.  *See In re eSpeed*, 232 F.R.D. at 102.  If, however, as this Court provides, plaintiffs' gains attributable to defendants' fraud are netted from the plaintiffs' total loss, then such gains are taken into consideration and utilizing FIFO as a method of matching does not produce a windfall to the plaintiffs.  *See* RAYMUND WONG, NERA ECON. CONSULTING, PURCHASE-SALE MATCHING IN SECURITIES LITIGATION: FIFO, LIFO, AND OFFSETS 9, 17, 22-23 (2008) (noting that many court decisions reveal that losses claimed by plaintiffs in securities class action cases should be offset by gains related to the alleged fraud regardless of whether FIFO or LIFO is used to avoid a windfall to plaintiff, even if these gains were from sales of securities purchased prior to the class period), *available at* http://www.nera.com/image/PUB_Purchase_Sale_Matching_Wong_1008.pdf.

Further, FIFO has historically been the accounting method of choice for governmental institutions.  For instance, FIFO has been used by courts and the Internal Revenue Service ("IRS") to determine losses and gains for tax purposes.  Treas. Reg. § 1.1012-1(c); *see Holmes v. Comm'r of Internal Revenue*, 134 F.2d 219, 221 (3d Cir. 1943) ("[FIFO] is so old and well known . . . it is incorporated in [the tax code].  It is sufficient to say that it establishes a presumption to be followed."); *Thompson v. Shaw Group, Inc.*, No. 04-1685, 2004 U.S. Dist. Lexis 25641, at *14 n.5 (E.D. La. Dec. 15, 2004) ("Many federal appeal courts and commentators regard FIFO, which the IRS consistently uses, as a firmly established

15

**A368**

methodology for calculating loss for tax purposes in the context of securities investments.").

FIFO also has been the preferred method of calculating losses by the IRS "where shares of stock

cannot be identified with any particular lots purchased." *Helvering v. Campbell*, 313 U.S. 15,

20-21 (1941). Further, because of the convergence between Generally Accepted Accounting

Principles ("GAAP") and International Financial Reporting Standards ("IFRS"), which do not

permit the use of LIFO as an inventory method, LIFO will likely become obsolete for both

financial reporting and tax purposes in the near future.[4] FIFO has been established as a

reasonable measure for computing losses or gains from stock purchases or sales in the past, and

as such this Court holds that FIFO is the appropriate method for matching purchases and sales

given the tax laws and recent developments in the accounting world.

      In sum, by utilizing netting this Court has avoided applying FIFO in a way that will result

in a windfall to the plaintiffs. Therefore, this Court holds that the fair and reasonable method for

calculating damages in this class action is to apply FIFO for the method of matching purchases

and sales while netting plaintiffs' losses against any profits attributable to defendants' fraud.

## <u>Conclusion</u>

---

[4] Although GAAP is currently authoritative in the United States, IFRS has been developing a set
of accounting standards that are becoming the global standard. *IFRS Resources*, AMERICAN
INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, www.ifrs.com/updates/FASB-
IASB_Projects.html (last visited Oct. 21, 2010). These standards do not permit the use of LIFO
as an inventory method. IASB International Accounting Standard 2.25. The SEC, backed by the
American Institute of Certified Public Accountants ("AICPA") and others, have agreed to a
series of steps that could require the use of IFRS by publicly traded companies in the United
States by 2014. Roadmap for the Potential Use of Financial Statements Prepared in Accordance
with International Financial Reporting Standards by U.S. Issuers, 73 Fed. Reg. 70,816, 70,825
(proposed Nov. 21, 2008) (to be codified at 17 C.F.R. pts. 210, 229, 230, 240, 244 & 249).

As outlined herein, the Court has addressed the parties' arguments regarding the protocol for Phase II and determined the appropriate method of calculating damages with respect to each class member's claims. The Court approves lead plaintiff's proof of claim form and release as modified by the Court's rulings herein. Plaintiffs shall prepare and file a final version that includes the proposed schedule for mailing the form and release to the class as well as the deadline for responses thereto prior to the status hearing of January 5, 2011.

**SO ORDERED.**                         **ENTERED:  November 22, 2010**

**HON. RONALD A. GUZMAN**

**United States District Judge**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Lawrence E. Jaffe Pension Plan, on behalf of itself and all others similarly situated, | ) ) ) ) | |
| | ) | No. 02 C 5893 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Hon. Ronald A. Guzmán |
| | ) | |
| Household International, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Order**

Plaintiffs move the Court for a protective order pursuant to Federal Rule of Civil Procedure 26(c)(1)(D). Plaintiffs seek an order limiting defendants' discovery demands to: (1) interrogatories and document requests that address whether institutional class members had any material non-public information or otherwise knew of the fraud and still purchased Household stock; (2) only allowing depositions of, and discovery of trading strategies or models from, the institutional class members who indicate in their responses to interrogatories and document requests that they had material non-public information or otherwise knew of the fraud and still purchased Household stock knowing the price was inflated; (3) prohibiting defendants from seeking discovery regarding reliance issues such as the truth on the market defense already rejected by the jury; (4) prohibiting any discovery regarding any firewall policy separating analysts and investment decisions; and (5) limiting the relevant period for discovery to March 22, 2001 through October 11, 2002. Plaintiffs also seek similar restrictions regarding deposition questions.

The motion is prompted by defendants' rather expansive discovery requests. It appears that defendants have served 98 class members and all 3 named plaintiffs with identical Rule 30(b)(6) deposition notices, requests for production of documents and interrogatories.

The issue presented is not new to this case. It was a topic of discussion at the March 2009 pretrial conference. As the Court put it then:

> The problem, of course, is that if a class action is going to mean anything, it's going to mean that we don't have to bring before the court every single investor in this case on any issue including the issue of reliance. On the other hand, a claim of a constitutional right to challenge the presumption of reliance to a jury if taken to its logical extreme, would require giving the defendant the right to bring in every single investor, which would, of course, destroy the entire concept of a class action. So how we balance those concerns is a question.

**A371**

(3/12/09 Hr'g Tr. 34.)  Defendants' discovery requests and plaintiffs' motion for a protective order now require the court to resolve this issue.

Discovery, of course, is not without limits.  Federal rule of Civil Procedure 26(c) allows the court to limit discovery to protect the parties or persons from, among other things, undue burden or expense.  Moreover, discovery from non-named class members is not warranted as a matter of course. In allowing some such discovery, the Seventh Circuit stated:

> If discovery from the absent member is necessary or helpful to the proper presentation and correct adjudication of the principal suit, we see no reason why it should not be allowed so long as adequate precautionary measures are taken to insure that the absent member is not misled or confused. While absent class members should not be required to submit to discovery as a matter of course, if the trial judge determines that justice to all parties requires that absent parties furnish certain information, we believe that he has the power to authorize the use of the Rules 33 and 34 discovery procedures.

*Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971); *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 & n.2 (1985) (stating that generally, "an absent class-action plaintiff is not required to do anything"); *Clark v. Universal Builders*, 501 F.2d 324, 340-41 (7th Cir. 1974).  Indeed, one of the principal advantages of class actions over massive joinder or consolidation would be lost if all class members were routinely subject to discovery.  Manual for Complex Litigation, Fourth, § 21.41.

Plaintiffs object to the interrogatories, requests to produce and deposition notices because, in their view, the proposed discovery items seek information meant to relitigate the truth on the market defense and/or information that is neither relevant nor likely to lead to admissible evidence. For example, Interrogatory 3 states:  "Identify all Documents that You reviewed or relied upon in making any decision to engage in any Transaction with respect to Household Securities."  Plaintiffs responded:

> Objectionable to the extent it calls for publicly available information.  Defendants litigated truth-on-the-market at trial and should not be given a second bite at the apple. Further, class members should not have to respond further, if they answer "no" to the claim form-type question.  A response to this Interrogatory should be deferred until a class member answers "yes" to the claim form-type question.

Because the jury has already determined that the publicly available information was insufficient to dissipate the effect of defendants' fraudulent statements, *i.e.*, rejected the truth on the market defense, it is highly unlikely that this inquiry will lead to evidence of class members who chose to purchase knowing that the price of the stock was fraudulently inflated.  Moreover, responding to defendants' many detailed interrogatories and production requests about hundreds or thousands of individual transactions that took place nearly a decade ago would impose an unacceptably onerous burden on unnamed class members.  As a result, it is very likely that having to respond to the requests will discourage eligible unnamed class members from making claims.  This issue is more directly and simply addressed by the question each party claiming damages will have to answer under oath in

2

**A372**

responding to the class notice/claims form.[1]  The answers to that question will allow defendants to determine whether there are any purchasers to whom the presumption of reliance does not apply without imposing a high burden on unnamed class members or discouraging eligible members from making claims.

Because the truth on the market defense has already been fully litigated and rejected, the likelihood that any individual purchaser concluded from his or her knowledge of publicly available information that the price of the stock was fraudulently inflated is small. The same is not true, however, for decisions based upon non-publicly available information.  Requests for disclosure of any non-publicly available information relied upon by individual purchasers would be more likely to uncover admissible evidence and would not pose as great a burden on the respondents.  If the interrogatories and requests to produce are limited to this issue, are phrased in such a manner as to go directly to the issue and do not impose an unnecessary burden on the unnamed class members, the Court will allow them.

Requests that are improperly tailored, however, will be prohibited.  For example, a request to produce all documents relating to any information regarding pricing or market analyses considered in each of hundreds of transactions, would be unnecessarily burdensome.  The same is true for discovery requests relating to trading strategies utilized during the damages period.  If still available, such information would not likely require inquiry into thousands of individual transactions while still allowing defendants to identify the existence of a consideration that might be reasonably likely to lead to admissible evidence of non-reliance.

Plaintiffs contend that defendants' burdensome discovery requests are intended to harass class members and deter them from filing claims.  (Mem. Law Supp. Pls.' Mot. Protective Order 2.) Plaintiffs' argument is a common one in discovery disputes, although it is more often the defendants complaining of plaintiffs' unnecessary requests.  And indeed, one of the considerations articulated by the *Brennan* Court in allowing discovery was that it found nothing in the record to suggest that the discovery procedures were being used as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants.  But the Court need not reach the conclusion as to defendants' intention that plaintiffs urge.  It is sufficient that  in this case the request for a protective order is supported, in addition to the reasons given above, by defendants' own prior representations to this Court.  As far back as the pretrial conference of March 12, 2009, Ms. Patricia Farren, counsel for the defendants, while discussing the desirable parameters of the second phase of the proceedings, informed the Court that it was not defendants' intention to "drag in every pension fund in the country" to be deposed.  In fact, she pointed out:

> [I]f we deposed 10 entities . . . we would capture information on 50% of the stock
> ownership of this Company. . . .  [T]he institutional investors who owned the lions

---

[1]Part III of the claim form requires each claimant to answer the following question:  "If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household stock and thereby caused you to pay more for Household stock than you should have paid, would you still have purchased the stock at the inflated price that you paid?"

share of Household stock were big major sophisticated banks and other funds . . . . We could capture information about 50% of stock ownership by deposing only 10 of them. We could capture 60% by deposing only 15 of them. It may be that one or two sample depositions will tell us what we need to know and whether this is a worthwhile defense or not.

(3/12/09 Hr'g Tr. 27.)  Ms. Farren repeated this assertion a few minutes later:  "[A]s I said, Your Honor, we could encompass 60% of the ownership by looking at only 15 large institutional investors." (*Id.* 32.)  Finally, Ms. Farren drove the point home one more time, virtually telling the Court just what defendants needed to do in discovery in order to prepare to rebut the presumption of reliance:

But we don't have any intention, your honor, of dragging every small investor in here. We need to know what the 15 big institutional investors – what they did, whether or not they can prove reliance on an individual basis, whether we can – I should put it correctly.  Whether we can rebut the rebuttable presumption of reliance as to them by simply finding out the facts that were denied during fact discovery.

(*Id.* 33) (emphasis added).

It could not be clearer from these statements that defendants, after careful consideration and investigation, determined that the depositions of 10 to 15 large institutional investors would be sufficient to prepare to rebut the presumption of reliance.  And, it was with this premise in mind, that the Court, in response to defendants' requests to reconsider, allowed them to move ahead with discovery even before any responses to the reliance interrogatory were returned.  With good reason, the Court fully expected that defendants would proceed to prepare to depose 10, or at most 15, of the large institutional investors.  Yet now, these same defendants tell us that they never committed to any such limited number of depositions, but actually require the deposition of nearly 100 investors.[2]  The difference is, to say the least, substantial.  Yet, defendants do not explain how or why 15 became 98.

The Court finds the defendants' first representations to be reasonable.  Therefore, defendants will be allowed a maximum of 15 depositions prior to the return of the claim forms.

SO ORDERED                          ENTER:  January 31, 2011

_____
RONALD A. GUZMAN
U.S. District Judge

---

[2]Whether defendants "committed" to a certain number of depositions is irrelevant.  The point is they told the Court that 10 to 15 depositions are what they needed and even stated the reasons for this determination.

4

**A374**

# EXHIBIT A

# Affidavit of

# Bradford Cornell

# October 13, 2011

### Affidavit of Bradford Cornell

### I. Qualifications

(1)     I am currently a visiting Professor of Finance at the California Institute of Technology. Previously, I was a Professor of Finance and Director of the Bank of America Research Center at the Anderson Graduate School of Management at the University of California, Los Angeles ("UCLA") for 26 years.

(2)     I earned a master's degree in Statistics from Stanford University in 1974 and earned my doctorate in Financial Economics from Stanford in 1975. I have served as an editor of numerous journals relating to business and finance and have written approximately 100 articles and two books on finance and securities, including *Corporate Valuation: Tools For Effective Appraisal and Decision Making* (1993), published by McGraw-Hill, and *The Equity Risk Premium and the Long-Run Future of the Stock Market* (1999), published by John Wiley and Sons. To complement my academic writing, I have also authored articles for *The Wall Street Journal* and the *Los Angeles Times*.

(3)     My research has been widely recognized. In 1988, I was cited by the Financial Management Association as one of the ten most prolific authors in the field of finance. I have received prizes and grants for my research from the Chicago Board of Trade, the Chicago Mercantile Exchange and the Institute for Quantitative Research in Finance. My article, "Corporate Stakeholders and Corporate Finance,"[1] received the 1987 Distinguished Applied Research Award from the Financial Management Association. In 1999, I was awarded the I/B/E/S prize for empirical work in finance and accounting (with Wayne Landsman and Jennifer Conrad). Richard Roll and I received a Graham and Dodd Scroll Award from the Financial Analyst Society for our work on delegated agent

---

[1] Journal of Portfolio Management, 35, (2009).

**Affidavit of Bradford Cornell**

asset pricing theory. I won another Graham and Dodd Scroll Award in 2011 for my work on economic growth and equity investing. Recently, my paper entitled, "Luck, Skill, and Investment Performance" won an Outstanding Article prize from the 11th Annual Bernstein, Fabozzi/Jacobs, Levy Awards in *The Journal of Portfolio Management*.

(4)     I have also been active in my profession. I have served as a Vice President of the Western Finance Association. I am also a past director of both the American Finance Association and the Western Finance Association. I have served as an associate editor of numerous professional journals including: *The Journal of Finance*, *The Journal of Futures Markets*, *The Journal of Financial Research* and *The Journal of International Business Studies*. I have served as a reviewer for nearly a dozen other professional journals.

(5)     My teaching and writing have focused on a number of different financial and economic issues, many of which are relevant to the subject matter of this declaration. I currently teach Applied Corporate Finance and Investment Banking at Caltech. Examples of other classes I have taught over the course of my academic career include Corporate Valuation, the Law and Finance of Corporate Acquisitions and Restructurings, Corporate Financial Theory, and Security Valuation and Investments. I have drawn upon this experience in formulating my opinions in this case.

(6)     In addition to my teaching, writing, and research studies, I also serve as senior consultant to CRA International ("CRA"), an international consulting firm. In my position as a senior consultant, I advise business and legal clients on financial economic issues. Prior to my affiliation with CRA, which began in March of 1999, I operated FinEcon, a financial economic consulting company, through which I also advised business and legal clients on financial economic issues.

**A378**

**Affidavit of Bradford Cornell**

(7)     I have served as a consultant and given testimony for both plaintiffs and defendants in a variety of securities, regulatory and commercial lawsuits. During my many years of experience as an expert witness and consultant, I have provided economic analyses and expert testimony (again, for both plaintiffs and defendants) related to valuation, corporate finance and damages issues. I have been engaged as a damages expert in numerous high-profile cases that revolved around complex financial and securities transactions.

(8)     My background is described more fully in my curriculum vitae, which is attached as Exhibit 1 to this affidavit. A list of my publications may also be found as part of Exhibit 1.

(9)     My hourly rate in this matter is $800.


## II.  Materials Reviewed

(10)     In preparing my opinions in this matter I have reviewed the following documents related to the *Jaffe v. Household* litigation:

   a.  Professor Fischel's expert report dated August 15, 2007.

   b.  Professor Fischel's rebuttal report dated February 1, 2008.

   c.  Professor Fischel's deposition testimony dated March 21, 2008.

   d.  Professor Fischel's trial testimony (direct and rebuttal).

   e.  The jury verdict and Plaintiffs' Exhibits 1395 and 1397 referenced in the verdict form.


## III.  Opinions

(11)     For purposes of this affidavit, I have been requested by Counsel to accept as correct the "Leakage Model" as presented by Professor Fischel in this case and to address that

**Affidavit of Bradford Cornell**

model, the jury verdict rendered in the Phase I proceedings, and the economic and

finance principles applicable to the issue of the rebuttal of the presumption of reliance

where, as here, the "fraud on the market" presumption of reliance set forth in *Basic Inc.v.*

*Levinson*,[2] has been applied.

(12)    As explained in his expert report,[3] Professor Fischel expressly based his "Leakage

Model" on a paper which I co-authored entitled: "Using Finance Theory to Measure

Damages in Fraud on the Market Cases."[4]  My paper is the only article cited by Professor

Fischel as the basis for his "Leakage Model" in his expert report dated August 15, 2007.

(13)    In the paper on which Professor Fischel based his "Leakage Model" I discuss the

economic and finance principles that are directly applicable to rebutting the "fraud on the

market" presumption of reliance established in *Basic*.  Section III (B) of my paper is

entitled "Rebutting the Presumption of Reliance," and specifically addresses the

application of the efficient market hypothesis as a tool to determine whether the *Basic*

presumption has been rebutted as to alleged misrepresentations.  As set forth in my paper,

a necessary corollary of the "fraud on the market" presumption is that where it is shown

that an alleged misrepresentation did not independently result in an additional amount of

artificial inflation in the stock price, the market did not rely upon the alleged

misrepresentation and the *Basic* presumption is rebutted.

(14)    The economic and finance principles set forth in my paper, upon which Professor Fischel

relied in developing his "Leakage Model," involve the determination of a "true value

line" representing an "equivalent disclosure price."  The paper outlines a methodology

for determining this "true value line" based upon stock price movements during an

---

[2] 485 U.S. 224 (1988).
[3] Fischel Expert Report dated 08/15/07, pp. 23-24, paragraph 38.
[4] UCLA Law Review, Vol. 37, No. 2, 1990, pp. 883–924.

- 4 -

A380

**Affidavit of Bradford Cornell**

"observation window" in which price reaction is measured. A "Constructed Return" model is then built, and a "true value line" is calculated using the formula: Value(t-1) = Value(t)/(1 + Constructed Return (t-1)).[5] The inflationary price impact associated with an alleged misrepresentation is then determined by the difference between the "true value line" and the actual stock price and the changes in that differential across alleged misrepresentations.

(15)    As set forth in his Expert Report, Professor Fischel specifically relied upon the model set forth in my paper to prepare his "Leakage Model."[6] First, Professor Fischel selected an "observation window" consisting of the period from November 15, 2001 to October 11, 2002 ("Because I found that fraud-related information leaked out beginning no later than November 15, 2001, the observation window begins on this date; it ends on October 11, 2002, the last day of the Class Period."). Second, Professor Fischel used "the actual returns and predicted returns to construct a time series of daily stock price returns ('Constructed Returns') during the Class Period." Third, Professor Fischel calculated the "true value line" using the formula: "Value(t-1) = (Value(t) + Dividend(t))/(1 + Constructed Return (t))." Applying this model, Professor Fischel "computed daily artificial inflation as the difference between the Company's stock price and the true value line" and "[i]f the resulting inflation on any day was greater than the cumulative residual price decline during the observation window of $23.94" the inflation was limited to a maximum "artificial inflation" of $23.94. Professor Fischel stated that in following these steps he was "using the 'event study approach' described by Cornell and Morgan."

(16)    I previously prepared an affidavit identifying certain problems associated with Professor Fischel's application of the model set forth in my paper: namely, that (a) Professor

---

[5] UCLA Law Review, Vol. 37, No. 2, 1990, pp. 897-900.
[6] Fischel Expert Report dated 08/15/07, pp. 23-26, paragraphs 38-41.

**Affidavit of Bradford Cornell**

Fischel's methodology did not adequately address the impact of non-fraudulent company

specific information during the observation window in an appropriate manner, and (b) the

long observation window used by Professor Fischel created a compounding effect that

produces significant errors in measured inflation (Affidavit of Bradford Cornell dated

10/30/08, attached as Exhibit 2). As noted above, however, for present purposes I am not

offering specific criticisms of Professor Fischel's "Leakage Model" as it was developed

and presented by him. Rather, I am taking Professor Fischel's "Leakage Model" as a

given and simply addressing the consequences of the jury verdict by applying Professor

Fischel's "Leakage Model" as presented.

(17)    It is my understanding that the jury was asked, in part, to determine (a) which of the 40

alleged statements was a false and misleading statement or omission of material fact

under the court's instructions; (b) as to which of the three "issues" that plaintiffs alleged

to be a basis of the fraud the statement was a false and misleading statement or omission

of fact (the following three "issues" were alleged to be the basis of the fraud by plaintiffs

and were addressed by Professor Fischel in his model: (i) "Predatory Lending," (ii) "Re-

aging," and (iii) "Restatement"); and (c) selecting one of Professor Fischel's models, the

"measure of inflation," defined as "the difference between the price plaintiffs paid for

each share of Household stock and the price each share would have cost if no false or

misleading statement or omission of material fact occurred."

(18)    The jury determined that the first false and misleading statement or omission of material

fact occurred on March 23, 2001 as a result of what was identified in the jury verdict

form as "Statement 14." The jury specified that "Statement 14" was a false and

misleading statement or omission of material fact only with respect to the issue of

"Predatory Lending." After selecting the "Leakage Model" presented by Professor

- 6 -

A382

**Affidavit of Bradford Cornell**

Fischel, the jury assigned an amount of "artificial inflation" of $23.94 to Statement 14. I have been advised by counsel that based upon the jury instructions and the jury verdict form, the jury determined that Statement 14 was a false and misleading statement or omission of material fact solely with respect to "Predatory Lending" and that the jury assigned "artificial inflation" of $23.94 to this alleged false and misleading statement or omission of material fact on the issue of "Predatory Lending" only.

(19)   I have examined the jury verdict with respect to the amounts of "artificial inflation" assigned by the jury in the verdict form pursuant to Professor Fischel's "Leakage Model." For the period prior to Professor Fischel's "observation window," the jury found 7 additional statements to be misrepresentations. The jury assigned the same maximum "artificial inflation" amount of $23.94 to each of these statements during this period. As a matter of straightforward economic and finance theory, this finding means that the jury found that there was no incremental independent inflationary price impact with respect to any of those statements. Rather, the $23.94 of artificial inflation attributed to the Statement 14 "Predatory Lending" misrepresentation had been maintained on dates of each of the 7 statements.

(20)   With respect to the "observation window" period under Professor Fischel's "Leakage Model," the jury found an additional 9 statements to be misrepresentations. During this "observation window" the amount of "artificial inflation" generally decreased throughout the period. On only two of the dates for which the jury found a misrepresentation were there increases in the amount of "artificial inflation": An increase from $22.59 on December 3, 2001 to $23.94 on December 4, 2001, and an increase from $23.65 on April 16, 2002 to $23.94 on April 17, 2002. The increase in inflation on April 17, 2002 was

Affidavit of Bradford Cornell

not statistically significant, as Professor Fischel acknowledged.[7] The increase in

"artificial inflation" on December 4, 2001, which corresponds to Statement No. 23 on the

Verdict Form, is a statement determined by the jury to be a false and misleading

statement or omission of material fact with respect to only the "Re-aging" issue.[8] The

jury verdict and Professor Fischel's "Leakage Model" establish that the $1.35

incremental increase in "artificial inflation" attributable to this statement fully dissipated

by December 11, 2001 (at which time the amount of "artificial inflation" had declined to

$22.20). Professor Fischel acknowledged in his testimony that the increased "artificial

inflation" associated with the December 4, 2001 Statement was statistically significant[9],

but also that it was eliminated by December 11, 2001, and thus only investors who

purchased between December 4 and December 11, 2001 would have suffered any harm

attributable to the December 4, 2001 misrepresentation.[10]

(21)     As set forth in my paper, and as a settled principle of economic and finance theory, if the

difference between the "true value line" and the actual stock price does not increase (*i.e.*,

the amount of "artificial inflation" does not increase) by a statistically significant amount

as a consequence of an alleged misrepresentation, then the market did not rely upon the

alleged misrepresentation and the "fraud on the market" presumption has been rebutted.[11]

(22)     The jury verdict thus establishes the following: (1) No misrepresentation identified by

the jury to be attributable to the issue of the "Restatement" resulted in any increase in

"artificial inflation," and (2) With respect to the issue of "Re-aging," only the December

---

[7] Fischel Trial Transcript at 2909: 16–19.
[8] Jury Verdict Form, page 23.
[9] Fischel Trial Transcript at 2878:5–7; 14–18.
[10] Fischel Trial Transcript at 2883:18–2885:3.
[11] UCLA Law Review, Vol. 37, No. 2, 1990, pp. 917-923.

**Affidavit of Bradford Cornell**

4, 2001 misrepresentation resulted in a statistically significant increase in "artificial inflation," and that increase of $1.35 fully dissipated by December 11, 2001.

(23) The verdict thus establishes that the "fraud on the market" presumption of reliance has been rebutted, based upon an absence of inflationary price impact, for all alleged misrepresentations on the issue of the "Restatement" and for all alleged misrepresentations with respect to the issue of "Re-aging," except for the $1.35 amount of inflationary price impact attributable to December 4, 2001 statement and only for the period between December 4, 2001 and December 11, 2001.

(24) This verdict result also has significant consequences with respect to the question of market reliance regarding Statement 14, the March 23, 2001 statement for which the jury assigned the full, maximum amount of "artificial inflation" of $23.94 under Professor Fischel's "Leakage Model." In discussing the underlying principles of economics and finance in my paper upon which Professor Fischel based his model, I and my co-author noted a critical feature and limitation of the "Leakage Model" approach: "Finance theory does make clear, however, that when there are interrelated frauds, separate value lines cannot be constructed. . . . Instead, the total damage must be estimated using one value calculated backwards from the time at which all elements of the fraud have been effectively disclosed."[12] That is, when, as here, it has been alleged that a securities fraud involved multiple "issues," the "Leakage Model" cannot be used to determine the amount of "artificial inflation" attributable to just one of those "issues" ("separate value lines cannot be constructed"). Instead, the "Leakage Model" develops a "true value line" that necessarily reflects misrepresentations as to all components of the alleged fraud. This is a well-established principle of finance and economics. In fact, Professor Fischel's

---

[12] UCLA Law Review, Vol. 37, No. 2, 1990, pp. 908.

**Affidavit of Bradford Cornell**

"Leakage Model" assumes a single "true value line" based upon all three alleged

fraudulent "issues" without distinction. Moreover, Professor Fischel has never stated,

and could never state in a manner consistent with economic and finance theory, that his

"Leakage Model" provides a means to determine the inflationary price impact associated

with any one individual issue among the three fraudulent issues alleged by Plaintiffs.

(25)     Professor Fischel did present an alternative model in his expert report under which

inflation could be estimated for each of the three fraud allegations. This is the

"Quantification using Specific Disclosures Model" discussed on pages 20-23 of Professor

Fischel's report. The inflation estimates calculated using the "Specific Disclosures

Model" assign non-zero inflation to each of the three fraud allegations. For example, on

12/11/01 Legg Mason published an analyst report critical of Household's re-aging

policies and the artificial inflation as estimated by the "Specific Disclosures Model"

declined from $6.05 to $3.66 thereby assigning at least $2.39 of artificial inflation to the

"Re-aging" fraud issue. [13] On 11/14/01 Household was sued for alleged predatory

lending practices and the artificial inflation declined from $7.97 to $6.11 thereby

assigning at least $1.86 of inflation to the "Predatory Lending" fraud issue. [14] On 8/14/02

Household announced that it was restating its prior reported financial results downwards

and the artificial inflation declined from $2.16 to $0.32 thereby assigning inflation of at

least $1.84 to the "Restatement" fraud issue. [15]

(26)     Professor Fischel also states that his two inflation models, the "Leakage Model" and the

"Specific Disclosures Model" are internally consistent. He explains this point in detail in

his rebuttal report in footnote 6, concluding that, "… my quantifications of artificial

---

[13] Fischel Trial Transcript at 2640-41.
[14] Fischel Trial Transcript at 2629-31.
[15] Fischel Trial Transcript at 2643-44.

**Affidavit of Bradford Cornell**

inflation are consistent…"[16]  It follows from Professor Fischel's analysis and explanation that, while the "Leakage Model" does not disaggregate inflation into components related to each of the three fraud allegations, the numerical values of each of these three individual inflation components in the "Leakage Model" calculation must be non-zero. That is, although the "Leakage Model" does not provide a means to disaggregate the specific amount of inflationary price impact attributable to each of the three fraud "issues," the total inflationary price impact of $23.94 determined by Professor Fischel in his "Leakage Model" must be the result of some positive amount of inflationary price impact contributed by each of the three "issues."

(27)    This raises a fundamental problem based on the jury verdict with respect to Statement 14. The jury determined that Statement 14 was a misrepresentation only with respect to the issue of "Predatory Lending," but it assigned the full "artificial inflation" of $23.94 to that statement and therefore implicitly assigned an artificial inflation of $0 to "Re-aging" and "Restatement" fraud allegations.  This is squarely inconsistent with the fact that each of the three individual inflation components must be non-zero according to Professor Fischel's expert report as discussed above.  At no time did Professor Fischel attempt to disaggregate within his "Leakage Model" the amount of "artificial inflation" attributable to the each of the three fraudulent issues, nor is the "Leakage Model" designed to do so. However, there is no valid basis under Professor Fischel's model by which the full $23.94 inflationary price impact can be assigned to the March 23, 2001 statement or the single issue of "Predatory Lending."

(28)    As set forth above, the "Leakage Model" presented by Professor Fischel did not, and cannot be used to, determine the specific inflationary price impact associated with either

---

[16] Fischel Rebuttal Report dated 02/01/08, pp. 4-5, footnote 6.

**Affidavit of Bradford Cornell**

Statement 14 or the single issue of "Predatory Lending." Accordingly, although it can definitively be stated that the entire amount of $23.94 cannot be assigned to the March 23, 2001 statement or the single issue of "Predatory Lending," there is no valid basis under the jury verdict, and the jury's selection and application of Professor Fischel's "Leakage Model," to determine the actual inflationary price impact attributable to Statement 14 or the single issue of "Predatory Lending".

(29)   It should be noted that, in certain cases, it may be possible to disaggregate total inflation into different components of a "multi-issue" fraud, but one would have to abandon the "Leakage Model" to do so. As discussed earlier, the "Specific Disclosures Model" developed by Professor Fischel, but rejected by the jury, could potentially have been used as a means to allocate the amount of inflation attributable to separate "issues" in a multi-issue fraud. It is noteworthy that, although Professor Fischel did not undertake such an analysis, a review of the specific, statistically significant disclosures identified by Professor Fischel which he testified relate solely to the issue of "Predatory Lending" account for less than 40% of the aggregate amount of $7.97 of inflationary price impact he identified under his "Specific Disclosures Model." This serves to further demonstrate that there is no valid basis under Professor Fischel's "Leakage Model," or under economic and finance theory, to assign the entire amount of $23.94 of inflationary price impact to Statement 14 or the single issue of "Predatory Lending".

(30)   Accordingly, the jury's assignment of an inflationary price impact of $23.94 to the March 23, 2001 statement, is squarely inconsistent with Professor Fischel's own "Leakage Model" and contrary to the established principles of finance and economics that underlay the use of such a model. There is no valid basis under settled principles of economics and finance to determine, based on the jury verdict and its application of Professor

- 12 -

A388

**Affidavit of Bradford Cornell**

Fischel's "Leakage Model", the proper inflationary price impact attributable to the March

23, 2001 Statement.


Bradford Cornell

October 13, 2011


STATE OF CALIFORNIA            )
                               )
COUNTY OF LOS ANGELES          )


Subscribed and sworn to me on this /3ᵀᴴ day of _October_____, 2011, by

_BRADFORD CORNELL_____, proved to me on the basis of

satisfactory evidence to be the person who appeared before me.


SUSAN KIYO DROZDOWSKI
Commission # 1777324
Notary Public - California
Los Angeles County
My Comm. Expires Nov 28, 2011


- 13 -



## Exhibit 1

## Bradford Cornell
Senior Consultant

PhD Financial Economics
Stanford University

MS Statistics
Stanford University

AB (Interdepartmental)
Physics, Philosophy,
and Psychology
Stanford University

## Academic and professional positions

| | |
|---|---|
| 1999–Present | *Senior Consultant*, CRA |
| 2005–Present | *Visiting Professor of Financial Economics*, California Institute of Technology |
| 1987–2005 | *Professor of Finance and Director of the Bank of America Research Center*, Anderson Graduate School of Management, UCLA |
| 1990–1999 | *President*, FinEcon: Financial Economic Consulting |
| 1988–1990 | *Vice-President and Director of the Securities Litigation Group*, Economic Analysis Corporation |
| 1979–1986 | *Assistant and Associate Professor of Finance*, UCLA |
| 1983–1984 | *Visiting Professor of Finance*, California Institute of Technology |
| 1977–1979 | *Assistant Professor of Finance*, University of Southern California |
| 1975–1977 | *Assistant Professor of Finance*, University of Arizona |

## Courses taught

- Applied Corporate Finance and Investment Banking
- Corporate Valuation
- The Law and Finance of Corporate Acquisitions and Restructurings
- Corporate Financial Theory
- The Theory of Finance (in the UCLA Law School)
- Security Valuation and Investments
- A wide variety of executive and community education programs

## Special education programs include

- The US Business School in Prague—Special Finance Program, Summer 1991
- The Lead Program for Business Education of Minority High School Students, 1987–1997

## Consulting and professional activities

### Selected service at UCLA

- Twice Chairman of Finance Department
- Twice Vice Chairman of the Anderson School
- Three-time member of the staffing and promotion committee

### Service to scholarly journals and organizations

Served as an associate editor for a variety of scholarly and business journals, including *Journal of Finance, Journal of International Business Studies, Journal of Business and Economics, Journal of Financial Research, Journal of Futures Markets,* and the *Investment Management Review.*

Served as a reviewer for numerous finance and economics journals, including *American Economic Review, Journal of Political Economy, Journal of Financial Economics, Journal of Business, Journal of Financial and Quantitative Analysis,* and the *Review of Economics and Statistics.*

### Memberships in professional societies

- American Finance Association, 1973–Present
    - Member of Board of Directors, 1987–1989
- Western Finance Association, 1973–Present
    - Member of Board of Directors, 1982–1985
    - Vice President, 1987
- American Economic Association, 1973–Present
- American Bar Association, 1995–1999
- American Statistical Association, 1992–1999
- International Association of Financial Engineers, 1993–2003
- American Law and Economics Association, 1995–2000
- Human Behavior and Evolution Society, 1995–2000

### Research evaluation

- Project reviewer for the National Science Foundation, 1979–Present
- Program committee for the Western Finance Association, Various years

### Selected board and committee memberships

- Pension Policy Board, The Aerospace Corporation, 1985–2008
- Chairman, Mayor's Blue Ribbon Commission on Los Angeles' Municipal Investments, 1995
- Director, Forms Engineering Corporation, 1976–1997

- Trustee, Kellow Trust, 1982–1991

## Expert witness

Numerous cases involving the application of financial economics

## Media experience

- Occasional contributor to *The Wall Street Journal* and *The Los Angeles Times*
- Occasional commentator for local television and radio stations
- Lecturer on valuation theory, appraisal practice, and securities pricing

# Publications

## Books and book chapters

"Stock Repurchases: Tradeoffs and Trends." *Dividends and Dividend Policy*, H. Kent Baker, ed., Blackwell Publishing, New York, 2009.

"Securities Fraud Damages." With J. Hirshleifer and J. Haut. *Developments in Litigation Economics*, Vol. 87, P. Gaughan and R. Thornton, eds., Elsevier, Ltd., Oxford, UK, 2005.

*The Equity Risk Premium and the Long-run Future of the Stock Market*. John Wiley and Sons, New York, NY, 1999.

"Corporate Valuation." *Handbook of Modern Finance*, 3rd edition, Dennis Logue, ed., Warren Gorham Lamont, Boston, MA, 1994.

*Corporate Valuation: Tools for Effective Appraisal and Decision Making*. McGraw-Hill, New York, NY, 1993.

## Academic articles

"Market Efficiency and Securities Litigation: Implications of the Appellate Decision in Thane," *Virginia Law and Business Review*, forthcoming 2011.

"Investment Strategies and Investment Track Records," invited editorial, *Journal of Portfolio Management*, forthcoming 2011.

"The Equity Premium Revisited." With M. Moroz, *Journal of Portfolio Management*, forthcoming 2011.

"The Intriguing Case of KMP and KMR," *Journal of Portfolio Management*, 2011, Vol. 37, 3, 121–127.

"Warren Buffett, Black-Scholes, and the Valuation of Long-Dated Options," *Journal of Portfolio Management*, Summer 2010, 36, 4, 107–111.

"Economic Growth and Equity Investing." *Financial Analysts Journal*, January/February, 2010, Vol. 66, 1, 54–64. Winner Graham and Dodd G&D Scroll Award for 2010.

"Beliefs Regarding Fundamental Value and Optimal Investing." With J. Cvitanic and L. Goukasian, *Annals of Finance*, January 2010, Vol. 6, 1, 83–105.

"Collateral Damages and Securities Litigation." With J. Rutten. *Utah Law Review,* Vol. 2009, 3, pp. 717–748.

"The Fundamental Nature of Recessions: A Contracting and Restructuring Approach, *The Economists Voice*, October 2009, pp. 1–4.

"The Pricing of Volatility and Skewness." *Journal of Investing*, Vol. 18, Fall 2009, pp. 27–31.

"Implications of the Financial Crisis for Financial Education." *Journal of Financial Education*, Vol. 35, Spring, pp. 1–6.

"Investment Research: How Much Is Enough." Management Online Review, Oxford Management Publishing, 2009, http://www.morexpertise.com/download.php?id=135.

"Luck, Skill, and Investment Performance." *Journal of Portfolio Management*, Vol. 35, Winter 2009, pp. 85–89. Winner Bernstein/Fabozzi Award for 2009.

"The Basic Speed Law for Capital Market Returns." *CFA Magazine*, November/December 2008, pp. 10–11. Also published electronically by *Real Capital Markets*, October 24, 2008, http://www.realclearmarkets.com/articles/2008/10/the_basic_speed_law_for_capita_1.html.

"The Impact of Analysts' Forecast Errors and Forecast Revisions on Stock Prices." With W. Beaver, W. Landsman, and S. Stubben. *Journal of Business Finance and Accounting*, Vol. 35, No. 5/6, 2008, pp. 709–740.

"Market Efficiency, Crashes, and Securities Litigation." With J. Rutten. *Tulane Law Review*, Vol. 81, No. 2, 2006.

"Dividends, Stock Repurchases, and Valuation." *Journal of Applied Finance*, Vol. 15, No. 2, 2005, pp. 13–24.

"How Do Analysts' Recommendations Respond to Major News?" With J. Conrad, W. Landsman, and B. Roundtree. *Journal of Financial and Quantitative Analysis*, Vol. 41, No. 1, 2006, pp. 39–68.

"A Delegated Agent Asset Pricing Model." With R. Roll. *Financial Analysts Journal*, Vol. 61, No. 1, 2005, pp. 57–69. Winner Graham and Dodd G&D Scroll Award for 2006.

"Co-movement as an Investment Tool." *Journal of Portfolio Management*, Vol. 30, Spring 2004, pp. 1–5.

"Compensation and Recruiting: Private Universities vs. Private Corporations." *Journal of Corporate Finance*, Vol. 10, No. 1, 2004, pp. 37–52.

"Accounting and Valuation: Is the Quality of Earnings an Issue?" With W. Landsman. *Financial Analysts Journal*, Vol. 59, No. 6, 2003, pp. 20–28.

"The Information that Boards Really Need." *Sloan Management Review*, Vol. 44, Spring 2003, pp. 71–76.

"When is Bad News Really Bad News." With J. Conrad and W. Landsman. *Journal of Finance,* Vol. 57, December 2002, pp. 2507–2532.

"The Parent Company Puzzle: When is the Whole Worth Less than the Sum of the Parts." With Q. Liu. *Journal of Corporate Finance*, Vol. 4, December 2001, pp. 341–366.

"Is the Response of Analysts to Information Consistent with Fundamental Valuation? The Case of Intel." *Financial Management*, Vol. 30, Spring 2001, pp. 113–136.

"Equity Duration, Growth Options, and Asset Pricing." *Journal of Portfolio Management*, Fall 2000, pp. 171–180.

"Risk, Duration, and Capital Budgeting: New Evidence on Some Old Questions." *Journal of Business*, Vol. 2, April 1999, pp. 183–200.

"The Term Structure, the CAPM, and the Market Risk Premium: An Interesting Puzzle." *Journal of Fixed Income*, Vol. 4, December 1998, pp. 85–89.

"Cash Settlement when the Underlying Securities are Thinly Traded: A Case Study." *Journal of Futures Markets*, Vol. 17, No. 8, 1997, pp. 855–871.

"Estimating the Cost of Equity Capital." With J. Hirshleifer and E. James. *Contemporary Finance Digest*, Vol. 1, Fall 1997, pp. 5–26.

"The Valuation of Complex Derivatives by Major Investment Firms: Empirical Evidence." With A. Bernardo. *Journal of Finance*, Vol. 52, June 1996, pp. 785–798.

"Culture, Information, and Screening Discrimination." With I. Welch. *Journal of Political Economy*, Vol. 104, June 1996, pp. 542–571.

"Throwing Good Money after Bad? Cash Infusions and Distressed Real Estate." With F. Longstaff and E. Schwartz. *Journal of the American Real Estate and Urban Economics Association*, Vol. 24, 1996, pp. 23–41.

"An Hypothesis Regarding the Origins of Ethnic Discrimination." *Rationality and Society*, Vol. 7, January 1995, pp. 4–29.

"Change Reinforces Use of DCF Method." *Natural Gas,* Vol. 11, October 1994, pp. 5–15.

"Adverse Selection, Squeezes, and the Bid-Ask Spread on Treasury Securities." *Journal of Fixed Income*, Vol. 3, June 1993, pp. 39–47.

"The Reaction of Investors and Stock Prices to Insider Trading." With E. Sirri. *Journal of Finance, Vol.* 47, July 1992, pp. 1031–1059.

"Liquidity and the Pricing of Low-grade Bonds." *Financial Analysts Journal*, Vol. 48, January/February 1992, pp. 63–68.

"Measuring the Investment Performance of Low-grade Bond Funds." With K. Green. *Journal of Finance*, Vol. 66, March 1991, pp. 29–48.

"Using Finance Theory to Measure Damages in Fraud on the Market Cases." With G. Morgan. *UCLA Law Review*, Vol. 37, No. 2, 1990, pp. 883–924.

"The Incentive to Sue: An Option Pricing Approach." *Journal of Legal Studies*, Vol. 17, No. 1, 1990, pp. 173–188.

"Volume and $R^2$." *Journal of Financial Research*, Vol. 13, No. 13, 1990, pp. 1–7.

"Measuring the Term Premium: An Empirical Note." *Journal of Economics and Business*, Vol. 42, No. 1, 1990, pp. 89–93.

"Cross Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes." With W. Landsman and A. Shapiro. *Journal of Accounting, Auditing, and Finance*, Vol. 4, No. 4, 1989, pp. 460–479.

"The Mispricing of US Treasury Bonds: A Case Study." With A. Shapiro. *The Review of Financial Studies*, Vol. 2, No. 3, 1989, pp. 297–310.

"The Impact of Data Errors on Measurement of the Foreign Exchange Risk Premium." *Journal of International Money and Finance*, Vol. 8, 1989, pp. 147–157.

"Security Price Response to Quarterly Earnings Announcements and Analyst Forecast Revisions." With W. Landsman. *The Accounting Review*, Vol. 64, October 1989, pp. 680–692.

"Financing Corporate Growth." With A. Shapiro. *Journal of Applied Corporate Finance*, Vol. 1, summer 1988, pp. 6–22.

"Measuring the Cost of Corporate Litigation: Five Case Studies." With K. Engelmann. *Journal of Legal Studies*, Vol. 17, June 1988, pp. 135–162.

"Corporate Stakeholders and Corporate Finance." With A. Shapiro. *Financial Management*, Vol. 16, Spring 1987, pp. 5–14.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis." With A. Shapiro and W. Landsman. *Journal of Banking and Finance*, Vol. 3, 1987, pp. 161–178.

"Pricing Interest Rate Swaps: Theory and Empirical Evidence." *Proceeding of Conference on Swaps and Hedges*, Salomon Brothers Center, New York University, 1987.

"Forecasting the Eleventh District Cost of Funds." *Housing Finance Review*, Vol. 6, Summer 1987, pp. 123–135.

"Commodity Own Rates, Real Interest Rates, and Money Supply Announcements." With K. French. *Journal of Monetary Economics*, Vol. 18, July 1986, pp. 3–20.

"The Reaction of Bank Stock Prices to the International Debt Crisis." With A. Shapiro. *Journal of Banking and Finance*, Vol. 10, 1986, pp. 55–73.

"Inflation Measurement, Inflation Risk, and the Pricing of Treasury Bills." *Journal of Financial Research*, Vol. 9, Fall 1985, pp. 193–202.

"Interest Rates and Exchange Rates: Some New Empirical Evidence." With A. Shapiro. *Journal of International Money and Finance*, Vol. 4, 1985, pp. 431–442.

"The Weekly Pattern in Stock Returns: Cash versus Futures." *Journal of Finance*, Vol. 40, June 1985, pp. 583–588.

"The Income Approach to Valuation." *Proceedings of the Wichita State University Conference on the Appraisal of Railroads and Public Utilities*, 1985.

"The Value of Rate Base Options in the Eurocredit Market." With O. Sand. *Journal of Bank Research*, Vol. 16, Spring 1985, pp. 22–28.

"The Money Supply Announcements Puzzle: Review and Interpretation." *American Economic Review*, Vol. 73, September 1983, pp. 644–658.

"The Money Supply Announcements Puzzle: Reply." *American Economic Review*, Vol. 75, June 1985, pp. 565–566.

"Taxes and the Pricing of Stock Index Futures." With K. French. *Journal of Finance*, Vol. 38, June 1983, pp. 675–695; reprinted in *Proceedings of the Seminar for the Analysis of Securities Prices*, University of Chicago Press, 1983.

"Money Supply Announcements and Interest Rates: Another View." *Journal of Business*, Vol. 56, January 1983, pp. 1–25; reprinted in *Proceedings of the Seminar for the Analysis of Securities Prices*, University of Chicago Press, 1983.

"Monetary Policy and the Daily Behavior of Interest Rates." *Journal of Business and Economics*, Vol. 35, 1983, pp. 189–203.

"Managing Exchange Risk." With A. Shapiro. *Midland Corporate Financial Journal*, Vol. 1, Fall 1983, pp. 16–31; reprinted in *New Developments in International Finance*, J. Stern and D. Chew, eds., Basil Blackwell, New York, 1988.

"The Pricing of Stock Index Futures." With K. French. *Journal of Futures Markets*, Vol. 3, Fall 1983, pp. 1–14; reprinted in *Readings in Futures Markets*, Vol. 5 and in *Selected Writings on Futures Markets: Explorations in Financial Futures*; both published by the Chicago Board of Trade, 1984.

"Money Supply Announcements, Interest Rates, and Foreign Exchange." *Journal of International Money and Finance*, Vol. 1, 1982, pp. 201–208.

"Forward versus Futures Prices: Evidence from the Foreign Exchange Markets." With M. Reinganum. *Journal of Finance*, Vol. 36, December 1981, pp. 1035–1046.

"Taxation and the Pricing of Treasury Bill Futures." *Journal of Finance*, Vol. 36, December 1981, pp. 1169–1176.

"The Relationship between Volume and Price Variability in Futures Markets." *Journal of Futures Markets*, Vol. 1, Fall 1981, pp. 303–316.

"Relative vs. Absolute Price Changes: An Empirical Study." *Economic Inquiry*, Vol. 16, April 1981, pp. 302–309.

"The Consumption Based Asset Pricing Model: A Note on Potential Tests and Applications." *Journal of Financial Economics*, Vol. 9, March 1981, pp. 103–110.

"Strategies for Pairwise Competitions in Markets and Organizations." With R. Roll. *Bell Journal of Economics*, Vol. 12, Spring 1981, pp. 201–216.

"What is the Future for Floating Rate Bonds?" *Chase Financial Quarterly*, Vol. 1, Fall 1981, pp. 27–38.

"The Denomination of Foreign Trade Contracts Once Again." *Journal of Financial and Quantitative Analysis*, Vol. 5, November 1980, pp. 933–945.

"Inflation, Relative Price Changes, and Exchange Risk." *Financial Management*, Vol. 9, Spring 1980, pp. 30–35.

Bradford Cornell
Page 8

---

"Asymmetric Information and Investment Performance Measurement." *Journal of Financial Economics*, Vol. 7, December 1979, pp. 381–390.

"Treasury Bill Pricing in the Spot and Futures Markets." With D. Capozza. *Review of Economics and Statistics*, Vol. 61, November 1979, pp. 513–520; reprinted in *Interest Rate Futures: Concepts and Issues*, Robert Dame International, 1981.

"A Variance Forecasting Test of the Option Pricing Model." With D. Capozza. *Financial Review*, Vol. 7, 1979, pp. 381–390.

"Relative Price Changes and Deviations from Purchasing Power Parity." *Journal of Banking and Finance*, Vol. 3, 1979, pp. 263–279.

"A Note on Capital Asset Pricing and the Theory of Indexed Bonds." *Southern Journal of Economics*, Vol. 45, 1979, pp. 1239–1247.

"Do Money Supply Announcements Affect Short-term Interest Rates?" *Journal of Money, Credit, and Banking*, Vol. 11, February 1979, 80–86.

"Risk, Currency Substitution, and the Exchange Rate." *Proceedings of the Fall 1978 Conference*, Federal Reserve Bank of San Francisco, 1978.

"Determinants of the Bid-Ask Spread on Forward Foreign Exchange Contracts Under Floating Exchange Rates." *Journal of International Business Studies*, Vol. 9, Fall 1978, pp. 33–41.

"Using the Option Pricing Model to Measure the Uncertainty Producing Effect of Major Announcements." *Financial Management*, Vol. 7, Spring 1978, pp. 54–59.

"Price as a Signal of Quality: Some Additional Experimental Results." *Economic Inquiry*, Vol. 16, April 1978, pp. 302–309.

"Mean Absolute Deviation versus Least-Square Regression Estimation of Beta Coefficients." With J. Dietrich. *Journal of Financial and Quantitative Analysis*, Vol. 13, March 1978, pp. 123–131.

"Monetary Policy, Inflation Forecasting, and the Term Structure of Interest Rates." *Journal of Finance*, Vol. 33, March 1978, pp. 117–127.

"The Efficiency of the Market for Foreign Exchange Under Floating Exchange Rates." With J. Dietrich. *Review of Economics and Statistics*, Vol. 60, February 1978, pp. 111–120.

"Option Pricing in Bear and Bull Markets." *Journal of Portfolio Management*, Vol. 4, Summer 1978, pp. 30–32.

"Spot Rates, Forward Rates, and Exchange Market Efficiency." *Journal of Financial Economics*, Vol. 5, August 1977, pp. 55–65; reprinted in *Frontiers in International Financial Management*, D. Lessard and J. Wiley, Eds., 1979, and in *International Finance: Concepts and Issues*, R. Kalb and G. Gay, Eds., Robert F. Dame, 1982.

"Measuring the Informational Content of Consumer Price Announcements." *Nebraska Journal of Economics and Business*, Vol. 16, Summer 1977, pp. 57–64.

"Which Inflation Rate Affects Interest Rates?" *Business Economics*, Vol. 12, May 1977, pp. 22–25. Reprinted in *Certified Financial Analysts Digest*, 1977.

"Are Deep Discount Convertibles Underpriced?" *Journal of Portfolio Management*, Vol. 3, Spring 1977, pp. 55–57.

"Using the Goldsmith-Nagan Survey to Estimate the Liquidity Premium." *Journal of Economics and Business*, Vol. 2, February 1977, pp. 148–151.

"Managing Money in a Competitive Securities Market." *Arizona Review*, Vol. 25, September 1976, pp. 1–5.

"Asset Pricing Under Uncertain Inflation: A Note on the Work of Long and Roll." *Intermountain Economic Review*, Vol. 7, Spring 1976, pp. 85–91.

"The Arizona Retirement System 1956–1975: An Investment Analysis." *Arizona Review*, Vol. 25, March 1976, pp. 1-9.

## Book reviews and discussion comments

"Statistical Analysis of Price and Basis Behavior: October 12–6, 1987," *The Stock Market: Bubbles, Volatility, and Chaos*, E. Dwyer and R. Hafer, eds., Kluwer Academic Publishers, 1990.

Review of *Futures Markets*, *Journal of Monetary Economics*, M. Streit, ed., Vol. 16, July 1985, pp. 133–135.

Review of *Exchange Rates and International Macroeconomics*, *Journal of International Money and Finance*, J. Frenkel, ed., Vol. 4, 1985, pp. 212–214.

Review of *Exchange Rate Policy*, by Ray A. Batchelor and Geoffrey Wood, *Journal of Economic Literature*, Vol. 21, 1983, pp. 1027–1029.

## Working papers

"Assessing the Risk of Securities Lending Transactions." 1999.

*Social Decoding and Ethnic Discrimination*, 1996, book-length manuscript.

"Using the DCF Method to Estimate the Cross-Sectional Variation of Expected Returns." With S. Cheng. 1995

"Testing the Tax Timing Option Theory: A New Approach." 1984.

"Determinants of Corporate Capital Structure: An Empirical Analysis." With J. Dietrich. 1979.

## Awards and honors

Bernstein, Fabozzi/Jacobs, Levy Award for outstanding research from T*he Journal of Portfolio Management*, 2010

Graham and Dodd G&D Scroll Award for research on securities analysis and valuation (with Richard Roll), 2006

I/B/E/S award for research in empirical finance (with W. Landsman and J. Conrad), 1999

Charles River Associates

Cited as one of the 10 most prolific research authors in the field of finance in "Most Frequent Contributors to the Finance Literature" by Jean Louis Heck and Phillip L. Cooley, *Financial Management*, Autumn 1988

Financial Management Association Prize for Applied Research, 1987

Institute for Quantitative Research in Finance, Research Grant, 1984

Center for the Study of Futures Markets, Research Grant, 1983

Center for the Study of Futures Markets, Research Grant, 1981

Chicago Mercantile Exchange, Research Grant, 1979

Phi Beta Kappa, Stanford University, 1970

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAWRENCE E. JAFFE PENSION PLAN, on behalf of itself and all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **02 C 5893 (Consolidated)** |
| | ) | |
| **HOUSEHOLD INTERNATIONAL, INC.,** | ) | **Judge Ronald A. Guzmán** |
| **MERRILL LYNCH, PIERCE, FENNER,** | ) | |
| **& SMITH, INC., GOLDMAN SACHS &** | ) | |
| **CO., INC., ARTHUR ANDERSEN, L.L.P.,** | ) | |
| **WILLIAM F. ALDINGER, DAVID A.** | ) | |
| **SCHOENHOLZ, GARY GILMER,** | ) | |
| **J.A. VOZAR, ROBERT J. DARNALL,** | ) | |
| **GARY G. DILLON, JOHN A.** | ) | |
| **EDWARDSON, MARY JOHNSTON** | ) | |
| **EVANS, J. DUDLEY FISHBURN,** | ) | |
| **CYRUS F. FREIDHEIM, LOUIS E. LEVY,** | ) | |
| **GEORGE A. LORCH, JOHN D.** | ) | |
| **NICHOLS, JAMES B. PITBLADO,** | ) | |
| **S. JAY STEWART, and LOUIS W.** | ) | |
| **SULLIVAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

In phase one of this bifurcated case, a jury returned a verdict in favor of plaintiffs and against some or all of the defendants on the Section 10(b)/Rule 10b-5 claims as to Statement Nos. 14-18, 20-24, 27-29, 32, 36-38 ("the seventeen statements"). (Verdict Form at 14-18, 20-24, 27-29, 32, 36-38; *id.*, Table A, Alleged False or Misleading Statements at 11-26.) This means the jury found that the statements made and/or facts withheld regarding predatory lending, 2+ delinquency/re-aging, and the Restatement were false or misleading, material, made with the requisite state of mind, and substantially caused the economic loss plaintiffs suffered. (*See id.*; *see also* Jury Instructions at 25-

**A400**

32.)  In addition, the jury credited the Leakage Model of damages presented by plaintiffs' expert Daniel Fischel.  (*See* Verdict Form at 41.)  At trial, defendants offered, and the jury rejected, two of the three types of evidence that can be used to rebut the presumption of reliance, *i.e.*, that market makers were privy to the truth, and the truth had credibly entered the market and dissipated the effects of the omissions and misstatements.  Thus, in phase two, the focus has been on the third kind of rebuttal evidence, that which severs the link between the alleged omissions and misstatements and either the price paid or received by any claimant.  Accordingly, each claimant was required to respond "yes" or "no" to the following inquiry:  "If you had known at the time of your purchase of Household stock that defendants' false and misleading statements had the effect of inflating the price of Household stock and thereby caused you to pay more for Household stock than you should have paid, would you have still purchased the stock at the inflated price that you paid?"  (hereinafter "claim form question").  (1/11/11 Order, Ex. 2 at 8.)  The Court also permitted the custodian banks and third-party claim filers to send claimants with an allowed loss greater than $250,000.00 a supplemental form that asked the same question.  (5/31/11 Order.)   In addition, the parties were afforded discovery to meet their respective burdens with regard to the presumption of reliance.  The parties now present the individual claims as to which they contend there is no triable issue with regard to reliance.

There are three categories of claimants:  (1) those that responded "no" to the claim form question;[1] (2) those that responded "yes" to the claim form question; and (3) those that returned the

---

[1]When the Court uses the term "claim form question" it refers to the question that appeared in Section III of the initial proof-of-claim notice to all plaintiffs and/or the supplemental form sent to those plaintiffs with an allowed loss of greater than $250,000.00.

claim form but did not answer the claim form question.[2]

If a claimant responded "no" to the claim form question, and defendants do not point to any evidence that reasonably suggests "no" does not mean "no," that claimant is entitled to judgment as to liability because defendants have not created a triable issue of fact as to his reliance on price. Defendants argue that anything short of a jury trial on all issues relating to an award of statutory damages is a deprivation of their Seventh Amendment rights. *See* U.S. Const. amend. VII (stating that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved"). It is well settled, however, that summary disposition procedures do not violate the Seventh Amendment. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006). Thus, if there are no factual issues to be resolved, the claims can be adjudicated short of trial without running afoul of the Seventh Amendment.

Defendants also argue that the jury verdict itself rebuts the presumption of market reliance as to the entire class because the dates on which the actionable misstatements/opinions occurred do not correspond to an increase in inflationary impact on Household stock. However, the expert testimony credited by the jury was that a misstatement or omission may cause inflation in the stock price merely by maintaining the market expectations or preventing them from falling further, even if the inflation does not increase on the date the misstatement or omission is made. (*See, e.g.*, Trial Tr. at 2605 (plaintiffs' expert Fischel stating that stock is inflated where stock is prevented from falling to a lower level)); *see Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010) (price can be inflated by false statement or omission when it stops price from declining); *Nathenson v. Zonagen*

---

[2]Claimants who answered "yes" or "no" to the claim form question, but explained that they did not make the contested investment decision are included in this category.

*Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (statement actionable with no price increase); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011) ("[A] statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value."). Thus, the fact that the artificial inflation did not increase each day on which the jury found an actionable misstatement or omission occurred does not mean that there is a triable issue as to whether the presumption of reliance has been rebutted.

Defendants also argue that the jury verdict itself rebuts the presumption of market reliance as to the entire class because the Leakage Model did not isolate as to any given day the inflation caused by a misstatement or omission regarding each of the three subjects presented to the jury, *i.e.*, predatory lending vs. 2+ delinquency/re-aging vs. Restatement, and thus plaintiffs have failed to show that the actionable misstatement or omission about a particular subject caused an independent inflationary price impact. (Defs.' Submission Regarding Rebuttal Presumption Reliance at 3-17.) As the evidence at trial demonstrated, the actionable misstatements or omissions on these three subjects were inextricably intertwined. The jury found that defendants made actionable misstatements about re-aging to cover up their predatory lending practices and, in turn, made actionable Restatement misstatements to cover up their re-aging methods. Moreover, as Fischel explained, the inflated price of Household's stock at any given time reflected the ever-changing mix of information that was publicly available. Given the interdependence of the fraudulent statements and the volatility of the information mix, it would be virtually impossible to parse out the damages by topic.

Fortunately, the law does not require the impossible. Rather, it gives a jury discretion to determine a damages award, as long as the award has a reasonable basis in the evidence. *See Am.*

4

**A403**

*Nat'l Bank & Trust Co. v. Reg'l Transp. Auth.*, 125 F.3d 420, 435-40 (7th Cir. 1997); *Dresser Indus., Inc. v. Gradall Co.*, 965 F.2d 1442, 1447 (7th Cir. 1992) (per curiam); *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 896 (7th Cir. 1985); (*see also* Jury Instructions 34 ("Any damages you award must have a reasonable basis in the evidence. Damages must not be proved with mathematical certainty but there must be enough evidence for you to make a reasonable estimate of damages.")). In this case, there were multiple statements and partial disclosures over an extended time period, and the parties' experts provided testimony in support of their positions regarding whether the stock price was affected by misrepresentations or omissions and the estimate of damages stemming therefrom, and the jury chose to credit Fischel's Leakage Model of damages (discounting industry, market or company-specific non-fraud declines unrelated to the actionable misstatements or omissions) over defendants' counter-arguments. Here, all of the evidence, including Fischel's testimony about the amount of artificial inflation, provided a reasonable basis for the jury's damages award.

Defendants also argue that they have rebutted the presumption of reliance as to index funds that answered "no" to the claim form question because the evidence shows that the price of stock has no impact on their purchasing decisions. (*See, e.g.*, Defs.' Ex. 7, The Munder Institutional Funds Prospectus at MCM 0000410 (stating that it "attempts to duplicate the investment composition and performance of the particular index through statistical procedures").) The Court disagrees. The weight of each stock in a capitalization-weighted index is proportional to each company's market capitalization, *i.e.*, its market price multiplied by the number of outstanding shares. *See* Reuters.com, Financial     Glossary,     http://glossary.reuters.com/index.php/Capitalization-Weighted_Index     &

5

**A404**

http://glossary.reuters.com/index.php/Market_Capitalization (last visited Sept. 20, 2012).[3]  In other words, indexes rely on investor opinion as reflected in market price to assign weight to stocks. Likewise, the index funds, which adjust their portfolios to match a target index, rely on investor opinion as reflected in stock price each time they make an adjustment.  (*See* Defs.' Ex. 9, Rule 30(b)(6) Dep. State Street at 43-44 ("[W]e wouldn't have purchased the stock in any of the portfolios which were found to be fraudulent.").)  In short, the evidence about the investment goals of index funds, which is all that defendants offer, does not support the inference that such funds are indifferent to market price. *See In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 (C.D. Cal. 2009) ("Defendants argue that because index purchases seek to match a predetermined index of securities, such purchases are not made in reliance on any misrepresentation.  To the contrary: because index purchases seek only to match the index and exclude other considerations (such as, for example, reliance on nonpublic information or other idiosyncratic motivations), index purchases rely exclusively upon the market to impound any representations (including misrepresentations) into securities' prices."); *see also In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009) (rejecting argument that plaintiff, which made some of its trades "based on a computer program that was designed to mirror a stock index," was not typical of the class of investors because there was no evidence suggesting "that the index did not . . . rely on the integrity of the market").  Defendants have not, therefore, created a triable issue of fact as to the reliance of index investors that responded "no" to the claim form question.

The same is true for Capital Guardian Trust Co., Capital Research & Management Co. and

---

[3]Defendants have not offered any evidence that suggests any of these investors are something other than capitalization-weighted index funds.

Davis Select Advisors ("DSA"), claimants who gave a "no" answer to the claim form question but testified that they rejected or doubted the validity of the efficient capital market theory. (*See* Pls.' Ex. 13, Capital Guardian Trust Co. Rule 30(b)(6) Dep. at 68-69 ("[H]istory . . . show[s] that the efficient capital markets pricing theory" that "all current available information has already been factored into the stock price[,]" is "not always accurate."); Pls.' Ex. 14, Capital Research & Management Co. Rule 30(b)(6) Dep. at 37-38 (testifying that its "investment philosophy" suggests it is "not true" that "the price of a stock reflects all the information available at that time"); Pls.' Ex. 12, DSA Rule 30(b)(6) Dep. at 45-46 (stating that it "cannot be correct," given the stock market's history, that "stocks are fairly priced at all times because [the market price] immediately reflects all information in the public domain")). Given the parties' stipulation that "Household common stock traded in an efficient market" (Final Pretrial Order, Ex. A, Uncontested Fact No. 10), whether these claimants fully subscribe to the efficient market theory is irrelevant. What is relevant is whether they would have traded in Household stock if they had known about the fraud. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Each of them unequivocally answered "no." (*See* Pls.' Ex. 12, DSA Rule 30(b)(6) Dep. at 143 ("It is definitely not appropriate to invest in companies run by crooked executives."); Pls.' Ex. 13, Capital Guardian Trust Co. Rule 30(b)(6) Dep. at 35 ("If we'd ever known that a management had knowingly misled or misstated or produced false statements, I think that would almost, . . . automatically exclude us from wanting to invest in – with such a company."); Pls.' Ex. 14, Capital Research & Management Co. Rule 30(b)(6) Dep. at 71-73 (deponent testifying that he could not "imagine a scenario where [he] would have bought . . . Household stock knowing that it was inflated above its true value" because "part of our investment philosophy is to find undervalued assets . . . . [and] that involves the values of the enterprise, the

7

**A406**

strength of the fundamentals and a sense of trust in the management"); *id.* at 74 ("[I]f we would have

known [the price of Household stock] was inflated, we wouldn't have purchased the stock.").) Thus,

these claimants' testimony about efficient market theory does not create a triable issue as to whether

they relied on price when they engaged in the stock transactions at issue in this case.

Alternatively, defendants argue that DSA could not have relied on any Restatement

misstatement in purchasing Household stock because the Restatement affected earnings near term

and DSA judges its performance over a three- to ten-year term.  (*See* Defs.' Ex. 13, DSA Rule

30(b)(6) Dep. at 95, 185.)  But DSA does not say that it would have purchased Household stock even

if it had known of the fraud.  On the contrary, DSA testified that "one of the biggest parts of an

investment decision is the price of the stock and management's integrity and what they are telling

you." (*Id.* at 185.)  Thus, no reasonable jury could infer solely from DSA's emphasis on long-term

performance that it did not rely on the integrity of the Household stock price.  Defendants have not,

therefore, raised a triable issue as to DSA's reliance on the Restatement misstatements.

Defendants also argue that they have created a triable issue as to whether lead plaintiff

Glickenhaus & Co. and claimants for which it made investment decisions relied on the March 23,

2001 *Origination News* article misstatement.  (*See* Verdict Form, Table A at 11 ("Gary Gilmer,

president and chief executive of Household's subsidiaries HFC and Beneficial said the company's

position on predatory lending is perfectly clear.  Unethical lending practices of any type are abhorrent

to our company, our employees and most importantly our customers.")  In support, defendants cite

to Glickenhaus' deposition testimony that it would not "necessarily believe that [an *Origination

News* quote is] accurate or true," but believes that Household's press releases are true and "relies on

[them] in making investment decisions."  (Defs.' Ex. 8, Glickenhaus Rule 30(b)(6) Dep. at 58-65.)

8

**A407**

It is undisputed, however, that the quote from the *Origination News* article appeared in a Household press release.  (*Id.*)  Thus, viewing the facts in defendants' favor, no reasonable jury could find that Glickenhaus did not rely on Gilmer's quote.  The Court, therefore, holds that defendants have not created a triable issue of fact as to Glickenhaus' reliance.

Defendants have, however, created a triable issue of fact as to the reliance of claimants who: (1) responded "yes" to the claim form question; (2) submitted duplicate claims with conflicting answers to the claim form question; and (3) submitted multiple claims with different answers to the claim form question.  These claims must be resolved at trial.

That leaves the claims of those who did not answer the claim form question and/or supplemental interrogatory.  Defendants contend that, by failing to respond to discovery, these claimants have forfeited their claims.  Plaintiffs argue that summary dismissal is too harsh a sanction and contend that these claims should be tried.  The parties' arguments underscore the challenge of balancing defendants' right to gather information for their defense with the class members' right not to be subjected to abusive discovery.  (*See, e.g.*, 3/12/09 Hr'g Tr. at 34.)

Initially, the task did not seem daunting, as defendants said their discovery needs were slight:

> [T]he institutional investors who owned the lion's share of Household stock were big major sophisticated banks and other funds . . . .  We could capture information about 50 percent of stock ownership by deposing only 10 of them.  We could capture 60 percent by deposing only 15 of them.  It may be that one or two sample depositions will tell us what we need to know and whether this is a worthwhile defense or not.
>
>  . . . .
>
> We need to know what the 15 big institutional investors – what they did, whether or not they can prove reliance on an individual basis, whether we can – I should put it correctly. Whether we can rebut the rebuttable presumption of reliance as to them by simply finding out the facts that were denied during fact discovery.

9

**A408**

(*Id.* at 27, 33.)  Accordingly, the Court ordered that Notice of the Verdict and Claim Form be sent to the class  and  gave defendants 120 days to take discovery of any class member.  (*See* 11/22/10 Mem. Op. & Order at 9; 1/5/11 Hr'g Tr. at 20, 25-26.)

Among other things, the Notice sent to the class members states you "must submit a valid Proof of Claim form enclosed with this notice no later than May 24, 2011" to be able to recover under the verdict.  (1/11/11 Order, Ex. 1 at 6.)  Moreover, the Proof of Claim form itself states:  (1) if you fail to submit a properly addressed . . . Proof of Claim and Release, your claim may be rejected and you may be precluded from any recovery pursuant to the verdict"; (2) "**YOU MUST ANSWER THE QUESTIONS IN PART III OF THE CLAIM FORM IN ORDER TO BE ELIGIBLE TO RECOVER PURSUANT TO THE VERDICT**"; and (3) "**YOU MUST ALSO ANSWER THE** [Claim Form] **QUESTION IN ORDER TO BE ELIGIBLE FOR RECOVERY ON YOUR CLAIM PURSUANT TO THE VERDICT**."  (*Id.*, Ex. 2 at 1, 3, 8) (emphasis original).

Subsequently, defendants served document production requests, interrogatories and Rule 30(b)(6) deposition notices on ninety-eight institutional class members.  Plaintiffs argued that the discovery was overly burdensome and harassing and asked the Court for a protective order.  The Court granted plaintiffs' motion in part and ordered that defendants take no more than fifteen depositions, the number defendants initially said they would need, before the claim forms were returned.  (*See* 1/31/11 Order at 4.)

In early April 2011, plaintiffs told the Court that:

[S]everal custodian banks have expressed concern regarding the difficulty of obtaining the investor clients' answers to a discovery inquiry on the claim form prior to the claim deadline of May 24, 2011.  This difficulty arises from the fact that although these custodian banks are authorized to file claims on behalf of their clients, they were not the decision-makers regarding the relevant investments as to those

10

**A409**

clients. Thus, to obtain an answer to the discovery inquiry, such custodian banks must identify, and transmit the discovery inquiry to, each relevant decision-maker.

(4/11/11 Order at 1-2) (footnote omitted). Consequently, the Court ordered plaintiffs "to propose a plan . . . as to the most efficient way to . . . obtain responses" to the claim form question from this group of claimants. (*Id.* at 2.)

Plaintiffs reported that thirty-eight custodian banks and third-party filing services had filed multiple claims, "12,506 [of which] generate an allowed loss . . . of $1,248,357,070." (Lead Pls.' Proposed Plan Obtaining Resp. Disc. Inquiry Proof Claim Form at 2.) 11,760 of these claims had an allowed loss of $250,000.00 or less, 326 had an allowed loss of $250,001.00-$500,000.00, 204 had an allowed loss of $500,001.00-$1,000,000.00 and 216 had an allowed loss of more than $1,000,000.00. (*Id.*) Given this information, plaintiffs proposed that the custodian banks only be required to obtain an answer to the claim form question from the claimants whose losses accounted for the bulk of the claimed damages, those with an allowed loss in excess of $250,000.00 (*Id.* at 5-6.)

Defendants objected to the plan because it did not require the custodian banks to obtain answers from the 11,760 claimants whose allowed loss was less than $250,000.00. (*See* Defs.' Resp. Pls.' Proposed Plan Obtaining Resp. Disc. Inquiry Proof Claim at 1.) They urged the Court to reject the plan and order that "the Proof of Claim form, or a Court-approved follow-up notice, be sent to *all* beneficial owners on whose behalf custodian banks or other nominees submitted Proof of Claim forms that do not contain an answer to the reliance question." (*Id.* at 3) (emphasis original).

The Court considered the parties' arguments in light of defendants' need for the information, the class members' need to be protected from unduly burdensome discovery and the unique

11

**A410**

circumstances of the case and, with certain modifications, adopted plaintiffs' plan:

> We now know that discovery of 80% of the claimed losses can be achieved by addressing only 6% of the claims. This, coupled with the other avenues of discovery the court has already approved, constitutes a reasonable approach to balancing the needs of the defendants for discovery with the need to protect class members from discouragement and the need to move this already 9 year-old case towards a conclusion.

(5/31/11 Order at 7.) Thus, class members with claims of more than $250,000.00 that were filed by custodian banks were sent a second notice that contained the claim form question and said: "**TO RECOVER FROM THE VERDICT FUND YOU MUST ANSWER THE QUESTION.**" (*See id.* at 7-8; Lead Pls.' Proposed Plan Obtaining Resp. Discovery Inquiry Proof Claim Form, Ex. B.) (emphasis original).

Though they were told repeatedly that they could recover in this suit only if they answered the claim form question, a substantial number of claimants did not. Plaintiffs argue that the Court should ignore this noncompliance and set the claims for trial. That the Court will not do. The Court carefully structured the discovery process to enable defendants to get the information they needed without overburdening the members of the class. Toward that end, each claimant was given the opportunity, larger claimants got two, to perfect his claim by answering "yes" or "no" to one simple discovery question. Given these unique circumstances, the only appropriate sanction for a claimant's failure to answer the question is dismissal of his claim. *See Newman v. Metro. Pier & Exposition Auth.*, 962 F.2d 589, 591 (7th Cir. 1992) ("A plaintiff's failure to comply with discovery orders is properly sanctioned by dismissal of the suit, a defendant's by entry of a default judgment."). Thus, defendants are entitled to judgment on any claims for which the claimant did not answer the claim form question.

To facilitate resolution of the claims that need not be tried, the Court appoints Phillip S. Stenger of Stenger & Stenger as special master to identify in accordance with this Order: (1) the claims on which plaintiffs are entitled to judgment as a matter of law and the amount of each such allowed claim; (2) the claims on which defendants are entitled to judgment as a matter of law; and (3) the claims that must be resolved at trial.

**SO ORDERED**                                **ENTERED: September 21, 2012**

**HON. RONALD A. GUZMAN**
**United States District Court Judge**

13

**A412**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAWRENCE E. JAFFE PENSION PLAN,  )
on behalf of Itself and All          )
Others Similarly Situated,           )
        Plaintiffs,     )
    vs.           ) No. 02 C 5893
HOUSEHOLD INTERNATIONAL, INC.,   )
et al.,                       )
        Defendants.    )

    The videotape deposition of
DANIEL R. FISCHEL, taken before Richard H. Dagdigian,
Illinois CSR No. 084-000035, Notary Public, Cook
County, Illinois, pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, at 115 South
LaSalle Street, Suite 2910, Chicago, illinois,
commencing at 8:56 a.m. on the 21st day March 2008.

## Page 2

```
 1                   APPEARANCES
 2
 3   On behalf of Plaintiffs:
 4       SPENCER A. BURKHOLZ, ESQ.
 5       COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
 6       655 West Broadway, Suite 1900
 7       San Diego, California 92101
 8       Phone: 619.231.1058
 9       Fax: 619.231.7423
10       E-mail: spenceb@csgrr.com
11
12       AZRA Z. MEHDI, ESQ.
13       LUKE O. BROOKS, ESQ.
14       CAMERON BAKER, ESQ.
15       COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
16       100 Pine Street, Suite 2600
17       San Francisco, California 94111
18       Phone: 415.288.4545
19       Fax: 415.228.4534
20       Email: azram@csgrr.com
21       Email: LukeB@csgrr.com
22       Email: cbaker@csgrr.com
23
24
```

## Page 3

```
 1                   APPEARANCES:(Cont'd)
 2
 3   On behalf of the Defendants:
 4       DAVID R. OWEN, ESQ.
 5       JASON M. HALL, ESQ.
 6       NICOLE M. SERRATORE, ESQ.
 7       MICHAEL J. WERNKE, ESQ.
 8       CAHILL, GORDON & REINDEL, LLP
 9       Eighty Pine Street
10       New York, New York 10005
11       Phone: 212.701.3000
12       Fax: 212.269.5420
13       Email: dowen@cahill.com
14       Email: jhall@cahill.com
15       Email: nserratore@cahill.com
16       Email: mwernke@cahill.com
17
18
19   ALSO PRESENT:
20       MR. BRUCE WITTY, Legal Videographer
21
22
23
24
```

## Page 4

```
 1                   I N D E X
 2   March 21, 2008
 3   THE WITNESS            EXAMINATION BY COUNSEL FOR
 4                          PLAINTIFFS      DEFENDANTS
 5   DANIEL FISCHEL
 6   (By Mr. Owen)                    6
 7         FISCHEL DEPOSITION EXHIBITS
 8   NUMBER        DESCRIPTION              PAGE
 9   Exhibit 1   Report of Daniel R. Fischel       10
10   Exhibit 2   Rebuttal report of Daniel R. Fischel   10
11   Exhibit 3   Document titled "Efficient Capital   21
12               Markets, the Crash, and the Fraud on
13               the Market Theory", by Daniel R. Fischel
14   Exhibit 4   Document titled "Appendix 1,      89
15               Household's Prospectus Disclosures"
16   Exhibit 5   Document dated Oct. 18, 2001 from   94
17               Ventana Capital, titled "Household
18               International (HI-$58-Sell)"
19   Exhibit 6   Document titled "Lead Plaintiffs'   105
20               Opposition to Household Defendants'
21               Motion to Compel", etc.
22   Exhibit 7   Document titled "VMS, Monitoring   170
23               Report", Bates Nos. HHS 02948918
24               through 02948926
```

Pages 1 to 4

## Page 45

1   A   The footnote says that those two things are
2   different pieces of information.  That's correct.
3       Q   When you are conducting the analysis that
4   you do in your report, do you have to identify all
5   the different pieces of information in order to reach
6   conclusions about material changes in the stock
7   prices?
8       A   Now, you are shifting to my report?
9       Q   It's a more abstract question, but it's
10  about the methodology that you are following.
11      You have to identify the key pieces of
12  information in order to analyze the changes in stock
13  price?
14      A   I'm not sure what you mean by "identify the
15  keys pieces of information".
16      I did an events study analyzing the
17  relationship between the stock price movements to all
18  disclosures on every day during the class period; and
19  for that matter, a stock price reaction today where I
20  couldn't identify any disclosures.
21      Q   Well, my question is, in footnote six of
22  your article, you talk about and identify two
23  distinct pieces of information that could relate to
24  the claim of fraud in that hypothetical case.

## Page 46

1       Generally speaking, do you have to know
2   what the relevant pieces of information are when you
3   are analyzing a plaintiff's claim of fraud?
4       A   I think what the footnote suggests is you
5   have to interpret stock price movements in a
6   particular context, and that's the purpose of the
7   footnote.
8       I think that's always true, if that's the
9   question.
10      Q   How can you tell if a particular piece of
11  information relates to an alleged fraud or not?
12      A   Again, generally, hypothetically, under any
13  conceivable circumstances?
14      Q   Uh hum.  What would be the way you would
15  analyze it?
16      A   Again, it's very difficult to answer
17  questions at this level of generality because every
18  situation has to be analyzed based on the relevant
19  facts and circumstances.
20      But, generally speaking, I would say you
21  would look at the allegations in the case, the
22  relevant public disclosures.
23      The stock price reaction to those
24  disclosures likely perform an events study or

## Page 47

1   regression analysis to make sure that the stock price
2   reactions that you were interpreting are not
3   attributable to market or industry or some other
4   factors.
5       You look at all the other relevant economic
6   evidence that might or might not be relevant
7   depending on the facts and circumstances, and make a
8   judgment, as well as look looking at all the other
9   relevant publicly available information.
10      Q   Your opinion says that the economic
11  evidence that you reviewed is "consistent with the
12  plaintiffs claims in this case".
13      A   Are you referring to a particular statement
14  in the report?
15      Q   It's on page six, the last paragraph before
16  Roman numeral III, the last sentence before Roman
17  numeral III.
18      A   I see that.
19      Q   "I have concluded that the economic
20  evidence is consistent with plaintiffs' claim that
21  the alleged wrongdoing caused investors in
22  Household's common stock to incur losses".
23      What do you mean by the words "consistent
24  with"?

## Page 48

1       A   What I mean is, in the context of this
2   case, that there are allegations about particular
3   nondisclosures and misrepresentations.
4       I don't have an opinion on whether there
5   were in fact misrepresentations or nondisclosures.
6       But in looking at the economic evidence, if
7   there were in fact material omissions or
8   nondisclosures as alleged, I would expect to see
9   certain behavior of stock price movements as well as
10  a certain pattern of reaction by market participants.
11      And when I looked at the economic evidence,
12  it was consistent, as I said in the report, with the
13  claims that are being made by the plaintiffs in this
14  case for the reasons described in my reports.
15      Q   Let me give you a hypothetical just to see
16  if I understand what you just said.
17      Take two hypothetical companies; each of
18  them is accused of the same undisclosed misconduct,
19  and one of them is accused falsely, and the other is
20  accused accurately.
21      The stock prices of both the companies
22  decline significantly on the accusation.
23      Both of the companies deny the allegations,
24  and both of the companies settle the claims for

## Page 49

1  undisclosed reasons while continuing to profess
2  innocence. Both are then sued for securities fraud.
3  Your methods, as they have been applied
4  here, would identify the presence of inflation for
5  both companies, is that correct?
6  A   I just don't know if that's correct. I
7  think I would have to look at all the relevant facts
8  and circumstances and -- and if this were a real
9  world situation.
10  But I do want to emphasize what might be
11  the premise of your question, which is that I'm not
12  expressing an opinion on whether there were in fact
13  misrepresentations or omissions.
14  The economic evidence that I've looked at
15  does not allow me to express an opinion on that
16  subject.
17  I can express an opinion as to whether
18  the economic evidence is consistent with those
19  allegations, but does not establish that the
20  allegations themselves are true.
21  Q   Let me just see if I understood that.
22  The economic evidence could be consistent
23  with the claims, but the claims themselves could be
24  false?

## Page 50

1  A   The claim that there is legal liability for
2  misrepresentations or omissions -- that may or may
3  not be correct.
4  I don't have an opinion one way or the
5  other on whether the claims that there were
6  disclosure defects that were actionable under the
7  securities laws -- I don't have an opinion on that.
8  I have an opinion as to whether the
9  economic evidence is consistent with those
10  allegations in the way that I described; that if
11  those allegations were accurate, I would expect to
12  see a certain pattern of stock price behavior as well
13  as a certain pattern to my analysis of publicly
14  available information.
15  I was able to test those things by looking
16  at relevant disclosures, publicly available
17  information, stock price movements, controlling for
18  market and industry movements.
19  I looked at all of Doctor Bajaj's
20  criticisms, responded to those, and I reached the
21  opinions that I reached.
22  But that's why the last sentence of
23  paragraph 11 says that, "the economic evidence is
24  consistent with plaintiffs' claim" as opposed to

## Page 51

1  establishes plaintiffs' claim.
2  Q   You are aware that Household settled a
3  bunch of different matters of litigation against it,
4  disputes of regulators in this case?
5  A   I am.
6  Q   Are you offering any opinion as to the
7  reasons Household settled any of those matters or
8  litigations?
9  A   No, I am not.
10  Q   Now, you conduct a regression analysis in
11  connection with your first report?
12  A   Correct.
13  Q   And that regression analysis tries to
14  identify statistically significant changes in stock
15  price after controlling for market and industry
16  factors?
17  A   That's correct.
18  Q   What standard is being applied for
19  statistical significance in your report?
20  A   You mean what is -- I'm not sure what you
21  mean by "what standard".
22  Q   Well, supposedly the regression will say
23  this movement is significant, and this other movement
24  is not significant.

## Page 52

1  And I want to know what the standard is to
2  decide which is which.
3  A   I used, as I typically do, as is
4  conventional, a standard of any stock price movement
5  that had a t-statistic of greater than 1.65, I
6  consider to be statistically significant.
7  And any stock price movement that had a
8  t-statistic less than 1.65, I did not consider to be
9  statistically significant under the specification
10  that's described in my report.
11  Q   You, talk about another standard involving a
12  t-statistic of 1.96, I think?
13  A   Correct.
14  Q   What -- why do you talk about that
15  standard?
16  A   Just for purposes of providing background
17  about the difference between a 1-tail test and a
18  2-tail test.
19  Q   So the other standard doesn't have anything
20  to do with the actual analysis that you do?
21  A   I'm not sure what you mean by "doesn't have
22  anything to do with" it. I think anybody could look
23  at the results that are reported and conclude that
24  the results are significant in either a 1-tail test

Pages 49 to 52

## Page 53

1　or a 2-tail test, or neither.

2　　　　　But in terms of the standard that I used, I

3　used a t-statistic of 1.65 which is the conventional

4　level of statistically significance in a 1-tail test.

5　　　Q　Speaking generally -- let me start again.

6　　　　　Did you apply a 2-tail test to any of the

7　dates that you analyzed in your regression analysis?

8　　　A　Well, the results lend themselves to

9　applying any level of statistical significance.

10　　　　　You could apply statistical significance at

11　the ten percent level, which would be the lowest

12　t-statistic; you could apply statistical significance

13　at the one percent level which would be a higher

14　t-statistic.

15　　　　　But in terms of what I consider to be

16　statistically significant, I used a 1-tail test and,

17　therefore, a t-statistic of 1.65.

18　　　　　But the results allow you to use any level

19　of statistical significance that anyone wants to do

20　for any purpose.

21　　　　　But if you are asking me what I did, for

22　the most part, I used a 1-tail test and a -- a

23　t-statistic of 1.65.

24　　　Q　So you talked about the 2-tail test in your

## Page 54

1　report but you didn't actually use it?

2　　　A　Again, I'm not sure what you mean by

3　"use it". By reporting it, again, this is

4　conventional, anybody can decide whether a particular

5　event is statistical -- excuse me, statistically

6　significant at the five percent level under either a

7　1-tail test or a 2-tail test.

8　　　　　But if you are asking me what I consider to

9　be statistically significant, I used a 1-tail test at

10　the five percent level, as opposed to a 1-tail test

11　at the ten percent level, a 1-tail test at the one

12　percent level, a 2-tail test at the ten percent

13　level, a 2-tail test at the one percent level, or any

14　other possible combination.

15　　　Q　Does the 2-tail test provide a stronger

16　indication of statistical significance than the

17　1-tail test?

18　　　A　I'm not sure what you mean by a stronger

19　indication. It requires a higher level of -- a

20　higher t-statistic.

21　　　　　So, therefore, fewer events would be

22　statistically significant at any given level of

23　statistical significance in a 2-tail test than a

24　1-tail test.

## Page 55

1　　　Q　So fewer events are going to meet the

2　2-tail criteria than the 1-tail criteria?

3　　　A　Holding everything else constant, correct.

4　　　Q　Speaking generally, what does a significant

5　-- statistically significant price change indicate to

6　you?

7　　　A　Generally it means that there is -- a

8　residual of this size will be attributable to chance

9　alone less than five percent of the time.

10　　　Q　Do you use that inference to support a

11　conclusion that some new piece of information has

12　entered the marketplace that is affecting the stock

13　in a way that can't be explained by market or

14　industry factors?

15　　　A　Sometimes. It depends on the relevant

16　facts and circumstances.

17　　　Q　Are there any statistically significant

18　stock price movements of Household for which you have

19　drawn that conclusion?

20　　　A　Well, yes, I think there are -- in the

21　context of my report, I think I identified 14 events

22　where I drew that conclusion.

23　　　　　But if I looked at the full events study,

24　there would be a lot more than 14. I just didn't

## Page 56

1　consider other statistically significant stock price

2　movements attributable to fraud related disclosures.

3　　　Q　I'm looking at days where there was no

4　statistically significant movement controlling the

5　industry and market factors.

6　　　　　Whatever new information might have been

7　available on those days wasn't sufficient to cause

8　the stock price to change?

9　　　A　In a statistically significant way,

10　correct.

11　　　　　MR. OWEN:　Do you want to take a break?

12　　　A　Sure.

13　　　　　THE VIDEOGRAPHER:　Going off the record at

14　10:17 a.m.

15　　　　　　　　(Whereupon, a short recess

16　　　　　　　　was taken.)

17　　　　　THE VIDEOGRAPHER:　This marks the beginning

18　of tape two in the deposition of Daniel Fischel.

19　　　　　Going on the record, the time is now

20　10:26 a.m.　Please proceed.

21　　　　　MR. BURKHOLZ:　Excuse me, Mr. Owen, I think

22　there was a discrepancy in his second to last answer

23　regarding whether he said fraud or non-fraud related

24　disclosures that I think he wants to clarify.

Page 57

```
 1            He thinks he said one thing and the record
 2   came out differently.
 3        A   I don't have it in front of me, but I think
 4   -- he pointed out to me that the transcript didn't
 5   reflect what I said.
 6            It's on line 19, the sentence, "I just
 7   didn't consider other statistically significant price
 8   movements", and I guess it should say, "not
 9   attributable to fraud related disclosures", so it's
10   clear in context.
11   BY MR. OWEN:
12        Q   So there are a bunch of stock price
13   movements that were significant under your regression
14   analysis that were not attributable to fraud related
15   disclosures?
16        A   Correct.
17        Q   And that actually leads into my next
18   question, which is, I want to talk about the alleged
19   fraud that you are analyzing in this case.
20            I guess, first, I want to ask you is, is it
21   three theories of fraud or one theory of fraud in
22   your mind?
23        A   I'm not sure how to answer that.  I guess I
24   don't have independent theories of fraud.
```

Page 58

```
 1            My understanding is that the plaintiffs are
 2   alleging a fraud with several different components,
 3   three different components.
 4        Q   So the overall lawsuit alleges fraud, and
 5   that fraud has three parts to it?
 6        A   That's my understanding, but I don't have
 7   -- in response to your earlier question, I don't have
 8   my own independent theory of fraud.
 9        Q   In the complaint, they plead them
10   separately, do you know that?
11        A   I don't know if that's true or not true.
12   It wouldn't have any significance to me in any event.
13        Q   Okay.  I don't need to show you the thing.
14   I will represent to you that there are three
15   different sections, and each deal with restatement,
16   reage and predatory lending.
17            That doesn't have any effect on your answer
18   to the prior question?
19        A   How the complaint is drafted, whether there
20   are three sections, three different sections?  No,
21   that has no relevance to me.
22        Q   And your report analyzes the three
23   components you talked about separately?
24        A   I'm not sure I agree with that
```

Page 59

```
 1   characterization.
 2        Q   Well, let's look at it.  It says --
 3   starting on page six, Roman numeral III, "The
 4   relationship between plaintiffs' allegations and
 5   investors' losses" -- and the next heading is A,
 6   "Predatory Lending", and thereafter you talk about
 7   predatory lending issues for seven pages before you
 8   get to page 13 where it says, "B. Reaging", and you
 9   talk about reaging for five or six pages, and then
10   you get to page 16, it says, "C.  The Restatement".
11            That's what I mean when I say you analyzed
12   them separately.
13        A   Again, I'm not sure whether anything from
14   for my purposes turns on whatever distinction you are
15   trying to draw.
16            But in terms of the organization of the
17   report, these are subsections under one general
18   heading.
19            So even as a semantic matter, I'm not sure
20   it's completely accurate to describe them as -- as
21   distinct as opposed to different aspects of the
22   plaintiffs' allegations.
23            But, again, the distinction that you are
24   drawing doesn't have any particular economic
```

Page 60

```
 1   significance to me anyway.
 2        Q   Well, I guess the question I have is, in
 3   your mind, are the facts and circumstances of the
 4   three different components, as you call them,
 5   interrelated or are they distinct?
 6        A   I guess my understanding is that the
 7   plaintiffs claim that they are distinct -- I'm sorry,
 8   the plaintiffs claim they are interrelated rather
 9   than distinct, but I don't have any independent
10   opinion on that one way or the other.
11        Q   And you would agree that of the components,
12   there are distinct factual issues and even different
13   business units involved?
14        A   I guess I understand that the three
15   different components involve different areas of
16   Household's business, so that by definition there
17   would be some different factual issues involved.
18        Q   Now, one set of issues relating to one
19   component could be correct and, then, another set of
20   issues relating to the other component could be
21   false, and the falsity of the second component
22   wouldn't necessarily have anything to do with the
23   first component, right?
24            MR. BURKHOLZ:   Objection, form.
```

Pages 57 to 60

A417

## Page 77

1  and the associated exhibits.

2      Q   Are there any practices that you are

3  analyzing with respect to the predatory lending issue

4  that are not described in those paragraphs that you

5  just identified?

6      A   Again, it really doesn't quite accurately

7  capture what I did. I wasn't performing an

8  independent analysis of Household's lending

9  practices, as I think I've been clear about.

10      I analyzed the relationship between

11  Household's lending practices and, particularly, the

12  criticism of those lending practices in publicly

13  available information to relevant stock price

14  movements during the class period, focusing

15  particularly on a series of events described in

16  paragraphs 12 through 21 and the referred to

17  exhibits.

18      Q   My question really relates to how am I

19  supposed to know what practices you are analyzing.

20  And if I understand you correctly, I'm supposed to

21  look at paragraphs 12 through 25 to find out the

22  answer to that question -- I'm sorry, 12 through 21

23  to answer that question?

24      MR. BURKHOLZ:  Objection, form.

## Page 78

1      A   I think the question misstates my previous

2  answers. I didn't perform an analysis of Household's

3  lending practices in the abstract.

4      I did what I described in my previous

5  answers and what I think is described more

6  comprehensively in my reports.

7  BY MR. OWEN:

8      Q   Does it matter what the definition of

9  predatory lending means in terms of the paragraphs 12

10  through 21?

11      A   In terms of the analysis that I performed,

12  I don't think it matters, no, in terms of what I

13  focused on is what market participants consider to be

14  predatory lending.

15      I didn't form any independent judgment as

16  to what the definition is of predatory lending.

17      Q   But suppose different market participants

18  had different ideas about what was predatory lending.

19  Wouldn't that raise a question for you as to what

20  they meant when they used the term?

21      A   Again, if you are referring to something

22  specific, you should refer me to it. I will give you

23  my best sense.

24      But my particular analysis did not require

## Page 79

1  any determination of whether every market participant

2  understood the same thing by the term "predatory

3  lending".

4      The focus in my report is on market

5  participants' belief that certain practices were

6  improper, ranging from excessive fees to improper

7  disclosures, and that those practices once revealed

8  might have certain legal consequences, and had a

9  particular effect on -- a particular negative effect

10  on Household's stock price.

11      That's what I focused on, and I focused on

12  it in slightly different ways in different parts of

13  the report.

14      But since you are only asking me about the

15  quantification of specific disclosures, I will limit

16  myself to the disclosures relating to predatory

17  lending that I considered to be fraud related,

18  because they had a statistically significant price

19  reaction associated with them.

20      Q   Let me see if I understand what you are

21  saying when you refer to disclosures relating to

22  predatory lending that I considered to be fraud

23  related because they had a statistically significant

24  price reaction associated with them.

## Page 80

1      How did you know if a disclosure related to

2  predatory lending that you considered to be fraud

3  related?

4      A   I described that in my report with respect

5  to the specific disclosures.

6      But, you know, again, generally speaking,

7  to the extent there were disclosures about

8  Household's predatory lending practices that had a

9  statistically significant stock price reaction

10  associated with them, I took those disclosures into

11  account in my quantification of inflation focusing on

12  specific disclosures.

13      Q   Well, Household disputed whether it had any

14  practices that were, quote-unquote, predatory lending

15  practices, right?

16      A   That's not completely clear to me either

17  based on the material that I've reviewed.

18      Q   But if somebody else said predatory lending

19  in the context of one of Household's practices, then

20  you deemed that report to be related to predatory

21  lending at Household?

22      A   I think what I did is described in my

23  report. To the extent that there were specific

24  disclosures that I identified, both when the

**West Court Reporting Services**    800.548.3668 Ext. 1

A418

## Page 81

1  disclosures were, why the disclosures were considered
2  by me to be fraud related, what their effect was on
3  my calculations of inflation, it's all described in
4  my report.
5       I'm happy to answer any questions about any
6  particular disclosure, but that's the general
7  methodology that I followed.
8       Q   So you didn't have to know what people
9  meant when they said "predatory lending" to do your
10  analysis?
11      A   Well, you know, that goes a little bit too
12  far.  I think I said I didn't need to know whether
13  everybody subjectively thought exactly the same
14  thing.
15      But the disclosures themselves refer to
16  what people meant when they refer to predatory
17  lending in terms of, as I said, charging excessive
18  fees, providing inaccurate disclosures, inducing
19  homeowners to enter into inappropriate transactions
20  -- all these different disclosures that I refer to
21  just don't use the term "predatory lending" in the
22  abstract.
23      They describe what the factual context is
24  for their particular conclusions with respect to

## Page 82

1  Household's predatory lending practices.
2       Q   We have talked about practices in the
3  context of Household's business.
4       Did you understand the term "predatory
5  lending" to include any products separate and apart
6  from the methods by which those products were sold?
7       A   I don't think I have an understanding on
8  that one way or the other.
9       Q   So you don't know?
10      A   Well, you asked do I have an understanding
11  of it.  I don't.  I didn't form an understanding one
12  way or another on that question.
13      Q   And as you said before, you don't have any
14  particularized expertise with respect to any of these
15  concepts?  Just reading analysts' reports?
16      MR. BURKHOLZ:   Objection, form.
17      A   I don't claim to have any particular
18  expertise as to whether or not Household's lending
19  practices conformed with applicable legal and
20  regulatory requirements.
21      I didn't make any independent determination
22  of that issue.  I don't have any particular expertise
23  on that issue.
24      BY MR. OWEN:

## Page 83

1       Q   Does your opinion assume that Household was
2  doing predatory lending things during the class
3  period?
4       MR. BURKHOLZ:   Objection, form.
5       A   Well, if what you mean by "predatory
6  lending things" -- again, not the most clearly
7  defined term in the world --
8       BY MR. OWEN:
9       Q   I agree with that.
10      A   That my opinion assumes that Household's
11  disclosures with respect to its lending practices
12  were deficient in the sense that Household did not
13  provide full disclosure of the extent to which it was
14  involved in predatory lending, and the various
15  practices that market participants concluded
16  constituted predatory lending which could have
17  possible adverse legal consequences and adverse
18  consequences for the value of Household stock.
19      Q   Would that condition also exist in the time
20  before the class period started?
21      A   I guess I don't have an opinion on that one
22  way or the other.
23      Q   Well, your inflation analysis shows 7.97 of
24  inflation on the first day of the class period, does

## Page 84

1  it not?
2       A   Correct.
3       Q   And that inflation presumably relates to a
4  state of affairs that exists on that first day of the
5  class period, correct?
6       A   That I'm assuming exists on the first day
7  of the class period, correct.
8       Q   And have you no opinion about whether or
9  not it exists the day before the class period or not?
10      A   As I said, I don't have an opinion whether
11  it exists on any day during the class period other
12  than --
13      Q   Fair enough --
14      A   -- than what I've already stated.  I don't
15  have an opinion as to the accuracy of Household's
16  disclosures in the abstract other than in the way
17  that I've already stated.
18      Q   Okay.  Well, you said you assumed that it
19  exists on the first day of the class period?
20      A   I assumed that there were disclosure
21  defects on the first day of the class period, without
22  having an opinion about whether there were or there
23  were not.
24      Q   And those disclosures on the first day of

## Page 85

1  the class period would presumably relate to
2  circumstances that existed prior to the class period,
3  and practices and products that were being sold at
4  that time?
5      A   Again, that's possible, but I don't have an
6  opinion on that one way or the other.
7      Q   Assume some of the practices that we are
8  talking about as within the meaning of predatory
9  lending were disclosed to the public, but were
10  nevertheless criticized as predatory lending by
11  activists or others.
12          Would that affect your inflation analysis?
13      A   My analysis assumes that there were
14  disclosure defects.  So I guess my answer to your
15  question would be maybe.  It just would depend on the
16  relevant facts and circumstances.
17      Q   What would be the facts and circumstances
18  you would want to know?
19      A   Whether or not whatever disclosures you are
20  assuming in your question constituted full disclosure
21  or eliminating the possibility of any disclosure
22  defects.
23      Q   One of the things that's at issue in this
24  case is the settlement that Household entered into

## Page 86

1  with this group of Multi-state Attorneys General.
2          Looking again at the first day of the class
3  period, is that a disclosure defect that existed in
4  your mind as of that date?
5      A   I'm not sure I understand the question.
6  Obviously, the settlement itself is not a disclosure
7  defect because it hadn't occurred on the first day of
8  the class period.
9      Q   I'm not really talking about the settlement
10  itself.  I guess it's the possibility of that future
11  settlement.
12      MR. BURKHOLZ:   Objection, form.
13  BY MR. OWEN:
14      Q   Well, let me try again.  Is it a part of
15  plaintiffs' claim here at all, as you understand it,
16  that Household should have disclosed that they would
17  settle with the Multi-state group of Attorneys
18  General?
19      MR. BURKHOLZ:   Same objection, form.
20      A   You know, I guess I don't have an opinion
21  on that question one way or the other, except to the
22  extent that I understand plaintiffs' claim to be that
23  Household failed to disclose details of its lending
24  practices which ultimately resulted in a series of

## Page 87

1  legal and regulatory repercussions which adversely
2  affected the value of Household securities during the
3  class period.
4  BY MR. OWEN:
5      Q   Would Household in making this hypothetical
6  disclosure on the first day of the class period have
7  had to accuse itself of illegal misconduct to correct
8  the disclosure defects that you discuss in your
9  report?
10      A   I don't really have an opinion on what
11  Household would have had to have disclosed to be in
12  compliance with all applicable disclosure
13  requirements on the first day of the class period.
14      Q   You identify inflation on that day though?
15      A   I do, that's correct.
16      Q   And you don't have an opinion about how it
17  could have eliminated that inflation on the first day
18  of the class period?
19      A   I have the opinion that I stated earlier;
20  by having disclosures on that day and subsequent days
21  which eliminated the alleged disclosure defects with
22  respect to its lending practices.
23      Q   Let me just say this as clearly as I can.
24  In response to the question, what should Household

## Page 88

1  have said to correct the disclosure defects on the
2  first day of the class period with respect to the
3  predatory lending issue, you don't have any answer?
4      A   Other than what I've said, correct.  I
5  don't consider myself a disclosure expert, and I have
6  not attempted to create model disclosures.
7          But in order to eliminate the inflation
8  that my analysis shows on the first day of the class
9  period, it would be necessary for there to be an
10  absence of any disclosure defects with respect to
11  this particular issue and the other issues addressed
12  in my report.
13      Q   And I guess at trial, it will be
14  plaintiffs' burden to establish that these defects
15  existed?
16      MR. BURKHOLZ:   Objection, form.
17      A   Again, I'm not sure who would have what
18  burden, but certainly there would have to be an
19  adjudication that there were disclosure defects for
20  my analysis to be meaningful.
21  BY MR. OWEN:
22      Q   Are you offering any opinion regarding
23  scienter?
24      A   No, I'm not.

## Page 129

1  just giving you my understanding of what the
2  allegations are.
3      Q   Okay.  That's important, because you are
4  the one who is quantifying the effects of those
5  allegations.
6      A   Is that a question?
7      Q   Well, is it not important for you to
8  understand what the allegations are accurately if you
9  are going to put forth an opinion about what the
10  effects of those allegations may have been?
11     A   I would say it is important for my analysis
12  to understand that the plaintiffs allege that there
13  were disclosure defects in the three areas that I
14  discuss in my report dating back to the beginning of
15  the class period.
16     Q   And the disclosure defects, as you
17  understand them, relate to quarterly financial
18  results, 10-K's, 10-Q's, 8-K's, and anything else?
19     A   I only use those as illustrative.  I
20  haven't attempted to -- to identify every single
21  disclosure that the plaintiffs allege to be false and
22  misleading either because of a misrepresentation, or
23  omission, or both.
24     Q   But they had to relate to financial results

## Page 130

1  at the very least?
2      A   I'm not ensure that's true.  Again, I'm not
3  the one making the allegations, but I could imagine
4  there could be allegations about particular
5  disclosures that don't report actual financial
6  results.
7      Q   And you don't know whether plaintiffs are
8  claiming those or not?
9      MR. BURKHOLZ:   Objection, form.
10     A   You know, as I sit here, I don't recall
11  exactly what plaintiffs' allegations are with respect
12  to every single disclosure that Household made during
13  the class period.
14  BY MR. OWEN:
15     Q   Let's look at the August 16th date, 1999,
16  when they release quarterly financial results.
17     A   Okay.
18     Q   Would the allegedly false statements for
19  that -- applicable to that particular quarterly
20  statement be the same for the announcement of the
21  results that took place on July 22nd?
22     MR. BURKHOLZ:   Objection, form.
23     A   I think for purposes of my analysis, I
24  think it is fair to say that to the extent that I've

## Page 131

1  concluded that the artificial inflation on July 30th
2  and August 16th was identical, and the basis -- my
3  understanding of the basis for that conclusion with
4  respect to July 30th is the company's disclosure on
5  July 22nd, that I guess I would agree that the amount
6  of inflation that I've calculated on those two days
7  is the same with the very important caveat of what I
8  described at length before lunch, that in order to
9  have inflation, you have to have a basis to recover.
10  BY MR. OWEN:
11     Q   But putting aside the basis to recover, the
12  falsity would be the same as to the announcement of
13  results on the 22nd of July and a reporting of the
14  results on August 16th?
15     MR. BURKHOLZ:   Objection, form.
16     A   I would say based on my analysis, the
17  impact of a hypothetical disclosure or series of
18  disclosures on those two dates would be the same.
19         But there is the important caveat that I'm
20  not going to repeat again.
21  BY MR. OWEN:
22     Q   That was the caveat in my question.  I
23  accept it, that that's your position.
24         Assume that Household had disclosed its

## Page 132

1  second quarter 99 results on some day other than
2  the 16th, say the 18th.  Would that have any impact
3  on your inflation chart in your report?
4      A   Which inflation chart?
5      Q   The specific disclosures chart.
6      A   No, it would not.  It would on the other
7  one, but not -- it would on the leakage model, but
8  not the quantification based on specific disclosures.
9      Q   The last two words of that sentence says
10  "in order to become inflated".
11         And I think we understand that on all of
12  the days we are talking about here at the beginning
13  of the class period, the inflation stays exactly the
14  same.
15         In what sense --
16     A   I'm sorry, on all --
17     Q   Well, from July 30 to August 17, the day
18  after the first announcement, the inflation is the
19  same on each day?
20     A   Correct.
21     Q   I want to understand in the sense that you
22  use the words "to become inflated", how the stock
23  price is becoming inflated on any of those days?
24     A   I think I've explained that at length, as a

## Page 133

1  result of my quantification of what I am assuming to
2  be a series of nondisclosures on the first day of the
3  class period where the inflation remained constant,
4  until there was a disclosure either increasing the
5  amount of inflation or decreasing the amount of
6  inflation which, based on my analysis, occurred on
7  November 15th of 2001.
8      Q   And I think you've already answered this,
9  but I'm just going to ask it to be clear.
10      The impact of the nondisclosures you are
11  talking about can't be measured with an event study
12  using specific disclosures of the kind you use in
13  your report?
14      A   I don't agree with that.
15      Q   Well, illuminate me.
16      MR. BURKHOLZ:   Objection, form.
17      A   The impact of those assume nondisclosures
18  as exactly what's calculated using an events study.
19      BY MR. OWEN:
20      Q   It's not your opinion in connection with
21  this case that there was artificial inflation in the
22  stock?
23      A   I think I've answered that numerous times.
24  In order for there to be artificial inflation, there

## Page 134

1  has to be an actionable disclosure defect.
2      I'm assuming the existence of actionable
3  disclosure defects.
4      Based on that assumption, I have attempted,
5  using two different methods, to calculate the amount
6  of inflation resulting from those disclosure defects.
7      Q   Plaintiffs' theory that we are talking
8  about here, again in paragraph 38, doesn't rely upon
9  the presence of statistically significant changes in
10  price, is that correct?
11      A   Are you asking me about what exactly?   The
12  plaintiffs' -- the sentence -- the first sentence of
13  paragraph 38, plaintiff's theory in this case or
14  generally -- I'm not sure what you are asking me.
15      Q   Well, it says, "Under this theory the
16  company's stock price did not have to increase".
17  So I'm saying the theory then doesn't demonstrate
18  itself by way of increases in stock price.
19      A   I'm not sure what you mean by "the theory
20  doesn't demonstrate itself".
21      What I would say is exactly what this
22  sentence says, that again, in the context of the
23  proper use and limits of regression analysis, that it
24  would be an incorrect interpretation of regression

## Page 135

1  analysis to conclude that because there is no
2  statistically significant price reaction to a
3  statement, that necessarily means that the statement
4  did not produce artificial inflation.   That's the
5  purpose of the sentence.
6      Q   Looking at the period between July 30 and
7  November 15 -- July 30, 1999 and November 15, 2001,
8  are the alleged omissions that prevented the price
9  from falling to its true uninflated value the same at
10  all times between those two dates?
11      A   Well, I would say, based on my analysis,
12  the economic effect of the alleged omissions is the
13  same between those two dates.
14      Q   Do you know the answer to the question I
15  asked you, though, whether the alleged omissions are
16  the same?
17      A   I can't answer that question because of
18  what I've said numerous times, that I haven't made
19  any independent analysis of the adequacy of
20  disclosures at any point in time, including between
21  those two points in time.
22      Q   Well, I'm not really asking about whether
23  they were adequate or not.
24      I'm asking whether or not the alleged

## Page 136

1  omissions are the same during the time period
2  between those two dates?
3      A   I guess the only opinion that I have about
4  that is what I said, that based on my analysis, the
5  economic effect of the alleged omissions is the same
6  between those two dates based on my analysis of
7  quantification using specific disclosures.
8      It's not the same based on my other theory
9  which -- not really a theory, my other calculation,
10  which in some ways, as I discuss in the report, I
11  think more accurately reflects a proper
12  interpretation of Household's stock price movements
13  during the class period.
14      Q   Do you not know whether the alleged
15  omissions are the same during that period?
16      MR. BURKHOLZ:   Objection to form, asked and
17  answered.
18      A   I haven't analyzed that question because I
19  haven't attempted to analyze the alleged disclosure
20  defects apart from the economic effect of those
21  alleged disclosure defects under two different
22  methods.
23      BY MR. OWEN:
24      Q   So you didn't investigate it.   I'm

Pages 133 to 136

Page 137

1    sorry.  Let me start again.
2            You know, I'm not talking about the
3    economic effects now.  I'm just talking about what
4    the alleged omissions are during that period, and
5    whether they are the same throughout the period.
6            And I understand you to be saying you
7    didn't investigate that so you can't answer the
8    question.
9            And my question comes, because you didn't
10   investigate the question, you don't know whether they
11   are the same or not throughout that period?
12       MR. BURKHOLZ:   Objection, form.
13       A    This actually is related to what I said
14   earlier.  In connection with this one analysis that
15   I performed, the quantification using specific
16   disclosures, I analyzed the economic effect of
17   particular statements that occurred during the class
18   period.
19           And I made an assessment based on the
20   economic effect of those statements, what the amount
21   of inflation was at the beginning of the class period
22   and, at least under that first method, how long that
23   amount of inflation that existed at the beginning of
24   the class period lasted until it varied, went up or

Page 138

1    down based on the existence of other events or
2    statements that occurred during the class period.
3            If, however, as I said before, the evidence
4    at trial or other developments between now and trial
5    indicate that my analysis should be modified in one
6    direction or another, my analysis is capable of
7    incorporating any of those developments.
8            So if, for example, it was the case that
9    one of the issues falls out of the case altogether,
10   or the evidence shows that there is a difference in
11   the nature of the omitted or misrepresented
12   information at any point in time, the analysis can be
13   modified to incorporate any of those developments.
14           But for present purposes, I am assuming
15   that the information that came out during the period
16   about these three different areas was something that
17   the company did not disclose during the class period
18   beginning from the first day of the class period.
19       Q    Looking at paragraph 39, the second
20   sentence, reads, "Because plaintiffs allege that
21   defendants failed to disclose new adverse information
22   concerning Household's business practices until later
23   in the class period, investors in the company did not
24   learn and therefore could not react to this

Page 139

1    information until then".
2            I want to focus on the words "new adverse
3    information", and ask you what you were referring to
4    there.
5       Q    Again, there is two different methods that
6    I used, and I don't want to suggest by focusing on
7    one, that that was what I --
8       Q    We are not talking about leakage at all.
9       A    I understand.
10           But when you ask me what I meant by a
11   sentence, I can't really answer that using your
12   restrictions, because what I meant was everything
13   I discussed in the report, not the limits that you
14   want to place upon me in terms of what you are asking
15   about.
16           So I can answer in terms of what I meant --
17       Q    Okay, please.
18       A    Okay.  That during the class period, over
19   the course of the class period, there were a series
20   of specific disclosures which I identified, which
21   provided new adverse information to investors about
22   Household's practices, and one of the different areas
23   in those are included in my first methodology
24   quantifying inflation based on specific disclosures.

Page 140

1            But as I said in the report, I think that's
2    a very incomplete analysis of the artificial
3    inflation that existed, because numerous commentators
4    all refer to a decline in Household's stock price
5    over the course of the class period.
6            That was attributable to market
7    participants learning new negative information about
8    Household's practices that are the subject of the
9    alleged disclosure defects.
10           And I confirmed that commentary by market
11   participants, by comparing Household's performance
12   over a longer period in comparison with various
13   indexes.
14           I looked for alternative explanations for
15   Household's long term stock price decline, and what I
16   concluded was that investors learned what I refer to
17   as new adverse information concerning Household's
18   business practices both as a result of stock price
19   reactions to specific disclosures which resulted in
20   statistically significant stock price declines, as
21   well as by a gradual release of information during
22   the class period both by Household and by other
23   market participants revealing that Household was much
24   less profitable than market participants originally

Pages 137 to 140

Page 197

1        Things that are fully disclosed themselves
2    don't produce changes in stock prices, at least as a
3    first approximation, without knowing anything more
4    about the relevant facts and circumstances.
5        That's the difficulty that I'm having with
6    your question.
7        Anything that's fully disclosed is not
8    going to be something that creates inflation in my
9    quantification of inflation based on specific
10   disclosures.
11       And my leakage model is based specifically
12   on market participants learning new information about
13   the alleged disclosure defects that were not
14   previously disclosed.
15       So for those reasons, a determination that
16   something was or was not disclosed in a
17   securitization prospectus wouldn't have any obvious
18   effect on any of my opinions.
19   BY MR. OWEN:
20       Q   I understand what you are saying.  And here
21   is what I'm trying to get at.  I think it could have
22   an impact even if it was disclosed, but it would be
23   for a different reason.
24       If the marketplace knows that Household is

Page 198

1    selling single premium credit insurance, and a lot of
2    people are unhappy about that, they think it's a bad
3    product, it's predatory, it's unfair, it's improper
4    -- whatever pejorative terms you want to put on it --
5    and information comes out that suggests that these
6    criticisms are going to bear fruit in the form of
7    Household stopping selling single premium credit
8    insurance, the stock price could go down even though
9    the product itself was well known?
10       MR. BURKHOLZ:   Objection, form.
11       A   Well, I guess I have a couple of reactions
12   to that.
13       First, I don't think that -- or that the
14   factual predicate of your question fairly describes
15   what I described in my report as market participant's
16   analysis of why Household stock price was declining.
17       Secondly, because there is an industry
18   variable in my regression, a second industry variable
19   based on the industry variable that Doctor Bajaj
20   claims that we should have included, any change in
21   the regulatory framework that affects the
22   profitability of the entire industry is going to be
23   taken into account in my analysis.
24       So I guess for those reasons, both of those

Page 199

1    reasons, the predicate of your question I don't think
2    would have any effect on my opinions.
3        Q   Bear with me.  I'm trying to find an
4    exhibit.
5        We can't seem to find the exhibit.  But I
6    will just read to you from an analyst report, and one
7    of the things it says is, "We suspect" -- it's not
8    important for the point -- it's not important for the
9    point.  I just want to read the sentence.
10       "We suspect that Household may have become
11   more of a lightning rod for consumer groups as it is
12   the only large public company in the space".
13       And --
14       MR. BURKHOLZ:   I'm sorry, Exhibit I, you said?
15   BY MR. OWEN:
16       Q   My question is, if that's in fact the case,
17   wouldn't a change in the regulatory approach on a
18   subject, say, like single premium credit insurance
19   have an effect on Household that wouldn't be
20   registering with respect to other companies in the
21   industry index that you used?
22       MR. BURKHOLZ:   Objection, form.
23       A   Well, first of all, I know I used an
24   industry index, but I also used the industry index

Page 200

1    that Doctor Bajaj identified as the proper industry
2    index to use.
3        So --
4    BY MR. OWEN:
5        Q   I'm not quarreling with the industry index
6    that you selected or the one Bajaj selected.  It's
7    really a question of what's going to show up in that
8    index.
9        If Household is the biggest player in that
10   field, and a change is made that affects Household
11   more than anybody else, isn't that going to be
12   something that could produce a significant impact on
13   Household's stock price after controlling for
14   industry and market forces?
15       MR. BURKHOLZ:   Objection, form.
16       A   I would say yes, potentially, but not
17   simply because it's the biggest.
18       If it disproportionately affected by --
19   hypothetically -- a regulatory change, meaning that
20   the regulatory change has a bigger effect on its
21   expected future profitability than for other firms,
22   then the industry index would maybe partially pick up
23   the effect of the change.
24       But there still could be hypothetically a

Page 201

```
 1  firm specific effect for Household.
 2       BY MR. OWEN:
 3       Q   And that would be because, notwithstanding
 4  the fact that it was a known product, a disclosed
 5  product, or almost because of the fact that it was a
 6  disclosed product?
 7       A   Well, that's a separate issue.  I wasn't
 8  speaking about the actual facts and circumstances of
 9  the case.
10            I was just speaking, as a matter of
11  statistics, is it possible that a regulatory change
12  that affects the entire industry could affect one
13  firm, whether Household or any other firm,
14  disproportionately.
15            So even though you have a control for an
16  industry variable, you still have a firm specific
17  component to the return, and the answer to that is
18  yes.
19       Q   So my point, I guess, is that the fact that
20  a product that Household sells is being called
21  predatory, notwithstanding the fact that it's been
22  disclosed, could have a negative effect on Household
23  that would show up in the form of negative price
24  changes after controlling for industry and market
```

Page 202

```
 1  forces?
 2       A   Again, are you asking me hypothetically or
 3  under the facts and circumstances of this case?
 4       Q   It's hypothetical.
 5       A   Hypothetically, it's what I said in my
 6  previous couple of answers.
 7            Hypothetically, a regulatory change could
 8  have a disproportionate effect on Household in either
 9  direction.
10            It either could affect Household more than
11  the industry or less than the industry.
12       Q   On the last day of the class period, the
13  inflation level reaches zero, is that correct?
14       A   Correct, by definition.
15       Q   What does that mean when it reaches zero?
16       A   Well, for purposes of my analysis, it means
17  that because it's the last day of the class period,
18  I'm assuming that full disclosure occurred as of that
19  date, meaning that there is no further inflation to
20  measure after that date.
21       Q   Now, the number -- the inflation number
22  reaches zero as a result of the settlement with the
23  Multi-state Attorney General group?
24       A   Correct.  I should say, it's possible that
```

Page 203

```
 1  inflation continues beyond that date.
 2            But because that date is the end of the
 3  class period, that's the date, for purposes of my
 4  inflation calculations, I'm assuming that there is no
 5  further inflation.
 6       Q   What is the information that the settlement
 7  provides to produce the full disclosure statement?
 8       A   As I said, it's really assumed full
 9  disclosure, because --
10       Q   Okay.  Assumed full disclosure.  I will
11  accept that.
12       A   Well, I discussed that extensively in my
13  rebuttal report, on pages 11 through 13, in
14  paragraphs 15, 16 and 17.
15       Q   What is the explanation that's contained in
16  these paragraphs?
17       A   Well, I think the paragraphs speak for
18  themselves, and I incorporate them by reference.
19            But I would say the points that come to
20  mind, as I sit here, is that some market participants
21  thought that the settlement amount might be
22  significantly higher; some market participants were
23  concerned that there might be no settlement at all.
24  Those are the things that come to mind.
```

Page 204

```
 1       Q   I'm sorry, maybe I'm looking at the wrong
 2  place.  Pages 11 through 13 -- yes, okay.  I'm sorry.
 3  Here we go.
 4            So the new information is the actual
 5  settlement amount?
 6       A   And the fact of the settlement.
 7       Q   And the fact of the settlement.  Is the
 8  fact of the settlement good news?
 9       A   Based on the reaction of market
10  participants, I would say yes.
11       Q   But in another sense, it ultimately
12  revealed the fraud that the plaintiffs have alleged
13  in this case, isn't that true?
14       A   I'm not sure I understand that question.
15       Q   Well, until you get to the last day, my
16  understanding of the plaintiffs' allegations is that
17  the fraud is still on.
18       MR. BURKHOLZ:  Objection, form.
19       A   I'm not sure what you mean by "fraud is
20  still on".
21            Under the plaintiffs' claim, which I
22  analyzed the economic evidence in connection with,
23  there is still artificial inflation in the stock
24  until the last day of the class period.
```

Pages 201 to 204

## Page 205

1    BY MR. OWEN:

2        Q    I want to read to you from paragraph 23 of

3    the complaint.

4             It says, "It was only at the end of the

5    class period on October 11th, 02, when defendants

6    announced that the company would pay $484 million to

7    settle the predatory lending charges, that investors

8    learned that Household had been conducting its

9    nationwide operations in direct violation of federal

10   and state lending laws".

11            So the plaintiffs are saying that investors

12   in the marketplace learned about the fraud on the

13   same day that Household makes an announcement that

14   you just characterized as good news, and I see some

15   tension between those two propositions.

16       MR. BURKHOLZ:    Objection, form.

17       A    Well, obviously, my report focuses on my

18   analysis as opposed to the allegations in the

19   complaint.

20            And I think I've described the reason why

21   market participants interpreted the announcement of

22   the settlement as good news, and why it not only is

23   not inconsistent with the existence of inflation, but

24   why it supports the conclusion of earlier inflation,

## Page 206

1    all of which is described at length in my report.

2        MR. OWEN:    I think we are getting pretty

3    close.  Can we take a short break.

4        THE VIDEOGRAPHER:    Going off the record at

5    4:16 p.m.

6                 (Whereupon, a short recess

7                  was taken.)

8        THE VIDEOGRAPHER:    Going back on the record at

9    4:24 p.m.  Please proceed.

10       BY MR. OWEN:

11       Q    Mr. Fischel, how much have you been paid in

12   connection with your engagement with the plaintiffs

13   in this case?

14       A    Well, are you asking what the amount of the

15   bill submitted by the firm has been, or how much have

16   I personally been paid?  Those are two different

17   questions.

18       Q    The bill submitted by the firm to whom?

19       A    I'm not sure who we send them to.  I assume

20   we send them to counsel for the plaintiffs --

21       Q    Oh, the firm being Lexecon?

22       A    Yes.

23       Q    Okay, yes.  How much of the bill is from

24   Lexecon then?

## Page 207

1        A    I actually don't know exactly.  I don't

2    send them out.  I would say they have been

3    significant.  We have done a considerable amount of

4    work over a long period.  But I don't know exactly

5    what the amount is.

6        Q    Can you give me a ballpark number?

7        A    I can, but I wouldn't want to be held to it

8    because it's something that could be checked.  I

9    don't know the answer.

10            If I had to estimate, I would say somewhere

11   between 500,000 and a million.

12       MR. OWEN:    You guys know what the answer to

13   this is, right --

14       A    I could be wrong.  As I said, I wouldn't

15   want to be held to it.  It's a good faith estimate.

16       BY MR. OWEN:

17       Q    Is there any portion of that bill that

18   hasn't been paid, to your knowledge?

19       A    Maybe the last bill -- I think we have been

20   paid currently, with some lag for a month or possibly

21   two months.

22       MR. OWEN:    Could you guys provide us that

23   information.

24       MR. BURKHOLZ:    We will.  It's allowed under

## Page 208

1    our agreement, I believe.

2        MR. BAKER:    Actually, it's not.  The agreement

3    is pretty specific, that you can ask deposition

4    questions, but we can look at the issue again.

5             I think the stipulation is pretty specific.

6             Don't roll your eyes, David.  I mean,

7    because we thought we were allowed subpoenas, and you

8    said no, and the Judge has issued a pretty clear

9    ruling that it's not covered by the stipulation.

10            We can look at the issue, and maybe we will

11   provide it, and maybe we won't.

12       MR. OWEN:    All of our witnesses have provided

13   that information.  We haven't objected to it.  We

14   think it's certainly relevant.

15       MR. BURKHOLZ:    Have they provided it in

16   deposition?

17       MR. OWEN:    Indeed.

18       MR. BURKHOLZ:    The amounts that they have been

19   billed and paid?

20       MR. OWEN:    Yes.

21       MR. BURKHOLZ:    Why don't you maybe leave a

22   blank in his deposition, and he can fill it in when

23   he reviews it.

24       A    Okay.  I will be happy to do that.

## Page 209

```
 1        MR. OWEN:  All right.  I don't have any more
 2   questions really.  Thank you very much.
 3        A    Thank you.  Again, I apologize for the
 4   weather.
 5        THE VIDEOGRAPHER:  This marks the conclusion
 6   of today's deposition of Daniel Fischel.
 7             Going off the record, the time is now
 8   4:28 p.m.
 9                  (Whereupon, at 4:28 p.m., the
10                   signature of the witness having
11                   been reserved, the witness being
12                   present and consenting thereto,
13                   the taking of the instant
14                   deposition ceased.)
15
16        IN THE UNITED STATES DISTRICT COURT
17      FOR THE NORTHERN DISTRICT OF ILLINOIS
18             EASTERN DIVISION
19
20   LAWRENCE E. JAFFE PENSION PLAN,    )
21   on behalf of Itself and All        )
22   Others Similarly Situated,         )
23             Plaintiffs,              )
24        vs.                           ) No. 02 C 5893
```

## Page 210

```
 1   HOUSEHOLD INTERNATIONAL, INC.,     )
 2   et al.,                            )
 3             Defendants.              )
 4
 5        I, DANIEL R. FISCHEL, state that
 6   I have read the foregoing transcript of the
 7   testimony given by me at my deposition on
 8   the 21st day of March 2008, and that said
 9   transcript constitutes a true and correct
10   record of the testimony given by me
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 211

```
 1   at said deposition except as I have so indicated
 2   on the errata sheets provided herein.
 3
 4        _____
 5             DANIEL R. FISCHEL
 6
 7   No corrections  (Please initial)_____
 8   Number of errata sheets submitted _____(pgs)
 9
10   SUBSCRIBED AND SWORN TO
11   before me this _____day
12   of _____, 2008.
13
14   _____
15        NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
```

## Page 212

```
 1   STATE OF ILLINOIS )
 2                     ) SS:
 3   COUNTY OF C O O k )
 4        I, RICHARD E. DAGDIGIAN, Illinois CSR No.
 5   084-000035, Registered Professional Reporter and
 6   Notary Public in and for the County of Cook, State of
 7   Illinois, do hereby certify that previous to the
 8   commencement of the examination, said witness was
 9   duly sworn by me to testify the truth; that the said
10   deposition was taken at the time and place aforesaid;
11   that the testimony given by said witness was reduced
12   to writing by means of shorthand and thereafter
13   transcribed into typewritten form; and that the
14   foregoing is a true, correct, and complete transcript
15   of my shorthand notes so taken as aforesaid.
16        I further certify that there were present at
17   the taking of the said deposition the persons and
18   parties as indicated on the appearance page made a
19   part of this deposition.
20        I further certify that I am not counsel for
21   nor in any way related to any of the parties to this
22   suite, nor am I in any way interested in the outcome
23   thereof.
24
```

Pages 209 to 212

Page 213

```
 1          I further certify that this certificate
 2     applies to the original signed IN BLUE and certified
 3     transcripts only.  I assume no responsibility for the
 4     accuracy of any reproduced copies not made under my
 5     control or direction.
 6
 7          IN TESTIMONY WHEREOF, I have hereunto set
 8     my hand and affixed my notarial seal this ____day of
 9     _____, 2008.
10
11
12          _____
13          Richard H. Dagdigian, CSR, RMR, CRR
14
15     My Commission expires
16     May 1, 2011.
17
18
19
20
21
22
23
24
```

West Court Reporting Services        800.548.3668 Ext. 1

A428

04-16-09 Volume 12

2477

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN,  )
     on behalf of itself and all      )
 4   others similarly situated,       )
                                      )
 5             Plaintiff,             )
                                      )
 6   vs.                              )  No. 02 C 5893
                                      )
 7   HOUSEHOLD INTERNATIONAL, INC.,   )
     et al.,                          )  Chicago, Illinois
 8                                    )  April 16, 2009
               Defendants.            )  9:18 a.m.
 9                             VOLUME 12
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

2478

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiff:        MILLER LAW LLC
                               BY:  MR. MARVIN ALAN MILLER
```

Page 1

04-16-09 Volume 12
3                                  115 South LaSalle Street
                                   Suite 2910
4                                  Chicago, Illinois  60603
                                   (312) 332-3400
5
      For the Defendants:          EIMER STAHL KLEVORN & SOLBERG LLP
6                                  BY:   MR. ADAM B. DEUTSCH
                                   224 South Michigan Avenue
7                                  Suite 1100
                                   Chicago, Illinois  60604
8                                  (312) 660-7600

9                                  CAHILL, GORDON & REINDEL LLP
                                   BY:   MS. SUSAN BUCKLEY
10                                       MS. PATRICIA FARREN
                                         MR. THOMAS J. KAVALER
11                                       MR. DAVID R. OWEN
                                         MR. HOWARD G. SLOANE
12                                       MS. JANET A. BEER
                                         MR. JASON M. HALL
13                                       MR. JOSHUA M. NEWVILLE
                                         MS. LAUREN PERLGUT
14                                       MS. KIM A. SMITH
                                         MR. MICHAEL J. WERNKE
15                                 80 Pine Street
                                   New York, New York  10005
16                                 (212) 701-3000

17

18

19

20

21

22    Court Reporter:             NANCY C. LaBELLA, CSR, RMR, CRR
                                   Official Court Reporter
23                                 219 South Dearborn Street
                                   Room 1222
24                                 Chicago, Illinois  60604
                                   (312) 435-6890
25                                 Nancy_LaBella@ilnd.uscourts.gov

                                                                2479

1             THE CLERK:   02 C 5893, Jaffe v. Household

2     International.

3             THE COURT:   Good morning, everyone.  Is there any

4     issues that the parties want to take up?

09:18:29  5             MR. DOWD:  I believe, your Honor, we brought our

6     response to the Court's jury instructions this morning.  I

7     believe Mr. Drosman has them.
                              Page 2

**A430**

8    A.   Thank you.

9    Q.   And is that your quantification of the inflation under

04:12:15 10   your leakage model?

11   A.   Yes.  If you can put it on the screen maybe.

12   Q.   Did you prepare this document?

13   A.   I did.

14        MR. BURKHOLZ:  Your Honor, I don't believe there's an

04:12:24 15   objection to 1395 if we can move it into evidence.

16        THE COURT:  It will be admitted.

17     (Plaintiffs' Exhibit 1395 received in evidence.)

18   BY MR. BURKHOLZ:

19   Q.   Can you explain what this exhibit is?

04:12:35 20   A.   This exhibit, again, is analogous to the previous exhibit

21   which focused on the 14 specific disclosures; but this exhibit

22   takes leakage into account and, once again, has a calculation

23   of the stock price on every day, what the true value is, which

24   is what my calculation is of the uninflated price, what the

04:13:00 25   price should have been had there been no fraudulent

Fischel - direct

2683

1    disclosures or omissions in the various Household statements

2    and disclosures during the relevant period.  That's the second

3    column, true value.

4        And the artificial inflation is the number in the

04:13:20 5   last column.  And, again, you'll see that it's different from

6    7.97 at the beginning because this calculation doesn't just

7    focus on 14 disclosures.  It focuses on all the negative

8    disclosures that came out, particularly after November 15th

9    when the market started to, in a much more systematic way,

04:13:44 10   disbelieve Household's denials that it was engaging in

11   predatory lending and that it was engaging in improperly

Page 177

**A431**

04-16-09 Volume 12

12    aggressive accounting.

13    Q.   Like your specific disclosure model, does this

14    quantification use statistical methods to account for the

04:14:00 15    market and industry influences on Household's stock prices?

16    A.   Yes, it does.

17    Q.   And did you also analyze whether company-specific factors

18    unrelated to the alleged fraud can explain Household's stock

19    price decline during this latter part of the relevant period?

04:14:16 20    A.   Yes, I did.  I looked at that carefully.

21          I noticed that there were a lot of disclosures that

22    had some fraud-related information in it and some other

23    disclose -- and part of the disclosure did not have -- dealt

24    with something other that was fraud related.

04:14:37 25          There were some -- some of those disclosures that had

Fischel - direct

2684

1    a positive effect, some had a negative effect; but overall it

2    was impossible to conclude that the difference between the

3    true value line and the actual price would have been any

4    different had there been no disclosures about

04:15:02 5    non-fraud-related information during this particular period.

6    Some positive, some negative.  They cancel each other out.

7    Q.   Okay.  Now, reaching your opinion about inflation, did you

8    consider whether investors during the relevant period were

9    fully informed about Household's accounting and lending

04:15:17 10    practices?

11    A.   I did.

12    Q.   And what did you find?

13    A.   I found that they were not fully informed for a number of

14    different reasons.

04:15:25 15    Q.   And what were the reasons?

16    A.   Well, first, the disclosures coming out criticizing

Page 178

**A432**

04-16-09 Volume 12

17    Household's practices didn't come from Household; and if a

18    company is disclosing information about itself, it's one thing

19    for third parties to comment, but it's another thing for the

04:15:46 20    information to come directly from the company itself.

21        Since the company was not disclosing what the

22    analysts and the critics were saying, market participants did

23    not have full information.

24    Q.    Okay.  So you had your analysts' reaction or commentary,

04:16:03 25    some of -- the Barron's article and the analysts' reports, the

Fischel - direct

2685

1    Legg Mason article we looked at -- report we looked at in

2    December, right?

3    A.    Yeah, and many others.  In other words, disclosures by

4    third parties is not the same as disclosures by the company

04:16:17 5    itself.

6        In a situation like this, disclosures by third

7    parties are given less weight; and, therefore, investors were

8    not fully informed for that reason.

9        But that effect is compounded by the fact that

04:16:30 10    Household, throughout the period, is denying that there's any

11    problem, so that even with respect to the third-party

12    disclosures, which are less important than disclosures by the

13    company, those disclosures are being discounted through much

14    of the period until the very end because of management

04:16:50 15    denials.

16        By the very end, the denials of management are

17    systematically disregarded by many analysts and market

18    participants.

19        In addition to that, I came across a lot of

04:17:06 20    information that regulators concluded, a lot of exam reports,

Page 179

**A433**

04-16-09 Volume 12

3     MR. DOWD:  No, your Honor, just 12:30 tomorrow?

4     THE COURT:  12:30 tomorrow.

04:30:45  5     MR. DOWD:  Thank you, your Honor.

6     THE COURT:  We'll see you all then.

7     MR. KAVALER:  Thank you, your Honor.

8     THE COURT:  Thank you.

9     (Court adjourned, to reconvene at 12:30 p.m. on 4-17-09.)

10     * * * * *

11     C E R T I F I C A T E

12     We certify that the foregoing is a correct

13  transcript from the record of proceedings in the

14  above-entitled matter.

15

16     /s/ Nancy C. LaBella
     _____

17

18     /s/ Frances Ward
     _____

19

20     /s/ Kathleen Fennell     April 17, 2009
     _____   _____
     Official Court Reporters     Date

21     United States District Court
     Northern District of Illinois

22     Eastern Division

23

24

25

A434

04-20-09 Volume 14

2802

1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3   LAWRENCE E. JAFFE PENSION PLAN,  )
    on behalf of itself and all      )
4   others similarly situated,       )
                                     )
5            Plaintiff,              )
                                     )
6    vs.                             )  No. 02 C 5893
                                     )
7   HOUSEHOLD INTERNATIONAL, INC.,   )
    et al.,                          )  Chicago, Illinois
8                                    )  April 20, 2009
             Defendants.            )  9:00 a.m.
9                          VOLUME 14
10           TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:   MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:   MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25

2803

1   APPEARANCES:   (Continued)

2   For the Plaintiff:         MILLER LAW LLC
                               BY:   MR. MARVIN ALAN MILLER
                    Page 1

**A435**

04-20-09 Volume 14

```
 3                              115 South LaSalle Street
                               Suite 2910
 4                             Chicago, Illinois  60603
                               (312) 332-3400
 5
     For the Defendants:        EIMER STAHL KLEVORN & SOLBERG LLP
 6                             BY:  MR. ADAM B. DEUTSCH
                               224 South Michigan Avenue
 7                             Suite 1100
                               Chicago, Illinois  60604
 8                             (312) 660-7600

 9                             CAHILL, GORDON & REINDEL LLP
                               BY:  MS. SUSAN BUCKLEY
10                                  MS. PATRICIA FARREN
                                    MR. THOMAS J. KAVALER
11                                  MR. DAVID R. OWEN
                                    MR. HOWARD G. SLOANE
12                                  MS. JANET A. BEER
                                    MR. JASON M. HALL
13                                  MR. JOSHUA M. NEWVILLE
                                    MS. LAUREN PERLGUT
14                                  MS. KIM A. SMITH
                                    MR. MICHAEL J. WERNKE
15                             80 Pine Street
                               New York, New York  10005
16                             (212) 701-3000

17

18

19

20

21

22   Court Reporter:           NANCY C. LaBELLA, CSR, RMR, CRR
                               Official Court Reporter
23                             219 South Dearborn Street
                               Room 1222
24                             Chicago, Illinois  60604
                               (312) 435-6890
25                             Nancy_LaBella@ilnd.uscourts.gov
```

                                                              2804

```
 1           THE CLERK:  02 C 5893, Jaffe v. Household

 2   International.

 3           THE COURT:  Good morning, everyone.

 4           Can we bring the jury out?

09:10:59  5           MR. DOWD:  Your Honor, there are a couple of issues I

 6   mentioned on Friday that needed to be addressed.  One was a

 7   stipulation regarding the exhibit that was the record of
```
                              Page 2

**A436**

04-20-09 Volume 14

3          MR. KAVALER:  Pass them out.

4      (Brief pause.)

5    BY MR. KAVALER:

6    Q.  And what this exhibit shows us, Professor, it presents the

7    quantification of total inflation on each day during the

8    relevant time period using your first method?

9    A.  That's correct.

01:10:04 10  Q.  And in this quantification using specific disclosures, you

11   only included those dates on which news --

12          MR. KAVALER:  Withdrawn.  That's not right.

13   BY MR. KAVALER:

14   Q.  This is every day from July 30 -- every -- that's not

01:10:20 15  right, either.

16          This is every trading day from July 30, 1999, through

17   October 11, 2002?

18   A.  Correct.

19   Q.  Okay.  Got it right on the third try.

01:10:30 20          Now, as you and I were discussing before lunch,

21   you've already shown us at least one example of inflation

22   going into the stock price; and, that was the December 5,

23   2001, event, correct?

24   A.  Correct.

01:10:42 25  Q.  Okay.

Fischel - cross

2874

1          And that was after Mr. Aldinger spoke at the Goldman

2    Sachs conference?

3    A.  Correct.

4    Q.  Okay.

01:10:53 5          And, so, we know at least on that day we can find

6    inflation coming into the stock.  And let's see if we can look

Page 62

**A437**

04-20-09 Volume 14

7   together at how that works.

8           Turn in this exhibit, if you would, to Page 13.

9           MR. KAVALER:   And can we highlight the entry for

01:11:12 10   December 5, 2001.

11   BY MR. KAVALER:

12   Q.   And this shows us actual inflation in that column is

13   $6.05, correct?

14   A.   That's right.

01:11:29 15   Q.   Okay.

16           And on December 6th, the inflation is also $6.05?

17   A.   Correct.

18   Q.   And on December 7, same thing:   $6.05?

19   A.   Correct.

01:11:38 20   Q.   But on December 4, the day before, it was $4.20, correct?

21   A.   Correct.

22   Q.   So, that's where you got the number that was on the

23   demonstrative you showed us during your direct testimony of a

24   dollar eighty-five.   A dollar eighty-five is the difference

01:11:53 25   between 4.20 and 6.05?

Fischel - cross

2875

1   A.   That's right.

2   Q.   So, the way we did that is we saw the inflation increase

3   from 4.20 to 6.05?

4   A.   Correct.

01:12:03 5   Q.   So, Mr. Aldinger's statement to Goldman Sachs at the

6   Goldman Sachs conference, in the language you and I agreed to

7   use this morning about measure effect, had an effect, correct?

8   A.   Correct.

9   Q.   And the effect was to create artificial inflation in the

01:12:17 10   amount of a dollar eighty-five?

11   A.   Correct.

Page 63

**A438**

04-20-09 Volume 14

<table>
<tr><td></td><td>12</td><td>Q.  Okay.</td></tr>
<tr><td></td><td>13</td><td>Now, let me show you Plaintiffs' Demonstrative 139.</td></tr>
<tr><td></td><td>14</td><td>And that was your analysis of this day.</td></tr>
<tr><td>01:12:42</td><td>15</td><td>The residual price change of 1.85 is the very thing</td></tr>
<tr><td></td><td>16</td><td>you and I just talked about?</td></tr>
<tr><td></td><td>17</td><td>A.  Correct.</td></tr>
<tr><td></td><td>18</td><td>Q.  And the text on there discusses the event that caused that</td></tr>
<tr><td></td><td>19</td><td>effect.  That's Mr. Aldinger's speech at Goldman Sachs?</td></tr>
<tr><td>01:12:56</td><td>20</td><td>A.  That's right.</td></tr>
<tr><td></td><td>21</td><td>Q.  Okay.</td></tr>
<tr><td></td><td>22</td><td>And now let's look at Exhibit 1391 in evidence.</td></tr>
<tr><td></td><td>23</td><td>MR. KAVALER:  And, again, your Honor, may I publish</td></tr>
<tr><td></td><td>24</td><td>this to the jury, as well, so they can follow on their own</td></tr>
<tr><td>01:13:21</td><td>25</td><td>copy?</td></tr>
</table>

Fischel - cross

2876

<table>
<tr><td></td><td>1</td><td>MR. BURKHOLZ:  Your Honor, Mr. Kavaler did not follow</td></tr>
<tr><td></td><td>2</td><td>the protocol of providing me with everything he's --</td></tr>
<tr><td></td><td>3</td><td>MR. KAVALER:  I'm terribly sorry.  Very sorry.</td></tr>
<tr><td></td><td>4</td><td>They're your exhibits.</td></tr>
<tr><td>01:13:29</td><td>5</td><td>MR. BURKHOLZ:  I don't have any objection.</td></tr>
<tr><td></td><td>6</td><td>MR. KAVALER:  Okay.</td></tr>
<tr><td></td><td>7</td><td>MR. BURKHOLZ:  That's fine.</td></tr>
<tr><td></td><td>8</td><td>MR. KAVALER:  Give him the other one, too.</td></tr>
<tr><td></td><td>9</td><td>THE COURT:  I'm sorry, is there an objection?</td></tr>
<tr><td>01:13:37</td><td>10</td><td>MR. KAVALER:  May I hand them out, your Honor?</td></tr>
<tr><td></td><td>11</td><td>THE COURT:  Is there an objection?</td></tr>
<tr><td></td><td>12</td><td>MR. KAVALER:  No, there's no objection.</td></tr>
<tr><td></td><td>13</td><td>MR. BURKHOLZ:  I would like all of the other ones</td></tr>
<tr><td></td><td>14</td><td>they're going to show the jury.</td></tr>
<tr><td>01:13:43</td><td>15</td><td>THE COURT:  Why don't we do that now --</td></tr>
</table>

Page 64

**A439**

04-20-09 Volume 14

16          MR. KAVALER:  Okay.

17          THE COURT:  -- and get it done.

18          MR. KAVALER:  There are only two others I might show

19     the jury.

01:13:52 20          Why don't you give him copies of --

21          I think I won't show them to them, your Honor.

22          THE COURT:  I'm sorry?

23          MR. KAVALER:  I think I won't show them.  They're

24     single pages.  Easy enough.  I'm showing them these because

01:14:04 25     they're large and cumbersome.

Fischel - cross

2877

1          THE COURT:  All right.

2          Does he have all the ones you're going to use now?

3          MR. BURKHOLZ:  I believe so.

4          MR. KAVALER:  The one ones I intend to publish to the

01:14:11 5     jury, yes, your Honor.

6          THE COURT:  Okay.

7          Which exhibit are you seeking to publish now?

8          MR. KAVALER:  Plaintiffs' 1391 in evidence, your

9     Honor.

01:14:16 10          THE COURT:  It's in evidence.  It may be published.

11          MR. KAVALER:  Thank you, your Honor.

12          (Document tendered to the jury.)

13          (Brief pause.)

14     BY MR. KAVALER:

01:14:30 15     Q.  All right.  Now, this, Professor Fischel -- 1391 -- is the

16     results of your event study?

17     A.  Correct.

18          THE COURT:  Why don't you wait a second until the

19     jurors are through passing those around.

01:14:45 20          MR. KAVALER:  Yes, sir.

Page 65

**A440**

21        (Brief pause.)

22            MR. KAVALER:  Okay.  Looks like everyone has one.

23   BY MR. KAVALER:

24   Q.  Professor, if you turn to Page 30 and look at an entry for

01:14:59 25   December 5 --

Fischel - cross

2878

1            MR. KAVALER:  Can we highlight that, please, Brian?

2   BY MR. KAVALER:

3   Q.  And that tells us, according to what you testified to

4   Thursday because of the three -- well, let me ask this way:

01:15:15 5   Does this tell us that this is a statistically-significant

6   price increase that resulted in inflation on December 5, 2001?

7   A.  Yes, it does.

8   Q.  Okay.

9            So, we've just gone through together an example of

01:15:36 10   inflation coming into the price of Household stock as an

11   effect or as a result of a statement that Mr. Aldinger made,

12   correct?

13   A.  That's right.

14   Q.  And I think you testified on direct that the reason the

01:15:53 15   price went up is because of what Mr. Aldinger said?

16   A.  Correct.

17   Q.  So, Mr. Aldinger's remarks caused the price to go up?

18   A.  Correct.

19   Q.  Gotcha.

01:16:01 20            All right.  So, let's put December 5, 2001, on the

21   white board.

22            MR. KAVALER:  Can everybody see that, more or less?

23        (Jurors nodding.)

24   BY MR. KAVALER:

Page 66

**A441**

01:16:32 25    Q.  So, this will be a list, Professor Fischel, of days where

♀

Fischel - cross

2879

1    we can see a remark by a defendant causing the price of the

2    stock to go up.

3    A.  Okay.  That's fine.

4    Q.  Okay.

01:16:42  5        Now let's look at Plaintiffs' Demonstrative 140.

6    This is a week later.  It's a Legg Mason report.  And this

7    time this causes the price to go down, correct?

8    A.  That's right.

9    Q.  It goes down $2.39?

01:17:08 10   A.  Adjusted for market and industry movements based on the

11   statistical model that I used, correct.

12   Q.  That's your number up there, 2.39?

13   A.  That's right.

14   Q.  That's all I'm pointing to.

15   A.  That's fine.

16   Q.  I'm not quarrelling with you at all.

17   A.  I'm not quarrelling with you, either.

18   Q.  Okay.

19       (Laughter.)

20   BY THE WITNESS:

21   A.  We're agreeing on everything.

22   BY MR. KAVALER:

23   Q.  Excellent.  Very agreeable fellows here.

24       Okay.  And this is the Legg Mason report that causes

01:17:26 25   this decline?

♀

Fischel - cross

2880

1    A.  That's correct.

2    Q.  And it relates to the same subject matter as

Page 67

**A442**

04-20-09 Volume 14

     3   Mr. Aldinger's remarks at Goldman Sachs a week earlier?

     4   A.  That's right.

01:17:35  5   Q.  Okay.  I'm getting the hang of this.

     6       And, again, if you look at your Exhibit 1397 at Page

     7   13 -- I'm in the wrong place -- I'm in the right place,

     8   sorry -- for December 12, 2001, what we see there is we see

     9   the price is at three dollars and six- -- I'm sorry.

01:18:11 10       MR. KAVALER:  Withdrawn.

    11   BY MR. KAVALER:

    12   Q.  The artificial inflation is at $3.66 on December 12,

    13   correct?

    14   A.  I don't want to interrupt you, sir, but could I also have

01:18:21 15   a copy?

    16   Q.  Oh, absolutely.

    17   A.  I prefer that to --

    18   Q.  I apologize.

    19   A.  -- looking back and forth.

01:18:24 20   Q.  I thought you had the exhibits up there.

    21   A.  Yeah, but I have to find them every time.  It's just

    22   simpler if I have a copy.

    23   Q.  I apologize.

    24       MR. KAVALER:  Get me a copy of the other one, too.

01:18:36 25       I thought you had Thursday's exhibits.  Sorry.

Fischel - cross

2881

     1   (Document tendered.)

     2       THE WITNESS:  Thank you.  Appreciate it.

     3       MR. KAVALER:  Here's a copy of 1391, as well.

     4       THE WITNESS:  Got it.

01:18:44  5   (Document tendered.)

     6       MR. KAVALER:  Figured since I wasn't moving them into

**A443**

04-20-09 Volume 14

7    evidence, I'd save the trip.

8    BY MR. KAVALER:

9    Q.   Okay.  So, we're on Page 13 of 1397.  We're looking at the

01:18:51 10    entry for December 12, 2001.  We see that the artificial

11    inflation is $3.66, correct?

12    A.   Correct.

13    Q.   And the day before, the artificial inflation on December

14    11 was $6.05, correct?

01:19:04 15    A.   That's right.

16    Q.   And the difference between those two, if my math serves,

17    is the $2.85 we're talking about?

18    A.   That's right.

19    Q.   $2.39, which appears on Plaintiffs' Demonstrative 140?

01:19:15 20    A.   Correct.

21    Q.   Okay.  Good.

22         And now if you'll look at your event study, which is

23    Plaintiffs' 1391 in evidence, and turn to Page 31 and you'll

24    see the entry there for December 12, 2001.  And that shows a

01:19:38 25    statistically-significant price decrease that resulted in

Fischel - cross

2882

1    inflation on December 12, correct?

2    A.   Correct.

3    Q.   And that's as a result of the Legg Mason report, correct?

4    A.   Correct.

01:19:49 5    Q.   And if we go to Plaintiffs' Demonstrative 140, we see,

6    again, the same format.  Up in the box, you've got the dollar

7    amount of the residual price change; and, in the text, you

8    explain what it is Legg Mason is saying?

9    A.   Correct.

01:20:06 10    Q.   All right.

11         So, in this one example, we see the inflation coming

Page 69

**A444**

04-20-09 Volume 14

12    in on December 5, and we see it coming out on December 12,

13    correct?

14    A.   We see inflation increasing on December 5th and decreasing

01:20:28 15    on December 12th, that's correct.

16    Q.   And the amount of the decrease is larger than the amount

17    of the increase?

18    A.   Correct.

19    Q.   So, all of the inflation that increased on December 5 came

01:20:39 20    out in the decrease a week later?

21    A.   I guess you could call it that, but --

22    Q.   I'll tell you why I think that.

23    A.   Please, go ahead.

24    Q.   Sure.

01:20:50 25         MR. BURKHOLZ:   Your Honor, he's interrupting the

Fischel - cross

2883

1    witness.

2         MR. KAVALER:   I'm sorry.

3    BY MR. KAVALER:

4    Q.   It came in because of whatever Mr. Aldinger said at

01:21:00 5    Goldman Sachs?

6    A.   Well, when you say "came in," there's pre-existing

7    inflation.   So, it increased as a result of the statements

8    made on December 5th.   And, then, because there was a partial

9    corrective disclosure on December 12th, that decreased the

01:21:19 10    amount of inflation.

11         I think that's the proper relationship.

12    Q.   I appreciate your correcting my terminology.   I'll try to

13    stick to "increased" and "decreased."

14         And the amount of the decrease was greater than the

01:21:31 15    amount of the increase?

Page 70

**A445**

16    A.    Based on those two dates, that's correct.

17    Q.    Right.

18          So, for example, Professor, if we were to assume --

19    just like the plaintiff asked you to make an assumption, I'm

01:21:46 20    asking you to make an assumption -- that's all this case were

21    about; the only statement by Mr. Aldinger or by Household in

22    this case were that one; he made it on the 4th; the market

23    reacted on the 5th; there was what you described as a partial

24    corrective disclosure on the 12th; the decrease was larger

01:22:08 25    than the increase, you would say the inflation that -- the

Fischel - cross

2884

1    increased inflation that -- occurred had been dissipated --

2    at least dissipated -- because the decrease was smaller -- and

3    we're finished, right?

4    A.    Decrease is larger, not smaller.

01:22:24 5    Q.    I apologize.

6          You understood my point?

7    A.    Well, in your hypothetical, if that were the whole case, I

8    would say that assuming the -- again, the -- hypothetical jury

9    found the statement on December 5th to be false and

01:22:38 10    misleading, then all purchasers of Household stock between

11    December 5th and December 12th suffered harm because they

12    purchased at a price that was greater than the true value;

13    and, then, the price and the true value equaled each other,

14    again, on December 12th.

01:22:58 15          So, in your hypothetical, any investors before

16    December 12th wouldn't suffer any harm and any investors after

17    December 12th wouldn't suffer any harm, but investors between

18    December 5th and December 12th would suffer harm.

19    Q.    I'd be happy to take the gift you just gave me, but I

01:23:14 20    think you misspoke when you said any investors before December

Page 71

**A446**

04-20-09 Volume 14

21  12 wouldn't suffer harm and any investors after December 12th

22  wouldn't suffer any harm.  You meant before the 5th and after

23  the 12th?

24  A.  I did.  If I misspoke, I appreciate the correction.

01:23:25 25  Q.  And when you said Mr. Aldinger's statement on the 5th, you

Fischel - cross

2885

1  meant his statement on the 4th, which is when he spoke to

2  Goldman Sachs after the market closed, right?

3  A.  Yeah.  I was thinking in terms of trading days.

4  Q.  Right.  That was exactly my point.

01:23:36 5      He spoke, you know, after the market closed, so it's

6  reflected in the following day's trading?

7  A.  That's my recollection.

8  Q.  Perfect.  Okay.

9      Let's see if we can do that same exercise, Professor,

01:23:56 10  with some other dates.

11  A.  Okay.

12  Q.  Hopefully, now that we know how to do it, at least I can

13  do it more efficiently.

14      Let's look at some of the other dates that the

01:24:03 15  plaintiffs have either shown this jury or I understand are

16  going to show this jury or they may show this jury.

17      They've shown this jury the 10-K -- I'm sorry, the

18  10-Q -- that Household filed on August 16, 1999.

19  A.  Okay.

01:24:20 20  Q.  Okay.  Let's see what happened on August 16, '99.  Let's

21  do the same methodology we just used.  Let's start by looking

22  at Plaintiffs' 1397.  And we'll look on Page 1 for August 16,

23  1999.

24      And that shows us that the artificial inflation that

Page 72

**A447**

04-20-09 Volume 14
01:24:40 25    day was 7.97, correct?

Fischel - cross

2886

1    A.   Correct.

2    Q.   And the artificial inflation the day before was 7.97,

3    correct?

4    A.   That's right.

01:24:45 5    Q.   And the artificial inflation the day after was 7.97?

6    A.   Correct.

7    Q.   In fact, to save time, the "Artificial Inflation" column

8    on this entire page is 7.97?

9    A.   That's right.

01:24:54 10    Q.   Okay.

11         So, that means, in the language we were just using --

12    we've just used -- the filing of the Household 10-K on August

13    16, 1999, had no effect on the amount of inflation in the

14    stock?

01:25:15 15    A.   You know, you can't say that definitively.  It depends.

16    Is this the -- what assumption am I making as to whether this

17    is the first false and misleading disclosure?

18    Q.   I'll tell you what assumptions to make.  Assume your chart

19    is accurate.

01:25:29 20    A.   Okay.

21    Q.   Assume I've read the numbers correctly.

22    A.   Okay.

23    Q.   And assume I'm trying to understand the process.  So, I'm

24    looking at August 13, where I see the inflation is 7.97, okay?

01:25:39 25    A.   Okay.

Fischel - cross

2887

1    Q.   And, then, I'm looking at August 16 or August 17 because

2    we don't know what time of the day it was filed.

Page 73

**A448**

04-20-09 Volume 14

    3   A.   Right.

    4   Q.   And on both days I see "7.97."

01:25:48  5   A.   Okay.

    6   Q.   So, the number hasn't changed?

    7   A.   All right.  And let me explain why that is, sir.

    8   Q.   First, you agree with me?

    9   A.   No, obviously, the number hasn't changed.

01:25:57 10   Q.   Okay.

   11         And you prepared these numbers?

   12   A.   I did.

   13   Q.   I had nothing to do with it?

   14   A.   No, that's right, you had nothing to do with it.

01:26:03 15         But --

   16   Q.   All right.

   17   A.   -- the reason is that this document, as I hopefully

   18   explained earlier, is based on the assumption that the first

   19   time where there is a false and misleading disclosure or the

01:26:19 20   failure to make an accurate disclosure is on July 30th, 1999,

   21   which is why the exhibit begins on July 30th, 1999.

   22         Based on my first method, the specific disclosure

   23   method -- not the second method, the specific disclosure

   24   method -- nothing changes between the time of the first

01:26:45 25   misleading disclosure or failure to disclose on July 30th and

                        Fischel - cross

                                2888

    1   August 16th.  And that is why there was no change in inflation

    2   between August 15th, August 16th, August 17th.

    3         If, on the other hand -- and this is what I tried to

    4   explain in terms of how the exhibit should be interpreted, if

01:27:08  5   -- the jury were to conclude that there was no misleading

    6   disclosure on July 30th or failure to disclose accurately on

                 Page 74

**A449**

04-20-09 Volume 14

7    July 30th, but the first misleading disclosure was the second

8    quarter result announcement on August 16th, then the right way

9    to read the exhibit would be that the amount of artificial

01:27:32 10    inflation from July 30th to August 15th is zero; and, then, it

11    goes from zero to 7.97 on August 16th.

12        So, when inflation increases or decreases is a

13    function of what the jury concludes as to when the first

14    misleading disclosure that Household makes is.  And the proper

01:27:54 15    number of inflation is zero on every day until the day that

16    the jury concludes, if they so conclude, that Household made a

17    misleading disclosure.

18    Q.   But I'm looking at 1397 in the column headed "Artificial

19    Inflation."  I don't see any zeros, right?

01:28:12 20    A.   There's no zeros because of the assumption that -- I hope

21    I explained clearly, but if not, I'll try and explain it,

22    again.

23    Q.   That's okay.

24    A.   -- that the first time inflation entered Household's stock

01:28:25 25    price was July 30th.  But that's a jury determination.  It's

Fischel - cross

2889

1    not a determination for me to make.

2        So, any date later than that, if the jury concludes

3    that's the first date of a misleading disclosure, the right

4    way to read the exhibit is to substitute zero for 7.97 until

01:28:45 5    the date -- the first date -- that the jury concludes there

6    was a misleading disclosure.

7    Q.   For purposes of this question, I'll agree with you.  Let's

8    assume it starts on July 30, 1999, okay?

9    A.   Okay.

01:28:57 10    Q.   So, then, we agree that if it starts on July 30, 1999,

11    whatever Household said on August 16 had no effect?

Page 75

**A450**

04-20-09 Volume 14

12   A.   That's correct --

13   Q.   Okay.

14   A.   -- based on that assumption.

01:29:11 15   Q.   A witness named Mr. Devor was here last week and he showed

16   us this chart (indicating).  I don't know if you can see that.

17   It's just the cover sheets of a series of 10-Ks and -Qs.  And

18   this is the one I just asked you about, the June 30, 1999 --

19   A.   Okay.

01:29:30 20   Q.   -- Q, which was filed on August 16, 1999.

21        So, based on what we just talked about, I'm going to

22   cross that off my list.  I will not come back to it, again,

23   and I will not put it on that list over there (indicating).

24   Okay?

01:29:49 25   A.   Okay.

Fischel - cross

2890

1   Q.   Okay.

2        If you look at your event study for this day --

3   that's Exhibit 1391, and it's on Page 1 -- did you find a

4   statistically-significant price increase that resulted in

01:30:22 5   inflation on August 16, 1999?

6   A.   No, sir, I did not.

7   Q.   Okay.

8        I should have asked you that before I put my X up

9   there.  I apologize.  I'll get the hang of this.

01:30:35 10        All right.  Let's look at the next one.

11        Plaintiffs may show you a press release that -- I'm

12   sorry, plaintiffs may show the jury a press release -- that

13   Household issued on October 19, 1999.  I'm going in

14   chronological order.  How much did you find that inflation

01:30:53 15   increased or decreased on that date when that press release

Page 76

**A451**

04-20-09 Volume 14

16  was issued?

17       And to do that, we're going to look, again, at

18  Plaintiffs' 1397.  We're going to turn to Page 2, look at the

19  entry for October 19.  And to save time, I will observe --

01:31:10 20  tell me if I'm right -- this whole page also has actual

21  inflation steady at 7.97 throughout, correct?

22  A.   Correct.

23       And, again, I just want to make sure we're talking

24  about my -- the first method.

01:31:20 25  Q.   The first method.

Fischel - cross

2891

1  A.   Okay.

2  Q.   Absolutely.

3  A.   Because the second method is different.

4  Q.   Understood.

01:31:24 5       Your first method, 7.97 throughout the page, right?

6  A.   Correct.

7  Q.   So, therefore -- can I cut to the chase and eliminate all

8  the interim steps, therefore -- you agree that the filing by

9  Household -- the issuance by Household -- of the press release

01:31:38 10  on October 19, 1999, had no effect on the amount of inflation?

11  A.   I would not agree with that for the reasons that I stated

12  before.

13       It would have no effect on the amount of inflation if

14  the jury were to conclude that Household made a false and

01:31:57 15  misleading disclosure prior to this date.  If that were the

16  case, then there would be no change.  But if the jury were

17  conclude that this was the first date where Household made a

18  false and misleading disclosure, again, then the proper way to

19  read the exhibit would be every day prior to this date would

01:32:15 20  have zero inflation and $7.97 of inflation would have entered

Page 77

**A452**

04-20-09 Volume 14

21    Household's stock price on this date.

22    Q.  What I'm trying to avoid is me asking you the exact same

23    questions for every document and you giving me the exact same

24    answers.  I'm accepting, for purposes of this series of

01:32:31 25    questions, what you said earlier, that your starting

Fischel - cross

2892

1    assumption was the first false statement was July 30.

2    A.  Fine.  It's just that I have to answer your question

3    accurately as you ask it.

4    Q.  I appreciate that.

01:32:46 5        But on those assumptions, just as we established with

6    regard to the June 30 10-Q, so you would agree, would you not,

7    that the -- let me ask you before I do that -- let's look at

8    1391.

9        And we're looking for October 19, which is on Page 3.

01:33:06 10   October 19, 1999.

11        Do you see that?

12   A.  I do.

13   Q.  Did you find any statistically-significant price increase

14   that resulted in inflation on October 19, 1999?

01:33:19 15   A.  No, I did not.

16   Q.  Okay.

17        So, based on those two answers, I'm going to cross

18   off this one (indicating), and I'm not going to list it on

19   that board following the methodology we're using?

01:33:32 20   A.  Sir, what you decide to cross off or what you do with your

21   boards, I'm not going to give you any advice on that.

22   Q.  Fair enough.

23        But we agreed that we would list over there on the

24   white board any disclosure that caused an increase in

Page 78

**A453**

04-20-09 Volume 14
01:33:45 25  inflation.   Remember that?

♀

Fischel - cross

2893

1   A.   Again, I'm not sure what decision rule you're using with

2   respect to what you're writing down, what you're crossing off,

3   what you're leaving alone.   You know, that's however you

4   decide to do it.

01:34:02 5  Q.   I'm sure the jury remembers what we said to each other.

6   I'm going to cross off this one and not come back to it,

7   again.

8        Let's go to the next one.

9        Plaintiffs have shown this jury the December 31st,

01:34:27 10 1999, 10-K that Household filed on March 28, 2000.   Let's look

11  at first Exhibit No. 1397 for March 28, 2000.   And that's on

12  Page 4.

13       And, again, we'll highlight it on the board there.

14       And to save time, you agree that the number in the

01:34:53 15 "Artificial Inflation" column on this page is $7.97 throughout

16  the page?

17  A.   I do, sir.

18  Q.   Okay.

19       Then let's go to your event study, which is

01:35:03 20 Plaintiffs' Exhibit 1391, and we'll find the same date, which

21  is 3-28-2000.

22       And that will be on Page 8.

23  A.   Okay, I have it.

24  Q.   Did you find any statistically-significant price increase

01:35:28 25 that resulted in inflation on March 28th, 2000?

♀

Fischel - cross

2894

1   A.   No, sir, I did not.

2   Q.   All right.   I won't bother you about this one.

Page 79

**A454**

04-20-09 Volume 14

          3        MR. KAVALER:  Don't have it?  Plaintiffs'

          4    Demonstrative 99.

01:35:44  5        Sorry.  99, 10-K.

          6    BY MR. KAVALER:

          7    Q.  Plaintiffs have shown this jury the March 31, 2000, 10-K

          8    that Household filed on May 10, 2000.  Let's do the same

          9    exercise.  Let's look at your chart, which is 1397 in

01:36:22 10    evidence.  Let's look at 5-10-2000, which is on Page 5.

         11        Again, try to save time.  Same result:  No increase

         12    in artificial inflation?

         13    A.  Correct.

         14    Q.  And now let's look at your event study, which is

01:36:39 15    Plaintiffs' 1391 for the same date.  It's on Page 10.  Did you

         16    find a statistically-significant price increase that resulted

         17    in inflation on May 10, 2000?

         18    A.  No, sir, I did not.

         19    Q.  Okay.

01:36:58 20        So, once again --

         21        MR. KAVALER:  I think I'm crossing the wrong thing

         22    off.  I'll fix it later.  I'm confusing myself here.

         23    BY MR. KAVALER:

         24    Q.  Plaintiffs have shown this jury the June 30 10-K -- 10-Q,

01:37:25 25    rather -- that Household filed on August 11, 2000.  Let's look

                              Fischel - cross

                                                              2895

          1    at August 11, 2000, in the first document, which is 1397.

          2    It's on Page 6.

          3        Once again, no increase in artificial inflation,

          4    correct?

01:37:41  5    A.  Correct.

          6    Q.  And let's look at it in your event study on Page 14.

                              Page 80


                              **A455**

04-20-09 Volume 14

7      Did you find any statistically-significant price

8  increase that resulted in inflation on August 11, 2000?

9  A.  No, sir, I did not.

01:38:03 10  Q.  All right.

11      Plaintiffs have shown this jury a newspaper article

12  in the St. Louis Post-Dispatch on November 1, 2000, and that

13  one says something about, "Craig Streem says HFC never

14  pressures people to buy credit life insurance."

01:38:33 15      Let's do the same exercise.  Look at Plaintiffs'

16  Exhibit 1397 for November 1, 2000, at Page 7.

17  A.  I see it.

18  Q.  Okay.

19      No increase in artificial inflation in connection

01:38:49 20  with that event, either, right?

21  A.  That's correct.

22  Q.  All right.

23      Now, let's look at your event study, which is

24  Plaintiffs' Exhibit 1391.  I'm going to go to Page 17.  And

01:39:04 25  you see the entry there for 11-1-2000?

Fischel - cross

2896

1  A.  I do, sir.

2  Q.  Did you find any statistically-significant price increase

3  that resulted in inflation on 11-1-2000?

4  A.  No, sir, I did not.

01:39:17 5  Q.  Okay.

6      MR. KAVALER:  Plaintiffs' Demonstrative No. 12,

7  please.

8  BY MR. KAVALER:

9  Q.  Plaintiffs have shown this jury the Origination News

01:39:28 10  article that appeared on March 23, 2001, which says something

11  about Gary Gilmer saying the company's position on predatory

Page 81

**A456**

04-20-09 Volume 14

12  lending is perfectly clear.

13          I think we have the language up here.  It's the

14  second one.  This one here (indicating), down at the bottom.

01:39:50 15  A.  I see it, sir.

16  Q.  Okay.  Thank you.

17          Let's look at your Plaintiffs' Exhibit 1397.  We'll

18  go to Page 9.  We'll look at 3-23-01.  And let's look at

19  3-28-01.  It's possible there might be a mistake in the

01:40:19 20  dating, possibly not; but, either way, there's no change in

21  the artificial inflation in that column?

22  A.  That's correct, sir.

23  Q.  Okay.

24          And, then, let's go to your event study.  And I guess

01:40:33 25  we'll have to -- this is Exhibit No. 1391.  It is the right

Fischel - cross

2897

1  date.

2          And we'll look at Page 21.  Did you find a

3  statistically-significant price increase that resulted in

4  inflation in connection with either March 23 or March 28,

01:41:01 5  2001?

6  A.  Let me just check something because -- it looks like March

7  23rd is a statistically-significant price increase.

8  Q.  And the 28th is not?

9  A.  Correct.

01:41:22 10  Q.  Okay.

11          This is plaintiffs' board.  So, we'll see how we

12  resolve that.

13          Let me ask you this -- well, let me come back to

14  that.  So, we'll leave this one open for the moment.

01:41:39 15          The plaintiffs have shown this jury the December 31,

Page 82

**A457**

16   2000, 10-K that Household filed on March 28th, '01.  That's

17   one of the dates we just looked at and, in Exhibit 1397, we

18   found no change in artificial inflation, correct?

19   A.   That's correct.

01:41:53 20   Q.   And on your event study, which is Exhibit 1391, we found

21   no statistically-significant price increase that resulted in

22   inflation on March 28, correct?

23   A.   That changed the amount of inflation, correct.

24   Q.   Okay.

01:42:12 25        So, that's the December 31 10-K.  Plaintiffs have

                        Fischel - cross

                                                              2898


1   shown this jury the Star Tribune article that appeared on July

2   27, 2001 --

3        MR. KAVALER:   This is Plaintiff's Demonstrative 13.

4   BY MR. KAVALER:

01:42:42 5   Q.   -- in which they say Household spokeswoman Megan Hayden

6   said the terms of loans are disclosed to all customers?

7        MR. KAVALER:   You can put it right in front.  Put it

8   up -- sorry.  Should have known you'd know what to do.

9   BY MR. KAVALER:

01:43:01 10   Q.   So, we're looking at July 27, '01.  It's this one over

11   here (indicating).

12        It's Megan Hayden saying, "The terms of loans are

13   disclosed to all customers as required by state and federal

14   laws -- " and something has been left out on this board -- "so

01:43:25 15   I take exception to any characterization that we engaged in

16   predatory lending practices."

17        By the way, Professor, you understand these are

18   plaintiffs' boards, we just blew them up?

19   A.   I don't have -- I don't have -- any understanding, one way

01:43:36 20   or the other.

                        Page 83



                        **A458**

04-20-09 Volume 14

21  Q.  Do you see in the lower right-hand corner it says

22  "PDEMO13"?

23  A.  Actually, I can't really read it from here, but I'm sure

24  that's what it -- there's no need to show it to me.  I'm sure

01:43:47 25  that's what it says.

Fischel - cross

2899

1  Q.  I was going to bring it over to you.

2  A.  No, I'm happy to --

3  Q.  And you know that means "plaintiffs' demonstrative"?

4  A.  That's fine.

01:43:53 5  Q.  So, I'm not the one who left whatever's left out of there,

6  but I'm not suggesting anything follows from it.

7       Okay.  Let's look at that date in Exhibit 1397.  It's

8  on Page 11.  And, again, we have an entire page where

9  artificial inflation is 7.97, correct?

01:44:13 10  A.  That's right.

11  Q.  So, no change here, either?

12  A.  Correct.

13  Q.  All right.

14       Let's now look in your event study.  This is at

01:44:20 15  Page -- this is Exhibit 1391.  And we go to Page 26, it's the

16  second entry down.

17       Did you find any statistically-significant price

18  increase that resulted in inflation on July 27, 2001?

19  A.  No, sir, I did not.

01:44:54 20  Q.  Let me see if I can shorten this.  In fact, you didn't

21  find any statistically-significant price increases that

22  resulted in inflation from July 30, 1999, through November 15,

23  2001; is that right?

24  A.  Under the first method, that's correct.

Page 84

**A459**

04-20-09 Volume 14
01:45:25 25    Q.  The first method.  Absolutely.

Fischel - cross

2900

1    A.  Correct.

2    Q.  Right?

3         Okay.

4         MR. KAVALER:  Let's put up everything we have that
01:45:33 5    the plaintiffs were kind enough to furnish us that occurred

6    before November 15, 2001.

7         (Brief pause.)

8         MR. KAVALER:  January 19, 2000; April 19, 2000;

9    August 11, 2000; October 18, 2000; January 17, 2001.

01:47:23 10        MR. BURKHOLZ:  Your Honor, is there a question

11   pending or is this demonstrative --

12        MR. KAVALER:  These are all following from the last

13   question, your Honor.  He told me everything remains the same

14   through a certain date.  I'm simply trying to expedite matters
01:47:35 15   so we don't waste all afternoon.  This is the same process I

16   went through each of the other exhibits.  I'd be happy to do

17   it piecemeal.  It will just take forever.

18        THE COURT:  Do you have an objection?

19        MR. BURKHOLZ:  Is there a question pending?

01:47:47 20        THE COURT:  Do you have an objection?

21        MR. BURKHOLZ:  No.  It's fine, your Honor.

22        THE COURT:  Okay.

23        MR. KAVALER:  Thank you.

24        THE COURT:  Proceed.

01:47:55 25        MR. KAVALER:  July 18, 2001.

Fischel - cross

2901

1    BY MR. KAVALER:

2    Q.  Now, Professor, I may not have a board for every
Page 85

**A460**

04-20-09 Volume 14

3    statement, but if the statement falls within the same time

4    frame as my last question, you'd give me the same answer?

01:48:17  5    A.  If you're just asking me the mechanical question as to

6    whether there's a change in the amount of inflation or whether

7    there's a statistically-significant price increase --

8    Q.  Those are my only questions.

9    A.  If those are your only questions, as opposed to explaining

01:48:32 10    why the numbers are what they are, then I agree with you.

11    Q.  All right.

12         Now let's look at some days after November 15.

13    A.  Okay.

14    Q.  We're not going to be able to expedite.  We're going to

01:48:43 15    have to go day by day.

16    A.  Okay.

17    Q.  Okay.  Plaintiffs may show this jury a December 4 -- I

18    think we did that already.  We did Goldman Sachs.  It's that

19    one (indicating).

01:48:55 20         MR. KAVALER:  Plaintiffs' Demonstrative 23, please.

21    BY MR. KAVALER:

22    Q.  Plaintiffs may show this jury a press release that

23    Household issued on January 16, 2002.  It looks like this

24    (indicating).  It's Mr. Aldinger in the photograph here and

01:49:18 25    talks about receivable and revenue growth exceeded our

Fischel - cross

2902

1    expectations, et cetera.

2         Let's look at January 16, 2002, in your exhibit,

3    Plaintiffs' Exhibit 1397.  And that will be on Page 14.

4         And you see that the inflation on January 15 is 3.66.

01:49:45  5    On January 16, it's 3.66.  On January 17, it's 3.66.

6         So, although we no longer have a full page of 7.97,

Page 86

**A461**

04-20-09 Volume 14

7   we still have the same phenomenon.   The artificial inflation

8   did not increase upon the issuance of this press release,

9   correct?

01:50:00 10   A.   That's correct.

11   Q.   Okay.

12        And now let's go to your event study, which is

13   Plaintiffs' Exhibit 1391.   And let's find the same date, which

14   is January 16, 2002, which will be on Page 32.   And tell me

01:50:19 15   whether you found a statistically-significant price increase

16   that resulted in inflation on January 16, 2002.

17   A.   No, sir, I did not.

18   Q.   Plaintiffs have shown this jury the Copley News Service

19   article --

01:50:42 20        MR. KAVALER:   This is Plaintiffs' Demonstrative 13,

21   please.

22   BY MR. KAVALER:

23   Q.   Plaintiffs have shown this jury the Copley News Service

24   article which appeared on February 6th, 2002.   I have it over

01:50:56 25   here (indicating):   "We do the right thing for our borrowers.

Fischel - cross

2903

1   We make good loans.   They're not only legal loans, but are

2   beneficial for our customers."

3        Do you see that?

4   A.   I do, sir.

01:51:05 5   Q.   Okay.

6        Let's look at our old friend Plaintiffs' 1397 for

7   that date, February 6.   I think we're on the same page, Page

8   14.

9        And you see the inflation there is -- it's a 3.66

01:51:19 10   number in a whole column of 3.66 numbers.   Not the entire

11   page, but a bunch of them, right?

Page 87

**A462**

04-20-09 Volume 14

12    A.   Correct.

13    Q.   Again, inflation did not increase upon the release of this

14    press release, right?

01:51:29 15    A.   That's right.

16         Again, we're talking only about the first method.

17    Q.   Only the first model.

18    A.   That's right.

19    Q.   Absolutely.  I promise you when I switch to the second

01:51:35 20    model, I'll tell you.  I have it in my notes.

21    A.   Okay.

22    Q.   First model.  I agree with you.

23         Now, let's look at your event study, Plaintiffs'

24    1391, for the same date, which is February 6, '02, which will

01:51:50 25    be Page 33.

Fischel - cross

2904

1         Did you find any statistically-significant price

2    increase that resulted in inflation from any disclosure on

3    February 6th, 2002?

4    A.   Statistically it's giving price decrease, but not

01:52:09 5    increase.

6    Q.   But not increase?

7    A.   Correct.

8    Q.   That's exactly my point.  I'm asking about an increase.

9    Not an increase?

01:52:14 10    A.   Okay.  Not an increase.

11    Q.   In other words, whatever Ms. Hayden-Hakes said, it did not

12    artificially -- it did not increase the amount of artificial

13    inflation?

14    A.   That's correct.  Decreased it.

01:52:33 15         MR. KAVALER:  Plaintiffs' Demonstrative 14.

Page 88

**A463**

16    BY MR. KAVALER:

17    Q.    Plaintiffs have shown this jury the National Mortgage News

18    article which appeared on February 18, 2002.  And that's --

19    what it says there is -- "Our first take on the allegations of

01:52:48 20    predatory lending raised in the ACORN action is that it is not

21    a significant issue, not indicative of any widespread problem

22    and certainly not a concern that it will spread elsewhere?"

23            It's attributed to David Schoenholz.  Do you see

24    that?

01:53:01 25    A.    Can I just -- in my previous answer, when I said it

Fischel - cross

2905

1    decreased it in this first method, and no effect, I want to

2    correct my previous answer.

3    Q.    Okay.

4            I'll be clear with you.  You be clear with me.

01:53:13  5    Again, I'm not trying to trick you.

6    A.    You have been clear --

7    Q.    The first method.

8    A.    You have been clear --

9    Q.    The first method.

01:53:18 10    A.    -- I misspoke.  I wanted to correct it.

11    Q.    Okay.  And I appreciate that.

12            And, just, the point is previously you said it

13    decreased it.  Now, you're saying it was flat.  My question

14    was:  It didn't increase it, correct?

01:53:27 15    A.    Correct.

16    Q.    All right.

17            So, from my point of view, both your answers are the

18    same.  You've now made it more accurate, but it's still not an

19    increase --

01:53:35 20    A.    Okay.

Page 89

**A464**

04-20-09 Volume 14

```
          21   Q.  -- correct?

          22   A.  Correct, yes.

          23   Q.  Thank you.

          24        Okay.  Let's look at this date (indicating).  We'll
01:53:43  25   go to Plaintiffs' 1397.  The date is February 18, 2002.  We
```

Fischel - cross

2906

```
           1   are on Page 14.  And we see there is no "February 18, 2002,"

           2   probably because it's a weekend.  There's a "February 15" and

           3   "February 19."

           4        Do you see that?

01:53:58   5   A.  Yes, sir, I do.

           6   Q.  Where should I go, the 19th?

           7   A.  If it came out on the weekend, you should go to the 19th.

           8   Q.  It doesn't matter because it's 3.66 for days and days

           9   before, and days and days after, correct?

01:54:08  10   A.  Correct.

          11   Q.  So, again, this didn't cause any increase in artificial

          12   inflation, correct?

          13   A.  That's right.

          14   Q.  Now, let's go to 1391, your Event Study, and let's see if

01:54:19  15   we can find the same date.

          16        This is February 18 (indicating) and it looks like

          17   it's February 19, and it's on Page 34.

          18        Do you see that?

          19   A.  I do, sir.

01:54:30  20   Q.  Okay.

          21        Am I on the right date?

          22   A.  You are.

          23   Q.  All right.

          24        And did you find any statistically-significant price
```

Page 90

**A465**

04-20-09 Volume 14

01:54:36 25    increase under your first method that resulted in inflation on

Fischel - cross

2907

1    February 18, 2002?

2    A.   No, sir, I did not.

3    Q.   Plaintiffs have shown this jury the December 31, 2001,

4    10-K filed by Household on March 13, 2002.

5         MR. KAVALER:   Did we do this already?

6    (Brief pause.)

7         MR. KAVALER:   We did not.   Okay.

8    BY MR. KAVALER:

9    Q.   Let's look at Plaintiffs' 1397.   We'll look at it for

01:55:11 10    March 13, 2002.

11         And you see that artificial inflation is 5.30 there

12    (indicating), and 5.30 for several days before and 5.30 for

13    several days thereafter, right?

14    A.   I see that, sir.

01:55:23 15    Q.   Once again, no increase in artificial inflation upon the

16    filing of the December 31 10-K, correct?

17    A.   Correct.

18    Q.   And let's look at your Event Study, which is Exhibit 1391.

19         Let's go to March 13, 2002, which looks like it's on

01:55:41 20    Page 35.

21         Did you find any statistically-significant price

22    increase that resulted in inflation on March 13, 2002?

23    A.   No, sir, I did not.

24    Q.   Plaintiffs have shown this jury statements made at the

01:56:09 25    Household Financial Relations Conference that took place on

Fischel - cross

2908

1    April 9, 2002.

2         Let's look at your Exhibit 1397.

Page 91

**A466**

04-20-09 Volume 14

     3          I think we're on Page 15.

     4          No increase in artificial inflation on April 9 or

01:56:32  5   April 10 or April 11 of 2002, correct?

     6   A.   Correct.

     7   Q.   Let's look at your Event Study, Plaintiffs' 1391, for the

     8   same date, which will be on Page 36.

     9          Did you find any statistically-significant price

01:56:49 10   increase that resulted in inflation on April 9, 2002?

    11   A.   No, sir, I did not.

    12   Q.   Okay.

    13          So, we don't have a board for that; but, if we did,

    14   we'd cross it off.

01:56:59 15          Plaintiffs may show this jury a press release issued

    16   by Household on April 17, 2002.

    17          Let's look at Plaintiffs' Exhibit 1397 for April 17.

    18          Again, no increase in artificial inflation that day

    19   or any of the days within five or ten thereafter, right?

01:57:19 20   A.   Let me look at it on there.

    21   Q.   Absolutely.  Please, please.

    22   A.   No change in inflation on those dates.

    23   Q.   Okay.

    24          I'm just giving you a window so as to make it easier

01:57:29 25   for you to hone in.

                         Fischel - cross

                                                              2909

     1          Let's look at your Event Study, which is Exhibit --

     2   Plaintiffs' -- 1391, for the same day, which will be on Page

     3   37, I think.

     4          Give me a second here.

     5      (Brief pause.)

     6   BY MR. KAVALER:

                         Page 92

                         **A467**

04-20-09 Volume 14

7   Q.   Correct.   37?

8        Now, I'm not sure I understand the entry here.   It

9   says, "4-21," and, then, there's nothing.

10       Am I on the wrong date?

11       Hang on.

12     (Brief pause.)

13   BY MR. KAVALER:

14   Q.  I'm on the wrong date.  I apologize.

01:58:04 15       4-17.  Okay.  4-17.

16       Did you find any statistically-significant price

17   increase that resulted in inflation on April 17, 2002?

18   A.   No, sir, I did not.

19   Q.   All right.

01:58:14 20       And that's this press release here (indicating), with

21   a picture of Mr. Aldinger, talking about, "A credit quality

22   performance was well within our expectations," et cetera.

23       Plaintiffs have shown this jury the Bellingham Herald

24   article that appeared on April 21, 2002.  This is Plaintiffs'

01:58:36 25   Demonstrative No. 14, the second item, and that's this one

Fischel - cross

2910

1   here in the middle (indicating).

2        "Megan Hayden-Hakes:  It is absolutely against our

3   policy in any way to quote a rate that is different than a

4   true rate."

01:58:55 5       I can't underscore that enough -- that quote.

6        Let's look at Plaintiffs' Exhibit 1397 for April 21,

7   2002, Page 15.

8        Again, no change in the artificial inflation

9   associated with that event, right?

01:59:08 10   A.   I believe that's correct, but it's not highlighted yet.

11   Q.   Oh, sorry.

Page 93

**A468**

04-20-09 Volume 14

02:33:41 25    right up against July 30, 1999, which you understand to be the

Fischel - cross

2935

1    first day of the relevant period, correct?

2    A.   Correct.

3        MR. KAVALER:   Your Honor, I offer Plaintiffs'

4    Demonstrative 1511 in evidence pursuant to Rule 801(d)(2).

02:34:03  5        THE COURT:   A response?

6        MR. BURKHOLZ:   I don't think it's a party admission

7    under that rule, your Honor.

8        THE COURT:   Excuse me.

9        MR. BURKHOLZ:   I don't think it's a party admission

02:34:17 10    under 801(d)(2).

11        MR. KAVALER:   I refer specifically, your Honor, to

12    subpart (B) or (C) or (D).

13        THE COURT:   I will allow it subject to a later ruling

14    after we have a sidebar.

02:34:43 15        But you may proceed as if it has been admitted.

16        MR. KAVALER:   Thank you, your Honor.

17    BY MR. KAVALER:

18    Q.   Now, turn your attention, Professor Fischel, to

19    Plaintiffs' Exhibit -- Plaintiffs' Demonstrative -- 154?

02:34:55 20    A.   Can I just have a copy, sir?

21    Q.   Absolutely.   Sorry.

22        You can even have a color copy.

23        Here's 151.

24        (Document tendered.)

02:35:04 25        MR. KAVALER:   Mr. Burkholz, one for you.

Fischel - cross

2936

1        (Document tendered.)

2        MR. KAVALER:   Now, let's do 154.

Page 115

**A469**

04-20-09 Volume 14

3            Copies, please.

4            (Brief pause.)

02:35:15  5            MR. KAVALER:  Let the record reflect I'm handing the

6    witness 154.

7            THE WITNESS:  Thank you.

8            MR. KAVALER:  And a copy for counsel.

9            (Document tendered.)

10   BY MR. KAVALER:

11   Q.  The same series of questions, Professor Fischel.

12           Once again, the horizontal axis shows at the extreme

13   left-hand end July 30, 1999, correct?

14   A.  Correct, sir.

02:35:36 15   Q.  And you go up that axis, you see a blue line (indicating),

16   which is the true value; a red line (indicating), which is

17   price; and, a pink -- it looks blue up there (indicating) --

18   whatever color it is, the area between the lines is shaded in?

19   A.  Yeah.

02:35:54 20           That corresponds precisely to the table that we were

21   just looking at on the amount of inflation.  So -- well, since

22   we haven't talked about this yet, if you just put the other

23   one up on the screen for a second?

24   Q.  Okay.  Sure.

02:36:23 25           Go back to 151.

                        Fischel - cross

                                                          2937

1            (Brief pause.)

2    BY THE WITNESS:

3    A.  So, what the -- the red line is the actual price, and you

4    can see what it was relative to -- the level of the price

02:36:24  5    relative to -- the vertical axis on price.

6            And the blue line is the true value.

                        Page 116

                        **A470**

         7          So, what this predicts is that the price fluctuates

         8    every day; but, the true value, based on my calculations, is

         9    $7.97 lower than the actual price until November 15th of 2001;

02:36:53 10    and, then, it gets more or less than -- the inflations

        11    increases or decreases based on the specific disclosure.

        12    BY MR. KAVALER:

        13    Q.   I hear you.  None of that is my question.

        14          I want to go back to -- I put up 151 because you

02:37:03 15    wanted me to.  I want to go to 154 for a minute.

        16    A.   I apologize.

        17          Okay.   Thank you.

        18    Q.   154, my only question is:   You prepared this chart?

        19    A.   I did.

02:37:11 20    Q.   Okay.

        21          On this chart, as on the other one, the blue line,

        22    the red line and the shaded-in space all butt right up against

        23    July 30, 1999, correct?

        24    A.   Correct, for the reasons I've stated.

02:37:24 25          MR. KAVALER:   Your Honor, I offer Plaintiffs'

                                     Fischel -

                                                              2938

         1    Demonstrative 154 in evidence, pursuant to Rule 801(d)(2).

         2          THE COURT:   Let's take our afternoon break now.

         3    We'll take 15 minutes; we'll discuss this; and, then, we'll

         4    bring the jury back out and continue.

02:38:38  5          (Jury out.)

         6          THE COURT:   So, you're offering these two

         7    demonstrative exhibits as?

         8          MR. KAVALER:   As an admission by a party opponent,

         9    your Honor.

02:38:43 10          THE COURT:   Okay.

        11          A response?

                           Page 117

**A471**

7   you've got a residual price change of minus $1.86.

8       Do you see that?

9       MR. BURKHOLZ:   Could you show him where it is?

03:27:51 10     MR. KAVALER:   Sure.

11  BY MR. KAVALER:

12  Q.  It's tab three, which just happens to be the first one

13  in --

14  A.  I'm looking at it on the screen.

03:27:54 15 Q.  If I were looking at the price of the stock, closing price

16  on the New York Stock Exchange, on November 15, 2001, I

17  wouldn't see minus $1.86, would I?

18  A.  You would not, for the reasons that I explained at length.

19  Q.  And if I were watching Bloomberg News, I wouldn't see

03:28:12 20 minus $1.86, would I?

21  A.  Probably not.

22  Q.  And if I were reading the Wall Street Journal in the

23  morning or the New York Times or the Chicago Tribune, I

24  wouldn't see minus $1.86?

03:28:22 25 A.  I suspect you would not.

Fischel - cross

2959

1   Q.  And if I were looking at my brokerage statement if I owned

2   Household stock, I wouldn't see minus $1.86?

3   A.  No.   But in all those documents, you might see discussion

4   of how the stock price movement compared with the overall

03:28:39 5  market and movements of other firms in the industry.   That's a

6   very common measure that Household itself used in its proxy

7   statements that's, in effect, required by SEC regulations.

8   Q.  I'm making --

9   A.  So this is just a quantification of what investors look at

03:28:57 10 all the time.

11  Q.  I'm making a very small point, sir.   Stocks are quoted in

Page 135

**A472**

04-20-09 Volume 14

12    a price which is the price usually that they close on the New

13    York Stock Exchange, right?

14    A.    Correct.    But there's also frequently comparisons of stock

03:29:12 15    prices and prices of the overall -- movement to the overall

16    market, movements in the industry.    That's what Household

17    itself disclosed in its proxy statement.    This is just a

18    quantification of that relationship.

19    Q.    You've been very patient all afternoon while we talked

03:29:28 20    about your first model.    I want to turn to your second model.

21    A.    Okay.

22    Q.    This is the model with the leakage, right?

23    A.    Okay.

24    Q.    Okay.    And you agree there are a bunch of stock price

03:29:39 25    movements that were significant under your aggression analysis

Fischel - cross

2960

1    that were not attributable to fraud-related disclosures, don't

2    you?

3    A.    There were probably some, both positive and negative, but

4    a lot of the significant movements were combined disclosures

03:29:57 5    of -- they had some fraud-related aspect and then they had

6    some other aspect in addition to the fraud-related aspect.

7    Q.    And were there some, any, that had no fraud-related

8    aspect?

9    A.    It's a matter of judgment as to whether something has a

03:30:13 10    fraud-related aspect or not.    I would say there were a few,

11    but there were also, I would say, a significant number of the

12    statistically significant movements that had this combined

13    aspect.

14        But just to be clear, under the leakage model,

03:30:31 15    whether they did -- whether they were purely fraud related,

Page 136

**A473**

04-20-09 Volume 14

16    combined fraud related or not at all fraud related, they were

17    all included in the leakage model.

18    Q.   I understand.   But my point is there was some of all

19    three?

03:30:46 20    A.   You probably could -- that would probably be a fair

21    statement.

22    Q.   Okay.   Now, this is not on either model.   This is a

23    general question.

24    A.   Okay.

03:30:56 25    Q.   You assumed that the defendants did make false statements

Fischel - cross

2961

1    during the relevant period, didn't you?

2    A.   That's correct.

3    Q.   Okay.   Can you do this:   Assume the opposite.   Assume the

4    defendants did not make any false statements during the

03:31:10  5    relevant period.

6    A.   Okay.

7    Q.   Okay.   The stock price still declined in the real world,

8    didn't it?

9    A.   The stock price declined in the real world, that's

03:31:23 10    correct.

11    Q.   Why?

12    A.   I think the stock price declined for a variety of

13    different factors.   I touched on this in my testimony.   There

14    was a -- a big part of the stock price decline that's --

03:31:40 15    according to both of my calculations that's attributable to

16    some combination of market industry and non-fraud-related

17    effects.   And also some percentage of the stock price decline

18    that's attributed -- attributable -- excuse me -- to the

19    market learning correct information about Household's

03:32:05 20    predatory lending practices, its re-aging policies and the

Page 137

**A474**

04-20-09 Volume 14

7    Q.   Is it a common method to focus on the disclosures later in

8    the relevant period to quantify the inflation due to the

9    statements Household made earlier in the relevant period?

03:37:01 10    A.   It's completely standard because if what you're trying to

11    do is measure the value of the truth and the truth is not

12    provided early in the period, the only way to analyze the

13    effect of the truth is to see what the effect on investors and

14    market prices is when the truth comes out.  And by doing that,

03:37:23 15    you're able to make a judgment, as I did, about what the,

16    quote, true value of the stock would have been at the

17    beginning had the truth been told the entire time.

18    Q.   Now, counsel showed you the beginning of the relevant

19    period, July 30, 1999, and then the first statement on August

03:37:43 20    16, 1999, the 10-Q.

21         Do you remember that?

22    A.   I do.

23    Q.   And do you have an understanding that the beginning of the

24    relevant period, July 30, 1999, is due to a Court decision in

03:37:54 25    this case?

Fischel - redirect

2966

1    A.   That's my understanding.

2    Q.   Okay.  And if the first false statement that plaintiffs

3    allege in this case is on August 16, 1999, how would you

4    calculate inflation on that date?

03:38:06 5    A.   I would calculate inflation the same way as of August 16,

6    but there would be no inflation from July 30 to August 15.  So

7    as I indicated, where I have an entry for artificial inflation

8    from July 30 to August 15, the correct way to interpret the

9    exhibit is just to replace the inflation number with a zero

03:38:28 10    for every day until August 16.  And beginning on August 16, it

11    would then be $7.97 under the first method.

Page 141

**A475**

04-20-09 Volume 14

    12  Q.   And your assumption that plaintiffs will be able to prove

    13  the various statements are false and misleading during the

    14  relevant period is a common assumption that you make in your

03:38:58 15  field?

    16  A.   Again, it's a necessary assumption because the

    17  responsibility of determining whether a statement is false or

    18  not, that's not for an expert witness, for any expert witness.

    19  It's not for an economist.  It's really a function for the

03:39:12 20  jury to decide.

    21            MR. BURKHOLZ:   Can we bring up Plaintiffs' Exhibit

    22  1391.  Can we have the switch, your Honor.

    23            If we can turn to the third page.

    24            If we can highlight the last date on the bottom,

03:39:36 25  November 12, 1999.

                          Fischel - redirect

                                                              2967

    1  BY MR. BURKHOLZ:

    2  Q.   That's the date of a public statement by Household.

    3            Do you see the three bars on the right?

    4  A.   I do.

03:39:49  5  Q.   What does that signify?

    6  A.   That it's a statistically significant day.

    7  Q.   And that was a statistically significant price increase on

    8  that date, correct?

    9  A.   Correct.

03:39:57 10  Q.   Why didn't you take, under your specific disclosure model,

    11  the $7.97 and just add the dollar and two cent inflation on

    12  that date?

    13  A.   Because, as I indicated, to be one of my 14 specific

    14  disclosures, three criteria had to be met.  There had to be an

03:40:16 15  event, there had to be a statistically significant stock price

                          Page 142

                          **A476**

04-20-09 Volume 14

16    reaction and I had to believe to a reasonable degree of

17    certainty that the event caused the stock price reaction.

18         So what I did with respect to dates like November 12

19    was that there was a statistically significant price increase.

03:40:38 20   I could have included that date to increase the amount of

21    inflation, but I didn't do it because I wasn't confident that

22    there was a fraud-related disclosure on that date that was

23    responsible for that price increase, which is why in my first

24    method of quantification I only had 14 dates, as opposed to

03:41:00 25   every date where there was a statistically significant price

Fischel - redirect

2968

1    movement.

2    Q.   And under your leakage model, the inflation varies

3    throughout the relevant period?

4    A.   Correct, from the first day to the last day.  It varies

03:41:12 5   every day.

6    Q.   And then counsel was quizzing you on some of the specific

7    disclosure dates.  I want you to go back to the September 23,

8    2002, date, which is tab 16 in your binder.

9    A.   Okay.  I have it.

03:41:29 10  Q.   And he asked you whether or not that date related to

11   predatory lending.  And I think you said it did.  But you

12   didn't look at the actual report.  Can you look at the second

13   page of the report?

14   A.   I have it.

03:41:51 15  Q.   Okay.  Do you see the first paragraph -- at the end of the

16   first paragraph on the second page, Moreover, skepticism

17   regarding the company's rapid portfolio growth, particularly

18   within the auto business, and mounting credit quality concerns

19   related to Household's loan workout and re-aging practices

03:42:08 20  have also been a drag on the stock.

Page 143

**A477**

04-20-09 Volume 14

21    A.    Correct, I see that.  The correct answer would have been

22    this disclosure related both to predatory lending practices as

23    well as a re-aging, not just to predatory lending.

24    Q.    And, finally, it's your opinion that the leakage model is

03:42:26 25    a better estimate of inflation from Household's false

Fischel - recross

2969

1    statements as alleged by the plaintiffs than your specific

2    disclosure model?

3    A.    Yes, because of all the evidence of the leakage of the

4    Washington department of financial insurance report, as well

03:42:41 5    as all the leakage of the settlements, the possible

6    settlements, and all the criticism of Household's predatory

7    lending practices, as well as its re-aging policies.

8        MR. BURKHOLZ:   Nothing further at this time, your

9    Honor.

03:43:00 10       THE COURT:   Recross.

11       MR. KAVALER:   Briefly, your Honor.

12    (Brief pause.)

13       THE WITNESS:   Be careful.

14              RECROSS EXAMINATION

03:43:05 15 BY MR. KAVALER:

16    Q.    Anything happens a lot of lawyers that will throw their

17    cards at my body.

18       Let me just pursue what you just told Mr. Burkholz.

19    He directed your attention to November 12, 1999.  Let's look

03:43:32 20    at Plaintiffs' Exhibit 1397, page two.  That's your list

21    there.

22    A.    13 -- which --

23    Q.    1397 is this one, the one with the columns.

24    A.    Okay.  Let me find it.  I've got 1395.

Page 144

**A478**

04-20-09 Volume 14

25

♀

3012

1                           * * * * *

2                   C E R T I F I C A T E

3           We certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

         /s/ Nancy C. LaBella
7    _____

8

9        /s/ Joseph Rickhoff              April 21, 2009
     _____    _____
10       Official Court Reporters              Date
         United States District Court
11       Northern District of Illinois
             Eastern Division
12

13

14

15

16

17

18

19

20

21

22

23

24

25

04-24-09 Volume 18

3824

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
 4  others similarly situated,      )
                                    )
 5            Plaintiff,            )
                                    )
 6     vs.                          )  No. 02 C 5893
                                    )
 7  HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         )  Chicago, Illinois
 8                                  )  April 24, 2009
       Defendants.                  )  11:00 o'clock a.m.
 9                        VOLUME 18
10            TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE RONALD A. GUZMAN
11

12  APPEARANCES:

13  For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. SPENCER A. BURKHOLZ
                                   MR. MICHAEL J. DOWD
15                                 MR. DANIEL S. DROSMAN
                                   MS. MAUREEN E. MUELLER
16                            655 West Broadway
                              Suite 1900
17                            San Diego, California  92101
                              (619) 231-1058
18
                              COUGHLIN STOIA GELLER RUDMAN &
19                            ROBBINS LLP
                              BY:  MR. DAVID CAMERON BAKER
20                                 MR. LUKE O. BROOKS
                                   MR. JASON C. DAVIS
21                                 MS. AZRA Z. MEHDI
                              100 Pine Street
22                            Suite 2600
                              San Francisco, California  94111
23                            (415) 288-4545

24

25
```

3825

```
 1  APPEARANCES:   (Continued)

 2  For the Plaintiff:        MILLER LAW LLC
                              BY:  MR. MARVIN ALAN MILLER
```
                        Page 1

**A480**

04-24-09 Volume 18
```
 3                        115 South LaSalle Street
                         Suite 2910
 4                        Chicago, Illinois  60603
                         (312) 332-3400
 5
     For the Defendants:    CAHILL, GORDON & REINDEL LLP
 6                        BY:   MR.  THOMAS J.  KAVALER
                               MS.  PATRICIA FARREN
 7                             MR.  DAVID R.  OWEN
                               MS.  JANET A.  BEER
 8                             MR.  JASON M.  HALL
                               MR.  JOSHUA M.  NEWVILLE
 9                             MS.  KIM A.  SMITH
                               MS.  SUSAN BUCKLEY
10                             MS.  YAFIT COHN
                               MR.  MICHAEL WERNKE
11                        80 Pine Street
                         New York, New York  10005
12                        (212) 701-3000

13

14

15

16

17

18

19

20

21

22
     Court Reporter:        NANCY C. LaBELLA, CSR, RMR, CRR
23                         Official Court Reporter
                          219 South Dearborn Street
24                         Room 1222
                          Chicago, Illinois  60604
25                         (312) 435-6890
                          Nancy_LaBella@ilnd.uscourts.gov
```
⚲

3826

```
 1              THE CLERK:   O2 C 5893, Jaffe vs. Household
 2     International, incorporated.
 3              THE COURT:   Good morning, everyone.
 4              MR. BURKHOLZ:   Good morning.
11:01:01  5     MR. KAVALER:   Good morning, your Honor.
 6              THE COURT:   Does anybody remember where we left off
```
Page 2

**A481**

04-24-09 Volume 18

11:19:02 25    what the factual record is, that's for the jury to decide

3838

1    unless you can convince me in your motion for ruling as a

2    matter of law that there's an absolute lack of any such

3    information; and, therefore, the issue shouldn't go to the

4    jury.

11:19:15  5              You know, when we argue these instructions, we posit

6    that there's sufficient evidence out there for it to go to the

7    jury.  If that's the case, how do we instruct the jury on what

8    the rules are in determining whether, depending on what they

9    find the evidence shows, liability has been established?

11:19:41 10              MS. BEER:  I think we were focusing on the factual

11    record, in part, to suggest that giving the jury an abstract

12    statement like this is simply going to be confusing; and, it

13    opens the door to a great many individuals about whom there is

14    no evidence whatsoever in the record.

11:19:58 15              There's also --

16              THE COURT:  Well, why don't we tell them we're

17    talking about Vozar and Rybak?

18              MR. BURKHOLZ:  Vozar, Rybak, McDonald and Makowski.

19              And McDonald and Makowski came out with the

11:20:09 20    Schoenholz testimony about the 10b-5-K.  So, it's in the

21    record with respect to those -- certainly those -- four

22    individual corporate officials that are so high up at

23    Household, that they meet the Tellabs standard.

24              MS. BEER:  I think we also need to look at the timing

11:20:23 25    of their statements, as they -- the timing of the statements

3839

1    that they made providing information to the individual

2    defendants, as opposed to as that relates to the timing of the

Page 13

**A482**

04-24-09 Volume 18

3    statements that were issued to the public.  Because the

4    scienter of the corporation will have to be determined by the

11:20:43  5    scienter -- by the state of mind at the time the statements

6    were made public.

7              MR. BURKHOLZ:  Well, certainly that's for argument,

8    your Honor.  They can argue that.

9              THE COURT:  Let's see.

11:21:40 10              MS. BEER:  The instruction we would propose, your

11    Honor, would simply identify the individuals -- the three

12    individual defendants -- and the two corporate spokespeople by

13    name and not try to confuse the jury with a statement of law

14    that could open the door to any number of other people who

11:21:57 15    have yet to be identified to us.

16              And if the inclination is to include the language

17    from the Tellabs case, it needs to be modified, because it has

18    been changed in a way that makes the -- what are parenthetical

19    subsidiary points in the Tellabs opinion appear to be

11:22:27 20    equivalent bases for liability.

21              THE COURT:  I'm not sure I know what that means.

22              MR. BURKHOLZ:  I don't, either.

23              THE COURT:  What does that mean?

24              MS. BEER:  Making the different parts of the sentence

11:22:38 25    No. 1, 2 and 3 elevates them all to the same level.  And

3840

1    that's not the way the language appears in Tellabs.

2              MR. BURKHOLZ:  I could modify that, your Honor, to

3    have the exact language from Tellabs.  I thought we were

4    pretty close.

11:22:55  5              I'm looking at it.  It says, "Corporate liability for

6    a violation of 10b-5 requires -- "

Page 14

**A483**

04-24-09 Volume 18

```
          7          THE COURT:  Slow down and louder.
          8          MR. BURKHOLZ:  Sorry about that.
          9          I'll read it in, again.
11:23:11 10          "To establish corporate liability for a violation of
         11   10b-5 requires 'looking to the state of mind of the individual
         12   corporate official or officials who make or issue the
         13   statement, or order or approve it or its making or issuance,
         14   or who furnish information or language for inclusion therein
11:23:32 15   or the like.'"
         16          That's it.
         17          THE COURT:  I think that's pretty much what I said,
         18   isn't it?
         19          MR. BURKHOLZ:  It is.
11:23:48 20          THE COURT:  Is there a structure in there that I
         21   don't -- that I'm missing?
         22          Is there a structuring of that sentence that I'm
         23   missing?
         24          MS. BEER:  I'm sorry?
11:23:57 25          THE COURT:  What am I missing here?  You were arguing
```

3841

```
          1   that --
          2          MS. BEER:  Well, we're arguing, first of all, that
          3   the sentence should not be included in the instruction at all.
          4          THE COURT:  Okay.
11:24:06  5          And why is that?
          6          MS. BEER:  Because there's been no -- there's no
          7   court in this circuit that has imposed liability on the basis
          8   of the scienter of individuals within the organization, who
          9   were not also the persons who issued the statement.
11:24:20 10          THE COURT:  You mean no district courts?
         11          MS. BEER:  There's no court.
```

Page 15

**A484**

04-24-09 Volume 18

12          THE COURT:  Okay.

13          MS. BEER:  The Tellabs case recites this language,

14     but it does not deal with this issue.

11:24:30 15          THE COURT:  Right.  But it appears to be the most

16     recent instruction that we can glean from Seventh Circuit

17     opinions on the precise issue that we're talking about now,

18     right?

19          You're telling me it's not a holding, but it appears

11:24:50 20     to be the best language we have right now to interpret the

21     Seventh Circuit's thinking on this precise issue.  Why

22     shouldn't we adopt it?

23          MS. BEER:  The language appears in the Tellabs case,

24     in a section in which the court is attempting to limit the

11:25:08 25     scope of the corporate scienter doctrine, not in a context in

3842

1     which they're attempting to expand it beyond those who are

2     individual defendants.

3          The case that the Court draws the language from --

4     the Southland Securities case in the Fifth Circuit -- quotes a

11:25:29 5     case from California -- the Apple Computer case -- in which

6     the court says, "It is not enough to establish fraud on the

7     part of a corporation that one corporate officer makes a false

8     statement."

9          THE COURT:  No, no, I missed that whole first part.

11:25:42 10     You have got to slow it down a bit for me.

11          MS. BEER:  The Southland case from the Fifth Circuit,

12     the Apple Computer Securities Litigation case from the

13     Northern District of California are the authorities that the

14     Tellabs case is relying on.  Those cases both refused to find

11:26:08 15     or permit cases to proceed on allegations that the scienter of

Page 16

**A485**

16   a corporation could be established on the basis of the

17   scienter of an employee or officer of the corporation, who was

18   not also the individual who had made the allegedly false

19   statement.

11:26:30 20        So, the same language that is appearing in Tellabs --

21   that is now being argued to open the doors more widely -- was

22   quoted in Tellabs in exactly the opposite direction and --

23        THE COURT:  Well --

24        MS. BEER:  -- was applied in the cases that are being

11:26:46 25   cited to limit liability to -- to limit the imputation of

3843

1   scienter to those persons who had also made the statements.

2        And if I could just clarify the timing point.

3        If we're going to be looking to the state of mind of

4   individuals, other than the individual defendants and the

11:27:04 5   corporate spokespersons, that state of mind needs to be

6   assessed at the time they provided the information.

7        THE COURT:  Of course.  When else?

8   But we --

9        MR. KAVALER:  Your Honor --

11:27:17 10        THE COURT:  -- haven't gotten to that issue yet.

11        I just don't understand how it is that, because the

12   language that establishes the scope of the corporation's

13   liability in regards to the acts of its employees, was applied

14   to a certain set of facts -- and, the result reached was that

11:27:38 15   there was no liability -- that that language is somehow not

16   valid to be applied to the set of facts that we have in this

17   case.

18        The language is the language.  Whether it resulted in

19   a no-liability finding, in Tellabs or any other case,

11:27:59 20   shouldn't determine whether we apply the language in this

04-24-09 Volume 18

21    case, should it?
22          Whether there's going to be a resulting liability or
23    lack of liability will depend on the facts in this case; and,
24    fortunately, that's a determination that the jury will make in
11:28:11 25    this case, not the Court, because we're at the stage where

3844

1    we're actually having a trial.
2          MR. KAVALER:  Your Honor, may I --
3          THE COURT:  And I don't think -- I'm trying to --
4          MS. BEER:  There are a number of cases that deal with
11:28:29  5    this issue, your Honor, that end with a statement something
6    like, "It's theoretically possible" or "It's conceivable," but
7    not here.
8          And I think our position on the factual record in
9    this case is that that's where we are here, as well.
11:28:47 10          It may be theoretically possible, but is it
11    appropriate to be giving the jury an instruction on something
12    that is theoretically possible, when the factual record will
13    not support it?
14          THE COURT:  Well, I think that's another way of
11:29:15 15    telling me that there's insufficient basis to instruct the
16    jury on this issue --
17          MS. BEER:  I believe that's the case.
18          THE COURT:  -- and the factual -- okay, which I'm
19    sure you argue in your motion for a ruling as a matter of law.
11:29:30 20          Let's try to get past that and assume that it goes to
21    the jury; and, therefore, assume there's a sufficient factual
22    basis for the different theories of liability, that are not
23    knocked out on your motion for judgment as a matter of law.
24          How, then, do we instruct the jury?

Page 18

**A487**

04-24-09 Volume 18

11:29:50 25        Not do we instruct them or not destruct them, but

3845

1    how, then, do we instruct them?

2            And I think that the Pugh case -- the Tribune case --

3    is clearly the Seventh Circuit's latest statement on the law

4    that should be applied.  And I think that they ruled, you

11:30:05 5    know, as you're arguing, that the facts pled in that case were

6    not sufficient to establish the inference of scienter.

7            But we're not at that stage.  And the question is:

8    If we get past that stage, how do we instruct the jury on how

9    they should undertake this deliberation?

11:30:27 10            And I fail to see why that language, which is a

11    language the court cites as the appropriate language,

12    shouldn't be used.  It doesn't --

13            Well, go ahead.  You've been standing for a while,

14    Mr. Kavaler.  I don't want you to get tired.  Go ahead.

11:30:48 15            MR. KAVALER:  I'm way beyond tired, your Honor.

16            I just want to make a pragmatic observation, which

17    occurred to me as I listened to your question about three back

18    as directly responsive to precisely where you are now.

19            The answer to why we shouldn't -- I take your point

11:31:04 20    entirely.  This entire dialogue assumes you deny the motion

21    and the motion is addressed to the sufficiency of the

22    evidence.  Agreed.  Understood.

23            The reason you shouldn't, as a pragmatic matter, your

24    Honor, is because if it engenders this much debate at this

11:31:20 25    session here today, and it is possible that Ms. Beer's

3846

1    interpretation of what the Seventh Circuit said and meant is

2    correct, if you include the instruction and you get a

Page 19

**A488**

04-24-09 Volume 18

       3   plaintiffs' verdict, you will you have a big problem in the

       4   Seventh Circuit if there's a reversal.

11:31:36  5           On the other hand, if you don't include the

       6   instruction and you get a plaintiffs' verdict, there's no

       7   problem.

       8           So, the question for the plaintiffs is --

       9           THE COURT:  Well, sure there is.  Then they go up and

11:31:45 10   appeal and they say, "That instruction should have been

      11   included," and we've got a big problem for a reversal.

      12           MR. KAVALER:  No, your Honor.  I'm positing you get a

      13   plaintiffs' verdict.  I'm saying if you get a plaintiffs'

      14   verdict, then there's no issue.

11:31:55 15           THE COURT:  Sure, but let's look at -- I have to look

      16   at -- both sides, unfortunately.

      17           MR. KAVALER:  I agree.  I'm trying to get there.

      18           THE COURT:  Okay.

      19           MR. KAVALER:  So, the question is for the plaintiffs,

11:32:01 20   your Honor.  If they think it is worth the risk of including

      21   this language, and they press for it, they create a situation

      22   of their own making.

      23           If they, rather, think they're better off without

      24   this language, they create a different situation.  I'm merely

11:32:16 25   pointing out that what you're really dealing with here is a

                                                                    3847

       1   practical question about a sentence in a Seventh Circuit

       2   opinion, which the parties have differing views as to what it

       3   means and how it is to be applied, whether it's a holding or

       4   not a holding.

11:32:30  5           It's clearly not a holding.  And the question is

       6   predicting what the Seventh Circuit will do when they see that

                                  Page 20

                                  **A489**

04-24-09 Volume 18

 7    issue, again.

 8         My point is simply Mr. Bley drew a matrix on the

 9    board yesterday.  This is a matrix situation.  And I'm just

11:32:43 10   suggesting that people should think about it as a practical

11    matter of what the consequences are, appreciating your Honor's

12    point it could be error either way.  I understand that.

13         The question is:  Who wants to be arguing which side

14    of that error, based upon if error it is, because one way or

11:33:00 15   the other it's error, based upon what everybody thinks about

16    everything else in the case.

17         What I'm saying is, it does tie into the motion.  If

18    the factual record survives the motion, my suspicion is it

19    will be barely.  And in a case where the factual record barely

11:33:17 20   survives the motion, the Court, I respectfully submit, should

21    err on the side of caution.  That's my only observation.

22         THE COURT:  I understand your argument and it's one

23    of my pet peeves.  I don't know that I acted any differently

24    when I was a trial attorney; but, as I sit up here now, I

11:33:36 25   often think to myself:  "Why?  Why?"

                                                              3848

 1         The chances that they're going to win this case on

 2    this instruction and nothing else are about like that

 3    (indicating); and, the door for an argument on appeal, that

 4    they're opening up, is like this (indicating).

11:33:57 5        What's the risk benefit here?

 6         But that's not my decision to make.  It's not my

 7    decision to force on a case.  That's the decision for the

 8    litigants to make.

 9         And I could say the same thing about defendants, as

11:34:09 10   well, frankly, on many occasions.  But more so the plaintiffs

11    usually.

                   Page 21


**A490**

04-24-09 Volume 18

12          So, given that they're asserting this theory of

13     liability, it seems to me that -- I think that the Makor or

14     Makor case language tells us what the law is, or is likely to

11:34:29 15     be, as close as we can come in this circuit when it arrives up

16     there.  And I think that's the language that we should use in

17     instructing the jury.

18          I think we should tell them -- and how we put it in

19     here is a different matter.  I mean, I'm looking at a false or

11:34:47 20     misleading statement instruction, where we talk about, "The

21     plaintiff must prove that the defendant made a false or

22     misleading statement."  Not necessarily so.

23          I mean, "made," "issued," "ordered," "provided false

24     information to be included in," I think there's evidence as to

11:35:12 25     most of those.  And it seems to me that that's a place where

3849

1     we start incorporating this language.

2          Go ahead.

3          MR. BURKHOLZ:  Well, I don't know if we need to do

4     that.  I think the defendant is Household.  They make the

11:35:31 5     statements.  Their scienter is what we're struggling with --

6     the definition.

7          THE COURT:  That's one defendant.  But unless I'm

8     mistaken, there was a substantial amount -- or you asked a

9     substantial number -- of questions of -- oh, who was the lady

11:35:44 10     that --

11          MR. BURKHOLZ:  Ms. Hayden-Hakes.

12          THE COURT:  Yes, Ms. Hayden-Hakes.

13          -- about who told her to say this and did she have

14     knowledge or did she get the knowledge from somebody else, as

11:35:54 15     to the various public statements that she made.

Page 22

**A491**

04-24-09 Volume 18

16          Are those statements attributable to the defendant

17    that gave her the information to include in the statements?

18          MR. BURKHOLZ:  Well, the statements are attributable

19    to the company that she's making.

11:36:10 20          THE COURT:  Yes.

21          Are they attributable to the defendant who told her,

22    "Go out there and say that there's no predatory lending"?

23          Are you going to argue that?  Is Mr. Dowd going to

24    argue that in closing?  Is he going to say, "He told her to

11:36:24 25    say those things"?

                                                                3850

1          MR. BURKHOLZ:  That goes to the scienter issue of the

2    company.

3          THE COURT:  It goes to the making of the statement

4    issue, as well.

11:36:30 5          MR. BURKHOLZ:  Well, that's the company's statement;

6    and, the scienter of the company, you look at the --

7          THE COURT:  So, you are not going to argue that when

8    Mr. Gilmer said to Ms. Hayden-Hakes, "Go out there and make

9    this statement," but when they got together and discussed it

11:36:49 10    and when they put together the statements that she was going

11    to issue to the press, that the statements she subsequently

12    made were statements also made by Mr. Gilmer, that he can be

13    held accountable for those?

14          You're not going to argue that?  You're just going to

11:37:06 15    argue that the corporation can be held liable?

16          MR. BURKHOLZ:  Right.  The individual defendants are

17    liable for the company's statements.

18          THE COURT:  Gee, there you go.  Okay.

19          So, you're going to argue just the company's liable;

11:37:23 20    and, then, you're going to, because the company is liable for

Page 23

**A492**

04-24-09 Volume 18

21    that statement, say that you're going to impute the company's

22    intent to Mr. Gilmer and to Mr. -- well, the other defendants?

23            MR. BURKHOLZ:  Aldinger and Schoenholz.

24            THE COURT:  Yes.

11:37:40 25            Is that your theory?

3851

1            MR. DOWD:  Your Honor, I think it depends which

2    statements we're talking about.

3            I mean, the issue I think --

4            THE COURT:  I'm asking but all them because I want to

11:37:51 5    know if I should instruct the jury as to all them.

6            MR. DOWD:  I understand, your Honor.

7            I think it's -- I mean, I think it's true that the

8    defendants, to the extent that they're involved in furnishing

9    the statements, they're liable for them.

11:38:05 10            THE COURT:  Well, the instruction we have right now,

11    you know, just says, "prove that the defendant made a false or

12    misleading statement of fact or omitted a fact that was

13    necessary"; and, if that's the case, then -- and if that's all

14    there is -- and I don't know that the statements made by any

11:38:24 15    of their subordinates, that were -- that they ordered or

16    issued or provided the information for, are statements that

17    they would be liable for.

18            MR. BURKHOLZ:  Well, but we have the -- I think it's

19    the -- respondeat superior statement that talks about the

11:38:44 20    company is --

21            THE COURT:  You're focusing on the corporation's

22    liability.  I'm focusing right now on the individual

23    defendants.  Okay?

24            What I don't want is for Mr. Dowd to get up and

Page 24

**A493**

04-24-09 Volume 18
11:38:56 25    argue, "You know, Mr. Gilmer told Ms. Hayden-Hakes to supply

3852

1    this information to the press."  She did it and that's a false
2    and material misleading statement by him.  And for the
3    defendants to get up and say, "Objection.  It's not what the
4    instructions say.  Objection, your Honor."  He shouldn't even
11:39:17 5    be allowed to argue that.
6        And for the jury, then, to go back with no guidance
7    on that -- because I have -- I mean, unless those questions
8    you were asking her about -- where she got the information and
9    who told her to make the statement and whether she had
11:39:30 10    independent knowledge of the truth or falsity of the statement
11    she was making -- were going nowhere, I assumed that you were
12    going to make that argument.
13        If you're not, that's fine.  I'd rather not instruct
14    the jury.
11:39:54 15        But if you are going to make that argument, then I
16    think we need to instruct the jury as to, essentially, the
17    language in the Makor case, that that's what we're talking
18    about.  We're talking about -- I think other cases have called
19    it -- "substantial participation."
11:40:22 20        And the corporation, it seems to me, is the same
21    language with respect to scienter.  If it fits within that
22    Makor language, how do we instruct on that?  There's a
23    different --
24        MR. DOWD:  I think --
11:41:01 25        THE COURT:  We find the defendants' instruction,

3853

1    where?
2        MR. BURKHOLZ:  It's on Page 60- -- I think it starts
Page 25

**A494**

04-24-09 Volume 18

3    on Page 63 of their red-lined version -- 63 of their red-line

4    version.  The language that they have proposed is on the

11:41:18    5    bottom of 64, running into 65 of their red-line version they

6    propose.

7         THE COURT:  So, what about their language do you

8    oppose?

9         MR. BURKHOLZ:  The -- I guess the -- what's missing

11:43:48    10    is the "or furnishing information or language for inclusion"

11    in the statement, which would go on the top of Page 65 after

12    "In making a false statement or omission of material fact."

13         MS. BEER:  We object, your Honor, to the addition of

14    that language as being unsupported by controlling law in the

11:44:22    15    Seventh Circuit and not supported by the factual record of

16    this case.

17         THE COURT:  Then what do we tell the jury about scope

18    of employment?  Do you think they know what that is?

19         Does the defense have a definition for "scope of

11:45:15    20    employment" language?

21         MS. BEER:  We did not include a definition of the

22    language on the assumption that it is relatively common

23    terminology that --

24         THE COURT:  Well, among lawyers, I'm sure it is; but,

11:45:45    25    I don't know too many lay people who walk around talking about

3854

1    scope of employment, do you?

2         Well, I mean, in my circles they don't, maybe in your

3    circles --

4         (Laughter.)

11:46:02    5         THE COURT:  -- I don't know.

6         Actually, I think I lost a page here:  "Was acting

Page 26

**A495**

04-24-09 Volume 18

7    within the scope of his or her employment."

8        Well, I guess I could suggest language from the

9    Illinois pattern jury instructions, which reads something

11:46:34 10    like, "An agent is acting within the scope of his authority if

11    he is engaged in the transaction of business, which has been

12    assigned to him by his principal; or, if he is doing anything

13    which may reasonably be said to have been contemplated as a

14    part of his employment.

11:46:57 15        "It is not necessary that an act or failure to act

16    must have been expressly authorized by his principal."

17        MR. BURKHOLZ:  That's fine with plaintiffs.

18        MS. BEER:  We have no problem with the language, your

19    Honor.

11:47:18 20        Where would this fit into the instruction?

21        THE COURT:  I don't know.  You folks are proposing

22    the instructions.  I guess it would fit in about where -- or

23    it may be a separate instruction to add after the instruction

24    on scienter.

11:48:08 25        MS. BEER:  It might make sense, then, your Honor, to

3855

1    pull all of the material, rather than doing a separate

2    instruction only on the scope of employment, to put -- pull --

3    all of the material on the imputation of an employee's state

4    of mind to the corporation, into that separate instruction.

11:48:38 5        THE COURT:  Yes, there's a lot of ways of doing it

6    for sure.  I have no preference, one way or the other.  I

7    think that first we need to go back and revisit the language

8    on the first element of the 10b-5 claim, to include language

9    in the Makor case, which makes perfect sense to me.

11:49:18 10        I mean, it just makes -- it's just logical that an

11    individual defendant's liability for violating the rules

Page 27

**A496**

04-24-09 Volume 18

12    against fraud in the sale of securities, should not depend on

13    whether he, himself, actually uttered the words that caused

14    the violation, but should also be assigned to him if he

11:49:54 15    provided the information for that purpose or ordered someone

16    else to do it or directed someone else to do it.

17         I can't -- it would be a really crab reading, I

18    think, of the statute, not to conclude that.

19         And, then, with respect to scienter --

11:50:24 20         MS. BEER:  Can we back up to that just for a moment,

21    your Honor?  I'm sorry to interrupt.

22         If that language is introduced, what's the point of a

23    20-A claim?  Maybe I'm missing something in this, but I don't

24    see the distinction between "imposing liability on an

11:50:44 25    individual defendant for statements he did not make" and

3856

1    "imposing liability on that individual defendant, as the

2    controlling person who caused someone else's statements."

3         THE COURT:  Well, I don't think it's quite the same

4    thing.  For example, "controlling person" depends on

11:51:10 5    establishing a primary liability.  So, if the theory is that,

6    for example, Mr. Gilmer is liable for what Ms. Hayden-Hakes

7    said, you would first have to establish that Ms. Hayden-Hakes

8    committed a liability -- was liable; committed a violation of

9    10b-5.  And if she did not have the requisite intent or

11:51:31 10    scienter, that fails.  It's a non-starter.  It doesn't even

11    get there.

12         So, whether he's her controlling person or not

13    doesn't bring liability on him.

14         I think "controlling person" is for a slightly

11:51:46 15    different situation.  I mean, it's for the situation where

Page 28

**A497**

04-24-09 Volume 18

16 Ms. Hakes actually had the Full Monty, if you will.  She made
17 the statement, she knew it was false, she had the intent, she
18 had everything.  And Mr. Gilmer was her controlling person.
19 This is exactly the opposite situation, really -- what we're
11:52:11 20 talking about.
21     We're talking about -- we're talking about -- sending
22 liability in a different direction in the situation that we're
23 involved in.
24     MS. BEER:  If we started off talking about the
11:52:28 25 individuals who provided information to the individual

3857

1 defendants --
2     THE COURT:  That's not what we're talking about.
3 We're talking about the individual defendants as the
4 individuals who provided information to those who are not
11:52:40 5 defendants.
6     Mr. Gilmer, who is a defendant, providing information
7 or instruction or instructing or ordering Ms. Hakes to tell a
8 lie; to commit a fraud under 10b-5 -- which, I think, is the
9 whole crux of the cross-examination that they were doing of
11:53:03 10 Ms. Hakes -- as to whether she knew the truth of what she was
11 saying as to where she got the information, who it came from.
12     I don't see how, given that situation, we're somehow
13 eradicating "controlling authority" liability.
14     MS. BEER:  We started off with attempting to analyze
11:53:36 15 the instructions in which the corporation can be found to have
16 a wrongful state of mind on the basis of the actions of
17 employees who did nothing but provide information to someone
18 else who made a statement.
19     THE COURT:  Okay.
11:54:03 20     MS. BEER:  Now, we're talking about providing --
Page 29

**A498**

04-24-09 Volume 18

21    finding liability on the part of an individual defendant

22    who -- for a statement that individual defendant did not make,

23    on the basis that that individual provided information to

24    someone else who did speak.

11:54:29 25        Am I following that correctly?  It seems we've

3858

1    shifted to something quite different.

2        THE COURT:  Well, we're talking about two things.

3    Along the way, it struck me -- as I was looking at the

4    scienter materials, based upon the conversation we had last

11:54:44 5    time -- that the language that the Seventh Circuit used in its

6    scienter discussion also applied to the making of a statement.

7        I mean, they talked about not only uttering the

8    statement, but providing information for it, and so on.

9        And, so, it appeared to me that it would be necessary

11:55:06 10    or appropriate to go back to our instruction on making a false

11    or misleading statement and include that language in it.

12        Ultimately, we're back at where we started out, which

13    is imputing the scienter to the corporation and how we should

14    instruct there.  And it shouldn't surprise anyone that some of

11:55:34 15    the same language applies to both questions.

16        So, it's not as if I started out saying one thing or

17    doing another.  It's that the language led me to consider

18    something else and I brought it up here.

19        MS. BEER:  I think it may be that a part of the

11:55:52 20    difficulty comes from attempting to break the cause of action

21    down into the elements.  Because the act that provides a basis

22    for liability includes both the making of a statement and the

23    wrongful state of mind; and, by atomizing those into separate

24    elements to be analyzed, we're separating -- we're maybe

Page 30

**A499**

11:56:16 25  separating -- them too far.

3859

1       And if we end up with a situation where one person

2   does the statement -- makes the statement -- and another

3   person has the state of mind, it's one thing to talk about

4   that going up to the corporation, and quite another thing to

11:56:31  5   say that someone who didn't make the statement can now have --

6   that liability can be imposed on someone who didn't make a

7   statement, without finding the elements of the cause of action

8   as to that individual.

9       THE COURT:  Well, I mean, the argument seems to me

11:56:49 10  you're making -- and now we are talking about the individual

11  liability -- is that if -- I hate to pick on him, but, again,

12  let's use Mr. Gilmer.

13      If Mr. Gilmer said to Ms. Hakes -- if Mr. Gilmer

14  believed in his heart of hearts and his mind that the company

11:57:08 15  was involved in predatory lending practices and he said to

16  Ms. Hakes, "Go out there and tell them we're not involved in

17  any such thing," that he would not be liable under 10b-5.

18      Is that your argument?

19      MS. BEER:  No, that's not my argument.

11:57:22 20      THE COURT:  Okay.

21      Well, that's all I'm saying is that by including the

22  language in our "false or misleading" instruction -- "ordered

23  approved or furnished information to be included in the

24  statement" -- the person can be liable, assuming that all the

11:57:45 25  other elements are met, as well, of course.

3860

1       That's all I'm saying.  I don't find that to be a

2   radical proposition.

Page 31

**A500**

04-24-09 Volume 18

3          But I guess I'm misunderstanding your argument.  What

4     --

11:58:12  5          MS. BEER:  Yes, I can understand the note.

6          MR. HALL:  Your Honor, I think maybe the confusion is

7     that we're talking about statements made by the corporation.

8     And I think the only reading of 10b-5 is that the only

9     primary -- primarily -- liable party for a statement by a

11:58:25 10   corporation is the corporation.  Anybody else you want to

11    impute liability to has to come in through 20-A.  So, that's

12    the secondary liability issue.  I think there's two layers.

13          MR. BURKHOLZ:  I don't think that's correct.  There's

14    "substantial participation" language in a number of cases.  I

11:58:46 15   think we might have even proposed some language with our

16    initial instructions.

17          But if the individual defendants substantially

18    participate in the making of a statement by the company, or

19    somebody else on behalf of the company, they can be held

11:58:59 20   liable.  And that's the --

21          MR. HALL:  I think that's a separate issue, your

22    Honor.  I just want to make sure we're separating out the

23    issues.

24          THE COURT:  Well, I think that's the issue I was

11:59:08 25   talking about.  I mean, I think -- I hope -- that's the issue

3861

1     I was talking about.

2          MR. BURKHOLZ:  That is.

3          MR. DOWD:  Your Honor, I took what you were saying

4     was that the scienter issue as to the corporation that led you

11:59:28  5     to wonder about the false statement one because you have to

6     have the substantial participation issue covered.

Page 32

**A501**

04-24-09 Volume 18

7    THE COURT:  Yes.

8    MR. DOWD:  And we agree with that.

9    THE COURT:  Yes.

11:59:36 10    I mean, the language in the Seventh Circuit opinion

11    just immediately popped into my mind, that we're not just

12    talking about with scienter here, we're talking about the

13    actual acts, as well:  Who makes the statement?  Who makes the

14    statement?

11:59:55 15    And only individuals make statements, you know.  We

16    can -- then the corporation can derive liability from that,

17    but you also have the liability of the individuals.  And, so,

18    we have to clearly define when they're deemed to have made a

19    statement.

12:00:09 20    And it's not just that they opened their mouths and

21    told the press.  It can also be that they told someone else to

22    tell the press.  And that's all.  That's all I'm saying here.

23    That's why I went back to that false and misleading and said,

24    "We should add this language, I think, and make it clear."

12:00:26 25    But now getting back to the corporate liability and

3862

1    the scienter issue, it appears that the language that you have

2    in 64 and 65 is -- starting on the last paragraph on Page 64

3    and going on to Page 65 -- there's not a great deal of

4    disagreement with that; is that correct?

12:01:07 5    MR. BURKHOLZ:  That's correct.  It's just the

6    "furnishing information or language for inclusion in the

7    statement" that's missing, that's, you know, from the Tellabs

8    case.

9    But, otherwise, the rest of it's fine, except for, of

12:01:19 10    course, the last paragraph of the instruction.  And we

11    probably could add in the definition of "scope of employment"

Page 33

**A502**

04-24-09 Volume 18

12    after the -- that -- sentence that discusses it.

13         MS. BEER:  Yeah, we've come full circle, but I just

14    want to reiterate our objection to adding the "furnishing

12:01:51 15    information" language into the instruction.

16         THE COURT:  Yes, it's on the record.

17         And I think we have to give an instruction on the

18    scope of employment.  I don't think you can leave that to the

19    jury, unless the parties want to stipulate that there's no

12:02:20 20    issue as to scope of employment in this case.

21         I, frankly, think this is a case where there's no

22    issue as to scope of employment.  I don't think anybody that

23    has been named here can reasonably be argued not to fit within

24    the definition of "doing something that he was assigned to do"

12:02:40 25    or that "might reasonably be said to have been contemplated as

3863

1    part of his employment" -- any of the people that the

2    plaintiffs have named.

3         But if there's no agreement on that, then I think

4    this instruction tells the jury how to determine whether

12:03:00 5    that --

6         MS. BEER:  We'd be happy to consider a stipulation,

7    if we have a specific list of the individuals and the

8    communications that the plaintiffs intend to bring within the

9    scope of it.

12:03:12 10         An open-ended stipulation might be a little bit more

11    problematic.

12         MR. BURKHOLZ:  I would just propose that we include

13    the language from the pattern instruction regarding "scope of

14    employment," so the jury has a better understanding of what

12:03:23 15    that might be within the context of this instruction.

Page 34

**A503**

04-24-09 Volume 18

16          THE COURT:  Okay.

17          And do you want to take a turn at preparing a

18    scienter instruction that complies with what we discussed

19    here?

12:03:48 20          MR. BURKHOLZ:  We will.

21          Should we also take a shot at the first element --

22    revising that?

23          THE COURT:  I'm sorry?

24          MR. BURKHOLZ:  Should --

12:04:04 25          THE COURT:  If you want to try to -- yes.

                                                          3864

1          I think we can move, then, to "loss causation."

2          MR. BURKHOLZ:  We're fine with the Court's

3    instruction.

4          THE COURT:  Let me try to find the defendants'.

12:05:03  5          MR. BURKHOLZ:  Page 73 of their mark-up.

6          THE COURT:  Thank you.

7          By the way, the language about "scope of employment"

8    came out of Illinois Pattern Jury Instruction 50.06, the 2006

9    Edition, with very, very, very little modification.

12:06:49 10          MS. BEER:  The changes that defendants have proposed

11    in that instruction, your Honor, are intended to make clear to

12    the jury that, "Loss causation must be proved as to a

13    particular false statement or omission."

14          THE COURT:  Okay.

12:07:23 15          MS. BEER:  And, in fact, if I might, we have some

16    additional language that we'd like to propose in the final

17    paragraph of our proposed instruction.

18          THE COURT:  Give me a second to finish looking

19    through it.

12:10:11 20          (Brief pause.)
                              Page 35

**A504**

04-24-09 Volume 18

3          We certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

           /s/ Nancy C. LaBella
7   _____

8

           /s/ Kathleen Fennell
9   _____

10

           /s/ Joseph Rickhoff                    April 25, 2009
11  _____    _____
           Official Court Reporters                 Date
12      United States District Court
       Northern District of Illinois
13          Eastern Division

14

15

16

17

18

19

20

21

22

23

24

25

04-27-09 Volume 19

3966

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all    )
 4    others similarly situated,     )
                                     )
 5              Plaintiff,           )
                                     )
 6       vs.                         )  No. 02 C 5893
                                     )
 7    HOUSEHOLD INTERNATIONAL, INC., )
      et al.,                        )  Chicago, Illinois
 8                                   )  April 27, 2009
                  Defendants.        )  1:25 p.m.
 9
                            VOLUME 19
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

3967

```
 1    APPEARANCES:    (Continued)

 2    For the Plaintiff:        MILLER LAW LLC
                                BY:  MR. MARVIN ALAN MILLER
```

Page 1

**A506**

04-27-09 Volume 19

3      115 South LaSalle Street
       Suite 2910
4      Chicago, Illinois  60603
       (312) 332-3400

5

6      For the Defendants:        EIMER STAHL KLEVORN & SOLBERG LLP
                                  BY:  MR. ADAM B. DEUTSCH
                                  224 South Michigan Avenue
7      Suite 1100
       Chicago, Illinois  60604
8      (312) 660-7600

9                                 CAHILL, GORDON & REINDEL LLP
                                  BY:  MS. SUSAN BUCKLEY
10                                     MS. PATRICIA FARREN
                                       MR. THOMAS J. KAVALER
11                                     MR. DAVID R. OWEN
                                       MR. HOWARD G. SLOANE
12                                     MS. JANET A. BEER
                                       MR. JASON M. HALL
13                                     MR. JOSHUA M. NEWVILLE
                                       MS. LAUREN PERLGUT
14                                     MS. KIM A. SMITH
                                       MR. MICHAEL J. WERNKE
15     80 Pine Street
       New York, New York  10005
16     (212) 701-3000

17

18

19

20

21

22     Court Reporter:            NANCY C. LaBELLA, CSR, RMR, CRR
                                  Official Court Reporter
23                                219 South Dearborn Street
                                  Room 1222
24                                Chicago, Illinois  60604
                                  (312) 435-6890
25                                Nancy_LaBella@ilnd.uscourts.gov

                                                           3968

1          THE CLERK:  02 C 5893, Jaffe v. Household.

2          THE COURT:  Good afternoon, everyone.

3          Give me a second.

4     (Brief pause.)

01:28:00  5          THE COURT:  Okay.  I think I have the plaintiffs'

6     latest submission here.  We can just go over those.

7          MR. KAVALER:  Your Honor, if I may?  Just so we can
                          Page 2


                          **A507**

04-27-09 Volume 19

```
             3         MR. BURKHOLZ:  Yes.
             4         MS. BEER:  Yes, your Honor.
02:29:50     5         THE COURT:  I think it was in here, in my proposed
             6    instructions, because somebody, if not both of you, submitted
             7    a summary instruction.  But that will be withdrawn.
             8         Court's next is No. 19, previously 18, demonstrative
             9    exhibits.  I don't believe there's an issue as to that one.
02:30:26    10         MR. BURKHOLZ:  There is not.
            11         MS. BEER:  No, your Honor.
            12         THE COURT:  Next is Court's No. 20, previously
            13    No. 19, multiple claims, multiple defendants.
            14         MR. BURKHOLZ:  I think we addressed this already, and
02:30:42    15    I think this was what the Court decided.
            16         MS. BEER:  Defendants' requested instruction No. 21
            17    included language that I believe has been now adopted into
            18    other instructions.  So we have no objection to the Court's
            19    No. 20.
02:31:05    20         THE COURT:  Okay.
            21         Next is Court's instruction No. 21, previously
            22    Court's No. 20, dismissed/withdrawn defendant.
            23         MR. BURKHOLZ:  I think we covered that in the later
            24    instruction on the elements regarding Andersen.  So the
02:31:35    25    Court's current instruction, I think, is appropriate.
```

                                                              4003

```
             1         THE COURT:  I believe so.
             2         MS. BEER:  Provided the language appears in the
             3    instruction on the 10b-5 elements, which, I believe, is where
             4    we discussed it on Friday.
02:31:52     5         MR. BURKHOLZ:  It's in there.
             6         MS. BEER:  After we finished discussing it.
             7         We have no objection to the Court's instruction
```

**A508**

04-27-09 Volume 19

8    No. 21, previously 20, so long as the language is in the later

9    instruction.

02:32:06 10    THE COURT:  Next is Court's 22, previously No. 21,

11    burden of proof.

12    MR. BURKHOLZ:  No objection.

13    MS. BEER:  No objection.

14    THE COURT:  Next is Court's 23, previously 22.

02:32:46 15    MS. BEER:  Defendants have no objection to the

16    additional language in the second paragraph of this

17    instruction.

18    We do object to the revisions to the third paragraph,

19    which is the first -- the description of the first 10b-5

02:33:01 20    element.  And we request that that paragraph be given as

21    provided in defendants' requested instruction No. 25.

22    The language is, "First, that during the relevant

23    time period between July 30, 1999, and October 11, 2002, the

24    defendant made a false or misleading statement of fact or

02:33:25 25    omitted a fact that was necessary in light of the

4004

1    circumstances to prevent a statement that was made from being

2    misleading."

3    MR. BURKHOLZ:  I think we covered this in detail last

4    week, your Honor.  This is the language I thought we came up

02:33:38 5    with, and that's why I added it in.

6    MS. BEER:  We did have an extended discussion of it,

7    your Honor, but I don't believe we reached agreement on it.

8    THE COURT:  Okay.  Well, this is the language I

9    recall that the Court settled on.  So we'll give it like that.

02:33:58 10    MS. BEER:  We object to that language, your Honor, as

11    being legally incorrect.

Page 33

**A509**

04-27-09 Volume 19

12          THE COURT:  Very well.

13          MS. BEER:  We know of no authority, your Honor, and I

14     don't believe the plaintiffs have provided any, for the

02:34:10 15     imposition of 10b-5 liability on any actor who has not made a

16     material misrepresentation or false or misleading statement.

17          THE COURT:  Okay.

18          MS. BEER:  In particular, your Honor, if I could

19     refer the Court to the decision of the Supreme Court in

02:34:28 20     January 2008 in the StoneRidge Investment case, in which the

21     Court specifically addressed the question of liability for an

22     actor who did not make a direct statement to the plaintiffs

23     and rejected that theory.

24          THE COURT:  Well, as I recall, the Seventh Circuit

02:34:49 25     cases subsequent to that -- and I think before that as well --

4005

1     indicate that if someone authorizes or provides information to

2     be used in a false statement for that purpose, that that

3     person is liable.

4          It would be, indeed, I think ironic if all corporate

02:35:23 5     officers could shield themselves completely from 10b-5

6     liability by simply hiring innocent spokespersons, press

7     relations people, intentionally giving them false information

8     and then telling them to provide that information to the

9     public.  It just doesn't make any sense to me.

02:35:57 10          MS. BEER:  In that scenario, your Honor, those

11     individuals would not be shielded from liability because a

12     20(a) claim would lie.

13          THE COURT:  Not necessarily.

14          MR. DROSMAN:  Moreover, your Honor, StoneRidge has no

02:36:10 15     applicability to this case.  StoneRidge dealt with a

16     third-party, I believe, supplier.  It had nothing to do with

Page 34

**A510**

04-27-09 Volume 19

3   thing they're going to be asked to determine as they go

4   through as to each statement is whether it's true or false,

04:52:17  5   whether they've established the falsity of the statement; and

6   if they haven't, they don't have to do the other columns.

7   They just go straight down to the next one.

8        If it turns out to be as you hope and suspect, that

9   the vast majority of findings will be that there's no falsity

04:52:32 10   in these statements, it will be just as quick.  It will be

11   just as quick putting it all in one form for them to check off

12   the columns than have them go through it three times.

13        And hopefully it will be less daunting for them as

14   they look at the form that they have to go through.  So we

04:52:52 15   only have to do this once.  Let's get to it.

16        So that would be my suggestion.

17        The other suggestion I guess we can -- we can table

18   until we get your -- you're going to make a submission, I

19   guess, on need to establish the disclosure dates for purposes

04:53:14 20   of preserving the issue of determining the cap, which will

21   come at another point in time.

22        If we end up submitting that to the jury, which is my

23   predisposition now, question number 17, where you have that

24   issue, I think we need to, although much can be identified

04:53:44 25   from looking at the record, I think you need to add as to each

4066

1   event what issues are involved, predatory lending,

2   restatement.  Otherwise, we may not -- I mean it's possible

3   that you have a disclosure as to predatory lending, but not as

4   to restatement or re-aging or credit card statements, and so

04:54:17  5   we won't be establishing a date for each of those three.

6        Many of these statements only relate to one topic;

7   but it would be good, I think, to put in the description of

Page 86

# A511

04-27-09 Volume 19

8    the event the issue as to which the jury is finding that there

9    was disclosure on that date.

04:54:40 10    Are you following me?

11    MR. DROSMAN:  Yeah, I think I understand what you're

12    saying.

13    Can we just back up for one moment?  I know it's

14    getting late.  I just wanted to make one point.

04:54:48 15    THE COURT:  I hadn't noticed.

16    MR. DROSMAN:  And this bears on what you were

17    discussing.  It's sort of captured in questions number 3 and 6

18    and 9 and 12 and 15, I think.

19    And that's the issue -- I understood how you asked us

04:55:03 20    to put it in a landscape format, sort of incorporate these

21    into one question rather than making them three, but my

22    question is --

23    THE COURT:  You don't have to put it in landscape

24    format.  If you can get it in the way it is, that's fine.  I'm

04:55:17 25    just saying if we need to spread it out, I would rather -- I

4067

1    don't particularly like that format, but I would rather do

2    that so they only have to go through the list once.

3    MR. DROSMAN:  Right, right.

4    I guess my concern was that by asking them to

04:55:29 5    delineate why the statement is false or the basis, the reason

6    for the falsity, what we're doing is we're imposing on the

7    jury a step that isn't required by the law.  And I spent some

8    time this weekend researching this issue to try to find out

9    whether -- to try to see whether I could see other instances

04:55:50 10    where plaintiffs were required to explain or prove why the

11    jury found a particular statement false and misleading.

Page 87

**A512**

04-27-09 Volume 19

12 And I surveyed the civil cases on the issue.  I

13 couldn't find a single case where plaintiffs were required to

14 prove why.

04:56:06 15 And I'm not sure that -- I mean I read the 10(b) and

16 then Rule 10b-5, and neither of those two statutory

17 requirements contemplate a basis for the falsity.  What they

18 ask is was it materially false and misleading, which I think

19 your first question asks; and if it's materially false and

04:56:26 20 misleading, I understand why we need to understand why --

21 whether it was reckless or knowing because you may or may not

22 apportion liability based on that finding.

23 But the issue of the reason or the basis for the

24 falsity is not found anywhere, and here's the concern.  You

04:56:45 25 have this question number three and the jury gets to it, and

4068

1 you have a lively discussion, let's just hypothetically say on

2 statement number one.

3 THE COURT:  Question number three is?

4 MR. DROSMAN:  Question number three is check all that

04:56:58 5 apply.  For each of the statements to which you answered yes,

6 why was the statement false or misleading?  Check each that

7 applies.

8 So then you've got statement number one, predatory

9 lending, two-plus delinquency or restatement.  And you could

04:57:09 10 imagine a scenario where the jurors go back there and five

11 feel very strongly that it was false and misleading for all

12 three of those reasons, and five feel very strongly that it's

13 false and misleading for only one of the reasons, and then you

14 have a hung jury over an issue that isn't even a requirement

04:57:27 15 under the statute, and that's the concern.

16 THE COURT:  Well, let me tell you why we need to do

Page 88

**A513**

17   that because you just brought it up.

18          Statement number one includes how many different

19   issues as to which the jury you could find that the statement

04:57:38 20   was false?

21          MR. DROSMAN:   Three.

22          THE COURT:   How do we know which one?  How could we

23   know that all of them agreed to one?

24          MR. DROSMAN:   We don't.

04:57:46 25          THE COURT:   Maybe two agreed to delinquency

4069

1   restatements and eight agreed -- disagreed with that.

2          MR. DROSMAN:   Right.

3          THE COURT:   And agreed to predatory lending, and we

4   have no unanimity of a finding.

04:57:59 5          MR. DROSMAN:   But we do.  We have unanimity.

6          THE COURT:   No, we don't.

7          MR. DROSMAN:   What you have is you have unanimity

8   that they made a materially false and misleading statement.

9   You don't need unanimity as to the reason that that statement

04:58:13 10   was false and misleading.

11          THE COURT:   I disagree, period.  I disagree.

12          MS. BEER:   The other danger, your Honor --

13          THE COURT:   I think that's a formula for reversal.

14          MR. DROSMAN:   I'm sorry?

04:58:19 15          THE COURT:   I think that's a formula for reversal.

16          MR. DROSMAN:   I searched the cases.  There's nothing

17   I could find that talked about that issue.

18          THE COURT:   How many cases did you find that talk

19   about it at all?

04:58:30 20          MR. DROSMAN:   36 discuss -- you know, had something

Page 89

**A514**

04-27-09 Volume 19

21   to do with the issue.

22        THE COURT:  And how many made findings and how many

23   went up and were either confirmed or reversed?

24        MR. DROSMAN:  Yeah, I mean there's no case on point.

04:58:43 25   I freely admit that.

                                                            4070

1        THE COURT:  That's right.  That's right.

2        You want to break out each one of these statements

3   and make it 80 statements or 120, otherwise, we're going to

4   check as to what -- which statement and why.  I think it's the

04:59:01 5   only way to do it.  I just think it's the only way to do it.

6        Will we be through tomorrow with the evidence?

7        MR. KAVALER:  Your Honor, we, as I mentioned earlier,

8   we're calling one more witness.  We've told them who it is,

9   Professor Bajaj.  There's no secret about it.  Then we're

04:59:21 10   going to rest.

11        I understand they may or may not call Professor

12   Fischel.  It's my expectation we'll be through with all the

13   evidence tomorrow, as far as we imagine either one of our

14   times, Professor Bajaj won't take any more than that.

04:59:33 15        THE COURT:  Okay.  Well, then, if that's the case, I

16   suspect that we're going to have to give the jury a day off

17   while we finalize the instructions and then bring them back on

18   one day for closing arguments and instructions.

19        MR. KAVALER:  I'm sorry.  Today is Monday, so if we

04:59:46 20   finish the evidence tomorrow, give them a day off, it will be

21   Thursday.

22        MR. BURKHOLZ:  That makes sense, your Honor.

23        MR. KAVALER:  Okay.

24        THE COURT:  Yeah, it will be.  I mean if you think

04:59:56 25   that we can finish the instructions --

Page 90

**A515**

04-27-09 Volume 19

4071

```
          1        MR. KAVALER:  You said Wednesday.  I thought I heard
          2   you say give them a day off and come back Wednesday.
          3        THE COURT:  No.  I think I said another day, which
          4   may have sounded like Wednesday.
05:00:08  5        MR. KAVALER:  Sorry, Judge.
          6        So the plan is to sum up on Thursday.
          7        THE COURT:  So far.
          8        MR. KAVALER:  Or later.
          9        THE COURT:  I -- no, not later.
05:00:17 10        MR. KAVALER:  Not Wednesday is my question.
         11        THE COURT:  It's not likely to be Wednesday, I don't
         12   think.
         13        MR. KAVALER:  Can we rely on that, or should we be
         14   prepared?
05:00:25 15        THE COURT:  I mean I suppose if you folks send me
         16   back a set of revised forms and instructions that you've given
         17   to opposing counsel and they agree with all of them and there
         18   are no objections or changes and I read the submissions that
         19   you make and I agree with everything you say and so nothing
05:00:45 20   has to be changed and we all agree as to which of these
         21   statements are going to go to the jury and which aren't, and
         22   if all those things are resolved in time, between the time
         23   that you finish the evidence tomorrow and Wednesday morning, I
         24   guess we could go to the jury on Wednesday.
05:01:11 25        MR. KAVALER:  Your Honor, do you want the flying pigs
```

4072

```
          1   to stop in the courtroom or outside?
          2        THE COURT:  Yeah, but that's -- so --
```

Page 91

**A516**

04-27-09 Volume 19

3          MR. KAVALER:  Fair enough.

4          THE COURT:  -- I don't envision it happening.

05:01:23  5          MR. KAVALER:  We'll plan on Thursday.

6          THE COURT:  I think that would be a wise move.

7          MR. KAVALER:  And I assume, your Honor, just as with

8     the openings, there are no specific time limits.  We're each

9     limited by our remaining portion of our 44 hours.

05:01:33 10          THE COURT:  Let's talk about that.  I don't want --

11     no, I don't want 44 hours of argument.  I don't want ten hours

12     of argument.  I don't want 12 hours of argument.

13          You folks tell me how much time you think you need.

14     You might want to go back to some of the 7th Circuit writings.

05:01:53 15     I think they have opined on how many notes the human mind can

16     adequately cope with.  There may just be too many notes in

17     what you're planning.  And come up with a reasonable period of

18     time for your closing arguments.  We're not going to do an

19     unlimited number of hours left over.  Not going to do that.

05:02:17 20          But certainly it's a long case, and I'll be

21     reasonable.

22          Okay, anything else?

23          MR. BURKHOLZ:  No.

24          MR. DROSMAN:  No, your Honor.

05:02:25 25          THE COURT:  Thank you.


                                                            4073

1          MR. KAVALER:  9:00 o'clock tomorrow, your Honor?

2          THE COURT:  Excuse me?

3          MR. KAVALER:  9:00 o'clock tomorrow?

4          THE COURT:  Yes, sir.

5          MR. KAVALER:  Okay.  Thank you.

6     (Court adjourned, to reconvene at 9:00 a.m. on 4-28-09.)

7                         *  *  *  *  *

**A517**

04-27-09 Volume 19

8                    C E R T I F I C A T E

9                We certify that the foregoing is a correct

10    transcript from the record of proceedings in the

11    above-entitled matter.

12
            /s/ Nancy C. LaBella
13    _____

14

15        /s/ Kathleen Fennell              April 28, 2009
      _____    _____
16          Official Court Reporters                  Date
          United States District Court
17        Northern District of Illinois
              Eastern Division
18

19

20

21

22

23

24

25

Page 93

A518

04-28-09 Volume 20

4074

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN,  )
    on behalf of itself and all      )
 4  others similarly situated,       )

 5            Plaintiff,             )
                                     )
 6    vs.                            )  No. 02 C 5893
                                     )
 7  HOUSEHOLD INTERNATIONAL, INC.,   )
    et al.,                          )  Chicago, Illinois
 8                                   )  April 28, 2009
            Defendants.             )  9:10 a.m.
 9
                        VOLUME 20
10          TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:      COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
14                          BY:  MR. LAWRENCE A. ABEL
                                 MR. SPENCER A. BURKHOLZ
15                               MR. MICHAEL J. DOWD
                                 MR. DANIEL S. DROSMAN
16                               MS. MAUREEN E. MUELLER
                            655 West Broadway
17                          Suite 1900
                            San Diego, California  92101
18                          (619) 231-1058

19                          COUGHLIN STOIA GELLER RUDMAN &
                            ROBBINS LLP
20                          BY:  MR. DAVID CAMERON BAKER
                                 MR. LUKE O. BROOKS
21                               MR. JASON C. DAVIS
                                 MS. AZRA Z. MEHDI
22                          100 Pine Street
                            Suite 2600
23                          San Francisco, California  94111
                            (415) 288-4545
24

25
```

4075

```
 1  APPEARANCES:   (Continued)

 2  For the Plaintiff:      MILLER LAW LLC
                            BY:  MR. MARVIN ALAN MILLER
```

Page 1

**A519**

04-28-09 Volume 20
```
 3                              115 South LaSalle Street
                                Suite 2910
 4                              Chicago, Illinois  60603
                                (312) 332-3400
 5
      For the Defendants:       EIMER STAHL KLEVORN & SOLBERG LLP
 6                              BY:  MR. ADAM B. DEUTSCH
                                224 South Michigan Avenue
 7                              Suite 1100
                                Chicago, Illinois  60604
 8                              (312) 660-7600

 9                              CAHILL, GORDON & REINDEL LLP
                                BY:  MS. SUSAN BUCKLEY
10                                   MS. PATRICIA FARREN
                                     MR. THOMAS J. KAVALER
11                                   MR. DAVID R. OWEN
                                     MR. HOWARD G. SLOANE
12                                   MS. JANET A. BEER
                                     MR. JASON M. HALL
13                                   MR. JOSHUA M. NEWVILLE
                                     MS. LAUREN PERLGUT
14                                   MS. KIM A. SMITH
                                     MR. MICHAEL J. WERNKE
15                              80 Pine Street
                                New York, New York  10005
16                              (212) 701-3000

17

18

19

20

21

22    Court Reporter:           NANCY C. LaBELLA, CSR, RMR, CRR
                                Official Court Reporter
23                              219 South Dearborn Street
                                Room 1222
24                              Chicago, Illinois  60604
                                (312) 435-6890
25                              Nancy_LaBella@ilnd.uscourts.gov
```

                                                    4076

```
 1              THE CLERK:  02 C 5893, Jaffe v. Household.

 2              THE COURT:  Good morning, everyone.

 3         Are we ready to proceed with the jury?

 4              MR. KAVALER:  Your Honor, you asked us to hand up --

09:10:16  5    I thought I'd hand you before we start -- the spoliation

 6    language --

 7              THE COURT:  Sure.
```
                                Page 2

**A520**

04-28-09 Volume 20

12  Q.  So this shows us the price of Household stock declining?

13  A.  It shows price of Household stock going up for part of the

14  period and going down for part of the period.

10:13:22 15  Q.  Does -- I'm sorry.

16  A.  And the period it went down, in light of what we talked

17  about the economic environment, is not at all surprising.

18  Q.  Does it tell us anything whatsoever about inflation?

19  A.  It has nothing to do with inflation.

10:13:35 20  Q.  Nothing to do with it.

21        In preparing your analysis, Professor, that you're

22  testifying about here today, did you identify other consumer

23  finance companies as a first step to conducting your analysis?

24  A.  Yes, I did.

10:13:50 25  Q.  How did you do that?  How did you identify these consumer

Bajaj - direct

4113

1  finance companies?

2  A.  So there is an industry code assigned by the government to

3  various publicly traded companies based on what is their major

4  line of business.  It's called GCIS code.  And according to

10:14:11 5  Standard & Poor's, Household belonged to a certain GCIS code

6  along with six other companies that traded over the relevant

7  period.

8        So I looked at those six companies with the same GCIS

9  code as a first step in my statistical analysis to put

10:14:37 10  Household's stock price movements in context.

11  Q.  And that's a code provided by the United States

12  government?

13  A.  Yes.

14  Q.  And Standard & Poor's tells you what companies fall within

10:14:49 15  that code?

16  A.  Yes.  And this is a very, very, very well-accepted and

Page 34

A521

17  commonly used methodology to start to look for comparable

18  companies.

19  Q.   And how did Household's stock price perform relative to

10:14:59 20  other consumer finance companies during the same time period?

21           MR. BURKHOLZ:   Objection, vague as to time.

22           MR. KAVALER:   I'll specify.

23  BY MR. KAVALER:

24  Q.   During the period between July 30, 1999 -- I'll do even

10:15:14 25  better than that.

                          Bajaj - direct

                                                        4114

1            Did you look at how Household's stock price performed

2    during the period from July 30, 1999, to October 11, 2002, in

3    relationship to the other companies which fall within this

4    government code called GCIS and are identified as being

10:15:33 5   consumer finance companies?

6    A.   Yes, I did.  And what I found is Household's stock price

7    was right in the middle of the pack.

8    Q.   Do you have a demonstrative that shows that?

9    A.   Yes.

10:15:42 10  Q.   Can we see DDX 405, please.

11           Okay.  Tell us what this chart is designed to show.

12   A.   Well, this chart shows what would happen if you invested a

13   hundred dollars in Household stock on July 29, 1999, the day

14   before the relevant period, and you held it until the end of

10:16:08 15  the relevant period.  Unfortunately, over this relevant

16   period, you would have lost about 34 and a half percent of

17   your money.

18   Q.   That's --

19   A.   Your -- I'm sorry.

10:16:18 20  Q.   I apologize.  Go ahead.

                          Page 35

                          **A522**

04-28-09 Volume 20

21    A.  I was just going to say, your hundred dollars becomes $65

22    at the end of the period.

23    Q.  A bad result?

24    A.  A bad result.

10:16:26 25    Q.  But you said Household was in the middle of the pack?

Bajaj - direct

4115

1    A.  Yes.

2    Q.  Do we have the capacity to see the rest of the pack on

3    this chart?

4    A.  Yes.

10:16:34 5    Q.  Show us the rest of the pack, please.

6            What does the chart show now, Professor?

7    A.  Well, the first thing I would point out is the red line,

8    and you'll see the label on the right-hand side, S&P 500.

9    You'll see if you had invested $100 in the most well-

10:16:55 10    diversified U.S. large company stocks that investment

11    professionals recommend you do -- that's S&P 500 portfolio,

12    it's the proxy for the market, it's about 80 percent of the

13    market value of all publicly traded companies -- you would

14    have $62.29 left of your hundred dollars.

10:17:19 15    Q.  So Household performed better than the S&P 500 during the

16    time period we're looking at?

17    A.  Household did better than the market over the relevant

18    period; not by much, but it did better.

19    Q.  What about the rest of these companies?

10:17:34 20    A.  Of the six consumer finance companies that share the GCIS

21    code with Household, Providian, AmeriCredit and Capital One

22    did worse than Household.  Had you invested $100 in Providian

23    instead of in Household, you would have lost over 90 percent

24    of your money.  You would have less than $1 left at the end of

10:17:56 25    this period.

Page 36

**A523**

04-28-09 Volume 20

Bajaj - direct

4116

1          With AmeriCredit, you would have $47 left.  With

2    Capital One Financial, you would have $63 left or almost 64,

3    as compared to with Household, 65.50.

4          But three consumer finance companies did better than

10:18:16  5    Household.  MBNA did better.  Cash America did better.  Cash

6    America broke even, made a positive 1 percent return.  And

7    Countrywide did the best.  They had a 25 percent return.

8          But the other thing I want to point out, just going

9    back to our previous point, you know, the reason these trends

10:18:38 10   are not as clear, the $65 going from $100 looks almost like a

11   flat line, is there's no way to scale this chart to show that.

12   35 percent decline to most people would look like a pretty

13   significant decline.

14          Look at the volatility in these individual companies.

10:19:00 15  Look at the green line AmeriCredit.  This is what it means to

16   invest in individual stocks.  They go up and down a lot.  And

17   Household was right in the middle of the pack during this time

18   period.

19   Q.   And so does that mean that other finance companies also

10:19:20 20  lost money during the same time period?

21   A.   Well, three did, three didn't.  And also it depends on

22   when you invested.  Like we talked about AmeriCredit doing

23   worse than Household.  But what if you were lucky enough to

24   buy just before a big run-up and you happened to sell at the

10:19:37 25  top of the run-up?  You would have made a lot of money.

Bajaj - direct

4117

1    Q.   Did you prepare a demonstrative listing the factors that,

2    in your opinion, affected Household's stock price during the

Page 37

**A524**

04-28-09 Volume 20

16    him.   He is my hero.

17            THE COURT:   Yes, yes.   Well, we all need one, don't

18    we?

19            All right.   We will see you folks tomorrow, usual

04:44:46 20    time.

21            THE CLERK:   Court stands adjourned.

22            MR. KAVALER:   Your Honor, are we going to sit on

23    Friday?

24            Is the jury going to deliberate on Friday?

04:44:58 25            THE COURT:   We will talk about that.

                                                                4303

1     (An adjournment was taken at 4:44 p.m.)

2                        *  *  *  *  *

3                    C E R T I F I C A T E

4            We certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

        /s/ Nancy C. LaBella

8     _____

9

        /s/ Joseph Rickhoff

10    _____

11

        /s/ Frances Ward                        April 29, 2009

12    _____      _____

        Official Court Reporters                  Date

13      United States District Court

        Northern District of Illinois

14           Eastern Division

15

16

17

18

19

20

**A525**

05-01-09 Volume 23

4672

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN,  )
     on behalf of itself and all     )
 4   others similarly situated,       )
                                      )
 5              Plaintiff,            )
                                      )
 6      vs.                          )    No. 02 C 5893
                                      )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )    Chicago, Illinois
 8              Defendants.          )    May 1, 2009
                                      )    1:20 p.m.
 9                       VOLUME 23
10   TRANSCRIPT OF PROCEEDINGS - JURY INSTRUCTIONS CONFERENCE
               BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

4673

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiff:       MILLER LAW LLC
                              BY:  MR. MARVIN ALAN MILLER
```

Page 1

05-01-09 Volume 23

```
 3                              115 South LaSalle Street
                               Suite 2910
 4                              Chicago, Illinois  60603
                               (312) 332-3400
 5
        For the Defendants:    EIMER STAHL KLEVORN & SOLBERG LLP
 6                             BY:  MR. ADAM B. DEUTSCH
                               224 South Michigan Avenue
 7                             Suite 1100
                               Chicago, Illinois  60604
 8                             (312) 660-7600

 9                             CAHILL, GORDON & REINDEL LLP
                               BY:  MS. SUSAN BUCKLEY
10                                  MS. PATRICIA FARREN
                                    MR. THOMAS J. KAVALER
11                                  MR. DAVID R. OWEN
                                    MR. HOWARD G. SLOANE
12                                  MS. JANET A. BEER
                                    MR. JASON M. HALL
13                                  MR. JOSHUA M. NEWVILLE
                                    MS. LAUREN PERLGUT
14                                  MS. KIM A. SMITH
                                    MR. MICHAEL J. WERNKE
15                             80 Pine Street
                               New York, New York  10005
16                             (212) 701-3000

17

18

19

20

21

22      Court Reporter:        NANCY C. LaBELLA, CSR, RMR, CRR
                               Official Court Reporter
23                             219 South Dearborn Street
                               Room 1222
24                             Chicago, Illinois  60604
                               (312) 435-6890
25                             Nancy_LaBella@ilnd.uscourts.gov
```

♀

4674

```
 1           THE CLERK:  02 C 5893, Jaffe v. Household.

 2           THE COURT:  Okay.  Good afternoon, everyone.  I hope

 3  you've all noticed the weather is as promised.  It's beautiful

 4  today.

01:29:12  5           Let's see.  Can you hand those out to each side?

 6      (Tendered.)

 7           THE COURT:  I thought we'd start with these proposed
                         Page 2
```

A527

05-01-09 Volume 23

4679

1    calculate an element of damages.

2          MR. KAVALER:  Your Honor, they're going to calculate

3    inflation.

4          THE COURT:  You can call it an inflation element of

01:33:23  5    damages or you can just call it damages for the sake of this

6    jury.  They don't know the difference, and it won't make any

7    difference to them.  The calculation they're being asked to

8    make will serve our purposes in the next round.

9          MR. KAVALER:  It may serve some purpose, your Honor.

01:33:34  10   It will not serve the purpose of either accuracy of the law or

11   fairness.  Those are my concerns.

12         THE COURT:  Well, I don't think --

13         MR. KAVALER:  I believe it's unfair, and I believe

14   it's inaccurate.  I believe it's error.  And I respectfully

01:33:45  15   ask you to reconsider.  And if the only argument against it is

16   retyping a portion of the charge, you know, we'll do what we

17   can to alleviate the burden.  We're not trying to make work

18   for you.

19         THE COURT:  I understand.  It's not merely a question

01:33:58  20   of retyping a few words, as you know.  Everything has a

21   trickle effect in these instructions.  Everything.  We would

22   have to review the entire set of instructions.  And we'd have

23   to consider whether the language you're asking us to use

24   comports with the language that was used during the course of

01:34:13  25   the trial.  And I'm not sure that it does.  I think the term

4680

1    inflation and the term damages were used interchangeably.

2          And we make it clear to the jury in these

Page 7

**A528**

05-01-09 Volume 23

3   instructions, the instructions on damages, we tell them that

4   the only damages they're going to be asked to ascertain in

01:34:28  5   this case is the price change per share, which is the

6   inflation.   And we even use the word inflation in the damages

7   instruction.   So I just disagree.

8           All right.   Then if there are no other objections --

9           MS. BEER:   Your Honor, this is not a request for any

01:34:47 10  additional changes on the page that has been handed out.   But

11  we do want for the record to reflect that while we've been

12  trying to cooperate with the Court in developing a version of

13  this form that will be useful to the jury, we have not

14  withdrawn our request that defendants' proposed verdict form

01:35:06 15  be used and not any form that the plaintiffs submitted or the

16  verdict form that we've been looking at today.

17          One of the reasons -- and we put many of our

18  objections on the record previously.   But one of the reasons

19  is that in answering question four, if the jury rejects any

01:35:26 20  aspect of Professor Fischel's analysis, if they find that on

21  any day reflected in his table there was not a corrective

22  disclosure that he found or there was not a false statement

23  made that he relied upon in developing his table, that from

24  that day forward none -- the jury has no guidance whatsoever

01:35:49 25  on how to reflect that decision.   And the form in its totality

4681

1   then becomes meaningless.

2           THE COURT:   Well, I think what you're attacking --

3           MS. BEER:   It's a fundamental flaw with the form.

4   It's a fundamental failure of proof on the plaintiffs' part.

01:36:08  5           THE COURT:   That's what you're arguing.   You're

6   arguing Dr. Fischel's theory is insufficient to support the

7   plaintiffs' claim.   I understand that.   You've argued that.

Page 8

**A529**

05-01-09 Volume 23

8    To the extent that we disagree with that and we've ruled

9    against that, any form we prepare is going to reflect that

01:36:20  10    ruling.  And that's what you're pointing out here.  I

11    understand that.

12         MS. BEER:  I'm trying to be very, very specific in

13    this objection to this particular question asking the jury

14    that if no loss was caused on any date, write none.  Once they

01:36:40  15    have reached that conclusion, that on any given date the

16    inflation was none, there's really -- they have no guidance

17    for how to determine the figure to use on any day following

18    that that doesn't just rely on speculation.

19         THE COURT:  Okay.  Well, that statement has been

01:36:57  20    there since this form was first proposed.  And to the extent

21    that you've made your objection, it stands on the record.

22         MR. KAVALER:  Your Honor, just because I'm aware of

23    your devotion to accuracy, I just want to point out you've

24    fallen to Mr. Dowd's erroneous method of speech.  It's

01:37:17  25    Professor Fischel and Dr. Bajaj.

4682

1         MS. BEER:  And if I may, there's also one other

2    objection that we have previously made that I want to be sure

3    that we are aware of today and reflected in the record.

4         To the extent the verdict form requires a

01:37:35  5    determination of the elements of a 10b-5 claim on the numbered

6    items 1 through 40 that are included on Table A, defendants do

7    object to the combination of separate statements drawn from

8    the same document as though they are one -- one statement.  We

9    feel that will be confusing to the jury and does not require

01:38:00  10    that the elements be assessed separately as to each separate

11    alleged false statement.

Page 9

**A530**

05-01-09 Volume 23

♀

4700

1          THE COURT:  Yes, that applies to the verdict form,

2     all of it, Tables A and B.  Okay.

3          MR. MILLER:  Should the demonstrative exhibits be

4     taken away from the jury box before they return on Monday?

02:08:36  5          THE COURT:  We'll take care of destroying those.

6          MR. DOWD:  Thank you, your Honor.

7          THE COURT:  Okay.  Thank you.

8     (Trial adjourned until May 4, 2009, at 9:00 o'clock a.m.)

9                         * * * * *

10                   C E R T I F I C A T E

11          We certify that the foregoing is a correct

12     transcript from the record of proceedings in the

13     above-entitled matter.

14

15     _____        May 2, 2009

          /s/ Nancy C. LaBella

16             Official Court Reporters              Date
           United States District Court
17        Northern District of Illinois
              Eastern Division

18

19

20

21

22

23

24

25

Page 25

**A531**

05-04-09 Volume 24

4701

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN,  )
     on behalf of itself and all      )
 4   others similarly situated,       )
                                      )
 5              Plaintiff,            )
                                      )
 6     vs.                            )   No. 02 C 5893
                                      )
 7   HOUSEHOLD INTERNATIONAL, INC.,   )
     et al.,                          )   Chicago, Illinois
 8              Defendants.           )   May 4, 2009
                                      )   9:00 a.m.
 9
                                 VOLUME 24
10                 TRANSCRIPT OF PROCEEDINGS - TRIAL
                BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

4702

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiff:        MILLER LAW LLC
                               BY:  MR. MARVIN ALAN MILLER
```

Page 1

**A532**

                        05-04-09 Volume 24
      3                              115 South LaSalle Street
                                     Suite 2910
      4                              Chicago, Illinois  60603
                                     (312) 332-3400
      5
          For the Defendants:        EIMER STAHL KLEVORN & SOLBERG LLP
      6                              BY:  MR. ADAM B. DEUTSCH
                                     224 South Michigan Avenue
      7                              Suite 1100
                                     Chicago, Illinois  60604
      8                              (312) 660-7600

      9                              CAHILL, GORDON & REINDEL LLP
                                     BY:  MS. SUSAN BUCKLEY
     10                                   MS. PATRICIA FARREN
                                          MR. THOMAS J. KAVALER
     11                                   MR. DAVID R. OWEN
                                          MR. HOWARD G. SLOANE
     12                                   MS. JANET A. BEER
                                          MR. JASON M. HALL
     13                                   MR. JOSHUA M. NEWVILLE
                                          MS. LAUREN PERLGUT
     14                                   MS. KIM A. SMITH
                                          MR. MICHAEL J. WERNKE
     15                              80 Pine Street
                                     New York, New York  10005
     16                              (212) 701-3000

     17

     18

     19

     20

     21

     22  Court Reporter:            NANCY C. LaBELLA, CSR, RMR, CRR
                                     Official Court Reporter
     23                              219 South Dearborn Street
                                     Room 1222
     24                              Chicago, Illinois  60604
                                     (312) 435-6890
     25                              Nancy_LaBella@ilnd.uscourts.gov

                                                                  4703

      1       THE CLERK:  02 C 5893, Jaffe v. Household.

      2       THE COURT:  Good morning, ladies and gentlemen.

      3       Are we ready for the jury?

      4       MR. KAVALER:  Your Honor, in an abundance of caution,

09:16:10  5  I would like to renew our 50(a) motion before you charge the

      6  jury.

      7            If I might just say, at the close of all the
                              Page 2

                              **A533**

05-04-09 Volume 24

12    whether his testimony here in court was true and what weight

13    to give to his testimony here in court.

14        In considering a prior inconsistent statement or

09:30:57 15    conduct, you should consider whether it was simply an innocent

16    error or an intentional falsehood and whether it concerns an

17    important fact or an unimportant detail.

18        It is proper for a lawyer to meet with any witness in

19    preparation for trial.

09:31:18 20        You may find the testimony of one witness or a few

21    witnesses more persuasive than the testimony of a larger

22    number.  You need not accept the testimony of the larger

23    number of witnesses.

24        The law does not require any party to call as a

09:31:41 25    witness every person who might have knowledge of the facts

4712

1    related to this trial.  Similarly, the law does not require

2    any party to present all exhibits -- all papers and materials

3    mentioned during this trial.

4        I'm sorry.  Let me reread that.

09:31:59  5        Similarly, the law does not require any party to

6    present as exhibits all papers and materials mentioned during

7    this trial.

8        Plaintiffs contend that defendants at one time

9    destroyed documents regarding Andrew Kahr's recommendations

09:32:15 10    for Household and documents regarding use of the effective

11    rate presentation.  However, defendants contend that they did

12    not destroy any documents regarding Andrew Kahr's

13    recommendations, and whatever they did with regard to

14    documents relating to the effective rate presentation was for

09:32:35 15    legitimate business purposes.

16        Defendants' destruction of a document, standing

Page 10

**A534**

05-04-09 Volume 24

17    alone, does not warrant an inference that the document

18    contained information that is unfavorable to the defendants.

19    You may assume that such evidence would have been unfavorable

09:32:55 20    to defendants only if you find by a preponderance of the

21    evidence that:

22         One, defendants intentionally destroyed evidence or

23    caused evidence relevant to plaintiffs' claims to be

24    destroyed; and, two, defendants destroyed the evidence or

09:33:14 25    caused the evidence to be destroyed in bad faith, in other

4713

1    words, for the purpose of hiding adverse information.

2         You have heard witnesses give opinions about matters

3    requiring special knowledge or skill.  You should judge this

4    testimony in the same way that you judge the testimony of any

09:33:37 5    other witness.  The fact that such a person has given an

6    opinion does not mean that you are required to accept it.

7    Give the testimony whatever weight you think it deserves,

8    considering the reasons given for the opinion, the witness'

9    qualifications, and all of the other evidence in the case.

09:34:01 10         Certain demonstrative exhibits have been shown to

11    you.  Those exhibits are used for convenience and to help

12    explain the facts of the case.  They are not themselves

13    evidence or proof of any facts.

14         You must give separate consideration to each claim

09:34:26 15    and each party in this case.

16         When I say a particular party must prove something by

17    "a preponderance of the evidence" or when I use the expression

18    "if you find" or "if you decide," this is what I mean:  When

19    you have considered all the evidence in the case, you must be

09:34:49 20    persuaded that it is more probably true than not true.

Page 11

**A535**

05-04-09 Volume 24

21      Plaintiffs contend that defendants Household, William

22   Aldinger, David Schoenholz and Gary Gilmer violated Section

23   10(b) of the Securities Exchange Act and the Securities

24   Exchange Commission or SEC's Rule 10b-5.  From now on, I will

09:35:19 25   use 10b-5 to refer to both the section and the rule.

4714

1      To prevail on their 10b-5 claim against any

2   defendant, plaintiffs must prove each of the following

3   elements by a preponderance of the evidence as to that

4   defendant:

09:35:38 5      One, the defendant made, approved or furnished

6   information to be included in a false statement of fact or

7   omitted a fact that was necessary, in light of the

8   circumstances, to prevent a statement that was made from being

9   false or misleading during the relevant time period between

09:36:01 10   July 30, 1999, and October 11, 2002;

11      Two, the false statement or omission was material;

12      Three, the defendant acted with a particular state of

13   mind; and

14      Four, the defendant's statement or omission was a

09:36:24 15   substantial factor in causing plaintiffs' economic loss.

16      If you find that the plaintiffs have proved each of

17   the above elements as to any defendant, your verdict should be

18   for the plaintiffs and against that defendant.  If you find

19   that the plaintiffs have not proved each of the above elements

09:36:47 20   as to any defendant, your verdict should be for that defendant

21   and against the plaintiffs.

22      To meet the first element of their 10b-5 claim

23   against any defendant, plaintiffs must prove that during the

24   relevant time period, the defendant made a false or misleading

09:37:07 25   statement of fact or omitted a fact that was necessary to

Page 12

**A536**

05-04-09 Volume 24

4715

     1   prevent a statement that was being made from being misleading.

     2       Table A to the verdict form that you will be given

     3   sets forth the statements that plaintiffs claim are false and

     4   misleading.

09:37:24  5       In determining whether a statement of fact is false

     6   or misleading, you must consider the statement in light of the

     7   circumstances that existed at the time it was made.

     8       An omission violates 10b-5 only if the defendant has

     9   a duty to disclose the omitted fact.  The defendants do not

09:37:45 10  have a duty to disclose every fact they possess about

    11   Household or any fact that is in the public domain.  But each

    12   defendant has a duty to disclose a fact if a prior or

    13   contemporaneous statement he or it made about the same subject

    14   would be misleading if the fact is not disclosed.  If a

09:38:09 15  defendant does not have a duty to disclose a fact but chooses

    16   to make a statement about it, the statement must be truthful

    17   and not misleading.

    18       Defendant Household is required to file with the SEC

    19   an annual report, called a 10-K, and quarterly reports, called

09:38:33 20  10-Qs, for the first three quarters of each year.  These

    21   reports include financial statements and other disclosures.

    22   Financial statements present a company's financial position at

    23   one point in time, or its operating results and cash flows for

    24   a specified period.  Household has no duty to update its 10-Q

09:38:56 25  reports on any cycle other than quarterly.

4716

     1       Household is required to prepare its financial

     2   statements regarding the delinquency status of loans and the

**A537**

05-04-09 Volume 24

21

22

23

24

25

4742

1                              * * * * *

2                      C E R T I F I C A T E

3          I certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7

       /s/ Nancy C. LaBella                May 5, 2009
8   _____     _____
        Official Court Reporter              Date
9    United States District Court
     Northern District of Illinois
10        Eastern Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 36

A538

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/D. Zachary Hudson
D. Zachary Hudson