No. 13-3532

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself
and All Others Similarly Situated, et al.,
*Plaintiffs/Appellees*,
vs.
HOUSEHOLD INTERNATIONAL, INC., et al.,
*Defendants/Appellants*.

_____

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 02-C-5893
The Honorable Ronald A. Guzman

---

PLAINTIFFS-APPELLEES' SUPPLEMENTAL APPENDIX
VOLUME 1 OF 3

---

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL J. DOWD
SPENCER A. BURKHOLZ
DANIEL S. DROSMAN
JOSEPH D. DALEY
MAUREEN E. MUELLER
655 West Broadway, Suite 1900
PSAn Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
JASON C. DAVIS
Post Montgomery Center
One Montgomery Street, Suite 1800
PSAn Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs-Appellees
[Additional counsel appear on signature page.]

# INDEX TO SUPPLEMENTAL APPENDIX

## VOLUME 1 OF 3

### *TRIAL TRANSCRIPTS*

DOCUMENT DESCRIPTION                               PAGE RANGE

Excerpt from the transcript of Catherine Ghiglieri's
trial testimony on March 31, 2009 - April 2, 2009 ........................ PSA1-PSA28

Excerpt from the transcript of Gary Gilmer's
trial testimony on April 6, 2009 - April 7, 2009 ............................ PSA29-PSA41

Excerpt from the transcript of Craig Streem's
trial testimony on April 9, 2009 ...................................................... PSA42-PSA52

Excerpt from the transcript of  David Schoenholz'
trial testimony on April 13, 2009 - April 14, 2009 ........................ PSA53-PSA83

Excerpt from the transcript of Harris Devor's
trial testimony on April 15, 2009 - April 16, 2009 ........................ PSA84-PSA123

Excerpt from the transcript of Daniel Fischel's
trial testimony on April 16, 2009 .................................................... PSA124-PSA185

Excerpt from the transcript of District Court
proceedings on April 17, 2009 ........................................................ PSA186-PSA187

Excerpt from the transcript of Daniel Fischel's
trial testimony on April 20, 2009 .................................................... PSA188-PSA213

Excerpt from the transcript of William Aldinger's
trial testimony on April 20, 2009 - April 22, 2009 ........................ PSA214-PSA260

Excerpt from the transcript of Lisa Sodeika's
trial testimony on April 23, 2009 .................................................... PSA261-PSA263

Excerpt from the transcript of District Court
proceedings on April 24, 2009 ........................................................ PSA264-PSA266

Excerpt from the transcript of Mukesh Bajaj's trial
testimony on April 28, 2009 ............................................................ PSA267-PSA284

Excerpt from the transcript of Daniel Fischel's
trial testimony on April 28, 2009 - April 29, 2009 ........................PSA285-PSA307

Excerpt from the transcript of District Court
proceedings on April 29, 2009 ......................................................PSA308-PSA310

Excerpt from the transcript of closing arguments
on April 30, 2009 ...........................................................................PSA311-PSA315

Excerpt from the transcript of jury instructions
conference on May 1, 2009 .............................................................PSA316-PSA317

Excerpt from the transcript of jury instructions
on May 4, 2009 ...............................................................................PSA318-PSA324

Excerpt from the transcript of jury verdict on
May 7, 2009 ....................................................................................PSA325-PSA329

## VOLUME 2 OF 3

### *TRIAL EXHIBITS*

DOCUMENT DESCRIPTION                                    PAGE RANGE

Plaintiffs' Trial Exhibit 79 (E-mail re: "DAS
Request – OTS Recidivists") ......................................................... PSA330-PSA334

Plaintiffs' Trial Exhibit 135 (Excerpt from
presentation at the Financial Relations
Conference, Apr. 9, 2002) .............................................................. PSA335-PSA351

Plaintiffs' Trial Exhibit 140 (Legg Mason report
entitled "Spring Cleaning But Risks Remain,"
Apr. 10, 2002) ............................................................................... PSA352-PSA355

Plaintiffs' Trial Exhibit 183 (Excerpt from
transcript of the Financial Relations
Conference, Apr. 9, 2002) .............................................................. PSA356-PSA429

Plaintiffs' Trial Exhibit 198 (Excerpt from
Investor Relations Report, May-August 2002)............................... PSA430-PSA433

926591_1

Plaintiffs' Trial Exhibit 199 (Excerpt from
Investor Relations Report, September-October 2002).................... PSA434-PSA438

Plaintiffs' Trial Exhibit 231 (Excerpt from
Household International, Inc. Form 10-K/A
for the Fiscal Year Ended December 31, 2001)............................. PSA439-PSA440

Plaintiffs' Trial Exhibit 267
(Jan. 4, 1999 e-mail re: "Tomorrow") ........................................... PSA441-PSA442

Plaintiffs' Trial Exhibit 347 (Memorandum
re: "U.S. Consumer Finance Growth Strategies
(Meeting with Andrew Kahr 12/18)") ........................................... PSA443-PSA445

Plaintiffs' Trial Exhibit 348 (Jan. 27, 1999
Memorandum re: "Initiatives to Accelerate
Growth of U.S. Consumer Finance").............................................. PSA446-PSA452

Plaintiffs' Trial Exhibit 349 (Excerpt from
March 18, 1999 Memorandum re: "Minutes
of February 1999 Senior Management Meeting")......................... PSA453

Plaintiffs' Trial Exhibit 458 (Dec. 22, 1998
e-mail re: "Growth in 1999") ......................................................... PSA454-PSA455

Plaintiffs' Trial Exhibit 461 (Excerpt from
Jan. 18, 1999 Memorandum re:
"December and YTD Operating Results") ................................... PSA456-PSA457

Plaintiffs' Trial Exhibit 512 (June 27, 2002
Memorandum re: "Revised – New Reaging Policy").................... PSA458-PSA460

Plaintiffs' Trial Exhibit 515 (July 11, 2002
Memorandum re: "CFRA Report") ................................................ PSA461-PSA466

Plaintiffs' Trial Exhibit 516 (July 1, 2002
e-mail re: "Discussion Framework") .............................................. PSA467-PSA475

Plaintiffs' Trial Exhibit 550 (Aug. 15, 2002
e-mail re: "Multistate Working Group
Reply to HFC") .............................................................................. PSA476-PSA479

Plaintiffs' Trial Exhibit 573 (Mar. 15, 2002
e-mail from Thomas Detelich re: "Effective rate") ........................ PSA480

Plaintiffs' Trial Exhibit 596 (July 5, 2001
e-mail re: "Very important to do today")....................................... PSA481

Plaintiffs' Trial Exhibit 796 (Excerpt
from June 18, 2001 e-mail string
re: "Unauthorized Materials")........................................................ PSA482

Plaintiffs' Trial Exhibit 820 (Excerpt
from Investor Relations Report,
November-December 2001)............................................ PSA483-PSA485

Plaintiffs' Trial Exhibit 1007 (Mar. 12, 2001
Memorandum re: "Andrew Kahr") ............................... PSA486-PSA487

Plaintiffs' Trial Exhibit 1026 (June 28, 2002
e-mail re: "Kahr Memos") ............................................................. PSA488

Plaintiffs' Trial Exhibit 1038 (Apr. 26, 2002
e-mail re: "REVISED Tier 1 & 2 Spreadsheets")........................... PSA489-PSA491

Plaintiffs' Trial Exhibit 1117 (July 11, 2002
e-mail re: "Reage Meeting Summary 7/9/2002") ........................... PSA492-PSA493

Plaintiffs' Trial Exhibit 1156 (Aug. 30, 2002
e-mail re: "Tom")........................................................................... PSA494

Plaintiffs' Trial Exhibit 1248 (Goldman Sachs
Presentation, Dec. 4, 2001) .......................................... PSA495-PSA508

Plaintiffs' Trial Exhibit 1307 (Mar. 23, 2001
*Origination News* article entitled "Fed's
predatory proposal supported by Household") ............... PSA509-PSA510

Plaintiffs' Trial Exhibit 1338 (Executive
Review Report re: "Wells Fargo Bank
Corporate Consumer Credit Administration")............... PSA511-PSA512

926591_1

Plaintiffs' Trial Exhibit 1351 (Wells Fargo
Executive Summary re: "Due Diligence,"
May 9, 2002) .................................................................................. PSA513-PSA532

Plaintiffs' Trial Exhibit 1371 (Apr. 22, 2002
e-mail re: "Project Blazer") ........................................................... PSA533-PSA535

Plaintiffs' Trial Exhibit 1391 (Event Study
for Household Int'l, Inc.) ................................................................ PSA536-PSA605

## VOLUME 3 OF 3

### *TRIAL EXHIBITS (CONT.)*

Plaintiffs' Trial Exhibit 1395 (Household
Int'l, Inc. Common Stock Estimate of
Alleged Artificial Inflation for Quantification
Including Leakage) ........................................................................ PSA606-PSA623

Plaintiffs' Trial Ex. 1397 (Household Int'l, Inc.
Common Stock Estimate of Alleged Artificial
Inflation for Quantification Using Specific
Disclosures).................................................................................... PSA624-PSA641

Plaintiffs' Trial Exhibit 1429 (Aug. 27, 2002
*Bellingham Herald* Press Release entitled
"State Report Details HFC Lending Abuse") ................................ PSA642-PSA644

Plaintiffs' Trial Exhibit 1431 (Bernstein
Research Call analyst report, Sept. 3, 2002).................................. PSA645-PSA665

Plaintiffs' Trial Exhibit 1435 (Excerpt from
Sept. 22, 2002 CIBC World Markets –
Equity Research Report entitled "Household
Int'l, Lowering Price Target on Persistent
Headline Risk, But Maintaining SP Rating") ................................ PSA666-PSA667

Plaintiffs' Trial Exhibit 1446 (May 31, 2002
*American Banker* article entitled "For Household,
New Fight and Small Victory") ...................................................... PSA668-PSA670

Plaintiffs' Trial Exhibit 1450 (Excerpt from
Sept. 12, 2002 Deutsch Bank Securities,
Inc.'s analyst report entitled "Household:
Management Visit – Addressing the Challenges")......................... PSA671-PSA672

Defendants' Trial Exhibit 263 (Sept. 20, 2000
Memorandum re: "Statement on Predatory
Lending") ..................................................................................... PSA673-PSA675

Defendants' Trial Exhibit 850 (Excerpt from
Household International Inc., Form 10-K
for the Fiscal Year Ended December 31, 1999).............................. PSA676-PSA677

Defendants' Trial Exhibit 851 (Excerpt from
Household International Inc., Form 10-K
for the Fiscal Year Ended December 31, 2000).............................. PSA678-PSA680

Defendants' Trial Exhibit 852 (Excerpt from
Household International Inc., Form 10-K
for the Fiscal Year Ended December 31, 2001).............................. PSA681-PSA683

### *TRIAL DEMONSTRATIVES*

DOCUMENT DESCRIPTION                                     PAGE RANGE

Plaintiffs' Trial Demonstrative Ex. 136
(Chart showing that Household's Stock
Performed Substantially Worse Than
Market and Industry Indices From
November 15, 2001 to October 11, 2002) ...................................... PSA684

Plaintiffs' Trial Demonstrative Ex. 137
(Prof. Fischel's Specific Disclosures
November 15, 2001) ...................................................................... PSA685

Plaintiffs' Trial Demonstrative Ex. 138
(Prof. Fischel's Specific Disclosures
December 3, 2001)...........................................................PSA686

Plaintiffs' Trial Demonstrative Ex. 139
(Prof. Fischel's Specific Disclosures
December 5, 2001)...........................................................PSA687

Plaintiffs' Trial Demonstrative Ex. 140
(Prof. Fischel's Specific Disclosures
December 12, 2001).........................................................PSA688

Plaintiffs' Trial Demonstrative Ex. 141
(Prof. Fischel's Specific Disclosures
February 27, 2002)..........................................................PSA689

Plaintiffs' Trial Demonstrative Ex. 142
(Prof. Fischel's Specific Disclosures
July 26, 2002)..................................................................PSA690

Plaintiffs' Trial Demonstrative Ex. 143
(Prof. Fischel's Specific Disclosures
August 14, 2002).............................................................PSA691

Plaintiffs' Trial Demonstrative Ex. 144
(Prof. Fischel's Specific Disclosures
August 16, 2002).............................................................PSA692

Plaintiffs' Trial Demonstrative Ex. 145
(Prof. Fischel's Specific Disclosures
August 27, 2002).............................................................PSA693

Plaintiffs' Trial Demonstrative Ex. 146
(Prof. Fischel's Specific Disclosures
September 3, 2002) .........................................................PSA694

Plaintiffs' Trial Demonstrative Ex. 147
(Prof. Fischel's Specific Disclosures
September 23, 2002) .......................................................PSA695

926591_1

Plaintiffs' Trial Demonstrative Ex. 148
(Prof. Fischel's Specific Disclosures
October 4, 2002) ............................................................ PSA696

Plaintiffs' Trial Demonstrative Ex. 149
(Prof. Fischel's Specific Disclosures
October 10-11, 2002) ..................................................... PSA697

Plaintiffs' Trial Demonstrative Ex. 150
(Calculation of Artificial Inflation From
Professor Fischel's Quantification Using
Specific Disclosures)...................................................... PSA698

Plaintiffs' Trial Demonstrative Ex. 152
(Artificial Inflation from Prof. Fischel's
Quantification Using Specific Disclosures
Compared with Household's Total Stock
Price Decline)................................................................. PSA699

Plaintiffs' Trial Demonstrative Ex. 154
(Household Stock Price and True Value
From Professor Fischel's Quantification
Including Leakage) ........................................................ PSA700

Defendants' Trial Demonstrative Ex. 802-01
(Household's Review Process for 10-K Filings) ........................... PSA701

## *ORDERS FROM THE DISTRICT COURT*

DOCUMENT DESCRIPTION                                    PAGE RANGE

Excerpt from the Final Pre-Trial Order
dated March 12, 2009 (Dkt. No. 1545)........................... PSA702-PSA713

District Court Order, dated Nov. 22, 2010
(Dkt. No. 1703) ............................................................ PSA714-PSA730

District Court Order, dated Jan. 14, 2011
(Dkt. No. 1724) ............................................................ PSA731

District Court Order, dated Jan. 31, 2011
(Dkt. No. 1737) ............................................................... PSA732-PSA735

District Court Order, dated May 31, 2011
(Dkt. No. 1763) ............................................................... PSA736-PSA743

District Court Order, dated Aug. 16, 2011
(Dkt. No. 1775) ............................................................... PSA744-PSA754

District Court Order, dated Sept. 21, 2012
(Dkt. No. 1822) ............................................................... PSA755-PSA767

District Court Order, dated Dec. 6, 2012
(Dkt. No. 1836) ............................................................... PSA768-PSA769

## *TRANSCRIPTS*

<u>DOCUMENT DESCRIPTION</u>                                    <u>PAGE RANGE</u>

Excerpt from transcript of deposition of
Todd May  played to the jury on April 20, 2009 ........................... PSA770-PSA779

Excerpt from transcript of District Court
hearing held on Jan. 5, 2011 ........................................... PSA780-PSA784

Excerpt from transcript of District Court
hearing held on Dec. 10, 2013 ......................................... PSA785-PSA787

## *OTHER DOCUMENTS*

<u>DOCUMENT DESCRIPTION</u>                                    <u>PAGE RANGE</u>

Excerpt from Lead Plaintiffs' Responses
and Objections to Defendants' Interrogatories
to Lead Plaintiffs filed May 12, 2008
(Dkt. No. 1228-2)........................................................... PSA788-PSA841

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  March 31, 2009
               Defendants.           )  9:00 a.m.
 9
                                VOLUME 2
10                TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. SPENCER A. BURKHOLZ
                                     MR. MICHAEL J. DOWD
15                                   MR. DANIEL S. DROSMAN
                                     MS. MAUREEN E. MUELLER
16                              655 West Broadway
                                Suite 1900
17                              San Diego, California  92101
                                (619) 231-1058
18
                                COUGHLIN STOIA GELLER RUDMAN &
19                              ROBBINS LLP
                                BY:  MR. DAVID CAMERON BAKER
20                                   MR. LUKE O. BROOKS
                                     MS. AZRA Z. MEHDI
21                              100 Pine Street
                                Suite 2600
22                              San Francisco, California  94111
                                (415) 288-4545
23

24

25
```

**PSA1**

Ghiglieri - direct

393

              1    portfolio, since that's the largest asset.

              2           And the past due percentages are very important, to

              3    see what the quality of the loan portfolio is.

              4           So, the regulators don't want the lenders to be

02:24:51      5    masking that number to them.  And, so, that's one of the

              6    things that I would look at when I was a field examiner.

              7    Q.  Let's now turn to the opinions you actually reached in

              8    this case.

              9           Did you reach any conclusion about whether Household

02:25:05     10    engaged in predatory lending practices during the 1999 to 2002

             11    time frame?

             12    A.  I did reach an opinion.

             13    Q.  And tell us what that is.

             14    A.  My opinion is, after looking at everything, that Household

02:25:18     15    engaged in company-wide systemic predatory lending.

             16    Q.  Now, did you also reach any opinion or conclusion as to

             17    whether Household hid the quality of its loans during the 1999

             18    to 2002 time frame?

             19    A.  I did reach an opinion.

02:25:35     20    Q.  And please tell the jury what that opinion is.

             21    A.  My opinion, after looking at everything that I looked at,

             22    is that Household utilized re-aging practices to mask their

             23    delinquencies.

             24    Q.  Let's -- before we talk in more detail about how you

02:25:51     25    arrived at those opinions and what you found that supported

**PSA2**

1    the limited purpose of showing you -- or assisting you to

2    evaluate the expert witness' opinion and how sound that

3    opinion is.

4         The underlying opinion must not be used by you for

03:45:03 5   any other purpose than to evaluate the opinion of the expert

6    witness.

7         You may proceed.

8         MR. DROSMAN:  Thank you, your Honor.

9    BY MR. DROSMAN:

03:45:15 10   Q.  Ms. Ghiglieri, before the break I asked you whether you

11   prepared a demonstrative exhibit to assist you in explaining

12   your conclusion that Household engaged in a variety of

13   predatory practices during the 1999-to-2002 time frame.

14        Did you prepare such an exhibit?

03:45:33 15   A.  I did.

16   Q.  Would that assist you in explaining your testimony?

17   A.  Yes, it would.

18   Q.  At this time I will show you what has been marked as

19   Plaintiffs' Demonstrative Exhibit 29 for identification.

03:45:45 20        What are the entries on Plaintiffs' Exhibit 29?

21   A.  These are the various predatory lending practices that I

22   found when I was reviewing all of the documents.

23   Q.  Let's take the first predatory lending practice listed,

24   the effective or equivalent rate.

03:46:06 25        Can you tell the jury what that is?

**PSA3**

Ghiglieri - direct

435

1  A.  Yes.  Household's rates were higher than its competitors.

2  So in order for it to be able to make loans, they came up with

3  a way of describing their rates as effective rates.

4       Basically what they would do is tell the customer,

03:46:25 5  you can pay your mortgage payment -- half of your mortgage

6  payment every two weeks instead of making your mortgage

7  payment once a month.  And in that way, you will pay it off

8  faster.  And that's true because you make 13 payments instead

9  of 12 payments if you make a half of a payment every other

03:46:48 10  week.

11       But what they would do is, they would then calculate

12  what they called an effective rate and compare it to someone

13  that's making their payment once a month for 30 years.  And

14  they would say, because you are paying less interest, you are

03:47:02 15  paying a lower interest rate, which is not true.

16       If I took out a 30-year mortgage and I refinanced it

17  somewhere else after two years, the amount of interest I would

18  pay to the first lender would be less than if I would have

19  stayed there for 30 years and paid it.  But my interest rate

03:47:20 20  didn't change.

21       So Household used what they called this effective

22  rate.  Sometimes they would call it equivalent rate.

23  Sometimes they would call it comparative rate.  But they would

24  couch this, their higher rate, in terms of this biweekly

03:47:37 25  payment plan and say, you know, your effect rate is lower.  So

**PSA4**

Ghiglieri - direct

436

1    this is an example.

2            Someone would come in, apply for a loan or refinance

3    their current loan.  Household would do this effective rate

4    calculation based on the biweekly payment plan.  And they

03:47:55  5    would say, well, you currently have an 8 percent rate.  But if

6    you come and refinance with us, the effective rate would be

7    7 percent.  And the customer would say, oh, that's great; I am

8    going to refinance.  But really what would happen is, the

9    interest rate would still be, you know, 12 and a half or

03:48:11 10    13 percent.

11            So Household used this predatory lending practice to

12    get people to come in and borrow from them, even though their

13    rates were not competitive.  If they would have said, if you

14    pay your loan every two weeks on the current loan, the rate

03:48:30 15    would be 4 percent, you know, as compared to our 7 percent.

16            So the reason why Regulation Z is in place, as I said

17    this morning or earlier -- I am sorry -- this afternoon is

18    lenders are required to only use the annual percentage rate so

19    that customers can compare from lender to lender what the

03:48:50 20    rates are so they can compare apples to apples.  Regulation Z

21    is violated when you come up with all these different sorts of

22    rates to give to the customer.  So that was the effective

23    equivalent rate scam that Household was running during this

24    1999-to-2002 time frame.

03:49:08 25    Q.  Now, we have touched on the second practice, insurance

**PSA5**

Ghiglieri - direct

437

                1   packing.  But can you tell us what that is?

                2   A.   Yes.   Insurance packing is when you add insurance premiums

                3   for credit life, accident and health, unemployment, whatever

                4   kind of insurance, on to the loan without the borrower's

03:49:27        5   knowledge.   That's a typical insurance packing definition.

                6        Household did some of that.

                7        They also would tell the customers that the insurance

                8   was required.   Sometimes they wouldn't tell them at all.   And

                9   if the customer would come to the loan closing -- let me back

03:49:46       10   up a minute.

               11        What Household trained their employees to do was to

               12   assume that the customer wanted all of these insurance

               13   products.   So when the customer got to the loan closing, the

               14   insurance would already be added on.   If the customer would

03:50:00       15   notice it, they would say many times, oh, we have to run all

               16   your loan documents; this is going to take a long time.

               17        If the customers, you know, asked about it and really

               18   said, we don't want it, we don't want it; they would say,

               19   don't worry about it.   You can cancel after 30 days.

03:50:17       20        They would get their premium back -- a portion of

               21   their premium back, but the premium would still be on their

               22   loan.   And they would be making not only payments over

               23   30 years because of the insurance, they would also be paying

               24   interest on that insurance premium.

03:50:32       25        So this is considered a predatory lending practice.

**PSA6**

1    And it's particularly egregious when the type of insurance is

2    single premium credit insurance.  And that is where you make a

3    premium payment up-front.  You pay it off, of course, as you

4    pay your mortgage off over 30 years, but the insurance only

03:50:54  5    lasts for five years.  So you no longer have insurance, and

6    still after the fifth year, you are paying for this.  So

7    regulators in a lot of states have prohibited this.  That is a

8    particularly egregious predatory lending practice.

9    Q.  Did you see instances in which Household packed single

03:51:14  10   credit premium insurance on?

11   A.  Yes.

12   Q.  What about the next practice, failure to properly

13   disclose?  Can you tell us what that is?

14   A.  Failure to properly disclose is in two major categories.

03:51:29  15   There were a lot of problems with disclosure, but I will

16   confine it to these two categories.

17        One is the good faith estimate.  And for anyone that

18   has gone to close on a home, you will know that when you make

19   an application to a lender, three days after the application

03:51:46  20   is accepted you are supposed to receive a good faith estimate

21   of the closing costs.  And that's under the Real Estate

22   Settlement Procedures Act, which is known as RESPA.

23        The good faith estimate that Household would give,

24   when they would give it -- sometimes they didn't give it;

03:52:17  25   sometimes it was late -- but when they would give the good

Ghiglieri - direct

439

1  faith estimate, it was a wide range.  They would say, your

2  closing costs are going to be between zero dollars and $8,000.

3       The majority of the time on the documents that I

4  looked at, Household charged at the high end of the range or

03:52:35 5  in excess of the range.  The lenders are never supposed to

6  charge in excess of what they have on the closing costs

7  without redisclosing.  But in many cases, Household would

8  charge in excess of that range.

9       Household's practice was to charge at the high end of

03:52:52 10  the range.  And if you look at the regulatory literature, when

11  you give a range and almost all the time when you charge at

12  the high end of the range, it's considered deceptive if you

13  are giving too wide of a range to a borrower.  So that's one

14  of the problems with failure to properly disclose.  And it's

03:53:11 15  considered a predatory lending practice.

16       The other example of failure to disclose was the

17  prepayment penalty.  A prepayment penalty is when you go to

18  pay off your mortgage either through refinance or from other

19  means and you are charged a penalty for paying it off.  Some

03:53:28 20  states have prohibited this, but some states have not.

21       And when Gary Gilmer took over Household in 1999 --

22  1998, starting in 1999 they increased the amount of the

23  prepayment penalty from three years to five years.  What that

24  meant was, if you came in to pay off your loan inside of five

03:53:49 25  years, you were charged six months' worth of interest as a

1    penalty.

2          And this prepayment penalty disclosure was buried in

3    the fine print in the middle of the loan documents.  You know,

4    you always have a big stack of loan documents to sign.  Many

03:54:05 5    times the customers didn't know about this prepayment penalty.

6          If they would see the prepayment penalty and ask

7    about it, they would be told, don't worry about it; it will be

8    waived.  And then, of course, as I saw in some of the

9    complaints, people would have to move for their job or

03:54:22 10    whatever and come into Household and they would say, sorry,

11    it's not waived.

12          So those are two examples of failure to disclose: the

13    good faith estimate being in too wide of a range and the

14    prepayment penalty not being clearly disclosed.

03:54:35 15    Q.  The next practice is excessive fees and points.

16          Can you tell us what that is and how it existed at

17    Household?

18    A.  Yes.  Excessive fees and points.  A point is 1 percent of

19    the loan balance.  And what discount points are normally used

03:54:54 20    for is to buy down the rate.  So if your lender has a program,

21    for example, where if you pay 1 or 2 points, you can buy down

22    the rate by, you know, like a half a percent or something,

23    that's a decision that the borrower and the lender -- that the

24    borrower makes in negotiation with the lender.

03:55:14 25          As an examiner, when I am looking at a lender's books

**PSA9**

Ghiglieri - direct

1    and records and they are offering discount points, I would

2    expect to see a wide range of discount points.  In other

3    words, maybe Borrower A has paid 1 point because that's all

4    they could afford.  Borrower B might pay no points because

03:55:34 5    they don't want to buy down the rate.  Borrower C might pay

6    3 points to buy down the rate a little more.

7         What Household was doing was a couple of different

8    things.

9         One is, they would -- it was their goal to charge

03:55:51 10    7 to 7 and a half or whatever the state would allow.  Some

11    states would only allow 5 points; other states would allow up

12    to 7 and a quarter, 7 and a half.  And it was their goal to

13    charge that for each and every loan.

14         When you charge discount points, again, you are

03:56:10 15    supposed to have a negotiation with the borrower, and then the

16    rate is supposed to be reduced.  I did not see that here.  And

17    many of the regulators agreed with that opinion.  They said

18    the customers don't know about being able to buy down the

19    rate, and so they should have been shown differently on the

03:56:30 20    good faith estimate as origination fees.

21    Q.  The next practice is loan splitting.

22         Can you tell the jury what that is?

23    A.  Loan splitting is where a customer would apply to

24    refinance their mortgage, and they would show up and not only

03:56:44 25    would there be one loan there, there would be two.

Ghiglieri - direct

442

1        The first loan, of course, Household had higher rates

2   than other lenders.  So they would have their first mortgage

3   at a noncompetitive rate.  But Household would tack on

4   insurance premiums.  They would tack on these discount points.

03:57:02  5   They would load up the first mortgage such that they had to

6   make a second loan to account for all the fees and insurance

7   premiums they were adding on.

8        Now, the second loan was at a very high rate,

9   sometimes up to 24 percent.  And the customers would be

03:57:21 10   surprised that -- you know, they wanted to refinance their

11   mortgage, and they show up and there is two loans.  So that's

12   called loan splitting.  And it's considered a predatory

13   practice.

14   Q.  The next practice is equity stripping.

03:57:35 15        Can you tell us how that was used at Household and

16   what that is?

17   A.  Now, we talked a little bit earlier about equity

18   stripping.  And that is where -- for example, you have a

19   $100,000 home, that's the value of it; and your mortgage, your

03:57:48 20   current mortgage is $80,000.  And it takes a long time to

21   build up your equity.

22        But you could go to Household and refinance that

23   loan.  And in the time it would take you to sign the papers,

24   that hard-earned equity would be stripped away because of

03:58:03 25   these fees and insurance premiums and other things tacked on

**PSA11**

Ghiglieri - direct

443

1   to the loan.

2          Equity stripping means that the lender has stripped

3   away the equity in your home because of the high cost of the

4   loans that they are making.

03:58:22  5   Q.  The next practice is prepayment penalties.  I know you

6   already spoke about that in the context of failure to properly

7   disclose.

8          Was there anything else with respect to prepayment

9   penalties that Household engaged in that was predatory?

03:58:36 10   A.  One of the things that Household did was increase their

11   prepayment penalties from three to five years.

12          And a five-year prepayment penalty, I can tell you

13   from the regulatory perspective, is considered excessive.  And

14   the reason that Household was so interested in assessing these

03:58:56 15   prepayment penalties -- well, I should say one of the

16   reasons -- is because they didn't want the borrowers to be

17   refinancing their loans at another lender.

18          THE WITNESS:  Can I just take a one-second break?

19          MR. DROSMAN:  Sure.

03:59:33 20   (Brief pause.)

21          THE COURT:  We would take a break, ladies and

22   gentlemen, but it's 4 o'clock, and I would just as soon wait

23   here and see if the witness can get back here and we can

24   utilize the time more effectively that way.  So just try to

04:00:00 25   sit and relax.

Ghiglieri - direct

444

1    (Brief pause.)

2    BY MR. DROSMAN:

3    Q.  We were talking about prepayment penalties.

4    A.  Yes.

04:00:33 5    Q.  Do some states prohibit prepayment penalties altogether?

6    A.  Some states do prohibit them, yes.

7    Q.  Did Household find a way to impose prepayment penalties in

8    states that had prohibited them?

9    A.  Yes.  There is something called the Alternative Mortgage

04:00:52 10    Transaction Parity Act, AMTPA for short.  What this says is, a

11    lender who is licensed in the state that otherwise prohibits

12    certain things like prepayment penalties can charge them if

13    they meet certain requirements under this federal law.

14         And one of the requirements -- one of the ways that

04:01:11 15    you can come under AMTPA is if you have a variable rate, a

16    variable interest rate.  So they came up with a product that

17    they thought allowed them to do that.  A lot of the states

18    disagreed.  But they did try and charge prepayment

19    penalties -- or they did charge prepayment penalties trying to

04:01:32 20    fall underneath AMTPA.

21    Q.  The next practice is loan flipping.

22         Can you tell us what that is and how it was used at

23    Household?

24    A.  Loan flipping is simply continuous refinances.  And each

04:01:52 25    time Household would refinance a loan -- they would flip a

**PSA13**

1    loan, they would add more fees and more product premiums to

2    it.

3        If the borrower couldn't pay, for example, they would

4    refinance it adding more fees and insurance premiums.  And so

04:02:11 5    it just became even more difficult for the customers to pay.

6    So that's called loan flipping, continuous refinancing.

7    Q.  Did you see that practice at Household?

8    A.  I did.

9    Q.  Did you conclude whether that was systemic and widespread?

04:02:26 10    A.  Yes, it was.

11    Q.  Finally, there is blocking the back door.

12    A.  Blocking the back door.

13        Remember I said that Household had a higher interest

14    rate than their competitors.  So what they wanted to do, once

04:02:41 15    they got them in the front door, is, they wanted to prevent

16    them from refinancing with someone else and going out the back

17    door.  This is just a term that they use, "blocking the back

18    door."

19        And the way they would do this is -- if you just look

04:02:52 20    at my list -- first, they would get them in by saying, this is

21    the effective rate, when that was not true.  They would pack

22    on insurance premiums.  They would pack on high fees and

23    points.  They would strip away the equity and charge

24    prepayment penalties.

04:03:13 25        Now, if you think about going to a lender and asking

Ghiglieri - direct

1    to borrow money for a house, normally they want you to have a

2    20 percent down payment, which means you are going to have

3    20 percent equity in the home.

4        Many lenders will not lend the closer you get to

04:03:31 5    100 percent of loan-to-value, it's called, where the loan is

6    getting closer and closer to the value of the home.

7        Household actually had a product that went to

8    125 percent loan-to-value.  So not only did you not have

9    equity in your home, you had negative equity in your home.

04:03:50 10        So they used a variety of ways to block that back

11    door so that the customers couldn't go to another lender and

12    refinance.

13    Q.  And did you determine whether Household was engaged in all

14    of the practices that you have just discussed?

04:04:06 15    A.  Yes.  All of these practices I saw at Household.

16    Q.  Did you determine whether all of these practices were

17    widespread at Household?

18    A.  Yes, they were.

19    Q.  Let's shift gears for a moment and talk about Household's

04:04:18 20    corporate culture.

21        Did you examine Household's corporate culture in

22    reaching your conclusions?

23    A.  I did.

24        They had a corporate culture of growth.  That was

04:04:27 25    their main focus when Gary Gilmer came to Household in 1998.

**PSA15**

1    A.  I do.

2    Q.  What is it?

3    A.  This is one of the documents that I reviewed in

4    formulating my opinions regarding predatory lending.

04:18:28 5    Q.  What is the document?

6    A.  This document is a memo from Gary Gilmer to Mr. Aldinger

7    and Mr. Schoenholz and other top officials of Household.  The

8    date is January 27th, 1999.  And the subject is "Initiatives

9    to Accelerate Growth of U.S. Consumer Finance."

04:18:48 10         MR. DROSMAN:  Your Honor, there has been no

11    objection.  We move to admit Exhibit 348 into evidence.

12         THE COURT:  It will be admitted without objection.

13         MR. DROSMAN:  I am sorry?

14         THE COURT:  Admitted without objection.

04:18:59 15    (Said exhibit was received in evidence.)

16    BY MR. DROSMAN:

17    Q.  If you could, please tell me what the significance of the

18    first page of Exhibit 348 is to your opinions in this case.

19    A.  If you look at the first paragraph, it says, "As discussed

04:19:14 20    at our meeting regarding growth on January 18th, 1999, the

21    services of consultant Andrew Kahr have been retained.  The

22    directive for Mr. Kahr is to introduce opportunistic methods

23    to accelerate growth of U.S. consumer finance in 1999."

24    Q.  Why don't we stop there.

04:19:36 25         What is the significance of that to your opinion in

1    this case?

2    A.  Well, the significance of this to my opinion is that their

3    focus was on growth.  They hired Andrew Kahr to help them

4    focus on growth.  And they formulated products that were

04:19:53   5    predatory in nature in order to grow and to keep the customers

6    at Household.

7    Q.  Is the next paragraph on the first page of the document,

8    Plaintiffs' Exhibit 348, significant to your opinions?

9    A.  Well, it talks about from the list of 60 potential

04:20:10   10   initiatives, 10 have been selected for further review and

11   potential immediate implementation.  And then the list is

12   attached.

13   Q.  I will direct your attention to the next page, page ending

14   367.  It looks like the third initiative.

04:20:32   15        Is that significant to your opinion in this case?

16   A.  Yes.  If you look at No. 3, over under "Description," it

17   says, "Can sell as fee protection product, as mortgage

18   benefit, or as free insurance penetration device."

19        So this is where they are talking about the insurance

04:20:56   20   packing.

21   Q.  And this is one of Mr. Kahr's initiatives?

22   A.  Yes.  Well, this is one of the suggestions that came out

23   of the meeting with him.

24   Q.  And then, if I can direct your attention to page ending

04:21:11   25   369.  The seventh initiative is on that page.

1    project sponsor within the U.S. consumer finance."

2            And down below 13, it says, "Overall" -- and it's

3    actually underlined there -- "Overall Gary Gilmer and Dave

4    Schoenholz will continue to co-head the Andrew Kahr initiative

04:25:56  5    areas within USCF," which is U.S. consumer finance.

6    Q.  If you take a look at Item No. 12 on this page --

7    A.  Yes.

8    Q.  -- and the hash marks under it, is there anything of

9    significance to you about that?

04:26:08  10   A.  Yes.  You can see the performance-based pricing is there.

11   And that's one of the things that we talked about where the

12   interest rate would come down if they made 36 straight months

13   of payments.

14   Q.  Did you determine whether Mr. Kahr developed predatory

04:26:33  15   lending practices at Household?

16   A.  Yes.  His suggestions were predatory in nature.

17   Q.  What predatory lending practices did Mr. Kahr develop at

18   Household?

19   A.  Well, his suggestions included performance-based pricing,

04:26:43  20   which we just talked about; increasing prepayment penalties

21   that blocked the back door; charging higher discount points;

22   credit insurance premiums, the single-premium credit insurance

23   in particular.  And those are the ones that I can remember off

24   the top of my head.

04:27:01  25   Q.  Did you determine whether Mr. Kahr developed an effective

**PSA18**

Ghiglieri - direct

462

1    rate plan?

2    A.   Yes.  An effective rate was also one of them, to make the

3    interest rate look more competitive.

4    Q.   Did you determine whether Household actually implemented

04:27:19  5    any of the predatory lending practices developed by Mr. Kahr?

6    A.   Yes.  The ones that I just talked about plus the effective

7    rate were ones that they implemented.

8    Q.   I am showing you what has been marked as Plaintiffs'

9    Exhibit 461 for identification.

04:27:33  10    (Document tendered.)

11    BY MR. DROSMAN:

12    Q.   Ms. Ghiglieri, do you recognize Plaintiffs' Exhibit 461?

13    A.   I do.

14    Q.   What is it?

04:27:57  15    A.   This is a memo from Gary Gilmer to Bill Aldinger, dated

16    January 18th, 1999.  The subject, "December and Year-to-Date

17    Operating Results."

18    Q.   And why do you recognize Plaintiffs' Exhibit 461?

19    A.   This is one of the documents that I reviewed in

04:28:16  20    formulating my opinions regarding Household's predatory

21    lending practices.

22         MR. DROSMAN:  Your Honor, there has been no objection

23    to this document.  We move it into evidence.

24         THE COURT:  It will be admitted without objection.

25    (Said exhibit was received in evidence.)

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all    )
 4  others similarly situated,      )
                                    )
 5            Plaintiff,            )
                                    )
 6     vs.                          ) No. 02 C 5893
                                    )
 7  HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         ) Chicago, Illinois
 8                                  ) April 1, 2009
              Defendants.           ) 9:55 a.m.
 9
                              VOLUME 3
10            TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Ghiglieri - direct

630

1    Q.  Why does this particular information support your opinion

2    in this case?

3    A.  Well, because my opinions outline that when Gary Gilmer

4    came to Household in 1998, the focus turned to growth; and

04:07:31  5    that for 1999, there was an obsession about growth.  And they

6    hired Andrew Kahr.  They developed these predatory products

7    and services, which they implemented.  And they did grow.  As

8    it shows here, Household's originations nearly doubled.  And

9    the conclusion of the regulators supports my conclusion that

04:07:56 10    they engaged in predatory lending practices and that they were

11    systemic and companywide.

12    Q.  This growth that you said, that they doubled their loan

13    originations, right?  What are loan originations?

14    A.  Those are new loans that they booked.  And we talked about

04:08:10 15    how the employees were being compensated for booking more

16    loans and for booking more dollars.  And that's what they're

17    talking about.  The number of new loans, the dollar amount of

18    new loans that they booked doubled and -- since 1999.  And the

19    date of this was August of 2002.

04:08:27 20    Q.  And what does the Washington State attorneys generals

21    attribute that huge doubling of loan originations to?

22    A.  To these deceptive sales practices that have -- that they

23    implemented and that they were using.

24    Q.  And is that consistent with your opinion in this case?

04:08:45 25    A.  Yes.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3  LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all     )
 4  others similarly situated,      )
                                    )
 5              Plaintiff,          )
                                    )
 6      vs.                         ) No. 02 C 5893
                                    )
 7  HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         ) Chicago, Illinois
 8                                  ) April 2, 2009
                Defendants.         ) 9:45 a.m.
 9
                          VOLUME 4
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

Ghiglieri - direct

680

1   A.   So as re-agings go up, as loans are re-aged, which is

2   taken out of the two-plus bucket and put back in current, the

3   number of two-plus delinquencies goes down.  So this is taking

4   loans from the two-plus bucket and putting them over into the

10:33:30  5   current bucket.  So there's an inverse relationship between

6   re-aging and delinquent -- two-plus delinquencies.

7   Q.   What if two-plus delinquencies go up instead of down, what

8   is the effect on re-aging?

9   A.   Well, if they -- if Household stopped re-aging, for

10:33:48  10   example, or diminished the amount of their re-aging, the

11   re-aging would go down and the delinquencies would go up

12   because then the -- there was no way to make those loans

13   current.  So here re-aging is going down and the two-plus

14   numbers are going up, so it's a direct inverse relationship.

10:34:05  15   Q.   And is re-aging of loans significant to a regulator?

16   A.   Yes.  When I was a field examiner, this is one of the

17   things that we looked at in particular to determine if a

18   lender was masking their delinquencies.  We would look at a

19   variety of tactics that they could use, for example, rewriting

10:34:27  20   the loan, forbearance, a variety of things.  And we would look

21   to see how prevalent that was in the loan portfolio because

22   the more they were doing that, the more it would lead us to

23   conclude that they were masking delinquencies.

24   Q.   Now, during your reviews as an expert in this case, did

10:34:47  25   you determine whether Household used re-aging to manipulate

**PSA23**

Ghiglieri - direct

1    its two-plus delinquency number?

2    A.  Yes, that was one of my conclusions, was that Household

3    used various re-aging tactics and practices to mask their

4    delinquencies.

10:35:02  5    Q.  I'll show you what has been marked as Plaintiffs' Exhibit

6    1387 for identification.

7       (Tendered.)

8    BY MR. DROSMAN:

9    Q.  Do you recognize Plaintiffs' Exhibit 1387?

10:35:34 10    A.  I do.

11    Q.  What is it?

12    A.  This is an e-mail from Elaine Markell to Rich Peters and

13    others at Household -- she was at Household -- regarding the

14    Re-aging Fitch Servicer Presentation Slides, dated November

10:35:48 15    12, 2002.

16    Q.  Why do you recognize this document?

17    A.  This was one of the documents that I looked at in

18    formulating my opinions on the re-aging issues.

19       MR. DROSMAN:  Plaintiffs move Exhibit 1387 into

10:36:02 20    evidence.

21       THE COURT:  It will be admitted.

22    BY MR. DROSMAN:

23    Q.  Why don't we start at the bottom e-mail, I guess, the

24    first in the string.  And can you tell us, first, who Elaine

10:36:12 25    Markell is in this e-mail?

Ghiglieri - direct

697

1    grace period adjustment.

2    Q.  And what's the date of this e-mail?

3    A.  August 7, 2001.  So this would be for July.

4    Q.  And do the rest of the e-mails show the same thing?

10:56:36  5    A.  Yes.

6    Q.  Does this -- is this significant to your opinion that

7    Household used re-aging tactics like the use of the grace

8    period to manipulate its two-plus delinquency numbers?

9    A.  Yes.

10:56:48  10    Q.  Why?

11    A.  Well, because there's no reason to make this kind of

12    adjustment.  Other lenders just do a straight-up deal.  Here,

13    what they were doing is using their grace period to move loans

14    from the two-plus bucket back to current.  And the pass --

10:57:03  15    these sorts of delinquency numbers are very important to

16    regulators and others because it shows the condition of the

17    loan portfolio.

18    Q.  Is this grace period right here, is this the same grace

19    period we heard referred to earlier in an earlier e-mail as

10:57:21  20    the magic?

21    A.  Yes.

22    Q.  Now, is there a relationship between predatory lending on

23    the one hand -- we talked quite a bit about that yesterday --

24    and the use of practices like re-aging to hide the true

10:57:34  25    quality of Household's loans on the other?

1    A.  Yes, there is a relationship.

2    Q.  Did you prepare a demonstrative to assist you in

3    explaining the relationship between predatory lending

4    practices on the one hand and hiding the quality of

10:57:46  5    Household's loans on the other?

6    A.  I did.

7    Q.  I'll show you what has been marked as Plaintiffs'

8    Demonstrative Exhibit 31 for identification.

9        Can you tell us what this exhibit shows?

10:58:05  10    A.  Yes.  Household starts out making a predatory loan.  And

11    remember, they're packing on fees and insurance premiums and

12    stripping away the equity.  And what happens is, the borrower

13    cannot pay the loan.  It's too large for the borrower to pay.

14        So Household has one of two choices.  They can either

10:58:26  15    re-age it so that it's not showing up on their two-plus

16    bucket.  Or they can refinance it or rewrite it down below,

17    which is flipping it, adding more insurance, adding more fees

18    to it.

19        And then --

10:58:39  20    Q.  Let me just pause there.  To refinance it or rewrite it,

21    does that take it out of the two-plus bucket as well?

22    A.  Right.  And it brings it back to current.  So they can

23    either re-age it using some sort of tactic that we've already

24    talked about or they can actually rewrite it and make a new

10:58:56  25    loan and start over.

1    Q.  Okay.

2    A.  And then, no matter what, the borrower still can't pay

3    because the loan is so packed full of products, premiums and

4    fees and can't go anywhere else because the equity has been

10:59:11  5    stripped and the loan to value is too high so they're stuck.

6    And Household then has one of two choices.  They can either

7    rewrite it on the top, which is flip it again and add more

8    fees and premiums, insurance premiums to it, or they can

9    re-age it using one of the tactics, like the grace period or

10:59:30  10    one of their other tactics.

11    Q.  So if they rewrite it right here, does that -- again, that

12    takes it out of the delinquent bucket; now all of a sudden

13    they have a brand new loan so it's current again?

14    A.  Yes.  So whether they re-age it or they rewrite it, that's

10:59:47  15    going to bring it to the current bucket.  But rewriting it

16    allows them to pack on more fees and insurance premiums.  So

17    they can do -- they can either re-age it or rewrite it.

18    Q.  And you talked -- is there a predatory lending practice

19    that this implicates right here?

11:00:02  20    A.  Yes.  I mean, it implicates all sorts of predatory lending

21    practices, loan flipping because they're re-aging it multiple

22    times, insurance packing, equity stripping.  If they rewrite

23    it into two loans, that would be loan splitting.  You know,

24    originally they're reeling them in with the effective rate, as

11:00:22  25    Dennis Hueman would say, and blocking the back door with the

Ghiglieri - cross

1    prepayment penalty so that -- and because they've stripped out

2    the equity, there's nowhere for them to go to refinance.

3    Q.  So what's the last step?

4    A.  So the borrower still can't pay, and the cycle starts over

11:00:39  5    again and go on one of two paths.  So there's a correlation

6    between predatory lending practices and the need for Household

7    to re-age and mask their delinquencies.

8    Q.  Thank you, Ms. Ghiglieri.

9        MR. DROSMAN:  I have no further questions at this

11:00:57 10    time.

11        THE COURT:  You may cross-examine.

12        MR. KAVALER:  Thank you.

13                  CROSS-EXAMINATION

14    BY MR. KAVALER:

11:01:22 15    Q.  Good morning, Ms. Ghiglieri.

16        As you know, I'm Tom Kavaler, and I represent the

17    defendants.  And we've met before, correct?

18    A.  Yes.

19    Q.  Okay.  I'm going to ask you a few questions today about

11:02:07 20    the same subject matter you've been talking about for the past

21    couple of days.  And my time is sort of limited, so I'm going

22    to try and ask you questions that can be answered yes or no.

23    If I do that, will you answer them yes or no?

24    A.  If I can answer them with a yes or a no.

11:02:20 25    Q.  Perfect.  Thank you.

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5               Plaintiff,          )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 6, 2009
                 Defendants.         )  9:45 a.m.
 9
                                VOLUME 5
10                 TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

Gilmer - direct

1   Q.  And did there come a time, sir, in the end of 1997 or

2   early 1998 that you returned to the United States?

3   A.  That is correct.

4   Q.  And at that time, you took a position as the head of the

11:45:48  5   consumer lending department at Household; is that correct?

6   A.  That is correct.

7   Q.  Could you briefly describe for me what your duties were in

8   that position when you came back in 1997, 1998?

9   A.  I can indeed.  I was responsible for the HFC branch

11:46:00 10   network, which was about 14 or 1,500 -- strike.  Let me back

11   up because I was adding Beneficial in that.

12          When I first returned to the United States, it was

13   just HFC and about 500 branches, as I recall.  So I was

14   responsible for all of that.

11:46:19 15          In addition, I was responsible for the operating

16   centers.  In our operating centers, you know, we did work that

17   you might imagine.  Those were collection calls, underwriting.

18   By that I mean loan decisions were made in that area of the

19   operation.  Customer service and that sort of thing.  So upon

11:46:42 20   my arrival in 1998, that was sort of the way the business was

21   set up.  And in round numbers, there were probably -- I won't

22   get this exactly right, but there were several thousand

23   employees.  I would guess probably 8,000 employees or so in

24   total at that time.

11:46:57 25   Q.  And you're saying 8,000 people in consumer lending that

1    reported ultimately to you?

2    A.  That is correct.  And that did not include, Mr. Dowd, a

3    goodly number of employees at home office, support-level kinds

4    of people, quality assurance kinds of people, training, human

11:47:14 5    resources.  A goodly number of employees working there as

6    well.

7    Q.  And during 1998, Household acquired Beneficial; is that

8    correct, sir?

9    A.  That is -- that is true.

11:47:24 10    Q.  That was in addition --

11    A.  I believe --

12    Q.  I'm sorry, sir.

13    A.  No, I just -- I was going to say I think that was around

14    June or July of 1998.

11:47:32 15    Q.  By this time, you were already running consumer lending at

16    Household?

17    A.  That's true.

18    Q.  And when you acquired Beneficial, you added about another

19    thousand branches; is that fair to say?

11:47:42 20    A.  That's right.  So that when we finished the

21    consolidation -- because some branches were consolidated and

22    put together -- we had about 1,400 or 1,500 or so branches.  I

23    believe it was in 46 states.  And we had six operating centers

24    to support those branches across the United States.  And

11:48:04 25    probably 15,000 or so employees.

PSA31

Gilmer - direct

971

1    Q.   And, sir, was consumer lending also called United States

2    consumer finance?

3    A.   Yes, it was.

4    Q.   And those two words were used interchangeably?

11:48:17  5    A.   Yes, they were.

6    Q.   And did you report directly to Mr. Aldinger during this

7    time from 1998 to 2002?

8    A.   I did.

9    Q.   And there was nobody between you and he?  He was your

11:48:27 10    boss?

11    A.   That is correct.

12    Q.   Now, is it fair to say, sir, that during -- towards the

13    end of 1998, you believed Household's stock was undervalued;

14    is that correct?

11:48:40 15    A.   I'm sure -- I'm sure I did.  I don't remember the exact

16    dates, but yes.

17    Q.   And you believe --

18    A.   That's a fair --

19    Q.   I'm sorry.

11:48:47 20    A.   That's a fair assessment.

21    Q.   And is it fair to say, sir, that you believed that

22    Household's stock was undervalued at that time because you

23    believed that the market would not believe that Household

24    could grow; is that correct?

11:49:00 25    A.   In part that is true.  I believe that our franchise was

**PSA32**

1   underappreciated.  I believed for a wide variety of reasons

2   our stock was undervalued.  But one of the key reasons I

3   believed that the stock was undervalued was because our growth

4   record in recent years had not been as good as I would have

11:49:20 5   hoped.

6   Q.  And, sir, I've noticed in some of the documents that

7   you've written over the years during your time with Household,

8   you used the word market.  There's other times when you say

9   Wall Street.  I mean, you concede you've used those words; is

11:49:33 10   that correct?

11   A.  I'm sure I have.

12   Q.  And I just want to make sure we're on the same page.  When

13   you talk about the market or Wall Street, are you referring to

14   people on Wall Street that work for investment banks that keep

11:49:46 15   track of Household, that watch it, that issue reports about

16   it?

17   A.  If I was talking about Wall Street market.  I mean,

18   another market, of course, would be the competitive market

19   or -- in the environment in which we operated, but I think

11:49:59 20   it's fair to agree with you there.

21   Q.  And you also -- when you refer to Wall Street, I take it,

22   sir, you also mean investors; is that fair to say?

23   A.  I do indeed.  I do indeed.

24   Q.  Sir, I'd like to show you what's been marked as

11:50:16 25   Plaintiffs' Exhibit 267.

**PSA33**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 7, 2009
                Defendants.          )  9:45 a.m.
 9
                           VOLUME 6
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

Gilmer - cross

1189

1  yesterday?

2  A.  No, sir, never.

3  Q.  Okay.  Was Household International, during the years that

4  you ran consumer lending, a public company?

01:23:47  5  A.  Yes, it was.

6  Q.  As a result, did you feel that you had responsibilities to

7  any particular groups of people?

8  A.  Certainly.

9  Q.  To whom, sir?

01:23:56  10  A.  Well, I had a responsibility to the people who worked

11  at -- in my business unit at Household, I had a responsibility

12  to the customers that we served, and I certainly had a

13  responsibility to the shareholders.

14  Q.  Were there any tensions among those three different

01:24:13  15  responsibilities that you felt?

16  A.  I would say yes.  There were some tensions in this sense:

17  The customers, of course, would like to have a product,

18  whatever that product may be, at the cheapest price that they

19  could get it at; and the shareholders, from their perspective,

01:24:37  20  wanted to make as much profit as we practically could.

21  Q.  And was it your job, along with other senior executives,

22  to harmonize those interests?

23  A.  It would be to balance -- to balance that, and, of course,

24  my view of that is that you can't have one without the other.

01:24:55  25  In other words, you can't have good shareholder, growing

**PSA35**

Gilmer - cross

1190

1    shareholder value unless you take care of the customers.  So

2    it's kind of a two-edged sword, I guess.

3    Q.  All right.  Now, we've heard several times that Household

4    was a finance company, not a bank.

01:25:10  5           Please explain the difference between a finance

6    company and a bank.

7    A.  Several.  One is a finance company doesn't take deposits.

8    In other words, the money that they lend to customers they

9    have to go out into the market and borrow from someone else.

01:25:28  10   That would be one difference.

11          The other, of course, conversely, a bank would take

12   deposits, so the money that they would lend would come from

13   their deposit base.  That's one point of difference of it.

14          Another major point of difference were the rules

01:25:44  15   under which banks and finance companies operate.  The finance

16   companies -- let me start with banks.  The banks had, as you

17   can imagine taking customer deposits, much more stringent

18   requirements, much more stringent requirements at almost every

19   level, and that included requirements around the kinds of

01:26:04  20   people that they could make loans to.  Fundamentally, they

21   would make loans to people who had pristine or near-pristine

22   credit.

23          A finance company was able to exist really because of

24   that -- of that rule, that -- by that I mean they had --

01:26:21  25   there's a market out there, a lot of people out there, that

**PSA36**

1  Q.  Now, Mr. Gilmer, you told us something about the

2  organization of the consumer lending group that you headed.

3       Did we prepare a demonstrative which would help you

4  walk through this and explain it, demonstrate it to the jury?

01:41:16  5  A.  Yes.

6       MR. KAVALER:  Your Honor, may we put up the

7  demonstrative?

8       THE COURT:  Yes.

9       MR. KAVALER:  Put up -- there we go.

10  BY MR. KAVALER:

11  Q.  Mr. Gilmer, where do you sit on this structure, as it

12  were?

13  A.  I -- I sit at the top of the pyramid.

14  Q.  Okay.  And who is that right under you?

01:41:39  15  A.  Her name is Lisa Sodeika.

16  Q.  And what is her title?

17  A.  She was a special assistant assigned to me.

18  Q.  Now, Mr. Dowd asked you a question earlier today and used

19  the word assistant, and you said the person you were talking

01:41:53  20  about was your secretary.

21       What's the difference between that person and

22  Ms. Sodeika?

23  A.  The secretary does clerical work, at least mine did

24  primarily, and a special assistant like Sodeika is not

01:42:06  25  involved in clerical work at all.  Her job, her responsibility

**PSA37**

Gilmer - cross

1204

1    is to be really my eyes and my ears out in the field.  By the

2    field, I mean in the branches or out in the processing

3    centers.  Her job was to keep me apprised of the things that

4    she thought were most important, and from time to time, I

01:42:23  5    would give her special assignments beyond -- beyond that.

6    Q.  She reported directly to you.

7    A.  Directly to me, that's correct.

8    Q.  How frequently?

9    A.  Virtually every day.

01:42:31  10   Q.  And how long had she worked for the company, do you know?

11   A.  Fifteen years or so.  I'm not sure exactly.

12   Q.  Did you trust her?

13   A.  Absolutely.

14   Q.  Did she have an officer title?

01:42:46  15   A.  Special assistant, yes.

16   Q.  Was she a vice president?

17   A.  She was also a vice president, that's right.

18   Q.  Do you know what her full title was?

19   A.  I don't remember.

01:42:55  20   Q.  Does it refresh your recollection if I suggest she was the

21   vice president of consumer affairs?

22   A.  That sounds -- that sounds right.  She had more than one

23   title over time, but that was it at one time.

24   Q.  And one of her responsibilities was consumer affairs?

01:43:09  25   A.  That's correct.

1    Q.  Underneath that, there's Tom Detelich.  Who is

2    Mr. Detelich?

3    A.  Tom Detelich was the managing director of the branch

4    network.  His job was to oversee all the branch sales

01:43:23 5    activity, the 1,400 or so branches that we had were his --

6    were his area of responsibility.

7    Q.  And did he report directly to you?

8    A.  He did.

9    Q.  How frequently would you have dealings with Mr. Detelich?

01:43:35 10    Excuse me.  How frequently would you have dealings

11    with Mr. Detelich?

12    A.  Probably not every day, but several times a week.

13    Q.  Okay.  And under that, there are three RGMs, Regional

14    General Managers.  What is an RGM?

01:43:49 15    A.  Geographically we had the United States broken up into

16    sort of three broad sections, in the east, a central and a

17    west, and each of the three division general managers were

18    responsible for that geographic area.

19    Within that area -- and when I say that geographic

01:44:04 20    area, I'm talking about the sales branch network itself, so

21    each one would have had about a third of the country.

22    Q.  Who did they report to?

23    A.  They reported to Mr. Detelich.

24    Q.  Under them we have 16 DGMs, Division General Managers.

01:44:19 25    What were they?

Gilmer - cross

1206

1   A.  That was yet still another subset of management that

2   reported directly to the Regional General Managers.  Each of

3   the 16 Division General Managers would have a group of

4   offices, and it changed from time to time, but probably

01:44:32  5   somewhere around 80 or so branches, some within a singular

6   state.  California, for example, might have had just one.  But

7   most of the Division General Managers, if not all, encompassed

8   more than one state.

9   Q.  Underneath that, we see 125 DSMs, District Sales Managers.

01:44:51  10   What did they do?

11   A.  The District Sales Manager group was the first-line

12   management that supervised the branches.  It was a group of

13   supervisors, each of which had responsibility for probably,

14   again, it varied from time to time, but each one would have 10

01:45:08  15   or 12 branches, and those 10 or 12 branches and all of the

16   activity within those branches would report to this district

17   manager.

18   Q.  And underneath them, we see 1,400 BSMs, Branch Sales

19   Managers.  What did they do?

01:45:22  20   A.  They were just as their title suggests.  We have one

21   branch manager for each of our 1,400 branches.  So each branch

22   manager was responsibility for the activity within his or her

23   individual branch.

24   Q.  And underneath that it says branch staff, approximately

01:45:38  25   8,000.  What did they do?

Gilmer - cross

1207

1    A.  They reported -- that was the job that I mentioned that I

2    started at back in 1972.  It was called branch representative

3    in those days, but it's the entry-level position.  These are

4    the 8,000 people that interface every day with the customer,

01:45:54  5    so if you were to walk into an HFC or Beneficial branch, you

6    would likely be greeted by one of these individuals, sometimes

7    the branch manager, but likely would be one of these account

8    executives.

9    Q.  And this entire universe of people all reported to you.

01:46:10  10    A.  They all did.

11    Q.  Okay.  And you're responsible for whatever they did.

12    A.  That's correct.

13        MR. KAVALER:  Okay.  Now, can we put up the chart

14    that Ms. Ghiglieri used?

15    BY MR. KAVALER:

16    Q.  Last week I think Ms. Ghiglieri testified more than once

17    that Household's rates were higher than its competitors', so

18    that in order to make loans, Household came up with a way of

19    describing rates as effective rates.  Do you recall that

01:46:41  20    testimony?

21    A.  I do indeed.

22    Q.  All right.  Mr. Gilmer, do you have personal knowledge --

23    not opinion, but fact -- of whether Household's rates were

24    higher than its competitors', lower than its competitors' or

01:46:50  25    the same as its competitors'?

PSA41

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5            Plaintiff,             )
                                     )
 6    vs.                            )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 9, 2009
              Defendants.            )  9:55 a.m.
 9
                            VOLUME 8
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Streem - direct

1    70 percent of its customers life insurance?  Did you know

2    that?

3    A.  No, I did not.

4    Q.  Is this the first time you've heard that?

01:35:43    5    A.  That is the first time I've heard that, to the best of my

6    recollection.

7    Q.  Now, your investor relations group prepared a report

8    called an investor relations report, right?

9    A.  Yes, we did.

01:36:01    10    Q.  And you prepared it every two or three months, correct?

11    A.  Yes.

12    Q.  During this time period of 1992 to 2002, right?

13    A.  I would assume that we prepared such reports during that

14    time period, yes.

01:36:13    15    Q.  Let me show you one of those reports.  We've identified it

16    as Plaintiffs' 198.

17    (Tendered.)

18        MR. BURKHOLZ:  A copy for counsel.

19    BY MR. BURKHOLZ:

01:36:36    20    Q.  Feel free to look through it.  I'm going to ask you a few

21    questions about the document.

22    A.  It's quite a lengthy document.  Do you want me to read the

23    entire thing?

24    Q.  No, I just want you to familiarize yourself with the

01:36:48    25    document.  And then I'll point you to certain parts of it.

```
         1   A.  That would be helpful.  Why don't you do that.

         2     (Brief pause.)

         3   BY MR. BURKHOLZ:

         4   Q.  Okay.  Now, you recognize the document, don't you?

01:37:17 5   A.  Yes.

         6   Q.  This is a document that your group would have prepared in

         7   the ordinary course of business at Household, correct?

         8   A.  Yes.

         9   Q.  And you were responsible for finalizing this document,

01:37:29 10  correct?

         11  A.  Yes.

         12  Q.  And Mr. Aldinger and Mr. Schoenholz had involvement in

         13  editing it, correct?

         14  A.  Generally we would have sent it to both Bill and Dave for

01:37:41 15  review.  I can't say that they reviewed this specific one.

         16  Q.  That was the practice, correct?

         17  A.  Yes, it was.

         18         MR. BURKHOLZ:  Your Honor, I move 198 into evidence.

         19         MR. KAVALER:  Your Honor, could we come to the

01:37:50 20  sidebar?

         21         THE COURT:  Sure.

         22     (Proceedings heard at sidebar:)

         23         THE COURT:  Yes.

         24         MR. KAVALER:  Your Honor, I didn't want to say

01:38:18 25  anything in the hearing of the jury.  I want to make sure I'm
```

1    doing what you want me to do.  These are the instructions that

2    we agreed upon to give the jury.  When I said earlier

3    instruction No. 1, this is instruction No. 1.  Your Honor was

4    focused on a specific item within it.  This time it is, again,

01:38:36 5    instruction No. 1.  It's item second.  I referred to

6    instruction No. 1 to distinguish it from instruction No. 2.  I

7    don't want to suggest there's any error.  On the other hand, I

8    want to be sure the jury --

9            THE COURT:  I think you're accurate.  So you want to

01:38:55 10   direct them to the second part of instruction No. 1, investor

11   relation report?

12           MR. KAVALER:  Yes.  And I think you should tell them

13   the other one was instruction No. 1, item number five.

14           THE COURT:  I don't think it's necessary.  We were

01:39:07 15   referring to what we gave them.  There's only one fifth in

16   what we gave them.

17           MR. KAVALER:  That's why I thought they would be

18   confused because you said instruction No. 5.

19           THE COURT:  No, I said fifth.  I think they'll

01:39:20 20   understand it.

21           MR. KAVALER:  Thank you, your Honor.

22       (Proceedings heard in open court:)

23           THE COURT:  You may proceed.

24           You wanted to make --

01:39:49 25           MR. KAVALER:  Your Honor, limiting instruction No. 1,

Streem - direct

1636

1    paragraph second.

2         THE COURT:  Correct.  This document will be admitted

3    subject to the second paragraph in the limiting instruction

4    No. 1.

01:40:04  5         MR. KAVALER:  Thank you, your Honor.

6    BY MR. BURKHOLZ:

7    Q.  This is an investor relations report for the time period

8    May to August 2002, correct?

9    A.  Yes.

01:40:16  10   Q.  This is a report that was prepared by your investor

11   relations group, correct?

12   A.  Yes.

13   Q.  Now, the first three pages of the document has a

14   description of events during different months during this time

01:40:38  15   period, correct?

16   A.  Yes.

17   Q.  And how did you prepare that particular part of the

18   document?

19   A.  This -- this would have been prepared based on our

01:40:51  20   knowledge of just news events, analyst reports, ancillary

21   activities that affected the trading of the stock or the stock

22   market in general.

23   Q.  So you were looking at newspaper articles and analysts'

24   reports, for example?

01:41:07  25   A.  Among other things, yes.

Streem - direct

1637

1    Q.   What were the other things you were looking at?

2    A.   As I said, other events that affected the stock market and

3    the trading of our stock.

4    Q.   And you were looking to see how these events, these

01:41:18 5   newspaper articles and analysts' reports, impacted Household's

6    stock prices, correct?

7    A.   Really just trying to track the particular article or

8    event with changes in the stock price.

9    Q.   And how did you figure out the change in the stock price?

01:41:36 10  What did you look at?

11   A.   Public information about how the stock prices go up and

12   down.

13   Q.   So if an event -- an analyst's report came out on a

14   particular day and you include it in here, you look at how the

01:41:48 15  stock performed over that day or the next couple of days; is

16   that what you did?

17   A.   Yes.

18   Q.   Now, you didn't perform any statistical analysis in

19   preparing this analysis of the stock price impact, did you?

01:42:05 20  A.   Not generally, I don't think so, no.

21   Q.   You're not an expert in statistical analysis of stock

22   price movements?

23   A.   No, sir.

24   Q.   You're not an expert in loss causation, are you?

01:42:16 25  A.   No.

**PSA47**

Streem - direct

1638

1    Q.  You're not an expert in damages, are you?

2    A.  No.

3    Q.  Nobody in your group that prepared this report is an

4    expert in those areas, are they?

01:42:22 5    A.  I don't believe anyone was at that time.

6    Q.  And you're not an expert in determining if Household's

7    stock price declined because of the market declining or

8    because of information coming out regarding Household's

9    business practices?

01:42:39 10   A.  If you don't mind, could you just repeat the question?

11   Please just read it back.

12   Q.  Sure.  You're not an expert in determining if Household's

13   stock price declined because of the market going down or

14   because of information coming out regarding Household's

01:42:53 15   business practices?

16   A.  That is correct, I would not be.

17   Q.  But this investor relations report does compare Household

18   to its peers, correct?

19   A.  Yes, yeah.

01:43:07 20   Q.  Over a period of time, right?

21   A.  Right.

22   Q.  And it also compares Household to the market, the S & P

23   500, correct?

24   A.  Yes, it does.

01:43:16 25   Q.  Okay.  Let's look at that on page four of the document.

Streem - direct

1    We can highlight the top portion, performance versus financial

2    indices, that section right there, to the bottom, S & P 500.

3        This part of the document shows how Household

4    performed compared to a peer group average, the S & P 500 and

01:43:44 5    the S & P 500 Financial for various months for this report,

6    correct?

7    A.  Yes.

8    Q.  And these are the months May, June, July and August of

9    2002, correct?

01:43:55 10    A.  Yes.

11    Q.  And it also shows how Household performed for the entire

12    year, from January 1, 2002, up until the end of August 2002,

13    correct?

14    A.  Yes.  Sorry.

01:44:10 15    Q.  And that's what the year-to-date refers to on the

16    right-hand side, right?

17    A.  Yes.

18    Q.  And that shows that Household declined by 37.7 percent

19    compared to its peer group going down 9.4 percent for the

01:44:24 20    entire year up until the end of August 2002, correct?

21    A.  Yes.

22    Q.  Let's look at the peer group that's on the next page.  I'm

23    sorry, two pages from there.

24        Who selected that group?

01:44:56 25    A.  It would have been my group that picked the names.

Streem - direct

1640

1    Q.  And those are companies that Household compared itself to

2    during this time period, correct?

3    A.  Yes, sir.

4    Q.  Included AIG, Citigroup and Wells Fargo, correct?

01:45:09 5    A.  Among others, yes.

6    Q.  Keep that document handy.  I want to show you another one.

7    We marked it as Plaintiffs' 1156.

8    (Tendered.)

9        MR. BURKHOLZ:  A copy for counsel.

01:45:36 10       MR. KAVALER:  Thank you.

11   BY MR. BURKHOLZ:

12   Q.  This is an e-mail that you received on or about August 30,

13   2002, correct?

14   A.  Yes, sir.

01:45:47 15   Q.  From Donna Taillon; is that correct?

16   A.  Yes.

17   Q.  She worked at Household, correct?

18   A.  Yes, she did.

19       MR. BURKHOLZ:  Your Honor, I move 1156 into evidence.

01:45:58 20       THE COURT:  It will be admitted.

21   BY MR. BURKHOLZ:

22   Q.  Let's highlight the entire part of the e-mail.

23       It says Craig, Tom phoned.  Would like the price

24   history of Household's stock, as he wants to measure the

01:46:13 25   decrease in the stock price from various points in time in the

**PSA50**

Streem - redirect
1665

1    people, right?

2    A.  Well, you said around the country.  I was responding to

3    that.

4    Q.  And these people were investors in Household stock, right?

02:13:47  5    A.  From time to time, yes.

6    Q.  When you went and you met with -- did you meet with people

7    from Schwab, Charles Schwab and Company?

8    A.  That, I don't recall.

9    Q.  How about Putnam Investments?

02:13:58  10    A.  Yes.

11    Q.  And they had individual accounts that owned stock in

12    Household, correct?

13    A.  I don't know if Putnam had individual accounts.

14    Q.  Now, let's go back to, let's say, the spring of 2002.  Do

02:14:21  15    you remember that there were critical articles of Household in

16    Barron's and Business Week in late 2001?

17    A.  Yes.

18    Q.  Very critical of Household's accounting policies,

19    especially with respect to its loans, correct?

02:14:34  20    A.  Yes.

21    Q.  And, in fact, Mr. Schoenholz, Mr. Aldinger made

22    presentations at the -- at the FRC conference, the Financial

23    Relations Conference, in the spring of 2002, right?

24    A.  Yes.

02:14:47  25    Q.  And they provided information to analysts and investors

PSA51

Streem - redirect

1666

1    that were there that day, correct?

2    A.  Yes.

3    Q.  Provided slides regarding information regarding Household,

4    right?

02:14:56  5    A.  Yes.

6    Q.  Now, you didn't review any of the backup material for any

7    of those slides, did you?

8        All the information that went into those slides and

9    that were presented to those investors that day, you didn't

02:15:11 10   review that, did you?

11   A.  I would not have reviewed all of the information that went

12   into preparing those slides.

13   Q.  So if Mr. Schoenholz made a statement on that day

14   regarding Household's re-age policies, you wouldn't know the

02:15:22 15   basis for the statement?  You just believed he was telling the

16   truth because you worked with him, right?

17   A.  In general, that would be the case.  But in other cases,

18   there was information that I was aware of.  So it would be

19   both.

02:15:33 20   Q.  But you wouldn't have all the information that

21   Mr. Schoenholz had when he made a public statement like that,

22   did you?

23   A.  I'm not sure I could have had all of the information that

24   anyone would have had.

02:15:41 25   Q.  You just relied on the fact that you didn't think that he

**PSA52**

```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,     )
                                    )
 5             Plaintiff,           )
                                    )
 6    vs.                           )  No. 02 C 5893
                                    )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                        )  Chicago, Illinois
 8                                  )  April 13, 2009
               Defendants.          )  9:00 a.m.
 9
                              VOLUME 9
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Schoenholz - direct

1    about your two-plus statistics; is that right, sir?

2    A.  Yes.

3    Q.  Okay.

4         And that's the paragraph that begins, "Own Consumer

02:47:44  5    Two Month and Over Contractual Delinquency."

6         Do you see that?

7    A.  I do.

8    Q.  All right.

9         And, then, you provided a table regarding your

02:47:51 10    two-plus numbers at Page 902 of this document; is that right?

11    A.  Yes.

12    Q.  Okay.

13         And, sir, one of the reasons that you reported your

14    two-plus statistics -- this information about the percentage

02:48:12 15    of your portfolio that was more than two months delinquent --

16    was because that was an important metric that both Wall Street

17    and investors looked at; isn't that correct?

18    A.  Yes.

19    Q.  Okay.

02:48:26 20         In other words, you were a loan company and the

21    quality of loans would be something that would be of interest

22    or be significant to readers of your financial statements; is

23    that right?

24    A.  What I'm hesitating about is I think, taken by themselves,

02:48:47 25    it wouldn't be of great interest.  I think it would be

Schoenholz - direct

1898

1    interest in the context also of the loss reserves of the

2    company -- to get a full picture of the credit position of the

3    company.

4    Q.  Right.

02:49:02  5        My question to you, though, was:  One of the reasons

6    that you put the two-plus statistics in your Qs and your Ks

7    was because that's something investors would want to look at

8    in considering the quality of your loan portfolio; is that

9    correct?

02:49:14  10  A.  Correct.

11   Q.  And, sir, in arriving at the re-age -- or, I'm sorry, at

12   the two-plus numbers in Defendants' Exhibit 854 -- in this

13   10-Q, did Household say anything about the percentage of the

14   portfolio that had been re-aged before this number -- this

02:49:37  15  two-plus number -- had been arrived at?

16   A.  I'm sure not.

17   Q.  Okay.

18       Did Household say anything about the percentage of

19   this portfolio that had been re-aged multiple times before

02:49:47  20  this number was arrived at?

21   A.  No.

22   Q.  Sir, I'll show you what's been marked as Plaintiffs'

23   Exhibit 736.  I'd ask you to take a look at that, if you

24   would.

02:50:22  25       (Document tendered to counsel and the witness.)

**PSA55**

1    BY MR. DOWD:

2    Q.  Sir, do you recognize Plaintiffs' Exhibit 736 to be the

3    Household International 10-Q for the period ending September

4    30th, 1999?

02:50:38  5    A.  It purports to be.

6    Q.  Okay.

7         And you have no reason to doubt that it is, right,

8    sir?

9    A.  I don't.

02:50:43  10    Q.  And looking at the page that ends with the Bates range

11    229, you signed off on this 10-Q for the period ended

12    September 30, 1999, as the Executive Vice-President and Chief

13    Financial Officer at Household; is that right?

14    A.  Correct.

02:50:59  15    Q.  And you were affirming that it was accurate in all

16    material respects; is that correct, sir?

17    A.  Correct.

18    Q.  And, sir, again, you would have reported net income

19    information in this document; is that correct?

02:51:13  20    A.  Yes.

21    Q.  And you would have reported earnings per share information

22    in this document; is that correct?

23    A.  Yes.

24    Q.  And, in addition to that, you would have reported your

02:51:25  25    two-month -- two-plus -- statistics; is that right?

1    A.  What I'm telling you is that our policy said that,

2    under -- my understanding, under all circumstances, that a

3    collector would talk to a delinquent customer, would document

4    those discussions on the customer's record before an account

03:54:04  5  was re-aged.

6    Q.  Well, let's see what you said about that a little while

7    later, all right, sir.

8         Let me ask you:  Did there come a time that you

9    changed this 10-K?

03:54:21  10  A.  Well, as --

11        THE COURT:  When you say this 10-K, which one are you

12   referring to?

13        MR. DOWD:  I'm sorry, your Honor.  We're referring to

14   Defendants' 852.  I apologize to the Court.

03:54:28  15       THE COURT:  Which is for what year?

16        MR. DOWD:  That's December 31, 2001.

17   BY THE WITNESS:

18   A.  Say again, please.

19   BY MR. DOWD:

03:54:39  20  Q.  Yes, sir.

21        Was there a time that you reissued this 10-K to

22   correct or to amend this disclosure about your re-age

23   practices?

24   A.  Well, we already talked about the fact that in the summer

03:54:55  25  of 2002, we reissued the 10-K.  And the language that was

Schoenholz - direct

1933

1  included in the first version and reviewed by our -- by Arthur

2  Andersen and the language included in the second version,

3  which was reviewed by KPMG, was the same language.  I believe

4  in 2003, the company revised the language in the 10-K in

03:55:25  5  connection with the HSBC acquisition.

6  Q.  Okay.  Let me just ask you to back up a little bit.

7      You said the language was looked at by Arthur

8  Andersen.  These aren't Arthur Anderson's financial

9  statements, right?  They're your financial statements, aren't

03:55:41 10  they, sir?

11  A.  When I -- when I signed these financial statements --

12  Q.  Sir, just answer my question.  Are they your financial

13  statements, Household's, or Anderson's financial statements?

14  A.  They're the financial statements of Household

03:55:54 15  International.

16  Q.  And Household International's financial statements are the

17  responsibility of management of Household International to get

18  it right; isn't that right?

19  A.  In discharging -- yes.  And in discharging that

03:56:06 20  responsibility, I relied on business unit and corporate office

21  financial people and credit risk people who had more detailed

22  knowledge than I did; and I relied on their informed

23  professional judgment.  And I also relied on the fact that our

24  auditors would have reviewed that language.

03:56:34 25  Q.  Okay.  Sir, but they were your responsibility?  You were

Schoenholz - direct

1934

1    the guy who signed them, right?

2    A.   No question.

3    Q.   Okay.  Sir, I'll show you what's been marked as

4    Plaintiffs' Exhibit 1267.  I'd ask you to take a look at that

03:56:48  5    if you would.

6    (Tendered.)

7    BY MR. DOWD:

8    Q.   Sir, do you recognize Plaintiffs' Exhibit 1267 to be a

9    copy of a document entitled form 10-K/A for Household

03:57:25  10    International for the period ended December 31, 2001?

11    A.   That's what it says.

12    Q.   Okay.

13          MR. DOWD:  Your Honor, I'd offer Plaintiffs' Exhibit

14    1267 if I could.

03:57:36  15          THE COURT:  It will be admitted.

16    BY MR. DOWD:

17    Q.   Okay.  I just want to make sure I get this straight, sir.

18    You had filed Defendants' 852, a 10-K for the period that

19    ended December 31, 2001, you filed that in the regular course

03:57:49  20    in March of 2002; is that right?

21    A.   Correct.

22    Q.   Okay.  And then a year later, in March of 2003, you filed

23    an amended version of that 10-K; is that correct, sir?

24    A.   Where does it say it was filed a year later?

03:58:07  25    Q.   It's March of 2003, isn't it, sir?

1       Sir, I'll show you what's been marked as Plaintiffs'

2  Exhibit 183.  I'd ask you to take a look at that if you would.

3  (Tendered.)

4  (Brief pause.)

04:13:53  5  BY MR. DOWD:

6  Q.  Sir, do you recognize Plaintiffs' Exhibit 183 to be a copy

7  of a transcript of the Household International financial

8  relations conference call; is that right?

9  A.  It seems to be.

04:14:17 10  Q.  Okay.  And, sir, there's nothing unusual about you guys

11  preparing a transcript or having a transcript prepared of a

12  conference call; is that right?

13  A.  Correct.

14  Q.  Okay.  And it notes the moderator is Edgar Ancona; is that

04:14:31 15  correct?

16  A.  Correct.

17  Q.  And I believe you told me earlier that he was the

18  treasurer of the company; is that right?

19  A.  Correct.

04:14:37 20  Q.  And does this refresh your recollection that the financial

21  relations conference that you had referred to earlier took

22  place on April 9, 2002?

23  A.  It appears to be.

24  Q.  Sir, you were present in person at this financial

04:14:50 25  relations conference; is that right?

**PSA60**

1    A.  Yes.

2    Q.  And in addition to yourself, was Mr. Gilmer there?

3    A.  I think so.

4    Q.  Okay.  Was Mr. Aldinger there?

04:15:03  5    A.  Yes.

6    Q.  And tell me a little bit about this financial relations

7    conference.  Was it held in a public place?  Where was it

8    held?  A hall?  How did it work?

9    A.  It was a gathering of bankers, commercial bankers,

04:15:23  10   investment bankers, equity analysts, fixed-income analysts,

11   generally people who followed Household in the financial

12   community.  It was held in the Chicago area at a conference

13   room in a hotel.

14   Q.  Okay.  And I take it this is like a conference room that

04:15:51  15   you guys from Household rented; is that right?

16   A.  Right.

17   Q.  About how many of these bankers and financial analysts and

18   other people that followed Household, about how many of them

19   were there that day?

04:16:01  20   A.  My guess is it was close to 400.

21   Q.  Okay.  And these people were all there to listen to

22   yourself and Mr. Aldinger make presentations, among other

23   things; is that right?

24   A.  Among other things.

04:16:12  25   Q.  Okay.  Did people also get to listen in on the phone that

Schoenholz - direct

1    day?

2    A.  I believe under the SEC regulations, under the fair

3    disclosure regulations, that it was like Web cast or

4    simulcast.

04:16:27  5    Q.  Okay.  So, in other words, in addition to these 400 people

6    who were in the room, there were other people that follow

7    Household, as you put it, investment analysts, bankers, people

8    like that, that could also watch what you were saying?

9    A.  Correct.

04:16:42 10    Q.  Now, sir, I'd ask you to turn to the page that ends with

11    the Bates range 300 in Plaintiffs' Exhibit 183.

12         MR. DOWD:  Your Honor, I'd offer Plaintiffs' Exhibit

13    183 at this time.

14         THE COURT:  It will be admitted.

04:17:18 15    BY MR. DOWD:

16    Q.  Sir, have you found the page that ends with the Bates

17    range 300?

18    A.  I did.

19    Q.  I'd refer you specifically to the very bottom of that page

04:17:31 20    and ask you to take a look at that.

21    (Brief pause.)

22    BY THE WITNESS:

23    A.  Correct.

24    BY MR. DOWD:

04:17:41 25    Q.  Okay.  And, sir, this portion of the transcript, this was

1959

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 14, 2009
                Defendants.          )  8:45 a.m.
 9
                          VOLUME 10
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545

24

25
```

**PSA63**

         1    A.  They did.

         2    Q.  Okay.  You had to report something at the end of March,

         3    and then you said we got to change that policy back; isn't

         4    that right?

10:20:49 5    A.  It said we needed to take and test to see what the right

         6    policy should be.  And changing it back -- I think what this

         7    says is we rescinded it as implemented and started a test.  So

         8    the idea was to figure out what policy did make sense.

         9    Q.  But the policy -- people were asking questions about

10:21:12 10   re-aging or restructuring at the end of 2001, right?

         11   A.  It was a topic of discussion.

         12   Q.  Okay.  And you made a decision to reduce the amount of

         13   re-aging and restructuring you were doing in this business

         14   unit; is that right?

10:21:27 15   A.  Correct.

         16   Q.  Okay.  The two-plus numbers went up; is that right?

         17   A.  That's correct.

         18   Q.  And then you said, we're not going to -- we're going to

         19   rescind that policy change; is that right?

10:21:37 20   A.  I think what I said is the two-plus numbers went up, which

         21   we reported as they went up.  And that what we wanted to do

         22   was to execute the new policy or start a test to figure out

         23   what the new policy should be.

         24   Q.  Right.  But what I asked you is, you rescinded the new

10:21:53 25   policy, right?

Schoenholz - direct

2032

1    Q.  And among others, both yourself and Mr. Aldinger were cc'd

2    on Mr. Makowski's June 21 e-mail, right?

3    A.  Yes, sir.

4    Q.  Okay.  There's a bunch of handwriting on the right-hand

10:57:11  5    side of the page.  Do you recognize that handwriting?

6    A.  It's Mr. Aldinger's.

7    Q.  So, in other words, he sent you the e-mail after he had

8    kind of written a bunch of stuff on there; is that right?

9    A.  It appears to be.

10:57:20 10    Q.  The subject of Mr. Makowski's e-mail is Revised - New

11    Re-aging Policy; is that right?

12    A.  Correct.

13    Q.  And he goes on in the text of the e-mail to say, At the

14    senior management meeting this week, new policies for re-aging

10:57:36 15    delinquent accounts were approved; is that right?

16    A.  That's what it says.

17    Q.  What was your understanding of what Mr. Makowski referred

18    to when he talked about the senior management meeting?

19    A.  We had -- Mr. Aldinger periodically would have an off-site

10:57:55 20    meeting with his senior team to go through kind of topics that

21    weren't just the day-to-day topics.

22    Q.  Okay.  And I take it you would have attended the senior

23    management meetings?

24    A.  Yes, sir.

10:58:07 25    Q.  Okay.  And Mr. Makowski lists these new policy changes for

**PSA65**

Schoenholz - direct

2033

1      re-aging delinquent accounts, right?

2      A.  That's what he does.

3      Q.  Okay.  And, for example, on the left-hand side, one of the

4      policies relates to real estate secured; is that right?

10:58:25  5      A.  Correct.

6      Q.  And then it says BUs.  I assume that's business units,

7      right?

8      A.  Yes.

9      Q.  And it says MS.  That would be mortgage services.  CL, for

10:58:36 10      example, consumer lending, right?

11      A.  Correct.

12      Q.  And then he lists these new policies as requiring two

13      payments and a minimum of 12 months since prior re-age, for

14      example, for real estate secured; is that right?

10:58:50 15      A.  That's correct.

16      Q.  And then he goes on to say, Our immediate next steps are

17      to affirm any impacts on financial projections and identify

18      any outstanding transition issues by July 1, 2002; is that

19      right?

10:59:03 20      A.  Correct.

21      Q.  And he says, Detailed policies need to be finalized and

22      approved by July 15; is that right?

23      A.  That's what he says.

24      Q.  And he goes on to say, The new policy changes will be

10:59:13 25      announced in July, with implementation to take effect August

**PSA66**

Schoenholz - direct

2034

1    1; is that right?

2    A.  That's what he says.

3    Q.  Okay.  And can you read Mr. Aldinger's handwriting?

4    A.  Pretty tough.

10:59:30  5    Q.  Okay.  I take it you would -- got used to reading it

6    during your time at the company though, right?

7    A.  Well, you know, that's why, if you notice, the bulk was

8    typed.  His secretary could translate it and would type it up

9    for people.

10:59:47  10    Q.  It looks like under number two there, he writes, Do we

11    have a better understand of the financial impact; is that

12    right?

13    A.  I guess.

14    Q.  That's what it looks like to you too?

11:00:00  15    A.  Do we have a better understand of the something impact.

16    Q.  Okay.

17    A.  It could be financial.  I don't know what it is actually.

18    Q.  Okay.  And these were questions directed at yourself, I

19    take it?

11:00:11  20    A.  I think this is what he would have wanted to discuss.

21    Q.  And so there was a management meeting where you talked

22    about changing your re-age policies in the summer of 2002; is

23    that right?

24    A.  It was in June, I believe.

11:00:26  25    Q.  Okay.  And was the intention at that time with regard to

**PSA67**

1    the re-aging policies to make them stricter or tighter?

2    A.  I think the -- I think the intention was to try to move to

3    more bank-like policies, while at the same time making sure we

4    still served our customer base -- because the consumer lending

11:01:04  5    wasn't a bank -- and to try to figure out how to balance those

6    two things, becoming more bank-like and still serving that

7    traditional customer base.

8    Q.  When you say more bank-like, the bank-like re-aging

9    policies would be stricter, right?

11:01:22  10    A.  Yes.

11    Q.  I'll show you what's been marked as Plaintiffs' 1117.

12    I'll ask you to take a look at that.

13    (Tendered.)

14        MR. DOWD:  A copy for counsel.

11:01:48  15    (Brief pause.)

16    BY MR. DOWD:

17    Q.  Sir, do you recognize Plaintiffs' 1117 as a series of

18    e-mails dated between July 9 and July 11, 2002?

19    A.  Yes, it is.

11:02:03  20        MR. DOWD:  Your Honor, at this time I'd offer

21    Plaintiffs' 1117.

22        THE COURT:  Admitted.

23    BY MR. DOWD:

24    Q.  Sir, let's start out with the bottom e-mail on this string

11:02:20  25    at the bottom of the first page.  That's a copy of an e-mail

Schoenholz - direct

2036

```
        1   from Dave Stockdale to yourself and others at Household, dated

        2   July 9, 2002, right?

        3   A.  Correct.

        4   Q.  And the subject of his e-mail is Re-age Meeting Summary,

11:02:37  5   July 9, 2002; is that right?

        6   A.  That's correct.

        7   Q.  And he says he wanted to summarize yesterday's meeting; is

        8   that right?

        9   A.  Correct.

11:02:44 10   Q.  Did you attend the re-age meeting that he's referring to

       11   there on July 9, 2002?

       12   A.  I don't think so.

       13       THE COURT:  Keep that mike close to you, please.

       14   BY MR. DOWD:

11:03:07 15   Q.  You all set?

       16   A.  Yeah.

       17   Q.  And in his e-mail, Mr. Stockdale says, We walked through

       18   the methodology of CCM and the businesses on the impact; is

       19   that right?

11:03:20 20   A.  That's what it says.

       21   Q.  Okay.  CCM is corporate credit management; is that right?

       22   A.  I think so.

       23   Q.  Okay.  And what he's talking about generally in this

       24   e-mail is these proposed policy changes for the re-age to

11:03:32 25   become more bank-like; is that right?
```

1    A.  That's correct.

2    Q.  Okay.  For example, he says consumer lending is okay with

3    the policies, but noted that the financial impact was

4    uncertain; is that right?

11:03:43  5    A.  That's right.

6    Q.  He says, They will implement a two-payment policy, right?

7    A.  That's what it says.

8    Q.  He says, Also real estate re-ages will immediately be done

9    no more frequently than 12 months; is that right?

11:03:54  10   A.  That's what he says.

11   Q.  He also goes on to say in his second numbered paragraph,

12   Retail services agreed to a policy requiring two payments for

13   the first re-age and three payments for subsequent re-ages; is

14   that right?

11:04:09  15   A.  That's what it says.

16   Q.  Okay.  And then, sir, you replied to that e-mail on July

17   11, 2002; is that right?

18   A.  I did.

19   Q.  And you talked about having further discussions with

11:04:24  20   Mr. Gilmer; is that correct?

21   A.  That's correct.

22   Q.  And you say, Gary's concern is that if we find that the

23   results are worse than we thought -- or you say "though."  I

24   assume you meant "thought," right?

11:04:40  25   A.  Right.

Schoenholz - direct

1    Q.   Okay.  We will not have time to modify before creating a

2    big financial impact; is that right?

3    A.   That's right.

4    Q.   And I take it that was a concern that Mr. Gilmer expressed

11:04:50 5    to you at that time and you put in this e-mail?

6    A.   I would assume so.

7    Q.   Okay.  And you go on to say, I'm not willing to run the

8    risk that we blow our second quarter forecast; is that right?

9    A.   That's right.

11:05:02 10   Q.   You meant you didn't want to start implementing these

11   changes and blow your financials, your forecast for that

12   quarter; is that right?

13   A.   This would have been the forecast for the year.

14   Q.   Okay.  And you say -- you say, Continue the steps already

11:05:25 15   in place to reduce the June stock numbers.

16        Do you see that?

17   A.   I do.

18   Q.   And that meant continue the steps that had already been

19   taken to reduce the re-aging; is that right?

11:05:35 20   A.   We're -- in this time period, we were trying to reduce the

21   reliance on re-ages where it didn't really impact the core

22   customer in a meaningful way.

23   Q.   Okay.  Sir, I'll show you what's been marked as

24   Plaintiffs' Exhibit 618 and ask you to take a look at that if

11:06:05 25   you would.

1    (Tendered.)

2            MR. DOWD:  A copy for counsel.

3    BY MR. DOWD:

4    Q.  Sir, I'd ask you to take a look at Plaintiffs' Exhibit

11:06:17  5    618.

6            Is that a copy of an e-mail chain dated July 12,

7    2002, among Household employees?

8    A.  Correct.

9    Q.  And --

11:06:26 10            MR. DOWD:  Your Honor, at this time I'd offer

11    Plaintiffs' Exhibit 618.

12            THE COURT:  Admitted.

13    BY MR. DOWD:

14    Q.  And at the bottom e-mail there is, again, an e-mail from

11:06:35 15    Dave Stockdale, this time dated July 12, 2002; is that right?

16    A.  That's correct.

17    Q.  And I take it that you received it on or about that date;

18    is that right?  You're cc'd there?

19    A.  I would assume so.

11:06:48 20    Q.  And the subject is Re-age Policies; is that right?

21    A.  Correct.

22    Q.  Now, Mr. Stockdale writes, After further discussion with

23    Dave Schoenholz, the new re-age policies that were agreed by

24    senior management last month should not be implemented until

11:07:01 25    further notice; is that right?

```
         1   A.  That's what it says.

         2   Q.  Okay.  And he goes on to say, The financial impact is too

         3   variable to risk the plan for 2002; is that right?

         4   A.  That's what it says.

11:07:12 5   Q.  Okay.  So, in other words, you had had this meeting in

         6   June where you had talked about going to these stricter

         7   bank-like restructuring/re-aging policies; is that right?

         8   A.  Correct.

         9   Q.  Then you had a discussion with Mr. Gilmer, and you decided

11:07:28 10  that if you went to these stricter re-aging policies, it could

         11  affect or risk you making your plan numbers for the year 2002;

         12  is that right?

         13  A.  That's not quite what happened.  What -- what -- what

         14  happened was when Makowski -- let me back up.

11:07:50 15      When Makowski did his memo or his presentation, your

         16  Exhibit 512, I don't think he was quite correct in saying that

         17  they had all been approved.  What we had agreed in -- at that

         18  meeting is that this is what we wanted to move towards.  And

         19  when I say move towards, this is the table you showed me.  But

11:08:24 20  Paul had not had a chance prior to making this presentation to

         21  meet with the business unit financial people or the business

         22  unit credit risk people, just due to time constraints.

         23      So what was left the meeting, the senior management

         24  meeting, is we wanted to move towards this; but Makowski had

11:08:44 25  to meet with the business unit financial people, the business
```

**PSA73**

Schoenholz - direct

1    unit collections people, credit risk people and so forth to

2    make sure everyone understood what would be done and to make

3    sure that we did it in an appropriate planned fashion.  So

4    they were having those conversations.  And I think that's what

11:09:06   5    Stockdale's -- your Exhibit 1117 refers to, Stockdale was

6    referring to those meetings.

7        And what came out of that was a difference of opinion

8    between the corporate credit risk group and the business unit

9    credit risk group.  And there were really two points of

11:09:24  10    contention.  The corporate guys thought that changing re-aging

11    wouldn't increase ultimate losses.  It was just a timing

12    issue.  The business unit guys didn't agree with that at all.

13    They said, no, if -- if you change your re-age policies

14    substantially, you're going to increase your ultimate losses

11:09:44  15    because once that customer starts getting delinquent, they'll

16    never get back and they'll roll to charge-off and so forth.

17    And so that you will actually have higher losses for the

18    company, for the shareholders if you try to move to this

19    immediately.

11:10:00  20        I believe that's what Gary Gilmer and I talked about.

21    And my feeling was we wanted to do this in a practical way.  I

22    remember the problem we had at Morgan Services when we didn't

23    do it with a testing environment.  So what we concluded was,

24    is that we would slow it down some.  We would continue to try

11:10:24  25    to, as it made sense, reduce that reliance on re-aging.  We

           1    would introduce testing.  So you had a test-and-learn thing in

           2    consumer lending.  And the other concern was how to implement

           3    it, how to roll it out, because, particularly in consumer

           4    lending, a lot of these customers had been originated with the

11:10:45   5    understanding that there would be that kind of flexibility in

           6    the collection side.  So people felt it was unfair to those

           7    customers to just change it immediately.

           8         So what we ultimately came up with was, we're going

           9    to do test-and-learn.  We're going to see what made sense.  We

11:11:05  10    would continue to try to reduce the reliance and move towards

          11    more bank-like policies.  And my recollection of what we

          12    agreed was, is that starting for new originations on January 1

          13    of '03 is when we would get to what Makowski had outlined.

          14    Q.  Okay.

11:11:23  15    A.  I think that's what was going on.

          16    Q.  All right.  And the reason that Mr. Stockdale gave here

          17    for this decision not to move to these tighter re-age policies

          18    was the financial impact is too variable to risk the plan for

          19    2002, right?

11:11:37  20    A.  I think that was his shorthand for what I just described

          21    to you.

          22    Q.  Okay.  But what he wrote was, The financial impact is too

          23    variable to risk the plan for 2002, right?

          24    A.  Those are his words.

11:11:56  25    Q.  Sir, I'd like to show you what's been marked as

1    statement?

2    A.  I don't remember one way or the other.

3    Q.  Okay.

4        Do you recall contacting the National Mortgage News

01:05:29  5    and asking them to correct this statement or anything like

6    that?

7    A.  I don't remember one way or the other.

8    Q.  Okay.

9        Sir, I'd like to talk to you a little bit about

01:05:41 10   Andrew Kahr.

11       You know who he is, right?

12   A.  I do.

13   Q.  And in late 1998/early 1999, you and Mr. Aldinger decided

14   to hire Andrew Kahr; is that right?

01:05:52 15   A.  That's right.

16   Q.  And you hired him, basically, to generate ideas for

17   growth; is that correct?

18   A.  That's correct.

19   Q.  And before you hired Andrew Kahr, you and Mr. Aldinger had

01:06:02 20   a meeting with him; is that correct?

21   A.  That's correct.

22   Q.  And, at that meeting, Mr. Kahr demanded that he be

23   accountable only to Mr. Aldinger; is that right?

24   A.  Andrew wanted to report only to Bill, that's correct.

01:06:22 25   Q.  Okay.

**PSA76**

Schoenholz - cross

1    Q.  Now, counsel asked you about a big stack of documents that

2    are piled up here (indicating) on the table -- various 10-Ks

3    and 10-Qs and other public filings.  Do you recall that?

4    A.  I do.

01:37:39 5    Q.  Now, would you explain to the jury and to the Court the

6    process by which --

7         MR. SLOANE:  Let me withdraw that.

8    BY MR. SLOANE:

9    Q.  Did you write those documents?

01:37:52 10    A.  I did not.

11    Q.  Would you explain to the Court and to the jury what was

12    the process by which those documents were created?

13    A.  Let me start with the 10-K document because that's a more

14    comprehensive document.

01:38:10 15    Q.  Let me interrupt you one second.

16         MR. SLOANE:  Your Honor, we have a demonstrative

17    exhibit, 802-01.  May we publish that on the board, please?

18         I don't believe there's any objection to it.

19         THE COURT:  If there's no objection, yes.

20    BY MR. SLOANE:

21    Q.  Perhaps this can serve as an aid to the jury and to you,

22    Mr. Schoenholz.

23         So, why don't you walk us through this document, if

24    you would.

01:38:38 25    A.  Okay.

Schoenholz – cross

1          Well, in this time frame, what it means is that the

2     10-K draft would have been initially prepared, generated by

3     the Corporate Controller's group with input from Investor

4     Relations, from the Treasury Department, from the Credit Risk

01:38:59  5     Department, clearly on the types of disclosures we've been

6     talking about would be drafted by the Credit Risk people; and,

7     also, would include initial input from the external auditors.

8          It would then be reviewed, after it was actually

9     drafted, by other people in the Corporate Controller's group.

01:39:17 10    I think that says "Internal Audit."

11          A draft would then go to Mr. McDonald, who was the

12     Chief Accounting Officer.

13     Q.  Mr. McDonald was the person that Mr. Dowd asked you about

14     in connection with certain of the exhibits you saw this

01:39:32 15    morning?

16     A.  Yes, sir.

17          He would then review the draft thoroughly, provide

18     his input, his comments, his direction, at which time he would

19     then circulate a 10-K document to all of those people listed:

01:39:46 20    Basically, senior business unit, operating managers, as well

21     as financial managers and functional heads within the

22     corporate office.

23          They were charged with reviewing the 10-K,

24     particularly as it related to disclosures that they had

01:40:07 25    specific informed knowledge on.  They provided their input

1    back to what we had was called a Disclosure Committee.  And

2    that Disclosure Committee consisted -- my recollection is it

3    consisted -- of McDonald; the treasurer; representatives of

4    the legal group that were, like, the SEC experts; as well as

01:40:32  5    some people -- a couple business unit financial people -- I

6    believe.

7         They would take it, digest it, come up with a draft

8    that they were happy with.  There would be then kind of a

9    summary meeting with Aldinger, myself, McDonald, and that says

01:40:51  10   Schwartz, who was kind of the SEC counsel in this time frame,

11   to talk about any issues, anything that we needed to revolve

12   at a higher level.

13        KPMG, the auditors, would then review that draft.

14   Although they had provided input at the very beginning part of

01:41:10  15   the process, but they would review it and, in essence, sign

16   off on that as part of their audit processes.  That would

17   include reviewing the MD&A and all those types of disclosures,

18   as well.

19        I would then get a draft and I'd review it very

01:41:27  20   carefully; generally, kind of in the late December time frame

21   and, then, probably updated in the late January time frame.

22        It would go to Mr. Aldinger.  Mr. Aldinger would take

23   and review it and provide whatever comments he had.  Then we

24   provided a draft of the 10-K to the Audit Committee generally

01:41:52  25   at the end of January for a meeting when the auditors would

Schoenholz - cross

1    present the results of their audit.

2         Mr. McDonald would take and talk about the financial

3    statements.

4         Prior to the meeting with the Audit Committee, we had

01:42:10  5    a separate advanced meeting -- this is pre-Audit Committee

6    meeting -- with Mr. Levy, who was the Chairman of the of Audit

7    Committee.

8         Mr. Levy was a retired senior technical partner with

9    KPMG and was a very -- truly an expert in this area of

01:42:29  10   financial reporting and disclosures.

11        He wanted to have a -- he wanted to have a -- private

12   advanced meeting with myself, McDonald, the internal auditors,

13   the external auditors.  And then he would meet privately just

14   with the internal auditors and privately just with the

01:42:48  15   external auditors, would get his input and then present it to

16   the Audit Committee and then get their input.

17   Q.  Let me be sure I understand this.

18        Did all of the 10-Ks and 10-Qs, after July 30, 2002,

19   go through this same process?

01:43:11  20   A.  That's correct.

21   Q.  Now, what was the process -- what's the significance of

22   the July 30, 2002, date, in your mind?

23   A.  That was when Sarbanes-Oxley came in.

24   Q.  What does that mean?

01:43:23  25   A.  Sarbanes-Oxley was legislation introduced on creating a

Schoenholz - cross

1  requirement for the Senior Chief Executive Officer and

2  principal Financial Officer.  So, in essence, certify

3  financial statements that were filed with the SEC.

4      And in response to that requirement to have that

01:43:47  5  certification, we created a sub-certification process that, in

6  essence, that had everybody in the business -- and there were,

7  I don't know, 40 or 50 people -- had to certify, in essence,

8  to Mr. Aldinger and myself the same things that we would have

9  to certify to the outside world.

01:44:10  10      That's why July -- that's the significance of July

11  30.

12  Q.  So, that was after July 30th, after this law got passed;

13  is that right?

14  A.  Right.

01:44:19  15  Q.  What was the process like before this law got passed?

16  A.  It was, essentially, the same process.  The difference

17  would be there wasn't a formal certification process and we

18  didn't have a formal disclosure committee.  So, it was more

19  like McDonald -- it would be the same where he would send it

01:44:38  20  out to the different business units and the functional heads,

21  but he would get the input back himself and working with his

22  department, giving it to KPMG; and, then, really are the rest

23  of the process was the same.

24  Q.  Now, when you signed these documents -- these 10-Ks or

01:44:59  25  10-Qs that Mr. Dowd showed you -- did you draw any comfort or

Schoenholz - cross

2111

1    reliance on this process?

2    A.  Of course.

3         I mean, I couldn't be aware of every detail or

4    everything.  So, I clearly reformed -- relied -- on kind of

01:45:20  5    the informed -- the judgments of informed -- professionals;

6    whether those were people internally or externally, I would

7    have relied and taken comfort from the fact that the external

8    auditors reviewed and signed off on things.

9         Now, that doesn't -- we earlier talked about were

01:45:40 10    they the responsibility of management.  Clearly, but --

11    Q.  Let me stop you.

12         How many people would have been involved in reviewing

13    this document before it got to you -- internal, external?  Can

14    you give us an order of magnitude?

01:45:52 15    A.  Literally dozens -- multiple dozens -- of people.

16    Q.  Now, did this apply both before and after July 30, 2002;

17    that is, literally dozens ands of people would have been

18    involved --

19    A.  Yes.

01:46:13 20    Q.  -- in the review of it?

21    A.  Yes.

22    Q.  And those -- that review -- would have gave you comfort as

23    to the accuracy of what was in there?

24    A.  Absolutely.

01:46:19 25    Q.  Now, you were responsible for what was in there because

1    you signed it; isn't that right?

2    A.  That's correct.

3    Q.  Now, Mr. Dowd showed you a document I'd like to put on the

4    screen.  It's Plaintiffs' Exhibit 1076 -- I'm sorry, it's 176.

01:46:40  5         MR. SLOANE:  176.

6       (Brief pause.)

7    BY MR. SLOANE:

8    Q.  Now, this was a document, I think you testified, was

9    something that was prepared -- when Mr. Dowd asked you -- I

01:46:50  10   think you said by Mr. McDonald?

11   A.  It was a combination of Mr. McDonald and the outside

12   auditors.

13   Q.  Okay.

14         And Mr. McDonald --

01:46:59  15        MR. SLOANE:  Going back to that chart, again, for a

16   second, Brian.

17      (Brief pause.)

18   BY MR. SLOANE:

19   Q.  -- Mr. McDonald, again, was one of the people who reviewed

01:47:06  20   the final version of these public disclosures before they were

21   issued to the public; isn't that right?

22   A.  Without question.

23   Q.  And that's him right there in the middle (indicating)?

24         MR. SLOANE:  Brian, if you can highlight "Steve

01:47:21  25   McDonald" right there (indicating) at the top.  It's over

**PSA83**

2220

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
4    others similarly situated,      )
                                     )
5               Plaintiff,           )
                                     )
6       vs.                          ) No. 02 C 5893
                                     )
7    HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         ) Chicago, Illinois
8                                    ) April 15, 2009
                Defendants.          ) 8:55 a.m.
9
                             VOLUME 11
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25

**PSA84**

1        (Brief pause.)

2    BY MR. DOWD:

3    Q.  Mr. Devor, is this a copy of the demonstrative that you

4    had prepared to assist you in explaining your conclusions?

02:15:51 5    A.  Yes, it is.

6    Q.  Okay.

7        And can you walk us through your conclusions that you

8    reached after performing your work in this case?

9    A.  Sure.

02:15:59 10        Basically, three conclusions; and, that is, that the

11    10-Ks and 10-Qs that were issued during the period that

12    contained financial statements and other disclosures were

13    misleading or false because --

14        THE COURT:  A little bit louder, sir.  The jurors

02:16:16 15    can't hear you.

16        THE WITNESS:  Sorry.

17        THE COURT:  Step back away from the mike and speak

18    loudly to that man over there (indicating), the one asking you

19    the questions.

02:16:23 20        (Laughter.)

21    BY THE WITNESS:

22    A.  I guess I should repeat my answer.

23    BY MR. DOWD:

24    Q.  Sure.  Go ahead.

02:16:30 25    A.  Basically, that during the period the company's 10-Ks and

1    10-Qs that were issued and which contained financial

2    statements, as well as disclosures and -- both in the form of

3    footnotes, as well as in something called Management's

4    Discussion and Analysis, were misleading or false because of

02:16:59  5    these three reasons.

6            First, Household failed to disclose required

7    information about improper lending practices.

8            Secondly, Household used re-aging and other loan

9    quality concealment techniques to manipulate delinquency

02:17:15  10   statistics.

11           And, thirdly, Household improperly recorded revenue

12   and expenses, resulting in a restatement.

13   Q.  Okay.

14           And, sir, what is it in your background that allows

02:17:30  15   you to formulate these opinions, to reach these conclusions?

16   A.  Well, first of all, I've been an auditor for 36 years.

17   And what auditors do is, again, look at reporting -- and, for

18   much of my career, it's been public reporting in public

19   companies -- and determine whether or not the reporting is, in

02:17:52  20   fact, fair or not fair.  That's what auditors do.

21           But over -- beyond -- that, in 36 years I've

22   developed a vast experience in applying technical accounting

23   and SEC rules, that need to be applied when one puts together

24   these 10-Ks and 10-Qs.

02:18:15  25           So, that's what's in my experience that gives me the

1    engaged in improper lending practices; and, therefore, what

2    were the reporting responsibilities of the company, as a

3    result of that.

4    Q.  And were you also asked to make a determination of amounts

02:39:25  5    attributable to predatory lending practices between 1999 and

6    2002?

7    A.  I was.

8    Q.  Okay.

9        Let me first ask you:  What was your conclusion

02:39:35  10  regarding Household's disclosures regarding predatory lending?

11   A.  That they were, in some cases, non-existent and certainly

12   inadequate.

13   Q.  Okay.

14       And let me ask you:  Did you also make an effort to

02:39:51  15  quantify the amount of revenue that Household had recorded,

16   that was attributable to loan splitting, misrepresenting loan

17   fees and points, misrepresenting interest rates, insurance

18   packing and imposing prepayment penalties during the relevant

19   time frame?

02:40:07  20      MS. BUCKLEY:  Objection, your Honor.

21       THE COURT:  The basis?

22       MS. BUCKLEY:  The subject of your MIL on revenue

23   recognition.

24       THE COURT:  Overruled.

25   BY MR. DOWD:

Devor - direct

2410

```
        1   Q.  You can answer.

        2   A.  Okay.

        3       I just have to remember the question.

        4   Q.  Do you want me to --

02:40:25 5  A.  No, I got it.

        6       The answer is:  Yes, I did.

        7   Q.  Okay.

        8       And what was the amount that you came up with?

        9   A.  Approximately $3.2 billion.

02:40:37 10 Q.  Okay.

        11      And, generally, how did you arrive at that $3.2

        12  billion number?

        13  A.  I used computations that were done by the company.

        14  Q.  Okay.

02:40:46 15      And did you look at that 3.2 billion for -- was that

        16  for the period from 1999 through the second quarter of 2002?

        17  A.  It was.

        18  Q.  Okay.

        19      And approximately what percentage of Household's

02:41:11 20 revenues were attributable to improper lending practices

        21  between the beginning of 1999 and the second quarter of 2002?

        22      MS. BUCKLEY:  The same objection, your Honor.

        23      THE COURT:  Overruled.

        24      MS. BUCKLEY:  I'd request a sidebar.

02:41:28 25     THE COURT:  Sure.
```

1    quantified, that was attributable to improper lending

2    practices, and compare it to the amount of revenue between

3    1999 -- June 30th, 1999 -- and June 30th, 2002?

4    A.  I did.

02:46:10  5    Q.  Okay.

6        And can you tell us approximately what percentage of

7    revenue was attributable to these practices during that time

8    period?

9    A.  I believe it ranged from, depending on what period we're

02:46:25 10   talking about, somewhere between five-and-a-half percent to

11   eight percent.

12   Q.  And did you also look at the 3.2 billion, as it compared

13   to net income, during that same time period?

14   A.  I did.

02:46:40 15   Q.  And did you prepare a demonstrative depicting that?

16   A.  I did.

17   Q.  Okay.

18       I'll show you what's been marked as Plaintiffs'

19   Demonstrative 40.  And I'd ask you to look at that, if you

02:46:51 20   would.

21       And can you explain to me what you were trying to

22   determine straight with Plaintiffs' Demonstrative 40?

23   A.  Just the impact of the amounts attributable to the alleged

24   improper lending practices, as a percentage of net income that

02:47:23 25   the company actually reported.

Devor - direct

2415

1    Q.   Okay.

2         And, so, for example, in 1999, what was the

3    percentage that you determined, based on the documents that

4    you looked at?

02:47:33 5    A.   As you can see, it's 28 percent, roughly.

6    Q.   Okay.

7         And, then, for the year 2000, 32 percent; is that

8    right?

9    A.   That's correct.

02:47:43 10   Q.   Okay.

11        And for the year 2001, 36 percent?

12   A.   That's correct.

13   Q.   And, finally, for the year 2002 -- the first two

14   quarters -- 32.8 percent?

02:47:55 15   A.   That's correct.

16   Q.   And, again, these amounts shown in that middle column

17   there (indicating) -- the -- attributable to the lending

18   practices -- are dollars of net income during these periods

19   attributable to loan splitting, misrepresenting loan fees and

02:48:14 20   points, misrepresenting the interest rate, insurance packing

21   and imposing prepayment penalties; is that right, sir?

22   A.   That's right.

23   Q.   Okay.

24        In addition to looking at internal calculations of

02:48:25 25   the amounts attributable to certain lending practices, did you

Devor - direct

2424

1    that the company had realized from improper lending.  That's

2    something that's important to an investor or anybody else

3    looking at these financial statements.

4    Q.  All right.

02:58:54 5         And, sir, going back to Plaintiffs' Demonstrative

6    Exhibit 107, what was your second opinion that you reached or

7    conclusion that you reached?

8    A.  That Household used re-aging and other loan quality

9    concealment techniques to manipulate delinquency statistics.

02:59:13 10  Q.  Okay.

11        Now, you've used the word "delinquency statistics."

12   What is a delinquency statistic in the Household world?  What

13   does that mean?

14   A.  Household -- and other people in the same industry --

02:59:27 15  disclose in that Management's Discussion and Analysis section

16   certain information about the loan portfolio's delinquency

17   status -- how much of the loans are delinquent -- and that's

18   what this is.

19   Q.  Okay.

02:59:45 20       Why would a finance company report information about

21   loan delinquency?

22   A.  Well, if you think about it, it's the largest item that

23   the company has on its balance sheet, on its financial

24   statements -- the loans.

02:59:58 25       So, if it's the largest asset and most important

**PSA91**

Devor - direct

1    asset, a reader would want to know how good the quality of

2    that asset is.

3        It's how the company actually makes a living; how the

4    company earns fee income and interest income as a result of

03:00:16  5    its loans.

6        It's almost the equivalent, if you think about it, of

7    a farmer who has a plow and a horse, and that's how the farmer

8    makes a living.

9        If you were going to make some sort of decision about

03:00:29  10    whether you want to buy that business or not, you'd want to

11    know the health of the horse or the plow, because that is

12    obviously going to impact the ability to make earnings going

13    forward.

14    Q.  And how did Household disclose information in its 10-Qs

03:00:46  15    and 10-Ks with regard to delinquency?

16    A.  They disclosed, again, in The Management's Discussion and

17    Analysis section something called their "Two-Plus Delinquency

18    Statistics," and I'm guessing you've heard that term before,

19    but that's what they disclosed --

03:01:03  20    Q.  All right.

21        And could we please --

22    A.  -- as well as charge-off statistics.

23        MR. DOWD:  Could we please pull up what's been marked

24    as Plaintiffs' Demonstrative Exhibit 120?

03:01:11  25    (Brief pause.)

Devor - direct
2426

1   BY MR. DOWD:

2   Q.  Sir, did you have Plaintiffs' Exhibit 120 prepared for

3   your use in presenting your opinion today?

4   A.  I did.

03:01:30  5   Q.  Okay.

6        And can you explain to us what its significance is?

7   A.  Well, this is an actual blow-up of what was included in

8   2001's 10-K for Household.  Over to the right are the 2- --

9   the right-hand four columns are the -- 2000 statistics.

03:01:51  10       If you look in the middle, the four columns, that's

11   the 2001 statistics.  And it's broken down by line of

12   business.  That's how Household reported it.  And it

13   represents the percentage of the loan portfolio that, in this

14   case, the company owned, that is greater than two months past

03:02:15  15   due at those dates.

16       So, for instance, under Column 1 that says, "No. 1"

17   there, that would be the delinquency -- the percentage of

18   loans over 60 days old -- at March 31st, 2001.  And, of

19   course, at the -- and the number 4 would be at the -- end of

03:02:36  20   the year.

21   Q.  And, sir, did you reach a conclusion as to whether

22   Household had accurately reflected the quality of its loan

23   portfolio through the two-plus statistics in the Qs and Ks?

24   A.  I did reach a conclusion.

03:02:49  25   Q.  And what was that conclusion?

1    A.  The conclusion is that these statistics were basically

2    false and misleading, as well as disclosures relating to it.

3    Q.  And why is that?

4    A.  Because the company used these techniques -- which I'll

03:03:06  5    call "loan quality concealment techniques," such as re-aging

6    and whatever -- to actually move things out of their two-plus

7    category and to reflect them either as current or in some

8    other category that's not two-plus, so that these numbers

9    don't really reflect the numbers that actually were two-plus,

03:03:32  10    as well as there isn't any disclosure indicating any of that.

11    Q.  Okay.

12        And have you prepared a demonstrative that explains

13    the type of loan quality concealment techniques that you

14    became aware of as you performed your work in the last four

03:03:42  15    years?

16    A.  I have.

17    Q.  Okay.

18        MR. DOWD:  And I'd ask that we pull up Plaintiffs'

19    Demonstrative Exhibit 39, please.

03:03:48  20        THE COURT:  Do you want to finish with that now or do

21    you want to take a break now, counsel?

22        MR. DOWD:  If you want, your Honor.  Let me just

23    finish with this one.  We'll walk through it quick.

24        THE COURT:  Okay.

03:04:00  25    BY MR. DOWD:

Devor - direct

2428

1    Q.  And, sir, what is contained in Plaintiffs' Demonstrative

2    Exhibit 39?

3    A.  Well, these are, I guess, six examples of the kinds of

4    practices that I've called "loan quality concealment

03:04:12  5    techniques" that the company used during the relevant period

6    of this case, that had the impact of moving things out of the

7    two-plus category; and, in effect, therefore, not reporting it

8    in the 10-Ks and 10-Qs.

9    Q.  And, just for the record, sir, what were those six types

03:04:32 10    of loan quality concealment techniques that you identified?

11    A.  Okay.  Re-ages and restructures; late stage re-ages;

12    forbearance; skip-a-pay; re-writes; and, grace periods.

13         MR. DOWD:  Do you want to stop there, your Honor?

14         THE COURT:  Yes.

03:04:49 15         Let's take our 15-minute break, ladies and gentlemen.

16         (Jury out.)

17         THE COURT:  You may step down, sir.

18         Okay.  We'll take a 15-minute break.

19         MR. DOWD:  Thank you, your Honor.

03:05:28 20         MR. KAVALER:  Your Honor, can I ask you a question?

21         THE COURT:  I'm sorry, go back on the record.

22         MR. KAVALER:  I just want to know if you had a time

23    chosen for Friday yet.

24         THE COURT:  No, I haven't.  Why don't you folks tell

03:05:34 25    me when you think you want to meet.

**PSA95**

Devor - direct

2429

```
 1              MR. KAVALER:  Are you available at all times?

 2              THE COURT:  The morning there's going to be a call

 3    for sure.

 4              About what time, Carol?  Noon, probably?

03:05:44  5    THE CLERK:  Yes.

 6              We have a sentencing at 10:30 and some statuses.  So,

 7    that's a good hour usually.

 8              THE COURT:  The sentencing will go until 11:30.

 9              So, it will be probably around 12:30.

03:05:56 10    MR. KAVALER:  Is that what you want us to do?

11              Whatever you want, your Honor.

12              THE COURT:  Why don't we count on that now:  12:30.

13              MR. KAVALER:  Is that all right with you guys?

14              MR. DOWD:  Fine.

03:06:07 15    THE COURT:  Now, we're in recess.

16         (Brief recess.)

17              THE COURT:  Let's bring the jury out.

18         (Jury enters courtroom.)

19              THE CLERK:  Please be seated.

03:24:51 20    THE COURT:  Proceed.

21              MR. DOWD:  Thank you, your Honor.

22    BY MR. DOWD:

23    Q.  Mr. Devor, when we left off, you were talking about these

24    re-aging and other loan quality concealment techniques, is

03:25:01 25    that right?
```

**PSA96**

Devor - direct

2430

1    A.  Yes.

2    Q.  Have you seen any evidence that would suggest to you that

3    these techniques were used extensively?

4    A.  Yes.

03:25:07  5    Q.  And can you tell us about that.

6    A.  Well, the -- first of all, there was a lot of company

7    documents that -- during the time period that indicate they

8    were.

9          MS. BUCKLEY:  Objection, your Honor.

03:25:20 10          THE COURT:  Basis?

11          MS. BUCKLEY:  The witness has conceded he's not an

12    expert in predatory lending.

13          THE COURT:  Overruled.

14    BY THE WITNESS:

03:25:33 15    A.  So that's one -- do I keep talking?

16    BY MR. DOWD:

17    Q.  Yes.  Go ahead.

18    A.  So that's one.

19          I think the company actually at some point used a

03:25:43 20    number like 17 billion in its proxy statement to also indicate

21    that at least for '01 they had used re-aging and other

22    techniques of close to $17 billion, so that's a pretty

23    significant number.

24    Q.  Okay.  And, sir, have you prepared an animation or a

03:26:00 25    series of demonstratives that will explain how these different

**PSA97**

1    the two-plus statistic column but included that in the

2    31-to-60-day column even though it might be being paid on,

3    say, day 74 or something, or even 75, but nonetheless it

4    would -- if it was paid at all, but it was -- but it was

03:39:58  5    included in the middle column as opposed to the far column.

6    Q.  Okay.  So in other words, it didn't show up as two-plus in

7    the Qs and Ks, is that right?

8    A.  That's correct.

9    Q.  Okay.  You just went through a number of these loan

03:40:08  10    quality concealment techniques.

11        Have you seen evidence that each of these was used by

12    Household during the relevant time period?

13    A.  I have.

14    Q.  Okay.  And have you prepared a slide that demonstrates how

03:40:19  15    all these different things work in conjunction in your

16    example?

17    A.  I have.

18    Q.  Okay.  And can we take a look at that, please.

19    A.  Sure.

03:40:29  20        So these are -- these are all the accounts that we've

21    really spoken about if you put them all up there, and if I can

22    just summarize.  So the first one we talked about was

23    automatic re-age, where they just take it out of 60 days plus

24    and move it over to current, notwithstanding nobody's paid.

03:40:50  25        Forbearance, they've agreed to lay off, but the

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all     )
4   others similarly situated,      )
                                    )
5              Plaintiff,           )
                                    )
6     vs.                           )  No. 02 C 5893
                                    )
7   HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         )  Chicago, Illinois
8                                   )  April 16, 2009
              Defendants.           )  9:18 a.m.
9
                         VOLUME 12
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                               BY:  MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                 655 West Broadway
17                               Suite 1900
                                 San Diego, California  92101
18                               (619) 231-1058

19                               COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                               BY:  MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                               100 Pine Street
                                 Suite 2600
23                               San Francisco, California  94111
                                 (415) 288-4545
24

25

1    order to get the context, Blazer's financial maneuvering over

2    the past few years -- just the word maneuvering to me is

3    somewhat troubling -- past few years has resulted in a clear

4    disconnect between the field approach to management and the

09:36:59  5    policies created by the finance group which were espoused to

6    be a solution to the issues created by the Beneficial

7    acquisition.

8        And here's really what's key to me.  But it is hard

9    to imagine that they are not also being employed to boost

09:37:16  10    earnings.

11    Q.  And what does earnings mean?

12    A.  Earnings is that thing on the income statement that shows

13    the net profit, how much the company earned during a period of

14    time.  And it's probably the number that most users, be they

09:37:33  15    investors, banks, whatever, would look at to gauge the

16    performance of the company more than any other.

17    Q.  Is there anything else about this document that you

18    considered significant in reaching your conclusions?

19    A.  I believe the rest of the document just gets into more

09:38:03  20    details, and there's other e-mails attached, but I think

21    that's the highlights of at least what I found significant.

22    Q.  Fair enough.

23        Now, sir, do you have an understanding as to what

24    happened to the proposed Household/Wells Fargo merger?

09:38:20  25    A.  Yeah, my understanding is that after the due diligence

PSA100

1    procedures -- my understanding, based on the testimony, is

2    that Wells Fargo decided not to continue with the acquisition.

3    Q.  Now, sir, I think we've covered your first two conclusions

4    or opinions.  You also had a third conclusion overall, and I'd

09:38:47  5    ask that we pull up Plaintiffs' Demonstrative 107.

6         And, sir, could you briefly walk us through your

7    third conclusion?

8    A.  Yes.  Household improperly recorded revenue and expenses

9    resulting in a restatement and, that is, originally issued

09:39:10 10    financial statements had to be restated or corrected.

11    Q.  And, sir, I'll show you what's been received in evidence

12    as Plaintiffs' Exhibit 231.

13    (Tendered.)

14    BY MR. DOWD:

09:39:42 15    Q.  Sir, is Plaintiffs' Exhibit 231 a copy of a restated 10-K

16    for the period ended December 31, 2001?

17    A.  It is.

18    Q.  Okay.  Now, first I'll ask you, did you prepare a

19    demonstrative to assist you in describing this restatement?

09:40:04 20    A.  I did.

21    Q.  And when did this restatement take place?

22    A.  I believe in August of '02, the company actually filed

23    this -- this restatement and restated a whole bunch of years

24    and -- including the first quarter, I believe.

09:40:24 25    Q.  And so initially, sir, Household had issued those 10-Qs

1    and 10-Ks that we saw, the ones from -- for the period ended

2    June 30th, 1999, through the first quarter of 2002, right?

3    A.  That's correct.

4    Q.  Okay.  And included within that was in March of 2002, the

09:40:50  5    company filed what we've looked at as Defendants' Exhibit 852,

6    which was the 10-K for the period ended December 31, 2001; is

7    that correct?

8    A.  That's correct.

9    Q.  And now in August, they come out and say we're going to do

09:41:02 10    this restatement; is that right?

11    A.  That's correct.

12    Q.  Okay.  Let's pull up Plaintiffs' Demonstrative Exhibit

13    127.

14         Sir, can you explain to us what is shown in

09:41:17 15    Plaintiffs' Demonstrative Exhibit 127?

16    A.  Yes.  Well, this is the disclosure that was made within

17    the restated, the amended 10-K -- that's why it says 10-K/A --

18    in 2001 which again was filed for 2001, which was filed in

19    August of 2002 correcting the '01 one as well as other

09:41:43 20    periods.

21         And it's just a blowup, I think, of, you know, the

22    first couple of lines of the paragraph in the 10-K that the

23    company -- where the company described in their footnotes the

24    disclosure to the numbers, what happened with the numbers.

09:41:58 25    Again, remember, going back to yesterday, the footnotes

1    explain what's in the numbers.

2    Q.  Okay.  And, sir, is the blowup basically just a blowup of

3    the language that's in Plaintiffs' 231?

4    A.  Yes.

09:42:10  5    Q.  And could you walk us through a brief description of the

6    restatement and how -- what the company said about it.

7    A.  Well, with the slide up there for one more second at

8    least.  The 386, I believe, was the impact on net income for

9    all the periods restated.  And the company restated, I

09:42:31 10    believe, back to 1994.  So they restated the earnings from '94

11    to the first or second quarter of 2002.

12         The restatement related to -- just briefly, to the

13    company's contracts that it had entered into relating to

14    credit card arrangements with four entities, General Motors,

09:42:55 15    the AFL-CIO, something called UP, a company called UP, as well

16    as a marketing company called Kessler.

17         And it basically in its most basic form related to,

18    for the most part, expenses that were, for the most part, not

19    being written off over a shorter -- short enough period of

09:43:22 20    time which, of course, had the impact of overstating income

21    and in one case actually booking revenue that should not have

22    been booked.

23         So in a nutshell, that's what it was.  All four of

24    them -- all four contracts, the accounting for it, overstated

09:43:40 25    net income for all those periods.

Devor - direct

2490

1    Q.  Okay.  Now, sir, you said that for that entire period, I

2    think you said '94 through sometime in 2002, they restated 386

3    million of net income; is that right?

4    A.  That's correct.

09:43:55  5    Q.  Okay.  And have you also prepared a demonstrative to show

6    what the effect was on the relevant time periods that we're

7    talking about from 1999 through 2002?

8    A.  Yes, which of course was my focus.  I have.

9    Q.  Okay.  And I'd ask to pull up what's been marked as

09:44:17 10    Plaintiffs' Demonstrative 128.

11         All right.  Can you walk us through what's been

12    marked as Plaintiff's Demonstrative 128?

13    A.  Yes.  The -- I mean, this demonstrative is just put

14    together to show what the company's reported historical net

09:44:42 15    income was for '99 through '02.

16         And the restated net income is what it was changed to

17    in that 10-K/A that we -- you know, that we referred to

18    before -- that I referred to before.  And the difference

19    between those two columns is the impact on net income, and

09:45:06 20    we've expressed it as -- or I've expressed it as percentage of

21    reported net income.  And you can see it goes from -- you

22    know, from 1 percent at the end to as high as 6 percent in

23    different periods.

24    Q.  All right.  Sir, I hate to do this, but just so it's in

09:45:27 25    the record, in other words, for year-end 1999, the company in

**PSA104**

Devor - direct

2491

1    its 10-K reported 1 billion 486 million in net income; is that

2    correct?

3    A.  That is correct.

4    Q.  That's what they put in originally back at the end of '99

09:45:45 5    in their Q -- K that they would have filed in the beginning of

6    2000; is that right?

7    A.  That is correct.

8    Q.  Okay.  And at this point in time in August of 2002, they

9    say, we have to change our accounting and the number that we

09:45:59 10    should have reported at that time was 1.428 million; is that

11    right?

12    A.  That's correct.

13    Q.  Okay.  And then that -- what you did is just try to figure

14    out how much of it was overstated, and that's the difference

09:46:11 15    between the 1486 and the 1428 and that's 4.1 percent of their

16    net income; is that right?

17    A.  That's correct.

18    Q.  Okay.  And then walking through these columns, sir, they

19    reported 372 million in the first quarter of 2000 and they

09:46:27 20    should have reported 351; is that right?

21    A.  That's correct.

22    Q.  And that's 6.1 percent overstated; is that right?

23    A.  That's correct.

24    Q.  Similarly, in the second quarter of 2000, they reported

09:46:38 25    383.9 million, and they should have reported 368.3 million; is

Devor - direct

2492

1    that right?

2    A.    That's right.

3    Q.    And that's an overstatement of 4.2 percent; is that

4    correct?

09:46:48  5    A.    That's correct.

6    Q.    The third quarter of 2000, they reported 451 million, they

7    should have reported 434; is that right?

8    A.    That's correct.

9    Q.    And that's an overstatement of 3.8 percent?

09:46:59 10    A.    That's right.

11    Q.    The same thing in the fourth quarter of 2000, 492 reported

12    versus 476 restated; is that right?

13    A.    That's correct.

14    Q.    And that's 3.5 percent, correct?

09:47:11 15    A.    That's right.

16    Q.    Okay.  And then looking through the four quarters of 2001,

17    in the first quarter they reported 431 in net income; it

18    should have said 405, right?

19    A.    That's right.

09:47:21 20    Q.    And that's 6.5 percent; is that correct?

21    A.    That's right.

22    Q.    Q2, 2001, we have 439 versus 423.3, and that's an

23    overstatement of 3.7 percent; is that right?

24    A.    That is right.

09:47:35 25    Q.    Q3, 2001, 503 versus 485.6; is that correct?

PSA106

1    A.    That's right.

2    Q.    And that's 3.8 percent?

3    A.    That's right.

4    Q.    Then Q4, 2001, we have 548.9, and they should have

09:47:47  5    reported and did report restated in August 2002, 533 million;

6    is that right?

7    A.    That's right.

8    Q.    And that's 2.9 percent; is that correct?

9    A.    That's correct.

09:47:58  10    Q.    First quarter 2002, they originally had reported in their

11    Q 511 in net income, and in their restatement they say the

12    number should have been 491; is that right?

13    A.    That's right.

14    Q.    And that's 4.1 percent; is that right?

09:48:11  15    A.    That's right.

16    Q.    Second quarter of 2002, 513 million versus 507 million; is

17    that right?

18    A.    That's right.

19    Q.    And that was 1.2 percent; is that right?

09:48:20  20    A.    That is right.

21    Q.    Can you just explain to us what exactly is a restatement?

22    A.    A restatement is when a company realizes there's something

23    wrong with financial statements that are on the street, so to

24    say, and there's something materially wrong.  And, of course,

09:48:46  25    under -- you know, to not mislead any users of those financial

**PSA107**

1    statements anymore, they need to pull them back and put out

2    the new numbers.  That's what a misstatement is.

3           It's a -- a restatement, rather.  It has to be

4    material and it's an admission that it was wrong.  You can't

09:49:04    5    restate for a change in estimate later on.  I mean, if you do

6    change your estimate to a better estimate, that's something

7    that gets recorded currently, prospectively, as opposed to

8    going back.

9           Basically the only time you restate is for

09:49:23 10    companies -- is when you know your numbers are materially

11    wrong.  So it's an admission that the numbers were wrong and

12    materially wrong.

13    Q.  Is a restatement a common event?

14    A.  It is not a common event.  I mean, it occurs occasionally.

09:49:36 15    But as you can imagine, you know, the -- you can imagine how

16    troubling it is for a company to restate, I mean, to go to

17    whoever the users are and say, hey, you know those financial

18    statements I gave you, they're wrong, I need them back, I'll

19    give you new ones.  So it's not done very commonly.

09:49:57 20    Q.  When a company restates, whose decision is it to restate?

21    A.  It's, you know, I believe -- by the way, just to finish

22    that last question, I think back in 2000, there was some kind

23    of study as I recall.  And in 2000, something like 2 percent

24    or so of all public companies and all filings had actually

09:50:18 25    restated, which means 98 percent did not.  I'm sorry.

**PSA108**

Devor - direct

1    Q.   Okay.  And whose decision is it to restate ultimately?

2    A.   Well, it has to be the company's.  Remember, as we said

3    yesterday, these financial statements belong to the company.

4    They don't belong to the auditors.  They don't belong to

09:50:36  5    anybody else.  They're the company's.

6         And remember, the company's management signs off on

7    those financial statements; and if the company restates, it's

8    the company's -- it's the company's place to do it.  They're

9    the only ones that can restate.

09:50:51  10   Q.   Okay.  And, sir, did you perform an analysis, look at the

11   underlying documents and materials produced in this litigation

12   and independently conclude as to whether the company should

13   have restated?

14   A.   Yes.  You know, this was vetted extensively by KPMG in the

09:51:14  15   2002 time frame.  And I read everything they did.  I looked at

16   the documents they referred to that were in the record.  I

17   read deposition testimony.

18        I also looked at the original accounting, read memos

19   and read the testimony that related to the original decisions

09:51:37  20   to record these transactions.  I looked at Arthur Andersen,

21   who was the predecessor auditor at the time.  I looked at

22   their testimony and whatever documents we had.  I looked at

23   the contracts.  And, you know, I reached my own conclusion.

24   Q.   Okay.  And did you agree with the company's decision that

09:52:00  25   it needed to restate these financial statements?

1    A.  I did.

2    Q.  Now, sir, I'd just like to conclude briefly with a sort of

3    summary of your opinions.  And I'd ask that we pull up

4    Plaintiffs' 126.

09:52:30  5         Sir, do you have that there on the screen?

6    A.  I do.

7    Q.  So, sir, you -- your first conclusion that you testified

8    to, could you just remind us of that, that we talked about

9    yesterday briefly?

09:52:44 10   A.  Yes.  That is Household failed to disclose required

11   information about improper lending practices.  And, again,

12   this goes to the fact that the 10-Ks and 10-Qs were false and

13   misleading because the information in there did not contain

14   disclosures that were in accordance with those GAAP

09:53:06 15   requirements that I indicated in footnote disclosure, as well

16   as the SEC MD&A disclosure requirements, management's

17   discussion and analysis with respect to significantly -- a

18   significant amount of revenue -- the company earning a

19   significant amount of revenue relating to the improper lending

09:53:30 20   practices, assuming that they are considered -- I was asked to

21   assume that those lending practices were considered improper.

22   Q.  Okay.  And, sir, I'd like to go back to one demonstrative

23   that we looked at yesterday.  It's Plaintiffs' Demonstrative

24   40.  If we can pull that up briefly.

09:53:53 25        Sir, this was -- you explained it to the jury -- a

1    chart of the amount of net income attributable to improper

2    lending practices during the relevant period.  And I think

3    when I asked you about it, I asked you about the percentages,

4    but I didn't ask you to put the actual numbers that you had

09:54:08    5    calculated on this net income into the record.

6         I'd just ask you, what was the amount that you

7    determined for 1999?

8    A.  $422 million, which was 28 percent of the company's

9    reported net income for that year.

09:54:27    10    Q.  Okay.  And the amount that you calculated for the year

11    2000 was 554 million; is that right?

12    A.  554 million, which was 32 percent or almost 33 percent of

13    the reported net income for 2000.

14    Q.  And in 2001, the amount was 696 million; is that correct?

09:54:47    15    A.  That is correct.

16    Q.  And for the first two quarters of 2002, it was 336

17    million; is that right?

18    A.  That's correct.

19    Q.  Sir, just going back to Plaintiffs' 126, your second

09:55:05    20    conclusion was the loan quality concealment techniques that we

21    even discussed this morning; is that correct?

22    A.  Yes.  I mean, we spent most of yesterday probably

23    discussing this issue.  And that is, again, that Household

24    used re-aging and other loan quality concealment techniques to

09:55:23    25    manipulate the delinquency statistics.  And, again, it goes to

Devor - cross

2498

1  that chart that was in the 10-K, the two-plus chart, you know,

2  having numbers that are, in essence, false and misleading and

3  no disclosures explaining it.

4  Q.  Okay.  And then that third reason was just a restatement

09:55:40  5  that we just spoke about; is that correct, sir?

6  A.  That is correct.

7  Q.  Thank you, Mr. Devor.  I have no further questions at this

8  time.

9  A.  Okay.  You're welcome.

09:55:48  10      THE COURT:  You may cross-examine.

11              CROSS-EXAMINATION

12  BY MS. BUCKLEY:

13  Q.  Good morning, Mr. Devor.

14  A.  Good morning.

09:56:38  15  Q.  You'll recall yesterday, Mr. Devor, Mr. Dowd asking you

16  how many times you had been retained as an expert witness or

17  consultant in connection with litigation matters.

18      Do you remember that?

19  A.  I don't actually remember him asking me how many times I

09:56:57  20  was retained.  I think he asked me to generally characterize

21  my expert accounting work, but he may have.  I don't remember

22  that specific question.

23  Q.  All right.  Well, let's go back and we can find it.  Would

24  it refresh your recollection if I were to tell you that you

09:57:15  25  said 30, 40 or 50 in terms of testimony?

PSA112

1    A.  Yes, actually, it would.  Thank you.

2    Q.  And as to being consulted, too numerous to mention.

3         Do you remember that?

4    A.  Yeah, basically.

09:57:27 5    Q.  Okay.  And Mr. Dowd asked you whether you had been hired

6    by both plaintiffs and defendants in connection with expert

7    witness work.

8         Do you remember that?

9    A.  I certainly remember it, yes.

09:57:43 10    Q.  And you said yes, but certainly much more by plaintiffs

11    than defendants; is that correct?

12    A.  That's correct.

13    Q.  Okay.  You recall, Mr. Devor, that you were required to

14    provide us with a listing back a few years ago of all of the

09:57:58 15    trial and deposition testimony that you had given in the last

16    four years.

17         Do you recall that?

18    A.  Vaguely.

19    Q.  Do you recall that you gave us such a list?

09:58:08 20    A.  I believe part of the rules are that I need to list in the

21    back of my report, which is the way we usually do it, the last

22    four years of testimony in cases that I've given, and I

23    believe I listed those cases in my Rule 26 report.

24    Q.  So you gave us a list, right?

09:58:29 25    A.  It was attached to the report, yes.

Devor - cross

1    Q.   Great.  I went back to my office last night, Mr. Devor,

2    and I checked that list and I counted all the federal

3    securities class actions that you listed on it.  Would it

4    surprise you to learn that there were 13?

09:58:47  5    A.   I would have no idea how many are listed on there.

6    Q.   You wouldn't know one way or the other?

7    A.   It's a report that was done about two years ago, and I

8    would have listed whatever the last four years' worth of oral

9    testimony was that I gave on that thing, which is what we do

09:59:05  10   in every case.

11   Q.   Well, let's go down the list, okay, Mr. Devor?  I'm going

12   to call out a case, and I want you to tell me whether you

13   represented the defendants -- whether you were retained by the

14   defendants or the plaintiffs.  Okay?

09:59:16  15   A.   Okay.  And just to make sure I understand your question,

16   whether I was engaged by counsel for the defendants or counsel

17   for the plaintiffs; is that correct?

18   Q.   No, that's not really what you said yesterday, Mr. Devor.

19   Mr. Dowd did not ask you whether you had been retained by

09:59:32  20   counsel for the plaintiffs or counsel for the defendants.  He

21   asked you whether you had been retained by the defendants or

22   the plaintiffs.

23        Do you remember that?

24   A.   Well, he may have.  I don't remember his exact question,

09:59:44  25   but my response was meant to be articulated, I'm hired by

**PSA114**

1    counsel.  I rarely meet the plaintiffs really.

2    Q.  So you're hired by counsel for the plaintiffs but you

3    testify for the plaintiffs; is that right?

4    A.  No, no, no.  Let's start that one over.  I am engaged by

10:00:02  5    counsel for either --

6        MS. BUCKLEY:  Move to strike, your Honor.

7        THE COURT:  He answered.  He answered no.  That's

8    sufficient.  Ask the next question.

9    BY MS. BUCKLEY:

10:00:11 10    Q.  We're going to go down the list now, Mr. Devor, of the

11    cases that you provided in your list as required by the

12    federal rules.  And the question is, in the case that I read,

13    were you retained by counsel for the plaintiffs or were you

14    retained by counsel for the defendants.  Is that okay with

10:00:30 15    you?

16    A.  Yes.  And, of course, just so you know --

17        MS. BUCKLEY:  Move to strike, your Honor.

18        THE COURT:  The answer yes will stand.

19        THE WITNESS:  I understand.

10:00:40 20    BY MS. BUCKLEY:

21    Q.  In re Sunbeam Securities Litigation, the Southern District

22    of Florida.

23    A.  In that case that I testified in, I was --

24    Q.  Counsel for plaintiffs or counsel for the defendants,

10:00:50 25    Mr. Devor?

```
         1   A.  I was retained by counsel for the plaintiffs.

         2   Q.  In re Jennifer Convertibles Securities Litigation, Eastern

         3   District of New York.

         4   A.  Counsel for the plaintiffs.

10:01:03 5   Q.  In re Safeskin Securities Litigation, the Southern

         6   District of California.

         7   A.  I was engaged by counsel for the plaintiffs.

         8   Q.  In re Steven J. Gutter v. E.I. DuPont de Nemours and

         9   Company and Edgar J. Woolard, Jr., Southern District of

10:01:17 10  Florida.

         11  A.  I believe I was engaged by counsel for the plaintiffs.

         12  Q.  In re Envoy Securities Litigation, Middle District

         13  Tennessee.

         14  A.  Same.

10:01:32 15  Q.  Counsel for plaintiffs?

         16  A.  Yes.

         17  Q.  In re A.T. Cross Securities Litigation, District of Rhode

         18  Island.

         19  A.  Counsel for the plaintiffs.

10:01:43 20  Q.  In re AT&T Corporation Securities Litigation, District of

         21  New Jersey.

         22  A.  Same.

         23  Q.  In re WorldCom, Inc., Securities Litigation, Southern

         24  District New York.

10:01:56 25  A.  Well, there are two WorldCom cases.
```

1   Q.  Not the bankruptcy case, Mr. Devor, the securities case.

2   A.  WorldCom, I was engaged by counsel for the plaintiffs.

3   Q.  How about in re CMS Energy Securities Litigation, Eastern

4   District of Michigan?

10:02:11 5   A.  I was -- same thing.

6   Q.  Fredda Levitt v. PricewaterhouseCoopers, LLP, Southern

7   District of New York.

8   A.  Same thing.

9   Q.  And in re Omnicom Group, Inc., Securities Litigation,

10:02:22 10   Southern District of New York.

11   A.  Same thing.

12   Q.  We're almost there, Mr. Devor.

13       In re Tenet Healthcare Corporation Securities

14   Litigation, Central District of California.

10:02:34 15   A.  Same thing.

16   Q.  And in re Ryan v. Flowserve Corporation, et al., Northern

17   District of Texas.

18   A.  Counsel for the plaintiffs.

19   Q.  Counsel for the plaintiffs.

10:02:46 20   A.  Those are cases that I just testified --

21   Q.  There's no question pending, Mr. Devor.

22       Let's talk a little bit about your expertise,

23   Mr. Devor.

24       Mr. Dowd asked you if you had been qualified as an

10:02:59 25   expert in federal courts.

1          Do you recall that?

2    A.  I don't remember the precise question, but it was

3    something like that, yes.

4    Q.  Well, we'll ask it again.  Have you been qualified as an

10:03:11  5    expert in federal courts?

6    A.  Sure, I've testified in federal courts.

7    Q.  And have you been disqualified in federal courts?

8    A.  To testify at a trial?  Not that I recall.

9    Q.  Not that you recall?

10:03:23 10    A.  At a trial?  No.

11    Q.  Has your opinion ever been rejected in federal courts?

12    A.  Never for reliability.  It may have been for relevance,

13    but never for reliability.

14    Q.  Do you recall submitting an opinion in a case called in re

10:04:02 15    Acceptance Insurance Companies, Inc., Securities Litigation,

16    Mr. Devor?

17    A.  I recall writing an affidavit on a narrow issue that was

18    used to determine, I believe, in support of a motion for

19    summary judgment as I recall.

10:04:19 20    Q.  You understand an affidavit is testimony, don't you,

21    Mr. Devor?

22    A.  I'm not a lawyer.  I -- I -- it's not oral testimony.  But

23    it is what it is.

24    Q.  It's sworn testimony under oath; is it not?

10:04:32 25    A.  I believe when I write that affidavit I swear that it's

1    the truth.  In my opinion, it's the whole truth.  I think I

2    do.  I say that on the affidavit, absolutely.

3    Q.  You have to sign it in front of a notary, don't you,

4    Mr. Devor?

10:04:43   5    A.  I believe that that goes to state rules, and it doesn't

6    necessarily -- I don't know that you have to sign it in front

7    of a notary.  I certainly have to sign it.  But, nonetheless,

8    I've never issued an affidavit that I would -- was not a

9    hundred percent comfortable with.

10:04:59  10    Q.  All right.  And you know that in the in re Acceptance

11    Insurance Companies Securities Litigation, that the Court

12    rejected your opinion there, correct?

13    A.  The Court deemed my opinion to be irrelevant because the

14    Court could not -- could not find the analysis within the

10:05:18  15    affidavit.  Again, no oral testimony.  So I think the Court

16    decided that my opinion was not helpful or relevant to the

17    decisions needed to be made and therefore would not be

18    considered because the analysis was not apparent in the

19    affidavit.  Again, I never testified in that case.

10:05:36  20    Q.  Mr. Devor, you seem to be having some problem with the

21    fact that an affidavit is testimony; is that right?

22    A.  Well, I'm distinguishing in my mind between oral

23    testimony, which I never gave in that to explain the

24    affidavit, and the affidavit.

10:05:51  25    Q.  The affidavit being written testimony, correct?

**PSA119**

1    A.  That's --

2          MR. DOWD:  Objection, your Honor.  It's

3    argumentative.

4    BY MS. BUCKLEY:

10:05:59  5    Q.  Relevance wasn't the ground on which your affidavit was

6    rejected, was it?

7    A.  Absolutely.  The Court said, I believe, in there because

8    the analysis is not present -- which, by the way, I

9    respectfully disagree with; it was there.  But with all due

10:06:16 10    respect, I believe the decision was because the opinion in --

11    because the affidavit does not make clear what the analysis

12    was.  It doesn't have problems with the analysis.  It just

13    said because the affidavit doesn't make clear what Mr. Devor's

14    analysis was, in essence, then the affidavit will not be

10:06:37 15    helpful to us and therefore is not relevant.  It does not go

16    to reliability or anything else.

17    Q.  Would it refresh your recollection, Mr. Devor, if the

18    Court said, quote, Devor does not explain how he reached his

19    ultimate opinions, nor does he describe the analytical

10:06:54 20    processes he went through to reach his opinions, unquote.

21    Would that refresh your recollection that your affidavit was

22    not rejected on grounds of relevance?

23          MR. DOWD:  Your Honor, perhaps if we're going to

24    refresh the witness' recollection, we should show him a copy

10:07:07 25    of the document so he can look at the other parts.  Otherwise,

**PSA120**

1    it's an improper question and not refreshing recollection.

2         MS. BUCKLEY:  I think I'm permitted to read him the

3    document first, your Honor.

4         MR. DOWD:  You're permitted to say is there anything

10:07:25 5    that would refresh your recollection and if it's the opinion,

6    you give it to him.

7         MS. BUCKLEY:  He already testified as to what he

8    thought the opinion said and why his opinion was rejected and

9    he's wrong.

10:07:35 10        MR. DOWD:  That's absolutely untrue.  Your Honor, I

11   move to strike that.  What he said is absolutely right.

12        THE COURT:  The objection is sustained.  There's no

13   basis for reading a document into evidence at this point.  My

14   recollection of the testimony was that the witness never

10:07:52 15   indicated that he did not recall or remember or that he needed

16   to have his recollection refreshed.  The objection is

17   sustained.

18   BY MS. BUCKLEY:

19   Q.  Mr. Devor, did you also submit testimony in a case called

10:08:07 20   in re IKON Office Solutions, Inc., Securities Litigation?

21   A.  Deposition testimony I did.

22   Q.  You recall that?

23   A.  It was a long time ago, but I recall it vaguely.

24   Q.  And you recall that your opinion was rejected in that case

10:08:26 25   because you relied on, quote, unreliable assumptions?

1    A.  No.

2    Q.  You don't?

3    A.  My opinion was rejected -- my ability to testify?  I'm not

4    sure I understand what you're saying.

10:08:37  5    Q.  I'm asking you --

6    A.  No, I don't remember that.

7    Q.  You don't remember.

8         MS. BUCKLEY:  May I approach the witness, your Honor?

9         THE COURT:  You may.

10:09:09  10    (Tendered.)

11    BY MS. BUCKLEY:

12    Q.  This is the problem with having two pairs of glasses,

13    Mr. Devor.  You never have the right one when you need it.

14         I think I gave you the wrong one.

10:09:28  15    (Tendered.)

16    BY MS. BUCKLEY:

17    Q.  Do you want to turn to page 21 of the printout, Mr. Devor,

18    right-hand column, halfway down.

19         And the earlier reference to your opinion is on page

10:09:52  20    20 of the printout, right-hand column, halfway down.

21    A.  I'm sorry.  20 or 21?

22    Q.  Both.  It starts on page 20, halfway down.

23    A.  Dealing with Professor Carmichael and Devor?

24    Q.  Right.

10:10:09  25    A.  Okay.  So I'm sorry.  Is there a question?

Devor - cross

1    Q.  And then there's another reference to your report on page

2    21 halfway down.

3    A.  Yes.

4    Q.  Does this refresh your recollection that your opinion was

10:10:21  5    rejected because it relied on unreliable assumptions?

6    A.  First of all, I'm not sure what you mean by my opinion was

7    rejected.  I wasn't precluded from testifying.  I mean, this

8    was not a -- that's not what this is.  I mean, in general, you

9    know, what happened, I believe, as I understand it, is this

10:10:45  10    was a case that dealt with reserves and whether a company's

11    policy equated to those GAAP rules that I put on the screen

12    yesterday.

13          And there was testimony in the record that indicated

14    the company believed that the whole purpose of these rules

10:11:05  15    was, in fact, to generate financial statements that were in

16    accordance with GAAP.  And that was one of the basis of my

17    opinions.

18          For whatever reason, with all due respect to I

19    believe Judge Katz, when he read this, for some reason he

10:11:25  20    ignored that.  He did not -- he didn't mention why.  He just

21    said that Devor's opinion that the company's policy equates to

22    GAAP is -- whatever he says -- unsupportable or not -- I think

23    he says not supported by the facts or whatever.  But he

24    doesn't mention the whole thing that I based my opinion on.

10:11:49  25          So I -- you know, and, again, there was no hearing so

1    And I measured the amount of inflation on every day during the

2    relevant period using two different methods, which is a way to

3    calculate the amount of loss that any individual investor

4    suffered during the relevant period, depending on what day

01:48:49  5    they purchased and what day they sold.

6    Q.  Based on the analysis that you described, did you form any

7    opinions in this case?

8    A.  Yes.  I formed the opinion that Household's disclosure

9    defects, its inaccurate disclosures, caused there to be

01:49:08  10   significant inflation in Household stock price for much of the

11   relevant period.  And as a result, again depending on when

12   investors purchased and when they sold, investors in Household

13   stock suffered very significant losses as a result of

14   Household's defective disclosures.

01:49:32  15   Q.  You mentioned the term stock price inflation.  What did

16   you mean by that?

17   A.  What I meant by that is that the stock price on any given

18   day for any company reflects the information that is known

19   about that company.  And if there is a situation where a

01:49:52  20   company is not disclosing accurate information about itself,

21   the stock price will reflect not only the accurate information

22   about the company but also the inaccurate, or the false

23   information, about the company.

24        And what inflation is, is a measure of how much the

01:50:11  25   stock price has been affected by the false information that's

Fischel - direct

2605

1    been disclosed by a particular company.

2    Q.  Can a misrepresentation and an omission both cause the

3    stock price to be inflated?

4    A.  Yes.  You can have -- there are two classic situations

01:50:30  5    where inflation can exist.

6         One situation is where a company makes a false

7    statement and the stock price rises to a level that's higher

8    than it would have been in the absence of the false statement.

9    That would be a classic misrepresentation situation.

01:50:48  10        There is also an equally equivalent way that

11    inflation can occur if a company discloses information but

12    fails to disclose something negative about itself that it

13    knows about but investors in the marketplace do not know

14    about.  In that situation the stock is inflated because the

15    stock is prevented from falling to a lower level, which is the

16    level that the stock would have fallen to had the company

17    disclosed the additional negative information that it failed

18    to disclose.  That's a traditional omission type of situation

19    causing inflation.

20    Q.  In your opinion, how could the wrongdoing that the

21    plaintiffs allege in this case have caused inflation in

22    Household stock?

23    A.  Well, first of all, I would say, in any situation where a

24    company does not accurately reflect its financial condition

25    and its growth prospects, that potentially could be very

PSA125

Fischel - direct

2620

1    stock price performance during the relevant period?

2    A.  Yes.  In a number of different ways, I did.

3    Q.  And what did you conclude?

4    A.  I concluded that during the implementation of the

02:20:21  5    Household growth strategy, particularly beginning in the end

6    of 1999, 2000, and much of 2001, Household stock performed

7    extremely well.

8           And then, when the criticism started to mount, when

9    Household's denials about its lending practices and aggressive

02:20:44 10    accounting began to be more and more questioned, when people

11    started to disbelieve what Household was saying in terms of

12    analysts and other market professionals, the stock price

13    started to fall.

14           So it went from somewhere in the 40s to almost 70.

02:21:01 15    And then in the latter part of the period, when the truth

16    started to come out, the stock fell to somewhere in the

17    high -- low 20s and then the higher 20s.

18    Q.  And did you also analyze the information that was being

19    communicated to investors during this relevant period?

02:21:18 20    A.  Yes.  Again, very carefully on a day-by-day basis.

21    Q.  And did you perform any statistical tests to analyze the

22    relationship between the information communicated to investors

23    at Household and its stock price during this time period?

24    A.  I did.

02:21:31 25    Q.  And what did you do?

PSA126

```
 1    A.  I performed what is generally referred to as an event

 2    study, which is a type of what -- a statistical technique

 3    known as a regression analysis.

 4    Q.  Let me hand you what we have marked as Plaintiffs' 1391.

 5    (Document tendered.)

 6    BY MR. BURKHOLZ:

 7    Q.  Is Exhibit 1391 your event study?

 8    A.  Yes.

 9         MR. BURKHOLZ:  Your Honor, there is no objection to

10    this document.  I move it into evidence.

11         THE COURT:  It will be admitted.

12    (Said exhibit was received in evidence.)

13    BY MR. BURKHOLZ:

14    Q.  I would like you to explain the event study to the jury.

15         And let's focus on one of the dates that you looked

16    at, August 14th, 2002.

17         What is the significance of that date, if you recall?

18    A.  That's the date that Household issued its restatement.

19    Q.  Okay.  Why don't you walk us through what you did in the

20    event study with respect to that date and explain to the jury

21    the different headings here.

22    A.  Okay.  Let me start by just very briefly explaining what

23    an event study is so that the context is clear.

24         One of the things that we know about the stock prices

25    for any company is that the stock price can be affected by
```

02:21:52 (line 5)
02:22:13 (line 10)
02:22:24 (line 15)
02:22:47 (line 20)
02:23:07 (line 25)

1    basically three things.

2         It can be affected by movements in the overall stock

3    market.  It could be movements in the industry that the

4    company is a part of, developments in the industry.  And it

02:23:26  5    could also be affected by things that are unique to the

6    particular company that are not shared with other companies in

7    the industry or not shared with the overall market.

8         And what the regression analysis does that's

9    reproduced in the event study is, it analyzes on any given day

02:23:50 10    how much of a company's stock price movement is explained by

11    the market in the industry as opposed to how much is specific

12    to the particular company.

13         And it's very important always, in understanding

14    stock price movements, to understand the relationship between

02:24:12 15    the company on the one hand and the overall market and the

16    industry.

17         So just for example, unfortunately, in roughly the

18    past year -- although it's gotten a little better -- the stock

19    market has basically fallen in half from 14,000 roughly to

02:24:34 20    below 7,000.  Now it's a little bit above 8,000.

21         So if you didn't know that and I told you that during

22    this period you had a stock that lost 5 percent of its value,

23    you might think that that wasn't so good because you lost

24    money.  But I guarantee that most people who buy stocks would

02:25:00 25    be delighted if they only lost 5 percent of their value in the

PSA128

1    last year because the overall stock market lost 50 percent of

2    its value.

3         Similarly, in the last month, the stock market has

4    gone up significantly, by 25 percent approximately.  And if I

02:25:18   5    told you during that period you had a stock that made

6    5 percent, you might think that you made money.  But then if I

7    tell you that the overall market went up by 25 percent, you

8    wouldn't think that was such a good investment.

9         And the purpose of the event study is to not look

02:25:34  10    just at whether a stock price goes up or down but rather to

11    understand how it performed relative to the overall market and

12    relative to the overall industry that it's a part of, because

13    unless you know that, it's impossible to know how a stock

14    really did.

02:25:53  15         And that's what an event study does.  It does that by

16    a fairly complicated statistical method.  But the basic idea

17    is pretty simply.  It's what I just described.

18         With that background, maybe we can just highlight the

19    top --

02:26:08  20    Q.  Can I ask you a question before we get to that?

21    A.  Sure.  Of course.

22    Q.  Is an event study a common technique that's used to

23    estimate damages?

24    A.  Yes, I believe it is the standard methodology that's used

02:26:17  25    in virtually every case that I am aware of to estimate both

Fischel - direct

2624

```
         1   whether a particular disclosure is important to investors as

         2   well as it can also be used to estimate damages.

         3   Q.  Let's look at the August 14th date.

         4        Why don't you walk us through what's going on here.

02:26:35 5   A.  Again, just briefly by way of background, I just want to

         6   go through the columns first at the top.

         7        The first is the date.  So if we go down to

         8   October 14th --

         9   Q.  August 14th, you mean?

02:26:47 10  A.  I am sorry.  Excuse me.  August 14th.

        11        The next column is the price.

        12        I don't know if everybody can read that.  In fact, I

        13   am having -- oh, I see it on the screen.

        14        $38.09.  That's the closing price on August 14th.

02:27:11 15        The next column is the volume, which is a little over

        16   18,659,000 shares.

        17        And the next column is Household return.  And what

        18   that means is that Household's stock price on August 14th went

        19   up by .77 percent relative to what the price was, the closing

02:27:42 20  price, the previous day.

        21        So again, you might think, looking at that, that

        22   Household stock price went up that day.  In fact, it did go up

        23   that day.

        24        But if you go to the next two columns, the return on

02:27:58 25  the S&P 500, which is a measure for the overall market, the
```

**PSA130**

Fischel - direct

1    that is simply a measure of whether the negative performance

2    of Household on that day is sufficiently large to be

3    considered significant using this particular regression

4    analysis and event study.

02:32:10  5        Any time there is three stars on a particular date,

6    the conclusion is that, based on this particular event study,

7    this particular regression analysis, Household stock price

8    underperformed by a statistically significant amount on this

9    particular day.

02:32:30  10        And that's how an event study works, basically.

11    Q.  What was the -- what is the relationship between this

12    event study and your quantification of inflation?

13    A.  I used two methods of quantification.  An event study is

14    basically used in both of them.

02:32:48  15        But with respect to the first method, what I did was,

16    I selected those disclosures which I considered to be

17    fraud-related during the relevant period where there was a

18    statistically significant price movement, where I was also

19    reasonably confident that the fraud-related disclosure on a

02:33:13  20    particular day was responsible for a particular statistically

21    significant price movement.

22    Q.  And how many dates did you find during this period?

23    A.  Using under my first method, 14 dates.

24    Q.  What was the first date that you found one of these

02:33:31  25    events -- one of the dates that you are testifying about?

Fischel - direct
2628

1    A.   November 15th, 2001.

2    Q.   Why were these 14 dates selected?

3    A.   They were selected because I wanted to isolate the

4    fraud-related disclosures that were important to investors.

02:33:55  5    So I had to make a series of judgments based on the event

6    study in order to do that.  I had to isolate disclosures.  I

7    had to determine whether those disclosures occurred at a time

8    when there was a statistically significant stock price

9    movement.  And I had to be reasonably confident that the

02:34:18 10    fraud-related disclosure was responsible for the price

11    movement.

12    Q.   And have you prepared a demonstrative that summarizes the

13    relationship between your analysis of the 14 dates and

14    inflation?

02:34:28 15    A.   I have.

16         MR. BURKHOLZ:  Can we bring up Plaintiffs'

17    Demonstrative 150.

18    BY MR. BURKHOLZ:

19    Q.   Now, before we look at -- is this the demonstrative that

02:34:44 20    you prepared?

21    A.   Yes.

22    Q.   Before looking at these 14 dates, was there another set of

23    dates that you could have picked?

24    A.   Yes.  I believe this particular analysis focuses on

02:34:59 25    14 dates.  I have seen an analysis by Household that

**PSA132**

1    identifies 166 dates.

2    Q.  If you included those dates in your quantification, would

3    the inflation be higher or lower?

4    A.  It would be almost double the number that I calculated

02:35:16  5    here.  We will get to it, but the $7.97 number.

6         If I included all the defendants' dates, that number

7    would increase by another $7, so it would be virtually $15,

8    which would make the harm and the losses to investors much

9    greater than what I myself calculated under this first method.

02:35:39 10  Q.  So selecting the 14 dates was conservative, in your view?

11   A.  Absolutely.  Relative to the choice of dates of the

12   defendants.

13   Q.  Let's look at the 14 dates.

14        Why is November 15th, 2001, the first date on this

02:35:51 15  exhibit?

16   A.  Because that is the date that the California Department of

17   Corporations filed suit against Household alleging that

18   Household had engaged in systematic unfair predatory lending

19   practices.

02:36:10 20  Q.  Did you prepare a demonstrative related to that date?

21   A.  I did.

22        MR. BURKHOLZ:  Can we bring up Plaintiffs'

23   Demonstrative 137.

24   BY THE WITNESS:

02:36:31 25  A.  I don't think -- this is not the right document.

PSA133

1          That's the right document.

2     BY MR. BURKHOLZ:

3     Q.  I want to hand you what we have marked as

4     Plaintiffs' 1305, Plaintiffs' 1405, and Plaintiffs' 1452.

02:36:44 5     (Documents tendered.)

6     BY MR. BURKHOLZ:

7     Q.  Plaintiffs' 1305 is a California Department of

8     Corporations press release.

9          Plaintiffs' 1405 is a Bloomberg article regarding a

02:36:52 10    lawsuit on November 14th, 2001.

11          And Plaintiffs' 1452 is a Household press release of

12    November 15th, 2001.

13          Did you take excerpts from those three exhibits and

14    include them on your demonstrative?

02:37:05 15   A.  I did.

16          MR. BURKHOLZ:  Your Honor, I move these three

17    exhibits into evidence subject to the limiting instruction.

18          THE COURT:  They will be admitted subject to the

19    limiting instruction.

02:37:18 20    (Said exhibits were received in evidence.)

21    BY MR. BURKHOLZ:

22    Q.  Can you describe the demonstrative that you prepared.

23    A.  Yes.  This is an exhibit which describes the events on

24    November 15th, 2001, the California Department of Corporations

02:37:39 25   lawsuit.

**PSA134**

Fischel - direct

2631

1        And it also, on the third line, says "residual price

2   change, negative $1.86," meaning that this is the first of my

3   14 dates where there was a fraud-related disclosure which had

4   a significant effect on Household stock price.

02:38:00   5        And I think it's fairly self-explanatory, but just so

6   we are all clear, the press release of the California

7   Department of Corporations stated that, "After the close of

8   trading on November 14th, 2001, the California Department of

9   Corporations issued a press release announcing that it had

02:38:24  10   sued Household for imposing 'excessive and improper fees,

11   penalties, interest, and charges in violation of state

12   consumer protection laws.'"

13        And then I also included Household's response.

14        "Household International responded that it is

02:38:42  15   'currently reviewing the specifics of the lawsuit but

16   vehemently denies any assertion that it has willfully violated

17   the lending laws that regulate its business.'"

18        But you can see from the price reaction, the negative

19   price reaction, the negative significant price reaction, that

02:39:00  20   this is the beginning of the time when Household, that had

21   been denying its involvement in predatory lending throughout,

22   when market participants begin to doubt Household's denials

23   because of the accumulation of accusations and firsthand

24   accounts by customers who had complained about their dealings

02:39:24  25   with Household.

Fischel - direct

2632

1    Q.  And did analysts comment on this lawsuit?

2    A.  Yes, quite extensively.

3    Q.  Let me show you Plaintiffs' Exhibit 1407.  It's a

4    November 15th, 2001, Salomon Smith Barney analyst report.

02:39:36  5    (Document tendered.)

6        MR. BURKHOLZ:  I would like to move that into

7    evidence, your Honor.  I don't believe there is an objection.

8    Again subject to the limiting instruction.

9        THE COURT:  It will be admitted subject to the

02:39:44 10    limiting instruction.

11    (Said exhibit was received in evidence.)

12    BY MR. BURKHOLZ:

13    Q.  What is the significance of this report to your opinion?

14    A.  Well, if we highlight under "summary" just the first

02:39:55 15    bullet point -- remember what I wanted to do was isolate

16    events and then be reasonably confident that the events are

17    the cause of the stock price movement; in this case, a stock

18    price decline.

19        Here you have the analyst saying exactly that: that

02:40:17 20    Household shares sold off almost 4 percent intraday on news

21    that the California Department of Corporations has filed an

22    $8.5 million lawsuit against Household for lending law

23    violations (predatory lending).

24        Then, on the next page -- this is quite important in

02:40:39 25    light of subsequent developments.  In the third paragraph, the

1    paragraph beginning "Clearly."  The second sentence, if we

2    could highlight that.

3         The analyst says, "The greater potential risk" -- in

4    other words, greater than the fact that they are being sued

02:41:00  5    for $8.5 million -- "in our view is that this lawsuit turns

6    into a larger development," which is exactly what occurred.

7         Then, the last sentence of the paragraph, if we could

8    highlight that.

9         "Thus, to the extent there were further findings from

02:41:19 10    another audit or another regulatory body was interested in

11    pursuing the matter, there could be further chapters in the

12    story."

13         And again, that's exactly what occurred.

14    Q.  Let me show you another analyst report, Exhibit 1408, a

02:41:37 15    Deutsche Bank Alex. Brown report, dated on the same day,

16    November 15th, 2001.

17    (Document tendered.)

18         MR. BURKHOLZ:  I would ask that to be admitted into

19    evidence, your Honor, subject to the limiting instruction.

20    BY THE WITNESS:

21    A.  Again --

22         THE COURT:  Excuse me.

23         THE WITNESS:  I am sorry, your Honor.

24         THE COURT:  That's all right.

02:42:01 25         It will be admitted subject to the limiting

Fischel - direct

2634

1    instruction the jurors have.

2      (Said exhibit was received in evidence.)

3         THE WITNESS:  I apologize, your Honor.

4         THE COURT:  Go ahead.

02:42:08 5  BY MR. BURKHOLZ:

6    Q.  Now, what is the significance of this analyst report to

7    your opinion?

8    A.  This analyst report, again, talks about the significance

9    of the lawsuit.  And, again, this analyst begins to suspect

02:42:21 10  that there is going to be problems with the long-term growth

11   strategy that might develop as a result of the lawsuit.

12        So if we look at the middle of the page on Page 94,

13   conclusion, if we can just highlight 1, 2, 3.  The analyst

14   talks about what the possible effect of the lawsuit might be.

02:42:53 15        It talks about how much more in refunds might

16   Household owe to consumers who are victims of predatory

17   lending.

18        Will the accusations escalate within or beyond the

19   state?  Again, that's exactly what occurred.

02:43:09 20        And three, will there be any operational constraints?

21   Meaning the business strategy that Household pursued to drive

22   its growth, whether they are going to be -- whether there were

23   going to be constraints on that strategy as more and more

24   complaints occurred, more and more lawsuits were filed, more

02:43:27 25  and more regulators were concerned and upset, whether

**PSA138**

1    Household was going to have to abandon the identical practices

2    which fueled its growth strategy in the first place.

3    Q.  Now, the article refers to the department filing the suit

4    on November 9th, 2001.  And this analyst report is on

02:43:43  5    November 15th, 2001.

6         What's the significance of that?

7    A.  Well, they are both relevant dates, but if you look at the

8    stock price reaction, the stock price reaction occurred on

9    November 15th.  That was also the day that Household issued a

02:44:01 10    press release denying the allegations as opposed to saying it

11    was working something out or some alternative form of

12    disclosure.

13         And November 15th was the date that the analyst, as

14    we just looked at, isolated as the date that Household stock

02:44:20 15    price fell because of the filing of this lawsuit, coupled with

16    Household's denial on November 15th.

17    Q.  Did the value of Household stock decline by the

18    $8.5 million that the California Department of Corporations

19    was seeking?

02:44:37 20    A.  No.  It declined by much, much more than that because

21    analysts concluded and investors concluded, with the benefit

22    of hindsight, correctly that it was much more than the

23    $8.5 million that was at stake.  It was Household's ability to

24    continue with the business practices that it was engaged in,

02:44:57 25    whether Household was going to be able to avoid more regulator

Fischel - direct

2636

1    scrutiny, more lawsuits, more complaints by consumers.

2        These are the things that analysts said might happen,

3    and those are the things that in fact did happen later on in

4    the relevant period.

02:45:12  5    Q.  Did you prepare a demonstrative for the second date that

6    you selected, December 3rd, 2001?

7    A.  I did.

8        MR. BURKHOLZ:  Can we bring up Demonstrative 138.

9    BY MR. BURKHOLZ:

02:45:27  10    Q.  Are there analyst reports and articles referred to in this

11    demonstrative?

12    A.  Yes.

13    Q.  Let me hand you what we have marked as Plaintiffs'

14    Exhibit 1409, a Dow Jones capital markets report of

02:45:42  15    December 1st, attaching the Barron's article; Plaintiffs'

16    Exhibit 1421, Bernstein Research report of December 4, 2001;

17    and Exhibit 1420, which is a Legg Mason December 3rd, 2001,

18    analyst report.

19    (Documents tendered.)

02:46:04  20    BY MR. BURKHOLZ:

21    Q.  Are those the documents that you are referring to in this

22    demonstrative?

23    A.  Yes, sir, they are.

24        MR. BURKHOLZ:  Your Honor, we move these three

02:46:09  25    exhibits into evidence subject to the limiting instruction.

**PSA140**

Fischel - direct

1          THE COURT:  They will be admitted subject to the

2     limiting instruction that the jury has already been given.

3     (Said exhibits were received in evidence.)

4     BY MR. BURKHOLZ:

02:46:18  5     Q.  What is the significance of the three documents that you

6     refer to in the demonstrative to your opinion?

7     A.  These are articles, a Barron's article and articles --

8     analyst reports discussing the Barron's article.  Again, you

9     can see at the heading that this is the second of my

02:46:37 10    14 specific disclosures.  It's a December 3rd article in

11    Barron's.

12          Again, you see residual price change of minus $1.90,

13    meaning that Household stock price declined by this amount,

14    according to the event study after adjusting for movement in

02:47:01 15    the overall market in the industry, as I explained with the

16    event study.  And it's also, based on my event study, a

17    statistically significant day.

18          And then, there are again some excerpts from what's

19    disclosed on this day.

02:47:17 20          So again, I think it's fairly self-explanatory, but

21    it states on Saturday, September 1st -- the difference between

22    September 1st and -- December 1st and December 3rd is, there

23    is no trading on Saturday, but there is on Monday.  So the

24    price impact is going to be on Monday, not Saturday.

02:47:34 25          Barron's published an article questioning Household's

**PSA141**

Fischel - direct

1    accounting and reaging practices.  And then a discussion of

2    how at least a few observers suggest that the bottom line

3    might also have benefited from aggressive accounting to, among

4    other things, minimize net loan losses.

02:47:57  5        An analyst, whose firm worked for Household, stated

6    that he was bothered that, among other things, "Other subprime

7    mortgage lenders have experienced losses at twice the level

8    reported by Household."

9        And then the demonstrative goes on to discuss the

02:48:14 10   analyst commentary.  And I don't need to read every single

11   thing on the demonstrative.  But the thing at the bottom of

12   the page I think is useful to read.

13        "Household stock is reacting to concerns about

14   management credibility."  In other words, the stock price is

02:48:34 15   falling because Household's denials are becoming less and less

16   credible as more and more complaints surface.

17        "Specifically, is management using the latitude

18   provided by its loan-recognition policies to distort reported

19   payment behavior by postponing the recognition of losses?"

02:48:57 20   Q.  Let me show you what we have marked as Plaintiffs' 1419.

21        It's a December 3rd Reuters release.

22        What is the significance of that document to your

23   opinion?

24   A.  Again, it just confirms what I just said, if we take a

02:49:15 25   look at the very first paragraph of it.

        1           MR. BURKHOLZ:  Your Honor, can I move Exhibit 1419

        2    into evidence?  I am sorry.  Subject to the  limiting

        3    instruction.

        4           THE COURT:  It will be admitted subject to the

02:49:45   5    limiting instruction.

        6    (Said exhibit was received in evidence.)

        7    BY THE WITNESS:

        8    A.  I am not sure everybody can read that, but it states

        9    shares of loan and credit card, Household International fell

02:49:55  10    5 percent on Monday -- the Monday we were just talking

       11    about -- amid heavy trading following an article in a business

       12    weekly, Barron's, which cited analysts' views that the firm

       13    was underestimating bad loans.

       14    BY MR. BURKHOLZ:

02:50:09  15    Q.  Okay.  I want to move to December 12th, 2001.

       16           One of your other dates was December 5th, 2001,

       17    correct?

       18    A.  Correct.

       19    Q.  What happened on that day?

02:50:22  20    A.  The stock price went up on that day, and the reason is

       21    that Household said that, notwithstanding all -- it might be

       22    useful just to put the demonstrative up for a second because I

       23    don't want to paraphrase.

       24           MR. BURKHOLZ:  Let's put up demonstrative -- I

02:50:45  25    believe it's 139.

1   BY THE WITNESS:

2   A.  This is a day when the stock price went up.  So you see

3   residual price change $1.85.

4       But if you look under the second bullet point, the

02:51:06  5   first dash there, where the statement is made that

6   Mr. Aldinger addressed concerns raised in a recent Barron's

7   article regarding the company's accounting practices.  And

8   then the statement is made that, "Household remains confident

9   in its ability to deliver 15 percent EPS" -- earnings per

02:51:32 10   share -- "growth in 2001 and 13 to 15 percent growth in 2002."

11      So Household again says that these practices are not

12  going to affect its ability to grow, which is actually

13  different from what occurred subsequent to this.

14      But at this particular time, investors see that.

02:51:50 15  They think the growth strategy is in place.  It's not going to

16  be affected.  The stock price goes up.

17  Q.  That ends up in your calculation reducing plaintiffs' --

18  inflation that you found in this particular model?

19  A.  Correct.  It included all positive movements and negative

02:52:06 20  movements that met my criteria in my 14 disclosures.

21  Q.  Let turn to the demonstrative -- strike that.

22      Did you prepare a demonstrative for the next date,

23  December 12th, 2001?

24  A.  I did.

02:52:18 25      MR. BURKHOLZ:  Can we bring up 140, please.

1  BY MR. BURKHOLZ:

2  Q.  Is this the demonstrative that you prepared for the

3  December 12th, 2001, date?

4  A.  Yes.

02:52:40  5  Q.  Let me show you what we have marked as Exhibit 1410.  It's

6  a December 11th, 2001, Legg Mason analyst report.

7  (Document tendered.)

8      MR. BURKHOLZ:  I would ask to move that into

9  evidence, your Honor, subject to the limiting instruction.

02:52:54  10     THE COURT:  It will be admitted subject to the

11  limiting instruction.

12  (Said exhibit was received in evidence.)

13  BY MR. BURKHOLZ:

14  Q.  Can you describe the significance of that analyst report

02:53:01  15  that's reflected on your demonstrative?

16  A.  Yes.  This is another analyst report that causes a stock

17  price decline.  And as the demonstrative indicates, after the

18  close of trading on December 11th, analysts at this particular

19  firm, Legg Mason, issued a report detailing their criticisms

02:53:25  20  of Household's reaging policies.

21      Then, again, I don't know if you want me to keep

22  reading every single --

23  Q.  No, that's okay.

24  A.  -- demonstrative.  But the point is that the analysts are

02:53:38  25  saying that we are very suspicious that Household is

Fischel - direct

2642

1    accurately reporting its loan portfolio and that it may have

2    losses far greater than what it's reporting.  And that

3    criticism causes the stock price to go down.

4    Q.  Okay.  Let's look at the date July 26th, 2002.

02:53:56  5        Did you prepare a demonstrative for that date?

6    A.  I did.

7        MR. BURKHOLZ:  Can we bring up 142, please.

8    BY MR. BURKHOLZ:

9    Q.  Did you prepare this demonstrative?

02:54:23  10   A.  I did.

11   Q.  And it refers to a Bellingham Herald article?

12   A.  It does.

13   Q.  Let me show you what we have marked as Plaintiffs' 283,

14   which is the Bellingham Herald of July 26th, 2002.

02:54:36  15       MR. BURKHOLZ:  I would ask to move that into evidence

16   subject to the limiting instruction.

17       THE COURT:  It will be admitted.

18    (Said exhibit was received in evidence.)

19   BY MR. BURKHOLZ:

02:54:43  20   Q.  What is the significance of this Bellingham Herald article

21   on July 26th, 2002?

22   A.  The significance of this document is, Household

23   acknowledges that some of its employees have misrepresented

24   loan terms to customers -- that's the first point -- where

02:55:05  25   they hadn't done that before, at least according to this

Fischel - direct

2643

1    article.

2            And then there is a statement by the Household

3    spokesperson that the internal company probe of customer

4    complaints had uncovered some serious problems in that the

02:55:25 5    Bellingham office manager has been replaced as a result.

6            But what's particularly significant in this article

7    to me, something that at least I had not seen before this

8    article, was that there was a response from the office manager

9    that was terminated.  And she took the position, as is stated

02:55:47 10    at the bottom of the demonstrative, that she was being made a

11    scapegoat for all of the criticism that Household was facing

12    and that what she did, the sales pitches she used, came from

13    the company.  It wasn't a matter of some rogue or isolated

14    employee.  At least her claim was, she was fired unfairly

02:56:11 15    because all she did was implement the predatory lending

16    practices of the company.

17    Q.  Let's look at the next date, which is August 14th, 2002.

18            That's the date of the statement that you talked

19    about before, correct?

02:56:26 20    A.  Correct.

21            MR. BURKHOLZ:  If we can bring up --

22    BY MR. BURKHOLZ:

23    Q.  Did you prepare a demonstrative for that date?

24    A.  I did.

02:56:32 25            MR. BURKHOLZ:  If we can bring up 143,

**PSA147**

Fischel - direct

1    Plaintiffs' 143.

2    BY MR. BURKHOLZ:

3    Q.  And do you cite in this demonstrative to various analysts'

4    reports and a company press release?

02:56:49  5    A.  Yes.  There was something of a difference of opinion about

6    the importance of this restatement among analysts, but a

7    number of analysts did conclude that the restatement indicated

8    that Household's credit card business was going to be much

9    less profitable in the future, lower their growth targets as a

02:57:11 10    result of this particular press release.

11         And, again, based on my event study, Household stock

12    price was negative on this particular day for the reasons we

13    talked about earlier.

14    Q.  Let me show you what we have marked as Plaintiffs' 227,

02:57:26 15    which is a Household press release of August 14th, 2002;

16    Exhibit 1426, which is the CIBC analyst report of August 14th,

17    2002; and the Morgan Stanley analyst report of August 15th,

18    2002.

19         These are the documents that you are referring to in

02:57:48 20    your demonstrative?

21    A.  Correct.

22         MR. BURKHOLZ:  Your Honor, can we move these three

23    exhibits in subject to the limiting instruction?

24         THE COURT:  I don't think the demonstrative is --

02:57:57 25         MR. BURKHOLZ:  Not the demonstrative, the three

**PSA148**

Fischel - direct
2645

1    exhibits, 227, 1426, and 1413.

2            THE COURT:  They will be admitted.

3    (Said exhibits were received in evidence.)

4    BY MR. BURKHOLZ:

02:58:09  5    Q.  What is the significance of the analysts' reaction to the

6    restatement?

7    A.  Well, it's really what I indicated.  There were certain

8    analysts who viewed the restatement as very important in terms

9    of whether or not Household was going to be able to continue

02:58:26 10    to grow at the same rate that investors thought previously and

11    Household had represented previously.  And that's what's

12    reflected in the two quotes at the bottom half of the document

13    where one analyst says, "As a result of the accounting

14    adjustment" -- the restatement -- "we have lowered our 2002

02:58:52 15    and 2003 earnings estimates" -- meaning lowered their growth

16    expectations for those years -- "and lowered our price target

17    on the stock to 57 from 65 to reflect the earnings adjustment

18    and the negative investor sentiment typically attached to any

19    accounting revisions."

02:59:12 20            And then the next one is to the same effect, that the

21    next analyst is also lowering its earnings projections because

22    "the restatement of earnings suggests to us that returns in

23    the credit card business are lower than we previously

24    thought," that growth is going to be lower than we previously

02:59:30 25    thought.

**PSA149**

1  Q.  Is there a relationship between the lowering of the

2  estimates and the expectation of investors?

3  A.  Yes.  The estimates are what create investors' belief that

4  there is going to be growth.  So if the estimates for improved

02:59:47  5  financial performance are lowered, that translates into lower

6  growth.

7  Q.  I think we talked about the Forbes article a little bit

8  before?

9  A.  Correct.

02:59:54 10  Q.  Exhibit 69.  Did you prepare a demonstrative for that

11  date, August 16th, 2002?

12  A.  I did.

13        THE COURT:  Why don't we maybe take a break now

14  rather than go into that.

03:00:05 15        It's 3 o'clock.  We will take our afternoon break,

16  ladies and gentlemen.  Fifteen minutes and then we will

17  return.

18  (Jury out at 3:00 p.m.)

19        THE COURT:  We will recess for 15 minutes.

03:00:39 20        MR. KAVALER:  Your Honor, what time are we going to

21  end for the mini summations?

22        THE COURT:  Well, we have an expert witness here.  So

23  my preference would be to go until 4:30, and then we can do

24  the summations after 4:30.

03:01:02 25        But if the jury -- that's a problem.  I guess we will

            1    stop about ten minutes before 4:30, and then we will do the

            2    summations.

            3         MR. BURKHOLZ:  Your Honor, we have one issue I just

            4    wanted to raise.

03:01:18    5         Professor Fischel does have a class Monday morning.

            6    I think he can get here by 11:00.  We are not going to finish

            7    with him today.  If we can start at 10:00, we can play -- we

            8    have an hour of video that we need to play.  We can finish

            9    that.

03:01:31   10         And we also have Mr. O'Han that we can put on, but I

           11    understand Mr. Kavaler doesn't want to do that.

           12         I just wanted to raise it before we leave the jury --

           13         MR. KAVALER:  Your Honor, that's not correct.  There

           14    is no issue about Mr. O'Han, Mr. Kavaler not wanting to put

03:01:51   15    on.  That's a complete misstatement of what transpired.  I

           16    would be happy to tell you, but that's not an issue.  That's

           17    just not true.

           18         THE COURT:  Well, it doesn't matter what transpired.

           19    You have either deposition testimony or witnesses to take up

03:02:02   20    whatever time between the start of our usual starting time and

           21    the time your expert can come back.  We will interrupt his

           22    testimony and bring him back when he is available.

           23         MR. BURKHOLZ:  Thank you, your Honor.

           24         THE COURT:  Okay.

03:02:15   25         THE WITNESS:  Thank you, your Honor.

                    1           THE COURT:  Recess.

                    2           THE CLERK:  Court stands recessed.

                    3    (A brief recess was taken at.3:02 p.m.)

                    4           THE COURT:  Ready to proceed?

03:18:44    5           MR. BURKHOLZ:  We are.

                    6           THE COURT:  Okay.  Let's bring the jury out.

                    7    (Jury enters courtroom.)

                    8           THE CLERK:  Please be seated.

                    9           THE COURT:  You may proceed.

03:19:48   10           MR. BURKHOLZ:  Thank you, your Honor.

                   11    BY MR. BURKHOLZ:

                   12    Q.  Do you have the Forbes article in front of you?

                   13    A.  If I can find it.  Do you have another copy?

                   14    Q.  Sure.  I do.

03:20:08   15           Did you prepare a demonstrative based on the Forbes

                   16    article?

                   17    A.  I did.

                   18    Q.  Give you a copy.

                   19    A.  Thank you.

03:20:21   20           MR. BURKHOLZ:  Can we bring up Plaintiffs'

                   21    Demonstrative 144?

                   22    BY MR. BURKHOLZ:

                   23    Q.  Is this the demonstrative you prepared?

                   24    A.  Yes.

03:20:32   25    Q.  What was the significance of the Forbes article that came

Fischel - direct

2649

1    out on this date, August 16, 2002, to your opinion?

2    A.  This was yet another in the series of disclosures that

3    came out during the relevant period criticizing Household's

4    lending practices.  And that's why you see again the residual

03:20:59 5    price change of negative $1.84, a significant price change,

6    and then the demonstrative excerpts a couple of paragraphs

7    from the underlying documents where, at the top of the

8    demonstrative, an article how Forbes accused Household of

9    improper lending practices, where it stated, "In addition to

03:21:32 10   the bait-and-switch on interest rates, Household charges high

11   prepayment penalties and service fees.  It lures clients with

12   proposals showing monthly savings that at times fail to

13   materialize, and it structures mortgages to include

14   last-minute second loans that make it difficult for borrowers

03:21:49 15   to defect and get refinancing elsewhere.  Household agents

16   call it closing the door," and then the article continues.

17   Q.  Did you mean "closing the back door"?

18   A.  Excuse me, "closing the back door."

19        And then the article continues that "the practices

03:22:06 20   were not isolated as Household had claimed.  In July, Forbes

21   had learned authorities for more than a dozen states descended

22   on Household to demand refunds and reforms."

23        And then a quote from the Minnesota Commerce

24   Commissioner stating, "Household encourages or at least

03:22:29 25   tolerates these abuses.  It's not just an occasional rogue

**PSA153**

1    officer or a rogue office, it has to do with corporate

2    culture, the corporate culture."

3    Q.  And just so we're clear, that decline of $1.84, how does

4    that relate to the market drop on that date?

03:22:49    5    A.  Well, again, that is the decline in Household's stock

6    price, taking into account movements in the overall market and

7    industry on that day, which is what the event study and the

8    regression analysis do with respect to every day during the

9    relevant period.

03:23:06    10    Q.  The dates, in the 14 dates we've been talking about,

11    you're analyzing the decline in Household's stock price that's

12    more than what would have occurred on that day.

13    A.  The decline or the increase that's more than what would

14    have occurred, given what you'd expect in light of the

03:23:22    15    performance of the market and the industry on those days.

16    Q.  Okay.  And your next date, August 27th, 2002, did you

17    prepare a demonstrative for that date?

18    A.  I did.

19         MR. BURKHOLZ:  Okay.  Can we bring up 145, please?

20    BY MR. BURKHOLZ:

21    Q.  Is that the demonstrative you prepared for August 27,

22    2002?

23    A.  It is.

24    Q.  Okay.  Let me show you Defendants' Exhibit 568, which is a

03:23:51    25    KBW analyst's report, and Plaintiffs' 1429, which is a

**PSA154**

1    Bellingham Herald article of August 27, 2002.

2            Are those referenced in your demonstrative?

3    A.  They are.

4            MR. BURKHOLZ:  Your Honor, I'd move those two

03:24:12 5    documents in, 568 from the defendants and 1429 from the

6    plaintiffs, subject to the limiting instruction.

7            THE COURT:  It will be admitted subject to a limiting

8    instruction.

9    (Defendants' Exhibit 568 and Plaintiffs' Exhibit 1429

10    received in evidence with a limiting instruction.)

11    BY MR. BURKHOLZ:

12    Q.  And what was the significance of these two, the KBW report

13    and the Bellingham Herald article that came out at that time

14    to your opinion?

03:24:31 15    A.  This was the -- the day when there is public -- public

16    disclosure discussing the Washington Department of Financial

17    Institutions report as well as an analysis, again, by another

18    analyst of Household's position in the marketplace in light of

19    the increasing number of complaints, lawsuits, regulatory

03:25:05 20    investigations, et cetera.

21    Q.  What is the -- if we can focus on the first part

22    underneath the KBW report, what is the significance of that

23    excerpt that you took out of the analyst's report?  If we can

24    highlight that.

03:25:19 25    A.  Yes.  This is where, again, market participants become

**PSA155**

Fischel - direct

1    increasingly critical of Household but also become

2    increasingly skeptical that Household is going to be able to

3    continue with its successful implementation of its growth

4    strategy because what the analyst states is that "We can't

03:25:45  5    help but think that the implementation of the company's best

6    practices could reduce the future profitability of a Household

7    home equity loan."  And then "Management contends that this is

8    not the case.  They deny it."

9         But then the analyst concludes, "However, unless the

03:26:03 10    company substitutes predatory revenues, upfront fees, with

11    non-predatory revenues, we do not see how profitability not

12    being affected is possible."

13         In other words, Household again states as they've

14    stated earlier that they don't believe their growth strategy

03:26:21 15    is going to be affected, but now Household -- now Household

16    analysts, market professionals who are observing Household, no

17    longer believe what Household is saying in the same way that

18    market professionals no longer believe that predatory lending

19    is not occurring or that accounting is not overly aggressive.

03:26:42 20  Q.  Is the second part of the KBW report significant in your

21    opinion?

22  A.  Yes, exactly, because it's related -- it's really the same

23    point as the predatory lending, that the conclusion that

24    management's aggressive accounting philosophy towards

03:27:03 25    accounting is not immaterial in our view.

1          Again, market participants, professional investors

2     becoming increasingly skeptical of what they can rely on in

3     terms of what Household is telling them.

4     Q.  And what's your -- what's the significance of the

03:27:19  5     Bellingham Herald article describing the contents of the

6     Washington DFI report and noting the widespread nature of the

7     predatory lending practices detailed in that report?

8     A.  The report as the excerpt on the demonstrative indicates

9     that the Washington regulators concluded that the abusive

03:27:43 10     predatory lending practices were not isolated but were rather

11     systematic and pervasive.

12          And, therefore, the Bellingham Herald quotes the

13     report or cites the report as saying, "The report rejects any

14     notion that the abuses are due to renegade local

03:28:03 15     representatives who are violating corporate policies.

16     Household has created a situation in which they can completely

17     mislead and confuse the borrower while later providing a

18     plausible explanation for their actions to the department or

19     other regulatory agencies."

03:28:21 20          Basically, the Washington report is saying the same

21     thing as the fired branch manager, that the practices are not

22     isolated, they're coming from the company and they're

23     pervasive.

24     Q.  And is the market, your understanding that the market is

03:28:36 25     learning more information about the Washington DFI report at

Fischel - direct

2654

1    this time?

2    A.  Exactly, because it's starting to be leaked more and more

3    into the press, and now it's disclosed and discussed in this

4    Bellingham Herald article.

03:28:51  5    Q.  Okay.  And did you prepare a demonstrative for our next

6    date, September 3rd, 2002?

7    A.  I did.

8        MR. BURKHOLZ:  Can we bring up 146, please?

9    BY MR. BURKHOLZ:

03:29:07 10    Q.  And is this the demonstrative you prepared for

11    September 3rd, 2002?

12    A.  I did.

13    Q.  And you reference a Sanford Bernstein report of September

14    3rd, 2002 and an American Banker article of September 10th,

03:29:20 15    2002?

16    A.  Correct.

17    Q.  Okay.  Let me show you what we've marked as Plaintiffs'

18    1431, which is the Sanford Bernstein analyst report, and 1402,

19    which is the American Banker article of September 10th.

03:29:39 20        Those are the two documents that you took excerpts

21    out of for your demonstrative?

22    A.  Correct.

23        MR. BURKHOLZ:  Your Honor, can we move those two

24    exhibits in, 1431 and 1402, subject to the limiting

03:29:50 25    instruction.

                1        THE COURT:  They'll be admitted with the limiting

                2    instruction.

                3    (Plaintiffs' Exhibits 1402 and 1431 received in evidence

                4    with a limiting instruction.)

03:29:56        5    BY MR. BURKHOLZ:

                6    Q.  What were the significance of the Bernstein report and the

                7    American Banker article to your opinion?

                8    A.  The Bernstein report and the -- well, let me start with

                9    the Bernstein report.

03:30:05       10        That was the first detailed analysis of the effect of

               11    the Washington report on Household's growth strategy and its

               12    ability to continue to pursue the same practices that had been

               13    responsible for the growth strategy in the first place.

               14        And what the demonstrative indicates at the top is

03:30:36       15    that the Bernstein analysts, having reviewed the Washington

               16    report, have --

               17    Q.  Let me cut you off there for a second.

               18    A.  Sure.

               19    Q.  When you say reviewed, what kind of analysis did this

03:30:49       20    analyst do with that report in the exhibit that you have in

               21    front of you?

               22    A.  Quite a detailed analysis.  There was a lot of leakage

               23    before this, but no real detailed analysis of exactly what the

               24    report said and, more importantly, what the effect of the

03:31:03       25    report would be on Household's profitability, its ability to

PSA159

Fischel - direct

2656

1    continue its growth strategy.

2    Q.  Did this analyst look at the impact of Household changing

3    its practices on how much money they could make in the future?

4    A.  That's exactly what they did.

03:31:21  5    Q.  Did he look at it in detail?

6    A.  Looked at it in great detail.  And, again, it's not just

7    my opinion, but it was commented on at the time, that that's

8    what the significance of this particular report was.

9    Q.  Okay.  Why don't you continue on, and let's look at the

03:31:36 10    second and third parts of that report.  Can you explain the

11    significance of that?

12    A.  Yes, that right at the beginning, you see that the

13    Bernstein analysts lowers their growth estimates for Household

14    based on the Washington report.  "Household will likely need

03:31:55 15    to abandon its target EPS," earnings per share, "growth rate

16    of 13 to 15 percent to a range of 10 to 12 percent as a result

17    of sales practices reform in its branch-based real estate

18    lending business.

19        "Our assumption of a long-run growth rate of 10

03:32:14 20    percent for the branch-based real estate portfolio may prove

21    to be at best case zero or even negative growth could occur,

22    and then the combined impact of sales practice reform, the

23    suspension of the stock buy-back program and the accounting

24    restatement announced on August 14th is an estimated 15 cents

03:32:37 25    in 2002 and 40 cents in 2003.

1           "As a result, we are lowering our EPS," earnings per

2      share, "estimate for 2002 to $4.48 from $4.63 versus a

3      consensus of $4.57, and for 2003 to $4.96 from $5.36 versus

4      consensus of $5.14."

03:33:04  5   Q.   And was -- is Bernstein a respected analyst entity?

6      A.   Yes, very much so.

7      Q.   Okay.  And would market participants consider this report

8      important?

9      A.   Yes, they would, and they did, as indicated by the next

03:33:20 10   excerpt that's in the bottom part of the demonstrative.

11      Q.   And what is the significance of the American Banker

12      article to your opinion?

13      A.   Well, they're commenting on exactly what you just asked me

14      about, how important the Bernstein article -- the Bernstein

03:33:35 15   report was, analyzing the Washington Department of Financial

16      Institutions report.

17           And the American Banker article a week after refers

18      to the Bernstein report and states that "For the first time an

19      equity analyst has put some hard numbers behind concerns that

03:33:59 20   Household International's lending troubles would reduce its

21      earnings."

22           So really the first time, rather than just stating

23      that Household's growth strategy might have to change, an

24      analyst is saying exactly how much it would have to change and

03:34:13 25   what the financial impact of the lowered growth would be for

Fischel - direct

2658

1    investors in the future.

2    Q.  And had some analysts in the summer 2002 tried to estimate

3    the impact of the Washington DFI report as parts of it were

4    leaking out?

03:34:28  5    A.  Yes, but this is really the first time that somebody

6    really did it in a concrete way in a way that was disseminated

7    to the public.

8    Q.  Okay.  And did you prepare a demonstrative for the next

9    date, September 23, 2002?

03:34:42 10    A.  I did.

11          MR. BURKHOLZ:  Can we bring up Plaintiffs'

12    Demonstrative 147?

13    BY MR. BURKHOLZ:

14    Q.  And is this a demonstrative you prepared for September 23,

03:34:57 15    2002?

16    A.  It is.

17    Q.  And the -- you cite an analyst report from CIBC of

18    September 22, 2002?

19    A.  Correct.

03:35:04 20    Q.  Okay.  Let me show you Plaintiffs' 1435, which is the CIBC

21    September 22nd, 2002, analyst report.

22          MR. BURKHOLZ:  I'd ask to move that into evidence

23    subject to the limiting instruction.

24          THE COURT:  It will be admitted subject to the

03:35:19 25    limiting instruction.

**PSA162**

1      (Plaintiffs' Exhibit 1435 was received in evidence with a

2      limiting instruction.)

3    BY MR. BURKHOLZ:

4    Q.  Now, what was the significance of this CIBC report on

03:35:24  5    September 22, 2002, to your opinion?

6    A.  The significance of this was, again, this is a report

7    that's analyzing the effect of the Washington Department of

8    Financial Institutions report on Household's profitability, on

9    what the likely effect of alteration in Household's lending

03:35:49 10    practices will have on its profitability and on its stock

11    price.

12         And you also see the -- again, the residual price

13    change of minus $1.52, which, again, is the price taking into

14    account movements in the market and the overall industry on

03:36:09 15    that particular day.

16    Q.  What is the reference to the resolution of the heightened

17    investigations and pending lawsuits?

18    A.  Well, if you're in the perspective of this particular

19    analyst, they're trying to figure out what's going to happen

03:36:32 20    in the future.

21         You have all of these lawsuits and complaints that

22    have been filed against Household, many more regulatory and

23    governmental investigations, the Washington Department of

24    Financial Institutions report is now public, and nobody knows

03:36:52 25    what's going to happen, what the effect on Household will

1      ultimately be.

2              So as a result, if you go back to the top of the

3      demonstrative, the analyst talks about how concerns about

4      these investigations, about the effect of the Washington

03:37:11  5    report caused the analysts to lower their price target for

6      Household from $57 to $36, which is a really major negative

7      shift because of the concern about what the ultimate effect is

8      going to be of all these investigations and lawsuits and

9      regulatory pressure on Household to change its predatory

03:37:38 10    lending practices.

11     Q.  And when you talked about the concern, are you talking

12     about how much money Household will have to pay for any

13     settlement as well as how much money they're going to make in

14     the future?  Is that what the analysts are looking at?

03:37:48 15    A.  I think there's some concern about how much money

16     Household will have to pay, but much more important than what

17     Household will have to pay is what the effect will be of

18     abandoning its predatory lending on its profitability and its

19     growth prospects for the future.

03:38:03 20            That's really what the analysts were more focused on,

21     although obviously the amount is also relevant.  But what's

22     more relevant is Household's business strategy, the

23     relationship between predatory lending and aggressive

24     accounting in that business strategy, and whether pressure

03:38:21 25    from investigations, lawsuits, et cetera, will force Household

**PSA164**

1    to abandon certain business practices and accounting

2    practices, reducing its profitability, reducing its growth,

3    causing its stock price to fall, which is why the analysts

4    lowered the price target from $57 to $36.

03:38:39    5    Q.  And analysts and investors look at the growth rate of a

6    company in order to estimate how to value that company, what

7    the stock price should be?

8    A.  Yes.  How a company is expected to perform in the future,

9    that's really what determines what a stock price is today.

03:38:53    10    Q.  Okay.  Have you prepared a demonstrative for our next

11    date, October 4th, 2002?

12    A.  I have.

13         MR. BURKHOLZ:  Okay, can we bring up 148, please?

14    BY MR. BURKHOLZ:

03:39:08    15    Q.  And is that the demonstrative you've prepared for

16    October 4th, 2002?

17    A.  Yes.

18    Q.  And you cite to a Wall Street Journal article of October

19    4th, 2002, correct?

03:39:17    20    A.  Correct.

21    Q.  Let me give you what's been marked as Plaintiffs' 1375,

22    which is the Wall Street Journal article of October 4th, 2002.

23         MR. BURKHOLZ:  Ask that that be marked into

24    evidence -- moved into evidence, your Honor, subject to the

03:39:31    25    limiting instruction.

**PSA165**

Fischel - direct

2662

1          THE COURT:  It will be admitted subject to the

2    limiting instruction.

3    (Plaintiffs' Exhibit 1375 was received in evidence with a

4    limiting instruction.)

03:39:36  5  BY MR. BURKHOLZ:

6    Q.  Now, what is the significance of this article coming out,

7    the Wall Street Journal article on October 4th, 2002, to your

8    opinion?

9    A.  This article is reporting basically leakage of a potential

03:39:49 10  settlement between Household and the attorneys general of the

11    various states that have accused Household of predatory

12    lending practices.

13    Q.  And has there -- there's been discussion about a potential

14    settlement we've looked at on other dates, correct?

03:40:07 15  A.  There was some earlier discussion beginning, I think, at

16    the end of July; but in this particular document, it's

17    reported in the Wall Street Journal, but it also reports that

18    the settlement might fall through because the attorneys

19    general might -- might not agree to it.

03:40:23 20  Q.  And did you prepare a demonstrative for our next two

21    dates, October 10th and 11th?

22    A.  I did.

23          MR. BURKHOLZ:  Okay.  Can we bring up Plaintiffs'

24    Demonstrative 149?

25    BY MR. BURKHOLZ:

Fischel - direct
2663

1    Q.  And you cite to an American Banker article on October 11,

2    2002, as well as a Dow Jones News Service on October 11, 2002,

3    correct?

4    A.  Correct.

03:40:51  5    Q.  Let me show you those exhibits.  Plaintiffs' 1418 is the

6    American Banker article, and Plaintiffs' 1415 is the Dow Jones

7    article of October 11th.

8         MR. BURKHOLZ:  Can we move those in, your Honor,

9    subject to the limiting instruction.

03:41:08  10         THE COURT:  It will be admitted subject to the

11    limiting instruction.

12    (Plaintiffs' Exhibits 1415 and 1418 received in evidence

13     with a limiting instruction.)

14    BY MR. BURKHOLZ:

03:41:14  15    Q.  So this is your demonstrative that you prepared, 149?

16    A.  Correct.

17    Q.  Okay.  What's the significance of the articles that came

18    out on October 11th to your opinion?

19    A.  These articles first disclose more rumors of a settlement,

03:41:34  20    and then the actual settlement, as well as Household's

21    disclosures about what the effect of the settlement and, again

22    more importantly, the change in their business practices will

23    have on its reported performance.

24         And one thing that's very important I want to

03:41:51  25    highlight is that Household's stock price went up

**PSA167**

Fischel - direct

2664

1   significantly in response to these particular disclosures on

2   October 10th and October 11th, correcting for movements in the

3   market and the industry as a whole, and the reason for that is

4   that there had been so much leakage, so much concern about

03:42:17  5   what the settlement might be, whether the settlement would

6   occur, how much Household would decline in profitability as a

7   result of the resolution of the lawsuits and reform of their

8   business practices that the stock price had fallen to a really

9   low level relative to where it had been before.  It was now in

03:42:42  10   the low 20s versus relatively close to 70 that it had been

11   earlier.

12          And when Household stated, looking at the bottom of

13   the demonstrative, that the effect of the series of business

14   practice reforms would only be 10 cents per share in 2003, 20

03:43:04  15   cents per share in 2004 and 30 cents per share in 2005, that

16   was much less than what many analysts were expecting.  They

17   were expecting the impact on Household's profitability to be

18   greater.  So this was relatively good news as compared with

19   what people were expecting.

03:43:24  20          And then subsequent to this, a number of analysts and

21   commentators said that these numbers were still too high.  But

22   as of this particular date, this was perceived as good news by

23   the market because even though Household was saying that it

24   was going to be less profitable in the future, that it wasn't

03:43:42  25   going to be able to grow at the same rate, the reductions in

**PSA168**

1   profitability and growth were less than some people were

2   forecasting, although, as I said, later these numbers were

3   criticized as well.

4   Q.  You were referring to the Bernstein article that we looked

03:43:54  5   at that was cutting their estimates, that this wasn't as

6   bad as what Bernstein said?

7   A.  Correct, correct.

8   Q.  So that's why the stock went up?

9   A.  Yeah, not just Bernstein, but a lot of other analysts as

03:44:04  10   well.

11   Q.  So this increase in the stock price, how did that impact

12   your quantification?

13   A.  I took it into account.  I gave Household full credit for

14   it; and as a result, it reduced my calculation of inflation

03:44:16  15   during the relevant period.

16   Q.  Let's talk about your quantification and go back to your

17   14 dates.  If we can bring up Plaintiffs' Demonstrative 150

18   again.

19         We've just looked at most of these dates.  I think

03:44:34  20   the only one we didn't look at was the February 27th, 2002.

21   Can you explain that to the jury?

22   A.  Yes.  That's a date when Household indicated or disclosed

23   that it was implementing a series of sales practice reforms to

24   try and deal with some of the complaints that it was

03:45:01  25   receiving, and that was perceived positively by the market,

Fischel - direct

2666

1   which is why there's a plus $1.64 entry there.

2        And, again, I took that, I gave Household credit for

3   that, took it into account in my calculation of inflation.

4   Q.  And can you explain the chart, how you got to the

03:45:19  5   calculation of taking the increases and decreases into

6   account?

7   A.  Yes.  I looked at what the event study showed with respect

8   to all 14 dates, every single one that I identified.  And if

9   you look at the last column, the entries in red --

03:45:36  10       MR. BURKHOLZ:  Highlight that whole last thing?

11   Thank you.

12        Sorry to interrupt.

13   BY THE WITNESS:

14   A.  No problem.

03:45:40  15       The entries in red are negative price movements

16   controlling for market and industry conditions.  The entries

17   in black are positive price movements controlling for market

18   and industry conditions.

19        The negative -- the negatives total 16 -- negative

03:46:04  20   $16.33.  The positives total $8.37.  I netted the positives

21   against the negatives for a total of $7.97.

22   BY MR. BURKHOLZ:

23   Q.  So including the positive price increases was conservative

24   in your view?

03:46:19  25   A.  Yes.  Obviously, if I only looked at the negative ones,

**PSA170**

Fischel - direct

2667

1   the inflation would be higher.  The harm to investors would be

2   greater.

3   Q.  Did you prepare a demonstrative that shows the artificial

4   inflation that you calculated based on the 14 dates?

03:46:32  5   A.  I did.

6          MR. BURKHOLZ:  Can we bring up 151, please?

7   BY MR. BURKHOLZ:

8   Q.  Okay.  Is this a demonstrative that you picked -- that you

9   prepared that shows the quantification -- quantifies the

03:46:50  10  inflation in Household's stock price for this particular

11  model?

12  A.  Graphically, that's correct.

13  Q.  Okay.  And I noticed at the very end, it's a little

14  difficult to see, but the blue line goes over the red line.

03:47:05  15         Can you explain what's happening in the last month of

16  the class period -- of the relevant period?

17  A.  Yeah.  And just for context, the red line is the price.

18  That's what the actual price was of Household on every day

19  during the relevant period.

03:47:21  20         The blue line, that's referred to as the "true

21  value."  That is what my calculations indicate the price of

22  Household would have been had there been no inflation in the

23  stock price as a result of the fraud-related disclosures, as a

24  result of the 14 fraud-related disclosures.

03:47:47  25         And you see for the entire period until the very end,

**PSA171**

Fischel - direct

1    Q.  Would there be inflation on that date if there was no

2    finding that the August 16th, 1999 10-Q was false or

3    misleading?

4    A.  No, no, that the -- well, it would depend, I guess, on

03:53:16  5    whether it was an earlier disclosure that was found to be

6    false and misleading.  It's hard to separate one from the

7    other.

8         But so long as there is a disclosure that Household

9    made that was false and misleading because it did not provide

03:53:31  10   accurate information about its predatory lending practices,

11   its re-aging policies, its credit card accounting, the ability

12   to sustain its growth strategy in the future, the inflation

13   would be this particular amount based on my calculations.

14   Q.  Okay.  Now, in your opinion, the $7.97 of inflation that

03:54:01  15   you calculated, does that capture, in your opinion, the amount

16   of inflation that was in Household's stock price?

17   A.  No.

18   Q.  And why not?

19   A.  Because what I did was I focused on individual

03:54:15  20   disclosures, but that's in some sense not a completely

21   realistic analysis because it's not as if there was only 14

22   disclosures during the relevant period.

23        There was a cascade of negative information that came

24   out about Household, particularly after negative --

03:54:36  25   particularly after November 15th, 2001, when market

1    participants, investors, analysts became to increasingly doubt

2    Household's denials and started to really question whether or

3    not Household's disclosures were accurate, whether its

4    accounting was accurate, whether its lending practices were

03:54:59  5    consistent with governing regulations.

6         There was, as we get a little bit later in the

7    period, tremendous amount of leakage of information about the

8    Washington Department of Financial Institutions report, about

9    the possibility of a settlement, about the need for Household

03:55:21  10   to reform its sales practices and the possible effect that

11   would have on Household's profitability, and I believe that

12   cascade of negative information had an effect, a negative

13   effect, on Household's stock price in addition to the effect

14   of the 14 disclosures that I originally quantified that we

03:55:44  15   just went through.

16   Q.  Do you have the Bellingham Herald article, that

17   Exhibit 1429?

18   A.  Probably better if you give me another copy of it because

19   I have so many documents.  I could search for it, but if you

03:55:57  20   have another copy, that would be better.

21        What's the date of it?

22   Q.  I have a copy.

23   A.  Thank you.

24        I have it.

03:56:30  25   Q.  Okay.  Is this an example of the type of leakage that you

1    were talking about?

2    A.  Yes.  In fact, the article discusses the very leakage that

3    I just described.

4    Q.  Okay.  And what in the article is significant to your

03:56:42   5    opinion regarding leakage?

6    A.  Well, if we just highlight the first half of the page on

7    the first page of the article.  The first paragraph talks

8    about the Washington report, the state investigative report on

9    Household.

03:57:08  10           Then it talks about how it's been suppressed by --

11    for three months as a result of a court order that Household

12    obtained; then describes, because the article's been now

13    leaked, a -- what the article refers to as a blistering

14    assessment of the Household's loan practices in Washington and

03:57:37  15    elsewhere in the state.

16           And then it goes on to talk about what the report

17    accuses the company of, misrepresentations and dishonest

18    statements, failure to provide customers with accurate

19    disclosures, coaxing borrowers into signing without reading

03:57:56  20    the documents that they're signing, talking borrowers into

21    refinancing at disadvantageous interest rates based on

22    misleading them, adding costly insurance premiums.

23           But then the next paragraph is really what is

24    supportive of what I said a minute ago.  It talks about how

03:58:19  25    Household's attorneys went to court to obtain a restraining

1    order blocking release of the report; but in recent weeks,

2    copies of the report have been leaked to every news

3    organization that has followed the HFC story, including the

4    New York Times, Forbes Magazine, American Banker Magazine, and

03:58:41 5    the Bellingham Herald.

6        And the point is that my 14 specific disclosures

7    don't pick up all this leakage going on behind the scenes to

8    all of these news organizations about the consequences to

9    Household of this report.

03:58:58 10        And, again, the same is true with respect to rumors

11    about the settlement, about rumors about the effect of sales

12    practice reform on Household's profitability and its growth

13    strategy, and that's why I think that my first quantification

14    doesn't fully capture the inflation in Household's stock

03:59:18 15    price.

16    Q.  Okay.  Before we get a little further into leakage and

17    your leakage analysis, did you prepare a demonstrative that

18    compared how Household's stock price went down from your first

19    date, November 15, 2001, until the end of the relevant period,

03:59:34 20    October 11, 2002, to the inflation that you found, the $7.97?

21    A.  I did.

22        MR. BURKHOLZ:  Okay.  Can we look at -- bring up 152,

23    please.

24    BY MR. BURKHOLZ:

03:59:46 25    Q.  Is this a demonstrative that you prepared?

1    A.  Yes.

2    Q.  And can you explain the demonstrative to the jury?

3    A.  Yes.  This is a comparison of Household's stock price

4    decline from November 15th, 2001, my first fraud-related

04:00:05  5    disclosure, the date of the California Department of

6    Corporations suit, to October 11th, 2002, when the settlement

7    and the reform of sales practices is announced, and the red

8    bar is the amount of the decline in Household's stock price.

9    $32.70 was the decline from I think it's, you know, somewhere

04:00:35  10    around 60 to somewhere in the 20s, but the exact amount of the

11    decline is $32.70.

12          And I compare that with the amount of inflation that

13    I calculated based on my 14 specific disclosures, which is the

14    blue bar, $7.97, and obviously $7.97 is a much smaller number

04:01:01  15    than $32.70.  So in my first method of the decline in price of

16    $32.70, only $7.97 of that $32.70 decline I attribute to

17    improper inflation, and the rest is attributable to other

18    factors under this first method.

19          So you can see the vast majority of the stock price

04:01:31  20    decline I do not count as inflation under my first method.

21    Q.  And it's your opinion that the $7.97 is -- doesn't fully

22    capture the inflation that was in Household's stock price

23    before this time period?

24    A.  Correct.  It captures the 14 specific disclosures, but it

04:01:50  25    doesn't capture the pervasive leakage of all of the

**PSA176**

Fischel - direct
2676

1    accusations and the findings in the Washington report,

2    consumer groups, the possibility of more regulatory

3    investigations, the effect on Household's -- rumors about the

4    effect on Household's lower profitability as a result of

04:02:13  5    reform of its sales practices, any analysis of specific

6    disclosures in a situation where there's so much leakage, the

7    specific disclosures can't fully capture all of the decline

8    that's attributable to fraud-related information.

9    Q.  And did you prepare -- compare Household's stock price

04:02:34 10    decline during this period we're looking at to what it

11    identified as its peer group?

12    A.  I did.

13          MR. BURKHOLZ:  Okay.  And can we look at -- bring up

14    demonstrative 136, please?

04:02:47 15          Let's highlight that.

16    BY MR. BURKHOLZ:

17    Q.  Is this a demonstrative that you prepared?

18    A.  Yes.

19    Q.  Can you explain it to the jury?

04:02:56 20    A.  Yeah.

21          Again, this is very important because, as I indicated

22    earlier, you can't really analyze a stock price in the

23    abstract.  You have to know how it compares to how the market

24    did and how the industry that it's a part of did.

04:03:12 25          And what I did was I looked at Household's

**PSA177**

Fischel - direct

1   disclosures to see what benchmark Household itself identified

2   as the market index and the industry index that its

3   performance should be compared against.

4          And Household identified the Standard & Poor's

04:03:36  5   Financial Index and the Standard & Poor's 500 Index, a much

6   broader index of the overall market.

7          So during this period when Household declined by

8   $32.70, I wanted to compare how Household performed versus the

9   indexes that Household itself said it should be compared

04:03:58  10  against, and this is what this graph indicates.

11         First of all, the full red bar is Household's

12  performance during this period.  The $32.70 decline translate

13  into a decline of 53 percent in Household's stock price during

14  this period.

04:04:21  15         But, again, I wanted to see how that compared with

16  the market and the industry to be consistent with my overall

17  analysis that you can't ever analyze stock prices in

18  isolation, you have to compare them to the market in the

19  industry.

04:04:38  20         So if you look at the two lines going across, they

21  represent the performance of the S&P Financials Index and the

22  S&P 500 Index, which, again, I did not choose those.

23  Household itself chose them as the relevant benchmarks to

24  assess its performance against.

04:04:58  25         And you can see that the Household -- the S&P

Fischel - direct

2678

1    Financials Index declined by approximately 20 percent.  The

2    S&P 500 Index declined by approximately 25 percent, but

3    Household declined by more than twice that amount.  It

4    declined by 53 percent during this period, which, again, gave

04:05:19  5    me confidence that Household's decline was not just

6    attributable to normal market and industry fluctuations, but

7    was attributable to new negative information coming out about

8    Household that is easily understandable in light of the

9    cascade of negative information that was coming out during

04:05:40 10    this period.

11    Q.  And was the $7.97 inflation that you found -- what was the

12    relationship between that and what you were finding in this

13    analysis?

14    A.  The $7.97 number is smaller than the amount of the -- of

04:05:59 15    Household's decline that exceeded the decline of the indexes

16    that Household itself compared itself to.  So my analysis was

17    conservative again in that respect.

18    Q.  And I want to show you the proxy that Household filed, 14A

19    proxy.  It's Exhibit 1275 dated May 14, 2002.

04:06:23 20         Is this a document that you used in preparing this

21    demonstrative?

22    A.  Yes.  Again, I didn't want to perform any comparisons of

23    Household to indexes that Household itself didn't compare

24    itself to, so under the governing regulations of the

04:06:45 25    Securities and Exchange Commission, companies have to identify

**PSA179**

Fischel - direct

1    which stocks and which stock indexes their performance should

2    be compared against so investors can assess whether their

3    performance is good or bad, not just in isolation, but

4    relative to the companies or the indexes that they themselves

04:07:06    5    compare themselves to.

6              MR. BURKHOLZ:  Okay.  Let's look at 1275.  Before we

7    bring it up, your Honor, can we move this in.  It's Household

8    SEC filing, 1275.

9              THE COURT:  No objection, it will be admitted.

10    (Plaintiffs' Exhibit 1275 received in evidence.)

11              MR. BURKHOLZ:  Thank you.

12    BY MR. BURKHOLZ:

13    Q.  Let's turn -- it's on page 31 of the proxy filing, and we

14    can highlight that paragraph that starts "The above chart."

04:07:39    15    A.  Yeah, actually if you highlight the panel right above

16    that.

17    Q.  Okay.

18    A.  And this is -- Household is reporting its performance

19    relative to the S&P Financials Index and the S&P 500 Index,

04:08:02    20    exactly the indexes that my exhibit just compared Household's

21    performance to.  And, in fact, the reason why I chose those

22    indexes is because Household itself identified those indexes

23    as what its performance should be compared against.

24              And then after the panel, Household's disclosure

04:08:21    25    states that "The above chart compares total returns (assuming

Fischel - direct

1   all dividends are reinvested) of Household to Standard &

2   Poor's Composite Financial Stock Price Index and Standard &

3   Poor's 500 Composite Stock Price Index.  Our common stock is

4   included in both of these indices.  The chart assumes $100 was

04:08:44  5   invested in Household common stock on December 31, 1996 and

6   that all dividends are reinvested.  We are required to publish

7   the five-year return chart so you could compare our

8   performance to other stocks."

9       So Household demonstrated in this document what they

04:09:03  10  considered the relevant comparison was.  I used the exact same

11  comparison that Household itself stated was the right

12  comparison to use.

13  Q.  And did you prepare an exhibit that shows the amount of

14  artificial inflation, taking into account the leakage that

04:09:17  15  you've discussed?

16  A.  I did.

17  Q.  Before we get to that, did you prepare a demonstrative

18  that shows the inflation taking into account the leakage?

19  A.  Yes, I -- yes, I did.

04:09:55  20      MR. BURKHOLZ:  Okay.  Let's bring up 154, the next

21  demonstrative, 154.

22  BY MR. BURKHOLZ:

23  Q.  And what does this show?

24  A.  This is analogous to the document that we've already

04:10:07  25  looked at, the graph focusing on the 14 specific disclosures.

**PSA181**

Fischel - direct

2681

1    But here instead of 14 specific disclosures, this method again

2    uses an event study, uses a regression analysis and attempts

3    to calculate the amount of inflation on every day during the

4    relevant period, again, taking into account the effect of the

04:10:34  5    market and the industry on Household's stock prices on every

6    day.

7         You can see that the difference between the red line,

8    the price, and the blue line is wider.  The blue line, the

9    true value line, the uninflated price, that's wider than in my

04:10:54  10   first method focusing on 14 disclosures, and the reason is

11   obvious, that you have so many more negative disclosures that

12   are leaking out that are not captured in my 14 specific

13   disclosures.

14        The result of that is that a greater percentage, a

04:11:11  15   greater proportion of Household's decline in price is

16   attributable to fraud-related disclosures and the correction

17   of fraud-related information in this exhibit than the previous

18   exhibit; but you can see again at the very end, the blue line

19   goes above the red line.

04:11:29  20        So even in this exhibit, I want to be careful that

21   investors who suffered no loss because they purchased at

22   particularly low prices are not entitled to recover because

23   they haven't suffered any harm.

24   Q.  And that's the investors in the last 30, approximately

04:11:48  25   30 days of the relevant period?

Fischel - direct

1    A.  Correct.  When the leakage resulted in a much lower stock

2    price than what ultimately occurred on October 10th and 11th.

3    Q.  And you prepared an exhibit that shows the amount of

4    inflation on every day during the relevant period for your

04:12:04  5    leakage model, right?

6    A.  Correct.

7    Q.  Let me show you Exhibit 1395.

8    A.  Thank you.

9    Q.  And is that your quantification of the inflation under

04:12:15 10    your leakage model?

11    A.  Yes.  If you can put it on the screen maybe.

12    Q.  Did you prepare this document?

13    A.  I did.

14         MR. BURKHOLZ:  Your Honor, I don't believe there's an

04:12:24 15    objection to 1395 if we can move it into evidence.

16         THE COURT:  It will be admitted.

17    (Plaintiffs' Exhibit 1395 received in evidence.)

18    BY MR. BURKHOLZ:

19    Q.  Can you explain what this exhibit is?

04:12:35 20    A.  This exhibit, again, is analogous to the previous exhibit

21    which focused on the 14 specific disclosures; but this exhibit

22    takes leakage into account and, once again, has a calculation

23    of the stock price on every day, what the true value is, which

24    is what my calculation is of the uninflated price, what the

04:13:00 25    price should have been had there been no fraudulent

Fischel - direct

2683

1    disclosures or omissions in the various Household statements

2    and disclosures during the relevant period.  That's the second

3    column, true value.

4         And the artificial inflation is the number in the

04:13:20 5    last column.  And, again, you'll see that it's different from

6    7.97 at the beginning because this calculation doesn't just

7    focus on 14 disclosures.  It focuses on all the negative

8    disclosures that came out, particularly after November 15th

9    when the market started to, in a much more systematic way,

04:13:44 10   disbelieve Household's denials that it was engaging in

11   predatory lending and that it was engaging in improperly

12   aggressive accounting.

13   Q.  Like your specific disclosure model, does this

14   quantification use statistical methods to account for the

04:14:00 15   market and industry influences on Household's stock prices?

16   A.  Yes, it does.

17   Q.  And did you also analyze whether company-specific factors

18   unrelated to the alleged fraud can explain Household's stock

19   price decline during this latter part of the relevant period?

04:14:16 20   A.  Yes, I did.  I looked at that carefully.

21        I noticed that there were a lot of disclosures that

22   had some fraud-related information in it and some other

23   disclose -- and part of the disclosure did not have -- dealt

24   with something other that was fraud related.

04:14:37 25        There were some -- some of those disclosures that had

1    a positive effect, some had a negative effect; but overall it

2    was impossible to conclude that the difference between the

3    true value line and the actual price would have been any

4    different had there been no disclosures about

04:15:02  5    non-fraud-related information during this particular period.

6    Some positive, some negative.  They cancel each other out.

7    Q.  Okay.  Now, reaching your opinion about inflation, did you

8    consider whether investors during the relevant period were

9    fully informed about Household's accounting and lending

04:15:17 10    practices?

11    A.  I did.

12    Q.  And what did you find?

13    A.  I found that they were not fully informed for a number of

14    different reasons.

04:15:25 15    Q.  And what were the reasons?

16    A.  Well, first, the disclosures coming out criticizing

17    Household's practices didn't come from Household; and if a

18    company is disclosing information about itself, it's one thing

19    for third parties to comment, but it's another thing for the

04:15:46 20    information to come directly from the company itself.

21        Since the company was not disclosing what the

22    analysts and the critics were saying, market participants did

23    not have full information.

24    Q.  Okay.  So you had your analysts' reaction or commentary,

04:16:03 25    some of -- the Barron's article and the analysts' reports, the

**PSA185**

```
 1               IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 17, 2009
                Defendants.          )  1:25 o'clock p.m.
 9
                           VOLUME 13
10            TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. SPENCER A. BURKHOLZ
                                     MR. MICHAEL J. DOWD
15                                   MR. DANIEL S. DROSMAN
                                     MS. MAUREEN E. MUELLER
16                              655 West Broadway
                                Suite 1900
17                              San Diego, California  92101
                                (619) 231-1058
18
                                COUGHLIN STOIA GELLER RUDMAN &
19                              ROBBINS LLP
                                BY:  MR. DAVID CAMERON BAKER
20                                   MR. LUKE O. BROOKS
                                     MR. JASON C. DAVIS
21                                   MS. AZRA Z. MEHDI
                                100 Pine Street
22                              Suite 2600
                                San Francisco, California  94111
23                              (415) 288-4545

24

25
```

           1    who are making the statement --

           2            THE COURT:  Well, I mean, I haven't researched that.

           3    Haven't researched that.  So if you have a case -- either of

           4    you have a case that says one way or the other --

04:32:11   5            MR. BURKHOLZ:  I think the Tellabs case is the case

           6    that we cited, the Seventh Circuit case, in our authority

           7    for -- and it has a good discussion of how to keep -- what the

           8    corporate liability is and scienter for the corporation.

           9            THE COURT:  Okay.  That speaks -- actually speaks to

04:32:26  10    it?

          11            MR. BURKHOLZ:  It does.  It's 513 F.3d 702.

          12            THE COURT:  I see what you've got here.  Does it say

          13    something other than a corporation may be held liable for

          14    statements by employees who have apparent authority to make

04:32:49  15    them?  Because if that's all it says, that's not going to do

          16    it for me.

          17            What you're talking about is what constitutes making

          18    a statement, is it the end person who says it to the public or

          19    does it include all the little whispering in his ear from

04:33:08  20    employees within the corporation?

          21            MR. BURKHOLZ:  I think it includes the other senior

          22    executives.

          23            THE COURT:  Okay.  I'll read it.  If you have --

          24    whatever you have on it, I will read.

04:33:24  25            I think that's as far as we get today, folks.

**PSA187**

2802

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3   LAWRENCE E. JAFFE PENSION PLAN, )
    on behalf of itself and all     )
4   others similarly situated,      )
                                    )
5               Plaintiff,          )
                                    )
6     vs.                           ) No. 02 C 5893
                                    )
7   HOUSEHOLD INTERNATIONAL, INC.,  )
    et al.,                         ) Chicago, Illinois
8                                   ) April 20, 2009
                Defendants.         ) 9:00 a.m.
9
                         VOLUME 14
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12  APPEARANCES:

13  For the Plaintiff:          COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25

PSA188

Fischel - direct

2839

1   Q.  What is Exhibit 1446?

2   A.  This is an American Banker article dated May 31, 2002.

3   Q.  And is this a denial by Household management that relates

4   to your opinion?

11:19:19  5   A.  Yes, very much so.  And, again, it's an indication by the

6   analysts that they're not quite sure whether the denial is

7   credible or there aren't going to be a lot more bad things to

8   come.

9   Q.  Okay.  Let's turn to the second page of the document.  If

11:19:35 10   we can highlight the part that begins with, Ms. Hayden said

11   Household took full and prompt responsibility.

12       What is the significance of that statement and the

13   statement underneath it?

14   A.  Well, this was a statement by a Household representative

11:20:02 15   that Household acknowledged there was a complaint that

16   customers -- some customers were confused about the rates that

17   they were paying on their loan.  But then she said that

18   Household was satisfied that this was basically a localized

19   situation, an isolated situation in one particular branch, but

11:20:24 20   again consistent with the pattern that I just described a

21   minute ago because this is very late in the period, very late

22   in the relevant period.

23       The author of the article then says, But Wall Street

24   analysts wonder if this is the tip of an expensive iceberg,

11:20:44 25   meaning that they didn't believe it was localized.  They

**PSA189**

Fischel - direct

2840

1   didn't believe it was isolated.  They believed this was just

2   the beginning of a lot more bad information coming out about

3   Household's predatory lending practices and its aggressive

4   accounting which again is, in fact, exactly what happened.

11:21:00 5   Q.  And does this article relate to your leakage opinion?

6   A.  Yes, very much, that -- as I said, I have two methods for

7   quantifying the amount of inflation.  The first method focused

8   on 14 specific disclosures, but I also explained that the 14

9   specific disclosures don't fully capture the negative

11:21:27 10   information that was increasingly coming out about Household

11   that wasn't present at the beginning of the relevant period

12   but became increasingly present towards the end of the period.

13       And this statement about Wall Street analysts

14   speculating about how big and bad this problem was going to be

11:21:46 15   and increasingly so as Household's denials became less and

16   less credible, that's precisely what underlies the leakage

17   theory.

18   Q.  And did you review an analyst's report by CFRA issued in

19   the summer of 2002 that was critical of Household's re-aging

11:22:03 20   practices?

21   A.  I did.

22   Q.  And did that relate to your leakage model?

23   A.  Yes.  Really the same thing, that Household had defended

24   its treatment of its re-aging practices.  There are a series

11:22:18 25   of disclosures by Household on that issue.  But then when this

**PSA190**

Fischel - direct

1    CFRA report comes out -- it's an independent organization as I

2    understand it, and it concludes that basically all of

3    Household's disclosures on re-aging that it had defended were,

4    in fact, highly misleading.

11:22:40  5         And, again, that's another situation where Household

6    defended its practices, denied that there was a problem, and

7    then a third-party commentator comes along and says we've now

8    looked at this, we don't believe the denials, we think the

9    re-aging practices and the treatment of the re-aging practices

11:22:58 10   in Household's financial statements were misleading and did

11   not provide an accurate picture for investors.

12   Q.  Let me show you what we've marked as Plaintiffs' Exhibit

13   515.

14      (Tendered.)

11:23:14 15        MR. BURKHOLZ:  A copy for counsel.

16   BY MR. BURKHOLZ:

17   Q.  Is Exhibit 515 an e-mail from Mr. Aldinger to Mr. Streem

18   attaching the CFRA report that you reviewed?

19   A.  Yes.

11:23:29 20        MR. BURKHOLZ:  Your Honor, we move Exhibit 515 into

21   evidence.  I don't believe there's any objection.

22        MR. KAVALER:  Just the limiting instruction.

23        MR. BURKHOLZ:  Subject to the limiting instruction.

24        THE COURT:  It will be admitted subject to the

11:23:41 25   limiting instruction.

Fischel - direct
2848

1    we close our case.  We can do it with, Mr. Aldinger.

2           THE COURT:  What's it being offered for, is what I

3    want to know.  What are you trying to prove with this thing?

4           MR. BURKHOLZ:  We're going to talk about one of the

11:32:52  5    statements in there.  I don't need to use the document with

6    him.

7           THE COURT:  Then don't use it for now.

8    (Proceedings heard in open court:)

9    BY MR. BURKHOLZ:

11:33:28  10  Q.  You testified Thursday that, I formed the opinion that

11   Household's disclosure defects, its inaccurate disclosures

12   caused there to be significant inflation in Household stock

13   price for much of the relevant period.

14           That is your opinion?

11:33:43  15  A.  Correct.

16   Q.  When you refer to disclosure defects causing inflation in

17   Household's stock, does that refer to statements plaintiffs

18   allege were false or misleading that were Household's public

19   statements to the media, press releases, 10-Qs and 10-Ks?

11:33:54  20  A.  Yes, both misleading statements and things that were left

21   out that would have been necessary to provide a more correct

22   picture of Household's financial situation.

23   Q.  Okay.  Let's look at two of the statements Household

24   issued that plaintiffs allege were false or misleading.  Let's

11:34:11  25  focus on your leakage model.

1          Can we bring up Exhibit 1395 that's been admitted

2     into evidence, and if we can highlight August 16, 1999.

3          Do you have Exhibit 1395?

4     A.  I can see it -- I do have it, but I can see it on the

11:34:38  5     screen.

6     Q.  I think it's tab 28 of your binder.

7     A.  Okay.  I have it now.

8     Q.  Okay.  And this is your daily quantification of inflation

9     under your leakage model?

11:34:49 10     A.  Correct.

11     Q.  Okay.  Now, you assume, do you not, that plaintiffs can

12     prove that Household's statement on August 16, 1999, was false

13     or misleading?

14     A.  Correct.  All of my opinions are based on that assumption.

11:35:04 15     The issue of falsity is really one for the Court and the jury

16     to decide.  It's not for me to decide.

17     Q.  And that's a common assumption in your field in estimating

18     damages?

19     A.  A necessary assumption because economists don't decide

11:35:19 20     truth or falsity.  That's for the Court and the jury.

21     Q.  Can you explain how you determined the inflation of $16.48

22     on August 16, 1999, as it relates to Household's 10-Q that was

23     issued on that day?

24     A.  Yes.  What -- the way the methodology works is that there

11:35:44 25     is an ending date on October 10 and 11 of 2002; and based on

**PSA193**

Fischel - direct

1    that ending date, what the model -- what the methodology

2    attempts to do is attempts to predict what Household's price

3    would have been on any given day, which is the true value

4    line -- the true value column rather, relative to the stock

11:36:17 5    price, which is the first column, based on a statistical model

6    of how Household's stock should behave in light of its

7    statistical relationship between the overall market and the --

8    the industry, the S&P Financials Index.

9        Remember, those are the two indexes that Household

11:36:42 10    itself said its performance should be judged against.  There's

11    a slightly different treatment before and after November 15,

12    2001, because remember that's the first date that I identified

13    that the market really started to become skeptical of

14    Household's denials.

11:37:04 15        But the basic idea is this statistical model trying

16    to adjust the actual stock price for how the stock price would

17    have behaved had there been no false and misleading

18    statements, had there been no continual leakage of negative

19    information, particularly after November 15, 2001.

11:37:24 20    Q.  And if there is no false or misleading statement before

21    August 16, 1999, does that mean that there's zero inflation in

22    the stock?

23    A.  No.  So long as there is a false and misleading statement

24    on this particular date, inflation would begin on this date

11:37:40 25    going forward.  But, again, I want to be careful because if

Fischel - direct

2851

1    there's no false and misleading statement before this date,

2    then any purchasers before this date wouldn't suffer any harm

3    and wouldn't be entitled to any recovery.

4         There would be no difference between the stock price

11:37:58  5    and the true value the way there is on my exhibit because I

6    assumed the false and misleading statements began on July 30,

7    1999.  But if it's more accurate, as I said in my report,

8    actually to start on August 16, then anybody who purchased

9    between July 30 and August 16, those columns in the exhibit,

11:38:22 10   would basically disappear and inflation would begin on August

11   16.

12   Q.  Okay.  Let's assume the Court and the jury doesn't find

13   the August 16, 1999, statement to be false or misleading.  And

14   then let's look at the next public statement on the next page

11:38:37 15   of October 19, 1999.

16        If we can highlight that.

17        Is Household's stock now inflated by the next

18   statement, October 19, 1999, assuming the prior statement is

19   not false or misleading?

11:38:54 20   A.  It's really the exact same point.  Under what my analysis

21   does is it provides a method of quantifying the amount of

22   inflation on any given day and subsequent days, provided that

23   the jury finds that as of that date a false and misleading

24   statement has been made.

11:39:14 25        So if the jury were to conclude that there were no

Fischel - direct

2852

1    statements that were made before October 19, 1999, that were

2    false and misleading, then for all practical purpose, my

3    exhibit should be read as beginning on that date.  And there

4    would be, again, for all dates before that no difference

11:39:35    5    between the stock price and the true value line, no artificial

6    inflation; any purchasers in any period before October 19,

7    1999, would not suffer any harm.

8    Q.  And do each subsequent statement -- public statement by

9    Household cause inflation to remain in a stock?

11:39:53    10    A.  Yes, absolutely.  And any increases or decreases depending

11    on misrepresentations, which occurred at the time of December

12    5 when there was the response to the Barron's article, another

13    misrepresentation with the best practices initiative in

14    February, those would be misrepresentations which affect the

11:40:20    15    amount of inflation.

16         There would be more inflation coming in to the stock

17    on those days.  But basically, as of the first false and

18    misleading statement, there would be inflation on every single

19    day after that until the false and misleading information was

11:40:36    20    corrected.

21    Q.  And does the -- as the truth comes out in late 2001 into

22    2002, what happens to the inflation in the stock until the end

23    of the relevant period?

24    A.  For the most part, it declines.  Because what's happening

11:40:49    25    is as more and more -- there are more and more criticisms of

1    Household's practices, which become believable -- more and

2    more believable by investors, causing the stock price to

3    decline.

4         The effect of that is, in effect, to partially cure

11:41:09  5    the false information that's existed from the beginning so the

6    amount of inflation over time declines so that it's zero at

7    the end when the truth is revealed.

8    Q.  And does a company like Household need to admit its prior

9    statements were false in order for the truth to come out as

11:41:25 10    relates to those statements?

11    A.  Well, in an ideal world, yes.  But as a practical matter,

12    frequently what happens, as in this case, is that the denials

13    become less and less credible to the point that investors

14    learn the truth simply because the denials are not matched by

11:41:46 15    what occurs in reality in the real world.

16         And investors and analysts can see what happens in

17    the real world, and that can ultimately, in effect, constitute

18    the truth, although obviously it's better if the company

19    itself tells the truth.

11:42:00 20    Q.  And let's take a look at your demonstrative, Plaintiffs'

21    Demonstrative 136.  I think it's tab 24 of your binder.

22    A.  I have it.

23    Q.  And this is a demonstrative that you prepared, correct?

24    A.  It is.

11:42:20 25    Q.  And Household's stock declined from about $60 to $28 as

**PSA197**

Fischel - direct

1    the truth leaked out from November 2001 to October 2002?

2    A.  Correct, from November 15, 2001, to October 11 of 2002.  I

3    should also say of these -- I think there's almost 70 firms in

4    the S&P Financials Index.  These are indexes which is a

5    composite of firms.

6            But if you look at the firms individually, Household

7    was the fourth worst-performing firm out of 70 firms during

8    this particular period.  So they dramatically underperformed

9    relative to the indexes that Household itself deemed to be

11:43:02 10    comparable.  But if you look at the individual firms that

11    compose the index, Household is the fourth worst as compared

12    to the full 70 firm set.

13    Q.  Now, your specific disclosure model estimates inflation of

14    only about $7.97 during this period, correct?

11:43:23 15    A.  As the maximum amount, correct.

16    Q.  And your opinion is that that understates the inflation in

17    Household's stock due to Household's public statements?

18    A.  Yes, because it doesn't take into account the leakage that

19    we've been discussing and I've been describing.

11:43:36 20    Q.  And your leakage model estimates daily inflation ranging

21    from $13 to approximately $23 for each day of the relevant

22    period?

23    A.  Yes.  And actually, let me just explain why there's a cap

24    of $23.  Because what I did was I calculated the total

11:43:53 25    underperformance of Household on -- relative to these indexes

Fischel - direct

2855

1    based on my statistical model and that number was, I think,

2    $23.94 or something like that.

3        So I made that the maximum possible inflation on any

4    given day.  So even when my model would predict or would

11:44:18  5    indicate inflation of more than $23.94, I made $23.94 the cap

6    because that's the amount that Household underperformed the

7    S&P Financials Index and the S&P 500 Index.

8    Q.  So compared to the stock price decline of $32, you

9    attribute anywhere from 13 to $23 due to disclosures related

11:44:45 10    to the fraud?

11    A.  13 to $23 based on leakage and $7.97 as the maximum under

12    the specific disclosure models.

13    Q.  And it's your opinion that the leakage model is a better

14    estimate of the inflation in Household's stock price during

11:44:56 15    the relevant period due to the alleged false statements and

16    omissions?

17    A.  Correct, because it takes into account the economic

18    reality in this case where negative information came out

19    slowly over time precisely because Household did not admit the

11:45:12 20    predatory lending practices that it was involved in or the

21    improper accounting as a result of re-aging, and the

22    restatement of the truth only became known gradually as a

23    result of real world events and commentary by third parties.

24        MR. BURKHOLZ:  Nothing further at this time, your

11:45:29 25    Honor.

Fischel - cross

1          THE COURT:  Cross-examine.

2          MR. KAVALER:  Thank you, your Honor.

3                  CROSS-EXAMINATION

4    BY MR KAVALER:

11:46:39 5    Q.  Good morning, Professor Fischel.

6    A.  Good morning.

7    Q.  My name is Tom Kavaler.  I represent the defendants.

8    A.  We met before actually.

9    Q.  Briefly, I think.

11:46:48 10          And I'm going to ask you some questions today.  I'm

11   going to try to -- try to understand what you said on direct

12   and explore how it applies to some other aspects of the case

13   that I'm interested in.  I would appreciate it if you would

14   answer the questions I ask you and just those questions.

11:47:04 15          Can you do that?

16   A.  I will do my best, sir.

17   Q.  Excellent.

18          Now, you have an extensive background in this area in

19   connection with disclosures and their impact on stock price,

11:47:16 20   don't you?

21   A.  I do.

22   Q.  You are widely regarded as if not the preeminent, one of

23   the preeminent experts in this field; are you not?

24   A.  That's very kind of you to say.  I hope that's the case,

11:47:28 25   but I accept your gracious compliment.

**PSA200**

Fischel - cross

1    Q.   And your work has been cited by the Supreme Court,

2    correct?

3    A.   It has.

4    Q.   And, in fact, when we were looking for an expert, we

11:47:39 5    contacted you to see if you were available, but you had

6    already been hired by these folks, correct?

7    A.   You were nice enough to contact me to try and hire me in

8    this case, but I was already retained, yes.

9    Q.   And you've conducted a substantial number of event studies

11:47:55 10    in connection with various cases over the years?

11    A.   I have.

12    Q.   An event study is a well-established methodology for

13    analyzing loss causation in securities fraud cases?

14    A.   Correct.

11:48:05 15    Q.   In fact, an event study is widely regarded as the gold

16    standard by both courts and economists for evaluating the

17    economic aspects of a case like this?

18    A.   In connection with -- in combination with other economic

19    evidence, I would say that's correct.

11:48:22 20    Q.   And you conducted an event study in this case?

21    A.   We did.

22    Q.   And, in fact, the results are one of the documents marked

23    in evidence?

24    A.   Correct.

11:48:29 25    Q.   And you used your event study to analyze and detail the

**PSA201**

Fischel - cross

2866

1    that I didn't understand that.  Let me be sure we're precisely

2    on the same page.

3         In that time period starting November 15, 2001,

4    basically the inflation is coming out, but there are a couple

12:00:22 5    of days where new inflation comes in and the amount of

6    inflation increases; but over the time period net/net, it's

7    decreasing, correct?

8    A.  Net/net, that's correct; but on a daily basis, you need to

9    look at the particular --

12:00:35 10   Q.  And we're going to do that in a minute, sir.  I just

11   wanted to be sure I understood.

12        So by November 15, 2001, the inflation was in there.

13   And then subject to the couple of days where it goes up, from

14   there to October 21, it's essentially coming out?

12:00:53 15   A.  Again, I don't want to accept essentially coming out.  But

16   under my analysis, inflation exists from the first time the

17   jury concludes that there is a false or misleading statement

18   either as a result of a misrepresentation or as a result of a

19   failure to disclose something about Household's lending

12:01:14 20   practices or accounting that should have been disclosed, and

21   then it continues throughout the relevant period.

22        The first under -- particularly under my first method

23   focusing on specific disclosures, the first time where

24   inflation decreases is on November 15, 2001, because of the

12:01:37 25   CDC lawsuit.  And after that, it fluctuates on a day-by-day

**PSA202**

Fischel - cross

2870

<pre>
                1      THE CLERK:  02 C 5893, Jaffe vs. Household

                2   International, Incorporated.

                3      THE COURT:  Ready to resume?

                4      MR. KAVALER:  Ready, your Honor.

01:05:47        5      THE COURT:  Bring out the jury, please.

                6   (Jury in.)

                7      THE COURT:  Welcome back, ladies and gentlemen.

                8      Ready to resume?

                9      MR. KAVALER:  Thank you.

01:07:00       10   DANIEL FISCHEL, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

               11              CROSS-EXAMINATION - Resumed

               12   BY MR. KAVALER:

               13   Q.  All right, Professor Fischel.  Where I think we were was

               14   we had talked about what you told us about last week.  Today

01:07:07       15   I'd like to spend a little time -- hopefully, very little --

               16   trying to understand how the inflation came into the price of

               17   the stock.

               18       In other words, I want to see if we can observe

               19   together where it came from, when it got there and what it was

01:07:26       20   the effect of, to use the word -- the reason, why I'm trying

               21   to avoid the "caused" word?

               22       I take it your sophisticated analysis can do that, as

               23   well?

               24   A.  Well, when the inflation comes into the stock, as I've

01:07:38       25   explained numerous times, is a function of what the jury
</pre>

**PSA203**

Fischel - cross

1    concludes as to when the first leading -- first misleading

2    statement is.

3    Q.  That's the first time.  I'm going to talk about a later

4    period of time.  In the post- -- I should have been clear.  In

01:07:54  5    the post-November 15 period.

6         You told us this morning there are days when it comes

7    in, days when it goes out?

8    A.  Correct.

9    Q.  That's what I want to talk about.

01:08:01  10        And I'm talking now specifically about your

11   quantification using specific disclosures.  In other words,

12   your first method.

13   A.  Okay.

14   Q.  Okay?

01:08:07  15   A.  Got it.

16   Q.  I'll tell you when we switch to the second method.

17   A.  All right.  That's fine.

18   Q.  Okay.

19        So, until I tell you that, we're talking about the

01:08:12  20   first method, all right?

21   A.  I understand.

22   Q.  Okay.

23        And in the quantification-using-specific-disclosures

24   model, what you attempted to do is based on the assumptions

01:08:22  25   you were asked to make by the plaintiffs about a false

Fischel - cross

2921

1   Q.   Okay.

2        And the first day you put on here is July 30, 1999.

3   A.   Correct.

4   Q.   And you performed your various analytical processes and

02:16:25  5   came up with artificial inflation of 7.97?

6   A.   That's right.

7   Q.   Okay.

8        So, according to your analysis, it was there on July

9   30th?

02:16:36 10  A.   Well, I think I've explained this numerous times, sir.  It

11  was there at the time that the jury concludes the first false

12  and misleading statement was made; the first time the jury

13  concludes that when Household was describing how it was

14  going -- it was committed to a growth strategy, it would

02:16:57 15  continued to grow; its lending and its accounting were proper.

16       The first time that they conclude that a statement of

17  that nature was false; the inflation, based on my calculation

18  of the effect of specific disclosures after November 15th,

19  based on this particular methodology; my calculation suggests

02:17:18 20  that the price would have fallen by $7.97, which is why the

21  inflation is listed at $7.97.

22       But the first date -- I want to emphasize, again --

23  is a function of what the jury concludes when the first false

24  statement occurred, if they conclude a false statement

02:17:41 25  occurred.

**PSA205**

Fischel - cross

2922

1          And I put "July 30th" on my exhibit because it's the

2     first possible date.

3          But if the jury concludes it's not July 30th, it's

4     August 16th or October 19th -- or whatever date the jury

02:17:55   5     picks -- the exhibit can be used.  It's just that every date

6     prior to the first date that the jury picks as the first false

7     and misleading disclosure, there is no artificial inflation.

8     And artificial inflation begins on whatever the jury decides

9     the first date is of a false and misleading disclosure.

02:18:14  10     Q.  I don't disagree with you, sir, that you've given that

11     answer before.  I'm trying to find out if there's any other

12     answer I can get.

13          Let me try this:  You said it was the first possible

14     date.  There couldn't have been inflation before then?

02:18:25  15     A.  Not as I understand the relevant period in this case,

16     correct.

17     Q.  Okay.

18          But what causes inflation is a false statement by the

19     company?

02:18:35  20     A.  Not just a false statement.  A false statement that

21     investors have a right to recover on; and, as I understand the

22     allegations in this case currently, the first possible date

23     where that might be the case is July 30th, 1999.

24     Q.  Well, was there any inflation on July 29th?

02:18:58  25     A.  If there's no claim of any right to recover on July 29th,

1   significant effect on Household's stock price, those 14

2   disclosures, netting out the positives and the negatives, had

3   a cumulative effect of $7.97.

4        And what that means is that the best estimate of what

02:28:11  5   the effect on Household's stock price would have been the

6   first time there was a false and misleading statement, instead

7   of talking about its growth strategy; how its growth strategy

8   was going to continue in the future; how its lending practices

9   were appropriate at all points in time; how it wasn't going to

02:28:30  10  get into trouble with consumers and regulators; how its

11  accounting was proper; didn't disguise its re-aging practices;

12  how its credit card accounting was proper and didn't result

13  ultimately in a restatement, all those corrected disclosures

14  are sum to $7.97.

02:28:49  15       So, the best estimate of what Household's price would

16  have been on the first date when they made a false and

17  misleading statement, according to the jury -- if the jury

18  were to so conclude -- the price of Household stock would fall

19  by $7.97 relative to what it was in the real world when

02:29:13  20  investors bought and sold.  And that's why the inflation

21  number is $7.97.

22  Q.  So, it's all hindsight.  Until something happens on

23  December 5, 2001, you can't go back to July 30, '99, and tell

24  us what's going on; is that right?

02:29:26  25  A.  Correct.  Precisely because Household did not disclose

**PSA207**

Fischel - cross

2931

1    accurate information.

2          The only way that you can judge the value of the

3    information is look at what the market reaction was when the

4    markets learned that the growth model wasn't going to be able

02:29:41  5    to be sustained; that lending practices were attacked as

6    predatory in lawsuits; consumer groups; regulators, et cetera;

7    that the accounting was deemed to be inaccurate; and,

8    Household had to restate its disclosures about its accounting;

9    independent groups, like CFRA, as well as many analysts

02:30:02  10    concluded that Household's accounting was false and

11    misleading.

12          When there was a restatement of its credit card

13    accounting on August 14th, only at that time did the market --

14    at those times did the market -- learn about what the value

02:30:16  15    was of the new information -- the corrective information --

16    that came out at the end of the period, that investors in

17    Household stock at the beginning of the relevant period did

18    not know.

19          So, in that sense, it's corrected in hindsight; but,

02:30:31  20    the only reason it's in hindsight is because Household didn't

21    disclose what ultimately came out later.  In fact, they kept

22    denying it.  And it was only when analysts and other market

23    participants didn't believe the denials any more that the

24    value of that information became known to market participants.

02:30:48  25    And the value of that information, based on my calculation

1    under my first method, is $7.97.

2    Q.  So, notwithstanding you said twice in that long answer

3    that it's all by hindsight, you put $7.97 on the line for July

4    30, correct?

02:31:04  5    A.  Correct, for the reasons that I stated.

6    Q.  I understand that.  Okay.

7        And everything you said in that last lengthy answer

8    about what Household did and didn't say, and it was true and

9    false, those are assumptions because you've already told us

02:31:21  10   several times you're not here to pass upon the truth or

11   falsity of anything, right?

12   A.  Well, I'm not here to pass on the truth or falsity.  Many

13   analysts and commentators passed on the truth or falsity.

14       The ultimate determiner in this case is, obviously,

02:31:32  15   as I've indicated numerous times, up to the jury.  But the

16   quantification is not an assumption.  That's --

17   Q.  Correct.

18   A.  -- a product of my own analysis.

19   Q.  Let's look at two other documents.

02:31:44  20       Plaintiffs' Demonstrative 151, this (indicating) is a

21   chart you showed us yesterday.

22   A.  Yes, sir.

23   Q.  And this relates to your quantification, using specific

24   disclosures?

02:32:00  25   A.  Correct.

PSA209

Fischel - redirect

2963

1  hypothetical.  And there's sort of a contradiction in terms in

2  the question.

3  Q.  All right.  I take your point.  Let me try it this way:

4  What we know for a fact is the stock price went down, correct?

03:33:34 5  A.  Correct.

6  Q.  What you've done here yesterday and today is give us your

7  opinion as to why?

8  A.  Based on the assumption that I've explained numerous

9  times, correct.

03:33:44 10  Q.  Exactly.  And the assumption was -- the assumption -- you

11  assumed because these gentlemen here asked you to -- that

12  there was fraud?

13  A.  Correct, because if there's no misstatements, then there's

14  no case, so there's nothing to quantify.

03:34:00 15  Q.  Thank you, Professor Fischel.  I couldn't have said it

16  better myself.

17        MR. KAVALER:  No further questions, your Honor.

18        THE COURT:  You may redirect.

19                REDIRECT EXAMINATION

03:34:12 20  BY MR. BURKHOLZ:

21  Q.  Let me ask you a simple question.  Counsel showed you all

22  these public statements that Household made.  Do you need to

23  find a statistically significant price increase on the dates

24  of these public statements in order for there to be inflation

03:34:38 25  in Household's stock under your specific disclosure model?

**PSA210**

Fischel - redirect

2964

1    A.   No.   That's really the whole point, that the reason why

2    there's no statistically significant price increase in

3    response to all those disclosures where there's big red Xs is

4    because in each one of those disclosures, Household was

03:34:57  5    reaffirming its growth strategy.  It was denying any

6    wrongdoing.  It was defending its accounting.

7         When it started later to say that there were

8    problems, it was either because of a computer glitch or

9    localized to a particular employee or a group of employees.

03:35:18 10    Because Household made all those statements and reiterated the

11    same statements from the beginning until later in the class

12    period, of course, the market didn't react because Household

13    is saying the same thing over and over and over again.

14         It was only when the truth began to come out when

03:35:40 15    market participants began to disbelieve the denials, when the

16    complaints from regulators started to pile up, the lawsuits

17    started to pile up, the complaints from customers started to

18    pile up, Household had to restate its accounting, had to

19    restate and provide a correct disclosure of its re-aging

03:35:59 20    practices and the effect of those re-aging practices, when

21    there was leakage of the very damaging Washington department

22    of financial insurance report, rumors of the effect of the

23    settlement and the combined effect of what that would mean for

24    Household's growth strategy, it was only then when you started

03:36:21 25    to see statistically significant price reactions because the

**PSA211**

Fischel - redirect

1     market was learning the truth.

2          In fact, the market became so negative, as I

3     indicated, that the price went below what my true value line

4     indicated, demonstrating that investors who bought at the end

03:36:43  5     basically bought at a bargain price and, at least under both

6     of my quantifications, are not entitled to any compensation.

7     Q.  Is it a common method to focus on the disclosures later in

8     the relevant period to quantify the inflation due to the

9     statements Household made earlier in the relevant period?

03:37:01 10     A.  It's completely standard because if what you're trying to

11     do is measure the value of the truth and the truth is not

12     provided early in the period, the only way to analyze the

13     effect of the truth is to see what the effect on investors and

14     market prices is when the truth comes out.  And by doing that,

03:37:23 15     you're able to make a judgment, as I did, about what the,

16     quote, true value of the stock would have been at the

17     beginning had the truth been told the entire time.

18     Q.  Now, counsel showed you the beginning of the relevant

19     period, July 30, 1999, and then the first statement on August

03:37:43 20     16, 1999, the 10-Q.

21          Do you remember that?

22     A.  I do.

23     Q.  And do you have an understanding that the beginning of the

24     relevant period, July 30, 1999, is due to a Court decision in

03:37:54 25     this case?

**PSA212**

                    1          MR. BURKHOLZ:  I have a copy.

                    2          MR. KAVALER:  We can put it up on the board.  Can we

                    3    have the switch, your Honor?

                    4          THE COURT:  Sure.

03:44:05    5    BY MR. KAVALER:

                    6    Q.  Let's look at the date Mr. Burkholz directed you to,

                    7    November 12, 1999.  And the artificial inflation there is

                    8    7.97, correct?

                    9    A.  Correct.

03:44:18   10    Q.  Just like it is in every other entry on that page?

                   11    A.  Correct.

                   12    Q.  And every entry on the page before?

                   13    A.  Correct.

                   14    Q.  And every entry right up until November 15, 2001?

03:44:27   15    A.  That's right.

                   16    Q.  Okay.  Now, if I understood what you just said, you're

                   17    saying the jury should take this chart, 1397, and in the

                   18    column where you, the expert, the person quoted by the Supreme

                   19    Court, the person who wrote the book in this area literally --

03:44:49   20    you did write a book in this area, didn't you?

                   21    A.  I did.  And you're just too kind with your compliments.

                   22    Q.  You're the man, Professor.

                   23          What you wrote in this column was 7.97 on July 30,

                   24    7.97 on August 2, 7.97 on August 3, 7.97 on August 4, 7.97 on

03:45:12   25    August 5, 7.97 on August 6, 7.97 on August 9, et cetera, all

Aldinger - direct

3009

1    Q.  It was issued by Household International, correct?

2    A.  That's correct.

3    Q.  And this was reporting the third quarter 1999 results for

4    Household International, correct?

04:29:56 5    A.  That's correct.

6         MR. DROSMAN:  Plaintiffs offer Exhibit 506 into

7    evidence.

8         THE COURT:  Admitted.

9    BY MR. DROSMAN:

04:30:05 10   Q.  And in your press release, you report the earnings result

11   for Household International, correct?

12   A.  Yes.

13   Q.  And you report that because that's an important number to

14   investors, correct?

04:30:14 15   A.  Yes.

16   Q.  You report the EPS results to investors for your third

17   quarter 1999, right?

18   A.  Yes.

19   Q.  You reported EPS -- EPS, by the way, is earnings per

04:30:24 20   share, right?

21   A.  That's right.

22   Q.  You reported EPS results because that was an important

23   number for investors, correct?

24   A.  Yes.

04:30:30 25   Q.  And you reported the two-plus delinquency statistic or

**PSA214**

Aldinger - direct
3010

1  ratio to investors as well in this press release, didn't you?

2  A.  I don't know that.  I would have to read that.

3  Q.  Take a look at the second page of the press release, page

4  ending 430.  Do you see the heading Credit Quality and Loss

04:30:48  5  Reserves?

6  A.  I do.

7  Q.  Okay.  Look at the last sentence there.  It says, The

8  managed delinquency ratio, paren, 60-plus days, was 4.89

9  percent at September 30, compared with 4.72 percent at June 30

04:31:06  10  and 4.96 percent a year ago.

11       Do you see that?

12  A.  I do.

13  Q.  So you were reporting the two-plus delinquency ratio to

14  investors in this press release, weren't you, sir?

04:31:19  15  A.  Yes.

16  Q.  And you did that because it was an important metric to

17  investors, didn't you, sir?

18  A.  Yes.  I would also add, loss reserves, which are --

19       MR. DROSMAN:  Your Honor, move to strike.

04:31:29  20       THE COURT:  It will be stricken.  Just answer the

21  question, sir.

22       It's 4:30, so we are duty-bound to call it a day.

23       MR. DROSMAN:  Thank you.

24       THE COURT:  Ladies and gentlemen, we're done for the

04:31:44  25  day.  As always, we thank you for your attendance and your

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5               Plaintiff,          )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 21, 2009
               Defendants.          )  9:00 a.m.
 9
                         VOLUME 15
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
         BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

Aldinger - direct

3022

1    Household International, correct?

2    A.  That's right.

3    Q.  And we also talked about how the press release contains

4    Household International's two-plus delinquency statistics,

09:57:12 5    correct?

6    A.  That's correct.

7    Q.  And you told me that the reason that the two-plus

8    statistics are in the press release is because that was an

9    important metric or number for investors, correct?

09:57:21 10   A.  That's correct.

11   Q.  And if you turn to -- do you have a document we looked at,

12   as well, it's Exhibit 461?  It's a memo to you from Mr. Gilmer

13   dated January 18th, 1999.

14        Do you have that in front of you?

09:57:36 15   A.  Yes, I do.

16   Q.  Okay.

17        And this was a memo that Mr. Gilmer wrote to you

18   regarding the operating results at HFC, correct?

19   A.  That's correct.

09:57:45 20   Q.  A results memo, right?

21   A.  Yes.  A monthly memo.

22   Q.  And this wasn't the only monthly memo that you received

23   from Mr. Gilmer, was it?

24   A.  No, he would routinely send me monthly memos.

09:57:57 25   Q.  In fact, you received them in 2000, correct?

1    A.  Yes.

2    Q.  2001, as well, right?

3    A.  Yes.

4    Q.  And if you'd turn to the page of that monthly memo that

09:58:04  5    Mr. Gilmer sent you ending 333.

6         And the heading on the top of that page -- are you

7    there yet?

8    A.  I'm not there yet.

9    Q.  Just let me know when you get there.

09:58:25  10    A.  I will.

11        (Brief pause.)

12    BY THE WITNESS:

13    A.  I'm there.

14    BY MR. DROSMAN:

09:58:34  15    Q.  And you see the heading?  It's underlined in a larger font

16    at the top of the page?

17    A.  I do.

18    Q.  And it's entitled, "Key Performance Measures HFC Consumer

19    Credit Quality."

09:58:45  20        Do you see that?

21    A.  Yes, I do.

22    Q.  And, then, if you look, there's a box below that; and, at

23    the top of the box, there's a heading "Two-Plus

24    Delinquencies."

09:58:52  25        Do you see that?

PSA218

Aldinger - direct

3024

1    A.  Yes, I see that.

2    Q.  And you understood the two-plus delinquency was a key

3    performance measure, don't you?

4    A.  It was a measure, yeah.

09:58:59   5    Q.  You don't understand it was a key performance measure?

6    A.  Well, it's important, but I don't know that I'd call it

7    one of the key.  The key for me would be reserves and revenues

8    and expenses and things that hit the bottom line.

9    Q.  You understood that Mr. Gilmer entitled it a key

09:59:13  10    performance measure, right?

11    A.  Well, yes, he did, you're right.

12    Q.  Okay.

13        And this was a memo that you received, right?

14    A.  Absolutely.

09:59:19  15    Q.  You read, correct?

16    A.  Yeah.

17    Q.  And you saw the two-plus delinquency, at least according

18    to Mr. Gilmer, was a key performance measure, right, sir?

19    A.  Yes.

09:59:27  20    Q.  And Mr. Gilmer performed -- reported this key performance

21    measure, the two-plus delinquency number, in the other growth

22    memos that you received, right?

23    A.  I don't know.  I'd have to see that.

24    Q.  Okay.

09:59:38  25        Why don't we take a look at some other memos that

Aldinger - direct

3028

1    A.  You mean on other pages now, we're talking about?

2    Q.  Right.

3        The memo is four or five pages long?

4    A.  Yes.

10:02:33  5    Q.  Probably eight or nine headings, right?

6    A.  Yeah.

7    Q.  One of them's two-plus delinquency, right, sir?

8    A.  Yes.

9    Q.  Is there a loss reserves heading on this page -- in this

10:02:40  10  memo?

11   A.  No, I don't think there is.

12   Q.  So, we've established that the two-plus delinquency number

13   was a key performance measure that Mr. Gilmer reported to you,

14   right, sir?

10:02:55  15  A.  It's a key performance member -- number -- yeah.

16   Q.  Let's take a look back at the press release that we were

17   discussing, the one dated October 19th, 1999.

18   A.  I'm sorry, the first one?

19   Q.  It's Plaintiffs' Exhibit 506.

10:03:17  20      Do you have it in front of you?

21   A.  I've got three now.  I'm reconciling.

22      I've got it.

23   Q.  Okay.

24      And we talked about the two-plus delinquency

10:03:27  25  statistic that's reported in there, correct?

PSA220

Aldinger - direct

3053

1    GAAP?

2    A.  I just don't like the word "violate."  There's a

3    difference of opinion here that was totally -- different

4    opinion from two major accounting firms, two of the largest

10:28:24  5    accounting firms in the world, who -- and we adopted the view

6    of the firm that was our auditor at the current time and --

7    Q.  I didn't ask you about a difference of opinion, right?

8    A.  Well --

9    Q.  Did I ask you about a difference of opinion?

10:28:37 10    A.  I don't know where this is going.  The GAAP treatment

11    before was different from the GAAP treatment after, and I

12    guess that's where I'd end.

13    Q.  Okay.

14         And you understood that the reason Household restated

10:28:45 15    its financials is because it had violated GAAP?

16         I'm not asking you whether it intended to.  Just --

17    A.  I don't know that I'd use that term, "violated."  We had a

18    different GAAP treatment.

19    Q.  And you understand that in order to restate the

10:28:57 20    financials, the error must be material, correct?

21    A.  Yes.

22    Q.  You couldn't restate the financials if the error was

23    immaterial, correct?

24    A.  That's correct.

10:29:05 25    Q.  I'll show you what's been marked as Plaintiffs' Exhibit

1    this article had come out and it was not -- it was very

2    unflattering and we needed to respond to it.

3    Q.  Did you read the Barron's article?

4    A.  I did.

11:11:53  5    Q.  What was your takeaway?  What did you understand the main

6    thrust of the Barron's article about your company to be?

7    A.  Well, again, I'm going back a bit, but, you know, the main

8    thrust was that we had made accounting changes back in 1996

9    that were not disclosed to investors, according to the

11:12:11 10   article, so investors didn't understand.

11           There was some suggestions that Household was

12   aggressive in its growth in accounting and some other things

13   that we thought were not accurate.

14           And --

11:12:21 15   Q.  What did you -- I'm sorry.

16   A.  No, that's okay.

17   Q.  What did you do after Mr. Streem -- you said he called

18   you.

19           Where were you Saturday night when he called you?

11:12:29 20   A.  I was actually at a dinner party and he called me on my

21   cell and we -- it wasn't much fun after that, at the dinner

22   party.  I can tell you that.

23   Q.  What did you do the following day?

24   A.  The next day we met in the office.  We brought in Dave

11:12:43 25   Schoenholz and myself and Craig Streem and sat down, and some

1    of the Investor Relations people, and -- because, fortunately,

2    we were scheduled to speak at the Barron's conference on

3    Monday.

4    Q.  I'm sorry, the Barron's conference?

11:12:58  5    A.  I'm sorry, at the Goldman Sachs conference on Monday.

6    Q.  Monday or Tuesday?

7    A.  I thought it was Monday night.  It could have been

8    Tuesday.

9    Q.  You were there?

11:13:05 10   A.  It could have been Tuesday.  I don't remember now.  It's

11   been a lot of years.

12          But -- so, we came in; and, fortunately, we were able

13   to specifically respond during my presentation to some of the

14   issues that were raised in this -- in this -- article.

11:13:21 15   Q.  And what was your purpose in going to -- I'm sorry, you

16   said the Goldman Sachs conference had been previously

17   scheduled?

18   A.  Previously scheduled, yes.

19   Q.  So, you were scheduled to speak at Goldman Sachs before

11:13:32 20   you found out about the Barron's article?

21   A.  That's correct.

22   Q.  Was this one of these conferences where lots of CEOs were

23   going to speak?

24   A.  Yes, dozens, dozens.

11:13:40 25   Q.  Dozens.

```
 1                THE COURT:  I don't recall that.

 2                I'll overrule that.

 3                MR. DROSMAN:  Okay.

 4                MR. KAVALER:  Your Honor, I think counsel may be

11:16:06  5   referring to Paragraph third of Limiting Instruction No. 1.

 6   But it's not an analyst report.  It's exactly the opposite.

 7   It's a statement to analysts.

 8                But if he wants Limiting Instruction third of No. 1,

 9   I have no problem with that.

11:16:21 10                MR. DROSMAN:  I don't have the limiting instructions

11   in front of me, your Honor.  I apologize.

12                THE COURT:  I don't believe it applies.

13                MR. KAVALER:  Okay.

14                May I proceed, your Honor?

11:16:30 15                THE COURT:  Yes.

16                MR. KAVALER:  The document is received?

17                THE COURT:  Yes.

18                MR. KAVALER:  Thank you, your Honor.

19           (Defendants' Exhibit No. 46 received in evidence.)

11:16:37 20                MR. KAVALER:  For the jury, this appears at Tab 15 of

21   your binders.

22   BY MR. KAVALER:

23   Q.  Now, Mr. Aldinger, who prepared Defendants' Exhibit 46?

24   A.  It would have been a combination of our Investor Relations

11:16:56 25   group, combined with Dave Schoenholz and me.
```

1          Let's go to Page -- I'm sorry.

2          And is there any connection between the contents --

3     or some of the contents -- of this document and the Barron's

4     article, which you learned about Saturday night when

11:19:47  5     Mr. Streem interrupted your dinner?

6     A.  Yes, there is.  We made, towards the end, some specific

7     comments that I think refuted the comments in the article.

8     Q.  Okay.

9          Let's turn, if we can, together to Page 5.  I'm using

11:20:04 10     the numbers of the document, not the Bates numbers at the

11     bottom.

12          And that's labeled "Quality Growth"?

13     A.  Yes.

14     Q.  And there's an entry in there called, "Earnings Per

11:20:14 15     Share"?

16     A.  Yes.

17     Q.  What did you tell the people at the Goldman Sachs

18     conference was the significance of this slide?

19     A.  Well, I think the significance is that we, obviously, have

11:20:23 20     grown earnings every year during the eight years that I was

21     CEO there.  And the growth rate here would have been higher

22     than 90 percent of the large financial companies.

23          So, I think what we were saying is we had very good

24     results.  We had consistent results that grew over time.  And

11:20:43 25     we, for the most part, would have been one of the higher

1    deliver superior stockholder earnings results.  Performance is

2    measured primarily by earnings per share, EPS, growth.  We are

3    a pay-for-performance company.

4            Do you see that?

02:04:49 5    A.  Yes.

6    Q.  You told that to the shareholders every year?

7    A.  Yes, we did.

8    Q.  And that's what you were referring to this morning when

9    you said we are a pay-for-performance company?

02:04:58 10   A.  That's correct.

11   Q.  We will look back at the proxy statement in more detail in

12   a few minutes, Mr. Aldinger.  But does the proxy statement

13   also disclose each year to the shareholders, when they're

14   asked to vote for you or not, your compensation?

02:05:17 15   A.  Yes, it does.

16   Q.  All the things that counsel asked you about this morning,

17   your salary is disclosed?

18   A.  Yes, it is.

19   Q.  Every year?

02:05:23 20   A.  Every year.

21   Q.  Your bonus?

22   A.  Every year.

23   Q.  Your stock options?

24   A.  Every year.

02:05:27 25   Q.  Any other compensation you get?

**PSA226**

```
            1    A.  You bet.

            2    Q.  All of the compensation you get?

            3    A.  All our compensation.

            4    Q.  The same for Mr. Gilmer?

02:05:34    5    A.  For the top five people in the company, including

            6    Mr. Gilmer.

            7    Q.  And Mr. Schoenholz?

            8    A.  And Mr. Schoenholz.

            9    Q.  Required by SEC regulations?

02:05:41   10    A.  Yes, it is.

           11    Q.  Every public company in America?

           12    A.  Every public company in America, yes.

           13    Q.  Every year?

           14    A.  Every year.

02:05:46   15    Q.  In writing?

           16    A.  Yes.

           17    Q.  To the shareholders?

           18    A.  To the shareholders.

           19    Q.  All right.  Let's look back in Exhibit -- Defendants' 17,

02:05:56   20    which is the minutes of the annual meeting that we were

           21    looking at a minute ago, the same paragraph we were looking

           22    at.  So the shareholders voted to reelect directors or elect

           23    directors including you, sir?

           24    A.  Yes.

02:06:12   25    Q.  And they voted against Ms. Goodrich's proposal?
```

Aldinger - cross

3266

```
        1    Q.  And was that in connection with something called the FRC?

        2    A.  Yes.

        3    Q.  What is the FRC?

        4    A.  It's an annual Financial Relations Conference that we did

04:15:53 5    for investors as well as bankers, investment banks as well.

        6    Q.  And who did Household -- withdrawn.

        7        Did Household sponsor this?

        8    A.  Yes, we did.

        9    Q.  So this is not like the Goldman Sachs event.

04:16:06 10   A.  No.  This was really -- only one company was in focus

        11   here, and that was Household.

        12   Q.  And Household paid for this?

        13   A.  Yes, we did.

        14   Q.  You rented a room in a hotel or something?

04:16:15 15   A.  Yes.  We rented a room in a hotel.

        16   Q.  And you invited people.

        17   A.  Yes.

        18   Q.  And who came?

        19   A.  Well, bankers, investors, analysts, and some of the rating

04:16:26 20   agencies may have come as well.

        21   Q.  And when was this held?

        22   A.  I believe it was in April of '02.  It was an annual event,

        23   and the last one was April of '02, I believe.

        24   Q.  And were disclosures made by Household at this FRC,

04:16:42 25   Financial Relations Conference, in April '02 about its re-age
```

1  practices?

2  A.  That's my understanding, yes.

3  Q.  Were you there?

4  A.  I was there for part of it.

04:16:50  5  Q.  And who presented on these subjects primarily?

6  A.  I believe that Dave Schoenholz led that discussion, and

7  there may have been others as well.  I wasn't in the

8  conference all day.  I'd go in and out.

9  Q.  You introduced Dave?

04:17:06 10  A.  Probably introduced him.  Actually, I believe Edgar Ancona

11  introduced him.  I'd go in and out and then sum up at the end

12  and do question and answer.

13  Q.  Okay.  And there was a question-and-answer period?

14  A.  There was.

04:17:18 15  Q.  And you answered questions and Dave answered questions?

16  A.  That's correct.

17  Q.  Anyone else answer questions?

18  A.  I believe Gary Gilmer and some of our other senior

19  management team did as well.

04:17:27 20  Q.  Okay.  And did the market price respond to the disclosures

21  made by Household about its re-aging practices at the

22  Financial Relations Conference on April 9, 2002?

23  A.  I believe it did.

24  Q.  Do we have a demonstrative that shows what the market did?

04:17:49 25        What's your recollection before we put up the

**PSA229**

1    about that.  We'll come back to it.

2         Let's go to Auto Finance.  What was that?

3    A.  We had an auto finance business that would finance your

4    buying a car, and it was a pretty large business for us,

04:25:58  5    headquartered in San Diego.

6    Q.  And what about Mortgage Services, what was that?

7    A.  And Mortgage Services was a business that involved buying

8    mortgages at one point and consolidating those and servicing

9    them.

04:26:14  10   Q.  And what about International?  What was that?

11   A.  And International, we had two large businesses, one in

12   Canada that effectively replicated all of these businesses,

13   and one in the U.K., United Kingdom, England, and that

14   replicated all of these businesses there, too, or most of

04:26:30  15   them.

16   Q.  Finally, in the middle here we have Consumer Lending, and

17   that's Gary Gilmer's business, correct?

18   A.  That's correct.

19   Q.  And what did Consumer Lending do?

04:26:39  20   A.  Consumer Lending was our branch-based business, which was

21   HFC and Beneficial and all those other little companies we

22   bought and consolidated in there, about 1,500 branches, I'm

23   trying to remember 15,000 people or so, and our largest

24   business and the one that went back literally since 1878.

04:27:00  25   Q.  Now, when you say 15,000 people in Consumer Lending, how

**PSA230**

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 22, 2009
                Defendants.          )  9:10 a.m.
 9
                            VOLUME 16
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
            BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

**PSA231**

1    definition of predatory lending that you used?

2    A.  What I used was predatory lending is something that's

3    illegal or knowingly unfair to your customers.

4    Q.  And did you send a letter to the board of directors in

09:50:03  5    September 2000 telling them what your position was and what

6    the company's position was with regard to this subject,

7    predatory lending?

8    A.  I believe I did.

9    Q.  Let's have Defendants' 263.

09:50:15 10    I'm showing a copy of Defendants' 263 to counsel and

11    to you, Mr. Aldinger.

12    (Tendered.)

13    BY MR. KAVALER:

14    Q.  Is this that letter you sent to the board of directors?

09:50:25 15    A.  Yes, it is.

16    MR. KAVALER:  Your Honor, I move the admission of

17    Defendants' 263.

18    MR. DROSMAN:  No objection, your Honor.

19    THE COURT:  Admitted.

09:50:35 20    BY MR. KAVALER:

21    Q.  All right.  It's dated September 20, 2000.  It says, Dear

22    members of the board of directors.  In the first paragraph, it

23    says, In recent months, the community activist group ACORN has

24    sporadically protested at the offices of subprime lenders

09:50:52 25    across the country.

PSA232

1          Do you see that?

2     A.  I do.

3     Q.  And then it talks about other things about ACORN.  In the

4     second paragraph, you wrote, As you know, Household's position

09:51:02  5     against predatory lending is perfectly clear.  Unethical

6     lending practices of any type are abhorrent to our company,

7     our employees and, most importantly, our customers.

8          Do you see that?

9     A.  I do.

09:51:14 10     Q.  And then you said on the second page, Attached to this

11     memo is our media holding statement for your reference.

12          Do you see that?

13     A.  Yes, I do.

14     Q.  And then you sent this to a bunch of people, including

09:51:30 15     Mr. Gilmer.

16          Do you see that?

17     A.  I do.

18     Q.  Okay.  And then attached to it is a document called

19     "Statement on Predatory Lending," September 20, 2000.  Was

09:51:43 20     that the media holding statement that you referred to?

21     A.  Yes, it is.

22     Q.  And this reads, Household's position on predatory lending

23     is perfectly clear.  Unethical lending practices of any type

24     are abhorrent to our company, our employees and, most

09:51:57 25     importantly, our customers.  These practices undermine the

                1    integrity of the marketplace in which we compete and limit our

                2    ability to provide the financial service needs of this

                3    country's diverse consumer market.

                4         Did you approve of that statement, Mr. Aldinger?

09:52:12    5    A.  Yes, I did.

                6    Q.  The next paragraph reads, Frankly, we are surprised and

                7    dismayed that ACORN chose to disrupt the place of business of

                8    one of our board members in Chicago today.  Attempting to

                9    frighten or intimidate people accomplishes nothing.  We are

09:52:29   10    proud of our business and of the customers we have served for

               11    more than 122 years.  Today's disruptive behavior will not

               12    impede our efforts to serving the lending needs of millions of

               13    working Americans.

               14         Did you approve that statement, Mr. Aldinger?

09:52:42   15    A.  Yes, I did.

               16    Q.  Do you remember what the incident you're referring to is

               17    where ACORN disrupted the place of business of one of

               18    Household's board members in Chicago?

               19    A.  Yes.  They went to the offices of Cyrus Friedheim, one of

09:52:53   20    our directors, and who is vice chairman of a consulting firm

               21    in Chicago.

               22    Q.  And what did you understand they did there?

               23         MR. DROSMAN:  Objection, lack of foundation,

               24    relevance.

09:53:12   25         THE COURT:  What's the relevance?

1    lender outside of the prime consumer segment and has had a,

2    quote, bull's-eye, close quote, on its back since the merger

3    of Citigroup and Associates First Capital in 2000.  Also

4    unfortunate is once it became the only player, the economy

10:09:17  5    sank into a recession and the natural cycle of borrowers,

6    lawyers and politicians looking for a culprit all had their

7    sights set on HI.  A group, Association of Community

8    Organizations for Reform Now, parenthesis, ACORN, close

9    parenthesis, has filed suit against HI in multiple states.

10:09:38 10    And while in our opinion the net sum of the likely losses is

11    not material, the effect the negative press has on the shares

12    could be very material.

13        The most high profile of the legal battles in the

14    State of Washington is currently in recess.  The headline risk

10:09:56 15    will likely return as we near the fall elections.  Again, we

16    do not believe that any of these political/legal issues are

17    material by themselves; however, we do believe that the

18    aggregate issues facing HI in the near term warrants a hold

19    rating.

10:10:12 20        Did you understand this to be a discussion of

21    headline risk?

22    A.  Yes, I did.

23    Q.  Did you agree with his analysis or the analyst's analysis

24    of the headline risk?

10:10:22 25    A.  I thought he was spot on perfect.  He covered it well.

Aldinger - cross

3330

1    Q.  What did Household do to respond to this increased

2    headline risk?

3    A.  Well, we tried to be active with regulators.  We tried to

4    be active with investors to tell them our story.  But it was a

10:10:42 5    challenging time.

6    Q.  Did you add any employees?  Did you beef up any of your

7    departments?

8    A.  Well, we obviously -- after adding Jim Kauffman and his

9    team, we added a significant number of people to the

10:10:54 10    compliance effort.  We basically gave him an open budget.

11    Q.  What does an open budget mean?

12    A.  That means he could hire as many people as he wanted to,

13    no questions asked.  We said to him we want you to absolutely

14    have control of whatever you need.

10:11:09 15    Q.  Is that a normal thing in the company?

16    A.  No.  That's rare.

17    Q.  Why did you do that?

18    A.  Because I thought compliance was the really important

19    issue of the day.

10:11:17 20    Q.  Did you give any other departments any -- an open budget?

21    A.  Not that I recall.

22    Q.  Now, Mr. Aldinger, you've heard some testimony in this

23    case from various people about a settlement with the attorneys

24    general?

10:11:36 25    A.  Yes, I have.

**PSA236**

Aldinger - cross

```
           1   Q.  Let's see if we can put that in context.  What led up to

           2   that scenario?  Who were the attorneys general?  Let's start

           3   with that.

           4   A.  Well, each state has an attorneys general in it; and I

10:11:50   5   think as you've heard in earlier discussions, at some point

           6   the State of Washington was very active in discussing their

           7   issues with Household.  And there were two or three states,

           8   Minnesota being one, which eventually grew to be a group of 12

           9   to 15 attorneys general that began discussing with Household

10:12:12  10   the idea of trying to make some kind of a compromise or a

          11   settlement with that group.

          12   Q.  And did there come a time where you got involved in

          13   directing Household's efforts in connection with that subject?

          14   A.  Yes.

10:12:25  15   Q.  Why?

          16   A.  Well, I thought it was the most important issue in front

          17   of us.  Clearly, the concerns about regulatory issues were

          18   dragging our stock price down, were hurting the morale of the

          19   company, were distracting the executives, and so I thought at

10:12:41  20   some point it made sense, if we could, to reach a settlement

          21   potentially with the AGs even though we may not have agreed

          22   that we had done anything wrong.

          23   Q.  When you first got involved, how many attorneys general

          24   were gathered together opposing Household?

10:12:57  25   A.  I think it was between 12 and 15.  And at that point, I
```

1    A.  Well, we had 500 million shares, so basically it was north

2    of $3 billion.

3    Q.  It's the basically part that I'm not getting.  Do the math

4    for me.

10:30:38  5    A.  Well, if you've got 500 million shares and your stock goes

6    up by about $7, I was understating it.  It's about 3.5 billion

7    incremental value.

8    Q.  To all the shareholders?

9    A.  To all the shareholders.

10:30:51  10    Q.  Including you?

11    A.  Absolutely.

12    Q.  Including the plaintiffs?

13    A.  Yes.

14    Q.  And how much did Household -- withdrawn.

10:31:01  15         Is that the result you were anticipating and hoping

16    for?

17    A.  It is.

18    Q.  Is that the result you were working to achieve?

19    A.  Yes.

10:31:13  20    Q.  How much did Household pay the attorneys general to

21    achieve this increase in value for all the shareholders,

22    including yourself, and the plaintiffs of $3-1/2 billion?

23    A.  $484 million.

24    Q.  Were you satisfied that that was a good deal,

10:31:31  25    Mr. Aldinger?

Aldinger - redirect

3390

1                    REDIRECT EXAMINATION

2    BY MR. DROSMAN:

3    Q.  Mr. Aldinger, let's start with the Barron's article that

4    you spoke about, both today and yesterday.

11:45:28  5         Do you recall that discussion?

6    A.  I do.

7    Q.  Okay.

8         And this was an article that you received on December

9    1st, 2001, correct, sir?

11:45:35 10    A.  That's my recollection.

11    Q.  Okay.

12         And the Barron's article, essentially, said that some

13    of Household's re-aging was either deferring or masking

14    chargeoffs, right?

11:45:44 15    A.  I recall -- I don't recall that specifically.  I'd like to

16    see it, if I could.

17    Q.  You don't recall that it said that some of Household's

18    re-aging was either deferring or masking chargeoffs?

19    A.  I don't remember the specifics of the article without

11:45:58 20    seeing them; and, after yesterday's experience, I'd like to

21    see it before I -- I -- agree to anything.

22    Q.  You were worried about investors' reaction to the Barron's

23    article, weren't you?

24    A.  Yes, I was.

11:46:09 25    Q.  You understood that from the investors' point of view,

PSA239

1   investors were nervous about re-aging; didn't you, sir?

2   A.  Investors never raised anything about re-aging before that

3   article.

4   Q.  Fair enough.

11:46:18   5        I just want to understand that your testimony under

6   oath today is that you did not understand that, from the

7   investors' point of view, investors were nervous about

8   re-aging after you read the Barron's article?

9        Is that your testimony, sir?

11:46:29  10   A.  That's not my testimony.

11   Q.  Okay.

12        Is your testimony, sir, that you understood that,

13   from the investors' point of view, investors were nervous

14   about re-aging?

11:46:37  15   A.  My testimony is that until the Barron's article, nobody

16   had ever raised a question about re-aging to me in the entire

17   seven years I had been CEO of the company.

18        Post-Barron's, people were nervous about it and

19   that's why we responded the way we did.

11:46:54  20   Q.  Okay.  Fair enough.

21        So, post-Barron's article -- after you read the

22   Barron's article -- you understood that, from the investors'

23   point of view, investors were nervous about re-aging, right?

24   A.  Absolutely.

11:47:04  25   Q.  Okay.

Aldinger - redirect

3396

1          Answer:  "I'm referring to investors."

2          Did I read that correctly, sir?

3    A.  I think you did.

4          MR. KAVALER:  Your Honor, objection.  Improper

11:51:07  5    impeachment.  No inconsistency between his testimony today and

6    his testimony then.  It's the exact same testimony.

7          THE WITNESS:  That's the way I read it.

8          MR. DROSMAN:  Your Honor, I asked the question --

9          THE COURT:  Wait just a second.

11:51:16  10    If you don't mind, I'll rule on the objections.

11          THE WITNESS:  Sorry about that.

12          THE COURT:  I agree.  I don't think that was

13    impeaching.

14          The jury will disregard it.

11:51:25  15    Ask your next question.

16    BY MR. DROSMAN:

17    Q.  After you read the Barron's article, sir, you understood

18    that investors wanted to see less re-aging, correct?

19    A.  They would feel better with less re-aging.

11:51:33  20    Q.  Okay.

21          In fact, it's fair to say, isn't it, that the

22    re-aging issue raised in the Barron's article was an important

23    issue to you, isn't it?

24    A.  Well, it became an important issue.  It wasn't before.

11:51:42  25    Q.  Right.

1          After you read the Barron's article, the re-aging

2    issue that was raised in the Barron's article was an important

3    issue to you, correct?

4    A.   Yes, it was, because investors were asking about it and I

11:51:53 5    wanted to give them whatever they needed to know.

6    Q.   Right.

7          More information, right?

8    A.   Correct.

9    Q.   More data, right?

11:51:58 10    A.   That's right.

11    Q.   All about re-aging, correct?

12    A.   About everything they wanted to know.

13    Q.   Right.

14          In this case, they wanted to know about re-aging,

11:52:04 15    right?

16    A.   Yes.

17    Q.   And you thought you needed to respond to the Barron's

18    article right away, right?

19    A.   That's right.

11:52:08 20    Q.   So, you went to the Goldman Sachs conference.  You talked

21    about that yesterday.

22          Do you recall that discussion?

23    A.   I did.

24    Q.   And you went there a couple days after the Barron's

11:52:17 25    article, right?

**PSA242**

1   the question.

2   BY THE WITNESS:

3   A.  Whatever I was paid, I was paid.

4   BY MR. DROSMAN:

01:21:21  5   Q.  Okay.  And you didn't read this, is that right?

6   A.  No, I don't believe I did.

7   Q.  And you didn't read this despite the fact that you knew

8   that investors were nervous about re-aging, right?

9   A.  That's right.

01:21:30  10  Q.  And you didn't read it despite the fact that you wanted to

11  get more information out to investors, right?

12  A.  Well, I did want to get more information out to investors;

13  but, you know, if I looked at the nits and gnats of every one

14  of five major businesses and went five levels below, I'd never

01:21:47  15  get my job done.

16        My job is to look at things that impact the bottom

17  line of the company in a big way; but you need to put in

18  perspective that each of these businesses has its own CEO, a

19  CFO, Chief Financial Officer, a chief credit officer, a head

01:22:03  20  of collections, and all of those people, including the

21  controllers and accounting support, work on putting our

22  packages together.

23        Now, for me to know the specifics of what Auto does

24  versus what Credit Card does, it would be a very bad use of my

01:22:17  25  time, a very bad use of my time.

PSA243

1    A.  I did.

2    Q.  You looked at every page, didn't you, sir?

3    A.  Well, I looked at every -- mostly, yes.

4    Q.  Were there some pages you skipped, sir?

01:31:03 5    A.  No, I looked at every page.

6    Q.  Okay.  Why don't I show you what's been marked as -- in

7    evidence as Defendants' Exhibit 852.

8    A.  Are we done with the other one?

9    Q.  For the time being.  You can put it aside.

01:31:38 10       You understand that this was the 10-K that Household

11   filed on March 12th, 2002, is that right?

12   A.  I do.

13   Q.  Okay.  And you signed it, you said?

14   A.  Yes, I did.

01:31:51 15   Q.  And if you'd turn with me, would you, to page ending 798.

16       Are you on page 798?

17   A.  I'm almost there.

18   Q.  Okay.

19   A.  I'm at 798.

01:32:25 20   Q.  You see the second paragraph of text, do you see that?

21   A.  I do.

22   Q.  And it reads, "Our policies for consumer receivables

23   permit reset of the contractual delinquency status of an

24   account to current, subject to certain limits, if a

01:32:43 25   predetermined number of consecutive payments has been received

         1   and there is evidence that the reason for the delinquency has

         2   been cured."

         3        Do you see that?

         4   A.  I do.

01:32:53 5   Q.  And there Household was setting forth its re-aging

         6   policies, right?

         7   A.  That's one of them.

         8   Q.  I'm sorry?

         9   A.  Yeah, that's one of them, I assume.

01:33:02 10  Q.  What do you mean that's one of them?

         11  A.  One of the statements in there.  I assume there are more

         12  than one statement in the whole document.

         13  Q.  That was the policy that Household told investors that you

         14  used to re-age loans, right?

01:33:12 15  A.  That's what it says.

         16  Q.  Okay.  You needed two things, correct?

         17  A.  That's what it says.

         18  Q.  You needed consecutive payments, right?

         19  A.  That's what it says.

01:33:20 20  Q.  And consecutive, you understand that means more than one,

         21  don't you, sir?

         22  A.  I think I do.

         23  Q.  Okay.  So at least two, right?

         24  A.  Right.

01:33:26 25  Q.  Okay.  And then you told investors that the reason for the

**PSA245**

Aldinger - redirect
3439

1   delinquency has been cured.  You wouldn't re-age a loan unless

2   that happened, right?

3   A.  That's what it says.

4   Q.  Well, that's what you told investors, right?

01:33:36  5   A.  Well, I signed the document, so I'm accountable for what's

6   in it; but I have to say that in reading that, I didn't

7   micromanage what those little pieces said.

8        I relied on the input from the people who do this

9   every day and the process we put in place; but I'm accountable

01:33:54 10   because I signed it, but I can assure you that I didn't, you

11   know, I didn't focus on the detail of this.

12   Q.  You didn't focus on the detail -- you didn't focus on the

13   detail of this re-aging, is that your testimony, sir?

14   A.  That's correct, like I read -- what I focused on are the

01:34:13 15   large financial issues the most and the C and D we do to the

16   investment community, and I look at the rest and I read the

17   rest; but I certainly don't, you know, look at that in detail

18   and try to contrast it with something to see if it's right.

19   Q.  Okay.  So you weren't focused on the re-aging policies

01:34:30 20   when you put together the 10-K, right?

21   A.  I wasn't focused on the details of that.  I relied on our

22   team to do it.  We have a full financial team.  We have a full

23   back-up of people who do this, and it's looked at by our

24   outside auditors as well before I sign it.  And so I relied on

01:34:47 25   the expertise of people who do this for a living, but I'm

1    accountable because I signed it.

2    Q.  This was the nitty-gritty, right, sir?  Is that right?

3    A.  Look at the size of the report.  Do you expect me to know

4    every word of the report and memorize it?

01:35:01  5    Q.  Well, for $24 million, sir, aren't you expected to know

6    what's in the report?

7    A.  I know what's in the report generally, but I'm not -- I'm

8    not knowledgeable about these kinds of details to the nth

9    degree.  I'm just not knowledgeable to this level.

01:35:13 10    Q.  Right, because you just went out and commissioned a big

11    benchmarking study through KPMG, right?

12    A.  And I got a response that was helpful to me and the board,

13    yes.

14    Q.  Right, and you didn't read, according to your testimony,

01:35:24 15    some of the report that you received from KPMG?

16    A.  That's correct, that's correct.  I went with the

17    high-level view.

18    Q.  Right.  Some of the report that would have been directly

19    relevant to this particular 10-K, right, sir?

01:35:33 20    A.  Yes.

21    Q.  Okay.  So you also said that you had to have evidence that

22    the reason for the delinquency had been cured, right?

23    A.  That's what it says.

24    Q.  And you didn't tell investors that you actually re-aged

01:35:46 25    with one payment, did you?

```
        1   A.  Not there.

        2   Q.  You didn't tell investors that you actually re-aged

        3   automatically, did you?

        4   A.  It doesn't say that.

01:35:55 5   Q.  Okay.  You know that this was materially false and

        6   misleading, don't you?

        7   A.  I understand it was incorrect at the time.

        8   Q.  My question is, sir, you understand that this is

        9   materially false and misleading, correct?

01:36:09 10  A.  You could say that.

        11  Q.  No, sir.  I'm asking you a question.

        12      Do you understand that this is materially false and

        13  misleading?

        14  A.  I'll accept that characterization.

01:36:21 15  Q.  Is that a yes, sir?

        16  A.  Yes.

        17  Q.  Let's take a look at a document that's Exhibit 1267 for

        18  identification, Plaintiffs'.

        19      You know what this is, right, sir?

01:36:54 20  A.  Yes, I do.

        21      MR. DROSMAN:  This is Plaintiffs' Exhibit 1267.  We

        22  move it into evidence if it's not already in.

        23      It's in evidence, your Honor.  I apologize.

        24  BY MR. DROSMAN:

01:37:09 25  Q.  This is your 10-K/A, right?
```

**PSA248**

1    we didn't agree with.

2    Q.  That wasn't my question, sir, whether you agreed or

3    disagreed.  Apparently, you paid them 484 million, right?

4    A.  We did.

02:23:51  5    Q.  Okay.  My question wasn't whether you agreed or disagreed.

6    I asked you whether the attorneys general were -- was telling

7    Household that they engaged -- that they used the effective

8    rate presentation to mislead consumers?

9    A.  That's what that says.

02:24:04  10    Q.  And then it continues, "Household deceptively asserts that

11    the effective interest rate is lower under the biweekly

12    program because the loan is paid off sooner."

13        Do you see that?

14    A.  I see that.

02:24:16  15    Q.  No. 4.  Engaging in equity-based lending.

16        Do you see that?

17    A.  Yes.

18    Q.  You know what loan flipping is, right, sir?

19    A.  Yes, I do.

02:24:25  20    Q.  And you understand that the attorneys general was telling

21    Household that they engaged in systematic and widespread loan

22    flipping?

23    A.  I see what that says.

24    Q.  That wasn't my question, sir.

02:24:37  25    A.  Yes.

1    Q.  There's a date there July 15th, 2002, right?

2    A.  That's right.

3    Q.  And you understand that that was the date that this

4    document was printed, correct?

02:30:42  5    A.  I would assume so.

6    Q.  Then you see the Bates number at the bottom, HHS 03070933.

7    Do you see that?

8    A.  I do.

9    Q.  And you understand that this came from Household's files,

02:30:52 10    correct?

11    A.  Yes, I do.

12    Q.  Okay.  And then if you look -- plaintiffs move 681 into

13    evidence.

14        MR. KAVALER:  Objection, your Honor, MIL, and no

02:31:02 15    foundation.

16        THE COURT:  I'll sustain the objection.  There's no

17    testimony as to what this document is.

18    BY MR. DROSMAN:

19    Q.  Okay.  Sir, you mentioned that you dealt with a team of

02:31:31 20    people who were in charge of negotiating with the attorneys

21    general, right?

22    A.  I said I had a team of people that were negotiating with

23    the attorneys general, that's right.

24    Q.  Right.  And you communicated with them, right?

02:31:41 25    A.  I communicated particularly with one person.

**PSA250**

Aldinger - redirect

3478

1   Q.  You gave them instructions, correct?

2   A.  I did.

3   Q.  And then they communicated information back to you, right?

4   A.  That's correct.

02:31:48   5   Q.  And you knew one of the issues that the attorneys general

6   was dealing with was a calculation of how much Household

7   needed to redress all of the harm that it had caused to

8   consumers, right?

9   A.  I don't recall that.  I recall they had their own views on

02:32:04  10   what it would be valued at, but I don't recall us giving them

11   an estimate.

12   Q.  Well, you do understand that you paid $484 million.

13   A.  Oh, absolutely, I do.

14   Q.  And you understand what that $484 million went to, right?

02:32:17  15   A.  To our customers.

16   Q.  Right.  You understand that that was restitution, right?

17   A.  I'm not sure I'd characterize it as purely restitution

18   because, as I understand it under the terms of the agreement,

19   it was paid out to every customer in the state whether they

02:32:32  20   had an issue or not based upon how the attorneys general

21   elected to do it.

22       So all we knew is it was going to go to our

23   customers, which we were happy about, with no cost along the

24   way because the attorneys general don't take a cut.  So we

02:32:46  25   were -- that's what I understood, but I didn't believe --

**PSA251**

        1   Q.  Right, you didn't understand --

        2        MR. KAVALER:  Excuse me, your Honor.  He interrupted

        3   the witness.

        4        THE COURT:  I think he's answered the question.  I'll

02:32:55 5   overrule that objection.

        6   BY MR. DROSMAN:

        7   Q.  The reason you understood it was going to go to all your

        8   customers instead of the ones who had filed complaints is

        9   because the ones that filed complaints weren't the only ones

02:33:04 10  harmed, right, sir?

        11  A.  I don't think that's correct.  The reason it was going to

        12  go to everybody was just because they were going to give

        13  everybody something.  They didn't have to file a claim, they

        14  didn't have to have a specific product, as I understood it, or

02:33:16 15  they had their own allocation to do it.

        16        So from our perspective, it was going to customers,

        17  that was good; but it was not related to any complaint levels,

        18  no.

        19  Q.  You know who Carin Rodemoyer is, right, sir?

02:33:27 20  A.  No, I don't.

        21  Q.  You never heard the name before?

        22  A.  Never heard the name.

        23  Q.  Okay.  You understood that people were negotiating with

        24  the attorneys general, right?

02:33:33 25  A.  Yes, I did.

1    Q.   Okay.  And Household was telling the attorneys general

2    we'll pay X, and the attorneys general was saying we'll accept

3    Y, right?  You understood that those were the basic --

4    A.   Well, that's the way negotiations go.

02:33:44  5    Q.   Okay.  And so in the context of that negotiation,

6    Household derived some figures as to what it owed people,

7    right?

8              MR. KAVALER:  Objection to the form, your Honor.

9              THE WITNESS:  I'm not sure that's true at all.

02:33:54 10              THE COURT:  Excuse me?

11              MR. KAVALER:  Objection to the form, your Honor.

12              THE COURT:  What particular objection?

13              MR. KAVALER:  Owed.

14              THE COURT:  Overruled.

02:34:02 15              The witness can answer.

16    BY THE WITNESS:

17    A.   I don't think any -- any payment that we put together,

18    including the 484 million, tied to any number that I could

19    relate to damages or number of customers harmed or anything.

02:34:15 20    It was a number we agreed to to get this behind us in a global

21    settlement.

22              So I certainly had no view that it meant X for

23    something and Y for something else.

24    BY MR. DROSMAN:

02:34:28 25    Q.   Take a look at the first page of the document, upper

**PSA253**

```
         1    Q.  Okay.  And so you never left Household, right?

         2    A.  Well, I left -- I was no longer CEO after that.  It became

         3    a division of another company, so --

         4    Q.  Okay.  Let's just walk through your tenure as CEO from

02:42:14 5    1998 on, okay?

         6    A.  Fine.

         7    Q.  Sir, you brought Mr. Gilmer back from England in 1998 to

         8    run HFC, right?

         9    A.  That's correct.

02:42:25 10   Q.  And then you and Mr. Schoenholz hired Andrew Kahr at the

        11    end of 1999 to work with Mr. Gilmer to accelerate growth,

        12    right?  No dispute there.

        13    A.  No dispute there.

        14    Q.  Okay.  And then in July 1999, when our clients began

02:42:39 15   buying Household stock, it was selling for about 42 bucks a

        16    share, right, sir?

        17    A.  I don't remember the price at the given point; but if you

        18    show me something, I'll confirm it.

        19    Q.  Well, sir, you told me you had a ticker going on in -- all

02:42:54 20   around you, you were surrounded by the stock price, right?

        21    A.  Absolutely.

        22    Q.  So 42 bucks a share in the summer of 1999 sounds about

        23    right?

        24    A.  Well, let's see, that's nine-and-a-half years ago, and to

02:43:03 25   know what it was the summer of '99 or in a given month or a
```

1   A.  We sold the company.

2          MR. KAVALER:  Objection, your Honor.  Beyond the

3   relevant period.

4          MR. DROSMAN:  Your Honor, there was discussion

02:45:15 5   yesterday about 2003, so I'm not sure what he's talking about.

6          MR. KAVALER:  What I'm talking about is the question

7   seeks events that occurred after the end of the period we're

8   talking about in this lawsuit.

9          THE COURT:  I'll overrule the objection to that

02:45:28 10   question.

11   BY MR. DROSMAN:

12   Q.  You sold the company for HSBC, right?

13   A.  Yes, we did.

14   Q.  And you sold the company for about $28 a share, is that

02:45:40 15   right?

16   A.  I believe it was over 30, actually.

17   Q.  You believe it was over 30?

18   A.  I thought it was $30 and something, yes.

19   Q.  Okay.  So somewhere in that range, right?

02:45:49 20          So you testified yesterday that you lost it all.  You

21   did really poorly, right, with that stock drop?

22   A.  I lost a lot of money with the stock drop, that's correct.

23   Q.  Okay.  But you had something called a golden parachute,

24   didn't you?

02:46:01 25   A.  I did.

**PSA255**

Aldinger – redirect

1    Q.  And that golden parachute, it helped to cushion your

2    landing, didn't it, sir?

3    A.  I'm not sure I'd characterize it that way.  It was paid

4    out pursuant to my contract.

02:46:12  5    Q.  Okay.  You understand that the investors in this case,

6    they didn't have a golden parachute.  You understand that,

7    right?

8    A.  No.  Morgan Stanley and Merrill Lynch and all those people

9    didn't.  They didn't work at the company.

02:46:21 10    Q.  Okay.  And Mr. Smith and Ms. Smith who bought the stock as

11    well, they didn't have a golden parachute either, did they?

12    A.  They didn't work at the company either.

13    Q.  They didn't have a golden parachute, right, sir?

14    A.  Hard to get one if you don't work at the company.

02:46:49 15    Q.  Okay.  You had one, though, didn't you?

16    A.  I did.

17    Q.  And your golden parachute entitled you to about

18    $20 million in cash when HSBC purchased Household, didn't it?

19    A.  It was three times salary and bonus.  About that number,

02:46:49 20    that's right.

21    Q.  About 20 million in cash, right?

22    A.  That's about right.

23    Q.  And then you got an additional 10 million more in HSBC

24    stock grants, didn't you, sir?

02:46:55 25    A.  I'm not sure I understand that.  That was not part of any

1  contract.

2  Q.  So you didn't get the 10 million in stock grants from

3  HSBC?  Is that your testimony?

4  A.  Well, you're talking about a different point.  You're

02:47:05  5  talking about when HSBC asked me to stay on as CEO of both the

6  North American operations.  And in that capacity, they put in

7  a compensation plan that would be consistent with somebody

8  running two businesses with 55,000 people and multiple

9  locations around North America.

02:47:24  10         So that's -- that's accurate if you put it in that

11  context.

12  Q.  Sir, you talked yesterday about the proud 128-year history

13  of Household, right?

14  A.  That's right.

02:47:36  15  Q.  Okay.  You understand there's not going to be a proud

16  135-year history.

17         MR. KAVALER:  Objection, your Honor.  This is way

18  beyond the scope of anything on the direct, cross, of the

19  class period or anything else.

02:47:47  20         THE COURT:  I don't know if it's beyond the scope,

21  but it's argumentative.  The objection will be sustained.

22  BY MR. DROSMAN:

23  Q.  Okay.  Sir, is there going to be a proud 135-year history

24  for Household International?

02:47:57  25         MR. KAVALER:  Objection, your Honor.

Aldinger - recross

3494

1          THE COURT:  I'll sustain the objection.

2    BY MR. DROSMAN:

3    Q.  Okay.  Sir, you understand that HSBC recently said --

4          MR. KAVALER:  Objection, your Honor.

02:48:07 5          THE COURT:  Sustained.

6    BY MR. DROSMAN:

7    Q.  Sir, you took this company, and you drove it into the

8    ground, didn't you?

9    A.  No, I didn't drive it into the ground.

02:48:17 10   Q.  You destroyed this company, didn't you, sir?

11   A.  I did not.

12          MR. DROSMAN:  No further questions, your Honor.

13          MR. KAVALER:  Just about two or three, your Honor.

14                    RECROSS EXAMINATION

02:48:30 15   BY MR. KAVALER:

16   Q.  This parachute that Mr. Drosman is so interested in, that

17   was a result of your employment contract?

18   A.  That's correct.

19   Q.  Which was fully disclosed to the investors every year in

02:48:45 20   the proxy statement when they voted every year to reelect you

21   to the board.

22   A.  That's right.

23   Q.  Now, Mr. Drosman asked you about the attorney generals --

24   the attorneys general, and he gave you a document which you'd

02:49:03 25   never seen before, correct?

**PSA258**

Aldinger - recross

3495

1    A.  That's correct.

2    Q.  And you read it for the first time sitting right over

3    there on the witness stand.

4    A.  Absolutely.

02:49:11  5         MR. DROSMAN:  Objection, leading.

6              THE COURT:  Overrule it.

7    BY THE WITNESS:

8    A.  Absolutely.

9    BY MR. KAVALER:

02:49:15  10   Q.  Do you understand those to be accusations by the attorneys

11   general?

12   A.  I did.

13   Q.  Did you agree with them?

14   A.  No, I did not.

02:49:23  15   Q.  Nevertheless, there came a time when you and the attorney

16   generals -- attorneys general settled.

17   A.  Absolutely.

18   Q.  Mr. Drosman showed you some other document that he says

19   adds up to $3 billion.

02:49:35  20         Did you settle with the attorneys general for

21   $3 billion?

22   A.  No, I did not.

23   Q.  Did you settle for $2 billion?

24   A.  No, I did not.

02:49:41  25   Q.  $1 billion?

1    A.  No.

2    Q.  So the attorneys general turned out after all those

3    accusations to be satisfied with 484 million, correct?

4            MR. DROSMAN:  Objection, leading.

02:49:53  5            THE COURT:  It is leading.  Don't lead.  I'll allow

6    that question.

7            You may answer.

8    BY THE WITNESS:

9    A.  We settled for 484 million, and I would point out that

02:50:01 10    that also reflected a significant increase because Household

11    brought in 35 additional attorneys general.

12            So the number would have been less based on the

13    original discussions we were reading about but for the fact

14    that we brought in virtually all 50 states.

02:50:17 15            MR. KAVALER:  No further questions, your Honor.

16            THE COURT:  Anything else?

17            MR. DROSMAN:  Nothing further, your Honor.

18            THE COURT:  You may step down, sir.

19            MR. DROSMAN:  You know, before he steps down, I just

02:50:29 20    realized there's an exhibit that I needed to move in,

21    Exhibit 706 that I used with him.

22            THE COURT:  The witness may step down.

23            Is there an objection?

24            MR. KAVALER:  If I knew which one it was, I'd know,

02:50:40 25    your Honor.  Give me a second, please?

                  IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

LAWRENCE E. JAFFE PENSION PLAN, )
on behalf of itself and all     )
others similarly situated,      )
                                )
            Plaintiff,          )
                                )
   vs.                          )  No. 02 C 5893
                                )
HOUSEHOLD INTERNATIONAL, INC.,  )
et al.,                         )  Chicago, Illinois
                                )  April 23, 2009
            Defendants.         )  9:00 a.m.

                          VOLUME 17
              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury


APPEARANCES:

For the Plaintiff:            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
                              BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
                                   MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
                                   MS. MAUREEN E. MUELLER
                              655 West Broadway
                              Suite 1900
                              San Diego, California  92101
                              (619) 231-1058

                              COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
                              BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
                                   MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
                              100 Pine Street
                              Suite 2600
                              San Francisco, California  94111
                              (415) 288-4545

1          Sodeika - cross
                                              3637
2    paragraph there, Ms. Madura talks about seven of the 27

3    complaints relate to this effective rate; is that right?

4      (Brief pause.)

5    BY THE WITNESS:

6    A.  It talks about the -- we -- seven of the 27 complaints

7    mentioned refer to the fact that the borrower was quoted or

8    promised a 7 or 7-1/2 percent.

9    BY MR. DOWD:

10   Q.  Right.  Then it goes on to use the phrase effective rate

11   and give an example of it; is that right?

12   A.  She talks about the offices computing an effective rate.

13   Q.  Okay.  And so you heard about this effective rate

14   complaint; and you knew about seven of them in May of 2001,

15   right?

16   A.  Yes.

17   Q.  Okay.  Did you engage -- or you showed us a report from

18   the summer of 2002 that you did with Mr. Kavaler, Defendants'

19   465.  Do you have a report like this from, say, May or June of

20   2001?

21   A.  No.

22   Q.  Ma'am, one thing that did happen in May or June of 2001

23   was the branch purge; is that right?

24   A.  I know that we conducted a purge, if you call it that, but

25   I don't remember exactly what the date was.  But, yes.

26   Q.  Okay.  I didn't --

**PSA262**

1                    Sodeika - cross
                                                          3638
2   A.  We went through --

3   Q.  I didn't call it a purge.  You called it a branch purge,

4   didn't you?

5   A.  I don't think I called it that, but --

6   Q.  Okay.

7   A.  That's fine.

8   Q.  I'll show you what's been marked as Plaintiffs' 573.  I'd

9   ask you to take a look at that if you would, ma'am.

10  A.  Okay.

11    (Tendered.)

12  BY MR. DOWD:

13  Q.  And, Ms. Sodeika, that's a copy of an e-mail exchange

14  between yourself and Tom Detelich, dated March 14 and March

15  15, 2002; is that right?

16  A.  Yes.

17  Q.  Okay.

18          MR. DOWD:  I'd offer Plaintiffs' 573, your Honor.

19          THE COURT:  It will be admitted.

20  BY MR. DOWD:

21  Q.  And in your e-mail, you talk about effective rate; is that

22  correct?  That's the subject of your e-mail?

23  A.  Yes.

24  Q.  Okay.  And don't you use the phrase there, "Was that with

25  the branch purge sometime last summer?"

26  A.  Yes, I did.

                                                                3824


1                      IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
2                               EASTERN DIVISION

3    LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
4    others similarly situated,      )
                                     )
5                 Plaintiff,         )
                                     )
6      vs.                           )  No. 02 C 5893
                                     )
7    HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
8                                    )  April 24, 2009
       Defendants.                   )  11:00 o'clock a.m.
9
                             VOLUME 18
10              TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. SPENCER A. BURKHOLZ
                                    MR. MICHAEL J. DOWD
15                                  MR. DANIEL S. DROSMAN
                                    MS. MAUREEN E. MUELLER
16                             655 West Broadway
                               Suite 1900
17                             San Diego, California  92101
                               (619) 231-1058
18
                               COUGHLIN STOIA GELLER RUDMAN &
19                             ROBBINS LLP
                               BY:  MR. DAVID CAMERON BAKER
20                                  MR. LUKE O. BROOKS
                                    MR. JASON C. DAVIS
21                                  MS. AZRA Z. MEHDI
                               100 Pine Street
22                             Suite 2600
                               San Francisco, California  94111
23                             (415) 288-4545

24

25

1           MR. BURKHOLZ:  That goes to the scienter issue of the

2      company.

3           THE COURT:  It goes to the making of the statement

4      issue, as well.

11:36:30  5           MR. BURKHOLZ:  Well, that's the company's statement;

6      and, the scienter of the company, you look at the --

7           THE COURT:  So, you are not going to argue that when

8      Mr. Gilmer said to Ms. Hayden-Hakes, "Go out there and make

9      this statement," but when they got together and discussed it

11:36:49 10      and when they put together the statements that she was going

11      to issue to the press, that the statements she subsequently

12      made were statements also made by Mr. Gilmer, that he can be

13      held accountable for those?

14           You're not going to argue that?  You're just going to

11:37:06 15      argue that the corporation can be held liable?

16           MR. BURKHOLZ:  Right.  The individual defendants are

17      liable for the company's statements.

18           THE COURT:  Gee, there you go.  Okay.

19           So, you're going to argue just the company's liable;

11:37:23 20      and, then, you're going to, because the company is liable for

21      that statement, say that you're going to impute the company's

22      intent to Mr. Gilmer and to Mr. -- well, the other defendants?

23           MR. BURKHOLZ:  Aldinger and Schoenholz.

24           THE COURT:  Yes.

11:37:40 25           Is that your theory?

1    shifted to something quite different.

2        THE COURT:  Well, we're talking about two things.

3    Along the way, it struck me -- as I was looking at the

4    scienter materials, based upon the conversation we had last

11:54:44 5    time -- that the language that the Seventh Circuit used in its

6    scienter discussion also applied to the making of a statement.

7        I mean, they talked about not only uttering the

8    statement, but providing information for it, and so on.

9        And, so, it appeared to me that it would be necessary

11:55:06 10    or appropriate to go back to our instruction on making a false

11    or misleading statement and include that language in it.

12        Ultimately, we're back at where we started out, which

13    is imputing the scienter to the corporation and how we should

14    instruct there.  And it shouldn't surprise anyone that some of

11:55:34 15    the same language applies to both questions.

16        So, it's not as if I started out saying one thing or

17    doing another.  It's that the language led me to consider

18    something else and I brought it up here.

19        MS. BEER:  I think it may be that a part of the

11:55:52 20    difficulty comes from attempting to break the cause of action

21    down into the elements.  Because the act that provides a basis

22    for liability includes both the making of a statement and the

23    wrongful state of mind; and, by atomizing those into separate

24    elements to be analyzed, we're separating -- we're maybe

11:56:16 25    separating -- them too far.

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5            Plaintiff,             )
                                     )
 6     vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  April 28, 2009
              Defendants.            )  9:10 a.m.
 9
                            VOLUME 20
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

**PSA267**

1    technological breakthrough it was counting on is not going to

2    happen.  So now the company knows that this engine ain't going

3    to work.

4         And let's say on that day, the company has a legal

09:38:19 5    obligation to disclose that information to the market, but it

6    keeps quiet about it, fails to tell the market the truth.  In

7    this example, that omission has created an inflation, and the

8    amount of inflation is how much the stock price would have

9    dropped had the company truthfully made the announcement that

09:38:46 10    it was legally required to do.

11         So you can have a stock price becoming inflated

12    because of an affirmative misrepresentation or a lie that

13    makes it go up after adjusting for market and industry; or you

14    can have inflation when the company fails to tell the truth,

09:39:08 15    thereby preventing a decline in stock price, assuming it had a

16    duty to tell that truth.

17    Q.  So in both cases, Professor, there's an identifiable event

18    that causes the stock to be overpriced?

19    A.  Yes.  There has to be, for proper loss causation analysis,

09:39:30 20    an identifiable event which maps into a quantified quantum of

21    inflation, whether it is an omission or it is a

22    misrepresentation.

23    Q.  From an economist's perspective, Doctor, is there an

24    important difference between telling a lie that causes

09:39:48 25    inflation and omitting to make a statement that causes

Bajaj - direct

4092

1    inflation?

2    A.  There's no fundamental difference as we just explained.

3    Q.  So would a proper expert analysis identify either the

4    misstatement or the omission that gives rise to inflation in

09:40:03  5    either event?

6    A.  A proper economic analysis, whether it is about omission

7    or misrepresentation, will tie the amount of inflation

8    determined by the economic analysis to what was it that caused

9    the inflation, what specific lie, what specific omission

09:40:24 10    caused how much inflation.

11    Q.  So in that case, why can't the jurors just do what

12    Professor Fischel suggested they do, pick the first statement

13    that they believe to have been false and make that the date on

14    which the stock price became inflated?

09:40:41 15    A.  Well, assuming jurors don't believe my analysis, which

16    would be the easy way out, they'd have to do a lot of work

17    themselves to actually do all the statistical analysis to

18    determine how much a particular misstatement or omission

19    affected the stock price to create inflation.

09:40:59 20    Q.  Professor Fischel has not provided them with those -- that

21    data?

22    A.  Well, the only way Professor Fischel's analysis is

23    relevant is if the jurors believe 100 percent of the

24    plaintiffs' claim is correct and there are no methodological

09:41:18 25    flaws in Professor Fischel's analysis and he hit it right on

**PSA269**

1          In fact, Professor Fischel's own analysis, when

2    corrected, leads to the conclusion that Household's stock

3    price was weighed down by headline risk.  And as that headline

4    risk became worse, stock kept on getting punished more and

09:50:57 5    more.  And in the end when Household alleviated this headline

6    risk by buying peace with attorneys general, the stock price

7    went up over two days by 33 percent, which is the largest

8    history -- largest increase in history of the stock ever since

9    it was a public company.

09:51:24 10          And all the economic evidence is consistent with

11    Household's stock price never being inflated for a single day

12    during the relevant period.  And Professor Fischel's own

13    analysis, when reasonably corrected, supports that conclusion.

14    Q.  Now, can anything other than a lie cause inflation?

09:51:53 15    A.  Inflation is a term of art in a proceeding such as this

16    where overpricing that results from a lie is called inflation.

17    So as I said, you can have a stock being overpriced or

18    underpriced with the benefit of the hindsight.

19          If you look at all the stocks that lost a lot of

09:52:21 20    money yesterday and there was no news, well, with the benefit

21    of hindsight we can say, yeah, the day before yesterday, they

22    were overpriced.  But inflation comes into consideration when

23    it is a misrepresentation or omission, namely, a lie that

24    creates overpricing.

09:52:44 25    Q.  So if I understand correctly, inflation is different than

             1    has to determine in this particular case.  As long as the

             2    market did not learn the truth about the original lie, that

             3    inflation remains constant even though stock price may go up

             4    or down.

09:56:16     5            So what we have to do in economic analysis is to

             6    separate changes in stock price that result from any factor

             7    other than a lie or a correction of the lie.  We have to focus

             8    on change in inflation, not change in stock price.

             9    Q.  What happens next after this second stage?

09:56:41    10    A.  So in this hypothetical, when the market learns the truth

            11    that the company had lied, there was no such engine, and stock

            12    price drops, that's when inflation has come out of the stock.

            13            And the measure of economic harm that is at issue in

            14    this case is the loss investors suffered if they held the

09:57:11    15    stock when it was inflated and suffered the consequences of

            16    that inflation coming out of the stock.  The rest of their

            17    gains and losses have nothing to do with this case or a

            18    similar case.

            19    Q.  Professor, I noticed that your chart both begins and ends

09:57:30    20    at zero.  Is that a coincidence?

            21    A.  No.  Because before there is first actionable

            22    misstatement, there must be zero inflation.  And I apologize

            23    for the jargon.  Before there is a lie that the Court has

            24    ruled can be considered for purposes of this case, by

09:57:56    25    definition, the stock is not inflated.  And after the market

1    has learned the truth, which is at the end of the relevant

2    period, all the truth is out and inflation is zero.

3         So in a proper analysis, you begin with zero

4    inflation and you end with zero inflation.  So an investor who

09:58:16  5    had purchased before there was any inflation and held the

6    stock until after all the inflation was out has not been

7    harmed.  Only investors who have been harmed are those

8    investors who purchased while the stock maintained an

9    inflation and they held until after the inflation came out.

09:58:38 10    Q.  Let's look at one of Professor Fischel's inflation charts.

11    Can we see Plaintiffs' Demonstrative 151, please.

12         Does Professor Fischel show inflation starting at

13    zero?

14    A.  Not in the range of his chart.  So on the first day of the

09:58:59 15    relevant period, Professor Fischel shows $7.97 of inflation.

16    Q.  In other words, Professor Bajaj, over here on the left

17    side, I think you called it the left axis.  Let's put your

18    chart and this chart next to each other.  Can we do that?

19         Okay.  Do you see here on the left side of your

09:59:21 20    chart, your up leg starts at zero and goes up?

21    A.  Correct.

22    Q.  Where is Professor Fischel's analogous up leg showing the

23    first time a false statement put inflation into the price of

24    Household's stock?

09:59:36 25    A.  There is nothing in Professor Fischel's analysis that

**PSA272**

Bajaj - direct

4119

1    competitor, First Associates.

2        So consumer activists started to get very focused on

3    Household.  One of Professor Fischel's exhibits quotes a

4    consumer activist as saying, We will not rest until

10:22:57  5    Household's subprime customers are treated the same way as

6    conforming loan customers.

7        Well, you can't lend to subprime customers on same

8    terms that banks give to conforming loan customers so you can

9    stay in business.

10:23:13  10    Q.  Professor, what's a conforming loan and what is a

11    conforming loan customer?

12    A.  These are people with very good credit, very good income,

13    good savings that are usually very rate sensitive and are very

14    creditworthy with major banks and other depository

10:23:29  15    institutions.

16    Q.  Sometimes called prime customers?

17    A.  Those are prime customers.

18    Q.  Okay.

19    A.  So headline risk became a big factor.  And as you see us

10:23:38  20    talk about various analyst reports and what the market was

21    learning, you will see evidence of headline risk affecting

22    Household's stock price.

23        There were other non-fraud related firm specific

24    factors, and then there were days when nothing happened and

10:23:57  25    stock price moved a lot.  If I remember correctly, in

Bajaj - direct

4124

1    about the market's awareness of headline risk?

2    A.  Yes.

3    Q.  And the date on this document is December 3, 2001?

4         I'm sorry.  Wrong document.

10:51:31  5         The date of this document is June 23, 2000?

6    A.  That's correct.

7    Q.  Let's look at another one.  This is Defendants' 289.

8         A copy for counsel.  A copy for you, Dr. Bajaj.

9      (Tendered.)

10   BY MR. KAVALER:

11   Q.  Is this another document that you looked at in formulating

12   your opinion that you're testifying about here today?

13   A.  Yes, I did.

14        MR. KAVALER:  Offer Defendants' 289, your Honor.

10:52:14  15        THE COURT:  Admitted.

16   BY MR. KAVALER:

17   Q.  This is a UBS Warburg report from November 16, 2001?

18   A.  Yes, it is.

19   Q.  Another analyst report?

10:52:22  20   A.  Correct.

21   Q.  And if you'll turn to the second page, third bullet, it

22   says, We believe the more immediate danger to Household's

23   stock price stems from the headline risk and association,

24   justified or not, with predatory lending.

10:52:53  25        Do you see that?

Bajaj - direct

4125

1    A.  Yes, I do.

2    Q.  Is that one of the things you were referring to?

3    A.  Indeed.

4    Q.  And is this one of the things that supports your view that

10:53:01  5    it was headline risk and not fraud that caused Household's

6    stock price to decline in 2002?

7    A.  Yes.

8    Q.  Let me show you another document, Defendants' 357.

9        A copy for counsel.  A copy for you, Professor Bajaj.

10:53:25  10    (Tendered.)

11    BY MR. KAVALER:

12    Q.  Is this another analyst report that you relied on in

13    formulating your opinions that you're giving here today?

14    A.  Yes, I did, counsel.

10:53:34  15        MR. KAVALER:  Your Honor, I offer Defendants' 357.

16        MR. BURKHOLZ:  Same limiting instruction, your Honor.

17        MR. KAVALER:  Agreed.

18        THE COURT:  Admitted with the same limiting

19    instruction.

10:53:42  20    BY MR. KAVALER:

21    Q.  This is a Bear Stearns report dated December 3, 2001?

22    A.  Yes.

23    Q.  And the heading is, Is the biggest risk in subprime

24    lending headline risk.

10:53:54  25        Do you see that?

Bajaj - direct

1    A.  I do.

2    Q.  And turn to the second page, first full paragraph there.

3    It says, The real risk of subprime lending appears to be

4    headline risk.

10:54:14  5            Do you see that?

6    A.  Yes.

7    Q.  Is that another piece of information that you relied on in

8    coming to your conclusion that what was affecting Household

9    during the relevant period was headline risk and not fraud?

10:54:27 10   A.  Yes.

11   Q.  Are there others as well?

12   A.  There are many, many, many more.

13   Q.  Let's talk briefly about an event study.

14            To do this -- an event study is a method of analysis?

10:54:43 15   A.  Yes.  It's a widely recognized and accepted method of

16   analysis.

17   Q.  And to do this kind of an analysis -- withdrawn.

18            For what does one use an event study in connection

19   with what we're talking about here today?

10:55:01 20   A.  Well, as the name implies, event study is a statistical

21   technique to study the impact of an event on stock price of a

22   company after adjusting for market and industry or other

23   unrelated factors.

24   Q.  And what is your goal -- withdrawn.

10:55:24 25            Did you do an event study to come to your conclusions

Bajaj - direct

1    in this case?

2    A.  Yes, I did.

3    Q.  And what is the goal of the event study that you performed

4    in this case?

10:55:34  5    A.  Well, the goal in an event study was to see if there is

6    any relationship between plaintiffs' allegations and

7    investors' losses.

8    Q.  And do you use a tool called a regression analysis in

9    conducting an event study?

10:55:54 10    A.  Yes.  Regression analysis is a tool that is used to

11    conduct an event study.

12    Q.  And in order to conduct an event study, do you need to

13    perform a careful review of all of the economic evidence

14    available?

10:56:07 15    A.  That is correct.

16    Q.  Now, did Professor Fischel conduct an event study in this

17    case?

18    A.  He did.

19    Q.  And have you had an opportunity to review and study his

10:56:16 20    event study?

21    A.  Yes, I did.

22    Q.  In your opinion, is the event study that Professor Fischel

23    conducted a proper event study?

24    A.  In my opinion, his event study is subject to very serious

10:56:31 25    methodological flaws.

1   Q.  Right.  Okay.

2       Now, you will agree with me, won't you, sir, that you

3   don't need a stock price increase on the day a company makes a

4   false statement in order for inflation to come into that

03:14:59  5   company's stock price?  Do you agree with that?

6   A.  Yes, I do.

7   Q.  Thank you.

8       In fact, in the Computer Associates case, another

9   case in which you were an expert, you gave the opinion that

03:15:11 10   you don't have to measure a stock price increase in order to

11   estimate inflation, right?

12       You did that in that case, right?

13   A.  Well, what I did in that case was estimate inflation on

14   the way in by looking at other companies --

03:15:30 15   Q.  Sir, that wasn't my question, sir.

16       My question was, in that case you didn't measure the

17   stock price increase in order to estimate inflation, right?

18   You didn't do that, right?

19   A.  Counsel, if I may answer?

03:15:42 20   Q.  It's a "yes" or "no," sir.  Did you do it?

21       I asked you the question at your deposition and you

22   answered it.

23   A.  Well, I think a "yes" or "no" answer would be misleading,

24   so --

03:15:51 25   Q.  I don't want you to mislead anybody here.

1           MR. BURKHOLZ:  I will withdraw the question, your

2    Honor.

3    BY MR. BURKHOLZ:

4    Q.  Now, you will agree with me, sir, that a company does not

03:16:00  5    need to admit it committed fraud for inflation to come out of

6    the stock price?

7    A.  As a general proposition that could be true, yes.

8    Q.  Okay.

9          In fact, there are a number of ways in which

03:16:12 10   inflation can come out of a company's stock price.  It can

11   come out through a company admission.  It can come out from

12   information from third parties, such as analysts or the media.

13   Isn't that correct, sir?

14   A.  Not necessarily.

03:16:24 15   Q.  Okay.  Sir, your deposition was taken in this case, right?

16   A.  Yes.

17   Q.  And you gave an oath to tell the truth in the deposition,

18   right?

19   A.  Of course I did.

03:16:32 20   Q.  Okay.  Let's look at your deposition at Page 43, Lines 5

21   through 21.

22    (Said videotape was played in open court.)

23   BY MR. BURKHOLZ:

24   Q.  That was your testimony that day, right, sir?

03:17:46 25          MR. KAVALER:  I'm going to move to strike.  That's

Bajaj - cross

1    not proper.  He said the same thing on the stand that he said

2    in his deposition.

3           THE COURT:  I will allow it.

4           MR. BURKHOLZ:  Thank you, your Honor.

03:17:52  5    BY MR. BURKHOLZ:

6    Q.  Now, it's your opinion in this case that even if this jury

7    finds that Household made false statements, there is still

8    zero inflation, right, sir?  That is your opinion, right?

9    A.  That mischaracterizes my opinion.

03:18:08  10          MR. BURKHOLZ:  Can we see the deposition at Page 142,

11    Lines 18 to 25, please.

12      (Said videotape was played in open court.)

13    BY MR. BURKHOLZ:

14    Q.  That was your testimony on that day, right, sir?

03:18:49  15    A.  That is correct.

16    Q.  Thank you.

17          Now, did you read Mr. Aldinger's testimony in this

18    case where he admitted that Household's 2001 10-K was

19    materially false and misleading?  Did you read that testimony?

03:19:06  20    A.  I read through his testimony, and I do recall that

21    interchange even though I did not carefully study his

22    testimony.

23    Q.  Well, let me give you that page so you can refresh your

24    recollection.

03:19:19  25      (Document tendered.)

1    BY MR. BURKHOLZ:

2    Q.  Let me read from the transcript of April 22nd, 2009,

3    Page 3441.

4        "Q.  Okay.  You know that this was materially false

03:19:40  5    and misleading, don't you?"

6        And this is a discussion of the 10-K, 2001 10-K.

7        "A.  I understand that it was incorrect at the time.

8        "Q.  My question is, sir, you understand that this is

9    materially false and misleading, correct?

03:19:54  10       "A.  You could say that.

11       "Q.  No, sir.  I am asking you a question.

12       "Do you understand that this is materially false and

13   misleading?

14       "A.  I will accept that characterization.

03:20:04  15       "Q.  Is that a 'yes,' sir?

16       "A.  Yes."

17       Did I read that correctly?

18   A.  Yes, you did read the transcript correctly.

19   Q.  And it's still your opinion that there is no inflation in

03:20:15  20   this case, correct?

21   A.  I am not aware of any economic evidence --

22   Q.  It's a simple question.

23       There is no inflation in this case, right?  That's

24   your opinion, right?

03:20:24  25       Even after Mr. Aldinger admitted that the 2001 10-K

**PSA281**

        1    was false, it's still your opinion that there is zero

        2    inflation in this case, right, sir?

        3        You can answer that "yes" or "no," can't you?

        4    A.  It is my opinion that there is no economic evidence in

03:20:40 5    this case that shows that there was any inflation in

        6    Household's stock price at any time during the relevant

        7    period.

        8    Q.  And isn't it the jury's determination -- isn't it their

        9    role to decide whether or not any of Household's statements

03:20:55 10   were false and misleading in this case?

        11       You agree with me on that, don't you?

        12   A.  Yes, I do.

        13   Q.  Thank you.

        14       Let's talk about the index that you created, the six

03:21:07 15   companies that you put together.

        16       Household was a Fortune 500 company during the time

        17   period that we were discussing here, right, 1999 to 2002?

        18   A.  Yes.

        19       And I did not put those companies together.  I

03:21:19 20   selected those companies, yes.

        21   Q.  Right.  Okay.  You selected them.

        22       So Household is a Fortune 500 company.

        23       Let's look at one of the companies that you selected.

        24   It's called CashAmerica.  This is how you described it in your

03:21:34 25   expert report.

1    analyst who's afraid to talk because his company has an

2    investment banking relationship with Household and they want

3    to get fees from Household for doing the banking.

4         Here we have the same situation with Mr. Posner.

03:50:04  5         And you considered that in forming your opinion,

6    didn't you, sir?

7    A.  And you didn't want me to explain.

8    Q.  No.  You considered that in forming your opinion, didn't

9    you?

03:50:11 10   A.  Yes, I did.

11   Q.  Okay.  Thank you.

12        Now, you reject Professor Fischel's leakage model in

13   this case, don't you?

14   A.  Yes, I do.

03:50:40 15   Q.  Okay.  And Professor Fischel's opinion is that his leakage

16   model is the most appropriate way to estimate damages in this

17   case, right?  That's your understanding of his opinion, right?

18   A.  I heard him say that he preferred his leakage model, yes.

19   Q.  Now, you, sir, in fact, in your expert report, Page 58,

03:51:00 20   referred to the fact that the Washington DFI report had leaked

21   out at four various times during the summer of 2002, right,

22   sir?

23   A.  Where are you referring to in my expert report?

24   Q.  Page 58.

03:51:39 25   A.  I see that, yes.

**PSA283**

Bajaj - cross

4268

1    Q.  So there was evidence of leakage in this case on this

2    Washington DFI report which basically said Household was

3    committing predatory lending practices in Washington and

4    around the country.  And you saw evidence of that leakage,

03:51:56  5    didn't you, sir?  You put it in your report?

6    A.  And as I testified this morning, there is a proper way to

7    analyze that leakage.

8    Q.  Okay.  So your quarrel with Professor Fischel is over the

9    way that he quantified the leakage, right?  That's really your

03:52:09  10    qualm, right?

11    A.  I have no quarrel with Professor Fischel.  I like the man.

12    I am simply saying I have a difference of opinion with him on

13    how to analyze this evidence of leakage.

14    Q.  Okay.  Now let's talk about the October 10th and 11th

03:52:25  15    dates, okay?

16         Household gained about 3 billion in value on that day

17    because the stock went from $22 to about $28, right, sir?

18    About $6 a share, right?

19    A.  I think it's about $7 a share, and it's about 3.3 billion,

03:52:43  20    but give or take, you are about right.

21    Q.  Now, Household stock had lost somewhere between 16 and

22    $18 billion from November 15th, 2001, to October 10th, 2002,

23    right, sir?  Somewhere in that area?

24    A.  I didn't do the calculation, but I can take your

03:53:02  25    representation for it.

Fischel - direct
4273

```
          1    Q.  And you used an event study in this case for both your

          2    specific disclosures and your leakage model, didn't you?

          3    A.  Correct.

          4        I believe Professor Bajaj stated that my leakage

03:59:00  5    model was not based on an event study.  That's simply

          6    incorrect.

          7    Q.  And did you follow, in your leakage model, the approach

          8    that's been accepted in your field that's laid out in the

          9    Cornell and Morgan article?

03:59:12 10    A.  Yes, exactly.

         11    Q.  Now, your specific disclosure model, did you consider and

         12    reject any nonfraud reasons that Household stock price dropped

         13    on those dates?

         14    A.  Yes.

03:59:23 15    Q.  And did you find that new information was disclosed on

         16    each of those dates?

         17    A.  Yes.  What I noticed, listening to Dr. Bajaj's testimony

         18    where he continually stated that information that I said was

         19    part of a corrective disclosure was disclosed previously, he

03:59:46 20    was very selective in what he pointed to in terms of what was

         21    disclosed previously, and he left out critical information in

         22    my disclosure dates in connection with his statement that each

         23    and every -- all 14 happen to be stale or whatever the reason

         24    was that was given for the red lines, like the red Xs that we

04:00:14 25    had last time.
```

Fischel - direct

4281

1    the companies that Household itself compared itself to but

2    Dr. Bajaj's set of companies for purposes of this case, there

3    was still dramatic underperformance of Household during the

4    period from the first corrective disclosure until the end of

04:12:42 5    the period, even taking into account the stock price increase

6    on the last two days of the period.

7            So there is no difference in terms of

8    underperformance in the relevant period between any of the set

9    of companies, including Dr. Bajaj's set of six, what he calls

04:13:01 10    consumer finance companies.

11    Q.  What is your view of this issue or reason of headline risk

12    causing Household stock decline?

13    A.  Well, I have a couple of views.

14            My first view is, I don't think there is a meaningful

04:13:15 15    difference between headline risk and the fraud that creates

16    the headlines.  It's not a separate factor.  The headlines are

17    appearing for a reason.  They are not appearing out of nowhere

18    because somebody feels like creating headlines.

19            The headlines are existing or appearing because there

04:13:36 20    is a perception in the marketplace that there is sustained

21    abusive practices which are victimizing consumers and

22    ultimately to the detriment of investors as well.  So that's

23    one opinion.

24            I also have a second opinion that if you look at the

04:14:00 25    pattern of, even as the defendants calculated, the appearances

**PSA286**

Fischel - direct

4282

1    of disclosures of headline risk, it has nothing to do with

2    Household stock prices during the relevant period.  One of

3    their exhibits, which they didn't show, which I think maybe we

4    can show, which demonstrates that point very powerfully.

04:14:24  5         And third, another thing that Dr. Bajaj failed to

6    mention -- my friend, Dr. Bajaj -- is that a number of

7    analysts thought Household was benefiting by headline risk,

8    not harmed but benefited.  And we can go through that.  I have

9    some evidence of that.  And the reason is that Household was a

04:14:47 10   strong, well-capitalized company.

11         A number of analysts thought that if there was going

12   to be a regulatory crackdown because of abuses, the regulatory

13   crackdown would affect the smaller fringe firms so that firms

14   like Household would be in a better position competitively,

04:15:11 15   because a lot of their rivals -- the smaller, less

16   well-financed firms -- would be driven out of business.

17         So I guess I have those three different opinions.

18   Q.  Okay.  Let me show you what we have marked as

19   Plaintiffs' 140.

04:15:24 20    (Document tendered.)

21   BY MR. BURKHOLZ:

22   Q.  This is an April 10th, 2002, Legg Mason report.

23         MR. BURKHOLZ:  I would move this into evidence, your

24   Honor, subject to the limiting instruction.

04:15:42 25         THE COURT:  Number again, please?

Fischel - direct

4283

```
            1            MR. BURKHOLZ:  It is 140.

            2            THE COURT:  It's admitted subject to the limiting

            3    instruction.

            4    (Said exhibit was received in evidence.)

04:15:55    5    BY MR. BURKHOLZ:

            6    Q.  If we can, turn to the third page at the bottom.  If we

            7    can highlight the paragraph, "Lastly."

            8            I think it's Tab 5 in your binder.

            9    A.  This is an important --

04:16:21   10    Q.  Let's get the context of this report.

           11            So this is a Legg Mason report coming out April 10th,

           12    2002, the day after the FRC conference in which Mr. Schoenholz

           13    and Mr. Aldinger spoke, right?

           14    A.  Correct.

04:16:37   15    Q.  And Legg Mason -- this is the same analyst who was

           16    commenting -- had all the questions about the securitization

           17    and 10-K documents December 11th, right?

           18    A.  Correct.

           19    Q.  And what's the significance of the paragraph that we have

04:16:50   20    highlighted, to your opinion?

           21    A.  Well, this really goes to the issue of how market

           22    participants became increasingly skeptical of Household's

           23    denials and its defenses of its accounting and lending

           24    practices.

04:17:14   25            In fact, again to put this in context, I believe the
```

**PSA288**

             1    last thing that Dr. Bajaj said was that the disclosure on

             2    April 9th that Household made, when the stock price went up,

             3    that proved, in his opinion, that there was some fundamental

             4    inconsistency between that stock price increase and

04:17:40     5    plaintiffs' theory of the case.

             6         In fact, in my opinion, it's precisely the reverse

             7    because what happened was, market participants looked at what

             8    Household said on April 9th; they thought it was false and

             9    misleading -- as I will get to this quote in a minute -- and,

04:18:01    10    in fact, Household ultimately had to correct, had to restate,

            11    its disclosures about the reaging issue because they were

            12    found to be false and misleading.

            13         So with respect to this particular paragraph, which

            14    really supports the point that I just made, the analyst

04:18:22    15    states, "Lastly, and perhaps most importantly, we also believe

            16    that these policies" -- these are the reaging policies that

            17    were just described the day before by Household -- "overstate

            18    reported earnings per share and support a relatively lower

            19    price-earnings multiple for Household.  While Household

04:18:50    20    reported solid earnings per share and asset quality in 2001,

            21    we now know that the asset quality was artificially improved

            22    by the significant increase in the reaged portfolio.

            23         "To put it another way, Household appeared to

            24    significantly outperform its fellow subprime lenders which

04:19:09    25    struggled with rising losses and delinquencies last year.  It

Fischel - direct

4285

1    now appears this was more accounting-related rather than

2    driven by fundamentals, and we think Household should trade at

3    a discount as a result."

4         So when Dr. Bajaj said the market learned the truth

04:19:25  5    for the first time about Household's reaging policies the day

6    before, again, if you want to use the word the "truth," the

7    truth is precisely the reverse.  What market participants

8    concluded, and Household ultimately had to admit, that the

9    very statement which Dr. Bajaj said gave investors the truth

04:19:48 10    was itself false and misleading and ultimately had to be

11    corrected when Household had to correct its 2001 10-K.

12         MR. KAVALER:  Your Honor, sidebar?

13         THE COURT:  Sure.

14    (The following proceedings were had at sidebar:)

04:20:25 15    MR. KAVALER:  Your Honor, this is sounding to me

16    suspiciously like another instance where an expert is going to

17    try and sneak up on a document you specifically prohibited,

18    and that's the SEC consent decree.

19         MR. BURKHOLZ:  That's not going to happen.  I can

04:20:39 20    guarantee it.

21         MR. KAVALER:  He said Household was required to say

22    it was untrue.  It sounded to me like that's where he is

23    going.

24         I want to be absolutely certain that this time we

04:20:48 25    have a clear record.

            1          I am objecting in advance.  I am asking that counsel

            2    be instructed to make sure the witness --

            3          THE COURT:  Wait a minute.  Let me find out what's

            4    going on first.

04:20:55    5          MR. BURKHOLZ:  All he talked about was the 2001 10-K

            6    that was restated.  That's all he said.

            7          THE COURT:  So when he said they had to restate it,

            8    he was talking about the 10-K?

            9          MR. BURKHOLZ:  Yes.  That's already been testified.

04:21:05   10    He is not going to talk about any SEC consent.

           11          THE COURT:  That's already in evidence?

           12          MR. KAVALER:  I have no problem with that.  I thought

           13    he was heading to the C and D.  I want to be absolutely

           14    crystal clear.  If that happens, I have a major problem,

04:21:15   15    because that's a document you ruled out.

           16          We made specific tactical decisions in our case

           17    because of your rulings.  We did not call witnesses we might

           18    have called.  There is no way they can open their own door

           19    here, your Honor.

04:21:27   20          And if that is attempted or effected, it's going to

           21    have serious consequences.

           22          MR. BURKHOLZ:  It's not going to happen, your Honor.

           23          THE COURT:  Okay.

           24     (End of sidebar proceedings.)

           25    BY MR. BURKHOLZ:

Fischel - direct

4287

```
 1   Q.  Professor Fischel, did you find analysts in these articles

 2   attributing Household stock price decline in late 2001 to

 3   October 2002 to predatory lending, reaging, and restatement?

 4   A.  Yes.  Again, I heard Dr. Bajaj testify over and over and

 5   over again that there was no relationship between Household

 6   stock price movements and inflation or the plaintiffs'

 7   allegations.

 8        Again, to me, it's not a matter of a battle of

 9   statistics.  It's a matter of which opinion more closely

10   approximates reality.

11   Q.  Let me show you Plaintiffs' Exhibit 1450.

12     (Document tendered.)

13        MR. BURKHOLZ:  Plaintiffs' Exhibit 1450 is an analyst

14   report issued by Deutsche Bank on September 12th, 2002,

15   offered into evidence subject to the limiting instruction,

16   your Honor.

17        THE COURT:  It will be admitted.

18     (Said exhibit was received in evidence.)

19   BY MR. BURKHOLZ:

20   Q.  If we can, turn to the second page of the document, the

21   top part of the document.

22        What is the significance of this analyst report to

23   your opinion regarding news coming out about predatory

24   lending, reaging, restatement issues in 2002?

25   A.  Well, again, Dr. Bajaj testified that Household's stock
```

The times shown in the left margin: 04:22:26 (line 5), 04:22:46 (line 10), 04:23:09 (line 15), 04:23:17 (line 20), 04:23:39 (line 25).

Fischel - direct

4288

1    price had nothing to do with the allegations of predatory

2    lending, the regulatory investigations and complaints, the

3    lawsuits, consumer complaints.  It was all a function of what

4    happened with finance companies.

04:23:58 5              And I think I have shown, or certainly tried to show,

6    that if you look at the economic evidence with respect to

7    finance companies, there was dramatic underperformance of

8    Household.

9              But, again, it's not just an opinion of an expert.

04:24:16 10   It's supported by what observers were saying at the time.

11             Again, this first paragraph demonstrates that.  The

12   particular analyst talks about how "Household's stock has been

13   under pressure due to concern about accusations of unfair and

14   predatory lending practices, primarily consumer groups (ACORN

04:24:43 15  and AARP) and the State of Washington Department of Financial

16   Institutions."  And then talks about the possibility of

17   further developments along the same lines in the future.

18   Q.  I want to go back to your S&P financial group.

19             During the time period of your disclosure period,

04:25:04 20  November to October of '02 -- November of '01 to October of

21   '02, how did Household perform within that group?

22   A.  Much worse.

23   Q.  Did you look to see how they performed?

24   A.  Yes.  They were the fourth worst out of 70 firms.

04:25:20 25             By the way, that's also true if you take a look at

Fischel - direct

4289

1    the period that Dr. Bajaj selected -- again, not the correct

2    period, in my view, because it didn't start with

3    November 15th.  But even looking at his period, Household was

4    the fourth worst performing firm out of 70 firms --

04:25:39  5    approximately 70 firms in the S&P financials index, which was

6    the index that Household itself, as required by law, told

7    investors that it should be -- its performance should be

8    judged against.

9    Q.  Before we finish up today, I just want to go back to one

04:25:56 10    more topic, and that's the up-leg, as the defendants refer to

11    it, inflation coming into Household stock.

12        How does the false statements in this case cause

13    inflation to be in Household stock?

14    A.  The plaintiffs have alleged in this case that Household

04:26:21 15    failed to disclose that its growth strategy was based on an

16    unsustainable business model; that it was based on predatory

17    lending practices that would ultimately be the subject of

18    regulatory investigations, customer complaints, lawsuits,

19    proceedings by states' Attorney General, et cetera.  It also

04:26:44 20    alleged that Household's accounting was incorrect; that its

21    reaging policies masked delinquencies and defaults; and that

22    its accounting for its credit card revenues was incorrect as

23    demonstrated by the ultimate restatements.

24        When Dr. Bajaj gives his opinion over and over and

04:27:10 25    over again that there is no economic evidence that there is

**PSA294**

Fischel - direct

4290

1    any relationship between those allegations and inflation in

2    Household stock, what he is saying is that had Household

3    disclosed from the beginning of the relevant period everything

4    that the plaintiffs allege that Household should have

04:27:37  5    disclosed, its stock price would have been identical on every

6    day during the class period.

7         In other words, if Household had disclosed, our

8    growth model is based on predatory lending practices, which

9    can't be sustained; if it disclosed that our accounting is

04:27:56 10    overly aggressive and masked delinquencies; if it had

11    disclosed that our accounting is ultimately going to be the

12    subject of a restatement, that would have had no effect on

13    investors at any point in time during the relevant period,

14    even though we know when that information came out after

04:28:16 15    November 15th, when Household's denials became less and less

16    credible, the stock price fell dramatically.

17         So the premise of, really, both of my analyses -- the

18    specific disclosure model and the leakage model -- is that

19    stock price decreased, that dramatic underperformance from

04:28:37 20    November 15th forward.

21         If the information that came out after November 15th,

22    if that information had been properly disclosed at the

23    beginning of the relevant period, Household's stock price

24    would have fallen the same way that Household's stock price in

04:28:58 25    fact fell when the correct, or truthful, information came out

**PSA295**

Fischel - direct

4291

1    when Household's denials became less and less credible after

2    November 15th.

3          So the way inflation entered Household's stock prices

4    is very simple.

04:29:15  5          Dr. Bajaj had all kinds of complicated exhibits, but

6    the point is very, very simple.

7          If instead of the disclosures that Household in fact

8    made before they had to change their disclosures, admit that

9    some of their disclosures were false and misleading, if they

04:29:37 10   had said those things at the beginning, would the stock price

11   have been the same, or would it have fallen?

12          And what I tried to do was attempt to quantify, using

13   two different methods, how much Household's stock price would

14   have fallen had there been correct disclosures at all points

04:29:57 15   in time.

16          In other words, if the information that came out

17   gradually beginning on November 15th, 2001, if instead of

18   coming out at that time and with Household continually denying

19   the allegations, if Household had made truthful and accurate

04:30:16 20   disclosure at the beginning, its stock price wouldn't have

21   been in the 40s.  It would have been lower because investors

22   would have realized the growth strategy is not sustainable,

23   the accounting is not reliable, there is questions about the

24   integrity of management and financial reporting.  All those

04:30:34 25   things would have caused the stock price to be lower.  That's

**PSA296**

1    what constitutes the inflation.  That's what I tried to

2    quantify under my two different methods.

3              MR. BURKHOLZ:  Is this a good time to break, your

4    Honor?

04:30:46  5              I can keep going.

6              THE COURT:  No.  It is.  Very well.

7              Ladies and gentlemen, we will break for today.  We

8    will -- as you can no doubt perceive, we are nearing the close

9    of the evidence in this case.  So your patience and your

04:31:13 10   attention is, as always, appreciated.  But know that we are

11   almost at the end.

12             We will resume tomorrow at the usual time.

13             Please don't discuss the case with anyone or allow

14   anyone to discuss it with you.

04:31:26 15             Have a good evening.  We will see you tomorrow.

16   (Jury out at 4:31 p.m.)

17             THE COURT:  You may step down.

18             THE WITNESS:  Thank you, your Honor.

19             THE COURT:  Tell me what our schedule is.

04:32:10 20             MR. BURKHOLZ:  We have the 50(a) motion with respect

21   to --

22             THE COURT:  Tell me what the schedule is with the

23   evidence.  That's what I need to know.

24             MR. BURKHOLZ:  Probably another 20 to 30 minutes.

04:32:22 25             THE COURT:  With this witness?

4304

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6    vs.                            ) No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC., )
     et al.,                         ) Chicago, Illinois
 8                                   ) April 29, 2009
               Defendants.          ) 9:12 a.m.
 9
                            VOLUME 21
10             TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
14                              BY:  MR. LAWRENCE A. ABEL
                                     MR. SPENCER A. BURKHOLZ
15                                   MR. MICHAEL J. DOWD
                                     MR. DANIEL S. DROSMAN
16                                   MS. MAUREEN E. MUELLER
                                655 West Broadway
17                              Suite 1900
                                San Diego, California  92101
18                              (619) 231-1058

19                              COUGHLIN STOIA GELLER RUDMAN &
                                ROBBINS LLP
20                              BY:  MR. DAVID CAMERON BAKER
                                     MR. LUKE O. BROOKS
21                                   MR. JASON C. DAVIS
                                     MS. AZRA Z. MEHDI
22                              100 Pine Street
                                Suite 2600
23                              San Francisco, California  94111
                                (415) 288-4545
24

25
```

**PSA298**

Fischel - direct

4308

1    A.  That is my understanding.

2    BY MR. BURKHOLZ:

3    Q.  And what is your opinion about the -- if the plaintiffs

4    prove that there is a false statement on August 16, 1999, as

09:19:30  5    to what the inflation is on that day?

6    A.  It would depend on which of my two models the -- was used.

7    Under my specific disclosure model, it's $7.97.  And under my

8    leakage model, it's whatever the number is on the table that I

9    testified about and was handed to the jury as an exhibit.

09:20:00  10    Q.  Okay.  And is it your opinion that the inflation stays in

11    the stock price until the truth comes out later?

12    A.  Yes.  Again, the definition of inflation is whether

13    there's a difference between the actual trading price of the

14    stock and what the price of the stock would have been had

09:20:23  15    there been full and accurate disclosure.  So by definition,

16    inflation doesn't come out of the stock until the truth is

17    revealed so that the actual trading price of the stock equals

18    the price that the stock would be if there had been full and

19    accurate disclosure.

09:20:43  20         Once the truth comes out, there's no difference

21    between the two.  Before the truth comes out, there's

22    inflation in the stock.

23    Q.  And does each subsequent statement made, assuming it

24    doesn't disclose the truth, keep the stock inflated?

09:20:57  25    A.  Yes.  If there is a -- if there's inflation in the stock

                1    on the first day and nothing happens that changes that

                2    inflation, that brings truth into the marketplace, then the

                3    inflation remains in the stock, which is the reason, if we're

                4    talking about my specific disclosure model, the amount of

09:21:23        5    inflation stays the same until November 15, 2001, because

                6    that's the first date, based on my analysis, that investors

                7    began to learn the truth about Household's lending practices.

                8    Q.  Can we bring up Plaintiffs' Demonstrative 136.

                9         This is the demonstrative that you prepared to show

09:21:51       10    the decline of Household compared to the S&P Financials Index

               11    that it compared itself to on its proxy?

               12    A.  Correct.

               13    Q.  Okay.  And it shows -- and during this time period, this

               14    November 15, 2001, to October 11, 2002, Household's stock

09:22:07       15    price went from about 60 to $28; is that the 53 percent drop?

               16    A.  Correct.

               17    Q.  Okay.  And its peers went down about half, a little more

               18    than half, 20 percent, 22 percent?

               19    A.  Well, actually, it looks like about half or a little bit

09:22:29       20    less than half.

               21    Q.  Okay.  And so -- just to understand this, Household went

               22    down about $32, from 60 to $28, and its peers went down about

               23    half of that, so there's about 16 -- 15, $16 that Household

               24    went down more than its peers during this disclosure period?

09:22:47       25    A.  Correct.  And I also want to emphasize that in both of my

1    specific disclosure model and my leakage model, I controlled

2    for the decline in the market and the industry in calculating

3    the amount of inflation.  I netted that out to make sure that

4    Household was not penalized for general market or industry

09:23:10  5    conditions.

6    Q.  So this extra 15 or $16 that Household went down during

7    this period, Professor Bajaj says it's due to something not

8    related to the fraud.  Your opinion is it's due to

9    something -- information coming out about the fraud?

09:23:25 10        MR. KAVALER:  Objection, your Honor, leading.

11    BY MR. BURKHOLZ:

12    Q.  What is your opinion as to what the extra drop refers to?

13    A.  Well, again, I have two different models.  In my specific

14    disclosure model, because I tried to be careful in calculating

09:23:42 15    the amount of the stock price decline that was attributable to

16    inflation coming out of the stock, I calculated that $7.97 of

17    that 15 or $16 was attributable to the truth coming out about

18    Household's false and misleading statements.

19        And with the leakage model, because it's not based on

09:24:07 20    false and mis- -- corrective information on specific days, but

21    it takes into account that there was leakage of negative

22    information about Household, about the consumer complaints,

23    about the lawsuits, about the Washington investigation and

24    report, about the complaints by the attorneys general,

09:24:30 25    consumer groups, there's a focus not just on the 14 days but

Fischel - direct

1   on all days after November 15, so the amount of inflation is

2   larger under that model.

3   Q.  And the inflation under your leakage model varies between

4   13 and $23 a day during the relevant period?

09:24:50  5   A.  Correct.

6   Q.  Okay.  Now, I want to show you three Household investor

7   relations reports.  They're for the year-end 2000, year-end

8   2001, and then for -- covering October of 2002, January to

9   October 2002.

09:25:08  10   A.  Okay.

11   Q.  And the 2000 one is marked as Exhibit 411, 2001 is marked

12   as Exhibit 820, and the 2002, October 2002, is 199.  You can

13   keep those in front of you.

14   (Tendered.)

09:25:26  15       MR. BURKHOLZ:  A copy for counsel.

16   BY MR. BURKHOLZ:

17   Q.  Now, if you can look at Exhibit 411, that's the 2000

18   investor relations report.

19       MR. BURKHOLZ:  Your Honor, can we move 411 into

09:25:45  20   evidence, please, subject to the limiting instruction?

21       THE COURT:  It will be admitted.

22       MR. BURKHOLZ:  If we can bring up the third page --

23   or the fourth page of the document.

24   BY MR. BURKHOLZ:

09:25:59  25   Q.  Do you see there's a comparison performance versus

Fischel - direct

1    Household peers in the S&P 500 and the S&P Financials?

2    A.  I do.

3    Q.  And if you could just highlight that.

4        Do you see where it shows that for Household for the

09:26:13 5   year 2000, it went up 47.7 percent.  The peer group that

6    Household used went up 18.9 percent.  And the peer group that

7    it used in its proxy, the S&P Financial, those 80 or 90

8    companies went up 23.8 percent?

9    A.  Yes.  This is the period when Household was promoting its

09:26:34 10  growth strategy and denying that it was engaging in any

11   wrongdoing.

12   Q.  Now, let's turn to the year-end 2001 investor relations

13   report, and that's Exhibit 820.

14       MR. BURKHOLZ:  Your Honor, could we move 820 into

09:26:54 15  evidence, subject to the limiting instruction?

16       THE COURT:  Admitted.

17   BY MR. BURKHOLZ:

18   Q.  If we can turn to the third page of the document, the

19   similar performance measures for the year-end 2001.  If we can

09:27:09 20  highlight that.

21       Do you see where it shows Household was up 5.3

22   percent for the year 2001; the peer group, the group of nine

23   that we discussed yesterday that it compared itself to, was

24   down 21.9 percent during 2001; and the S&P Financials were

09:27:29 25  down 10.5 percent?

Fischel - direct

1          Do you see that?

2     A.  I do.  Again, this is right until the end of the year,

3     November 15, when, as I've indicated in my opinion, the truth

4     began to come out about Household's practices.

09:27:41 5     Q.  Okay.  Now, let's turn to the investor relations report

6     that Household prepared for October 2002.  And look at how

7     they did for -- up until that time.  This is Exhibit 199.

8          MR. BURKHOLZ:  If we can move this into evidence,

9     your Honor, subject to the limiting instruction.

09:28:01 10          THE COURT:  Admitted.

11    BY MR. BURKHOLZ:

12    Q.  If we can turn to the third page of the document,

13    highlight the same information.

14          I'm sorry.  Third page, 740.  There we go.

09:28:16 15          And this shows for year to date January to October

16    2002, Household was down 59 percent; its peer group, 10.9

17    percent; and the S&P Financials, 11.2 percent.

18          Do you see that?

19    A.  Yes.

09:28:35 20    Q.  This -- just to be clear, this is the month-end October

21    2002, so it covers about three weeks after the relevant

22    period.  And did you look at that period, the three weeks

23    after the relevant period?

24    A.  I did.

09:28:49 25    Q.  And what happened to Household's stock in those three

1    weeks?

2    A.  It declined because market participants did not believe --

3         MR. KAVALER:  Your Honor, objection, beyond the

4    relevant period.

09:29:01  5         MR. BURKHOLZ:  That's fine.  I'll withdraw the

6    question.

7    BY MR. BURKHOLZ:

8    Q.  So this shows that Household -- Household's decline

9    compared to its peer group that it compared itself to and the

09:29:09 10   S&P Financial, right?

11   A.  Yes.  This is the period of my -- after November 15, 2001,

12   going into 2002 when I identified the market learning the

13   truth about Household's practices, both in my specific

14   disclosure model and in my leakage model.

09:29:31 15   Q.  Is the declines that Household compared itself to, its

16   peer group and the S&P Financials, consistent with what you

17   observed in your analysis?

18   A.  Yes.  It's exactly what I testified to, that during the

19   period Household was touting its growth model and denying any

09:29:45 20   wrongdoing, it vastly outperformed the peer groups that

21   Household itself identified that it should be compared

22   against.

23        Once Household's denials began to be more suspect,

24   less believed by the market, as the complaints, the

09:30:03 25   investigations, the lawsuits, et cetera, analysts' criticisms

Fischel - direct

4315

1   began to pile up after November 15, 2001, Household vastly

2   underperformed the peers that it itself said it should be

3   judged against.

4   Q.  Okay.  I want to go back to yesterday's discussion about

09:30:22 5   this dispute over stale information and new information.

6           And it was in the context of your 14 specific

7   disclosure dates, I believe, that Professor Bajaj was

8   criticizing them as being stale.

9           Do you remember that?

09:30:35 10   A.  I do.

11   Q.  Okay.  Now, is there any relevance to your leakage model

12   of the staleness or newness of these dates at all?

13   A.  Yes.  Well, first of all, I don't agree that any of them

14   were stale.  But beyond that, the leakage model includes every

09:30:55 15   single date after November 15, 2001.  So when Dr. Bajaj said I

16   should have focused on the day before or a different day than

17   the day that I actually focused on, the leakage model includes

18   all of those days.

19           And, therefore, whether or not Dr. Bajaj is correct

09:31:20 20   that the information is stale, which I don't believe, but even

21   if I were to assume that he were to correct -- he were

22   correct, it would not -- it would still not follow that I

23   ignored those days because every one of those days is included

24   in the leakage model.

09:31:36 25   Q.  Now, in your leakage model, did you take out the decline

Fischel - direct

1   for Household that was due to the market and its peers?

2   A.  I did.

3   Q.  Okay.  I meant the market and the industry.

4   A.  Correct, I did.

09:31:46  5   Q.  Okay.  Now, did you find that there was new information

6   that the market learned on each of those 14 dates?

7   A.  Yes.

8   Q.  Okay.

9   A.  Yes, I did.

09:31:56  10   Q.  And you heard some testimony about that December 3, 2001,

11   Barron's article?

12   A.  Correct.

13   Q.  And I pointed out to Professor Bajaj that there was some

14   information regarding another analyst separate from the

09:32:13  15   analyst Ryan who had written the reports before?

16   A.  Yes, you did.  I heard that.

17   Q.  Is that new information that the market would have learned

18   on that day?

19   A.  Yes, absolutely.  And particularly in the context of that

09:32:26  20   particular report by -- or the particular article by Barron's.

21   This was a quote from an investment banking firm that was

22   affiliated with Household that was getting fees from Household

23   and, therefore, you would think ordinarily that such a firm

24   that was being, in effect, paid by Household would be

09:32:56  25   favorably inclined towards Household.

1    simply because of the findings as to defendant Household is

2    dependent upon the findings as to the individual defendants?

3           MR. BROOKS:  That's not the case, your Honor --

4    sorry.

01:40:45  5           THE COURT:  Excuse me?

6           MR. BROOKS:  It's not the case, Judge.  I think in

7    the jury instruction discussions we've discussed Household can

8    be liable even if the individual defendants aren't.

9           THE COURT:  I don't think it makes any great

01:40:57 10   difference, rather than -- I don't think it makes any great

11   difference.

12           Then after the last defendant, the instruction

13   form -- the verdict form -- reads, "If you answered 'No' for

14   all of the statements in Questions 1, 4, 7, 10 and 13, you

01:41:29 15  have finished with the verdict form."

16           I think you just need to add in there that they

17   should turn to the last page, sign and date the form and let

18   the Court know that they have finished.

19           MR. DROSMAN:  Your Honor, I should probably add a

01:41:46 20  date entry on the last form.  I think there's just signature.

21           THE COURT:  On the verdict form?  Yeah.

22           MR. DROSMAN:  I'll add a date.

23           THE COURT:  Okay.

24           "If you answered 'Yes' for any statement, please

01:42:13 25  proceed to Question No. 16."

1         Question No. 16 starts out, "Write the amount of loss

2    per share, if any, that any defendant or former defendant's

3    conduct -- " I guess we can leave out "or former

4    defendants" -- " -- any defendant's conduct caused plaintiffs

01:42:52  5    to suffer on each of the dates set forth in Table B.

6         "If no loss was caused on any date, write 'None'."

7         I suppose we could put in there, "Write 'None' or

8    'Zero.'"

9         We'll get this back with a bunch of zeros, then

01:43:21 10    there's a problem.  So, write "None" or "Zero."

11         Is there any objection to that portion of the verdict

12    form?

13         MS. BEER:  Yes, your Honor.

14         THE COURT:  Proceed.

01:43:29 15    MS. BEER:  There are two points here.  One is that we

16    believe before the jury is directed to Table B, they should

17    record their decision as to which of the two models they are

18    using.

19         THE COURT:  How about that?

01:43:46 20    MR. DROSMAN:  Well, your Honor, I think the jury is

21    free to put something that's -- any damage amount that's --

22    reasonable in the Table B.

23         THE COURT:  Yeah, but they only have two ways to

24    figure out what's a reasonable damage amount:  Either of the

01:43:59 25    two theories Professor Fischel gave them.  Anything else is

1    outside the evidence presented in the case.  It would be

2    creating their own theory of liability.

3         MR. DROSMAN:  Well, if that's the case, then what

4    we're doing, again, is we're posing Question No. 17 and asking

01:44:14 5    them the same question twice.  Because we're going to know

6    immediately what model they chose because it's either going to

7    conform to the artificial inflation numbers in the leakage

8    model or in the specific disclosures model.

9         THE COURT:  You know what my fear is with the way

01:44:27 10   this is -- and it's something I was going to bring up when we

11   got to the next two questions, but I think it comes in

12   logically with the issue counsel has raised -- that the way

13   this is stated here, you'll have two tables come back all

14   filled out.  You'll have amounts from both the specific

01:44:54 15   disclosure model and the leakage model.

16        MR. BROOKS:  The only reason these questions are

17   parsed out like this, Judge, is because Question 17 was going

18   to go to the specific disclosures.  I think that we can modify

19   the questions and --

01:45:11 20        THE COURT:  I think it would be best starting with

21   what counsel has suggested, to ask them to make a specific

22   finding as to which model they find most accurately reflects

23   the damages, if any; and, then, specifically instruct them

24   that they're to use one model and one model only.

01:45:32 25        MR. BROOKS:  And we would suggest, Judge, that we

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    LAWRENCE E. JAFFE PENSION PLAN, )
      on behalf of itself and all    )
 4    others similarly situated,      )
                                      )
 5               Plaintiff,           )
                                      )
 6      vs.                           ) No. 02 C 5893
                                      )
 7    HOUSEHOLD INTERNATIONAL, INC.,  )
      et al.,                         ) Chicago, Illinois
 8                                    ) April 30, 2009
                 Defendants.          ) 8:41 a.m.
 9
                             VOLUME 22
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
           BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12    APPEARANCES:

13    For the Plaintiff:         COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
14                               BY:  MR. LAWRENCE A. ABEL
                                      MR. SPENCER A. BURKHOLZ
15                                    MR. MICHAEL J. DOWD
                                      MR. DANIEL S. DROSMAN
16                                    MS. MAUREEN E. MUELLER
                                 655 West Broadway
17                               Suite 1900
                                 San Diego, California  92101
18                               (619) 231-1058

19                               COUGHLIN STOIA GELLER RUDMAN &
                                 ROBBINS LLP
20                               BY:  MR. DAVID CAMERON BAKER
                                      MR. LUKE O. BROOKS
21                                    MR. JASON C. DAVIS
                                      MS. AZRA Z. MEHDI
22                               100 Pine Street
                                 Suite 2600
23                               San Francisco, California  94111
                                 (415) 288-4545
24

25
```

1   you've got a one-week period.

2          What Professor Fischel is telling you is other than

3   that one week, he has ruled out any possible claim by this

4   bunch of plaintiffs because of the lack of loss causation for

02:40:02 5   the entire case.  All those 40 statements that are in your

6   verdict form, he's ruled them all out except for this one.

7          So let's look at this one.  That's the day that

8   plaintiffs claim that Bill made a false statement at the

9   Goldman Sachs conference.  Now, if that's what they want to

02:40:22 10  say, that's what they've got to prove.

11         Who came here and testified about the Goldman Sachs

12  conference?  It wasn't Mr. Goldman.  It wasn't Mr. Sachs.  It

13  wasn't any plaintiff.  It wasn't anybody from Wall Street.  It

14  wasn't any reporter, any financial analyst.  One person

02:40:44 15  testified about that conference, one person who was there:

16  Bill Aldinger.  That's the evidence.  There isn't any other.

17         Here's what he told you.  Saturday night, he's at

18  dinner, this phone rings, his cell phone, he answers it.  It's

19  Craig Streem.  You met Craig.  He's the director of corporate

02:41:05 20  communications.  He tells Bill a story is coming out in

21  Barron's unflattering to the company.

22         Bill says, okay, get all my senior guys together in

23  the office Sunday.  So they get together Sunday.  They know

24  that Bill has long since been scheduled to speak at this

02:41:19 25  Goldman Sachs conference on Tuesday, along with other

Kavaler - closing

1    corporate CEOs.  It's one of the things Bill said he does,

2    other CEOs do.

3        So they decide at the conference Bill is going to

4    respond to the Barron's article.  They spend Sunday preparing

02:41:34   5    some extra slides for Bill's PowerPoint that he's already

6    prepared.

7        What do plaintiffs say that Bill said at the

8    conference that was false?  Well, what Bill found offensive to

9    Household about the Barron's article he told you is it was

02:41:51  10    repeating stale information that Bill Ryan -- he's the analyst

11    from Ventana Capital who Professor Bajaj explained to you

12    yesterday is a bear analyst.  He wants the price of stocks to

13    go down.  He's a short seller.  A short seller boutique, I

14    think he said.  Whatever.

02:42:09  15        He has a longstanding dislike for Household Bill told

16    you.  He's always writing bad things about Household.  It's

17    part of Bill's life.  He deals with it.  He'd written some bad

18    stuff about Household previously, and Barron's is now

19    repeating Ryan's negative views of Household.

02:42:27  20        Barron's makes two points basically, as Bill

21    understood it.  One is that Household has adopted a new method

22    of accounting, and the other is that Household is concealing

23    that method of accounting.

24        Sound familiar?  That's what these guys say.  Bad

02:42:47  25    accounting, concealed accounting.  Bill heard that a lot back

Kavaler - closing

1    causation.  So he might get one or more of these nine boxes up

2    here.  It doesn't matter.  These are the elements.  He's got

3    to prove all of them.  I said this to you a number of times

4    today.  And the best he can do -- I don't think he can do

03:25:38  5    that.  But the best he can get is threes, a three, a three and

6    a three.  No good.

7         The way you're going to be asked to reflect that and

8    judge this verdict form, the same one Mr. Dowd showed you, is

9    this:  Loss causation is an element of a 10b-5 claim.  It's

03:25:58 10    part of the claim.  It's not damages.  It's part of the claim.

11    No loss causation, no claim.

12         Now, the activity that's being claimed didn't cause

13    it.  So what you do is you go up here to question number one,

14    first of 40 pages because there are 40 statements, you go in

03:26:17 15    the first column.  Statement number one.  Go to the box next

16    to Household and check no.  They haven't proven loss

17    causation, therefore, they haven't proven an element of the

18    claim.  Then you go to the box for Gilmer and check no.  Then

19    you go to the box for Schoenholz, you check no.  And then you

03:26:35 20    go to the box for Aldinger, you check no.  You've now

21    finished -- if you agree with me -- with this page.  Turn to

22    the next page, do it again.  39 more times.

23         You don't have to go to question number two or

24    question number three if you're checking no.  If you're not

03:26:50 25    checking no, then you have to work your way through the boxes.

PSA314

1          My point is:  Since he's got to get all four, loss

2     causation turns out to be the simplest one, doesn't it?  After

3     all that talk, it turns out to be pretty easy because Fischel

4     already did it for you with the red Xs.  Check no.  All right.

03:27:14  5     That's the box chart and the verdict form.

6          One final note on Professor Fischel's charts.  You

7     know, ladies and gentlemen, and your common sense tells you,

8     all these lawyers haven't been sitting around this room all

9     these weeks taking up your valuable time for $7.97.  I suspect

03:27:33 10     we all know there's some larger number involved.  Maybe none

11     of us are quite sure what it is.  But you know in this case

12     every number winds up being a gigantic number.

13          For example, what Bill was telling you, how he came

14     up with the 3 and a half billion dollar increase in the stock

03:27:50 15     price, which compared to the $484 million for the attorney

16     generals' settlement, he said there were 500 million shares

17     outstanding.  The stock went up about seven bucks.  He

18     multiplied 500 million by $7 and he came up with 3 and a half

19     billion dollars.  And that puts the settlement in perspective

03:28:08 20     for you.

21          Every number in this case is very large because the

22     company is very large.  I don't want you to think -- first of

23     all, I think you'll never think this because I don't believe

24     you'll ever get to the point of picking a number off this

03:28:19 25     chart.  And, secondly, if you are picking a number, you can't

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6     vs.                           )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  May 1, 2009
                Defendants.          )  1:20 p.m.
 9
                              VOLUME 23
10     TRANSCRIPT OF PROCEEDINGS - JURY INSTRUCTIONS CONFERENCE
                  BEFORE THE HONORABLE RONALD A. GUZMAN
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

```
        1   then becomes meaningless.

        2            THE COURT:  Well, I think what you're attacking --

        3            MS. BEER:  It's a fundamental flaw with the form.

        4   It's a fundamental failure of proof on the plaintiffs' part.

01:36:08 5            THE COURT:  That's what you're arguing.  You're

        6   arguing Dr. Fischel's theory is insufficient to support the

        7   plaintiffs' claim.  I understand that.  You've argued that.

        8   To the extent that we disagree with that and we've ruled

        9   against that, any form we prepare is going to reflect that

01:36:20 10  ruling.  And that's what you're pointing out here.  I

       11   understand that.

       12            MS. BEER:  I'm trying to be very, very specific in

       13   this objection to this particular question asking the jury

       14   that if no loss was caused on any date, write none.  Once they

01:36:40 15  have reached that conclusion, that on any given date the

       16   inflation was none, there's really -- they have no guidance

       17   for how to determine the figure to use on any day following

       18   that that doesn't just rely on speculation.

       19            THE COURT:  Okay.  Well, that statement has been

01:36:57 20  there since this form was first proposed.  And to the extent

       21   that you've made your objection, it stands on the record.

       22            MR. KAVALER:  Your Honor, just because I'm aware of

       23   your devotion to accuracy, I just want to point out you've

       24   fallen to Mr. Dowd's erroneous method of speech.  It's

01:37:17 25  Professor Fischel and Dr. Bajaj.
```

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5             Plaintiff,            )
                                     )
 6     vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  May 4, 2009
               Defendants.          )  9:00 a.m.
 9
                             VOLUME 24
10               TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:        COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
14                             BY:  MR. LAWRENCE A. ABEL
                                    MR. SPENCER A. BURKHOLZ
15                                  MR. MICHAEL J. DOWD
                                    MR. DANIEL S. DROSMAN
16                                  MS. MAUREEN E. MUELLER
                               655 West Broadway
17                             Suite 1900
                               San Diego, California  92101
18                             (619) 231-1058

19                             COUGHLIN STOIA GELLER RUDMAN &
                               ROBBINS LLP
20                             BY:  MR. DAVID CAMERON BAKER
                                    MR. LUKE O. BROOKS
21                                  MR. JASON C. DAVIS
                                    MS. AZRA Z. MEHDI
22                             100 Pine Street
                               Suite 2600
23                             San Francisco, California  94111
                               (415) 288-4545
24

25
```

**PSA318**

1          To prevail on their 10b-5 claim against any

2     defendant, plaintiffs must prove each of the following

3     elements by a preponderance of the evidence as to that

4     defendant:

09:35:38  5          One, the defendant made, approved or furnished

6     information to be included in a false statement of fact or

7     omitted a fact that was necessary, in light of the

8     circumstances, to prevent a statement that was made from being

9     false or misleading during the relevant time period between

09:36:01 10   July 30, 1999, and October 11, 2002;

11          Two, the false statement or omission was material;

12          Three, the defendant acted with a particular state of

13     mind; and

14          Four, the defendant's statement or omission was a

09:36:24 15   substantial factor in causing plaintiffs' economic loss.

16          If you find that the plaintiffs have proved each of

17     the above elements as to any defendant, your verdict should be

18     for the plaintiffs and against that defendant.  If you find

19     that the plaintiffs have not proved each of the above elements

09:36:47 20   as to any defendant, your verdict should be for that defendant

21     and against the plaintiffs.

22          To meet the first element of their 10b-5 claim

23     against any defendant, plaintiffs must prove that during the

24     relevant time period, the defendant made a false or misleading

09:37:07 25   statement of fact or omitted a fact that was necessary to

1    prevent a statement that was being made from being misleading.

2         Table A to the verdict form that you will be given

3    sets forth the statements that plaintiffs claim are false and

4    misleading.

09:37:24  5         In determining whether a statement of fact is false

6    or misleading, you must consider the statement in light of the

7    circumstances that existed at the time it was made.

8         An omission violates 10b-5 only if the defendant has

9    a duty to disclose the omitted fact.  The defendants do not

09:37:45 10    have a duty to disclose every fact they possess about

11    Household or any fact that is in the public domain.  But each

12    defendant has a duty to disclose a fact if a prior or

13    contemporaneous statement he or it made about the same subject

14    would be misleading if the fact is not disclosed.  If a

09:38:09 15    defendant does not have a duty to disclose a fact but chooses

16    to make a statement about it, the statement must be truthful

17    and not misleading.

18         Defendant Household is required to file with the SEC

19    an annual report, called a 10-K, and quarterly reports, called

09:38:33 20    10-Qs, for the first three quarters of each year.  These

21    reports include financial statements and other disclosures.

22    Financial statements present a company's financial position at

23    one point in time, or its operating results and cash flows for

24    a specified period.  Household has no duty to update its 10-Q

09:38:56 25    reports on any cycle other than quarterly.

1      Household is required to prepare its financial

2  statements regarding the delinquency status of loans and the

3  accounting for its credit card agreements in accordance with

4  Generally Accepted Accounting Principles or G-A-A-P, GAAP.

09:39:22 5  GAAP are the accepted rules and procedures used by accountants

6  in preparing financial statements.  If you find that any of

7  Household's financial statements regarding the delinquency

8  status of loans and the accounting for its credit card

9  agreements was not prepared in accordance with GAAP, you may

09:39:43 10  presume that that portion of the financial statement is false

11  or misleading.

12      To meet the second element of their 10b-5 claim

13  against any defendant, plaintiffs must prove that the false or

14  misleading statement of fact that the defendant made, or

09:40:04 15  failed to make, was material.

16      A statement of fact or omission is material if there

17  is a substantial likelihood that a reasonable investor would

18  have considered it important in deciding whether to buy or

19  sell Household stock.  An important statement or omission is

09:40:26 20  one that a reasonable investor would view as significantly

21  altering the total mix of information to be considered in

22  deciding whether to buy or sell Household stock.

23      A reasonable investor is presumed to have ordinary

24  intelligence and is presumed to have information available in

09:40:47 25  the public domain.

**PSA321**

1          In determining whether a statement or omission is

2    material, you must consider it in light of the circumstances

3    that existed at the time the statement was made or the fact

4    was omitted.

09:41:00   5          To meet the third element of their 10b-5 claim

6    against any defendant, plaintiffs must prove that the

7    defendant acted with a specific state of mind.  Defendants

8    William Aldinger, David Schoenholz, Gary Gilmer acted with the

9    required state of mind in making a statement of material fact

09:41:25  10   if he made the statement knowing that it was false or

11   misleading or with reckless disregard for a substantial risk

12   that it was false or misleading.

13          Defendants William Aldinger, David Schoenholz or Gary

14   Gilmer acted with the required state of mind in failing to

09:41:46  15   disclose a material fact if he knew that the omission would

16   make another statement he made on the same subject misleading

17   or he recklessly disregarded a substantial risk that the

18   omission would make another statement he made on the same

19   subject misleading.

09:42:05  20          A defendant's conduct is reckless if it is an extreme

21   departure from the standards of ordinary care and he knows

22   that it presents a risk of misleading investors or the risk is

23   so obvious that he had to have been aware of it.

24          A finding that any defendant acted with the required

09:42:29  25   state of mind depends on what he knew or should have known

**PSA322**

1   when he made a particular statement or omission.

2        Defendant Household, which can only act through its

3   employees, had the required state of mind with respect to a

4   false statement or omission if defendants William Aldinger,

09:42:51 5   David Schoenholz, Gary Gilmer or any other Household employee

6   made the statement or omission with the required state of mind

7   while acting within the scope of his or her employment.

8        The fact that Household restated certain financial

9   statements does not, by itself, prove that any defendant acted

09:43:14 10   knowingly or recklessly with respect to the information in the

11   original financial statements.  However, you may consider it

12   along with any other evidence to determine whether any

13   defendant acted knowingly or recklessly.

14        The intent of a person or the knowledge that a person

09:43:39 15   possesses at any given time may not ordinarily be proved

16   directly because there is no way of directly scrutinizing the

17   workings of the human mind.  In determining the issue of what

18   a person knew or what a person intended at a particular time,

19   you may consider any statements made or acts done by that

09:44:02 20   person and all other facts and circumstances received in

21   evidence which may aid in your determination of that person's

22   knowledge or intent.

23        You may infer, but you are certainly not required to

24   infer, that a person intends the natural and probable

09:44:20 25   consequences of acts knowingly done or knowingly omitted.  It

1    omission of material fact.

2         Both of these elements must be established as to each

3    individual defendant.  The parties have stipulated that both

4    William Aldinger and David Schoenholz actually exercised

09:50:13  5    general control over the operations of Household, so no proof

6    is required on that element as to those two defendants, in

7    their relation to Household.

8         Upon retiring to the jury room, you must select a

9    presiding juror.  The presiding juror will preside over your

09:50:36  10   deliberations and will be your representative here in court.

11        A verdict form has been prepared for you, and we will

12   go through that verdict form.

13        A copy of the very first page of the verdict form is

14   on the screen now, ladies and gentlemen.

09:51:04  15        The verdict form you receive will include two tables,

16   Tables A and B, and will require you to answer a series of

17   questions about the issues in this case.

18        You are, of course, free to answer those questions in

19   whatever order you prefer.

09:51:26  20        For example, as to statement number one, in the case

21   of defendant Household, you might first look to Table A to

22   identify what statement number one is.  Table A, you recall,

23   is a list of all of the false statements plaintiffs claim

24   defendants made.  You would then answer question number one.

09:52:01  25        If your answer to question number one is no, then the

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all    )
 4   others similarly situated,      )
                                     )
 5              Plaintiff,           )
                                     )
 6      vs.                          )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  May 7, 2009
                Defendants.          )  10:30 a.m.
 9
                         VOLUME 26
10              TRANSCRIPT OF PROCEEDINGS - TRIAL
          BEFORE THE HONORABLE RONALD A. GUZMAN, and a jury
11

12   APPEARANCES:

13   For the Plaintiff:       COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
14                            BY:  MR. LAWRENCE A. ABEL
                                   MR. SPENCER A. BURKHOLZ
15                                 MR. MICHAEL J. DOWD
                                   MR. DANIEL S. DROSMAN
16                                 MS. MAUREEN E. MUELLER
                              655 West Broadway
17                            Suite 1900
                              San Diego, California  92101
18                            (619) 231-1058

19                            COUGHLIN STOIA GELLER RUDMAN &
                              ROBBINS LLP
20                            BY:  MR. DAVID CAMERON BAKER
                                   MR. LUKE O. BROOKS
21                                 MR. JASON C. DAVIS
                                   MS. AZRA Z. MEHDI
22                            100 Pine Street
                              Suite 2600
23                            San Francisco, California  94111
                              (415) 288-4545
24

25
```

```
             1            JUROR STUBBS:  Gail Stubbs.

             2            THE COURT:  Ma'am, did you hear the verdicts as

             3   published by the Court?

             4            JUROR STUBBS:  Yes.

03:00:45     5            THE COURT:  And do these verdicts constitute your

             6   individual verdicts in all respects?

             7            JUROR STUBBS:  Yes.

             8            JUROR BERARD:  James Berard.

             9            THE COURT:  Sir, did you hear the verdicts as

03:00:55    10   published by the Court?

            11            JUROR BERARD:  Yes.

            12            THE COURT:  And do these verdicts constitute your

            13   individual verdicts in all respects?

            14            JUROR BERARD:  Yes.

03:01:03    15            JUROR HUNT:  David Hunt.

            16            THE COURT:  Sir, did you hear the verdicts as

            17   published by the Court?

            18            JUROR HUNT:  Yes.

            19            THE COURT:  And do these verdicts constitute your

03:01:11    20   individual verdicts in all respects?

            21            JUROR HUNT:  Yes.

            22            THE COURT:  Very well.

            23            Any other motions before I release the jury?

            24            MR. DOWD:  None from the plaintiffs, your Honor.

03:01:22    25            MR. KAVALER:  Yes, your Honor.  We believe the
```

**PSA326**

4807

1   verdict is fatally inconsistent in a number of ways, which

2   we're prepared to detail to the Court.  I'm not sure if you

3   need the jury to be present.  Obviously it's up to you.

4          Primarily it's the interspersal of the yeses and nos

03:01:36 5   when juxtaposed again Professor Fischel's leakage model,

6   whatever the -- whatever our position on the leakage model ab

7   initio might have been, it certainly doesn't work that way.

8   And certainly a verdict which contains both yeses and nos but

9   nevertheless adopts Professor Fischel's leakage damage model

03:01:55 10   is fatally flawed and internally inconsistent.

11          THE COURT:  Okay.

12          MR. KAVALER:  We have other things we'll say at the

13   appropriate time, but that is something which I thought should

14   be mentioned before the jury retires.

03:02:07 15          THE COURT:  All right.  Does the plaintiff have

16   anything to say?

17          MR. DOWD:  No, your Honor.  We think the verdicts are

18   consistent.

19          THE COURT:  Very well.

03:02:12 20          Ladies and gentlemen, that constitutes your jury

21   service in this case.  And I might add, quite a long, diligent

22   and some might even say heroic service it has been.  I want to

23   personally thank you for your patience, your attentiveness and

24   your persistence as jurors in this case.  I don't need to tell

03:02:44 25   you, it has been a difficult case.  It has been a long case.

**PSA327**

1    It has been a complicated case.  But it has been an important

2    case.  And as such, I thank you for having taken the time out

3    of your lives at what I know is considerable cost both

4    personal and pecuniary to many of you to do this.

03:03:09  5         I also tell you that you should consider yourselves

6    to some -- in some respect fortunate to have had the

7    opportunity to take part in what is a fundamental aspect of

8    our democratic way of life.  You have served your country

9    today without having to join the military, pay anything extra

03:03:39 10   in taxes or volunteer for community service.  And we very much

11   appreciate it, and you should be proud of it.

12         We'll be back for any of you who wish to stick around

13   to talk to you if you want to -- have any questions for me, if

14   there's anything you want to ask, anything you want me to

03:03:57 15   explain.  But you need not stick around.

16         Now, you are not required to and I would advise you

17   not to speak to anyone about your jury service after you leave

18   here today.  It's done.  You have done your duty.  You have

19   finished.  You have done it well.  Put it behind you and move

03:04:15 20   on.

21         Retire to the jury room.

22   (Jury out.)

23         THE COURT:  Date for motions?

24   (Brief pause.)

03:05:06 25        THE COURT:  Does anybody need a date for motions?

4809

1          MR. KAVALER:  Your Honor, I'm waiting to hear if

2    Mr. Dowd has anything to say.

3          MR. DOWD:  Not at this time, your Honor.  Did you ask

4    for a date for motions?

03:05:16  5          THE COURT:  Motions, yes.

6          MR. KAVALER:  Your Honor, we will be making formal

7    motions.  But at this time, I want to renew the 50(a) motion.

8    And specifically I want to observe to the Court that --

9    there's a couple of points.  Professor -- the jury has

03:05:35 10    selected Professor Fischel's more dubious by far, legally and

11    economically, damage model to the exclusion of anything else.

12    So we renew the motion on that ground since that model, in our

13    view, is not legally permissible and cannot sustain a

14    judgment.

03:05:48 15          Secondly --

16          THE COURT:  Let me ask you to -- I mean, the record

17    will reflect that you have reserved -- I'm ruling that you're

18    reserving any issues you wish to raise in a written motion.

19    So how much time do you want to file a motion?  That's really

03:06:04 20    what we need to --

21          MR. KAVALER:  Your Honor, let me say this:  I won't

22    repeat everything I've said previously.  And I appreciate your

23    Honor's comment.

24          To the extent the jury has found against the

03:06:14 25    defendant Gilmer on restatement, I believe the record contains

**PSA329**

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Michael J. Dowd
MICHAEL J. DOWD
Lead Counsel for Plaintiffs-Appellees